1   Alan R. Plutzik (State Bar No. 77785)
    Michael S. Strimling (State Bar No. 96135)
2   BRAMSON, PLUTZIK, MAHLER
3   & BIRKHAEUSER LLP
    2125 Oak Grove Road
4   Walnut Creek, CA 94598
    Telephone: (925) 945-0200
5   Facsimile: (925) 945-8792
    aplutzik@bramsonplutzik.com
6   mstrimling@bramsonplutzik.com

7
    Mark P. Kindall (State Bar No. 138703)
8   Robert A. Izard (pro hac vice forthcoming)
    Jeffrey S. Nobel (pro hac vice forthcoming)
9   Nicole A. Veno (pro hac vice forthcoming)
    IZARD NOBEL LLP
10  29 South Main Street, Suite 305
11  West Hartford, CT 06107
    Telephone: (860) 493-6292
12  Facsimile: (860) 493-6290
    mkindall@izardnobel.com
13  rizard@izardnobel.com
    jnobel@izardnobel.com
14  nveno@izardnobel.com

15
    *Attorneys for Plaintiff*

16                  UNITED STATES DISTRICT COURT

17                NORTHERN DISTRICT OF CALIFORNIA

18

| 19  STEPHEN FENERJIAN, Individually and on | No. |
| 20  Behalf of All Others Similarly Situated, | |
| 21                          Plaintiff, | CLASS ACTION COMPLAINT |
| 22          v. | |
| 23  NONG SHIM COMPANY, LTD.; NONGSHIM | DEMAND FOR JURY TRIAL |
| 24  AMERICA, INC.; OTTOGI COMPANY, LTD.; OTTOGI AMERICA, INC.; SAMYANG FOODS | |
| 25  COMPANY, LTD.; SAM YANG (U.S.A.) INC.; KOREA YAKULT CO, LTD.; KOREA YAKULT | |
| 26  CO., LTD. D/B/A PALDO AMERICA, and PALDO COMPANY, LTD. | |
| 27                          Defendants. | |
| 28 | |

Plaintiff, by his attorneys, on behalf of himself and all others similarly situated, demands a jury trial and makes the following allegations pursuant to the investigation of his counsel and based on information and belief, except as to allegations pertaining to his personal knowledge. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## INTRODUCTION

1.    This is a class action against Defendants Nong Shim Company, Ltd., Nong Shim America, Inc., Ottogi Company, Ltd., Ottogi America, Inc., Samyang Foods Company, Ltd., Sam Yang (U.S.A.) Inc., Korea Yakult Co., Ltd., Korea Yakult Co., Ltd. d/b/a Paldo America and Paldo Company, Ltd. (collectively, "Defendants") concerning their agreements to raise, fix, maintain and/or stabilize prices in the worldwide market for Korean Ramen Noodle Products from May 2001 to the Present (the "Class Period").

2.    During the Class Period, Defendants increased their prices for Korean Ramen Noodle Products six times, resulting in an average price increase of approximately 54% for the Products.

3.    The conspiracy was revealed in a July 12, 2012 Korean Fair Trade Commission Order (the "KFTC Order") detailing that Defendants colluded to increase and stabilize prices of Korean Ramen Noodle Products during the Class Period. The KTFC order fined Defendants a total of $136 billion won (approximately $120 million) and enjoined Defendants from exchanging information about pricing for Korean Ramen Noodle Products with one another.

4.    Defendant's unlawful conspiracy to raise, fix, maintain and/or stabilize prices of Korean Ramen Noodle Products resulted in artificially inflated prices of Korean Ramen Noodle Products in the United States. Plaintiff paid a premium for Korean Ramen Noodle Products during the Class Period over the price that would have prevailed in a competitive market.

## JURISDICTION AND VENUE

5.    This Court has original jurisdiction over the claims asserted herein individually and on behalf of the Class pursuant to 28 U.S.C. §1332, as amended in February 2005 by the

69900

**Class Action Complaint**

Class Action Fairness Act. Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; and (2) a substantial number of the members of the proposed Classes are citizens of a state different from that of Defendant. This Court also has subject matter over this action pursuant to 18 U.S.C. §§ 1331 and 1367.

6.     Personal jurisdiction is proper because each Defendant, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed Korean Ramen Noodles throughout the United States, including in this District; (c) had substantial aggregate contacts within the United States as a whole, including within this District; and/or (d) was engaged in an illegal price fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and/or entities residing in, located in, or doing business throughout the United States, including in this District. Defendants have purposefully availed themselves of the privilege of conducting business activities within the State of California and in the United States.

7.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and Section 12 of the Clayton Act, 15 U.S.C. § 22, because one or more Defendants is a resident of this District under 28 U.S.C. §1391(d) and because one or more of the Defendants are doing business in, have agents in, or are found and transact business in this District.

8.     Defendants' conduct involves the import of Korean Ramen Noodle Products from the Republic of Korea ("Korea" or "South Korea") to the United States and constitutes import commerce. In addition, Defendants' unlawful activities have had a direct, substantial and reasonably foreseeable effect on U.S. trade or commerce. The anticompetitive conduct, and its effect on United States commerce, proximately caused antitrust injury to Plaintiff and the members of the Class.

**Class Action Complaint**

1

**PARTIES**

2          9.     Plaintiff Stephen Fenerjian, a resident of the State of Massachusetts, is an

3    individual consumer who purchased Korean Ramen Noodle Products indirectly from one or

4    more Defendants during the Class Period.

5    *The Korean Defendants*

6          10.    Defendant Nong Shim Company, Ltd. ("Nong Shim") is headquartered in

7    Dongjak-gu, Seoul, South Korea.  During the Class Period, Nong Shim participated in the price-

8    fixing scheme alleged herein and exported Korean Ramen Noodles into the United States

9    through its importing subsidiary, Nongshim America, Inc.

10         11.    Defendant Ottogi Company., Ltd. ("Ottogi") is headquartered in Daechi-dong

11   Gangnam-gu, Seoul, South Korea.  During the Class Period, Ottogi participated in the price-

12   fixing scheme alleged herein and exported Korean Ramen Noodles into the United States

13   through its importing subsidiary, Ottogi America, Inc.

14         12.    Defendant Samyang Foods Company., Ltd. ("Samyang") is headquartered in

15   Seongbuk-gu, Seoul, South Korea.  During the Class Period, Samyang participated in the price-

16   fixing scheme alleged herein and exported Korean Ramen Noodles into the United States

17   through its importing subsidiary, Sam Yang USA.

18         13.    Defendant Korea Yakult Company, Ltd. ("Korea Yakult") is headquartered in

19   Seochu-gu, Seoul, South Korea.  Korea Yakult makes beverages, Korean Noodles, and other

20   dairy products.  During the Class Period, Korea Yakult participated in the price-fixing scheme

21   alleged herein and exported Korean Ramen Noodles into the United States to Korea Yakult's

22   U.S. operations in Los Angeles, California, which was doing business as Paldo America.

23         14.    The foregoing Defendants shall be referred to as "The Korean Defendants."

