1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE KOREAN RAMEN ANTITRUST LITIGATION | Civil Action No. C-13-04115-WHO |
| | **CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT** |
| THIS DOCUMENT RELATES TO: | |
| All Direct Purchaser Actions | JURY TRIAL DEMANDED |

# I.    **INTRODUCTION**

1.    Plaintiffs bring this action individually and on behalf of a class ("Class") consisting of all persons and entities who directly purchased Korean Noodles from Defendants[1] in the United States and its territories (collectively, "U.S." or "United States") from May 1, 2001 to December 31, 2010 (the "Class Period").  Korean Noodles is an instant noodle soup product consisting of dried instant noodles paired with a seasoning packet and dehydrated vegetables, packaged in a bag (or pouch), cup, or bowl.

2.    This action arises out of a conspiracy among the Defendants and their co-conspirators spanning over a decade to fix, raise, maintain and/or stabilize the prices of Korean Noodles sold to Plaintiffs and members of the Class in the U.S. and elsewhere.

3.    At an initial meeting at the Renaissance Seoul Hotel in December 2000 or January 2001, the Korean Defendants conspired and agreed to a specific protocol that would be followed to implement factory-level price increases.  As a direct result of this conspiracy, Defendants inflated the prices for Korean Noodles between 2001 and 2008 by conspiring on six specific price increases during that period of time.

4.    The Korean Noodles conspiracy was hidden from the public until July 12, 2012, when the Korean Fair Trade Commission ("KFTC") publicly issued an order and findings (the "KFTC Order") revealing that the Korean Defendants had colluded to increase prices of Korean Noodles and keep such prices inflated.  The KFTC Order, written in Korean, revealed that collusion manifested itself in at least two formal in-person meetings between the Korean Defendants (in 2001 and 2008), and included excerpts of hundreds of email communications between and among the Korean Defendants regarding details of future Korean Noodle price increases, including the timing and amounts of such price increases.

---

[1] Nong Shim Co., Ltd.; Ottogi Co. Ltd.; Samyang Foods Co. Ltd.; and Korea Yakult Co. Ltd. are referred to herein as the "Korean Defendants."  Nongshim America, Inc., Ottogi America, Inc., and Sam Yang (USA), Inc., are referred to herein as the "U.S. Defendants."  Collectively, they are all "Defendants."

5.       The KFTC Order also required the Korean Defendants to pay a total of 136 billion won (approximately $120 million) in fines.

6.       Defendants' price-fixing conspiracy resulted in increased prices for Korean Noodles sold to Plaintiffs and to other members of the Class.

## II.    JURISDICTION AND VENUE

7.       The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1337, because this action arises under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

8.       Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1391 (b), (c) and (d) and 15 U.S.C. §§ 15 and 22. A significant portion of the affected interstate trade and commerce discussed in this Complaint has been carried out in this District.

9.       This Court has personal jurisdiction over each of the Defendants because they, directly and/or through affiliates: (a) have headquarters in California; (b) transacted business throughout the United States, including in California; (c) have had substantial contacts with the United States, including in California; and/or (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in California.

10.      Defendants' conduct alleged in this Complaint involves import trade and import commerce between the United States and the Republic of Korea ("Korea" or "South Korea").  The conduct had a direct, substantial, and reasonably foreseeable effect on U.S. trade or commerce.

## III.   PARTIES

### A.    Plaintiffs

11.      Plaintiff The Plaza Market ("Plaza") is a corporation organized, existing, and doing business under the laws of California with its principal place of business located in Los Angeles, California.  Plaza directly purchased Korean Noodles from one or more of the Defendants during the Class Period.  As a result of the federal antitrust law violations described herein, Plaza was injured in its business or property.

2

12.     Plaintiff Pacific Groservice, Inc. d/b/a/ Pitco Foods ("Pitco") has its principal place of business located in San Jose, California.  Pitco directly purchased Korean Noodles from one or more of the Defendants during the Class Period.  As a result of the federal antitrust law violations described herein, Pitco was injured in its business or property.

13.     Plaintiff Summit Import Corporation ("Summit") has its principal place of business located in Jersey City, New Jersey.  Summit directly purchased Korean Noodles from one or more of the Defendants during the Class Period.  As a result of the federal antitrust law violations described herein, Summit was injured in its business or property.

14.     Plaintiff Rockman Company U.S.A. Inc. ("Rockman") has its principal place of business located in Commerce, California (Rockman will move to Santa Fe Spring, California on or around April 1, 2014).  Rockman directly purchased Korean Noodles from one or more of the Defendants during the Class Period.  As a result of the federal antitrust law violations described herein, Rockman was injured in its business or property.

15.     Plaintiffs Seoul Shopping Inc., Hansfood I Corp., Hansfoods II Corp., and Met Foods Ridgefield Corp. (collectively, "Seoul Shopping") have their principal places of business located in Flushing (NY), Hicksville (NY), Bergenfield (NJ), and Ridgefield (NJ), respectively.  Seoul Shopping directly purchased Korean Noodles from one or more of the Defendants during the Class Period.  As a result of the federal antitrust law violations described herein, Seoul Shopping was injured in its business or property.

16.     Plaintiff California Market, LLC d/b/a Gaju Market ("California Market") has its principal place of business located in Los Angeles, California.  California Market directly purchased Korean Noodles from one or more of the Defendants during the Class Period.  As a result of the federal antitrust law violations described herein, California Market was injured in its business or property.

**B.     Defendants**

**1.   Nong Shim Defendants**

3

17. Defendant Nong Shim Co., Ltd., established in 1965, is organized and existing under the laws of South Korea with its principal place of business in Dongjak-Gu, Seoul, South Korea.

18. Nong Shim Co., Ltd. is a leading food company in South Korea. Nong Shim Co., Ltd. has had a high market share in Korea since the 1990s and, since 2010, represents approximately 70% of the Korean Noodles business in Korea.

19. Defendant Nongshim America, Inc. ("Nongshim America") is headquartered in Rancho Cucamonga, California. It has other locations in Emeryville, California, as well as in Texas, New Jersey, Illinois, Georgia, and Maryland. Nong Shim Co., Ltd. owns Nongshim Holdings USA, Inc. which in turn owns Nongshim America. Thus, Nongshim America is a wholly owned and controlled subsidiary of Nong Shim Co., Ltd. and is under the direction and control of Nong Shim Co., Ltd.

20. Mr. Dong Wong Shin is Vice Chairman of the Board and Co-Chief Executive Officer of Nongshim Co., Ltd. Mr. Shin was formerly President of Nongshim Co., Ltd. Mr. Shin has been Chairman of Nong Shim America, Inc.'s board since Oct. 28, 1994.

21. Mr. Jun Park is President and Co-Chief Executive Officer of Nongshim Co., Ltd. Mr. Park has been Director of Nong Shim America, Inc. since Oct. 28, 1994.

22. Nongshim America has answered two previous iterations of the complaint filed by Plaza. Dkt. Nos. 43 and 58 in *Plaza Co. v. Nong Shim Co., Ltd.*, No. 2:13-cv-5274 PA (RZx) (C.D. Cal.)

23. Nong Shim Co., Ltd. and Nongshim America are referred to collectively herein as "Nong Shim".

4

24.     According to 2008 and 2009 annual report of Nong Shim, sales revenues in the United States from 2005 to 2009 were as follows:

**Nong Shim America**

**Sales Trend (US $, Millions)**

| Year | Sales (US $, Millions) |
|------|------------------------|
| 2009 | 102.24 |
| 2008 | 94.2 |
| 2007 | 81.9 |
| 2006 | 75 |
| 2005 | 68.6 |

Sales (US $, Millions)

25.     United States sales of Nong Shim's Korean Noodles accounted for 15% of the company's consolidated sales and 7% of the total operating profit in 2010.  As of 2006, United States sales accounted for 34.1% of Nong Shim's non-Korean sales.

26.     During the Class Period, Nong Shim Co., Ltd. manufactured Korean Noodles in South Korea, exported Korean Noodles to the United States, and sold them to members of the Class in the United States.  Accordingly, Nong Shim Co., Ltd.'s conduct had a direct effect on commerce in the United States.

27.     Nong Shim Co., Ltd. established a factory in Rancho Cucamonga, California in June of 2005 to manufacture Korean Noodles.  Nong Shim Co., Ltd. stated in 2012 that it was actively looking to establish a second manufacturing facility in the eastern part of the United States.  Nong Shim is the only one of the Korean Defendants to have a factory in the United States.  Nong Shim's 2008 Factbook stated that this factory produces approximately 200 million packs of instant noodles per year, including several of Nong Shim's key products, such as Shin Ramyun[2] and Yukgaejung Bowl Noodle Soup. Upon information and belief, in the United States during the Class Period, Nongshim America held a dominant share of the market for Korean Noodles.

---

[2] Korean Noodles are often spelled "ramen" or "ramyun".

5

## 2. Ottogi Defendants

28. Defendant Ottogi Co., Ltd. was formed in 1969, under its original name Pung-Lim Company. Ottogi Co., Ltd. is headquartered in Daechi-dong Gangnam-gu, Seoul, Korea.

29. Defendant Ottogi America, Inc. ("Ottogi America") was formed in 2005, and has its headquarters and a warehouse in Gardena, California. Ottogi America is a wholly owned and controlled subsidiary of Ottogi Co., Ltd. as Ottogi Co., Ltd. owns 100% of Ottogi America's stock. Ottogi America is under the direction and control of Ottogi Co., Ltd. Ottogi America sells and distributes Ottogi's Korean Noodles throughout the United States.

30. Ottogi America is described as follows on the Ottogi Co., Ltd. website: "[w]e [Ottogi America] provide [a] variety of products manufactured from our mother company, Ottogi Corporation founded in 1969. . . . Ottogi America distributes our products all over the United States and Canada. In September, 2009, we have expanded our office and warehouse to reach out to wider range of customers and to maximize customer satisfaction. Ottogi America, as a wide-ranging food distributor, has acquired top food technology and brand name from Ottogi Corporation to bring competitive products that will lead North and South America's Korean Food Industry. We will rise as the leading Asian food company in the continent of America and become the cornerstone in globalizing our Ottogi Corporation to expand as a worldwide company."[3] Ottogi's Korean Noodles are all manufactured in Korea.

