1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SQUIRE PATTON BOGGS (US) LLP
Mark C. Dosker, CA Bar #114789
  mark.dosker@squirepb.com
J. Brady Dugan (admitted *pro hac vice*)
  brady.dugan@squirepb.com
Anne Choi Goodwin, CA Bar #216244
  anne.goodwin@squirepb.com
Kate E. Kim (admitted *pro hac vice*)
  kate.kim@squirepb.com
275 Battery Street, Suite 2600
San Francisco, California 94111
Telephone: (415) 954-0200
Facsimile: (415) 393-9887

Attorneys for Defendants
NONGSHIM AMERICA, INC. and
NONGSHIM CO., LTD.

[*Counsel for the other Defendants
appear on signature page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE KOREAN RAMEN ANTITRUST LITIGATION, | Case No. 3:13-cv-04115 WHO |
| | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS DIRECT PURCHASER PLAINTIFFS' AND INDIRECT PURCHASER PLAINTIFFS' CLASS ACTION COMPLAINTS; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS** |
| THIS DOCUMENT RELATES TO: | |
| All Actions | |
| | Date:   October 1, 2014 |
| | Time:   2:00 p.m. |
| | Place:  Courtroom 2, 17th Floor |

1

**NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that on October 1, 2014, at 2:00 p.m. in Courtroom 2, 17th

4

Floor, of this Court at 450 Golden Gate Avenue, San Francisco, California 94102, Defendants

5

Nongshim Co., Ltd., Nongshim America, Inc., Ottogi Company, Ltd., Ottogi America, Inc.,

6

Samyang Foods Company, Ltd., Sam Yang (U.S.A.) Inc., Korea Yakult Co., Ltd., and, for

7

purposes of the Indirect Purchaser action, Paldo Company, Ltd. (collectively, "Defendants") will

8

and hereby do move the Court to dismiss with prejudice all claims against Defendants asserted by

9

the Direct Purchaser Plaintiffs and the Indirect Purchaser Plaintiffs (collectively, "Plaintiffs") in

10

all of the above-captioned and consolidated and related actions under Federal Rules of Civil

11

Procedure 12(b)(1) and (6).  As a matter of law, Plaintiffs' Consolidated Class Action Complaints

12

fail to state a claim against Defendants upon which relief can be granted.  In addition, there is a

13

failure of subject matter jurisdiction under the Foreign Trade Antitrust Improvements Act, 15

14

U.S.C. § 6a. This Motion to Dismiss is based on this Notice of Motion, the Memorandum of

15

Points and Authorities, the Complaints, the Request for Judicial Notice submitted herewith and

16

other such matters that the Court may consider.

17

**RELIEF SOUGHT**

18

Defendants seek an order dismissing with prejudice all claims against Defendants.

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3      INTRODUCTION AND OVERVIEW ......................................................................... 1

4      STATEMENT OF ISSUES ....................................................................................... 2

5      SUMMARY OF MATERIAL ALLEGATIONS ....................................................... 3

       ARGUMENT ............................................................................................................ 4

6      I.      LEGAL STANDARDS ................................................................................... 4

7      II.     THE PLAINTIFFS' COMPLAINTS FAIL TO STATE A CLAIM UNDER
               TWOMBLY AND IQBAL ............................................................................. 6

8              A.      The KFTC Order Does Not Support Plaintiffs' Claim That The Defendants
                       Fixed Prices For Products Sold In Or Into The United States ............................... 6

9              B.      The Plaintiffs Fail To Otherwise Allege That The Defendants Agreed To
10                     Fix U.S. Prices .............................................................................................. 8

11                     1.      Plaintiffs' Correlation Allegations do not Support Plaintiffs' Claims
                               that the Defendants Fixed U.S. Prices............................................ 9

12                     2.      Allegations of Conscious Parallelism Are Insufficient to Infer a
                               Price Fixing Agreement .............................................................. 12

13                     3.      Corporate Affiliation is not Evidence of an Agreement ..................... 13

14             C.      The Plaintiffs' Allegations As To Each Defendant Regarding A U.S.
                       Conspiracy Further Highlight The Inadequacies Of The Complaints ................. 16

15                     1.      The Specific Allegations Against Nongshim Are Inadequate ................ 16

16                     2.      The Specific Allegations Against Ottogi Are Inadequate...................... 17

17                     3.      The Specific Allegations Against Samyang Korea Are Inadequate ........ 18

                       4.      The Specific Allegations Against Sam Yang (U.S.A.), Inc. Are
18                             Inadequate ................................................................................ 18

19                     5.      The Specific Allegations Against Yakult are Inadequate ...................... 19

               D.      Conclusion:  The Plaintiffs' Have Failed To Properly Allege A Conspiracy
20                     By The Defendants To Fix Prices In The U.S ................................................ 20

21     III.    THE COMPLAINTS FAIL TO ALLEGE A VIOLATION WITHIN THE
               STATUTE OF LIMITATIONS ...................................................................... 20

22     IV.     THE COMPLAINTS FAIL TO ESTABLISH SUBJECT MATTER
               JURISDICTION OVER THE PLAINTIFFS' CLAIMS ................................... 22

23             A.      Plaintiffs Bear The Burden Of Establishing Subject Matter Jurisdiction ............ 22

24             B.      The Purpose And Statutory Framework Of The FTAIA – A Multi-Step
                       Test.......................................................................................................... 23

25             C.      The FTAIA Applies To The Plaintiffs' Foreign Purchase Claims ...................... 25

26                     1.      The Transactions at Issue Involve Trade or Commerce with Foreign
                               Nations .................................................................................... 25

27

28

Squire Patton Boggs (US) LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

**TABLE OF CONTENTS**
(continued)

Page(s)

2.   The Relevant Transactions do not Involve "Import Trade or Commerce"...................................................................................... 25

D.   The Court Lacks Subject Matter Jurisdiction Because Plaintiffs Fail To Adequately Allege A "Direct" Effect On U.S. Commerce ................................... 27

E.   Plaintiffs' Claims Also Fail Under The Sherman Act's  Common Law Extraterritorial Jurisdiction Test ..................................................................... 29

CONCLUSION................................................................................................................ 31

Squire Patton Boggs (US) LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*7-UP Bottling Co. v. Archer Daniels Midland Co. (In re Citric Acid Litig.)*,
5
    191 F.3d 1090 (9th Cir. 1999) ................................................................................... 13

6

*Advanced Micro Devices, Inc. v. Intel. Corp.*,
    1991 U.S. Dist. LEXIS 21036 (N.D. Cal. Dec. 23, 1991) ....................................... 22

7

*Animal Sci. Prod., Inc. v. China Nat'l. Metals & Minerals Import & Export Corp.*,
8
    596 F.Supp.2d 842 (D. N.J., 2008) ......................................................................... 29

9

*Animal Sci. Prods., Inc. v. China Minmentals Corp.*,
10
    654 F.3d 462 (3rd Cir. 2011) ................................................................................... 26

11

*Arbaugh v. Y & H Corp.*,
    546 U.S. 500 (2006) ................................................................................................. 23

12

*Ashcroft v. Iqbal*,
13
    556 U.S. 662 (2009) ................................................................................. 6, 16, 19, 20

14

*Bell Atl. Corp. v. Twombly*,
15
    550 U.S. 544 (2007) ....................................................................................... *passim*

16

*Brennan v. Concord EFS, Inc.*,
    369 F. Supp. 2d 1127 (N.D. Cal. 2005) ............................................................. 14, 16

17

*In re Cal. Title Ins. Antitrust Litig.*,
18
    2009 U.S. Dist. LEXIS 43323 (N.D. Cal. May 21, 2009) ....................................... 15

19

*Conmar Corp. v. Mitsui & Co., Inc.*,
20
    858 F.2d 499 (9th Cir. 1988) ................................................................................... 22

21

*Credit Bureau Servs. v. Experian Info. Solutions, Inc.*,
    2013 U.S. Dist. LEXIS 94313 (C.D. Cal. June 28, 2013) .......................................... 6

22

*Dee-K Enter., Inc. v. Heveafil Sdn. Bhd.*,
23
    299 F.3d 281 (4th Cir. 2002) ............................................................................. 30, 31

24

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    546 F.3d 981 (9th Cir. 2008) ............................................................................... 23, 29

25

*In re Elevator Antitrust Litig.*,
26
    502 F.3d 47 (2d Cir. 2007) ......................................................................................... 7

27

28

- iii -

Squire Patton Boggs (US) LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*Esco Corp. v. United States,*

4

340 F.2d 1000 (9th Cir. 1965)..................................................................................13

5

*F. Hoffman-LaRoche, Ltd. v. Empagran S.A.,*
542 U.S. 155 (2004) ..............................................................................24, 25, 26, 28

6

*In re Graphics Processing Units Antitrust Litig.,*

7

527 F. Supp. 2d 1011 (N.D. Cal. 2007) .....................................................................5

8

*Grimmett v. Brown,*

9

75 F.3d 506 (9th Cir. 1996)......................................................................................21

10

*Guerrero v. Gates,*
442 F.3d 697 (9th Cir. 2006).....................................................................................21

11

*Hartford Fire Ins. Co. v. California,*

12

509 U.S. 764 (1993) ............................................................................................24, 30

13

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.,*

14

647 F. Supp. 2d 1250 (W.D. Wash. 2009)..................................................................7

15

*Hennegan v. Pacifico Creative Serv. Inc.,*
787 F.2d. 1299 (9th Cir. 1986)..................................................................................21

16

*Illinois Brick Co. v. Illinois,*

17

431 U.S. 720 (1977) ....................................................................................................4

18

*Invamed, Inc. v. Barr Laboratories, Inc.,*

19

22 F. Supp. 2d 210 (S.D.N.Y. 1998).........................................................................16

20

*Jung v. Assoc. of Amer. Med. Coll.,*
300 F. Supp. 2d 119 (D.D.C. 2004) ..........................................................................15

21

*Kendall v. Visa U.S.A., Inc.,*

22

518 F.3d 1042 (9th Cir. 2008)................................................................................4, 5

23

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
511 U.S. 375 (1994) ..................................................................................................23

24

*In re Korean Air Lines Co. Antitrust Litig.,*

25

2008 U.S. Dist. LEXIS 111722 (C.D. Cal. Jun. 25, 2008) ......................................21

26

*In re Korean Air Lines Co. Antitrust Litig.,*

27

No. CV 07-01891, 2010 WL 3184372 (C.D. Cal. 2010)..........................................29

28

- iv -

Squire Patton Boggs (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*Kruman v. Christie's Int'l, PLC,*
    284 F.3d 384 (2d Cir. 2002)......................................................................26, 27

4

*In re Late Fee & Over-Limit Litig.,*
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ...............................................................5

5

6

*Lyshorn v. J.P.Morgan Chase Bank, N.A.,*
    2013 U.S. Dist. LEXIS 82062 (N.D. Cal. 2013)...............................................15

7

8

*MCI Telecom. Corp. v. Graphnet, Inc.,*
    881 F. Supp. 126 (D.N.J. 1995) .......................................................................15

9

*MedioStream, Inc. v. Microsoft Corp.,*
    869 F. Supp. 2d 1095 (N.D. Cal. 2012) .............................................................6

10

11

*Minn-Chem, Inc. v. Agrium Inc.,*
    683 F.3d 845 (7th Cir. 2012) (*en banc*) ..........................................................30

12

13

*Norris v. Baxter Healthcare Corp.,*
    397 F.3d 878 (10th Cir. 2005)..........................................................................11

14

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.,*
    CV-08-42 JG VVP, 2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013)....................27

15

16

*In re: Refrigerant Compressors Antitrust Litig.,*
    No. 09-2042, 2012 WL 2114997 (E.D. Mich. June 11, 2012)............................16

17

18

*RSM Prod. Co. v. Petroleos De Venezuela Societa Anonima* (PDVSA),
    338 F. Supp. 2d 1208 (D. Colo. 2004) ..............................................................15

