1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable William H. Orrick, Judge

4   PITCO FOODS,                    )
                                    )
5          Plaintiff,               )
                                    )
6   vs.                             )      No. C 13-04148-WHO
                                    )
7   NONG SHIM COMPANY, LTD,         )
    et al.,                         )
8                                   )
           Defendants.              )
9   _____)

10                                  San Francisco, California
                                    Monday, February 3, 2014
11
    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
12  _____RECORDING_____

13

    APPEARANCES:
14

15  For Plaintiff:
                                    Glancy, Binkow & Goldberg, LLP
                                    One Embarcadero Center
16                                  Suite 760
                                    San Francisco, California
17                                    94111
                          BY:   LEE ALBERT, ESQ.
18
                                    Hausfeld, LLP
19                                  44 Montgomery Street
                                    Suite 3400
20                                  San Francisco, California
                                      94104
21                        BY:   MICHAEL HAUSFELD, ESQ.
                                    CHRISTOPHER L. LEBSOCK, ESQ.
22
    Transcribed by:                 Echo Reporting, Inc.
23                                  Contracted Court Reporter/
                                      Transcriber
24                                  echoreporting@yahoo.com

25         (APPEARANCES CONTINUED ON FOLLOWING PAGE)

2

1   <u>APPEARANCES</u>:   (CONTINUED)

2   For Plaintiff:

                              Gold, Bennett, Cera & Sidener
3                             595 Market Street
                              Suite 2300
4                             San Francisco, California
                                94105
5                             (415) 777-2230
                         BY:  SOLOMON B. CERA, ESQ.
6
                              Lowey, Dannenberg, Cohen &
7                               Hart, PC
                              One North Broadway
8                             Suite 509
                              White Plains, New York  10601
9                        BY:  BARBARA J. HART, ESQ.
                              SUNG-MIN LEE, ESQ.
10
                              Cotchett, Pitre & McCarthy
11                              LLP
                              840 Malcolm Road, Suite 200
12                            Burlingame, California  94010
                         BY:  STEVEN NOEL WILLIAMS, ESQ.
13
                              Freed, Kanner, London &
14                              Millen, LLC
                              2201 Waukegan Road, Suite 130
15                            Bannockburn, Illinois
                                60015
16                            (224) 632-4500
                         BY:  STEVEN A. KANNER, ESQ.
17
                              Saveri & Saveri, Inc.
18                            706 Sansome Street
                              San Francisco, California
19                              94111
                         BY:  RICHARD ALEXANDER SAVERI, ESQ.
20
     For Defendants:          Gibson Dunn
21                            555 Mission Street
                              Suite 3000
22                            San Francisco, California
                                94105
23                            (415) 393-8268
                         BY:  JOEL SANDERS, ESQ.
24

25

3

1  <u>Monday, February 3, 2014</u>                                    <u>9:03 a.m.</u>

2                      P-R-O-C-E-E-D-I-N-G-S

3                           --oOo--

4          THE CLERK:  Calling civil matter 13-4148, Pitco

5  Foods versus Nong Shim Company, Ltd and associated cases.

6          THE COURT:  So welcome everybody.  Let me tell you

7  what I've gleaned from the papers, and then we'll go --

8  we'll let everybody make a little pitch.

9      First thing is, I'm not going to be able to

10 differentiate between the firms on the basis of the quality

11 of representation.  So I don't need to hear you tell me how

12 terrific your firms are, how many cases you've handled

13 because you're all great lawyers from great firms.  That's

14 not an issue for me.

15     The second thing is that nobody really talked about how

16 thorough you'd be at keeping your costs down and not doing

17 duplicative work and providing at the end of the day

18 complete records for your fee request without block billing.

19 All those things are important.  I'm just saying them at the

20 outset of the case so that there aren't any surprises at the

21 end.

22     So with respect to the firms, this is what I've seen

23 from the papers.  One is that Hausfeld and Glancy, Binkow &

24 Goldberg filed the first case two months before the others.

25 They've done a motion for class cert, obtained an expert

1 report, done multiple motions to dismiss, procured the

2 Korean fair trade opinion.  They've put in 115,000 bucks and

3 some costs.  They've got a Korean firm associated with them.

4 　　　　Lowey, Dannenberg and Gold, Bennett have five cases

5 that they represent.  They've done a database of probative

6 evidence, done an analysis of pricing information and

7 e-mails, retained an economic expert and worked with the

8 parties, put the stip together.

9 　　　　And then Freed Kanner and Saveri have three cases, $5

10 million in products, have experience with the Asian Food

11 Trade Association, litigation experience in Asia.

12 　　　　So what I'm interested in hearing from everybody is why

13 these facts or any others really matter in the determination

14 that I need to make, which I intend to make today.  So --

15 but not in this hearing.

16 　　　　So why don't we start with the folks who filed the

17 first case, Hausfeld.

18 　　　　　　MR. ALBERT:  Good morning, your Honor.  My name is

19 Lee Albert from Glancy, Binkow & Goldberg.

20 　　　　As you said, we filed the first case in July of 2013.

21 I've been working with the Hausfeld firm on this case,

22 however, for approximately a year.  We began investigating

23 the case on behalf of my client about February of 2013, and

24 subsequent to the investigation, we went on to translate and

25 analyze the KFTC opinion.  And subsequent to that, after we

5

1 filed suit, we then actually litigated the case.