24   *The Subsidiary Defendants*

25         15.    Defendant Nongshim America, Inc. ("Nongshim America") is a California

26   corporation headquartered in Rancho Cucamonga, California. Nongshim America has additional

27   offices in the following towns: Emeryville, California; Houston, Texas; Cranbury, New Jersey;

28   Niles, Illinois; Duluth, Georgia and Columbia, Maryland.  Nong Shim America is a wholly

1   owned and controlled subsidiary of Nong Shim.[1]   During the Class Period, Nongshim America
2   manufactured and distributed Korean Ramen Noodles in the United States and imported and
3   distributed Korean Ramen Noodle Products manufactured by Defendant Nong Shim.

4       16.   Defendant Ottogi America, Inc. ("Ottogi America") is a California corporation
5   headquartered in Gardena, California.   Ottogi America is a wholly owned and controlled
6   subsidiary of Ottogi.  During the Class Period, Ottogi America imported into the United States
7   and distributed Korean Ramen Noodle Products manufactured by Defendant Ottogi.

8       17.   Defendant Korea Yakult Co., Ltd. d/b/a Paldo America ("Korea Yakult d/b/a
9   Paldo") was a California corporation headquartered in Los Angeles, California.  Korea Yakult
10  d/b/a Paldo was a wholly owned and controlled subsidiary of Korea Yakult.  During the Class
11  Period, Korea Yakult d/b/a Paldo imported into the United States and distributed Korean Ramen
12  Noodle Products manufactured by Defendant Korea Yakult.

13      18.   Defendant Paldo Company, Ltd.     ("Paldo") is a California corporation
14  headquartered in Los Angeles, California.  Paldo is a wholly owned and controlled subsidiary of
15  Korea Yakult.  Since 2012, Paldo has imported into the United States and distributed Korean
16  Ramen Noodle Products manufactured by Defendant Korea Yakult.

17      19.   Defendant Sam Yang (U.S.A.), Inc. ("Sam Yang USA") is a California
18  Corporation headquartered in Santa Fe Springs, California.  Sam Yang USA is a wholly owned
19  and controlled subsidiary of Samyang.  During the Class Period, Sam Yang USA imported and
20  distributed Samyang's Korean Ramen Noodle Products in the United States.

21      20.   The foregoing Defendants shall be referred to as the "Subsidiary Defendants."

22                    **INTERSTATE TRADE AND COMMERCE**

23      21.   The violations of federal antitrust laws alleged herein have impacted substantial
24  amount of interstate trade and commerce.

25                      **CLASS ACTION ALLEGATIONS**

26      22.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

27  _____
[1] Nong Shim is the only defendant to have a factory in the United States, which opened in 2005. Nong Shim's 2008
28  Factbook stated that this his factory produces approximately 200 million packs of instant noodles per year, including
    several of Nong Shim's key products, such as Shin Ramyun and Yukgaejung Bowl Noodle Soup.

                                        4

Procedure 23 on behalf of himself and the following Classes (the "Classes") defined as follows:

    a.  All persons and entities that purchased Korean Ramen Noodle Products indirectly in the United States for their own use and not for resale from May 2001 to the present which products were made by any Defendant. Specifically excluded from this Class are any Defendant; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family (the "Nationwide Class"); in the alternative,

    b.  All persons and entities that purchased Korean Ramen Noodle Products indirectly in the States of Arizona, California, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Tennessee, Vermont, West Virginia, Wisconsin, the District of Columbia for their own use and not for resale from May 2001 to the present which products were made by any Defendant. Specifically excluded from this Class are any Defendant; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family (the "Count III Class"); and

    c.  All persons and entities that purchased Korean Ramen Noodle Products indirectly in the States of Arkansas, California, Florida, Massachusetts, Nebraska, New Hampshire, New York, and Vermont for their own use and not for resale from May 2001 to the present which products were made by any Defendant. Specifically excluded from this Class are any Defendant; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family (the "Count IV Class");

23.    The Classes are sufficiently numerous, as the Products are sold in thousands of stores and each Class includes thousands of persons who have purchased the Products.

24.    There are questions of law and fact common to the Classes and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

1     a.   whether Defendants engaged in or entered into a contract, combination or

2           conspiracy among themselves to fix, maintain, raise and/or stabilize the prices of

3           Korean Noodles sold in the United States;

4     b.   whether Defendants' unlawful conduct has enabled them to increase, raise,

5           maintain or stabilize above competitive levels the prices for Korean Noodles sold

6           in the United States;

7     c.   the duration of the contract, combination, or conspiracy alleged herein;

8     d.   whether Defendants violated Section 1 of the Sherman Act;

9     e.   whether Defendants violated the state antitrust laws referenced herein;

10    f.   whether the conduct of Defendants caused injury to the business or property of

11         Plaintiff and Class members;

12    g.   whether Defendants' conspiracy affected the prices of Korean Noodles sold in the

13         United States;

14    h.   the appropriate measure of damages sustained by Plaintiff and Class members;

15    i.   whether injunctive relief is appropriate; and

16    j.   the appropriate class-wide measure of damages.

17    25.    Plaintiff will fairly and adequately represent the Classes and has retained counsel

18 experienced and competent in the prosecution class action litigation. Plaintiff has no interests

19 antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous

20 prosecution of this action and anticipates no difficulty in the management of this litigation as a

21 class action.

22    26.    Plaintiff's claims are typical of the claims of the members of the Classes as all

23 members of the Classes are similarly affected by Defendant's wrongful conduct.

24    27.    A class action is superior to other available methods for the fair and efficient

25 adjudication of the controversy. Because of the amount of each individual Class member's claim

26 relative to the complexity of the litigation and the financial resources of the Defendant, few, if

27 any, members of the Classes would seek legal redress individually for the wrongs complained of

28

here.  Absent a class action, Class members will continue to suffer damages and Defendant's misconduct will proceed without remedy.

## SUBSTANTIVE ALLEGATIONS

I.      **The Market for Korean Ramen Noodles**

28.      Korean Ramen Noodle Products are instant food products made of noodles, seasoning and/or vegetables.  Generally, Korean Ramen Noodles are sold in a package with seasoning and dehydrated vegetables in a packet, cup or bowl.  The consumer adds boiling water to the noodles and mixes in any flavor packets to make an instant meal.  Many Korean Ramen Noodle Products are eaten warm or in a soup, although some Korean Ramen Noodles are made to be eaten cold.  The noodles in Korean Ramen Noodle Products range from thin noodles to thick udon noodles and come in a variety of flavors, including miso, potato and kimchi flavors.  The Korean Ramen Noodle Products manufactured by each Defendant include, but are not limited to, the following products:

   a.  **Nong Shim**

   > i.  *Ramen packet varieties*: Shin Ramyun, Ansungtangmyun, Neoguri, Kimchi Ramyun, Bean Ramyun, Chapaghetti, Squid Champong, Chal Bibimmyun, Jingook Sarigomtangmyun, Anchovy Kalgusi, Sangsang Udon.

   > ii.  *Ramen cup/bowl varieties*: Big Bowl, Shin Ramyun Bowl, Yukgaejang Bowl.

   b.  **Nongshim America**

   > i.  *Ramen packet varieties*: Shin Ramyun, Neoguri Spicy Seafood Noodle Ramyun, Chapagetti, Shin Ramyun Black Noodle Soup.