31. Defendants Ottogi Co Ltd., and Ottogi America are referred to collectively at "Ottogi."

32. During the Class Period, Ottogi manufactured Korean Noodles in South Korea, imported the Korean Noodles to the United States, and sold them to members of the Class in the United States. Accordingly, Ottogi's conduct had a direct effect on commerce in the United States.

### 3. Samyang Defendants

---

[3] http://www.ottogi.co.kr/otgr/english/NewsView.jsp?newseqno=10587&newspare=noticeE. (last checked March 24, 2014).

33.    Defendant Samyang Foods Co., Ltd. is headquartered in Seongbuk-Gu, Seoul, Korea.

34.    Defendant Sam Yang (USA), Inc. ("Sam Yang (USA)") is headquartered in Santa Fe Springs, California. Sam Yang (USA) sells and distributes Samyang Foods Co., Ltd.'s Korean Noodles throughout the United States. Upon information and belief, Sam Yang (USA) has a long-term exclusive distributorship agreement, as well as agreements concerning trademarks, service marks, and intellectual property, with Samyang Foods Co., Ltd. An entry on yellowpages.com indicates that Sam Yang (USA) is "a part of Sam Yang Foods Co., LTD who manufactures soy sauce products, ice cream and fresh milk." As stated herein, Sam Yang (USA) publicly conveyed information concerning the amount of, and the false and misleading reasons for, price increases of Samyang products in the United States. Accordingly, Sam Yang (USA) is under the direction and control of Samyang Foods Co., Ltd. and is an material participant in the conspiracy alleged herein.

35.    Defendants Samyang Foods Co., Ltd. and Sam Yang (USA) are referred to collectively as "Samyang."

36.    During the Class Period, Samyang manufactured all of its Korean Noodles in South Korea, imported the Korean Noodles to the United States, and sold them to members of the Class in the United States. Accordingly, Samyang's conduct had a direct effect on commerce in the United States.

### 4. <u>Korea Yakult</u>

37.    Defendant Korea Yakult Co., Ltd. ("Korea Yakult"), founded in 1969, is based in Seochu-gu, Seoul, Korea. Korea Yakult has made beverages, Korean Noodles, and dairy products. In fact, the term "yakult" refers to a Korean yogurt drink. Korea Yakult markets certain products, including its Korean Noodles, overseas under the name Paldo. Korea Yakult, registered to do business in California as Paldo America until 2010, distributed its Korean Noodle products throughout the United States.

38.    Korea Yakult's Korean Noodles are all manufactured in Korea.

39.    During the Class Period, Korea Yakult manufactured Korean Noodles in South Korea, imported the Korean Noodles to the United States, and sold them to members of the

Class in the United States.  Accordingly, Korea Yakult's conduct had a direct effect on commerce in the United States.

## IV.    INTERSTATE TRADE AND COMMERCE

40.    The violations of federal antitrust laws alleged herein have impacted a substantial amount of interstate trade and commerce.

41.    During the Class Period, Defendants and their co-conspirators sold substantial quantities of Korean Noodles in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

## V.    CO-CONSPIRATORS

42.    Various entities not named as defendants, including Nongshim Holdings USA, Inc. and Paldo Co., Ltd. are likely to have participated in the violations alleged herein and have performed actions and made statements in furtherance thereof.  Plaintiffs reserve the right to name some or all of these entities at a later date.  The acts alleged herein were done by each of the co-conspirators, or ordered, or done by duly authorized officers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

## VI.    CLASS ACTION ALLEGATIONS

43.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a), (b)(2) and 23(b)(3) on behalf of themselves and the following Class:

> All Persons and entities in the United States and its territories who purchased Korean Noodles directly from any Defendant at any time from May 21, 2001 through December 31, 2010.  The Class excludes the Defendants, co-conspirators, and any of their parents, subsidiaries or affiliates.  The Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

44.    Members of the Class are so numerous that joinder is impracticable.  Due to the nature of the trade and commerce involved, Plaintiffs believe that the members of the Class number in at least the thousands, the exact number and their identities being known to Defendants, and are so geographically diverse that joinder of all Class members is impracticable.

45.    Plaintiffs' claims are typical of the claims of other Class members, as they arise out of

8

the same course of conduct.  Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.  Accordingly, by proving Plaintiffs' own claims, Plaintiffs will prove other Class members' claims as well.

46.   Questions of law and fact are common to all members of the Class, and such common issues of law and fact predominate over any questions affecting only individual members of the Class. The common issues of law and fact include, but are not limited to, the following:

a.  whether Defendants and their co-conspirators engaged in or entered into a contract, combination or conspiracy among themselves to fix, maintain, raise and/or stabilize the prices of Korean Noodles sold in the United States;

b.  whether Defendants' and their co-conspirators' unlawful conduct has enabled them to increase, raise, maintain or stabilize above competitive levels the prices for Korean Noodles sold in the United States;

c.  the duration of the contract, combination, or conspiracy alleged herein;

d.  whether Defendants and their co-conspirators violated Sections 1 and 3 of the Sherman Act;

e.  whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and members of the Class;

f.  whether Defendants' and their co-conspirators' conspiracy affected the prices of Korean Noodles sold in the United States;

g.  the appropriate measure of damages sustained by Plaintiffs and members of the Class;

h.  whether injunctive relief is appropriate; and

i.  the appropriate Class-wide measure of damages.

47.   These common questions and others predominate over questions, if any, that affect only individual Class members.

48.   Plaintiffs and their counsel can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.  Plaintiffs understand and appreciate their duties to the Class as class representatives

9

1   under Rule 23 of the Federal Rules of Civil Procedure, are determined to diligently discharge those

2   duties, and are committed to vigorously protecting the rights of absent Class members.  Plaintiffs

3   have retained counsel who are competent and experienced in the prosecution of class action lawsuits

4   and, in particular, antitrust class action lawsuits.

5        49.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because the

6   Defendants have acted or refused to act on grounds that apply generally to the class, so that final

7   injunctive relief or corresponding declaratory relief is appropriate for the class as a whole.

8        50.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because common

9   questions predominate over individual questions and a class action is the superior procedural vehicle

10  for fairly and efficiently adjudicating the claims asserted.

11       51.    The questions of law and fact common to the members of the Class, as identified

12  above, predominate over any questions affecting only individual members, including legal and

13  factual issues relating to the Defendants' liability and damages.  The claims of Plaintiffs and other

14  members of the Class arise from the same course of conduct.  Plaintiffs and other members of the

15  Class share the same legal rights.

16       52.    A class action is superior to other available methods for the fair and efficient

17  adjudication of this controversy.  The Class is readily definable.  Prosecution as a class action will

18  eliminate the possibility of needlessly repetitious litigation.  Separate actions by individual Class

19  members would also create a risk of inconsistent or varying judgments, which could establish

20  incompatible standards of conduct for the Defendants and substantially impede or impair the ability

21  of Class members to pursue their claims.  There would be enormous efficiencies to the Court and the

22  parties in litigating the common issues on a class-wide, instead of a repetitive individual, basis.

23  Treatment as a class action will permit a large number of similarly situated persons to adjudicate

24  their common claims in a single forum simultaneously, efficiently, and without the duplication of

25  effort and expense that numerous individual actions would engender.  This action presents no

26  difficulties in management that would preclude maintenance as a class action.

27  **VII.    THE KOREAN NOODLE MARKET IN THE UNITED STATES**

28       **A.    Korean  Noodles  Have            Unique Characteristics**

10

**And Constitute A Distinct Product Market**

53. Korean Noodles is an instant noodle soup product with unique characteristics. The product is generally described as a dried instant noodle paired with a seasoning packet and dehydrated vegetables, packaged in a "bag" (or pouch), cup, or bowl. In the bag variety, the seasoning and dehydrated vegetables are added to the noodles after they are cooked in boiling water. With a cup or bowl, hot water and a seasoning packet are added to the prepackaged container which already contains dehydrated vegetables. The two main ingredients used to produce Korean Noodles are wheat flour and palm oil.

54. Korean Noodles often have a different flavor profile than other types of noodles sold in the United States, including Japanese ramen. Korean Noodles have unique spices, which are often hotter than instant noodles from Japan, China, or elsewhere. Korean Noodles are marketed in the United States as a premium product compared to other ramen.

55. For example, Nong Shim Co., Ltd.'s 2003 Factbook stated that:

- "By targeting Korean Americans and locals, exports to the United States increased by 14.2% over the previous year . . ."

- "Three Japanese firms, Maruchan, Nissin, and Sanyo, are competing on low-priced products, whereas Nong Shim is focused on differentiating itself through high-end products."

- "Nong Shim's marketing strategy is focused on enhancing its brand image through strengthening its marketing effort through emphasis on "Korean Taste".

56. Similarly, Nong Shim Co., Ltd.'s 2006 Factbook stated that:

- "Nong Shim is continuously spreading its unique taste, the representative taste of Korea, to every corner of the world."

- "Nong Shim continues to create unique tastes that appeal to Koreans through constant research and development efforts, which has allowed us to keep our top position in the domestic Ramyun market for the past 20 years."

"Nong Shim's hot taste came up with explosive demands from the markets of Korean Americans and Asian Americans, dramatically increasing our export quantities and

11

motivating us to set up a local factory in LA where we saw the biggest potential and geographical advantage in 2005 for the new momentum of our Globalization strategy."

- "This success was because Nong Shim's main product, Shin Ramyun, was created with a unique taste to fulfill its consumers' needs through well balancing the taste of red chili and beef in the hot soup and supplementary soup ingredients such as dried green onion and mushroom with chewy noodles of high quality flour."

57.    Likewise, Nong Shim Co., Ltd.'s 2008 Factbook stated that:

- "Targeting over 1.4 million ethnic Koreans living in the US, we have exported instant noodles to Los Angeles since 1971."

- "The North American market, which ranks fourth in instant noodle consumption, is in its early stages of maturity.  However, the high-end product market is still emerging.  Through market segmentation strategies, Nong Shim is reducing its dependence on ethnic Koreans in the US and moving toward the Hispanic market, which has a high growth potential, as well as toward the mainstream market in the East."