19

*Rutledge v. Boston Woven Hose & Rubber Co.,*
    576 F.2d 248 (9th Cir. 1978)............................................................................22

20

21

*In re Sagent Tech. Derivative Litig.,*
    278 F. Supp. 2d 1079 (N.D. Cal. 2003) .......................................................14, 16

22

23

*Standard Oil Co. v. United States,*
    221 U.S. 1 (1911)...............................................................................................5

24

25

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
    2010 WL 5477313 (N.D.Cal., Dec. 31, 2010 ...................................................23

26

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.,*
    608 F.Supp.2d 1166 (N.D.Cal.2009) ..........................................................11, 23

27

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO

Squire Patton Boggs (US) LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Tableware Antitrust Litig.*,
363 F. Supp. 2d 1203 (N.D. Cal. 2005) ....................................................................7

*In re: TFT-LCD (Flat Panel) Antitrust Litig.*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008) ..........................................................15, 16

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
822 F. Supp. 2d 953 (N.D. Cal. 2011) ...................................................................23

*In re Travel Agent Comm'n Antitrust Litig.*,
2007 U.S. Dist. LEXIS 79918 (N.D. Ohio 2007) ....................................................5

*Turicentro, S.A. v. Am Airlines, Inc.*,
303 F.3d 293 (3d Cir. 2002)...........................................................................25, 26

*United States v. Bestfoods*,
524 U.S. 51 (1998) .................................................................................................15

*United States v. LSL Biotechnologies*,
379 F.3d 672 (9th Cir. 2004)..............................................................23, 28, 30

*Wilcox v. First Interstate Bank of Oregon, N.A.*,
815 F.2d 522 (9th Cir 1987)...................................................................................13

**Statutes**

15 U.S.C. § 1 .................................................................................................... *passim*

15 U.S.C. § 1, 4 ......................................................................................................5

15 U.S.C. §15b ......................................................................................................21

15 U.S.C. § 1451 et seq. ..........................................................................................8

21 U.S.C. § 403(w) ..................................................................................................8

Egg Products Inspection Act, 21 U.S.C. §§ 1031 et seq........................................8

Federal Meat Inspection Act, 21 U.S.C. §§ 601 et seq. .........................................8

Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq...........................................8

Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ............................ *passim*

Poultry Products Inspection Act, 21 U.S.C. §§ 451 et seq......................................8

- vi -

Squire Patton Boggs (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Other Authorities**

16 C.F.R. Parts 500-503 ...............................................................................................8

21 C.F.R. Parts 101-102 ...............................................................................................8

21 C.F.R. §§ 101.1, 101.15(a), (c)(1) ...........................................................................8

21 C.F.R. §§ 101.9, 101.22 ...........................................................................................8

Fed. R. Civ. P. 12(b)(1) ...........................................................................................2, 23

ARS, Economic Research Report No. 165, Deconstructing Wheat Price Spikes,
    (U.S.D.A. April 2014)..........................................................................................10

DeMaria, Anthony N. Editor's Page: Lies, Damned Lies, and Statistics. 52 J.
    AMER. COLL. CARDIOLOGY 17, (2008) ....................................................................10

Federal Judicial Center, Reference Manual on Scientific Evidence (3d ed. 2011)........10

Ian Ayres, Super Crunchers: Why Thinking-By-Numbers is the New Way to be
    Smart (2007) .......................................................................................................10

Michael Hiltzik, *See some hilarious charts showing that correlation is not
    causation*, Los Angeles Times, (May 12, 2014) .....................................................11

Scott Simon, *Drawing Phony Connections With Mismatched Metrics*, National
    Public Radio (NPR)  (May 17, 2014)....................................................................11

Tyler Vigen, *Spurious Correlation*, *available at* http://www.tylervigen.com (last
    visited May 19, 2014) .........................................................................................11

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO

Squire Patton Boggs (US) LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

1

**INTRODUCTION AND OVERVIEW**

2          With the explosion of antitrust enforcement globally by foreign antitrust authorities, it is

3   now common for those authorities to investigate and prosecute price-fixing in their home

4   countries.  Often, the investigation and any resulting decision are focused solely on the local

5   domestic market, and not any export market to the United States or otherwise.  And, on occasion,

6   U.S. plaintiffs' attorneys seize on such cases and, with nothing more than hope and creative

7   drafting, file complaints in U.S. courts that attempt to stretch the decisions of those foreign

8   authorities to cover a U.S. market.

9          That is what has happened here.  The foundation for the Complaints is an order of the

10  Korea Fair Trade Commission ("KFTC"), a foreign government agency charged with regulating

11  the conduct of companies in Korea, finding that the named Korean Defendants fixed the prices of

12  Korean ramen noodle products for the Korean domestic market (the "KFTC Order").[1]  The

13  KFTC's findings do not extend to any ramen noodle products sold in or into the United States or

14  in any other export market.  Indeed, Plaintiffs admit as much, stating on the record in this Court

15  that the KFTC expressly and publicly "determined that exported products were not subject[ed] to

16  price-fixing."[2]  Nor does the KFTC Order suggest that any individual or company in the United

17  States had anything to do with the conduct investigated in Korea.  In short, there is nothing in the

18  KFTC Order that even hints of an antitrust violation in the United States.

19         Plaintiffs fail to plug the gaping holes in their Complaints with their remaining

20  allegations.  Rather, as demonstrated below, the courts have uniformly dismissed as inadequate

21  the types of vague, speculative allegations on which Plaintiffs rely.  This includes, for example,

22  allegations to the effect that the U.S. Defendants engaged in "parallel pricing," that the pricing of

23  the U.S. Defendants "correlates" with that of the Korean Defendants, or that the Korean

24  Defendants "control" their U.S. subsidiaries.  Plaintiffs also include in their complaint certain

25

26  [1] Whether the KFTC Order will be upheld on final appeal in Korea is not yet known.

27  [2] Transcript (Case No. 13-cv-04148 at Dkt 35) at 17:5-8, 16:2-9 and 16:21-22; Request for
    Judicial Notice submitted herewith at Exh. A (KFTC Statement and English translation of same).

28

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO
- 1 -

1   pricing data in an effort to bolster their "correlation" allegations that, ironically, rather than

2   supporting their price-fixing claim, actually undermines it.  Most fundamentally, Plaintiffs try but

3   fail to hide the Complaints' complete lack of any specificity regarding the details of an alleged

4   agreement to fix U.S. prices – the "who" "what" "where" "when" and "how" that are required

5   under *Twombly* and its progeny.

6            Dismissal of Plaintiffs' claims is required for several additional reasons.  As demonstrated

7   further below, Plaintiffs' claims fall outside the relevant statute of limitations period and must be

8   dismissed for this reason as well.  Finally, this Court lacks subject matter jurisdiction over

9   Plaintiffs' claims under the Foreign Trade Antitrust Improvements Act (the "FTAIA"), 15 U.S.C.

10  § 6a, because the Complaints allege harm only to foreign and not U.S. commerce.  In particular,

11  the Complaints do not allege a "direct" effect on U.S. commerce as is required by the FTAIA, and

12  therefore must be dismissed under Fed. R. Civ. P. 12(b)(1).

13           Simply put, the consolidated Complaints do not meet the minimum requirements for

14  pleading an agreement to fix prices under Section 1 of the Sherman Act and should be dismissed.

15  Because the Complaints' failings reflect Plaintiffs' transparent and unsuccessful efforts to use the

16  KFTC decision to create the illusion of a U.S. conspiracy – and do not arise from a failure of

17  drafting – the Complaints should be dismissed with prejudice.

18

19

20                              **STATEMENT OF ISSUES**

21    1.   Whether Plaintiffs fail to state a claim under 15 U.S.C. § 1 for failing to sufficiently allege
           facts showing an agreement to restrain trade in the United States.

22
      2.   Whether Plaintiffs' claims are barred by the applicable statutes of limitations.
23
      3.   Whether the Court lacks subject matter jurisdiction over Plaintiffs' claims under the
24         Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a.

25

26

27

28

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO
- 2 -

## SUMMARY OF MATERIAL ALLEGATIONS

Plaintiffs allege that "Korean Noodles is an instant noodle soup product consisting of dried instant noodles paired with a seasoning packet and dehydrated vegetables, packaged in a bag (or pouch), cup, or bowl." Consolidated Direct Purchaser Plaintiffs' Class Action Complaint (Dkt 61) ("DPC") ¶ 53; *see also* Consolidated Indirect Purchaser Plaintiffs' Class Action Complaint (Dkt 62) ("IPC") ¶ 44.[3] Korean Noodles, as alleged by the Plaintiffs, come in a variety of types, but all share two main ingredients: flour and palm oil. DPC ¶¶ 63, 53; IPC ¶ 47.

The DPC names four defendants alleged to be Korean companies that manufacture and sell Korean Noodles: Nongshim Co., Ltd.[4]; Ottogi Co. Ltd.; Samyang Foods Co. Ltd.; and Korea Yakult Co. Ltd. DPC ¶¶ 1 n.1, 17, 28, 33, 37. The IPC names the same four companies and adds a fifth defendant alleged to be a Korean company that imports and distributes Korean Noodles into the U.S. from Korea: Paldo Company, Ltd. IPC ¶¶ 1, 20–23, 28. Both the DPC and the IPC (collectively "Complaints") name three defendants alleged to be U.S. companies: Nongshim America, Inc.; Ottogi America, Inc.; and Sam Yang (U.S.A.), Inc.[5] DPC ¶¶ 1 n.1; 19, 29, 34; IPC ¶¶ 25-27, 29. These three U.S. companies are alleged to have imported and distributed Korean Noodles into the U.S. from Korea. DPC ¶¶ 174, 29, 34; IPC ¶¶ 25, 27, 29. Defendant Nongshim America, Inc. is also alleged to have manufactured and sold Korean Noodles in the U.S. DPC ¶ 27; IPC ¶ 25, 148.

The Direct Purchaser Plaintiffs are nine companies, each of whom is alleged to have purchased Korean Noodles from one or more of the defendants. DPC ¶¶ 11-16. The Indirect Purchaser Plaintiffs are ten individual residents of California, Florida, Massachusetts, Michigan, and New York who are alleged to have purchased Korean Noodles manufactured by one of the

---

[3] The IPC uses a description of Korean Ramen Noodle Products that is very similar to the DPC: "Korean Ramen Noodle Products are instant noodle soup products made of noodles, seasoning and/or vegetables. Korean Ramen Noodles are typically sold in a package with seasoning and dehydrated vegetables in a packet, cup or bowl." IPC ¶ 44. Hereinafter, "Korean Noodles" refers to the products as alleged in both the DPC and the IPC.

[4] Nongshim Co. Ltd. is incorrectly referred to in the Complaints as "Nong Shim Co. Ltd.".

[5] Sam Yang (U.S.A.), Inc. is incorrectly referred to in the DPC as "Sam Yang (USA), Inc."

1  Defendants.  IPC ¶¶ 10-19.  Although the individual Indirect Purchaser Plaintiffs reside in five

2  states, they allege violations of antitrust statutes in 21 states, and violations of consumer

3  protection statutes in 13 states.  IPC ¶¶ 192-221.[6]

4

5                                        **ARGUMENT**

6  **I.    LEGAL STANDARDS**

7          To properly state a claim under Rule 12(b)(6), the Complaints must contain facts that, if

   true, show that the Defendants reached an agreement in violation of the Sherman Act.  *Bell Atl.*

8  *Corp. v. Twombly*, 550 U.S. 544, 556 (2007).[7]  But *Twombly* makes clear that, before allowing

9  the Plaintiffs to subject Defendants to the tremendous costs of discovery[8] and defending this

10 antitrust litigation, the Court must be satisfied that the facts alleged in the Complaints raise an

11 inference "above the speculative level" such that there exists "a reasonable expectation that

12 discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 555.  The Ninth

13 Circuit has interpreted *Twombly* to mean that the usual "notice pleading" standards of Rule

14 8(a)(2) will not suffice in antitrust cases.  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047, n.5

15 (9th Cir. 2008) (citing *Twombly*, 550 U.S. at 555).