2      And Hausfeld and Glancy, Binkow have been efficiency,
3 the two firms together, litigating this case essentially
4 since July of 2013.  I've been working with the Hausfeld
5 firm, and I'd like to ask Mr. Hausfeld to speak for our
6 group's petition to avoid inefficiency of just duplication
7 of me talking.  Okay.

8           MR. HAUSFELD:  Good morning, your Honor.

9           THE COURT:  Good morning.

10           MR. HAUSFELD:  I'm Michael Hausfeld.

11           The trend in appointments of counsel on behalf of
12 Plaintiff's organization has moved in a different direction
13 more recently.  It used to be that there were four co-lead
14 counsels, sometimes executive committees of 10 or 12.  And
15 the courts have taken a more acute view of that number of
16 attorneys representing Plaintiffs in a class, particularly
17 in the anti-trust field.

18      And in this jurisdiction in particular, courts have
19 moved to approving or focusing on appointing one to two co-
20 lead counsel, particularly in the context of the litigation
21 itself, depending upon how large the litigation is.  And
22 this matter, from our perspective, seems to be relatively
23 modest.

24      So we proposed a two co-lead organizational structure,
25 even to the point of at one time, given all of the counsel

1 involved, if we could agree on two co-lead from among those,

2 that would seem to make sense.  But given the

3 practicalities, the litigation didn't seem to warrant more

4 than that in terms of the leadership structure itself.

5      We have extensive contacts in South Korea.  We have

6 affiliate offices in South Korea.  We represent a number of

7 South Korean large corporate clients in other matters, not

8 only in the U.S., but outside the U.S.  And this is a case

9 that's going to involve extensive discovery and

10 understanding of the business operations in South Korea.

11      We have affiliated with two South Korean firms, one of

12 which, the Drescher firm, actually represented the KFTC in

13 defending the KFTC's decision with regard to the claims of

14 price fixing in this litigation.

15      We were the first firm that held an anti-trust forum

16 with the KFTC three years ago, and we have extensive contact

17 with the senior personnel there in terms of their approach

18 to private enforcement in the anti-trust field in Korea.

19      This case, no matter what, is going to involve

20 extensive understanding of Korean business, Korean business

21 practices, Korean documents.  And given the association of

22 those firms with us, we feel we have an ability to cut

23 through a large part of that with firms that already know

24 the basic elements of the offense and where we should be

25 concentrating our efforts in prosecuting or extending that

1 violation to the United States market.

2      Recently, we were selected by a federal judge in
3 Birmingham, Alabama, because of the two people in our firm
4 that have probably the most extensive experience among
5 practitioners generally, not just plaintiffs, but
6 defendants, in e-discovery.  And we were -- part of that
7 selection was based on that knowledge and being able to
8 formulate the protocols necessary to examine the documents,
9 to examine them efficiently and have a protocol that would
10 be available for both the Plaintiffs and the Defendants to
11 get through the litigation.

12      And that was in a process where all counsel -- and
13 there were many -- were actually interviewed by a special
14 magistrate for consideration of a leadership structure
15 designed to provide exactly what your Honor asked for, and
16 that is an efficient discovery of the materials in the
17 litigation, plus a system in place that would monitor and
18 manage the time and have timely reports to the Court
19 concerning both expenditures of expenses as well as time
20 spent in the case.

21      Any other questions, your Honor?

22           THE COURT:  I have none.  Thank you.

23           MR. HAUSFELD:  Thank you, your Honor.

24           THE COURT:  All right.  How about Lowey,
25 Dannenberg and Gold, Bennett.

1        MR. CERA:  Good morning, your Honor.  Sol Cera
2 from Gold, Bennett.
3        THE COURT:  Mr. Cera, I think we should
4 acknowledge to the courtroom that we've seen each other in a
5 prior life.
6        MR. CERA:  Yes, your Honor, we have.
7        THE COURT:  We have daughters who went to school
8 together a couple of years apart.
9        MR. CERA:  Yes.  Yes, your Honor.
10        THE COURT:  Nice to have you in court.
11        MR. CERA:  Thank you.  I fondly remember those
12 days.  Time is passing quickly.
13        THE COURT:  I do mostly.
14        MR. CERA:  And your Honor, I think yesterday's
15 events in the game show that us 49er fans know that we
16 played in the real Super Bowl.  We lost it, but
17 unfortunately, we couldn't be there yesterday.
18      Your Honor, I'm going to speak just briefly with regard
19 to my clients, the Rockman Company and the M.T. Trading.
20 And I have partnered with the Lowey, Dannenberg firm in
21 connection with the prosecution of the class claims in this
22 case, and we think we have developed an effective team to
23 bring the cases.
24      Rockman is a very substantial buyer of this product.
25 We have indicated to the Court there was $30 million worth

1  of Korean Ramen noodle product bought by Rockman, a major

2  distributor of the products, over the length of the class

3  period.  We also have a large distributor located in the

4  Central United States, M.T. Trading in Texas, who also

5  distributes the product throughout the country.

6       These are significant clients.  They're keenly

7  interested in representing the class and effectively

8  prosecuting this case on behalf of the class.

9       We, of course, are mindful of the Court's concerns with

10 regard to costs and attorney's fees.  I don't think any of

11 the structure that is proposed here is going to have any

12 impact on the attorney's fees because at the end of the day,

13 no matter how large the case is -- and I think we may have a

14 slightly different view as to some counsel as to the

15 potential size of the case -- we're all going to be in here,

16 if we're successful of course, asking for a percentage fee

17 based on the result we've obtained.