   > ii.  *Ramen cup/bowl varieties*: Big Bowl Hot & Spicy Noodle Bowl, Shin Cup Noodle Soup, Shin Bowl Gourmet Spicy, Bowl Noodle Soup (Spicy Kimchi, Spicy Chicken, Chicken, Tempura Udon, Beef flavors), Tempura Udon Cup Noodle Soup.

   c.  **Samyang**

   > i.  *Ramen packet varieties*: Samyang Ramen, Beef Ramen, Pojangmacha Udon, Daeguanryung Kimchi, Doejang Ramen, Potato Ramen, Chacharoni, Seafood Champong, Yulmu Bibimmyun, Rice Sulrungtangmyun, Son Kalgugsu, Sang Udon.

7

     ii. *Ramen cup/bowl varieties*: Big Cup Samsyang Ramen, Cup Samyang Ramen, Yukgaejang Bowl.

  **d. Ottogi**

     i. *Ramen packet varieties*: Jin Ramen, Snack Myun, Odongtong Myun, Kimchi Ramen, Miso Ramen, Potato Myun, Beijing Restaurant Chajang, Beijing Restaurant Champong, Maemil Bibimmyun, Sagol Gomtangmyun, Sang Udon.

     ii. *Ramen cup/bowl varieties*: Jin Ramen Big Bowl, Jin Ramen Cup, Yukgaejang.

  **e. Korea Yakult**

     i. *Ramen packet varieties*: King Ramen, Fried Kimchi Ramen, Jang Ramen, Paldo Chajangmyun, Seafood Ramen, Paldo Bibimmyun, Paldo Sulrungtangmyun, Sang Udon.

     ii. *Ramen cup/bowl varieties*: King Lid, King Lid Cup, Mini King Lid.

**II.    The Korean Defendants Agreed to Fix Prices of Korean Ramen Noodle Products**

29.    During the Class Period, the Korean Defendants agreed to fix, maintain, raise and/or stabilize prices of Korean Ramen Noodle Products. The Korean Defendants executed their unlawful conspiracy through a series of meetings and communications where the Defendants shared information about planned price increases, sales results, plans for new product releases and advertising plans.

30.    Beginning December 2000 or January 2001, the Korean Defendants agreed to a protocol to implement factory-level price increases. Nong Shim, as the market leader, would increase prices first, and the other Defendants would raise the prices shortly thereafter. The Defendants would provide each other non-public pricing information, often through each company's market research teams, to promote this collusion.

31.    Once a Defendant made an internal decision to increase factory prices, it would then communicate the price increases to various stores. Defendants often communicated non-public details of price increases to each other at the same time, if not before, stores received such information.

32.    Defendants would also use the method of "old price support" to enforce compliance with price increases. Under this scheme, a price increase would be decided days or

weeks in advance of the increase taking effect. If one Defendant were to announce a price increase and other Defendants failed to do the same, the first Defendant would delay the price increase until the other Defendants relented and announced their own price increases. Old price support would prevent any Defendant from gaining a sales advantage from another Defendant's price increase. In fact, according to a Korea Yakult report, entitled, "The Analysis of Effect of Price Increase," Nong Shim once delayed its own price increase for 82 days because Samyang and Ottogi delayed their own price increases.

33. Defendants agreed to fix and raise prices for Korean Noodles Products numerous times between 2001 and 2008. Samyang's President, Kim,[2] affirmed to the KFTC that "'[f]rom price increase in 2001, when I [led] the price increase of [Samyang] for the first time, to price increase in 2008, [the] ramen market [] exercised price information exchange, real price increase work, etc. . . . systematically and repeatedly."

34. Kim also stated that the conspiracy would function as follows: "[b]efore the price increase, employees from each company in charge of market research/external business exchanged information. After the price increase, sales team of each company checked on price situation at distribution channels including chain stores. In addition, for the great matters which might jeopardize price system of the business, such as price dumping, the companies maneuvered through" the Ramen Conference, discussed below.

35. Similarly, Yui, a member of Samyang's Marketing Team, stated to the KFTC that "[i]n order not to break the bond of sympathy, which is about exchanging information before announcement of price increase, among ramen companies' employees in charge of market research/external business, I informed the competitors with the information when the proposal was completed or approved, even if not completed, if possible."

36. According to the KFTC Order, Yui further stated that pricing information was often provided to other Defendants even before it was provided to distribution channels:

> It was a rule that employees in charge of external business shared confirmed proposal of price increase before information about price was provided to

---

[2] The KFTC Order identified witnesses by their last names only and did not provide honorific titles.

**Class Action Complaint**

distribution channels. That is, **there was a tacit agreement among employees in charge of market research of external business to share information about price increase before ramen manufacturing company provides the proposal of price increase to each distribution channel**. Therefore, when it was revealed that one provided price increase proposal to distribution channels first by breaking the agreement, others complained to the employees in charge of the company violated the agreement.

[Emphasis added].

### a. <u>First Price Increase - May 2001</u>

37.    In late December of 2000 or early January of 2001, representatives of each Defendant met in the Renaissance Seoul Hotel. At this meeting, the Defendants agreed to collectively raise the prices of Korean Noodles.

38.    Choi, the Chairman of Samyang's Office of Business, reported to Chon, Samyang's CEO, about the discussions at this meeting. Choi told Chon that "[w]e talked this and that . . . then someone brought up the topic, 'shouldn't be increase ramen price.' And it seemed that **everyone agreed that once Nong Shim increased the price, everyone would increase this price as well.**" [Emphasis added]. Choi estimated that the price increases would provide Samyang with 200-300 million Korean won per month.

39.    Choi also discussed the meeting with Kim, a consultant at Samyang's head business office. Choi told Kim that "we talked that it had been 2-3 years since ramen price was increased. If Nong Shim increase[d] first, others will follow and raise it."

40.    On March 28, 2001, representatives from Nong Shim, Samyang, Korea Yakult, and Ottogi attended the Regular General Assembly of Ramen Conference, held at the Capital Hotel in Seoul. At this conference, Defendants met and confirmed their agreement to cooperate concerning price increases. According to Ahn, Vice Chair of Samyang's head business office, "[o]ne of the board members of either Ottogi or Paldo asked director [] Yoon of Nong Shim, [if they could] 'increase the price in consecutive order after Nong Shim increase[s] it. How has the price increase project of your company [] proceeded so far?'"

41.    Ottogi and Korea Yakult representatives responded: "Yes. We wouldn't be released from the pressure of production cost, unless there is a two-digit increase."

42.    Yoon replied "[w]ouldn't it be difficult to have a two digit increase? I remember

that there had not been any two-digit increase in the past . . ., anyway, the price increase will be implemented soon."

43.     Thus, at the March 28, 2001 Ramen Conference meeting, Defendants conspired to have a collective price increase.

44.     On May 10, 2001, Nong Shim announced to the media that is was increasing the price of its Korean Noodles.  Nong Shim provided few details about the price increase, and stated that the amount and timing of the price increase would be determined the following week.

45.     That same day, the other Defendants also announced that they were contemplating price increases as well.

46.     On May 14, 2001, Nong Shim decided to increase factory prices effective May 21, 2001.  The factory price increase averaged 9.9% for 34 products.

47.     That same day, Nong Shim provided Samyang with specific details about Nong Shim's price increase.

48.     An Ottogi internal memorandum, dated May 14, 2001, notes that the price of Jin Ramen would be increased 11%, which was identical to Nong Shim's price increase for its competing product, Shin Ramyun.