58.    In a similar vein, Nong Shim Co., Ltd.'s 2009 Factbook stated that:

- "Nong Shim has successfully tapped into the US market by putting emphasis on down-to-earth marketing and merchandising. . . .  Nong Shim has made stable growth in the US consumer markets as well as Korean American and Chinese American consumer markets.  Sales of 'SHIN' brand recorded US $32 million in the same period, which indicate an accelerated globalization of the brand."

59.    During the relevant time period, the Defendants sold hundreds of millions of dollars' worth of Korean Noodles in the United States.

**B.    Korean Noodle Product Offerings Are Interchangeable Among The Defendants**

60.    Although there are a number of different kinds of Korean Noodles, they all share the same general characteristics: fried or other dried noodles; in a bag, cup, or bowl; in a variety of noodle sizes; with unique seasonings and dehydrated vegetables.  The Defendants' Korean Noodle product offerings are similar in many respects, including   the   flavor   profiles,   spiciness,

12

packaging, product positioning, and distribution systems. There is not much variation in quality across Korean Noodle products. Given the commodity nature and characteristics of Korean Noodles, price competition is very important.

61. The KFTC Order explained that a Nongshim Report written in September 2007 concluded that there was "no difference of quality preference among Nongshim Shin Ramyun, Samyang Samyang Ramyun, and Ottogi Jin Ramen."

62. The processes used by the Defendants to manufacture Korean Noodles are very similar and include:

| Classification | Process Explanation |
|---|---|
| Mixing process | Mix flour and water to make dough |
| Noodle making process | First press the dough with a roller; second, make noodles by putting the pressed dough into a noodle making machine; and third, make ramen noodle shape by controlling the speed of the conveyor belt |
| Steaming process | Pass the noodles through a steam box to make them pre-gelatized |
| Forming process | Shape the steamed noodles by using a wax mold case |
| Frying process | By frying pre-gelatized steamed noodles with refined oil at 150 degrees Celsius, so that noodles' moisture is volatized as well as oil is absorbed into the noodles |
| Cooling process | Cool deep fried noodles to room temperature by moving them on conveyor belt |
| Packing process | Pack the noodles with wrapped soup added as a finished product |

63. Korean Noodles include, but are not limited to, the following:

- Kimchi Ramen – ramen noodles with kimchi added

- Udon – thick wheat-based noodle

- Kalgugsu – flat noodles with seafood

- Chajang - noodles with black bean or soy bean paste

- Champong – spicy seafood noodle soup

13

- Bibimmyun – spicy cold noodles

- Yukgaejang – spicy soup with beef and scallions

- Potato Ramen – ramen made with potato starch

**C.**      **The Korean Noodles Market is Concentrated and Has High Barriers To Entry**

64.      There are high barriers to entry into the Korean Noodles market. The manufacture and sale of Korean Noodles is capital-intensive. A company seeking to enter the Korean Noodles business must make a large scale investment in a manufacturing plant and various automated processes, as well as the establishment of a production line.  These challenges to market entry result in limited competition.

65.      The high barriers to entry into the Korean Noodles market are evidenced by the highly concentrated and stable market structure.  Concentrated across four manufacturers (the Korean Defendants), the suppliers of Korean Noodles have remained remarkably stable during the Class Period.  Since Binggrae Co., Ltd. exited the Korean Noodles business in 2003, there have not been any noteworthy changes in the market structure, thereby evidencing significant barriers to entry in the Korean Noodles market.

**VIII.**      **THE KOREAN NOODLES DEFENDANTS' CONSPIRACY**

**A.**      **Formation of Price Increase Protocol**

66.      Starting at the end of 2000 or beginning of 2001, Defendants each agreed to a specific protocol that would be followed in this and subsequent factory-level price increases.  Nong Shim, as the market leader, would generally increase prices first, and the other Defendants would raise the prices shortly thereafter.  The pattern of price increases occurred initially in Korea, followed thereafter by price increases in the United States through, and with, the assistance and cooperation of the U.S. Defendants.

67.      The Korean Defendants would provide each other non-public pricing information, often through each company's market research teams, to promote this collusion.  They continuously exchanged several kinds of sensitive management information, such as sales results, business support strategies, plans for new product releases, sales promotion and advertisement plans.  This exchange was to eliminate uncertainty about  whether or not the other companies would agree

14

with the price as well as to exchange price-related information.  Plaintiffs also allege that this was a means of policing the conspiracy by reinforcing the transparency of the market.  The KFTC Order lists **341** emails among Defendants that detail the exchanges of information related to prices and sales.

68.     Once a Korean Defendant made an internal decision to increase factory prices, it would then communicate the price increases to various stores.  With the exception of Nong Shim Co., Ltd. in May of 2001, as is discussed below, other than through communications to stores, information about such price increases was not made publicly available.  However, in furtherance of the conspiracy, Korean Defendants would often communicate non-public details of price increases to each other at the same time, if not before, stores received such information.

69.     The Korean Defendants would also use the method of "old price support" to enforce compliance with price increases.  Under this method, a price increase would be decided days or weeks in advance of the increase taking effect.  However, if one Korean Defendant was to announce price increases, and other Korean Defendants failed to do the same, the first Defendant could just delay the price increase until the other Defendants relented and announced their own price increases.  Old price support would prevent any Defendant from gaining a sales advantage from another Defendant's price increase.  In fact, according to a Korea Yakult report titled "The Analysis of Effect of Price Increase," Nong Shim Co., Ltd. once delayed old price support for 82 days because Samyang Foods Co., Ltd. and Ottogi Co., Ltd. delayed their own price increases.

70.     Defendants' collusion on prices for Korean Noodles happened repeatedly between 2001 and 2008.  Samyang Foods Co., Ltd.'s President, OO Kim,[4] affirmed to the KFTC that "[f]rom price increase in 2001, when I [led] the price increase of [Samyang] for the first time, to price increase in 2008, [the] ramen market [] exercised price information exchange, real price increase work, etc. . . . systematically and repeatedly."

71.     OO Kim also stated that the process would work as follows: "[b]efore the price increase, employees from each company in charge of market research/external business exchanged

---

[4] The KFTC Order identified witnesses by their last name only, and included the designation of "OO" presumably to mask the identity of certain of the individual participants in the conspiracy.

information. After the price increase, sales team of each company checked on price situation at distribution channels including chain stores. In addition, for the great matters which might jeopardize price system of the business, such as price dumping, the companies maneuvered through" the Ramen Conference, discussed below.

72. Similarly, OO Yui, a member of Samyang Foods Co., Ltd.'s Marketing Team, stated to the KFTC that "[i]n order not to break the bond of sympathy, which is about exchanging information before announcement of price increase, among ramen companies' employees in charge of market research/external business, I informed the competitors with the information when the proposal was completed or approved, even if not completed, if possible."

73. According to the KTFC Order, Mr. Jun Park, a director of Nongshim America, was on Nongshim's market research team and participated in the conspiracy.

74. According to the KFTC Order, OO Yui further stated that pricing information was often provided to other Defendants even before it was provided to distribution channels:

> It was a rule that employees in charge of external business shared confirmed proposal of price increase before information about price was provided to distribution channels. That is, there was a tacit agreement among employees in charge of market research of external business to share information about price increase before ramen manufacturing company provides the proposal of price increase to each distribution channel. Therefore, when it was revealed that one provided price increase proposal to distribution channels first by breaking the agreement, others complained to the employees in charge of the company violated the agreement.

**B.   First Price Increase: Defendants' Meetings in 2000 and 2001**

75. In late December of 2000 or early January of 2001, representatives of each Korean Defendant met in the Renaissance Seoul Hotel. At this meeting, the Korean Defendants agreed to collectively raise the prices of Korean Noodles.

76. OO Choi, the Chairman of Samyang Foods Co., Ltd.'s Office of Business, reported to OO Chon, Samyang's CEO, about the discussions at this meeting. OO Choi told OO Chon that "[w]e talked this and that . . . then someone brought up the topic, 'shouldn't be increase ramen price.' And it seemed that everyone agreed that once Nong Shim increased the price, everyone would increase this price as well." OO Choi estimated that the price increases would provide

1    Samyang with monthly 200-300 million Korean won.

2        77.    OO Choi also discussed the meeting with OO Kim, a consultant at Samyang Foods

3    Co., Ltd.'s head business office.  OO Choi told OO Kim that "we talked that it had been 2-3 years

4    since ramen price was increased.  If Nong Shim increase[d] first, others will follow and raise it."

5        78.    On March 28, 2001, representatives from Nong Shim Co., Ltd., Samyang Foods Co.,

6    Ltd., Korea Yakult, and Ottogi Co., Ltd. attended the Regular General Assembly of Ramen

7    Conference, held at the Capital Hotel in Seoul.[5]  At this conference, Defendants met and confirmed

8    their agreement to cooperate concerning price increases.  According to OO Ahn, Vice Chair of

9    Samyang Foods Co., Ltd.'s head business office, "[o]ne of the board members of either Ottogi or

10   Paldo asked director [] Yoon of Nong Shim, [if they could] 'increase the price in consecutive order

11   after Nong Shim increase[s] it.  How has the price increase project of your company [] proceeded so

12   far?'"

13       79.    Ottogi Co., Ltd. and Korea Yakult representatives responded: "Yes.  We wouldn't be

14   released from the pressure of production cost, unless there is a two-digit increase."

15       80.    OO Yoon replied: "[w]ouldn't it be difficult to have a two digit increase?  I remember

16   that there had not been any two-digit increase in the past . . ., anyway, the price increase will be

17   implemented soon."

18       81.    Thus, at the March 28, 2001 Ramen Conference meeting, the Korean Defendants

19   colluded on the subsequent collective price increase.

20       82.    On May 10, 2001, Nong Shim Co., Ltd. announced to the media that it was increasing

21   the price of its Korean Noodles.  Nong Shim Co., Ltd. provided few details about the price increase,

22   and stated that the amount and timing of the price increase would be determined the following week.

23       83.    That same day, the other Korean Defendants also announced that they were

24   contemplating price increases as well.

25       84.    The announcements of the price increases were unusual – usually price increases

26   were not reported to the media ahead of time.

27   _____

28   [5] These Ramen Conferences were held annually, usually at the end of March.

85.    On May 14, 2001, Nong Shim Co., Ltd. decided to increase factory prices effective May 21, 2001.  The factory price increase averaged 9.9% for 34 products.