16

17 _____

18 [6]  *See* Defendants' Motion To Dismiss Certain of the Indirect Purchaser Plaintiffs' State Law
   Claims filed concurrently (addressing arguments specific to the Indirect Purchaser Plaintiffs'
19 claims).

20 [7]  The Indirect Purchaser Plaintiffs assert their antitrust claims under state law because federal
   antitrust law does not permit recovery by indirect purchasers.  *See Illinois Brick Co. v. Illinois,*
21 431 U.S. 720, 735 (1977).  For purposes of this motion, the substantive differences between
   federal antitrust law and the various state antitrust laws are immaterial.  The arguments in this
22 motion apply equally to the federal and state antitrust claims.

23 [8]  In this litigation the costs of discovery will be even higher because as the Direct Purchaser
24 Plaintiffs have stated, much of the discovery in this case will be in Korea and in Korean.  Decl. of
   C. Lebsock in Supp. of Mot. to Appoint Hausfeld and Glancy Binkow and Goldberg LLP as
25 Interim Co-Lead Counsel for Proposed Direct Purchaser Class (Dkt. 20-1), para. 2.f ("this
   litigation in which much of the evidence of price fixing is likely to reside in Korea"; "in this
26 litigation, where the majority of relevant documents are likely to be written in Korean and most
   fact witnesses will be Korean-speaking."); *see also* Decl. of L. Albert in Supp. of Mot. to Appoint
27 Hausfeld and Glancy Binkow and Goldberg LLP as Interim Co-Lead Counsel for Proposed Direct
   Purchaser Class (Dkt. 20-3), para. 12; Mot. and Mem.in Supp. of Mot. to Appoint Interim Co-
28 Lead Counsel (Dkt. 20) at 30:1-2.

The elements of a claim under Section 1 of the Sherman Act are straightforward.  The Plaintiffs must plead evidentiary facts which, if true, will prove:  (1) an agreement among two or more persons or distinct business entities; (2) that unreasonably restrains commerce within the scope of the Sherman Act; (3) which causes actual injury.  15 U.S.C. § 1, 4; *see, e.g., Kendall*, 518 F.3d at 1047 (citations omitted).  When pleading these elements the Plaintiffs must allege facts that "plausibly suggest[]" a Sherman Act violation.  *Twombly*, 550 U.S. at 557.

Since *Twombly,* courts have consistently applied its plausibility and specificity requirements to dismiss Section 1 conspiracy claims based on allegations containing significantly more details than the Plaintiffs have alleged here.  *See, e.g., In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1014, 1023 (N.D. Cal. 2007) (finding allegations of specific, coordinated, price increases and new product introductions following attendance at specific trade meetings, and unnatural "price stability and upward pricing trends" was insufficient to specifically allege a Section 1 violation, even with an on-going criminal investigation of same alleged price-fixing conspiracy); *In re Travel Agent Comm'n Antitrust Litig.*, 2007 U.S. Dist. LEXIS 79918, 16-17, 31-38 (N.D. Ohio 2007) (dismissing claims despite allegations of, *inter alia*, parallel price increases on at least "six occasions," opportunities to conspire through "jointly formed business ventures" and "private meetings" at trade shows, acts against defendants' economic self-interest, exchanges of information such that defendants' respective price decisions were "common knowledge," and history of collusion in industry and repeated price-fixing conspiracies); *In re Late Fee & Over-Limit Litig.*, 528 F. Supp. 2d 953, 963-65 (N.D. Cal. 2007) (dismissing claims despite allegations of, *inter alia*, opportunities and motives to conspire, similar "cost structures" among defendants, concentrated market with high barriers to entry, "price leadership," and a series of "rapid," parallel price increases "unjustified by changes in defendants' costs") (citing *Twombly*, 550 U.S. at 554).

The essence of a Sherman Act violation is an agreement in restraint of trade.  *See Standard Oil Co. v. United States*, 221 U.S. 1, 58 (1911).  *Twombly* requires Plaintiffs to allege that agreement with specificity.  *See Twombly*, 550 U.S. at 565  n.10.  General references in a complaint to an "agreement" or "understanding" among defendants are not sufficient under

1   *Twombly* to show "facts indicating where, when, or who participated in the alleged agreement

2   between Defendants." *Credit Bureau Servs. v. Experian Info. Solutions, Inc.*, 2013 U.S. Dist.

3   LEXIS 94313, 20-21 (C.D. Cal. June 28, 2013) (citing *Twombly*, 550 U.S. at 564 ("[a]lthough in

4   form a few stray statements speak directly of agreement, on fair reading these are merely legal

5   conclusions resting on the prior allegations.")). Generalized statements about "agreements are

6   insufficient to state a plausible claim for relief." *MedioStream, Inc. v. Microsoft Corp*., 869 F.

7   Supp. 2d 1095, 1103 (N.D. Cal. 2012).

8   **II.      THE PLAINTIFFS' COMPLAINTS FAIL TO STATE A CLAIM UNDER**

9   **        *TWOMBLY* AND *IQBAL***

10          As demonstrated below, both Complaints fall short of the standard for pleading an

11  agreement in violation of the Sherman Act. By focusing almost entirely on conduct in Korea, as

12  set forth in the KFTC Order, the Plaintiffs fail to put forth plausible allegations of a conspiracy to

13  fix the prices of Korean Noodles sold in or into the United States. Rather, Plaintiffs' allegations

14  make clear that the implications of the KFTC decision come to a full stop at the Korean border,

15  and that the Complaints otherwise fail to extend the reach of that decision across the Pacific.

16          **A.      The KFTC Order Does Not Support Plaintiffs' Claim That The Defendants**
            **        Fixed Prices For Products Sold In Or Into The United States**

17          Most of Plaintiffs' factual allegations are copied directly from the KFTC Order. *See, e.g.*,

18  DPC ¶¶ 66-166, 216-217; IPC ¶¶ 55–154. The Plaintiffs allege that the factual record in the

19  KFTC Order is expansive: the KFTC Order "included excerpts of *hundreds* of e-mail

20  communications." DPC ¶ 4, IPC ¶ 3 (emphasis added). Yet despite having such a deep well of

21  information to draw from, the Plaintiffs can cite to nothing in the KFTC Order supporting their

22  allegations that any of the defendants discussed - let alone agreed to fix - the price of Korean

23  Noodles sold in or into the United States.[9] The clear inference to be drawn is that there are

24  indeed no facts in the KFTC Order tying the conduct in Korea to the prices of Korean Noodles

25

26  [9] Plaintiffs misrepresent the KFTC Order in an attempt to manufacture a connection between the
    alleged conduct in Korea and the United States, alleging that the KFTC Order identified certain

27  persons (Jun Park, Yong-Hoon Lee) as "participat[ing] in the conspiracy," "named as a
    conspirator in the KFTC Order," or having "a key role in the conspiracy." DPC ¶¶ 21, 73, 113,

28  156-157, 192; IPC ¶¶ 25, 56, 136, 137, 153. But nowhere in the KFTC Order are these persons
    named as having any role in any conspiracy.

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO
- 6 -

sold in the U.S.  Indeed, as Plaintiffs have admitted, the KFTC issued a statement explicitly stating that it uncovered and enjoined the "price-fixing that hurt the *Korean domestic market*" only, and that the "[KFTC] determined that exported products [*e.g.,* products shipped to the United States] were not subject[ed] to price-fixing…."  Transcript (Case No. 13-cv-04148 at ECF 35) at 17:5-8, 16:2-9 and 16:21-22 (emphasis added); *see* Request for Judicial Notice submitted herewith at Exh. A. (KFTC Statement and English translation of same).

Notwithstanding their failure to allege any facts that support an agreement to fix prices for Korean Noodles sold in or into the United States, the Plaintiffs hope the Court will infer that the Korean domestic conspiracy addressed in the KFTC Order likely included the prices of Korean Noodles sold in the United States.  Because the alleged conspiracy that is the subject of the KFTC Order was limited to Korean domestic prices, Plaintiffs' hopes are misplaced.  The existence of the KFTC Order does not cure the Complaints' failure to properly allege facts showing an agreement to fix the price of Korean Noodles sold in the United States.  *See In re Elevator Antitrust Litig*., 502 F.3d 47, 50-52 (2d Cir. 2007) (failure to allege facts showing how foreign conduct was linked to actions of affiliates in distinct U.S. market).

Even if a U.S. agency had investigated Korean Noodle prices in the United States – and there has been no such investigation – the Plaintiffs would still need to properly plead facts showing an agreement to fix prices for noodles sold in the United States.  Mere reference to an agency investigation or order, foreign or domestic, does not satisfy the Plaintiffs' pleading burden.  *See In re Tableware Antitrust Litig.,* 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) (complaint's reference to a government investigation does not satisfy the notice requirements of Rule 8, or a plaintiff's obligations under Rule 11); *In re Hawaiian & Guamanian Cabotage Antitrust Litig*., 647 F. Supp. 2d 1250, 1256-60 (W.D. Wash. 2009) (dismissal of complaint that alleged harm in a market based on a Department of Justice investigation of conduct by some of the defendants in a separate geographic market).  In any event, even if the Plaintiffs could somehow rely on a decision of a foreign tribunal in support of their claims, the fact remains, as Plaintiffs have admitted, that the KFTC has made clear in its public statement that its decision in

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO
- 7 -

1   no way addresses the Defendants' pricing practices outside of Korea.  *See* Exhibit A to the

2   Defendants' Request for Judicial Notice.

3       Indeed, it is worth noting that the noodles sold in Korea that were the subject of the KFTC

4   Order could not even be sold in the United States.  The different laws applicable to the Korean

5   market and the U.S. market require differences in the products sold in the two nations.  This

6   includes laws on packaging (*e.g.*, food labeling regulations) and laws on ingredients (*e.g.,*

7   regulations on food additives).[10]  The U.S. laws on packaging and ingredients mean that Korean

8   Noodles sold in the United States are different from those sold in Korea, making Plaintiffs'

9   reliance on the KFTC Order as a basis for an antitrust violation in the United States even less

10  plausible.

11      **B.      The Plaintiffs Fail To Otherwise Allege That The Defendants Agreed To Fix**
           **U.S. Prices**
12

13      The Plaintiffs' remaining allegations also fail to stretch the price fixing alleged in the

14  KFTC Order into an adequately pled conspiracy to fix U.S. prices.  Notably, the Complaints are

15  conspicuously lacking any specific allegations that are required for Section 1 price-fixing claims

16  regarding the key element of such claims:  an agreement to fix prices in a market that causes harm

17  to U.S. customers.  Rather than alleging specifically who, what, when, where and how

18  Defendants agreed to fix U.S. prices, the Complaints merely make references to generic

19  "Defendants" and assert that the "Defendants" "agreed to a specific protocol" to be followed in

20

21  ─────────────────────
    [10] Federal law, the USDA, and the FDA, as well as language differences, require differences in
22  ingredients, packaging, and labeling of Korean Noodles destined for sale in the U.S.  For
    example, products sold in the United States must adhere to the requirements of, *inter alia*, the
23  Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., the Fair Packaging and
    Labeling Act, 15 U.S.C. § 1451 et seq.; 16 C.F.R. Parts 500-503, and regulations of the U.S.
24  Department of Health and Human Services, Food and Drug Administration ("FDA") specifying
    nutritional labeling and product naming, 21 C.F.R. Parts 101-102, including with respect to
25  labeling and U.S. measurement requirements (*see* 21 C.F.R. §§ 101.9, 101.22); and style of
    information, such as the size, prominence and conspicuousness of the food label (see 21 C.F.R.
26  §§ 101.1, 101.15(a), (c)(1)); listing of certain food allergens (21 U.S.C. § 343(w).  In addition,
    Korean Noodles products containing meat, poultry, and egg products must comply with
27  Department of Agriculture regulations and the Federal Meat Inspection Act (21 U.S.C. §§ 601 et
    seq.), the Poultry Products Inspection Act (21 U.S.C. §§ 451 et seq.), and the Egg Products
28  Inspection Act (21 U.S.C. §§ 1031 et seq.).