18      And I think all of these firms in this room here that

19 represent Plaintiffs have careful systems in place to keep

20 track and monitor the hours that are spent on the

21 litigation.  And certainly with costs, we're very mindful of

22 keeping costs down, but expending what is necessary to

23 effectively prosecuting the case.  So it's a balance that

24 you strike.  Of course these costs are kept track of very

25 closely, monitored closely by counsel.  And we would do that

1   in this case.

2        Your Honor, with regard to the point you made about the

3   fact that there was an initial filing, I would like to point

4   out that -- by Mr. Hausfeld's firm and the Glancy, Binkow

5   firm in the Central District of California, these filings

6   that have been made, at least initially were based on a

7   public order issued by the Korean Fair Trade Commission.

8        Mr. Hausfeld and the Glancy, Binkow firm had their own

9   translation of that order.  We spent money also doing a

10  separate careful translation of the order.  But the

11  litigation that went on in the Central District of

12  California seems, if you look at the docket there, to be in

13  large part focused on responding to some initial orders that

14  the judge issued and entering into some agreements about

15  extending dates, and then trying very hard to get the case

16  transferred to what has turned out to be the appropriate

17  venue, the Northern District of California and your Honor's

18  courtroom here.

19       So I don't think there's been a great deal of progress

20  that was made in the first filed case.  And obviously what's

21  followed is a large number of cases, ours based on our own

22  translation of the order, a unique complaint.  We did not

23  copy anybody's complaint.  We filed a unique complaint.  We

24  carefully researched it.

25       We've got a group of five cases that are supported by

1  obviously my firm, the Lowey, Dannenberg firm, but also by

2  Cohen, Milstein, a nationally prominent anti-trust firm,

3  also by the Cotchett, Pitre firm, who is represented here

4  today, and also by the Joseph Saveri law firm.

5       So we have a group of lawyers that have worked together

6  carefully.  We've made strenuous efforts, your Honor, to try

7  and reach an agreement.  Unfortunately, they didn't bear

8  fruit.  But we believe our group, representing the largest

9  number of cases with careful work done to date, which my

10  colleague Ms. Hart will describe for you, is the appropriate

11  lead counsel in this matter.

12       And I would like to introduce Barbara Hart, your Honor,

13  from the Lowey, Dannenberg firm in New York.  Ms. Hart has

14  become a welcome colleague of mine.  We have worked well

15  together over the past several months in pursuing this

16  litigation.  She is head of the New York State Anti-Trust

17  Bar for 2014.  And I am pleased to introduce her to the

18  Court.  Thank you, your Honor.

19            MS. HART:  Good morning.

20            THE COURT:  Good morning.

21            MS. HART:  The Court is obligated to determine

22  which firm is going to truly advance the litigation and

23  which firm has demonstrated a commitment to advancing the

24  litigation.  And I'm here to say that I believe that what

25  we've proposed as the structure really should win it on the

1   merits.

2       We tried to do a collation of all the firms.  I
3   repeatedly tried to say that we were advancing the analysis
4   and that we had moved off of the KFTC order in the work that
5   we had done.  And I tried to share that collaboratively with
6   all the firms in order to discuss the substance of where our
7   thinking is.

8       And part of the reason that we did that is because of
9   the tremendous political pressure that the KFTC is under in
10  Korea due to the class actions in the U.S.  The KFTC order
11  speaks to a very long collaboration, conspiracy between the
12  Korean companies.  That has created a -- I don't know what
13  the legal term for blow-back is, but a lot of press in Korea
14  surrounding almost a sense of disloyalty of the government
15  against its own companies, once the domestic U.S. -- once
16  the U.S. litigation was initiated.  There's significant
17  press surrounding this issue.

18      We were very aware of that.  We too, like my colleague,
19  Sung-Min Lee, is a dual thinker in Korean and English
20  because of his life story.  He was reading all of the press
21  and reading much of the materials in Korean newspapers,
22  Korean databases.

23      Through that work, I was like, Sung, we're just going
24  to focus.  We're going to focus forward.  The KFTC order
25  gets us to impact in Korea.  It gets us to impact in Korea.

13

1  We are now charged with proving this case's impact in the

2  U.S.  DOJ is not here.  This isn't a lay-up on impact in the

3  U.S.  It's possibly a very compelling case already on the

4  record of a fact of a conspiracy at these Ramen gatherings

5  and discussions.

6       That goes this far.  We've got to focus over here.  So

7  to that end, Sung and I, back and forth, back and forth.  He

8  ends up coming up with this vast database where the Korean

9  government requires the Korean companies to report their

10  pricing and break it out on what is there called domestic,

11  meaning in Korea -- domestic pricing and export pricing.

12       None of the other firms came up with that database.

13  That was the database that our firm worked with our

14  economist with.  And I can tell you, we haven't sunk

15  $100,000 in costs.  If you're concerned about costs, there's

16  not really a lot of there there, but there's $100,000

17  already out the door.  So that's a little bit concerning.

18       But so we worked with this wealth of data that exists.

19  And you'll see this in the complaints that we filed.  And we

20  did some highlighting on some of the facts that we found.

21  We also, because we were very focused, we found admissions

22  by the American subsidiaries of the Korean companies about

23  the fact that there's a lag between the Korean pricing and

24  then the adoption of that same conspiratorily alleged

25  inflation in price.

1    There's a time lag, but then boom, it arrives in the

2    U.S.  And we have both class members quoted in various

3    publications in Korean that were translated as saying that

4    the wholesale food distributors received this impact, and we

5    have actors, the market participants, the domestic American

6    subsidiaries making admissions against interest.