49.     On May 17, 2001, Samyang decided to increase factory prices by June 1, 2001.  The factory price increase averaged 12% for 17 products.  Samyang also decided to increase the price of its Samyang Ramen the same amount as Nong Shim's competing product, Shin Ramyun.

50.     Later, Samyang provided additional non-public details of its price increase to the other Defendants.  For example, an internal memorandum from Ottogi, May 22, 2001, reveals non-public details about Samyang's price increase, demonstrating that Ottogi presumably obtained such information from Samyang as well.

51.     Similarly, "The Report of Examination of Ramen Price Increase Application Period" written by Ottogi's Marketing Team on May 24, 2001, contained   information concerning the other Defendants' price increases:

**From June 1st, Nong Shim expects to apply increased price.**  Provided, Nong Shim is looking for an additional support strategy because it worries the decrease of sales due to

11

the competitors' pushing previous price after normal price increase in June.

**Samyang decided increased price per item,** but increase details and application date on an official document have not been confirmed yet. **The expected date of increased price application is early June, and the expected date of previous price application is expected to be until June 15.**
**Yakult decided increase price per item,** but increase details and application date on an official document have not been confirmed yet. **The expected date of increase price application is early June, and the expected date of previous price application is expected to be until June 15.**

[Emphasis added].

52.     On May 24, 2001, Samyang provided pricing details, by fax, to Korea Yakult. On May 30, 2001, Korea Yakult decided to increase factory prices effective June 1, 2001. The factory price increase averaged 9.7% for 18 products. Korea Yakult also decided to increase the price of its King Ramen the same amount as Nong Shim's competing product, Shin Ramyun.

53.     According to notes created in 2011 by Choi, a member of Korea Yakult's legal team: "*[d]uring the price increase in 2001, [...] Kang working for Yakult Marketing team shared advance information with [...] Lee from Nong Shim, [...] Kim from Samyang, and [...] Hong from Ottogi.*" [Emphasis added]. His notes also stated that, "[b]efore [Korea Yakult's] price increase, Nong Shim confirmed in advance (email) it is assumed that these data were shared with Ottogi and Samyang."

54.     On May 22, 2001, Ottogi decided to increase factory prices effective June 15, 2001. The factory price increase averaged 10.5% for 52 products. Ottogi later pushed the effective date to July 1, 2001, after determining the other Defendants' price support periods. Ottogi increased the price of its Jin Ramen to the same price as Nong Shim's competing product, Shin Ramyun.

55.     Furthermore, Ottogi prepared a report titled "Our Company's Ramen Item Price Adjustment Proposal (Final)" on May 28, 2001. It sent this report to Korea Yakult soon after it was created.

b. **Second Price Increase - October 2002 to January 2003**

56.    On October 21, 2002, Nong Shim decided to increase factory prices effective October 25, 2002. The factory price increase averaged 8.5% for 39 products. That same day, it provided details and dates concerning this price increase to Samyang.

57.    On October 25, 2002, Samyang decided to increase factory prices effective November 1, 2002. The factory price increase averaged 9.5% for 28 products. Samyang also decided to increase the price of its Samyang Ramen to the same amount as Nong Shim's competing product, Shin Ramyun.

58.    Samyang, through employees on its Market Research team, provided the details of these price increases to the other Defendants.

59.    On November 1, 2002, Korea Yakult decided to increase factory prices effective December 1, 2002. The factory price increase averaged 8.6% for 25 products. Korea Yakult also decided to increase the price of its King Ramen to the same amount as Nong Shim's competing product, Shin Ramyun.

60.    On November 29, 2002 Ottogi decided to increase prices effective January 2, 20003. The factory price increased averaged 9.1% across 40 products. Ottogi decided to increase the price of its Jin Ramen to the same amount as Nong Shim's competing product, Shin Ramyun.

c. **Third Price Increase - December 2003 to April 2004**

61.    On or around December 15, 2003, Nong Shim decided to increase prices effective December 22, 2003. The price increase averaged 7.7% for 24 products.

62.    On December 18, 2003, Nong Shim emailed Samyang details of the price increase for each item.

63.    Samyang then provided the details of the price increase to other Korean Defendants' market research teams, including Nong Shim.

64.    Prior to February 21, 2004, the Nong Shim Distribution Research Team prepared a report titled, "The Trend of Samyang Ramen Price Increase Products Release" after receiving the information from Samyang described above.

65.     On January 6, 2004 Korea Yakult decided to increase prices on 19 items averaging 7.7% effective February 1, 2004.  Korea Yakult increased the price of its King Ramen to the same amount as Nong Shim's competing product, Shin Ramyun.  Korea Yakult sent Samyang details of its price increase, the price increase date, and period of old price support via email on January 27, 2004, February 5, 2004, and March 9, 2004.

66.     Samyang and Ottogi later delayed the dates of the price increase, and Korea Yakult accordingly adjusted the date of Korea Yakult's price increase from February 1, 2004 to March 1, 2004.

67.     On February 23, 2004, Ottogi decided to increase factory prices effective April 4, 2004.  The factory price increase averaged 6.9% for 47 products.  Ottogi also decided to increase the price of its Jin Ramen to the same amount as Nong Shim's competing product, Shin Ramyun.

### d.  Fourth Price Increase - December 2004 to April 2005

68.     On or around December 20, 2004, Nong Shim decided to increase prices effective December 24, 2004.  The price increase averaged 7.1% for 37 products.

69.     On December 22, 2004, Nong Shim informed Samyang of the price increase via email.

70.     On February 24, 2005, Samyang decided to increase prices effective March 1, 2005.  The price increase, covering 32 items, averaged 7.2%.  Samyang also decided to increase the price of its Samyang Ramen to the same price as Nong Shim's competing product, Shin Ramyun.  Samyang then provided the details of the price increase to other Korean Defendants, including Nong Shim.

71.     Samyang then provided the details of the price increase to other Defendants, including Nong Shim, through their market research teams.

72.     On January 7, 2005, Korea Yakult decided to increase prices effective February 15, 2005.  The price increase, covering 24 items, averaged 7.4%.  Yakult also decided to increase the price of its King Ramen to the same price as Nong Shim's competing product. Shin Ramyun.  Later, because the price increase of Samyang and Ottogi were delayed, Yakult delayed the price increase date from February 15, 2005 to March 15, 2005.

1    73.    On January 11, 2005, Korea Yakult emailed the details of the price increase to
2   Samyang.

3    74.    Korea Yakult's Management Team created two documents which discuss
4   competitors' price increases: (1) a "Plan of Ramen Price Increase (Proposal)" dated January 5,
5   2005, and (2) "The Request for Adjustment of Noodle Products Price Increase Period" dated
6   February 11, 2005. *These documents reported proposed price increases for both Samyang and*
7   *Ottogi.*    The later document noted that the "reason for Price Increase Adjustment" was a
8   "[m]arket response to competitors' price increase date and price support."

9    75.    On February 24, 2005, before Ottogi even conclusively decided to increase prices,
10  Ottogi sent Samyang the details of its proposed price increase.