86.    That same day, Nong Shim Co., Ltd. provided Samyang Foods Co., Ltd. with specific details about Nong Shim Co., Ltd.'s price increase.

87.    An Ottogi Co., Ltd. internal memorandum, dated May 14, 2001, notes that the price of Jin Ramen would be increased by 11%, which was identical to Nong Shim Co., Ltd.'s price increase for Shin Ramyun.

88.    On May 17, 2001, Samyang Foods Co., Ltd. decided to increase factory prices by June 1, 2001.  The factory price increases averaged 12% for 17 products.  Samyang Foods Co., Ltd. also decided to increase the price of its Ramen the same amount as Nong Shim's Shin Ramyun.

89.    Later, Samyang Foods Co., Ltd. provided additional non-public details of its price increase to the other Korean Defendants.  For example, an internal memorandum from Ottogi, dated May 22, 2001, reveals non-public details about Samyang Foods Co., Ltd.'s price increases, demonstrating that Ottogi Co., Ltd. presumably obtained such information from Samyang Foods Co., Ltd. as well.

90.    Similarly, "The Report of Examination of Ramen Price Increase Application Period" written by Ottogi Co., Ltd.'s Marketing Team on May 24, 2001, provided significant information concerning the other Defendants' price increases:

- "From June 1st, Nong Shim expects to apply increased price.  Provided, Nong Shim is looking for an additional support strategy because it worries the decrease of sales due to the competitors' pushing previous price after normal price increase in June."

- "Samyang decided increased price per item, but increase details and application date on an official document have not been confirmed yet.  The expected date of increased price application is early June, and the expected date of previous price application is expected to be until June 15."

91.    "Yakult decided increase price per item, but increase details and application date on an official document have not been confirmed yet.  The expected date of increase price application is early June, and the expected date of previous  price application is expected to be until June

18

15." On May 24, 2001, Samyang Foods Co., Ltd. provided pricing details, by fax, to Korea Yakult.

92.     On May 30, 2001, Korea Yakult decided to increase factory prices effective June 1, 2001.  The factory price increases averaged 9.7% for 18 products.  Korea Yakult also decided to increase the price of its King Ramen the same amount as Nong Shim's Shin Ramyun.

93.     According to notes created in 2011 by OO Choi, a member of Korea Yakult's legal team: "[d]uring the price increase in 2001, OO Kang working for Yakult Marketing team shared advance information with OO Lee from Nong Shim, OO Kim from Samyang, and OO Hong from Ottogi."  His notes also stated that "Before [Yakult's] price increase, Nong Shim confirmed in advance (email) it is assumed that these data were shared with Ottogi and Samyang."

94.     On May 22, 2001, Ottogi Co., Ltd. decided to increase factory prices effective June 15, 2001.  The factory price increases averaged 10.5% for 52 products.  Ottogi Co., Ltd. later pushed the effective date to July 1, 2001, after determining the other Defendants' price support periods.  Ottogi Co., Ltd. also decided to increase the price of its Ramen to the same price as Nong Shim's Shin Ramyun.

95.     Furthermore Ottogi Co., Ltd. prepared a report titled "Our Company's Ramen Item Price Adjustment Proposal (Final)" on May 28, 2001.  It sent this report to Korea Yakult soon after it was created.

**C.     Second Price Increase: October 2002 to January 2003**

96.     On October 21, 2002, Nong Shim Co., Ltd. decided to increase factory prices effective October 25, 2002.  The factory price increase averaged 8.5% for 39 products.

97.     That same day, it provided details and dates concerning these price increases to Samyang Foods Co., Ltd.

98.     On October 25, 2002, Samyang Foods Co., Ltd. decided to increase factory prices effective November 1, 2002.  The factory price increase averaged 9.5% for 28 products.  Samyang Foods Co., Ltd. also decided to increase the price of its Ramen to the same amount as Nong Shim's Shin Ramyun.

99.     Samyang Foods Co., Ltd., through employees on its Market Research team, provided the details of these price increases to the other   Korean Defendants.

19

100.    On November 1, 2002, Korea Yakult decided to increase factory prices effective December 1, 2002.  The factory price increase averaged 8.6% for 25 products.  Korea Yakult also decided to increase the price of King Ramen to the same amount as Nong Shim's Shin Ramyun.

101.    These price increases in Korea were reflected in prices of Korean Noodles exported from Korea for sale in the United States.

102.    Korea Daily and Korea Times, both widely-circulated newspapers for the Korean-speaking population in the United States, reported on February 20, 21, and 25, that, in response to Nongshim America's price increase, Nongshim America's competitors, including Sam Yang USA, Ottogi America, and Korea Yakult, were also likely to increase the price for their Korean Noodles they ship from Korea to the United States.

103.    In February 2003, Mr. Joon-Back Lee, a manager at Assi Supermarket in Los Angeles, stated, "Because, always, after Nongshim increases its price [for Korean Noodles], approximately a week or two later, Ottogi and Binggrae increase their prices.  Therefore, I am expecting a market-wide ramen price movement."

104.    These price increases in Korea were reflected in prices of Korean Noodles exported from Korea for sale in the United States.  According to Nong Shim Co., Ltd.'s Business Operations Report,[6] between 2002 and 2003, Shin Ramen's export price[7] increased from $5.25 to $6.30.

**D.    Third Price Increase: December 2003 to April 2004**

105.    On or around December 15, 2003, Nong Shim Co., Ltd. decided to increase prices effective December 22, 2003.  The price increase averaged 7.7% for 24 products.

106.    On December 18, 2003, Nong Shim Co., Ltd. emailed Samyang Foods Co., Ltd. with details of the price increase for each item.

---

[6] These Business Operations Reports were filed with the Korean government, and are available on DART, the repository for Korea's corporate filings.

[7] The prices in the DART Business Operations Reports often referred to a unit of a certain number of individual Korean Noodles packages, although the quantities in the DART reports are not always made clear.

107.    Samyang Foods Co., Ltd. then provided the details of the price increase to other Defendants, including Nong Shim.

108.    Sometime before February 21, 2004, the Nong Shim Co., Ltd.'s Distribution Research Team prepared a report titled "The Trend of Samyang Ramen Price Increase Products Release."   Nong Shim Co., Ltd. employees presumably prepared this report after receiving the information from Samyang Foods Co., Ltd. described above.

109.    Effective February 1, 2004, the price increase averaged 7.7% for 19 items. Korea Yakult also decided to increase the price of its King Ramen to the same amount as Nong Shim's Shin Ramyun.

110.    Samyang Foods Co., Ltd. and Ottogi Co., Ltd. later delayed the dates of the price increase, and Korea Yakult accordingly adjusted the date of Korea Yakult's price increase from February 1, 2004 to March 1, 2004.

111.    The leader of Korea Yakult's Distribution Management Team, OO Kim, revealed that the Korean Defendants' employees exchanged sales results during this process.  For example, Korea Yakult sent Samyang Foods Co., Ltd. the details of Korea Yakult's price increase, including the price increase date and the periods of old price support, by emails dated January 27, 2004, February 5, 2004, and March 9, 2004.

112.    On February 23, 2004, Ottogi Co., Ltd. decided to increase factory prices effective April 4, 2004.  The factory price increase averaged 6.9% for 47 products.  Ottogi Co., Ltd. also decided to increase the price of its Jin Ramen to the same amount as Nong Shim s Shin Ramyun.

113.    In addition, Nongshim America announced it would raise prices in conformance with these price increases in Korea.  In February 2004, Mr. Yong-Hoon Lee[8] of Nongshim America stated, "Because Korea [Nong Shim Co., Ltd.] increased the ramen price by 6.5% on average, the import price [from Korea] also increased. .... We decided to increase the ramen price [in the United States] by 8-9%, starting in April."

---

[8] Plaintiffs note that a Mr. OO Lee was also identified by the KFTC as a participant in the conspiracy.  See ¶ 93.

114.    These price increases in Korea were reflected in prices of Korean Noodles exported from Korea for sale in the United States.  According to Nong Shim Co., Ltd.'s Business Operations Report, between 2003 and 2004, Shin Ramen's export price increased from $6.30 to $6.45.  According to Samyang Foods Co., Ltd.'s Business Operations Report, between 2003 and 2004, Samyang Foods Co., Ltd.'s Korean Noodle export price increased from $4.57 to $4.80.

**E.    Fourth Price Increase: December 2004 to April 2005**

115.    On or around December 20, 2004, Nong Shim Co., Ltd. decided to increase prices effective December 24, 2004.  The price increase averaged 7.1% for 37 products.

116.    On December 22, 2004, Nong Shim Co., Ltd. informed Samyang Foods Co., Ltd. of the price increase via email.

117.    On February 24, 2005, Samyang Foods Co., Ltd. decided to increase prices effective March 1, 2005. The price increase, covering 32 items, averaged 7.2%.  Samyang also decided to increase the price of its Ramen to the same amount as Nong Shim's Shin Ramyun.  Samyang Foods Co., Ltd. then provided the details of the price increase to other Korean Defendants, including Nong Shim Co., Ltd.

118.    On January 7, 2005, Korea Yakult decided to increase prices effective February 15, 2005.  The price increase, covering 24 items, averaged 7.4%.  Korea Yakult also decided to increase the price of its King Ramen to the same amount as Nong Shim Co., Ltd.'s Shin Ramyun.  Later, because the price increase of Samyang Foods Co., Ltd. and Ottogi Co., Ltd. were delayed, Korea Yakult delayed the price increase date from February 15, 2005 to March 15, 2005.

119.    On January 11, 2005, Korea Yakult emailed the details of the price increase to Samyang Foods Co., Ltd.

120.    Korea Yakult's Management Team created two documents which discuss competitors' price increases: (1) a "Plan of Ramen Price Increase (Proposal)" dated January 5, 2005, and (2) "The Request for Adjustment of Noodle Products Price Increase Period" dated February 11, 2005.  These documents reported proposed price increases for both Samyang Foods Co., Ltd. and Ottogi Co., Ltd.  The later document noted that the "reason for Price Increase Adjustment" was a "[m]arket response to competitors' price increase   date and price support."

121.   On February 24, 2005, before Ottogi Co., Ltd. even conclusively decided to increase prices, Ottogi Co., Ltd. sent Samyang Foods Co., Ltd. the details of its proposed price increase.