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO

- 8 -

1   which one defendant would raise prices followed by price increases from other defendants.  DPC

2   ¶¶ 3, 66-74; IPC ¶¶ 2, 54-62.

3          Rather than allege any specific details regarding the alleged agreement to fix U.S. prices,

4   the Plaintiffs *seem to be* alleging – Defendants can't say with any confidence – that the Korean

5   Defendants conspired to cause their U.S. controlled subsidiaries to follow Nongshim U.S.'s price

6   changes, and that Nongshim would follow the price changes of the Korean Defendants.  In

7   addition to the fact that this conspiracy theory is not alleged with any of the specific facts required

8   of antitrust plaintiffs, this claim suffers from at least two other fatal failings.  First, of the four

9   Korean Defendants, only two are alleged to and do own and control U.S. subsidiaries.  Second,

10  and as also demonstrated below, the types of allegations on which Plaintiffs rely to support this

11  theory have been soundly rejected by the courts as inadequate under Rule 8 and *Twombly*.  These

12  allegations include those relating to:  (i) Plaintiffs' correlation allegations; (ii) Plaintiffs'

13  allegations of parallel pricing; and (iii) Plaintiffs' allegations regarding the corporate relationships

14  between the Korean and U.S. Defendants.

15              **1.      Plaintiffs' Correlation Allegations do not Support Plaintiffs' Claims**
                          **that the Defendants Fixed U.S. Prices**

16

17          The Plaintiffs first attempt to create the illusion of a U.S. conspiracy to fix prices of

18  Korean Noodles through allegations that the prices charged by the Defendants in the United

19  States "correlate" with the prices charged in Korea.  *See* DPC ¶ 175 ("Nongshim America's U.S.

20  price increases, correlating to the price increases in Korea, are reflected in the purchasing records

21  of Plaintiff Plaza and Summit"); ¶ 179 ("Ottogi's U.S. price increases, correlating to the price

22  increases in Korea, are reflected in the purchasing records of Plaintiff Plaza"); ¶ 183 ("Samyang's

23  U.S. price increases, correlating to the price increases in Korea, are reflected in the purchasing

24  records of Plaintiff Plaza").  The Plaintiffs then attempt to buttress their claims by attaching

25  charts as Exhibits to the DPC containing the results of their correlation analysis that purport to

26  support these allegations.  DPC Exhs. B-E.

27

28

As Mark Twain is reported to have said, "facts are stubborn things, but statistics are pliable."[11] The facts are stubborn in this case. Indeed, there is nothing in the Plaintiffs' alleged correlation analysis that suggests a causal link between prices in Korea and prices in the United States. That is because correlation analyses cannot be used to show causation. A correlation analysis merely shows that two or more prices moved in the same general direction over time; it says nothing about what caused the movement. Two products whose prices generally increase over time will always be strongly correlated. *See* Federal Judicial Center, Reference Manual on Scientific Evidence 298, 309-311 (3d ed. 2011) (explaining "spurious correlation"). For example, the price of Korean Noodles sold in the U.S. will be strongly correlated to the price of flour, a major ingredient of them. Yet such a correlation is not, of course, suggestive of a cartel among flour producers. The price of Korean Noodles will also be strongly correlated to the price of cookies sold in the U.S., which are also largely made of flour. *See* ARS, Economic Research Report No. 165, Deconstructing Wheat Price Spikes, iv (U.S.D.A. April 2014) ("wheat is used to make flour, bread products, cookies, cakes, and pasta. . . . [s]o, understanding wheat price spikes is an important step toward understanding food price spikes more generally."). The prices of Korean Noodles sold in the United States and Korea will be strongly correlated to each other simply because both are strongly correlated to the price of flour and other ingredients. The existence of a correlation between the price of Korean Noodles sold in Korea and the price of Korean Noodles sold in the U.S. is not surprising, nor is it probative of anything.[12] *See* Reference

---

[11] *See* DeMaria, Anthony N. Editor's Page: Lies, Damned Lies, and Statistics. 52 J. AMER. COLL. CARDIOLOGY 17, 1430-1431 (2008) (citing The Quotations Page, www.quotationspage.com/quote/27556 (accessed May 11, 2014)); Ian Ayres, Super Crunchers: Why Thinking-By-Numbers is the New Way to be Smart, 86 (2007) (quoted with no citation).

[12] Although the correlations in our examples have a common input – wheat – it is also easy to show a strong correlation between items that are completely unrelated. For example, the U.S. per capita consumption of mozzarella cheese shows a high correlation (0.95) with the number of civil engineering doctorates awarded in the United States; the U.S. per capita consumption of margarine shows a high correlation (0.99) with the divorce rate in Maine; and the money spent on pets in the United States shows a high correlation (0.99) with the number of lawyers in California. But these spurious correlations, like the Plaintiffs' alleged correlations, shed no light on causation. The foregoing examples are based on information from sources such as the U.S. Office of Management and Budget, the U.S. Centers for Disease Control and Prevention, the U.S.

Manual on Scientific Evidence at 264 ("a large correlation coefficient is not enough to warrant causal inference"); *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 885 (10th Cir. 2005) ("correlation does not equal causation"); *Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*, 608 F. Supp. 2d 1166, 1197 (N.D. Cal. 2009) ("correlation is not causation").

Even assuming for this motion that the information in the Exhibits is accurate, which it is not, rather than bolster Plaintiffs' efforts to create the appearance of a U.S. price conspiracy, Plaintiffs' own exhibits further demonstrate the implausibility of their claims. For example, the Plaintiffs in Exhibit B to the DPC attempt to correlate prices of products allegedly sold by Nongshim Co., Ltd., alleged to be in Korea, with the prices of products sold by Nongshim America, Inc., alleged to be in the United States. The supposed correlations between price increases in Korea and the U.S. on 22 products are shown in Exhibit B. The results are summarized as follows, and are shown in detail at the Appendix to this motion:

- For five products, there was a price rise in the U.S. 16 to 18 months after a price rise in Korea.

- For ten products, there was a price rise in the U.S. six to eleven months after a price rise in Korea.

- For seven products, there was a price rise in the U.S. three to five months after a price rise in Korea.

If a price in the United States rose three months after a price rise in Korea, the Plaintiffs claim it was caused by the alleged conspiracy. But if a price in the United States rose 18 months after a price rise in Korea, the Plaintiffs claim that too was caused by the same alleged conspiracy. In other words, Plaintiffs assert that *any and all* price rises in the U.S. fit into their theory of correlation. But such a non-falsifiable theory, in which every event no matter how

Department of Agriculture, the U.S. Census Bureau, the National Science Foundation, and the U.S. Department of Energy. *See* Tyler Vigen, *Spurious Correlation*, *available at* http://www.tylervigen.com (last visited May 19, 2014) cited by Michael Hiltzik, *See some hilarious charts showing that correlation is not causation*, Los Angeles Times (May 12, 2014) , *available at* http://www.latimes.com/business/hiltzik/la-fi-mh-see-correlation-is-not-causation-20140512-column.html; Scott Simon, *Drawing Phony Connections With Mismatched Metrics*, National Public Radio (NPR) (May 17, 2014), *available at* http://www.npr.org/2014/05/17/313343183/drawing-phoney-connections-with-mismatched-metrics.

distant is purported to show correlation, is not science or logic or even common sense.  It is mere conclusory assertion and it fails to make Plaintiffs' claims any more plausible.

### 2. Allegations of Conscious Parallelism Are Insufficient to Infer a Price Fixing Agreement

Plaintiffs devote substantial portions of their Complaints to allegations of seriatim price increases by certain Korean manufacturers of noodles for products sold in the U.S.  *See, e.g.,* DPC ¶ 191 ("The price increases in the United States followed a similar pattern to that in Korea. . . . Nongshim America, for example, would frequently raise prices first, and the three other companies would follow.").  All Plaintiffs have done, however, is allege the unsurprising fact that competitors in an industry often follow each other's price increases.  In antitrust jurisprudence, such conduct is known as "conscious parallelism."

Notably, the limited U.S. pricing data supplied by Plaintiffs in their Complaints does not even support their allegation that the Defendants engaged in parallel pricing.[13]  Even if the Plaintiffs' data supported this contention, the fact remains that the Supreme Court made clear in *Twombly* that "conscious parallelism [is] a common [and lawful] reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions.*"*  550 U.S. at 553-54.  Indeed, *Twombly* was a parallel pricing case in which the Supreme Court held that such allegations are not sufficient to plead an antitrust agreement under Section 1 of the Sherman Act.  "The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Twombly*, 550 U.S. at 554.

---

[13] The first record of Samyang's alleged price increase of SY Ramen 120G 20 pack is more than nine months after the first record of Nongshim America's alleged price increases of its Ramen 20 pack (Shin and Kimchi); the first record of Samyang's alleged price increase of SY Ramen 120Gx5x8 is nearly five months after the first record of Nongshim America's alleged price increase of Shin Ramen (no volume indicated); and the first record of Samyang's alleged price increase of SY Big Bowl is nearly six months after the first record of Nongshim America's alleged price increase of its Bowl Noodles (Shin. Kimchi, and Hot).  *See* DPC Exhs. A, E.

The Ninth Circuit has never permitted the inference of an agreement from mere parallel pricing. "A section 1 violation cannot . . . be inferred from parallel pricing alone, nor from an industry's follow-the-leader pricing strategy." *7-UP Bottling Co. v. Archer Daniels Midland Co. (In re Citric Acid Litig.),* 191 F.3d 1090, 1102 (9th Cir. 1999) (finding identical list prices among competitors and parallel price changes to be insufficient to infer a Section 1 violation); *Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965) (even conscious parallelism of prices is not in itself unlawful, nor is an individual competitor's sole decision to follow price). "[T]hat competitors may see proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or show any sinister domination." *Wilcox v. First Interstate Bank of Oregon, N.A*., 815 F.2d 522, 526 (9th Cir 1987) (quoting *United States v. International Harvester Co*., 274 U.S. 693, 708-09 (1927)).

In sum, Plaintiffs' allegations of conscious parallelism lend no more support to Plaintiffs' claims than does their "correlation analysis." These are simply not the types of allegations that courts credit as raising an inference of collusion "above the speculative level" such that there exists "a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 555.

### 3.      Corporate Affiliation is not Evidence of an Agreement

The Complaints do not allege that the U.S. Defendants were even aware of, much less complicit in, the conduct set out in the KFTC Order. The Complaints make passing allegations about the corporate relationships between the Korean and U.S. Defendants in a further effort to foster the illusion of a claim that the Defendants fixed U.S. prices. Plaintiffs allege, for example, that "[o]n information and belief, the Korean Defendants tightly oversaw the pricing policies of the U.S. Defendants". DPC ¶ 187. The Complaints contain other conclusory allegations inferring that each United States entity is controlled by its Korean parent company, and had knowledge of and participated in the alleged Korean conspiracy. DPC ¶¶ 19, 29 ,34, 187-194; IPC ¶¶ 25, 27-29, 148-161. Setting aside the fact that the Complaints contain no specific allegations supporting the assertion that the U.S. Defendants even knew of an alleged conspiracy in Korea, even when

1   viewed in the most favorable light, the allegations fail to make Plaintiffs' claims any more

2   plausible.