7    And we didn't set forth all of them in our moving

8    papers, but we set forth a couple of really good ones that

9    speak to what will be where the rubber meets the road in

10   this litigation, which is not a done deal based on the KFTC

11   order.  You can't rest on the laurels of what the KFTC did.

12   And this is acutely the case because when the KFTC

13   government came under pressure, there was press about this.

14   And your Honor, one of the key issues that I need to

15   speak to today, which is slightly unpleasant, and I don't

16   want -- I have to bring this to the Court's attention

17   because it could be to the detriment of the class, and it

18   could be seen as opportunism on my part.  And I -- you'll

19   have to assess that for yourself.  But I have an obligation.

20   Motions to disqualify are required to be brought promptly.

21   And I did my homework on that, and there's a

22   countervailing concern that they'll be seen as

23   opportunistic.  And so do this with due caution that I bring

24   this to the Court's attention, but it would come back to the

25   detriment of the class potentially down the road at class

1 certification.

2      So if I may, I'm going to ask Sung to distribute, and

3 I'm going to hand to the court reporter, if I may,

4 something.  And this just came to the attention of us

5 because it was disclosed for the first time -- if you could

6 give this out -- in the moving papers that the Glancy and

7 Hausfeld firms had affiliated with DR Aju, the Korean law

8 firm that they are touting as working with the Korean

9 government.

10      And in working with the Korean government, DR Aju,

11 brought a credibility to their application.  And I

12 understand why they would want to employ the affiliation.

13 They originally had Korean law firm, We The People law firm,

14 and then they had DR Aju that is just first on their papers.

15 So this is the first time I'm able to speak to this.

16      So I anticipate that they'll want to respond, but this

17 is the first time I can speak to this because of the

18 agreement among counsel that we would stand on single

19 submissions.  So I think this is the proper time.

20      So the first article is Korean press giving the KFTC a

21 hard time, a hard time about the fact that they were

22 subjecting Korean companies to litigation in the U.S.  I

23 mean, I might sound inappropriate, but I think it's a tight-

24 knit Korean world, you know.  And culturally, tight-knit.

25 And so there's a disloyalty, and the government is getting

1 this hard time.

2     The government -- the second piece of paper that I've

3 handed you is the KFTC's website responding to the negative

4 press.  And it's posted on the KFTC website.  And for the

5 convenience of the Court, because Sung -- you know, we're

6 working so closely on this.  We're really focused.  How do

7 we bring value.  We're focused, focused on how do we prove

8 U.S. impact, and where does the KFTC order get us, and what

9 does that accomplish, and where does it stop and start.

10     And this comes up because every company in Korea except

11 for Sam Yang took it up on appeal.  They objected to the

12 findings, and then just in November of 2013, the Korean

13 Appellate Court enforced the order of the KFTC.  So it goes

14 up -- it's a different language for what this is called, but

15 there was like an objection to the KFTC finding and the

16 fines, and they take it up on appeal, and the Korean courts

17 uphold the verdict.

18     And this is very controversial.  And there's press

19 surrounding this and press surrounding the U.S. litigation.

20 The KFTC is defending itself on its website in response to

21 the press.  And this is an English language translation of

22 what's on the press.

23     The KFTC, which DR Aju, the co-counsel in this

24 litigation, says specifically in response to the criticism

25 that they're subjecting us to the U.S. -- subjecting the

1 companies to U.S. litigation -- if you'll look at the last

2 two bullets on this, this is their determinations.  This is

3 the KFTC's determination with their counsel, DR Aju, which

4 is now affiliated with the other proposed lead counsel.

5      "We determined" -- this is the government -- the Korean

6 government's definitive position.  "We determined that

7 exported products were not subject to price fixing and did

8 not include in the calculation of relevant sales figures."

9      The latter part of that, what they're saying is, we

10 penalize the government -- the companies -- forgive me.  And

11 when we calculated the amount of the penalty, we didn't

12 calculate it based on export prices because we didn't -- we

13 found expressly our finding is it didn't have an impact in

14 what is the crux of our case.  Our obligation for our class

15 is that it impacted us over here.

16      The KFTC has taken a position antithetical to that.

17 And then they go on, "It is unreasonable to argue that the

18 injunction of price fixing which hurts the domestic market,"

19 to which they're alluding the Korean domestic market -- "is

20 the basis for lawsuits against our Korean companies,"

21 speaking to the loyalty that's felt.

22      So I don't think we need to reach a motion to

23 disqualify.  It wasn't briefed.  They should be heard.

24 Perhaps there was a waiver.  I don't think you can get an

25 absent class member waiver.  So that's a problem.  It's a

1 burden that the class isn't required to take on that they're

2 affiliated -- DR Aju on its website, there are handshakes,

3 pictures, photographs.  They are counsel to the KFTC.

4      What Mr. Hausfeld represented is quite correct.  They

5 have a very vast, vast contract as consultants to the KFTC.

6 I don't know that there was a waiver.  I don't know anything

7 about how it came to be that they're now co-counsel in U.S.

8 litigation.  Was that vetted?  Has that been vetted?

9      The weirdest part is that We The People, okay, in

10 November 2013, there's press -- Sung, did you have copies of

11 that one too?

12      There's press where We The People, their original Korea

13 co-counsel is saying, we believe that there was domestic

14 impact.  DR Aju is identified -- this is in Korean Daily.