11   76.    On February 22, 2005, Nong Shim created a document titled "Meeting for
12  Business Measures" *that contained the price increase and support plans of Samyang, Ottogi*
13  *and Yakult.*

14   77.    Sometime before March 10, 2005, Kim at Nong Shim created a document titled
15  "Ottogi's Price Increase Proposal per Item."   The document seemingly contains non-public
16  information concerning Ottogi's factory price increases, as it includes the exact factory prices of
17  products, which would not be known to the public.   For example, the document reveals that for
18  certain products, only the factory price, and not the retail price, would be increased.  An almost
19  identical document was sent by Ottogi to Samyang on February 25, 2005.  Accordingly, it is
20  likely that Ottogi provided both Nong Shim and Samyang with this information.

21   78.    Several of Defendants' employees have opined as to the difficulty of determining
22  factory prices based on retail prices.  Doh of the Department of Sales Planning at Ottogi stated
23  that "it is difficult to speculate exactly how much the price is.  We can guess approximately how
24  much percentage of price is different from one another based on market price.   However, we
25  cannot know the exact price."  Kim, the Chair of the Head Business Office at Ottogi stated that
26  while rated increase could be speculated roughly, "increase rate per item could not be
27  speculated."  Suh, the Chair of the Marketing Team at Samyang, stated,

28

15

"[i]t is not possible to know the exact factory price of a competitors' item by knowing the retail price per item only. That is why **ramen companies have exchanged not only the details of retail price increase, but also the details of factory price (release price) when they share price information of increased products** in most cases until now." [Emphasis added].

### e. Fifth Price Increase - March 2007 to December 2007

79. On February 12, 2007, Nong Shim decided to increase factory prices effective March 1, 2007. The factory price increases, covering 39 items, averaged 6.5%.

80. On February 23, 2007, Nong Shim sent a notice of price increase (written for the purpose of sending to stores) to Samyang via fax. On February 26, 2007, Nong Shim sent to Samyang the details of the price increase via email.

81. On February 28, 2007, the Ottogi Marketing Team wrote "The Report of Price Increase of Nong Shim Ramen and Snacks." *This report detailed specifics of Nong Shim, Samyang, and Yakult's upcoming price increases.*

82. In early and mid-March 2007, Nong Shim sent the release date and details of price support to Samyang. Samyang included this information in an internal document, dated February 26, 2007, titled "Details of Nong Shim's Price Increase in March 2007 (No. 1)."

83. A March 5, 2007 document, written by the Korea Yakult Noodle Marketing Team, titled "The Ramen Price Increase in 2007," reports details of the Nong Shim price increase, and the progress of Samyang and Ottogi's price increase projects.

84. On March 7, 2007, Korea Yakult decided to increase factory prices effective April 1, 2007. The factory price increases, covering 21 items, averaged 6.6%. Korea Yakult also decided to increase the price of its King Ramen to the same amount as Nong Shim's competing product, Shin Ramyun. On March 20, 2007, Korea Yakult emailed details of this price increase to Samyang.

85. On March 22, 2007, Samyang decided to increase factory prices effective April 16, 2007. The factory price increases, covering 28 items, averaged 7.3%. Samyang also decided to increase the price of its Samyang Ramen to the same amount as Nong Shim's competing product, Shin Ramyun.

86.     On April 11, 2007, Samyang provided details about its price increase to both Nong Shim and Ottogi via email. The email, from Yui of Samyang to Yoon at Nong Shim and Chung at Ottogi, stated,

> **"the price increase seems to be implemented by the 16th.** [...]. However, I should tell you that there is little bit of possibility that the date would be changed. **Please refer to the attached document for the details of price increase.** This document is a final draft, but had not been confirmed. PM in charge of the price increase said that the increase would be implemented almost as the document said."

[Emphasis added].

87.     On April 17, 2007, Yui of Samyang sent Yoon of Nong Shim an email detailing production dates of Samyang's price increased products.

88.     On May 4, 2007, Yui of Samyang sent Jung from Ottogi an email about Samyang's old price support period.

89.     On February 28, 2007, Ottogi's Marketing No.3 Team created "The Report of Price Increase of Nong Shim Ramen and Snacks." This report accurately tracked the details of what became Korea Yakult's price increase. Specifically, the report noted, as to its competitors:

> "Although Nong Shim continuously has sent out a rumor of price increase since the end of 2006, sales of that year declined about 1.2%. Therefore, internally the company had much more dispute about price increase. However, **because of the continued decline of ramen market, it is evident to promote the growth of sales amount and of profit through price increase,** rather than through growing the quantity of the sales, and because of its exclusive market share, the company judged that the market dynamics would not change much after the price increase. Therefore, Nong Shim decided to implement the price increase."

[Emphasis added].

90.     Indeed, in a competitive market, Nong Shim could not have raised prices facing a declining market for Korean Ramen Noodle Products.

91.     On May 18, 2007, Ottogi Marketing Team No. 3 wrote, "The Examination of Price Increase of Ramen Products." This document recommended increasing prices at the same level of Nong Shim, and detailed the proposal of such a price increase, including the price increase per item and increase dates.

1  92. On June 26, 2007, Ottogi Marketing Team wrote "the Report of Ramen Products

2 Price Increase." The report recommended raising prices on September 1, 2007 **"after checking**

3 **with the Samyang Marketing Team."** [Emphasis added].

4  93. On July 23, 2007, Ottogi decided to increase factory prices effective September 1,

5 2007. The factory price increases, totaling 90 items, averaged 4%. Ottogi also decided to reduce

6 a discount rate by 4%, so the actual average increase totaled 8%. Ottogi also chose to increase

7 the factory price of its Jin Ramen to 417 won, which was still lower than Nong Shim's Shim

8 Ramyun price of 430 won, but came out to the same price after taking into account the reduced

9 discount rate.

10  94. On July 27 and July 31, 2007, Jung of Ottogi emailed Yui of Samyang details of

11 the Ottogi price increase.

12  95. On August 10, 2007, Choi of Nong Shim emailed Yui of Samyang, stating that

13 "[a]s far as I know, Ottogi has not officially notified so far. . . . Its price increase rate is the same

14 as our company's and Samyang's, if we consider the result only."

15  96. On August 16, 2007, Kim of Korea Yakult emailed Yui of Samyang the details of

16 Ottogi's price increase.

17   **f. Sixth Price Increase - February to April 2008**

18  97. From February 20, 2007 to March 3, 2008, Nong Shim sent various emails to

19 Samyang detailing their price increases.

20  98. In early 2008, Nong Shim decided to increase factory prices. The factory price

21 increases, covering 42 items, averaged 11.9%.

22  99. On February 18, 2008, Choi of Nong Shim sent Yui of Samyang an email stating

23 that Nong Shim's price increase "is planned to be officially announced this afternoon, so I will

24 inform you again when the price is announced. :D And this information might be wrong, so

25 please do not have a blind faith in it. And, please pretend to Yakult that you haven't received

26 this provisional price." Choi sent Yui additional updates on February 20[th], 22[nd], 28[th], 29[th], and

27 March 3rd.

28

100. On February 18, 2008, Samyang decided to increase its prices, effective March 1, 2008. According to Suh, Chair of Samyang's Marketing Team, Samyang then sent the details of this price increase to Nong Shim, Ottogi, and Korea Yakult via wired communication.