122.   On February 22, 2005, Nong Shim Co., Ltd. created a document titled "Meeting for Business Measures" that contained the price increase and support plans of Samyang Foods Co., Ltd., Ottogi Co., Ltd. and Korea Yakult.

123.   Sometime before March 10, 2005, OO Kim at Nong Shim Co., Ltd. created a document titled "Ottogi's Price Increase Proposal per Item."  The document seemingly contains non-public information concerning Ottogi Co., Ltd.'s factory price increases, as it includes the exact factory prices of products, which would not be known to the public.  For example, the document reveals that for certain products, only the factory price, and not the retail price, would be increased.  An almost identical document was sent by Ottogi Co., Ltd. to Samyang Foods Co., Ltd. on February 25, 2005.  Accordingly, it is likely that Ottogi  Co., Ltd. provided both Nong Shim  Co., Ltd. and Samyang Foods Co., Ltd. with this information.

124.   Several of the Korean Defendants' employees have opined as to the difficulty of determining factory prices based on retail prices.  OO Doh of the Department of Sales Planning at Ottogi Co., Ltd. stated that "it is difficult to speculate exactly how much the price is.  We can guess approximately how much percentage of price is different from one another based on market price.  However, we cannot know the exact price."  OO Kim, the Chair of the Head Business Office at Ottogi Co., Ltd. stated that while the increases could be speculated roughly, "increase rate per item could not be speculated."  OO Suh, the Chair of the Marketing Team at Samyang Foods Co., Ltd., stated that "[i]t is not possible to know the exact factory price of a competitors' item by knowing the retail price per item only.  That is why ramen companies have exchanged not only the details of retail price increase, but also the details of factory price (release price) when they share price information of increased products in most cases until now."

125.   These price increases in Korea were reflected in prices of Korean Noodles exported from Korea for sale in the United States.  Between 2004 and 2005, Samyang Ramen's export price increased from $4.80 to $5.00.

126.   These price increases in Korea led  to price increases in the United States as well.

23

On December 24, 2004, Korea Times stated, "Based on the precedents where the price increase in the United States trails the price increase in Korea by 2-3 months, it is likely that the price increase will be implemented by next March at the latest for the products [including Korean Noodles] distributed to New York supermarkets and grocery stores."

127.    Samyang USA increased the price for packaged ramen products by 5%-7% in February 2005.  On March 15, 2005, Mr. Shi-Young Lee of Samyang USA stated, "There is a lot of pressure because the price for the main ingredients including flour and oil increased, and the exchange rate dropped. . . .   The impact of the ramen price increase by 8% in early March in Korea will reach the U.S. around July."

F.    **Fifth Price Increase*: March 2007 to December 2007***

128.    On February 12, 2007, Nong Shim Co., Ltd. decided to increase factory prices effective March 1, 2007.  The factory price increases, covering 39 items, averaged 6.5%.

129.    On February 23, 2007, Nong Shim  Co., Ltd. sent a notice of price increase (written for the purpose of sending to stores) to Samyang via fax.  On February 26, 2007, Nong Shim  Co., Ltd. sent to Samyang Foods Co., Ltd. the details of the price increase via email.

130.    On February 28, 2007, the Ottogi Co., Ltd. Marketing Team wrote "The Report of Price Increase of Nong Shim Ramen and Snacks."  This report detailed specifics of Nong Shim Co., Ltd., Samyang Foods Co., Ltd., and Korea Yakult's upcoming price increases.

131.    In early and mid-March 2007, Nong Shim Co., Ltd. sent the release date and details of price support to Samyang Foods Co., Ltd.  Samyang Foods Co., Ltd. included this information in an internal document, dated February 26, 2007, titled "Details of Nong Shim's Price Increase in March 2007 (No. 1)."

132.    A March 5, 2007 document, written by the Korea Yakult Noodle Marketing Team, titled "The Ramen Price Increase in 2007," reports details of the Nong Shim  Co., Ltd. price increase, and the progress of Samyang Foods Co., Ltd. and Ottogi Co., Ltd.'s price increase projects.

133.    On March 7, 2007, Korea Yakult decided to increase factory prices effective April 1, 2007.  The factory price increases, covering 21 items, averaged 6.6%.  Korea Yakult also decided to increase the price of its King Ramen to the same   amount as Nong Shim's Shin Ramyun.

24

134.    On March 20, 2007, Korea Yakult emailed details of these price increases to Samyang Foods Co., Ltd.

135.    On March 22, 2007, Samyang Foods Co., Ltd. decided to increase factory prices effective April 16, 2007.  The factory price increases, covering 28 items, averaged 7.3%.  Samyang Foods Co., Ltd. also decided to increase the price of its Samyang Ramen to the same amount as Nong Shim's Shin Ramyun.

136.    On April 11, 2007, Samyang Foods Co., Ltd. provided details about its price increase to both Nong Shim Co., Ltd. and Ottogi Co., Ltd. via email.  The email, from OO Yui of Samyang Foods Co., Ltd. to OO Yoon at Nong Shim Co., Ltd. and OO Chung at Ottogi Co., Ltd., stated that "the price increase seems to be implemented by the 16th.  However, I should tell you that there is little bit of possibility that the date would be changed.  Please refer to the attached document for the details of price increase.  This document is a final draft, but had not been confirmed.  PM in charge of the price increase said that the increase would be implemented almost as the document said."

137.    On April 17, 2007, OO Yui of Samyang Foods Co., Ltd. sent OO Yoon of Nong Shim Co., Ltd. an email detailing production dates of Samyang Foods Co., Ltd.'s price-increased products.

138.    On May 4, 2007, OO Yui of Samyang Foods Co., Ltd. sent OO Jung from Ottogi and email about Samyang Foods Co., Ltd.'s old price support period.

139.    On February 28, 2007, Ottogi  Co., Ltd.'s Marketing No. 3 Team created "The Report of Price Increase of Nong Shim Ramen and Snacks."  This report accurately tracked the details of what became Korea Yakult's price increase.  Specifically, the report noted, as to its competitors:

> Although Nong Shim continuously has sent out a rumor of price increase since the end of 2006, sales of that year declined about 1.2%.  Therefore, internally the company had much more dispute about price increase.  However, because of the continued decline of ramen market, it is evident to promote the growth of sales amount and of profit through price increase, rather than through growing the quantity of the sales, and because of its exclusive market share, the company judged that the market dynamics would not change much after the price increase.  Therefore, Nong Shim decided to implement the price increase.

140.    On May 18, 2007, the Ottogi  Co., Ltd. Marketing Team wrote "The Examination of

Price Increase of Ramen Products." This document recommended increasing prices at the same level of Nong Shim Co., Ltd., and detailed the proposals of such a price increase.

141. On June 26, 2007, Ottogi Co., Ltd. Marketing Team wrote "the Report of Ramen Products Price Increase." This report noted that information was obtained "after checking with the Samyang Marketing Team." The report recommended raising prices on September 1, 2007, once such information was obtained.

142. On July 23, 2007, Ottogi Co., Ltd. decided to increase factory prices effective September 1, 2007. The factory price increases, totaling 90 items, averaged 4%. Ottogi Co., Ltd. also decided to reduce a discount rate by 4%, so the actual average increase totaled 8%. Ottogi Co., Ltd. also chose to increase the factory price of its Jin Ramen to 417 won, which was still lower than Nong Shim's Shim Ramyun price of 430 won, but came out to the same price after taking into account the reduced discount rate.

143. On July 27 and July 31, 2007, OO Jung of Ottogi Co., Ltd. emailed OO Yui of Samyang Foods Co., Ltd. the details of the Ottogi Co., Ltd. price increase.

144. On August 10, 2007, OO Choi of Nong Shim Co., Ltd. emailed OO Yui of Samyang Foods Co., Ltd., stating that "[a]s far as I know, Ottogi has not officially notified so far. . . . Its price increase rate is the shame as our company's and Samyang's, if we consider the result only."

145. On August 16, 2007, OO Kim of Korea Yakult emailed OO Yui of Samyang Foods Co., Ltd. the details of Ottogi Co., Ltd.'s price increase. These price increases in Korea were reflected in prices of Korean Noodles exported from Korea for sale in the United States. According to Nong Shim Co., Ltd.'s Business Operations Report, between 2006 and 2007, Shin Ramyun's export price increased from $6.65 to $7.07.

146. This price increases also led to price increases of Korean Noodles in the United States as well. On June 7, 2007, Korea Times reported that, in response to Nongshim America's price increase, it appeared likely that other competitors including Samyang, Binggrae, and Paldo [Yakult] would also increase the price for their Korean Noodles shipped to the United States market.

1

**G.      Sixth Price Increase - February 2008 to April 2008**

2

147.    From February 20, 2007 to March 3, 2008, Nong Shim Co., Ltd. sent various emails

3

to Samyang Foods Co., Ltd. detailing their price increases.

4

148.    In early 2008, Nong Shim Co., Ltd. decided to increase factory prices.  The factory

5

price increases, covering 42 items, averaged 11.9%.

6

149.    On February 18, 2008, OO Choi of Nong Shim Co., Ltd. sent OO Yui of Samyang

7

Foods Co., Ltd. an email stating that Nong Shim Co., Ltd.'s price increase "is planned to be

8

officially announced this afternoon, so I will inform you again when the price is announced. :D  And

9

this information might be wrong, so please do not have a blind faith in it.  And, please pretend of

10

Yakult that you haven't received this provisional price."  OO Choi sent OO Yui additional updates

11

on February 20th, 22nd, 28th, 29th, and March 3rd.

12

150.    On February 18, 2008, Samyang Foods Co., Ltd. decided to increase its prices,

13

effective March 1, 2008.  According to OO Suh, Chair of Samyang Foods Co., Ltd.'s Marketing

14

Team, Samyang Foods Co., Ltd. then sent the details of these price increases to Nong Shim Co.,

15

Ltd., Ottogi Co., Ltd., and Korea Yakult via wired communication.

16

151.    On February 28, 2008, Samyang Foods Co., Ltd. completed approval of an increase

17

of factory prices effective March 1, 2008.  The factory price increase, covering 32 items, averaged

18

11.9%.  Samyang Foods Co., Ltd. also decided to increase the price of its Samyang Ramen to the

19

same amount as Nong Shim's Shin Ramyun.