3        First, Plaintiffs allege that only two of the four Korean Defendants have U.S. subsidiaries.

4   DPC ¶¶ 19, 29; IPC ¶¶ 25, 27.  The other two Korean Defendants do not:  Yakult Company, Ltd.

5   is alleged to have distributed into the United States, but does not have a U.S. subsidiary; while

6   Sam Yang (U.S.A.), Inc. is alleged to have been under the direction and control of Samyang

7   Goods Company, Ltd. based on "[a]n entry on yellowpages.com," but the IPC then correctly

8   notes that Sam Yang (U.S.A.) Inc. is not owned by Samyang Foods Company., Ltd.  DPC ¶¶ 34,

9   37; IPC ¶¶ 23, 29, 29 n.5, 148.[14]  Thus, the Plaintiffs' misplaced theory that the U.S. subsidiaries

10  became co-conspirators by virtue of their corporate structure is even less plausible since only two

11  of the four Korean Defendants have a U.S. subsidiary.

12       Second, it is simply not enough for the Plaintiffs to allege facts regarding a related

13  corporate entity and group entities together as generic "Defendants."  *See, e.g.*, DPC ¶¶ 1 n.1, 66-

14  70; IPC ¶¶ 47, 50, 54-55, 57-59.  Lumping U.S. and foreign corporate entities together as a single

15  defendant fails to provide proper notice to the defendants.  The Complaints must satisfy Rule 8's

16  pleading requirements with respect to each and every named defendant.  *See Brennan v. Concord*

17  *EFS, Inc.*, 369 F. Supp. 2d 1127, 1136-37 (N.D. Cal. 2005) (dismissing antitrust complaint based

18  on failure to provide particularized allegations as to the role that two companies had in an alleged

19  conspiracy other than that they were parent companies of another defendant); *In re Sagent Tech.*

20  *Derivative Litig.,* 278 F. Supp. 2d 1079, 1094-95 (N.D. Cal. 2003) (dismissing complaint that

21  "lump[ed]" defendants together without alleging which defendant was responsible for which

22  wrongful acts and noting that such pleading fails to give defendants "fair notice" of the claims

23  against them).  Plaintiffs' generalized allegations as to "Korean Defendants" and "U.S.

24  Defendants" similarly fail to meet federal pleading requirements.  *See, e.g.*, DPC ¶¶ 1 n.1, 4-5,

25  67-69, 75, 81, 89, 164, 168-69, 173, 187-94; IPC ¶¶ 2-4, 24, 30, 54-59, 63, 69, 140, 149-49, 151-

26

---

27  [14] Furthermore, the entry on yellowpages.com currently reflects correct information about Sam
    Yang (U.S.A.), Inc. being a privately owned company unaffiliated with Samyang Foods

28  Company, Ltd., making Plaintiffs' allegations in reliance of the entry on yellowpages.com
    untenable.

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO

- 14 -

54, 156, 164, 190 (using "Korean Defendants" and "Subsidiary/Affiliate Defendants").  Plaintiffs do not "provide each Defendant with fair notice" when they make these generalized allegations.  *Lyshorn v. J.P. Morgan Chase Bank, N.A.*, 2013 U.S. Dist. LEXIS 82062, 10-11 (N.D. Cal. 2013).  Grouping all Korean corporate entities together "is insufficient to put specific defendants on notice of the claims against them."  *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (general allegations as to "Japanese defendants" insufficient to meet pleading requirements); *Jung v. Assoc. of Amer. Med. Coll.*, 300 F. Supp. 2d 119, 158, 163-64 (D.D.C. 2004) ("at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it" and thus "plaintiffs are not relieved from alleging that each individual defendant joined the conspiracy and played some role in it.").

Finally, alleging a corporate relationship between Korean parent companies and their U.S. subsidiaries selling similar products does not cure this defect in the Complaints.  It is black letter law that "the mere fact that there exists a parent-subsidiary relationship between two corporations" does not "make the one liable for the torts of its affiliate."  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quoting 1 W. Fletcher, Cyclopedia of Law of Private Corporations § 33, p. 568 (rev. ed. 1990)).  Thus, a company cannot be liable for antitrust violations simply because another member of the same corporate family is alleged to have committed such violations.  *See, e.g.*, *RSM Prod. Co. v. Petroleos De Venezuela Societa Anonima (PDVSA)*, 338 F. Supp. 2d 1208, 1210, 1216 (D. Colo. 2004) (dismissing Sherman Act claims against subsidiary corporation because complaint alleged only that subsidiary CITGO was "the wholly owned U.S. marketing arm of PDVSA" and did "not contain any allegations of fact that would, if true, subject CITGO to liability under the Sherman Act or on any other basis[]"); *MCI Telecom. Corp. v. Graphnet, Inc.*, 881 F. Supp. 126, 131 (D.N.J. 1995) (dismissing antitrust claim against corporate subsidiary because plaintiff did not allege that the subsidiary itself, rather than another member of the same corporate family, violated the Sherman Act).

Relying on a corporate relationship to substitute for factual allegations is improper.  It constitutes nothing more than a factually unsupported legal conclusion that U.S. corporations participated in a conspiracy through their corporate status.  *See, e.g.*, *In re Cal. Title Ins. Antitrust*

*Litig.*, 2009 U.S. Dist. LEXIS 43323, 20-21 (N.D. Cal. May 21, 2009) (dismissing complaint for failure to plead more than an agency relationship between parent and subsidiary corporations); *see also Invamed, Inc. v. Barr Laboratories, Inc.*, 22 F. Supp. 2d 210, 219-220 (S.D.N.Y. 1998) (corporate affiliation alone insufficient to sustain Sherman Act claim).  Alleging a parent-subsidiary relationship is not enough to state a claim against a subsidiary.  The evidence of corporate affiliation therefore does not create an inference that any price fixing in Korea extended to the U.S., and certainly is not sufficient to state a claim against the U.S. Defendants.

### C.   The Plaintiffs' Allegations As To Each Defendant Regarding A U.S. Conspiracy Further Highlight The Inadequacies Of The Complaints

As demonstrated above, the Complaints must satisfy Rule 8's pleading requirements with respect to each and every named defendant.  See *Brennan* 369 F. Supp. 2d at 1136-37; *In re Sagent Tech.* 278 F. Supp. 2d at 1094-95.  The Complaints must be carefully scrutinized to determine whether they appropriately allege the facts necessary to show each defendant's involvement in the alleged conspiracy.  See, e.g., *In re: TFT-LCD (Flat Panel)* 586 F. Supp. 2d at 1116-17 (finding that the complaint did not adequately plead each defendant's role in the conspiracy); see also *Ashcroft v. Iqbal,* 556 U.S. 662, 682-83 (2009).  Vague references to "defendants" as a whole without specific factual allegations to the individual named defendants are insufficient to allege an antitrust conspiracy claim.  See, e.g., *In re: Refrigerant Compressors Antitrust Litig.*, No. 09-2042, 2012 WL 2114997, at *2 (E.D. Mich. June 11, 2012).  Even a cursory review of the Complaints, however, reveals that the specific "allegations" as to each Defendant relating to a price-fixing conspiracy in the United States are woefully inadequate and further demonstrates the Plaintiffs' failings.

### 1.   The Specific Allegations Against Nongshim Are Inadequate

Plaintiffs do not sufficiently plead facts stating a Sherman Act claim against Nongshim Co., Ltd. or Nongshim America, Inc.  Plaintiffs merely allege that "prices of Nongshim Korean Noodles were *expected* to increase and/or did increase in the United States shortly following price increases in Korea" (DPC ¶ 174 (emphasis added); *see also*  IPC ¶ 154), and that Nongshim America, Inc.'s prices correlated to the "price increases in Korea."  (DPC ¶ 175; DPC Exhs. A

and B).  Plaintiffs fail to allege any plausible facts that if proven would establish that Nongshim Co., Ltd., or Nongshim America, Inc. *agreed* with their competitors to increase the price of Korean Noodles sold in the United States – despite repeated and insufficient conclusory statements throughout the complaint.  *See, e.g.,* DPC ¶ 66 ("Defendants each agreed to a specific protocol that would be followed.").  In addition, the correlation allegations put forth by the Plaintiffs, as explained above in Part II.B.1, far from showing any causal connection, only allege something that would similarly correlate to any wheat-related price increase – or indeed any increasing numbers about anything anywhere – a truly conclusory allegation.  Plaintiffs' own allegations of fact in support of their correlation theory further show that Plaintiffs' claims are implausible.  *See* Appendix to this Motion.  Plaintiffs' attempt to reference news articles discussing price increases does not bridge the gap between the alleged price increases and the lack of alleged facts that if proven would establish *an agreement to increase prices in the United States.  See, e.g.,* DPC ¶ 146; IPC ¶ 154.  Finally, as explained above in Part II.B.3, the allegation of corporate affiliation – that Nongshim America is a wholly-owned subsidiary of Nongshim, Co., Ltd. (DPC ¶ 19; IPC ¶ 25) – simply does not establish that any price-fixing in Korea extended to the United States.

### 2.    The Specific Allegations Against Ottogi Are Inadequate

Plaintiffs also fail to sufficiently plead that Ottogi Co., Ltd. and Ottogi America, Inc. agreed to fix prices for Korean Noodles sold in the United States.  While Plaintiffs allege that "prices of Ottogi Korean Noodles were *expected* to increase in the United States shortly following price increases in Korea" (DPC ¶ 178, emphasis added), and that "Ottogi America . . . [was] also *likely* to increase the price for their Korean Noodles they ship from Korea to the United States," (DPC ¶ 102, emphasis added), Plaintiffs fail to allege (except in conclusory terms) that Ottogi Company, Ltd. or Ottogi America, Inc. *agreed* with their competitors to increase the price of noodles sold in the United States.  Plaintiffs' reference to articles reporting or speculating on increased prices do not close this gap between alleged price increases and an *agreement* to increase prices in the United States.  *See, e.g.,* DPC ¶ 163; IPC ¶ 154.  And, as set forth above, the allegation of corporate affiliation – that Ottogi America is "a wholly owned and controlled

subsidiary of Ottogi, Co., Ltd." (DPC ¶ 29) – simply does not establish that any price-fixing in Korea extended to the United States.

### 3.   The Specific Allegations Against Samyang Korea Are Inadequate

Plaintiffs also fail to sufficiently plead that Samyang Korea agreed to fix prices for Korean Noodles sold in the United States.  While Plaintiffs allege that "prices of Samyang Korean Noodles were *expected* to increase in the United States shortly following price increases in Korea" (DPC ¶ 182, emphasis added), and that "Sam Yang USA . . . [was] also *likely* to increase the price for their [Samyang Korea's] Korean Noodles they ship from Korea to the United States," (DPC ¶ 102, emphasis added), Plaintiffs fail to allege (except in conclusory terms) that Samyang Korea *agreed* with its competitors to increase the price of Korean Noodles sold in the United States.  Further, Plaintiffs similarly fail to plead that Samyang Korea agreed with Sam Yang USA to increase U.S. pricing for the noodles that Samyang Korea sold to Sam Yang USA for resale in the U.S.  Plaintiffs' reference to articles reporting or speculating on increased prices do not close this gap between alleged price increases and an *agreement* to increase prices in the United States.  *See, e.g.,* DPC ¶ 163; IPC ¶ 154.  And, as set forth above, the conclusory allegation that Sam Yang USA is "under the direction and control of" Samyang Korea (DPC ¶ 34) is contrary to the admitted fact that Samyang Korea does not own Sam Yang USA (DPC ¶¶ 34, 37; IPC ¶¶ 23, 29, 29 n.5, 148) and does nothing to establish that Samyang Korea agreed with anyone to fix prices for Korean noodles sold in the U.S.

### 4.   The Specific Allegations Against Sam Yang (U.S.A.), Inc. Are Inadequate.

Plaintiffs also fail to plead sufficiently that Sam Yang (U.S.A.), Inc. agreed to fix prices for Korean noodles sold in the United States.  The only allegations asserted in the IPC against Sam Yang (U.S.A.), Inc. are that "Sam Yang USA imported and distributed Samyang's Korean Ramen Noodle Products in the United States," and two citations to Korean newspaper articles written by unidentified columnists – the first article stating that Sam Yang (U.S.A.), Inc. had raised the price for one ramen product in February 2004 and was planning on raising the price for another ramen product in July 2005, and the second article completely speculating with no

1    support or justification that Sam Yang (U.S.A.), Inc. would be raising the prices of their products.