15 I'm sorry, your Honor.  Some of this we just were able to do

16 research on over the last couple of days because of the

17 submission dates.

18      So what publication is this, please?

19      So We The People is identified as counsel in the U.S.,

20 and DR Aju is identified as counsel to the KTFC.  And they,

21 in this one article, are taking different adverse positions

22 about the U.S. litigation.

23      And what I want to kind of say as diplomatically as I

24 can is, the fact that this wasn't vetted or discussed -- or

25 maybe it was, and you'll hear from them.  Maybe there's a

1  perfectly good answer, and that's for them to provide.  It

2  certainly wasn't addressed in the papers.  DR Aju is brought

3  forward as another feather in their cap of credibility,

4  right?  That's credibility.  It's going to be about the

5  Korean proceedings.  No, it's not.  We've got our own

6  burden.  We have to do this.  The Korean government says,

7  hey, we're not --

8          THE COURT:  I think I have your point there.

9          MS. HART:  Yeah.  So like why didn't Hausfeld's

10 firm and Glancy, Binkow drill down?  Because I don't think

11 they're focused.  I think they've got -- they're not really

12 focused on this.  I assure you, we're really focused on

13 this.  We will advance this efficiently.  We know how to run

14 complex litigation.  I think we've demonstrated we're here

15 to prove this case.  And that's our job for this class.

16     What's the publication, Sung?

17          MR. LEE:  Good morning, your Honor.

18          THE COURT:  Good morning.  If you would introduce

19 yourself for the record.

20          MR. LEE:  Absolutely.  My name is Sung-Min Lee

21 with Lowey, Dannenberg for Plaintiff, Pitco.

22     The article that I'm looking at right now is written in

23 Korean.  The title is "News This."  And it talks about the

24 impact on the Ramen industry in South Korea.

25     I can explain the two consecutive paragraphs in this

1  one article.  The first paragraph talks about We The People

2  firm, which is one of the firms associated with the Hausfeld

3  firm on behalf of The Plaza Company.  And We The People

4  states that this litigation in the U.S. is ongoing and also

5  explains the treble damages.

6      In the following paragraph, there are two statements by

7  two entities.  First is Defendant Nong Shim, and the second

8  is the KFTC.  Nong Shim states that because the products

9  sold in the U.S. are manufactured in the U.S., the pricing

10 structure and distribution is different.  Therefore, this is

11 irrelevant to the KFTC decision.

12     And in the next sentence, the KFTC states that the

13 domestic imposition of fines is irrelevant to the business

14 overseas.  This is all in response to the recent actions

15 brought by Nong Shim, Ottogi and Korea Yakult against --

16 against the KFTC in order to vacate the penalties.  So

17 that's what this document is.

18          THE COURT:  Thank you very much.

19          MS. HART:  So as I say, your Honor, I think we've

20 demonstrated that we're focused on what will need to be the

21 advancement of the litigation.  The analysis of the pricing

22 impact in the U.S., the analysis of the intent to impact

23 prices in the U.S. and the proof of price impact in the U.S.

24 And I'm happy to answer any questions that you have.

25          THE COURT:  That's fine.  Thank you very much.

1          MS. HART:  Thank you.

2          THE COURT:  Let's go -- before I go back to the

3   Hausfeld firm, let's go to Freed Kanner.  Take your time.

4          MR. KANNER:  Your Honor, we seem to have gone a

5   bit far afield of your original request for what you'd like

6   us to include in our presentations.  And I'll be mindful of

7   that.

8       I would like to present the firm of Freed, Kanner,

9   London & Millen -- my name is Steve Kanner -- as a logical,

10  rational, reasonable, good choice as one of the co-lead

11  counsel in this case.

12      There's been some discussion of firms that have

13  databases of pricing.  Candidly, Judge, we're representing

14  three major clients, as you identified earlier.  Any firm

15  that undertakes the representation of clients of that

16  stature and size ought to be creating from the get-go a

17  database of their clients' purchases and correlate those

18  with the Korean prices.

19      Do we include that in the pleadings?  No.  There are a

20  lot of things one doesn't include in initial pleadings

21  because, frankly, we're dealing with the initial complaint,

22  which we all know in a matter based on your Honor's

23  decision, 90 days, 60 days, will be a consolidated amended

24  complaint, which ought to bear some of the fruit of those

25  investigations and of the databases.  That's number one.

1    Your Honor talked about Korean contacts and how those
2    play into this.  I was with Mr. Hausfeld years ago when we
3    opened up Korea in terms of coordinating with these types of
4    cases and, in fact, have been working with those firms since
5    even before then as the Freed, Kanner firm represented two
6    major Korean companies.  Forgive me.  It's Kohap Chemical
7    Company.  If I just say Southern Korea, I'll have to go with
8    that.  I believe it's Busan.  And the other is Inhee
9    Lighting Company, which is a lot closer.
10    So we represented each of those cases in different U.S.
11    Anti-Trust cases.  It's really opened up an entire new area
12    of companies that needed representation in the U.S. because
13    they purchased in the United States.  We have been working
14    with the counsel at the -- at the Wan (phonetic) firm for
15    over a decade.  In fact, we helped to host one of their
16    primary attorneys, one of my contemporaries, Yung Ho Sun
17    (phonetic), who obtained his joint legal degree after his
18    Korean law degree at the University of Illinois.  We've been
19    working with them on a consistent basis.  They have
20    investigators.  They are our primary contacts over there,
21    and we work very successfully with them.
22    Your Honor also asked about how do we avoid duplication
23    and running the time, as it were.  That's a subject near and
24    dear to my heart, and frankly, it's a subject near and dear
25    to most judge's hearts.  And I'd like to give you two

1 examples of how we've addressed that in the recent past.