101. On February 28, 2008, Samyang decided to increase factory prices effective March 1, 2008. The factory price increase, covering 32 items, averaged 11.9%. Samyang also decided to increase the price of its Samyang Ramen to the same amount as Nong Shim's Shin Ramyun.

102. On February 27, 2008, Yui of Samyang emailed the details of its price increase to Choi of Nong Shim. On March 3, 2008, Yui of Samyang sent Choi of Nong Shim, Kim of Korea Yakult, and Jung of Ottogi an email concerning the details of Samyang's old price support.

103. On February 26, 2008, Ottogi decided to increase factory prices effective April 1, 2008. The factory price increase, covering 72 items, averaged 9.4%. However, Ottogi also decided to reduce a discount rate by 4.1%, the so the actual average increase totaled 13.5%. Ottogi also chose to increase the factory price of its Jin Ramen to 455 won, which was still lower than Nong Shim's Shim Ramyun price, but came out to the same price after taking into account the reduced discount rate.

104. On February 29, 2008, Jung of Ottogi sent Yui of Samyang an email concerning Ottogi's price increases, stating,

> [a]s I told you yesterday, whether or not there would be price increase has not been decided yet. However, **I am sending you the details of price increase which has been in progress so far, so that you can have it as a reference.** Our company has started production of price increased products of cup ramen, such as Jin Ramen multi packets and spaghetti cup ramen, on February 27.

[Emphasis added].

The email included a chart showing price increases for various Ottogi products.

105. On March 6, 2008, Jung sent Yui an additional email providing additional details about the dates of the price increases, stating "*I am sending you my company's production details for ramen products with new price.* Please refer to it." [Emphasis added].

106. On March 10, 2008, Korea Yakult decided to increase factory prices for major products effective April 1, 2008, and various other products effective May 1, 2008. The factory price increase, totaling 23 items, averaged 12.5%. Korea Yakult also decided to increase the price of its King Ramen the same price as Nong Shim's Shin Ramyun.

### g. **March 2008 Ramen Conference**

107. On March 26, 2008, the General Assembly of Ramen Conference was held at Capital Hotel in Seoul. At this conference, the Defendants all agreed that they would postpone price increases or lower prices after an increase.

108. Lee, Board Director of Samyang's Head Business Office, stated to the KFTC,

> Since the new administration [of the South Korean government], inaugurated on February 25, 2008, played an emphasis of price stabilization, it was difficult decision to make a price increase, and because customers' response was also negative about the increase, ramen manufacturing companies worried much about the increase. Nevertheless, because the price decision had already made based on the exchange of information and date about price increase, each company emphasized (agreed) that any company could not postpone the price increase or that **increased price could not be lowered again**.

[Emphasis added].

109. Similarly, Kim, Chair of Samyang Business Management Team, noted to the KFTC that due to the change in South Korean government,

> [South Korea] was experiencing the feeling of renewal. As the new administration suggested price stabilization as a major policy as soon as the president's inauguration, companies including Nong Shim discussed about ramen price which would be increased. While worrying about criticism or implications that would cause by price increase, we discussed the prospect of the process and strategic responses about the criticism.

110. Accordingly, the March 2008 Ramen Conference ensured that the raised prices remained inflated in the future.

### h. **KFTC Findings**

111. On July 12, 2012, the KFTC issued an Order finding that Defendants conspired to fix prices of Korean Noodles.[3] The KFTC fined the Defendants $136 billion won (approximately US$120 million) and ordered the Defendants to stop sharing pricing information.

---

[3] The KFTC Report also noted that a fifth South Korean company, Binggrae, also engaged in the conspiracy. In 2003, however, Binggrae left the Korean Ramen Noodle Products business.

III. **The Conspiracy Directly Affected Prices of Korean Noodles Sold In the United States and the Subsidiary Defendants Participated In and Effected The Korean Defendants' Unlawful Scheme**

112. During the Class Period, the Subsidiary Defendants were wholly owned and controlled by the Korean Defendants and served as importers and distributors for their parent company's products. The only subsidiary Defendant to manufacture Korean Ramen Noodle Products in the United States in addition to importing Korean Ramen Noodle Products from its parent company was Nongshim America.

113. Upon information and belief, as the U.S. distribution arms of the Korean Defendants, the Subsidiary Defendants had knowledge of and participated in the Korean Defendants' unlawful conspiracy to fix, raise, stabilize or maintain the price of Korean Ramen Noodle Products worldwide.

114. The unlawful price increases of factory prices in South Korea affected not only retail prices in Korea, but affected retail prices across the world, including the United States.

115. During the Class Period, the Korean Defendants shipped price-fixed Korean Ramen Noodle Products directly to their respective wholly owned and controlled Subsidiary Defendants in the United States for resale in this country.

116. Upon information and belief, the Korean Defendants closely oversaw the pricing policies of their United States subsidiaries. For example, in 2002, Nong Shim sought to globalize its Korean Ramen Noodle Products brand in order to capture a greater share of the $540 million United States ramen market. Its goal was to grow profits by 10% annually and sought to do this through "strategic initiatives" in product development, sales, and distribution. To achieve these goals, Nong Shim instituted a global "profitability management information system by product and business" and "management infrastructure" for sales from its South Korean Headquarters.

117. The Defendants engaged in collusive factory-level price increases for their Korean Noodle Products that were incorporated into their U.S. sales prices of these products. For example, in 2006, Ottogi's price increased 12.5% in the United States, while it effectively increased 8% in South Korea. Similarly, Nong Shim's price for Korean Noodle Products

1  increased by 11% in the United States, while it increased 6.5% in South Korea.

2  118.  Furthermore, during the sixth price increase on Korean Noodle Products in
3  February to April of 2008, Samyang's prices increased 13.3% in the United States, while they
4  increased 12.6% in South Korea.  Ottogi's prices increased 15% in the United States, while its
5  prices effectively increased 13.5% in South Korea.

6  119.  As a direct and proximate result of defendants' unlawful conduct, Plaintiff and the
7  members of the Class have been injured because they paid a price for Korean Ramen Noodle
8  Products in excess of the price that would have prevailed in a competitive market.

9  **FRAUDULENT CONCEALMENT**

10  120.  Plaintiff had neither actual nor constructive knowledge of the facts constituting its
11  claim for relief.  Plaintiff and members of the Class did not discover, and could not have
12  discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged
13  herein until shortly before filing its complaint.  Defendants engaged in a secret conspiracy that
14  did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a
15  conspiracy to fix prices for Korean Noodles.

16  121.  Because Defendants' agreement, understanding and conspiracy was kept secret,
17  Plaintiff and Class members were unaware of Defendants' unlawful conduct alleged herein and
18  did not know that they were paying artificially inflated prices for Korean Noodles.

19  122.  For example, Defendants each issued false and misleading announcements that
20  served as pretext for their price increases:

21      a.  On May 10, 2001, Nong Shim explained, "main ingredient cost increases like
22         10% increase of international wheat price with weakening of Korean won pushes
23         manufacturing costs increase 5-10%".  A nearly identical misleading statement
       was made by Nong Shim 6 days later and republished by Bloomberg.

24      b.  On October 23, 2002, Nong Shim stated, "it [would] increase the price around 8%
25         due to the price increase of ingredient, wheat flour."