20

152.    On February 27, 2008, OO Yui of Samyang Foods Co., Ltd. emailed the details of its

21

price increase to OO Choi of Nong Shim Co., Ltd.  On March 3, 2008, OO Yui of Samyang Foods

22

Co., Ltd. sent OO Choi of Nong Shim Co., Ltd., OO Kim of Korea Yakult, and OO Jung of Ottogi

23

Co., Ltd. an email concerning the details of Samyang Foods Co., Ltd.'s old price support.

24

153.    On February 26, 2008, Ottogi Co., Ltd. decided to increase factory prices effective

25

April 1, 2008.  The factory price increase, covering 72 items, averaged 9.4%.  However, Ottogi Co.,

26

Ltd. also decided to reduce a discount rate by 4.1%, the so the actual average increase totaled 13.5%.

27

Ottogi Co., Ltd. also chose to increase the factory price of its Jin Ramen to 455 won, which was still

28

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. C-13-04115-WHO

lower than Nong Shim's Shim Ramyun price, but came out to the same price after taking into account the reduced discount rate.

154.    On February 29, 2008, OO Jung of Ottogi Co., Ltd. sent OO Yui of Samyang Foods Co., Ltd. an email concerning Ottogi Co., Ltd.'s price increases, stating "[a]s I told you yesterday, whether or not there would be price increase has not been decided yet.  However, I am sending you the details of price increase which has been in progress so far, so that you can have it as a reference.  Our company has started production of price increased products of cup ramen, such as Jin Ramen multi packets and spaghetti cup ramen, on February 27."  The email included a chart showing price increases for various Ottogi products.

155.    On March 6, 2008, OO Jung sent OO Yui another email providing additional details about the dates of the price increases, stating "I am sending you my company's production details for ramen products with new price.  Please refer to it."

156.    On March 6, 2008, OO Kim of Korea Yakult sent an email to Mr. Park of Nong Shim (who was also a director of Nongshim America) and OO Yui, with a list of price increases for various Korea Yakult Korean Noodles.

157.    According to the KFTC Order, Mr. Park is on two other emails during that time conveying Korea Yakult's sales information.

158.    On March 10, 2008, Korea Yakult decided to increase factory prices for major products effective April 1, 2008, and various other products effective May 1, 2008.  The factory price increase, totaling 23 items, averaged 12.5%.  Korea Yakult also decided to increase the price of its King Ramen the same amount as Nong Shim's Shin Ramyun.

159.    These price increases in Korea were reflected in prices of Korean Noodles exported from Korea for sale in the United States. According to Nong Shim Co., Ltd.'s Business Operations Report, between 2007 and 2008, Shin Ramen's export price increased from $7.07 to $7.50.  According to Samyang Foods Co., Ltd.'s Business Operations Report, between 2007 and 2008, Samyang Ramen's export price increased from $5.00 to $6.30.

160.    These price increases affected Korean Noodle prices in the United States as well. On February 20, 2008, Mr. Yong-Hoon Lee of Nongshim America announced, "As for the

1  products manufactured in the United States, rather than the inflation in Korea, but in response to the

2  increase in price for the main ingredients including flour and palm oil, the price will be increased

3  before April at the latest."  The products that Nongshim manufactures in the United States include

4  Shin Ramyun, Japaghetti, and Cup Ramen.

5      161.    On February 21, 2008, Mr. Myung-Chul Shin, Nongshim America's manager for the

6  East Coast, stated, "Right now we are waiting for the announcement from the parent company in

7  Korea.  In Korea, the price increase becomes effective immediately after the announcement.  But, in

8  the United States, there should not be any sudden price increase because, customarily, there is

9  usually one or one and a half month waiting period.  But, we expect the price increase to become

10  effective [in the United States] in March or April."

11      162.    At that time, Mr. Yong-Hoon Lee of Nongshim America, who is in charge of

12  distribution, stated, "Currently we are supplying 14 products manufactured in the United States and

13  approximately 30 items shipped from Korea.  Because most products are ramen and snacks, which

14  require flour, price increase is inevitable."

15      163.    On February 28, 2008, Korea Daily reported, "Samyang and Ottogi announced in last

16  December and in January that they would increase prices by 10%-15% [in the United States], and

17  Paldo [Yakult] is also supposed to increase prices after March.  Nongshim America is reviewing the

18  timing and extent of the price increase.  Most of these companies are planning a second wave of

19  price increase in October, in addition to the price increase early this year."

20      **H.**    **The March 2008 Ramen Conference**

21      164.    On March 26, 2008, the General Assembly of Ramen Conference was held at Capital

22  Hotel in Seoul.  At this conference, the Korean Defendants agreed that they would postpone price

23  increases or lower prices after an increase.

24      165.    OO Lee, Board Director of Samyang Foods Co., Ltd.'s Head Business Office, stated

25  to the KFTC that: "Since the new administration [of the South Korean government], inaugurated on

26  February 25, 2008, played an emphasis of price stabilization, it was difficult decision to make a price

27  increase, and because customers' response was also negative about the increase, ramen

28  manufacturing companies worried much about the increase.  Nevertheless, because the price

1  decision had already made based on the exchange of information and date about price increase, each

2  company emphasized (agreed) that any company could not postpone the price increase or that

3  increased price could not be lowered again."

4      166.    Similarly, OO Kim, Chair of Samyang Foods Co., Ltd.'s Business Management

5  Team, noted to the KFTC that due to the change in South Korean government, South Korea "was

6  experiencing the feeling of renewal.  As the new administration suggested price stabilization as a

7  major policy as soon as the president's inauguration, companies including Nong Shim discussed

8  about ramen price which would be increased.  While worrying about criticism or implications that

9  would cause by price increase, we discussed the prospect of the process and strategic responses

10 about the criticism."

11     167.    Accordingly, the March 2008 Ramen Conference ensured that the collusively-raised

12 prices for Korean Noodles remained inflated.

13 **IX.    THE KFTC INVESTIGATION AND ORDER**

14     168.    On July 12, 2012, the KFTC issued the KFTC Order, concluding that the Korean

15 Defendants, who are the four main producers of Korean Noodles, conspired to fix prices of Korean

16 Noodles.[9]

17     169.    The KFTC imposed monetary and injunctive relief, including 136 billion won

18 (approximately $120 million) in fines.  It also ordered the Korean Defendants to stop sharing pricing

19 information.

20     170.    Nongshim Co., Ltd., Korea Yakult, and Ottogi Co., Ltd. appealed the KFTC Order,

21 but on November 8, 2013, the Seoul High Court affirmed the KTFC Order and its penalties as to

22 Nong Shim Co., Ltd.  and Ottogi Co., Ltd., stating that:

23

24         Ramen manufacturers sequentially implemented price increases within a close
           time period, deciding upon similar levels of increase. For important products with
25         a lot of market share, the pricing was the same - down to [one Won] …. Without
           exchange of pricing information, based solely on the information obtained
26         through the media or independent market study, it would have been difficult to

27 ─────────────
   [9] The KFTC Report noted that a fifth South Korean company, Binggrae Co. Ltd., also engaged in the
28 conspiracy.  However, in 2003, Binggrae left the Korean Noodles business.

prepare such precise and detailed information regarding competitors' prices. Therefore, it appears that the pricing aligned as a result of the exchange of pricing information.

171.    On December 4, 2013, the Seoul High Court affirmed the KTFC order and its penalties as to Korea Yakult.

172.    Samyang Foods Co., Ltd. revealed that it was excused by the KFTC from paying its fine and received leniency from the KTFC because it provided information about the conspiracy to the KFTC.

## X.    THE CONSPIRACY IMPACTED KOREAN NOODLE PRICES IN THE U.S.

173.    The unlawful price increases of factory prices in South Korea affected not only prices in Korea, but also prices in the United States.  During the Class Period, the Korean Defendants shipped price-fixed Korean Noodles directly to the U.S. Defendants for resale in this country.

### A.    Nong Shim

174.    During the Class Period, Nong Shim Co., Ltd. directly shipped its Korean Noodles to Nongshim America in the United States.  As alleged at ¶¶ 102-03, 113, 146, 160-62 herein, the prices of Nongshim Korean Noodles were expected to increase and/or did increase in the United States shortly following price increases in Korea.  Furthermore, as alleged at ¶¶ 104, 114, 145, and 159 herein, such price increases were reflected in Nong Shim Co., Ltd.'s Business Operations Reports.

175.    Nongshim America's U.S. price increases, correlating to the price increases in Korea, are reflected in the purchasing records of Plaintiff Plaza and Summit, as demonstrated in the chart attached hereto as Exhibit A.

176.    According to Summit's and Plaza's purchasing records, the purchase prices of Nong Shim Korean Noodles increased

- between 9.6% and 12.1% in 2003 (the second price increase),

- between 33.5% and 33.9% in 2004 (the third price increase),

- between 6.0% and 11.7% in 2007 (the fifth price increase), and

- between 19.6% and 27.3% in 2008 (the sixth price increase).

31

177.    A correlation analysis, using a three-month lag time between the price increase in Korea and the increase in the United States, indicates a correlation of between 0.89 and 0.96 between Korean Ramen CPI and Nong Shim Korean Noodles purchased by Summit, as demonstrated by a chart attached hereto as Exhibit B.[10]

**B.    Ottogi**

178.    During the Class Period, Ottogi Co., Ltd. directly shipped its Korean Noodles to Ottogi America in the United States.  As alleged at ¶¶ 102, 103, and 163 herein, prices of Ottogi Korean Noodles were expected to increase in the United States shortly following price increases in Korea.

179.    Ottogi's U.S. price increases, correlating to the price increases in Korea, are reflected

---

[10] Correlation analysis can be used to explore related co-movements in prices in the U.S. and Korea. Correlation analysis is a statistical tool that measures the linear relationship between two observable variables.   The correlation coefficient ranges between -1 and 1. A correlation coefficient of 1 (or -1) implies a perfect positive (or negative) linear relationship between the two variables. Similarly, a correlation coefficient of 0 implies no linear association between the variables. For example, suppose the correlation coefficient between prices in Korea and prices in the U.S. is 1. Then, as prices in Korea increase, prices in the U.S. increase via an exact linear relationship.