2    IPC ¶¶ 29, 154.  The DPC similarly alleges that "Sam Yang (USA) sells and distributes Samyang

3    Foods Co., Ltd.'s Korean Noodles throughout the United States," refers to vague articles

4    mentioning that prices of ramen products were expected to increase, and then alleges that

5    "Samyang USA stated, 'There is a lot of pressure because the price for the main ingredients

6    including flour and oil increased, and the exchange rate dropped…. The impact of the ramen

7    price increase by 8% in early March in Korea will reach the U.S. around July.'"  DPC ¶¶ 34, 102,

8    127, 182, 210.  Direct Purchaser Plaintiffs then allege that since the same reason was given by

9    Nongshim America and Sam Yang (U.S.A.) Inc. for a price increase of ramen products in the

10   United States, namely that the price of raw materials that are used to make ramen products

11   increased, this indicates a conspiracy existed.  DPC ¶ 189.

12        The allegations in the Complaints fall well short of showing that Sam Yang (U.S.A.), Inc.

13   *agreed* with its competitors to increase the price of Korean Noodles sold in the United States.

14   Indeed, articles written by third parties speculating about possible price increases do not come

15   close to showing a price-fixing conspiracy existed, nor do similar statements made by two

16   companies regarding the price of goods.  If Blackberry and Motorola both release statements that

17   an increase in the price of semiconductors will cause the price of cell phones to increase, this does

18   not even remotely suggest that a price-fixing conspiracy exists between the two companies.

19   Furthermore, as the Complaints correctly allege, Sam Yang (U.S.A.), Inc. is simply a distributor

20   of goods and nothing more.  Plaintiffs clearly fail to allege sufficient facts that could support a

21   finding of a conspiracy against Sam Yang (U.S.A.), Inc.

22              **5.      The Specific Allegations Against Yakult are Inadequate**

23        Plaintiffs fail to plead sufficiently that Korea Yakult agreed to fix prices for Korean

24   noodles sold in the United States for a period spanning nearly a decade.  Indeed, the *only* specific

25   allegation as to Korea Yakult's participation in the alleged conspiracy to fix U.S. prices is an

26   allegation that:

27        Korea Yakult, doing business as Paldo America, sold Korean Noodles directly in
28        the United States.  As alleged in ¶¶ 102, 146, and 163 herein, the prices of Korea

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

- 19 -

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO

Yakult Korean Noodles  *were expected to increase  in the United States* shortly following price increases in Korea.

DPC ¶ 186.  Paragraphs  102, 146 and 163 do no more than reference Korean newspaper articles speculating that the prices in the U.S. were *expected*  to increase due to price increases in Korea. It would be difficult to conceive of allegations that fell further short of satisfying a plaintiff's pleading burden under *Twombly* and *Iqbal.*

### D.   Conclusion:  The Plaintiffs' Have Failed To Properly Allege A Conspiracy By The Defendants To Fix Prices In The U.S.

In sum, and as amply demonstrated above, the Plaintiffs' heavy reliance on the KFTC's decision is misplaced:  it simply does not even *suggest* that the Defendants agreed to fix the prices of Korean Noodles sold in the U.S., let alone provide the foundation for such a claim.  Nor do Plaintiffs' other strained efforts to create the illusion of a conspiracy to fix U.S. prices satisfy their pleading burdens.  The Supreme Court and the Ninth Circuit have made clear that efforts to satisfy Rule 8 in an antitrust case with vague allegations and innuendo can no longer carry the day.  These conclusory allegations do not remotely satisfy Plaintiffs' burden of alleging the who, what, when, where and how of the alleged conspiracy.  *See Twombly,* 550 U.S. at 565  n.10 (allegation of agreement without "specific time, place, or person involved in the alleged conspirac[y]" is not sufficient).

Yet, this is all Plaintiffs have done, and they have fallen far short of filing complaints that warrant subjecting the Defendants to the extraordinarily costly and burdensome demands of antitrust discovery.

### III.   THE COMPLAINTS FAIL TO ALLEGE A VIOLATION WITHIN THE STATUTE OF LIMITATIONS

Claims under the Sherman Act are subject to a four-year statute of limitations.  15 U.S.C. §15b.  Because the Plaintiffs filed the Complaint on July 22, 2013, absent tolling of the statute of limitations, their claims must be limited to injuries suffered on or after July 22, 2009.  *Hennegan v. Pacifico Creative Serv. Inc.*, 787 F.2d 1299, 1300 (9th Cir. 1986) ("A civil cause of action under the [antitrust laws] arises at each time the plaintiff's interest is invaded to his damage, and the statute of limitations begins to run at that time.").  So even if the Plaintiffs had properly

pleaded a violation, which they have not, their recovery would be limited to injuries suffered after July 21, 2009.  Instead, they allege the last conspiratorial act (which related to prices in Korea) occurred in March 2008, sixteen months before the statutory period.  DPC ¶¶ 164-67; IPC ¶¶ 140-43.  Since the Complaints allege no injuries within the statutory period, they are time-barred, unless the statute of limitations is tolled.

Recognizing their statute of limitations problem, the Plaintiffs allege that fraudulent concealment of the alleged price-fixing conspiracy by the Defendants tolled the statute of limitations until the KFTC publicly issued its order and findings on July 12, 2012. DPC ¶ 221; IPC ¶ 169).  Fraudulent concealment implies conduct "affirmatively directed at deflecting litigation." *Grimmett v. Brown*, 75 F.3d 506, 515 (9th Cir. 1996) (quoting *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 220, 218-19 (4th Cir. 1987)).  Plaintiffs have a burden of alleging affirmative conduct "above and beyond the wrongdoing upon which the Plaintiffs' claim is filed." *Guerrero v. Gates*, 442 F.3d 697, 706 (9th Cir. 2006).  Moreover, since fraudulent concealment is based on fraud, the heightened pleading standard of Rule 9(b) applies. *In re Korean Air Lines Co. Antitrust Litig.*, 2008 U.S. Dist. LEXIS 111722, 37-39 (C.D. Cal. Jun. 25, 2008).  Therefore, to properly allege fraudulent concealment, Plaintiffs must plead, with particularity, "facts showing that [defendants] actively misled [them], [and] that [they] had neither actual nor constructive knowledge of the facts constituting [their] claim for relief despite [their] diligence in trying to discover the pertinent facts." *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 249-50 (9th Cir. 1978).

Plaintiffs fail to allege any instances of the Defendants affirmatively attempting to hide their alleged conduct, so the Plaintiffs attempt to fashion fraudulent concealment out of statements made in the ordinary course of business.  The Complaints allege statements made by Nongshim Co., Ltd., regarding "main ingredient cost increases" (DPC ¶ 201; IPC ¶ 164) and "cost increases of new material development."  DPC ¶ 211; IPC ¶ 164.  But nowhere in the Complaints do Plaintiffs allege facts showing that such statements regarding Defendants' rising costs are untrue.  Indeed, the Complaints admit that input costs of Korean Noodles in fact

1   increased.  DPC ¶ 216; IPC ¶ 165.  Thus on the face of the Complaints, there is no reason to think

2   that statements made by the Defendants regarding cost increases are false or fraudulent.

3       Undeterred by the lack of affirmative efforts by the Defendants to conceal their alleged

4   conduct, the Plaintiffs have suggested that the alleged conspiracy was "self-concealing."  DPC ¶

5   219; IPC ¶ 167.  But the law requires more than simply labeling the alleged conspiracy as "self-

6   concealing" to satisfy the requirements of fraudulent concealment.  *Conmar Corp. v. Mitsui &*

7   *Co., Inc.*, 858 F.2d 499, 505 (9th Cir. 1988); see also *Advanced Micro Devices, Inc. v. Intel.*

8   *Corp.*, 1991 U.S. Dist. LEXIS 21036, 6 (N.D. Cal. Dec. 23, 1991) ("[T]he 'self-concealing'

9   nature of the conduct is not enough to toll the statute of limitations.").

10      Because the Plaintiffs cannot adequately allege fraudulent concealment, their claims are

11  time-barred by the applicable four-year statute of limitations.

12  **IV.    THE COMPLAINTS FAIL TO ESTABLISH SUBJECT MATTER**
        **JURISDICTION OVER THE PLAINTIFFS' CLAIMS**

13

14      As demonstrated above, when stripped of the allegations that cannot be credited by this

15  Court, the Complaints allege nothing more than that the Korean Defendants fixed the prices of

16  Korean Noodles sold into a Korean domestic market.  This claim fails under the *Twombly-Iqbal*

17  pleading standard, and also because the Court lacks jurisdiction over such a claim that alleges, at

18  most, harm to foreign, not U.S. commerce.  In particular, this Court lacks subject matter

19  jurisdiction over Plaintiffs' claims under the Foreign Trade Antitrust Improvements Act (the

20  "FTAIA"), 15 U.S.C. § 6a, because the Complaints do not adequately allege that the alleged

21  conspiracy had a "direct" effect on U.S. commerce.  Alternatively, even assuming that the FTAIA

22  does not apply to Plaintiffs' claims, the Court would still lack subject matter jurisdiction over

23  them under the common law "effects" test because the Complaints do not allege a "substantial

24  effect" on U.S. commerce.  Under either test, the Complaints should be dismissed for lack of

25  subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

26      **A.    Plaintiffs Bear The Burden Of Establishing Subject Matter Jurisdiction**

27      The Plaintiffs have an affirmative obligation to establish subject matter jurisdiction.  *See*

28  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also In re Dynamic*

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO

- 22 -

*Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984 (9th Cir. 2008).  Thus, "[d]ismissal for lack of subject matter jurisdiction is appropriate if the complaint, considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction."  *In re DRAM,* 546 F.3d at 984-85.  The Ninth Circuit has held that the FTAIA is jurisdictional:  "The FTAIA provides the standard for establishing when subject matter jurisdiction exists over a foreign restraint of trade."  *United States v. LSL Biotechnologies*, 379 F.3d 672, 683 (9th Cir. 2004).[15]

### B.     The Purpose And Statutory Framework Of The FTAIA – A Multi-Step Test

Following decades of judicial and international conflict over the Sherman Act's extraterritorial reach, Congress passed the FTAIA in 1982.[16]  The FTAIA establishes a multi-step

---

[15] Other courts, including this court, have questioned whether the reasoning and conclusion of the Ninth Circuit in *LSL Biotechnologies* that the FTAIA is jurisdictional, as opposed to substantive, survives the Supreme Court's decision in *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)*.  See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.,* 822 F. Supp. 2d 953, 959 (N.D. Cal. 2011) ("Although the Court does not lightly disregard the Ninth Circuit's decision in *LSL Biotechnologies*, that decision cannot withstand *Arbaugh*.  The Supreme Court has indicated its strong preference for a 'bright-line' rule to differentiate between provisions that affect the federal courts' subject matter jurisdiction and those that do not . . . .  This Court agrees with the Third Circuit that application of this 'clearly states' test necessitates the finding that the FTAIA does not affect subject matter jurisdiction . . . .").  *Contra In re Static Random Access Memory (SRAM) Antitrust Litig.,* 2010 WL 5477313, at *3 (N.D.Cal., Dec. 31, 2010) ("Because *Arbaugh* did not clearly overrule the Ninth Circuit's treatment of the FTAIA as a jurisdictional statute, and the Ninth Circuit has not found that it did, the Court is obliged to treat the FTAIA as jurisdictional."); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.,* 608 F.Supp.2d 1166, 1185 (N.D.Cal.2009) (treating FTAIA as jurisdictional).  In the event this Court concludes the FTAIA is not jurisdictional, Defendants move in the alternative to dismiss under the FTAIA pursuant to Rule 12(b)(6).