2     Our firm was one of the co-lead counsel in the Air and

3 Oil Filter Anti-Trust litigation that was before Judge

4 Gettleman in the Northern District. And we're a Chicago

5 firm, and from the beginning of the case, the judge

6 admonished us, and, in fact, we had an in-chambers hearing

7 with how we were going to approach that very issue.

8     And I can tell you what the result was as opposed to

9 what happened at the hearing. The result was, we created a

10 time and expense chart that each firm involved in the case

11 was required to submit on a monthly basis. If they failed

12 to do so within the time period, they understood that that

13 time was not going to be submitted to the court for

14 compensation. That was the first layer.

15     The second layer is, we had to represent to the court

16 that we would make sure that those firms only did assigned

17 work and did not go off on their own issues. We've done

18 that. At the end of the case, Judge Gettleman was

19 complimentary of the manner in which we accomplished that

20 task.

21     That similar process was an issue raised by Judge

22 Batani (phonetic) a year and a half ago when we began the

23 Auto Products Anti-Trust litigation which was the result of

24 a massive U.S. Attorney investigation into the -- you name

25 it -- part of the automobile.

24

1    Now, I'm one of the co-lead counsel for the direct
2    purchaser class.  We have seven cases within the direct
3    purchaser group thus far.  Ultimately, Judge Batani was
4    concerned with time and expenses and fees, and we produced
5    to her quarterly reports of all time and expenses.  And thus
6    far, she's satisfied with the production.  And we continued
7    that as every new case was reached.
8    I'd like to talk for a moment about the AFTA, the Asian
9    Food Trade Association.  It's not just a trade organization.
10   The two largest groups -- and it really falls along ethnic
11   lines -- of Korean Ramen noodles is the Asian community and,
12   believe it or not, the fastest growing group is the Hispanic
13   community in terms of consumption of these products.  And I
14   think both our clients and the AFTA addressed those issues.
15   AFTA, for the last 30 years, has represented more than
16   200 members of its organization.  They market to 1500
17   supermarkets across the country, and 40 to 50 of those
18   members are major purchasers of Korean Ramen noodles.
19   Cooperation of the president of AFTA and through the
20   president, its members, has resulted in our being named
21   special counsel.
22   Now, why special counsel?  There's a real concern
23   within various segments of the community that talking to the
24   lawyers prosecuting the case could lead to those
25   conversations being publicized, which could lead to

1 potential retaliation.

2     The AFTA is very aware of this.  It's not unusual

3 within certain groups to be concerned about that.  We've

4 addressed that issue, and they've addressed that issue by

5 asking us to act as special counsel.

6     In the course of our work with the AFTA and since being

7 named special counsel, we've talked to more than two dozen

8 companies and individuals who have knowledge of what's going

9 on over the last eight years with the Korean -- the Korean

10 Ramen noodle conspiracy.  We plan to make use of that in the

11 amended complaint, and it's part of the prosecution of the

12 case.

13     That logically leads to who it is that we represent.

14 I'm actually proud to say that in connection with AFTA, we

15 represent Summit.  Summit is one of the largest purchasers

16 of Korean Ramen noodle products in the United States.  And

17 it's worth a side note that Summit is, of course, an Asian

18 company.  It was formed by a Chinese immigrant to this

19 country who had a professional degree in the 1960s and

20 couldn't get hired.  So he created Summit.

21     Summit went from being a ma and pa organization to

22 having hundreds of employees.  They're one of the largest

23 fillers in the U.S.  They sell 3,000 products to wholesalers

24 and literally sell through the United States and to foreign

25 countries.

1       The second and third companies we represent are in the
2  Hispanic community.  El Jarocho has been in business for 25
3  years.  They started as a ma and pa, if I use that term
4  again, organization in Chicago, not far from our offices.
5  They've since moved from this ma and pa organization to a
6  company that employs scores of individuals.  They sell to
7  seven states in the Southeast and sell to 3,000 wholesalers.
8  They're a significant company.

9       And then finally Diaz.  I'm particularly proud of Diaz
10 as a client.  Long discussions with them.  They've decided
11 to carry the flag on behalf of, in their minds, not just the
12 Hispanic users, but all users of these products and all
13 purchasers.

14      They've grown from a small company to over 200
15 employees, serving 5,000 customers in 25 states.  They've
16 also -- they're also proud to have been named among the top
17 500 Hispanic owned businesses in the country.

18      This case is more than just about a store acting as the
19 client's representative.  It's about serious purchasers,
20 people who are at risk, who believe they're truly at risk
21 for stepping forward.  In my practice for 35 years, I take a
22 somewhat serious approach to that, and our practice, as your
23 Honor saw from the pleadings, reflects that.  We've had a
24 lot of good successes.  And I truly believe that these
25 communities deserve to be represented in these cases.  I am

1 humbled by the fact that these companies have sought our

2 firm to be a lead counsel.

3      I want to add one or two more facts.  Number one, I've

4 worked -- and I think under 23(g), one of the issues to be

5 concerned is whether the firms over here are not just

6 competent, have the commitment, have the funding -- I think

7 we all have that, as your Honor noted.  But one of the

8 factors is how well we work with other firms.