26      c.  On October 24, 2002, Nong Shim stated that "it increase[d] the price due to
       ingredient price increase[s] like the increases of palm oil, wheat flour and due to
27         management costs increase like freight costs from economic condition changes."

28      d.  On October 24, 2002, Korea Yakult stated that "it is inevitable to increase the

price . . . due to the price increases of palm oil, wheat flour and the price increase of freight costs" and "it is inevitable for the companies to follow to the price increase range of Nong Shim since Nong Shim is the market leading company."

e. On December 18, 2003, Nong Shim stated that "[t]his year, the prices of importing ingredients like palm oil price, starch and domestic produces like red pepper and green onion are greatly increased" and "specifically, the increased costs of management fees like freight costs, promotion costs" required a price increase on Ramen Instant Noodles.

f. On February 24, 2004, Samyang stated that "the price is increased due to the price increases of ingredients, palm oil and starch, red pepper, green onion and onion since second half of the last year."

g. On December 23, 2004, Nong Shim stated that "For 8~9% price increase of wheat flour and potato starch and 18% increase of vinyl wrapping due to oil price surge makes inevitable to increase the price."

h. On February 28, 2005, Samyang stated that "For 9% price increase of wheat flour and 15% increase of packaging costs pressured cost burden and it was inevitable to increase the price."

i. On February 27, 2007, Nong Shim stated that "recently sudden price increases of the wheat flour price of 9% and palm oil increases of 42% are the major factors to increase the price" and "Thanks to wellbeing boom, there was cost increases of new material development to replace chemical seasoning and other environment friendly costs."

j. On February 18, 2008, Nong Shim stated, "recently, the sudden price increases of international ingredients like the price increase of wheat flour of 50% and palm oil increase of 94% and extreme weather changes, imbalance of supply and demand" caused an increase in Korean Noodle prices.

k. On March 14, 2008, Samyang stated "the wheat flour price increased 50%, palm oil price increased 95% and other ingredients prices increased with packaging cost, too" in order to justify a Korean Noodle price increase.

123.   As determined by the KFTC, the truth is that the price increases on Korean Noodle Products substantially exceeded increased input costs.

124.   The affirmative acts of the defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

125.   By its very nature, Defendants' price-fixing conspiracy was self-concealing.

126.   The combination and conspiracy alleged herein was fraudulently concealed by

1  Defendants by various means and methods, including, but not limited to secret meetings,

2  surreptitious communications between Defendants by the use of the telephone or in-person

3  meetings, the use of non-public emails, and concealing the existence and nature of their

4  competitor pricing discussions from non-conspirators (including customers).

5      127.   As a result of Defendants' fraudulent concealment of their conspiracy, any

6  relevant statute of limitations has been tolled with respect to any claims that Plaintiff and the

7  Class members have as a result of the anticompetitive conduct alleged in this complaint.

8                        **FIRST CAUSE OF ACTION**
                  **(Violation of the Sherman Act, 15 U.S.C. § 1,**
9      **brought by Plaintiff against all Defendants for Injunctive Relief)**

10     128.   The foregoing allegations are realleged and incorporated by reference as if fully

11  set forth herein.

12     129.   By virtue of the actions alleged herein, Defendants entered into and engaged in a

13  contract, combination, or conspiracy in restraint of trade in violation of the § 1 of the Sherman

14  Act.

15     130.   During the Class Period, Defendants and their co-conspirators entered into a

16  continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise,

17  maintain or stabilize prices for Korean Ramen Noodle Products.

18     131.   The contract, combination or conspiracy among Defendants consisted of a

19  continuing agreement, understanding, and concerted action among Defendants.

20     132.   For purposes of formulating and effectuating their contract, combination, or

21  conspiracy, Defendants did those things they contracted, combined and conspired to do,

22  including:

23      a.   Exchanging information on prices for Korean Ramen Noodle Products;

24      b.   Agreeing to raise, fix, and maintain prices for Korean Ramen Noodle Products;

25      c.   Selling Korean Ramen Noodle Products into and throughout the United States at

26          non-competitive prices.

27

28

133. Defendants' anticompetitive acts and practices had a substantial and forseeable effect on interstate commerce as the Korean Defendants imported their Korean Ramen Noodle Products into the United States.

134. As a result of Defendants' unlawful conspiracy, Plaintiff and Class members paid a price for Korean Ramen Noodle Products in excess of the price that would have prevailed in a competitive market.

135. The alleged contract, combination or conspiracy is a *per se* violation of the Sherman Act, 15 U.S.C. § 1.

136. The violations are continuing and will continue unless enjoined by this Court.

137. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Class seek an injunction against Defendants to enjoin the anticompetitive conduct alleged herein.

138. Wherefore, Plaintiff prays for relief as set forth below.

## SECOND CAUSE OF ACTION
**(Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, et seq. brought by Plaintiff against all Defendants for Damages)**

139. The foregoing allegations are realleged and incorporated by reference as if fully set forth herein.

140. By committing the acts alleged herein, Defendants have violated California Business and Professions Code, §§ 16700, *et seq*.

141. Beginning in December 2000 or January 2001, Defendants entered into and engaged in a continuing unlawful conspiracy in restraint of trade and commerce in violation of Cal. Bus. & Prof. Code §§ 16720 to raise, fix, maintain or stabilize prices for Korean Ramen Noodle Products.

142. As a result of Defendants' unlawful conspiracy, prices for Korean Ramen Noodle Products were raised, fixed, maintained or stabilized in the United States.

143. The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants.

144.   For purposes of formulating and effecting their unlawful agreement, Defendants did those things they contracted, combined and conspired to do, including:

a.   Participating in meetings and conversations to discuss the prices of Korean Ramen Noodle Products;

b.   Communicating orally and in writing to fix prices of Korean Ramen Noodle Products;

c.   Agreeing to manipulate prices of Korean Ramen Noodle Products sold in the United States in a manner that deprived direct and indirect purchasers of free and open competition;

d.   Issuing price announcements in accordance with the agreements reached;

e.   Selling Korean Ramen Noodle Products to consumers in the United States at non-competitive prices;

f.   Providing false statements to the public to explain increased prices of Korean Ramen Noodle Products.

145.   As a direct and proximate result of Defendants' unlawful conduct, California consumers have been injured in their business or property in that they paid a price for Korean Ramen Noodle Products in excess of the price that would prevail in a competitive market. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiff seeks treble damages and his cost of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

146.   It is appropriate to apply California antitrust law to the Nationwide Class. Each of the Korean Defendants maintains a United States distribution arm headquartered in the State of California. Additionally, Nongshim USA manufactures Korean Ramen Noodle Products in the State of California. The Defendants targeted their price-fixing activities at purchasers of Korean Ramen Noodle Products. California is the most populous state in the country, and has the largest population of persons of Korean descent in the country. Upon information and belief, sales of Korean Ramen Noodle Products in the State of California account for a significant portion of Defendants' United States sales.

147.   Wherefore, Plaintiff prays for relief as set forth below.

**THIRD CAUSE OF ACTION**
**(Violation of State Antitrust and Restraint of Trade Laws)**
**(On Behalf of the Count III Class Against All Defendants)**

148.   The foregoing allegations are realleged and incorporated by reference as if fully set forth herein.

149.   Should this Court determine that California law does not apply to the nationwide class, Plaintiff states this cause of action in the alternative on behalf of the Count III class.  The state statutes cited herein are substantially similar to California's antitrust laws and provide relief to indirect purchasers harmed by antitrust violations.