Here, the relevant analysis requires a measure of Korean Noodle prices in the U.S. and Korea. First, "paper" invoices provided by Plaintiffs Plaza and Summit were used to establish the price of Korean Noodles sold in the U.S.  Raw unit prices for the Defendants' Korean Noodles were extracted from these purchase invoices. To create an appropriate monthly price series to compare U.S. and Korean prices, average monthly price series were calculated from the raw data.

The Defendants identified in the KFTC Order were the major, and often the only, suppliers of Korean Noodles in Korea (it is unclear whether Binggrae was still marketing Korean Noodles during the time period analyzed for 2003 Nong Shim data).  As such, a Korean ramen monthly Consumer Price Index (CPI) provides an appropriate measure of ramen prices in Korea for the Defendants' products.  Such data (in this case provided by a February 8, 2012 KDB Daewoo Securities report) are generally representative of the price of Korean Noodles sold in Korea.

Finally, a correlation analysis between available U.S. and Korean monthly price series was used to analyze co-movements in the price series across the two countries.

The charts at Exhibits B and D illustrate the correlation between the Korean ramen CPI and a three-month lag in the price of various Korean ramen products sold in the U.S. There are a number of reasons why there may be an observed lag in the relationship between announced price changes in Korea and those observed in the U.S., including communication timing requirements, and existing contracts, or purchase orders.

32

1  in the purchasing records of Plaintiff Plaza, as demonstrated in the chart attached hereto as Exhibit

2  C.

3      180.    According to Plaza's purchasing records, Plaza's purchase prices of Ottogi Korean

4  Noodles increased between 13.6% and 18.2% in 2008 (the sixth price increase).

5      181.    A correlation analysis, using a three-month lag time between the price increase in

6  Korea and the increase in the United States, indicates a correlation of between 0.74 and 0.76

7  between Korean Ramen CPI and Ottogi Korean Noodles purchased by Plaza, as demonstrated by a

8  chart attached hereto as Exhibit D.

9      **C.    <u>Samyang</u>**

10     182.    During the Class Period, Samyang Foods Co., Ltd. directly shipped its Korean

11 Noodles to Sam Yang (USA) in the United States. As alleged at ¶¶ 102, 127, 146 and 163 herein,

12 prices of Samyang Korean noodles were expected to increase in the United States shortly following

13 price increases in Korea. Furthermore, as alleged at ¶¶ 104, 114, 125, and 159 herein, such price

14 increases were reflected in Samyang Foods Co., Ltd.'s Business Operations Reports.

15     183.    Samyang's U.S. price increases, correlating to the price increases in Korea, are

16 reflected in the purchasing records of Plaintiff Plaza, as demonstrated in the chart attached hereto as

17 Exhibit E.

18     184.    According to Plaza's purchasing records, Plaza's purchase prices of Samyang Korean

19 Noodles increased

20   •   between 4.8% and 9.1% in 2005 (the fourth price increase), and

21   •   between 8.3% and 13.3% in 2007-08 (the fifth and sixth price increases).

22     185.    A correlation analysis, using a three-month lag time between the price increase in

23 Korea and the increase in the United States, indicates a correlation of between 0.84 and 0.95

24 between Korean Ramen CPI and Samyang Korean Noodles purchased by Plaza, as demonstrated by

25 a chart attached hereto as Exhibit D.

26     **D.    <u>Korea Yakult</u>**

27     186.    During the Class period, Korea Yakult, doing business as Paldo America, sold

28 Korean Noodles directly in the United States. As   alleged at ¶¶ 102, 146, 163 herein, the prices of

33

Korea Yakult Korean Noodles were expected to increase in the United States shortly following price increases in Korea.

## XI.     THE U.S. DEFENDANTS ACTIVELY PARTICIPATED IN THE CONSPIRACY

187.     On information and belief, the Korean Defendants tightly oversaw the pricing policies of the U.S. Defendants. Nong Shim Co., Ltd.'s 2003 Fact Book provides an example. In 2002, it sought to globalize its Korean Noodles brand in order to capture a greater share of the $540 million United States ramen market. Its goal was to grow profits by 10% annually. It sought to do this through "strategic initiatives" in product development, sales, and distribution. In order to achieve these goals, Nong Shim Co., Ltd. instituted on a global basis from its headquarters in South Korea a "profitability management information system by product and business" and a "management infrastructure" for sales. One or more participants in the conspiracy had executive-level roles in both Nongshim Co., Ltd. and Nongshim America.

188.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been injured in their business and property in that they paid more for Korean Noodles than they otherwise would have paid in the absence of Defendants' unlawful conduct.

189.     Nongshim America and Sam Yang USA participated in, and furthered the objectives of the conspiracy alleged herein by providing the same subterfuge for price increases in the United States (such as the increase in the price of raw materials) as the Korean Defendants offered for the price increases in Korea. This indicates that, at least in the instances above, the Korean Defendant parents were cooperating with the U.S. Defendants to ensure that the disseminated misleading information was similar, and shows an independent involvement in, and a conscious commitment to, the conspiracy.

190.     The U.S. Defendants further participated in the conspiracy, and furthered its objectives, by raising and otherwise conforming the prices of Korean Noodles in the U.S. to price levels similar to those set collusively in Korea pursuant to and at the direction of the Korean Defendants.

191.     The price increases in the United States followed a similar pattern to that in Korea.

As alleged above, Nongshim America, for example, would frequently raise prices first, and the three other companies would follow. This coordination indicates that the Korean Defendants were communicating with the U.S. Defendants regarding the conspiracy. Such communications served to inflict illegal supracompetitive prices on U.S. purchasers of Defendants' Korean Noodles.

192.    The KFTC Order establishes that senior executives of the Korean Defendants were aware of and participants in the conspiracy.  Upon information and belief, some upper management at the Korean Defendant parents have positions and the respective U.S. Defendant subsidiaries.  For example, Mr. Dong Wong Shin, CEO of Nong-Shim Korea has been Chairman of Nong-Shim America Inc. since Oct. 28, 1994. Mr. Jun Park, President of Nong Shim Korea has been Director of Nong-Shim America Inc. since Oct. 28, 1994.  Mr. Park was named as a conspirator in the KTFC Order, and had a key role in the conspiracy, as demonstrated in ¶¶ 21, 73, and 156-57 above. Accordingly, to the extent that persons involved in the conspiracy had positions with both Korean Defendants and U.S. Defendants, they were acting on behalf of the U.S. Defendants as well.

193.    It was important for the Defendants to maintain the pricing relationships between Korean and U.S. pricing of Korean Noodles in order to prevent arbitrage, and this required coordination between the U.S Defendants and the Korean Defendants to ensure that the conspiracy achieved its desired result of increased worldwide prices for consumers of Korean Noodles.

194.    Accordingly, due to the factors described above, it is highly plausible that the U.S. Defendants made a conscious decision to enter the conspiracy and further its goals.

## XII.    TOLLING OF THE STATUTE OF LIMITATIONS

195.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting its claim for relief.

196.    Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least July 2012.

197.    Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for Korean Noodles. Accordingly, Plaintiff could not have had either  actual or constructive knowledge of the price

35

1   fixing scheme until the KFTC Order was issued on July 12, 2012.  But the KFTC Order was issued

2   in Korean, and is still unavailable in English publicly, making its discovery by members of the Class

3   extremely difficult.

4        198.   Because Defendants' agreement, understanding and conspiracy was kept secret,

5   Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct alleged herein

6   and did not know that they were paying artificially high prices for Korean Noodles in the United

7   States during the Class Period.

8        199.   Defendants actively misled the public about the price fixing scheme. For example,

9   Defendants issued false and misleading announcements concerning the reasons for their price

10  increases, none of which disclosed that the Defendants had agreed amongst themselves to fix and

11  raise the price of Korean Noodles.  When a party speaks on a subject matter, it must speak the whole

12  truth.

13       200.   No Defendant has publicly disclosed its participation in an agreement to fix and/or

14  raise the price of Korean Noodles.

15       201.   On May 10, 2001, Nong Shim Co., Ltd. stated that "main ingredient cost increases

16  like 10% increase of international wheat price with weakening of Korean won pushes manufacturing

17  costs increase 5-10%".  No mention of an agreement to fix prices with competitors was provided.  A

18  nearly identical misleading statement was made by Nong Shim Co., Ltd. six days later and

19  republished by Bloomberg.

20       202.   On October 23, 2002, Nong Shim Co., Ltd. stated that "it will increase the price

21  around 8% due to the price increase of ingredient, wheat flour".  No mention of an agreement to fix

22  prices with competitors was provided.

23       203.   On October 24, 2002, Nong Shim Co., Ltd. stated that "it increases the price due to

24  ingredient price increase like the increases of palm oil, wheat flour and due to management costs

25  increase like freight costs from economic condition changes".  No mention of an agreement to fix

26  prices with competitors was provided.

27       204.   On October 24, 2002, Korea Yakult stated that "it is inevitable to increase the price . .

28  . due to the price increases of palm oil, wheat   flour and the price increase of freight costs" and

36

"it is inevitable for the companies to follow to the price increase range of Nong Shim since Nong Shim is the market leading company".  No mention of an agreement to fix prices with competitors was provided.

205.    On December 18, 2003, Nong Shim Co., Ltd.  stated that "[t]his year, the prices of importing ingredients like palm oil price, starch and domestic produces like red pepper and green onion are greatly increased" and "specifically, the increased costs of management fees like freight costs, promotion costs" required a price increase on Ramen  Instant Noodles.  No mention of an agreement to fix prices with competitors was provided.

206.    On February 24, 2004, Samyang Foods Co., Ltd. stated that "the price is increased due to the price increases of ingredients, palm oil and starch, red pepper, green onion and onion since second half of the last year".  No mention of an agreement to fix prices with competitors was provided.

207.    In February 2004, Mr. Yong-Hoon Lee of Nongshim America stated, "Because Korea [Nong Shim Co., Ltd.] increased the ramen price by 6.5% on average, the import price [from Korea] also increased.  ….  We decided to increase the ramen price [in the United States] by 8-9%, starting in April." No mention of an agreement to fix prices with competitors was provided.

208.    On December 23, 2004, Nong Shim Co., Ltd.  stated that "[f]or 8~9% price increase of wheat flour and potato starch and 18% increase of vinyl wrapping due to oil price surge makes inevitable to increase the price".  No mention of an agreement to fix prices with competitors was provided.