[16] The FTAIA provides as follows:

> Sections 1 to 7 of [the Sherman Act] **shall not apply** to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations **unless**:
>
> (1)   such conduct has a direct, substantial, and reasonably foreseeable effect –
>
> (A)   on trade or commerce which is not trade or commerce with foreign nations [i.e., domestic commerce], or on import trade or import commerce with foreign nations; or

1   test that a court must apply to determine whether it has jurisdiction over claims predicated on

2   conduct involving foreign commerce.  First, the court should determine whether the alleged

3   conduct involves "trade or commerce (other than import trade or commerce) with foreign

4   nations."[17]  Next, if the court determines that the conduct at issue involved "trade or commerce . .

5   . with foreign nations," then it must determine whether the conduct at issue satisfies the FTAIA's

6   two-pronged exception.  *F. Hoffman-LaRoche, Ltd. v. Empagran S.A.*, 542 U.S. 155, 158 (2004).

7   Specifically, the district court lacks jurisdiction over claims arising from foreign trade or

8   commerce unless the conduct at issue (1) has a "direct, substantial, and reasonably foreseeable

9   effect" on U.S. commerce; *and* (2) the effect on U.S. commerce gives rise to the plaintiffs' claim.

10  15 U.S.C. § 6a; *Empagran*, 542 U.S. at 162.  The Supreme Court has recognized that this multi-

11  step test was designed "to clarify, perhaps to limit, but not to expand in any significant way, the

12  Sherman Act's scope as applied to foreign commerce."  *Empagran*, 542 U.S. at 169 (emphasis

13  omitted).

14          The Supreme Court based its decision in part upon principles of "prescriptive comity:"

15  *i.e.,* a rule of statutory construction under which a court is to "construe[ ] ambiguous statutes to

16  avoid unreasonable interference with the sovereign authority of other nations."  542 U.S. at 164.

17  The Court recognized that applying U.S. antitrust laws "to foreign conduct insofar as that conduct

18  causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim….

19  _____

20          (B)   on export trade or export commerce with foreign nations, of a
                  person engaged in such trade or commerce in the United
21                States [i.e. U.S.-based exporter]; **and**

22      (2)   such effect gives rise to a claim under the provisions of [the Sherman
              Act], other than this section.

23      If sections 1 to 7 of this title [*i.e.*, the Sherman Act] apply to such conduct only because of
        the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such
24      conduct only for injury to export business in the United States.  15 U.S.C. § 6a (emphasis
        and explanatory inserts added).

25  [17] 15 U.S.C. § 6a.  As discussed below, if the defendant's conduct involves domestic or import
26  commerce, then the FTAIA would not apply and the conduct would fall within the jurisdictional
    scope of the Sherman Act, subject to the traditional test articulated in *Hartford Fire Ins. Co. v.*
27  *California*, 509 U.S. 764, 796 (1993), which recognized that the Sherman Act applies "to foreign
    conduct that was meant to produce and did in fact produce some substantial effect in the United
28  States."

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO

- 24 -

creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs." *Id.* at 165 (emphasis omitted).  Recognizing that the U.S. antitrust laws can interfere with a foreign nation's interests, the Court concluded that "higher foreign prices … are not the consequence of any domestic anticompetitive conduct *that Congress sought to forbid.*" *Id.* at 165-66 (emphasis in original).

### C.   The FTAIA Applies To The Plaintiffs' Foreign Purchase Claims

#### 1.   The Transactions at Issue Involve Trade or Commerce with Foreign Nations

In *Empagran,* the Supreme Court broadly defined "trade or commerce…with foreign nations" to include export activities, and "other commercial activities taking place abroad."  542 U.S. at 161.  The Court also suggested that the phrase is meant to describe any commerce that is not domestic commerce.  *Id.*  Not surprisingly, all "transactions between foreign and domestic commercial entities" are deemed to fall within the scope of "trade or commerce . . . with foreign nations.  *See Turicentro, S.A. v. Am Airlines, Inc.,* 303 F.3d 293, 301 (3d Cir. 2002).

The transactions at issue clearly involve "trade or commerce… with foreign nations" under this test.  The Complaints plainly allege that the Plaintiffs were harmed by purchasing from the Defendants, including the Korean Defendants, Korean Noodles that were manufactured in Korea.  The alleged conduct clearly alleges "foreign trade or foreign commerce" for purposes of the FTAIA.

#### 2.   The Relevant Transactions do not Involve "Import Trade or Commerce"

Because all of the plaintiffs' purchases clearly "involv[e] trade or commerce… with foreign nations," they are subject to jurisdictional analysis under the FTAIA *unless* they "involve … import trade or import commerce."  15 U.S.C. §6a.  While the Complaints include allegations that the Korean Defendants exported Korean Noodles to the U.S., those allegations do not satisfy the FTAIA's import commerce exception.  Instead, "the relevant inquiry is whether the conduct of the defendants – not the plaintiffs – involves import trade or commerce."  *Kruman v. Christie's Int'l, PLC*, 284 F.3d 384, 395 (2d Cir. 2002), *abrogated on other grounds* in *Empagran*, 594 U.S. at 174.

1    As other courts have observed, the term "involving… import trade or commerce" should

2    be read narrowly so as to give other parts of the statute meaning.  *Turicentro*, 303 F.3d at 304.[18]

3    Thus, in order for the import commerce exception to apply, the defendants' alleged conduct must

4    have been "directed at an import market."  *Kruman*, 284 F.3d at 395 ; *see also Animal Sci. Prods.,*

5    *Inc. v. China Minmentals Corp.,* 654 F.3d 462, 470 (3d Cir. 2011) ("the import trade or

6    commerce exception requires that the defendants' conduct target import goods or services.").

7    As demonstrated above, when the Complaints are stripped of their vague allegations that

8    lack the specificity required for antitrust claims under Rule 8, Plaintiffs are left with nothing other

9    than allegations of a foreign conspiracy to fix the prices of a foreign product sold in a foreign

10   market.  Plaintiffs' failure in this regard is highlighted by the fact that Defendants are left with no

11   idea as to *how,* as Plaintiffs allege, "[t]he unlawful price increases of factory prices in South

12   Korea affected not only prices in Korea, but also prices in the United States."  DPC ¶ 173; *see*

13   IPC ¶ 150.  Thus, for example, Plaintiffs allege – with no supporting factual allegations

14   whatsoever – that the Korean Defendants fixed the prices of Korean Noodles in Korea for export

15   to the United States, and also that the Defendants set the price of the U.S. product in the U.S.

16   *Compare* DPC ¶ 173 ("During the Class Period, the Korean Defendants shipped price-fixed

17   Korean Noodles directly to the U.S. Defendants for resale in this Country") *with* DPC ¶ 190

18   ("The U.S. Defendants further participated in the conspiracy… by raising and otherwise

19   conforming the prices of Korean Noodles in the U.S. to price levels similar to those set

20   collusively in Korea pursuant to and at the direction of the Korean Defendants"); *see also* IPC ¶¶

21   54, 151, 154-56.

22   Under similar circumstances, courts have consistently held that foreign transactions could

23   not involve import trade or import commerce.  For example, in *Kruman*, the Second Circuit held

---

24   [18] In *Turicentro*, the Third Circuit held that an alleged conspiracy among airlines to fix
25   commissions paid to travel agents outside the U.S. did not involve import trade or commerce,
     under the FTAIA, even though those agents were providing booking services for flights to the
26   U.S.  *Turicentro*, 303 F.3d at 303-04.  With respect to the proper construction of the import
     commerce exception, the Third Circuit reasoned that the first prong of the FTAIA exception asks
27   whether the alleged conduct has a "direct, substantial, and reasonably foreseeable" effect on
     "import" commerce.  The Third Circuit thus recognized that to give meaning to the exception, the
28   terms "involving… import trade or commerce" contained in the rule must be read narrowly.  *Id.*

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO

- 26 -

that auction house defendants were not engaged in "import trade or commerce" where they fixed the price of auction services that were sold outside the United States, even where those services were sold to U.S. customers who eventually brought art into the United States. *Kruman,* 284 F.3d at 393. The court found that the case did not "involve import trade or commerce" because "while some of the goods purchased in those auctions may ultimately have been imported by individuals into the United States, the *object of the conspiracy* was the price that the Defendants charged for their auction services, *not any import market* for those goods." *Id.* at 395-96 (emphasis added). Crucial to the Second Circuit's reasoning was the fact that the object of the conspiracy "was directed at controlling the prices [the defendants] charged for their services in *foreign* auctions." *Id.* at 395.[19]

The same reasoning applies here. While Plaintiffs allege that Korean Noodles were sold into the United States, the "object of the [only] conspiracy" that is properly alleged "was the price that the Defendants charged" for Korean Noodles sold in Korea, "*not any import market for those goods.*" *Id.*at 395-96. Under these circumstances, the FTAIA's import commerce exception is inapplicable.

### D. The Court Lacks Subject Matter Jurisdiction Because Plaintiffs Fail To Adequately Allege A "Direct" Effect On U.S. Commerce

Because the Plaintiffs allege conduct that involves *foreign* commerce, this Court lacks jurisdiction over those claims unless plaintiffs have alleged facts sufficient to show *both* (1) that Defendants' conduct had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce; *and* (2) that the domestic effect proximately caused Plaintiffs' injuries. *Empagran*, 542 U.S. at 162.

The Ninth Circuit defines an effect as "direct" for purposes of the FTAIA if it "follows as an immediate consequence of the defendant's activity." *LSL Biotechnologies*, 379 F.3d at 680. The court also cited with approval a dictionary definition (Webster's Third) of "direct":

---

[19] *See also*, *Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, CV-08-42 JG VVP, 2013 WL 6481195 at *25 (E.D.N.Y. Sept. 20, 2013) (rejecting the argument that import commerce was involved even when involving businesses located in the United States when "the object of the alleged conspiracy was to fix the prices of services for shipments between foreign jurisdictions, and did not involve the United States import market.").

1    "proceeding from one point to another in time or space *without deviation or interruption.*" *Id.*

2    (citation omitted) (emphasis added).  The Complaints contain no specific, factual allegations that

3    can be credited by this Court that satisfies Plaintiffs' burden of alleging that higher U.S. prices for

4    Korean Noodles "follow[ed] as an immediate consequence" of the alleged conspiracy in Korea.

5    *Id.*  The Complaints contain at most various vague allegations that the U.S. Defendants

6    participated in the conspiracy by following Nongshim America's price increases.  *See, e.g.,* DPC

7    ¶ 190 ("[t]he U.S. Defendants further participated in the conspiracy, and furthered its objectives,

8    by raising and otherwise conforming the prices of Korean Noodles in the U.S. to price levels

9    similar to those set collusively in Korea pursuant to and at the direction of the Korean

10   Defendants"); DPC ¶ 191 ("Nongshim America… would frequently raise prices first, and the

11   three other companies would follow."); *see* IPC ¶ 54-55.

12        As demonstrated above however, (*see* Part II.B.2), allegations of parallel pricing are

13   insufficient to support a price-fixing claim.  And, in any event, as also demonstrated above, far

14   from supporting Plaintiffs' claims, the data proffered in the Direct Purchaser Plaintiffs'

15   Complaint in support of the "correlation" allegations in fact reflect no clear pattern in the

16   relationship between Korean and U.S. price increases.

17        Moreover, the Ninth Circuit has made clear that for purposes of the FTAIA, "a direct

18   correlation between prices does not establish a sufficient causal relationship."  *In re DRAM,* 546

19   F.3d at 989.  In *DRAM,* the Ninth Circuit rejected a correlation analysis as sufficient to support

20   the conspiracy because "[o]ther actors or forces may have affected the foreign prices."  *Id.* at 988.