9      I'm also pleased to say that I've worked with Mr.

10 Cera's firm.  I've run cases with him.  We're currently

11 involved in cases together quite successfully.  And I'm also

12 very proud to say that one of my mentors in this practice,

13 Mr. Hausfeld, we have been co-lead counsel in more than six

14 cases over the years, and I continue to work cases with him.

15      I'm a little sensitive to some of the remarks that were

16 made earlier.  I'm not carrying anyone's water, but I do

17 take some issue with the tone and the nature of those

18 suggestions.  It all brings to the point of firms that work

19 with each other well and can coordinate.

20      I believe, your Honor, we've coalesced into three

21 groups over here.  Mr. Cera and Ms. Hart filed a joint

22 petition.  Mr. Hausfeld and Mr. Glancy filed a joint

23 petition.  Each of those sought to name two of their

24 members.  The Freed, Kanner group as it were consists of

25 four law firms, the Specter, Roseman firm, the Heins, Mills,

1 Olson firm, and I'm privileged to have Rick Saveri, Guido's

2 son. I've worked with Guido for my entire career as my

3 senior partner, and I've run cases with Rick all

4 successfully.

5     I submit to your Court that there is a logical way to

6 approach this. It's a case -- we don't know the size of the

7 case. I can say -- and I wanted to remember to add this --

8 that during the affected time period -- and we're all

9 talking about the same period -- the product sales into the

10 United States were between 500 and $650 million.

11     I'm not in the business of calling it a small case or a

12 large case. I am in the business of prosecuting these cases

13 and getting the best results for my clients and for the

14 class. So we've naturally coalesced into three groups, one

15 at each table and then the Freed, Kanner group. And I

16 suggest, your Honor, there is a logical approach, and that

17 is to select one from each group to prosecute this case.

18     And I certainly commit to your Honor to doing so in a

19 way which fully incorporates all the firms, the clients and

20 pools our research and work product together. Thank you,

21 your Honor.

22         THE COURT: Thank you, Mr. Kanner.

23         So Mr. Hausfeld, I don't know whether you want to

24 respond to the conflict allegations that were made earlier

25 or whether you want to brief them. I'm a little bemused by

1 the whole topic at this point.

2      MR. HAUSFELD:  So am I, your Honor.  And I
3 think -- well, I thought that Groundhog Day was yesterday,
4 but apparently some of my colleagues wish to relive this
5 under the Joe McCarthy era.  I think it's simple to say that
6 the Drescher firm is not the Korean Trade Commission.  Their
7 name doesn't appear on those representations.

8      What the Drescher firm has is an ability of any counsel
9 here, is a complete understanding of the evidence that was
10 presented in Korea concerning the practices and an ability
11 to translate that evidence to what happened in the United
12 States.

13      With respect to the amount of expenditure, we were
14 within four days of having to file by order of the Court a
15 motion for class certification.  It was necessary to provide
16 an economic report, for which we would have been remiss in
17 our representation if we did not do an analysis economically
18 of how the practices in Korea may have mirrored the
19 consequences and effects of pricing of Ramen noodles in the
20 United States.  So we too had done that, would have done
21 that on an accelerated basis, based on the Court's
22 scheduling.

23      To state the obvious -- I don't want to say I'm the
24 oldest person necessarily on the Plaintiff's side, but let's
25 say the most senior.  We've been doing this for over four

1 and a half decades myself.  We've been selected in more

2 anti-trust cases to lead those cases for a reason over those

3 four and a half decades.  It's not only that we've taken

4 more of those cases to trial, that we've settled more of

5 those cases, but that we've also effectively adjusted the

6 practice to account for not only the presence of direct

7 purchaser plaintiffs, but indirect purchaser plaintiffs, as

8 well as opt-outs.

9      And we have a rich and long history in managing all of

10 those three that could be disparate elements and succeeding

11 in exiting the litigation successfully and responsibly on

12 the part of not just the direct claimant's class, but the

13 entire litigation.

14      The selection of counsel really rests in the discretion

15 of the Court in terms of the presentations of the

16 qualifications, the history and the reputation and character

17 of counsel, one in which the Court has to be the one that's

18 comfortable with the selection it makes.

19      I think the presentation today has given you a good

20 example or illustration of the character of the counsel and

21 the dedication and commitment and history of what they have

22 to bring.

23           THE COURT:  So enough, as you stand here, to

24 represent to the Court that there's not a concern about the

25 counsel in Korea that could lead to a successful

1 disqualification motion?

2        MR. HAUSFELD:  Not only would I give that

3 confirmation to the Court without revealing any other

4 information based on our conversations and dealings with

5 Drescher, I think that there is significant benefit and

6 information that they would bring that would assist in the

7 successful prosecution on behalf of the direct Plaintiffs

8 that any counsel would be remiss in not accepting on behalf

9 of that class.

10        THE COURT:  Thank you.

11    All right.  Well, you've all given me plenty to think

12 of.  Is somebody standing up?  You want to come forward

13 and -- step up to the microphone and introduce yourself.

14        MR. SANDERS:  Joel Sanders of Gibson, Dunn

15 representing the Defendant Ottogi America.

16        THE COURT:  Mr. Sanders.

17        MR. SANDERS:  And if I could just take two minutes

18 to talk a little bit about the structure of Plaintiff's

19 counsel.  Because it's something that I am concerned about.

20    I am not going to say anything about who among all

21 these lawyers ought to be appointed lead counsel.  I know

22 many of them.  I know this group includes some of the best

23 anti-trust lawyers in the country.  I am confident that from

24 within this group, the class can find excellent

25 representation.