150.   By committing the acts alleged herein, Defendants have violated the following state statutes:

    a.   **Arizona: The Uniform State Antitrust Act**,  Ariz. Rev. Stat., § 44-1401, *et seq.*;

    b.   **California: The Cartwright Act**, Cal. Bus. & Prof. Code, § 16700, *et seq.*;

    c.   **District of Columbia Antitrust Act**, District of Columbia Code Annotated § 28-4501;

    d.   **Illinois Antitrust Act**, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*;

    e.   **Kansas Restraint of Trade Act,** Kan. Stat. Ann. § 50-101, *et seq.;*

    f.   **Maine**:  Me. Rev. Stat. tit. 10, § 1101, *et seq.*;

    g.   **Michigan Antitrust Reform Act**: Mich. Comp. Laws Ann. § 445.773, *et seq.*;

    h.   **Minnesota Antitrust Law of 1971**: Minn. Stat. Ann. § 325D.49, *et seq.*;

    i.   **Mississippi Antitrust Act,** Miss. Code. Ann. § 75-21-1, *et seq.*;

    j.   **Nebraska: The Junkin Act**, Neb. Rev. Stat. § 59-801, *et seq.*;

    k.   **Nevada Unfair Trade Practice Act**, Nev. Rev. Stat. Ann. § 598A.010, *et seq.*;

    l.   **New Mexico: Antitrust Act**, N.M. Stat. Ann. § 57-1-1.1, *et seq.*;

    m.  **New York: Donnelly Act**, N.Y. Gen. Bus. Law § 340, *et seq.*;

n. **North Carolina Unfair Trade Practices Act,** North Carolina General Statutes §§ 75-1, *et seq.*;

o. **North Dakota: Uniform State Antitrust Act**, N.D. Cent. Code Ann. § 51-08.1-01, *et seq.*;

p. **Oregon: Antitrust Law**, Or. Rev. Stat. Ann. § 646.705, *et seq.*;

q. **Tennessee Antitrust Act**, Tenn. Code Ann. § 47-25-101, *et seq.*;

r. **Vermont Consumer Fraud Act**, Vt. Stat. Ann. tit. 9, § 2453, *et seq.*;

s. **West Virginia Antitrust Act**, W. Va. Code Ann. § 47-18-1, *et seq.*; and

t. **Wisconsin: Antitrust Act**, Wis. Stat. Ann. § 133.01, *et seq.*

151. During the Class Period, Defendants' unlawful conspiracy affected commerce in the States where members of the Count III class reside.

152. Defendants' unlawful conspiracy restrained, suppressed and/or eliminated competition in the market for Korean Ramen Noodle Products, prices for Korean Ramen Noodle Products were raised, fixed, maintained or stabilized and consumers were deprived of the benefit of free and open competition in the States where members of the Count III class reside.

153. Plaintiff and members of the Count III Class were damaged as a result of Defendants' unlawful conspiracy because they paid prices for Korean Ramen Noodle Products in excess of the price that would have prevailed in a competitive market.

154. Wherefore, Plaintiff prays for relief as set forth below.

### FOURTH CAUSE OF ACTION
**(Violation of State Consumer Protection Laws)**
**(On Behalf of the Count IV Class Against All Defendants)**

155. The foregoing allegations are realleged and incorporated by reference as if fully set forth herein.

156. Should this Court determine that California law does not apply to the nationwide class, Plaintiff states this cause of action in the alternative on behalf of the Count IV class. The state statutes cited herein are substantially similar to Massachusetts' consumer protection law and provide relief to indirect purchasers harmed by antitrust violations.

28

157. Defendants neither maintain a place of business nor keep assets within the Commonwealth of Massachusetts.

158. Defendants are engaged in trade or commerce in Massachusetts and the states where Count IV Class members reside.

159. Defendants acted in restraint of trade or commerce in the worldwide market for Korean Ramen Noodle Products, which includes the State of Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and noncompetitive levels, the prices at which Korean Ramen Noodle Products are sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiff and members of the Class.

160. By committing the acts alleged herein, Defendants have engaged in unfair, unlawful and deceptive acts and practices in violation of the Federal Trade Commission Act and the following state consumer protection statutes:

      a.  **Arkansas Deceptive Trade Practices Act**, Ark. Code Ann. § 4-88-101, *et seq.*;

      b.  **California Unfair Competition Law,** Cal. Bus. & Prof. Code § 17200 *et seq.*;

      c.  **Florida Deceptive and Unfair Trade Practices Act,** Fla. Stat. § 501.201, *et seq.*;

      d.  **Massachusetts Regulation of Business Practices for Consumers' Protection Act**, Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.*;

      e.  **Missouri Merchandising Practices Act**, Mo. Rev. Stat. § 407.010, *et seq.*;

      f.  **Nebraska Consumer Protection Act**, Neb. Rev. Stat. § 59-1601, *et seq.*;

      g.  **New Hampshire Consumer Protection Act**, N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*;

      h.  **New York Deceptive Acts and Practices Act**, N.Y. Gen. Bus. Law § 349, *et seq.*; and

      i.  **Vermont Consumer Fraud Act**, Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

161. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Count IV Class have were damaged when they paid a price for Korean Ramen Noodle Products in excess of the price that would have prevailed in a competitive market.

162. Wherefore, Plaintiff prays for relief as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief against Defendant as follows:

A.    For an Order certifying the Nationwide Class, and in the alternative, the Count III and Count IV Classes, appointing Plaintiff as Class Representative and his attorneys as Class Counsel;

B.    For a declaration that Defendants' conduct constituted an unlawful restraint of trade in violation of the federal and state statutes alleged herein;

C.    that the Court preliminarily and permanently enjoin Defendant from continuing its violations of state and federal antitrust law described in this Complaint;

D.    for actual damages and treble damages in favor of Plaintiff and the other members of the Classes and against Defendant;

E.    for pre- and post-judgment interest on any such monetary relief;

F.    that the Court grant Plaintiff his reasonable attorneys' fees and costs of suit;

G.    with respect to the Count IV Class: actual damages, pre- and post-judgment interest, appropriate equitable relief, double or treble damages and attorneys' fees and costs;

H.    that the Court grant such other and further relief as may be just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action so triable.

DATED: September 5, 2013

          /s/    Alan R. Plutzik
Alan R. Plutzik (State Bar No. 77785)
Michael S. Strimling (State Bar No. 96135)
BRAMSON, PLUTZIK, MAHLER
& BIRKHAEUSER LLP
2125 Oak Grove Road
Walnut Creek, CA 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792
aplutzik@bramsonplutzik.com
mstrimling@bramsonplutzik.com

**Class Action Complaint**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mark P. Kindall (State Bar No. 138703)
Robert A. Izard *(pro hac vice forthcoming)*
Jeffrey S. Nobel *(pro hac vice forthcoming)*
Nicole A. Veno *(pro hac vice forthcoming)*
IZARD NOBEL LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290
mkindall@izardnobel.com
rizard@izardnobel.com
jnobel@izardnobel.com

*Attorneys for Plaintiff*

31

Class Action Complaint