209.    On February 28, 2005, Samyang Foods Co., Ltd.  stated that "For 9% price increase of wheat flour and 15% increase of packaging costs pressured cost burden and it was inevitable to increase the price".  No mention of an agreement to fix prices with competitors was provided.

210.    On March 15, 2005, Sam Yang (USA) stated that prices were being raised in the United States because, among other things, "the price for the main ingredients including flour and oil increased." No mention of an agreement to fix prices with competitors was provided.

211.    On February 27, 2007, Nong Shim Co., Ltd.  stated that "recently sudden price increases of the wheat flour price of 9% and palm   oil  increases  of  42%  are  the  major  factors  to

37

increase the price" and "Thanks to well-being boom, there was cost increases of new material development to replace chemical seasoning and other environment friendly costs". No mention of an agreement to fix prices with competitors was provided.

212. On June 7, 2007, a Nong Shim Co., Ltd. representative ascribed prices increases in the United States to "the costs of flour, palm oil and wheat starch [which] have skyrocketed because of the current high oil prices."

213. On February 18, 2008, Nong Shim Co., Ltd. stated that "recently, the sudden price increases of international ingredients like the price increase of wheat flour of 50% and palm oil increase of 94% and extreme weather changes, imbalance of supply and demand" caused an increase in Korean Noodle prices. No mention of an agreement to fix prices with competitors was provided.

214. On February 20, 2008, Mr. Yong-Hoon Lee of Nongshim America announced, "As for the products manufactured in the United States, rather than the inflation in Korea, but in response to the increase in price for the main ingredients including flour and palm oil, the price will be increased before April at the latest." At that time, Mr. Lee, who is in charge of distribution, stated, "Currently we are supplying 14 products manufactured in the United States and approximately 30 items shipped from Korea. Because most products are ramen and snacks, which require flour, price increase is inevitable." No mention of an agreement to fix prices with competitors was provided.

215. On March 14, 2008, Samyang Foods Co., Ltd. stated that "the wheat flour price increased 50%, palm oil price increased 95% and other ingredients prices increased with packaging cost, too" in order to justify a Korean Noodle price increase. No mention of an agreement to fix prices with competitors was provided.

216. As determined by the KFTC, the truth is that Korean Noodle price increases had little correlation with input costs, and often substantially exceeded increased input costs. For example, as reflected in the chart below, which was included in the KFTC order, the price increase often was greater than the raw materials increase. (The rate of raw material increase is reflected through the blue bar on the left at each year, the rate of price increase is reflected through the red bar on the right at each year).

CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. C-13-04115-WHO



217.   This is further reflected in the chart below, which was included in the KFTC order:

| Classification | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|
| Increase in Cost of Goods Sold | 2.9% | 5.6% | 2.5% | 5.3% | -2.4% | 7.4% | 24.3% | 3.9% | 5.8% |
| Increase in Price | 10% | - | 8.5% | 6.7% | - | 7.8% | 13.5% | - | -4.9% |

218.   The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

219.   By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

220.   The combination and conspiracy alleged herein was concealed by Defendants by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings, the use of non-public emails, and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

221.   As a result of Defendants' concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class members have as a result of the anticompetitive conduct alleged in this complaint.

## XIII.   CLAIM FOR RELIEF

### Violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3

222.   Beginning at least as early as December 2000, Defendants and their co-conspirators

39

entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by artificially reducing or eliminating competition in the United States.

223. In particular, Defendants agreed, combined and conspired to raise, fix, maintain or stabilize the prices of Korean Noodles sold in the United States.

224. As a result of Defendants' unlawful conduct, prices for Korean Noodles were raised, fixed, maintained and stabilized in the United States.

225. The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

226. For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

    a. participating in meetings and conversations to discuss the prices and supply of Korean Noodles;

    b. communicating in writing and orally to fix prices and manipulate the supply of Korean Noodles, including but not limited to communicating price increases with each other;

    c. agreeing to manipulate prices and supply of Korean Noodles sold throughout the world and in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

    d. pricing Korean Noodles in accordance with the agreements reached; and

    e. selling Korean Noodles to customers in the United States at non-competitive prices.

227. Defendants' conspiracy had the following effects, among others:

    a. price competition in the sale of Korean Noodles by Defendants has been restrained, suppressed, and eliminated in the United States;

    b. prices for Korean Noodles sold by Defendants has been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

40

c.   direct purchasers of Korean Noodles have been deprived of the benefit of free and open competition in the purchase of Korean Noodles.

228.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been injured in their business and property in that they paid more for Korean Noodles than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## XIV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.   This action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and Interim Class Counsel appointed as Class Counsel;

B.   Defendants have combined and conspired in a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3), and that Plaintiffs and the members of the Class have been injured in their business and property as a result of Defendants' violations;

C.   Plaintiffs and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that judgment in favor of Plaintiffs and the Class be entered against Defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

D.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the conspiracy or agreement alleged herein, including:

i.   continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having any similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

ii.   communicating or causing to  be communicated to any other person engaged in

41

1    the manufacture, distribution or sale of Korean Noodles, information concerning

2    prices, customers, markets or other terms or conditions of sale of any such

3    product except to the extent necessary in connection with bona fide sales

4    transactions between the parties to such communications.

5    E.    Plaintiffs and members of the Class be awarded pre-judgment and post-judgment

6    interest, and that such interest be awarded at the highest legal rate from and after the date of service

7    of the initial complaint in this action;

8    F.    Plaintiffs and members of the Class recover their costs of this suit, including

9    reasonable attorneys' fees as provided by law; and,

10    G.    Plaintiffs and members of the Class receive such other or further relief as may be just

11    and proper.

12    **XV.    DEMAND FOR JURY TRIAL**

13    Plaintiffs demand a trial by jury as to all issues so triable.

14    DATED:    March 24, 2014

15                                        Respectfully submitted,

16                                  By:   __/s/ Christopher L. Lebsock__
                                         Michael P. Lehmann
17                                        Christopher L. Lebsock
                                         **HAUSFELD LLP**
18                                        44 Montgomery Street, 34th Floor
                                         San Francisco, CA 94104
19                                        TEL:  415-633-1908
                                         EMAIL: mlehmann@hausfeldllp.com
20                                                clebsock@hausfeldllp.com

21                                        Michael Hausfeld (*pro hac vice*)
22                                        Mindy Pava *(pro hac vice)*
                                         **HAUSFELD LLP**
23                                        1700 K Street, N.W., Suite 650
                                         Washington D.C.  20006
24                                        TEL: 202-540-7200
                                         EMAIL: mhausfeld@hausfeldllp.com
25                                                mpava@hausfeldllp.com

26                                        Lionel Z. Glancy
                                         Michael M. Goldberg
27                                        **GLANCY BINKOW & GOLDBERG LLP**
                                         1925 Century Park East, Suite 2100
28                                        Los Angeles, CA 90067

42

TEL: (310) 201-9150
EMAIL: lglancy@glancylaw.com
         mgoldberg@glancylaw.com

Lee Albert (*pro hac vice*)
Gregory B. Linkh (*pro hac vice*)
**GLANCY BINKOW & GOLDBERG LLP**
122 East 42nd Street, Suite 2920
New York, NY 10168
TEL: (212) 682-5340
EMAIL: lalbert@glancylaw.com
         glinkh@glancylaw.com

Susan G. Kupfer
Joseph M. Barton
**GLANCY BINKOW & GOLDBERG LLP**
One Embarcadero Center, Suite 760
San Francisco, CA 94111
TEL: (415) 972-8160
EMAIL: skupfer@glancylaw.com
         jbarton@glancylaw.com


*Interim Co-Lead Counsel*

YoungKi Rhee *(pro hac vice)*
**WE THE PEOPLE LAW GROUP**
15F The Salvation Army Bldg., 476
Chungjeongro 3-Ka
Seodaemun-Ku, Seoul 120-837, Korea
TEL: 822-2285-0062 (Dir.)
FAX: 822-2285-0071
EMAIL: ykrhee@wethepeople.co.kr

Seok Young Shin
**DR & AJU Law Firm**
7/11/12/13F, Donghoon Tower
702-19, Yeoksam-dong,
Gangnam-gu, Seoul
135-513 Korea

Guido Saveri
R. Alexander Saveri
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813
E-Mail: guido@saveri.com

Steven A. Kanner

43

William H. London
Douglas A. Millen
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4510
E-Mail: skanner@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan Jagher
**SPECTOR ROSEMAN KODROFF & WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
E-Mail: espector@srkw-law.com

Vincent J. Esades
**HEINS MILLS & OLSON, P.L.C.**
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
E-Mail: vesades@heinsmills.com

Barbara J. Hart (*pro hac vice*)
Sung-Min Lee (*pro hac vice*)
**LOWEY DANNENBERG COHEN & HART, P.C.**
One North Broadway, Suite 509
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
E-Mail: bhart@lowey.com

Steven N. Williams
**COTCHETT PITRE & McCARTHY LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
E-Mail: swilliams@cpmlegal.com

Solomon B. Cera
Thomas Bright
**GOLD BENNETT CERA & SIDENER**
LLP595 Market Street, Suite 2300
San Francisco, CA 94105-2835

44

Telephone: (415) 777-2230
Facsimile: (415) 777-5189
E-Mail: scera@gbcslaw.com

Manuel J. Dominguez
**COHEN MILSTEIN SELLERS & TOLL PLLC**
New York Avenue, NW., Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
E-Mail: jdominguez@cohenmilstein.com


Joseph R. Saveri
**JOSEPH SAVERI LAW FIRM INC.**
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Telephone: (415) 500-6800
E-Mail: jsaveri@saverilawfirm.com


*Additional Plaintiffs' Counsel*

45

**CERTIFICATE OF SERVICE**

I, Christopher L. Lebsock, declare that I am over the age of eighteen (18) and not a party to the entitled action.  I am a partner in the law firm of HAUSFELD LLP, and my office is located at 44 Montgomery Street, Suite 3400, San Francisco, California 94104.

On March 24, 2014 I caused to be filed the following:

**CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT**

with the Clerk of the Court of the United States District Court for the Northern District of California, using the official Court Electronic Document Filing System which served copies on all interested parties registered for electronic filing.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Christopher L. Lebsock*
Christopher L. Lebsock