21   Specifically, "that the conspiracy had effects in the United States and abroad does not show that

22   the effect in the United States, rather than the overall price-fixing conspiracy itself, proximately

23   caused the effect."  *Id.*  Therefore, the Ninth Circuit upheld the dismissal of the complaint as it

24   did "not set forth a theory with any specificity of how this price-setting occurred or how it shows

25   a direct causal relationship."  *Id.* at 990.  Other courts have reached the same conclusion under

26   analogous circumstances.  *See In re Korean Air Lines Co. Antitrust Litig.,* No. CV 07-01891,

27   2010 WL 3184372 at *1 (C.D. Cal. 2010) ("At best, Plaintiffs' briefing . . . suggests a correlation

28   between higher U.S.-purchase prices and higher Korea-purchase prices.  Such a correlation or

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO
- 28 -

1   interdependence of markets does not suffice to show that the effect in the United States actually

2   gives rise to Plaintiffs' Korea-purchase claims."). *Cf. Animal Sci. Prods., Inc. v. China Nat'l.*

3   *Metals & Minerals Imp. & Exp.t Corp.*, 596 F.Supp.2d 842, 863 (D. N.J., 2008) ("[M]ere ripple

4   effects felt in the United States as a result of anticompetitive conduct abroad are not sufficiently

5   'substantial' to meet FTAIA requirements.").

6        Here, allegations of parallel pricing and a putative "correlation" between Korean and U.S.

7   prices do not – by a long shot – allege that the U.S. prices "follow[ed] as an immediate

8   consequence of the defendant's activity."  The Complaints allege that the U.S. Defendants would

9   "follow" and "conform" their prices to those of Nongshim.  DPC ¶¶ 190-91; *see* IPC ¶ 54-55.  As

10  observed above, the "correlation" data reflects that the U.S. price increases by any one Defendant

11  would occur at vastly different times, both in relation to Korean price increases and as compared

12  to price movements of other U.S. Defendants.  What accounts for this?  The Complaints do not

13  say.  More importantly, however, these allegations do not remotely allege a causal relationship

14  between Korean and U.S. price increases that "proceed[ed] from one point to another in time and

15  space without deviation or interruption."  *LSL Biotechnologies*, 379 F.3d at 680.  In short, the

16  Complaints do not adequately allege that U.S. pricing of Korean Noodles followed as an

17  "immediate consequence of the defendant's activity," and therefore must be dismissed.  *Id.*

18        **E.      Plaintiffs' Claims Also Fail Under The Sherman Act's**
19        **           Common Law Extraterritorial Jurisdiction Test**

20        Even if Plaintiffs could somehow demonstrate that the FTAIA does not apply to their

21  claims, "[t]hat does not mean, however that plaintiffs are home free."  *Minn-Chem, Inc. v.*

22  *Agrium Inc.*, 683 F.3d 845, 855 (7th Cir. 2012) (*en banc*).  The common law for determining

23  whether conduct involving foreign commerce can give rise to a Sherman Act claim still applies

24  when the FTAIA does not.  *Id.*  The same deficiencies which doom Plaintiffs' claims under the

25  FTAIA also prove fatal under the common law as well.

26        The common law "effects test" was driven by the courts' recognition that "the Sherman

27  Act was meant to reach foreign conduct only if it was intended to and did affect United States

28  commerce."  *LSL Biotechnologies*, 379 F.3d at 677 , *citing United States v. Aluminum Co. of Am.*,

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO
- 29 -

148 F.2d 416, 444 (2d Cir. 1945) (L. Hand, J.).  The Supreme Court summarized that test in *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993), observing that "it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce *some substantial effect in the United States*" (emphasis added).  While the FTAIA was not intended to simply codify the effects test, the FTAIA's requirement that conduct involving foreign nations must "have a direct, substantial, and reasonably foreseeable effect" to give rise to a Sherman Act claim was obviously based in significant part on the effects test's "substantial effects" requirement.

For the same reasons that the Complaints do not allege a "direct" effect for purposes of the FTAIA, the Complaints fail to allege that the alleged conspiracy had a "substantial effect" in the United States.  Indeed, as demonstrated above, the Complaints do not fairly allege *any* effects on U.S. commerce, let alone "substantial effects."  In *Dee-K Enter., Inc. v. Heveafil Sdn. Bhd.,* 299 F.3d 281 (4th Cir. 2002), the Fourth Circuit considered claims brought by domestic purchasers of "extruded rubber thread" arising from a price-fixing conspiracy by Asian producers.  Plaintiffs alleged, and a jury eventually found, that the defendants had fixed the prices of extruded rubber thread.  The district court had found that the FTAIA did not apply because the plaintiffs had adequately alleged import commerce.  299 F.3d at 287.  The jury also found, however, that the conspiracy did not have "substantial effects" on U.S. commerce, and the Fourth Circuit affirmed.  In doing so, the court noted that "courts have consistently required a showing of effect on United States commerce even in cases involving price fixing on imports."  299 F.3d at 292.

Therefore, just as they do under the FTAIA, the Complaints fail for the lack of a link between the alleged conduct in Korea and any harm or effects in the United States.  Whether under the domestic injury exception of the FTAIA or the effects test of the common law, the result is the same and the Complaints must be dismissed.

Case3:13-cv-04115-WHO   Document83   Filed06/09/14   Page40 of 44

1

**CONCLUSION**

2    For the reasons discussed above, the Defendants respectfully submit that the Complaints

3 should be dismissed in their entirety.  Plaintiffs fail to allege sufficient facts demonstrating a

4 plausible claim of conspiracy to fix the price of Korean Noodles sold in the United States, fail to

5 allege facts sufficient to show how their claims are not barred by the applicable statute of

6 limitations, and fail to allege a claim within the subject matter jurisdiction of this Court.  For

7 these reasons, and because the Complaints' failings cannot be cured by a third round of drafting,

8 this Court should dismiss Plaintiffs' Complaints with prejudice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Dated:  June 9, 2014                          Respectfully submitted,

2

3  GIBSON, DUNN & CRUTCHER LLP                  SQUIRE PATTON BOGGS (US) LLP

4  By: /s/ Joel S. Sanders_____              By: /s/ Mark C. Dosker_____

5  Joel S. Sanders, CA Bar #107234              Mark C. Dosker, CA Bar #114789
      JSanders@gibsondunn.com                       mark.dosker@squirepb.com
6  Lindsey Blenkhorn Haswell, CA Bar #227484    J. Brady Dugan (admitted pro hac vice)
      Lblenkhorn@gibsondunn.com                     brady.dugan@squirepb.com
7  Minae Yu, SBN 268814                         Anne Choi Goodwin, CA Bar #216244
      MYu@gibsondunn.com                            anne.goodwin@squirepb.com
8  555 Mission Street, Suite 3000               Kate E. Kim (admitted pro hac vice)
   San Francisco, California 94105                  kate.kim@squirepb.com
9  Telephone: (415) 393-8200                    275 Battery Street, Suite 2600
   Facsimile: (415) 374-8458                     San Francisco, California 94111
10 Attorneys for Defendants                      Telephone: (415) 954-0200
   OTTOGI AMERICA, INC. and                      Facsimile: (415) 393-9887
11 OTTOGI COMPANY, LTD.                          Attorneys for Defendants
                                                 NONGSHIM AMERICA, INC. and
12                                               NONGSHIM CO., LTD.

13

14 STEPTOE & JOHNSON LLP                         LAW OFFICES OF MICHAEL K. SUH &
                                                 ASSOCIATES
15 By:  /s/ Edward B. Schwartz__
                                                 By:  /s/ Edward W. Suh_____
16 Edward B. Schwartz (admitted pro hac vice)
      eschwartz@steptoe.com                      Michael K. Suh, CA Bar #213855
17 1330 Connecticut Avenue, N.W.                    Michael@suhnassoclaw.com
   Washington, D.C. 20036                        Edward W. Suh, CA Bar #265356
18 Telephone: (202) 429-6220                        Edward@suhnassoclaw.com
   Facsimile: (202) 429-3902                     3810 Wilshire Boulevard, Suite 1212
19                                               Los Angeles, California 90010
   Seong H. Kim, CA Bar #166604                  Telephone: (213) 385-7347
20    skim@steptoe.com                           Facsimile:  (213) 383-3323
   Matthew D. Taggart, CA Bar #227482            Attorneys for Defendant
21    mtaggart@steptoe.com                       SAM YANG (U.S.A.), INC.
   2121 Avenue of the Stars, Suite 2800
22 Los Angeles, California 90067                 MAYER BROWN LLP
   Telephone: (310) 734-3254
23 Facsimile: (310) 734-3000                     By: /s/ Elizabeth Mann_____
   Attorneys for Defendants
24 PALDO CO., LTD. and                           Elizabeth Mann CA Bar #106524
   KOREA YAKULT CO., LTD.                           Emann@mayerbrown.com
25                                               350 South Grand Avenue
                                                 Los Angeles, California  90071-1803
26                                               Telephone: (213) 229-9574
                                                 Facsimile:  (213) 625-0248
27                                               Attorneys for Defendant
                                                 SAMYANG FOODS CO., LTD.
28

SQUIRE PATTON BOGGS (US)
LLP
275 Battery Street, Suite 2600
San Francisco, California  94111

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 3:13-cv-04115-WHO
- 32 -

**APPENDIX**

| Product | Plaintiffs' Alleged Time between Price Increase in Korea and Price Increase in the United States | Citation in the Record of Case No. 3:13-cv-04115-WHO |
|---|---|---|
| Nongshim Neoguri 20 Pk | 18 months | Dkt 61-1 at page 12 of 24 |
| Nongshim Bowl Noodle (Hot) 12/86g | 18 months | Dkt 61-1 at page 22 of 24 |
| Nongshim Bowl Noodle (Kimchi) 12/86g | 17 months | Dkt 61-1 at page 18 of 24 |
| Nongshim Shin Ramen 20 Pk | 16 months | Dkt 61-1 at page 4 of 24 |
| Nongshim Kimchi Ramen 20 Pk | 16 months | Dkt 61-1 at page 8 of 24 |
| Nongshim Bowl Noodle (Kimchi) 12/86g | 11 months | Dkt 61-1 at page 20 of 24 |
| Nongshim Neoguri 20 Pk | >10 months | Dkt 61-1 at page 11 of 24 |
| Nongshim Shin Ramen 20 Pk | 9 months (with a price *decrease* in the United States during part of that time) | Dkt 61-1 at page 3 of 24 |
| Nongshim Bowl Noodle (Hot) 12/86g | 8 months | Dkt 61-1 at page 21 of 24 |
| Nongshim Bowl Noodle (Kimchi) 12/86 | 8 months | Dkt 61-1 at page 17 of 24 |
| Nongshim Shin Ramen 20 Pk | 7 months | Dkt 61-1 at page 5 of 24 |
| Nongshim Neoguri 20 Pk | 7 months | Dkt 61-1 at page 13 of 24 |
| Nongshim Kimchi Ramen 20 Pk | 7 months, consisting of a small increase after 3 months followed by a much larger second increase 4 months later | Dkt 61-1 at page 7 of 24 |
| Nongshim Kimchi Ramen 20 Pk | 6 months | Dkt 61-1 at page 10 of 24 |
| Nongshim Neoguri 20 Pk | 6 months | Dkt 61-1 at page 14 of 24 |
| Nongshim Bowl Noodle (Shin) 12/86g | 5 months | Dkt 61-1 at page 16 of 24 |
| Nongshim Kimchi Ramen 20 Pk | 4 months | Dkt 61-1 at page 9 of 24 |

| Nongshim Bowl Noodle (Shin) 12/86g | 4 months | Dkt 61-1 at page 15 of 24 |
|---|---|---|
| Nongshim Bowl Noodle (Hot) 12/86g | 4 months | Dkt 61-1 at page 24 of 24 |
| Nongshim Shin Ramen 20 Pk | 3 months | Dkt 61-1 at page 6 of 24 |
| Nongshim Bowl Noodle (Kimchi) 12/86g | 3 months | Dkt 61-1 at page 19 of 24 |
| Nongshim Bowl Noodle (Hot) 12/86g | 3 months | Dkt 61-1 at page 23 of 24 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTESTATION**

I hereby attest that I have on file written authorization for any signatures indicated by a "conformed" signature (/s/) within this e-filed document.

/s/  Mark C. Dosker
Mark C. Dosker