1    I am concerned about the structure because the

2 structure of the Plaintiff's counsel, if it's not done

3 correctly, inevitably leads to inefficiencies, which drives

4 up the cost of the Defendants, which is our concern.

5    And what I'm going to suggest is that this is a case

6 that warrants a single firm on the Plaintiff's side taking

7 control of the litigation for the direct purchasers.  Let's

8 keep in mind there's another group of cases that will be

9 litigated with this.  Discovery will be consolidated.  The

10 indirect purchasers, they'll have their own counsel.

11    But I am concerned that people here are talking about

12 leadership structures with two, three or four different law

13 firms running them.  Those are structures that we have seen

14 in a number of cases.  In this district, for example, we've

15 seen it in the LCD case, the CRT case, the D-RAM case and

16 many others.  Those are much bigger cases.

17    Those are cases where the volume of commerce at issue,

18 the affected commerce, was typically somewhere between 10

19 billion and $100 billion.  Those are cases where there were

20 at least 10 defendant families in each case.  And big

21 companies.  We're talking Samsung, LG, Toshiba, Hitachi,

22 names that everyone is familiar with.

23    If you accept what's in the complaint and what counsel

24 has said, I think we'll find that the volume of commerce at

25 issue here is less than $1 billion.  We're talking less than

1  10-percent of any of those cases.  We're talking about four

2  defendant families.  These are not big companies.  These are

3  four makers of Korean noodles that I suspect almost no one

4  on the Defense side had ever heard of before this case was

5  filed.

6        Compared to some of these other cases that have

7  leadership structures with multiple law firms and maybe

8  warrant multiple law firms, this is, in fact, a small case.

9  So my plea, my argument, my request is that whatever you

10 decide, whatever firm you decide to choose to lead this,

11 that for the sake of efficiency, that you make it a single

12 law firm on the Plaintiff's side for the direct purchaser in

13 charge of representing the class.  Thank you.

14        THE COURT:  Thank you, Mr. Sanders.

15        MR. SAVERI:  Your Honor, may I be heard?

16        THE COURT:  Please.

17        MR. SAVERI:  Your Honor, Rick Saveri on behalf of

18 Summit, Jarocho and Diaz.

19        Well, I've heard it all.  Mr. Sanders has talked about

20 a few of the electronic cases that I am also co-lead on the

21 Plaintiff's side in there.  And I'd like to put in a few

22 kind words for a billion dollars, being a small case, your

23 Honor.  I've never heard that before.

24        This is a very good sized case and a big case.  Whether

25 it's a billion, 2 billion, 3 billion, 4 billion, it's a big

1 case, your Honor, and there's a lot of lawyers with a lot of

2 clients that have come before you.

3     And I want to just take one minute to make two quick

4 points, your Honor. One is is that, as Mr. Kanner has said,

5 we had three complaints with a group of lawyers that were on

6 those complaints. There were four law firms, all very

7 qualified, all of -- who have all been appointed by federal

8 judges, not only in this district, but across the country,

9 to lead anti-trust cases.

10     All of us have stepped down and selected one from our

11 group, the Freed, Kanner firm out of Chicago to be our

12 representative for our group to be a lead counsel here. And

13 that's really what it's broken down to, to the three groups.

14     So as far as our group, we have selected one, sponsored

15 him. And we've all worked with all of these counsel here.

16 My firm has worked with Mr. Cera in the <u>Methionine</u>

17 litigation. We were co-lead counsel. Three. Judge Briar

18 picked three in <u>Methionine</u>.

19     In <u>D-RAM</u>, you heard the reference by Mr. Sanders, Judge

20 Hamilton picked three. And just recently, Judge Rogers in

21 the <u>Lithium Ion Battery</u> litigation, which I was selected as

22 one of the co-lead counsel. Why do we need three? So we

23 went into the three and this very issue of why three was a

24 good number to go forward with the litigation.

25     And some of the reasons for that, your Honor, is we're

1  not just dealing with Mr. Sanders, just one defense counsel

2  over there.  You're going to see a group of defense counsel

3  coming in here.

4       So it's very nice that the defense counsel want to

5  limit the plaintiff counsel that are available for the

6  plaintiff class, but then have multiple counsel on their

7  side that we have to deal with.  And so what happens is,

8  when you have a group of two or three -- and three is a

9  very, very good number.  It's not too big and it's not too

10 small, so that you can deal with this counsel and that

11 counsel.  Well, I'll pick up this guy from this defense firm

12 to handle the issues as they come.  So that -- it becomes an

13 efficient way to move these litigations forward.

14      What there's a tendency is is that if you have one,

15 then it just gets farmed out, your Honor.  Where as when you

16 have three, you will be able to have a group that can handle

17 it and efficiently manage it.  And that's what Judge Rogers

18 decided just recently in the Lithium Ion Battery litigation.

19 It was three with a liaison, and it's worked excellently.

20 Thank you very much.

21           THE COURT:  Thank you, Mr. Saveri.

22      All right.  Nobody else is standing up, so I'm about

23 to.  Thank you all for your presentations, and I'll try and

24 get an order out hopefully today.

25           ALL:  Thank you, your Honor.

36

1          (Proceedings adjourned at 9:55 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

CERTIFICATE OF TRANSCRIBER

1

2

3       I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9       I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16          Echo Reporting, Inc., Transcriber

17          Wednesday, February 5, 2014

18

19

20

21

22

23

24

25