1
2
3
4
5
6
7
8
9
10

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: KOREAN RAMEN ANTITRUST LITIGATION | Civil Action No. C-13-04115-WHO |
| | **DIRECT PURCHASER AND INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO (1) DEFENDANTS' OMNIBUS MOTION TO DISMISS; (2) DEFENDANT SAM YANG USA'S MOTION TO DISMISS; AND (3) DEFENDANT SAM YANG FOODS CO. LTD.'S MOTION TO DISMISS** |
| This Document Relates to:<br><br>ALL ACTIONS | Date:          October 1, 2014<br>Time:          2:00 p.m.<br>Location:    Courtroom 2, 17th Floor<br><br>The Hon. William H. Orrick |

22
23
24
25
26
27
28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' OMNIBUS MOTION TO DISMISS; SAM YANG USA'S MOTION TO DISMISS; AND SAMYANG KOREA'S MOTION TO DISMISS
CASE NO. 13-CV-04115-WHO

1

## **TABLE OF CONTENTS**

2

**Page**

3  I.   PRELIMINARY STATEMENT ........................................................................... 1

4  II.  FACTUAL BACKGROUND............................................................................... 2

5  III. STANDARD OF REVIEW ................................................................................ 3

6  IV.  PLAINTIFFS' COMPLAINTS STATE A CLAIM UNDER *TWOMBLY*, *IQBAL*,
    AND RELEVANT NINTH CIRCUIT AUTHORITY ......................................... 4

7
      A.   Direct Evidence Supports Plaintiffs' Claims ............................................ 4
8
      B.   Contemporaneous Industry Statements And Plaintiffs' Correlation Analysis
9          Plausibly Demonstrate That The Conspiracy Affected U.S. Prices........... 8

10     C.   The U.S. Defendants Participated in the Conspiracy................................. 10

11          1.   Allegations Set Forth In The Complaints ....................................... 12

12          2.   Plaintiffs Plausibly Set Forth Additional Allegations of Agency.......... 14

13 V.   SAMYANG KOREA IS JOINTLY AND SEVERALLY LIABLE TO PLAINTIFFS........ 17

14 VI.  PLAINTIFFS' ALLEGATIONS OF DEFENDANTS' EFFORTS TO CONCEAL
    THEIR CONSPIRACY ARE SUFFICIENT TO INVOKE THE DISCOVERY RULE
15  AND TOLL THE APPLICABLE LIMITATIONS PERIOD .................................. 18

16     A.   The "Discovery Rule" Applies Here, And Thus Plaintiffs' Claims  Should Be
           Tolled Until The Revelation Of The Conspiracy In 2012 ......................... 18
17
      B.   Plaintiffs' Claims Would Still Be Tolled Until 2012 Under The "Fraudulent
18         Concealment" Rule ............................................................................... 19

19 VII. THE COMPLAINTS MAY NOT BE DISMISSED PURSUANT TO THE FTAIA ........... 22

20     A.   The FTAIA Is Not A Limit On The Court's Subject Matter Jurisdiction ................. 22

21     B.   The FTAIA Does Not Bar Damages Claims For Transactions Arising In
           Domestic U.S. Commerce And Those Involving Imports To The United States....... 22
22
      C.   Alternatively, Plaintiffs' Claims Fall Within The FTAIA's Domestic Effects
23         Test........................................................................................................ 26

24     D.   Defendants' Contention That The Complaint Also Fails To Satisfy A
           Common Law Effects Test Under The Sherman Act Is Equally Without Merit........ 31
25
   VIII. CONCLUSION.................................................................................................. 32

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*American Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
   456 U.S. 556 (1982) ................................................................................................14, 15, 27

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
   654 F.3d 462 (3d Cir. 2011) ...........................................................................................22, 30

*Animal Sci. Prods., Inc. v. China Nat'l.Metals & Minerals Imp. & Exp.t Corp.*,
   596 F. Supp. 2d 842 (D. N.J., 2008) ....................................................................................30

*Apex Oil Co., v. DiMauro*,
   822 F. 2d 246 (2d Cir. 1987) ..................................................................................................11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................................................4

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................................................4, 5, 20

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
   620 F.2d 1360 (9th Cir. 1980) ..........................................................................................11, 17

*Bowoto v. Chevron Texaco Corp.*,
   312 F. Supp. 2d 1229 (N.D. Cal. 2004) ................................................................................15

*Brennan v. Concord EFS, Inc.*,
   369 F. Supp. 2d 1127 (N.D. Cal. 2005) ................................................................................17

*Carrier Corp. v. Outokumpu Oyj*,
   673 F.3d 430 (6th Cir. 2012) .....................................................................................7, 11, 12

*Catalano, Inc. v. Target Sales*,
   Inc., 446 U.S. 643 (1980) ........................................................................................................5

*Conmar Corp. v. Mitsui & Co.*,
   858 F.2d 499 (9th Cir. 1998), *cert. denied sub nom. VSL, Inc. v. Conmar Corp.*,
   488 U.S. 1010 (1989) .........................................................................................................19, 20

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ................................................................................................................17

*D.R. Ward Const. Co. v. Rohm & Haas Co.*,
   470 F. Supp. 2d 485 (E.D. Pa. 2006) ...................................................................................10

*Dion LLC v. Infotek Wireless, Inc.*,
   No. C 07-1431 SBA, 2007 WL 3231738 (N.D. Cal. Oct. 30, 2007) .......................................15

*Eurim-Pharm GmbH v. Pfizer Inc.*,
  593 F.Supp. 1102 (S.D.N.Y. 1984) .........................................................................28

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004)..................................................................................23, 26

*Gilbert v. Concerta Health Servs., Inc.*,
  No. 03:07-CV-00264-LRH-VPC, 2008 WL 318356 (D. Nev. Jan. 31, 2008) ......................15

*Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*,
  850 F.2d 477 (9th Cir. 1988) .................................................................................14

*Hernandez v. Hilltop Fin. Mortg., Inc.*,
  622 F. Supp. 2d 842 (N.D. Cal. 2007) ........................................................................15

*In re Aftermarket Filters Antitrust Litig.*,
  No. 08-cv-4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ...................................17

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  Case No. 06-md-1775 (JG) (VVP), 2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008)
  ..........................................................................................................................23

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  MDL No. 1775, Case No. 06-md-1775 (JG)(VVP), 2009 WL 3443405 (E.D.N.Y., Aug. 21,
  2009) ................................................................................................................23

*In re Blood Reagents Antitrust Litig.*,
  756 F. Supp. 2d 623 (E.D. Pa. 2010) ........................................................................12

*In re Catfish Antitrust Litig.*,
  908 F. Supp. 400 (N.D. Miss. 1995)........................................................................21

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  738 F. Supp. 2d 1011 (N.D. Cal. 2010) ...........................................10, 11, 20, 21

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*,
  906 F.2d 432 (9th Cir. 1990) ....................................................................................5

*In re Copper Antitrust Litig.*,
  436 F.3d 782 (7th Cir. 2006) .............................................................................18, 19

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  546 F.3d 981 (9th Cir. 2008) ...........................................................................27, 28

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007)......................................................................................10

*In re Flash Memory Antitrust Litig.*,
  643 F.Supp.2d 1133 (N.D. Cal. 2009) ......................................................................4

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
    647 F. Supp. 2d 1250 (W.D. Wash. 2009).............................................................7

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ...................................................................17

*In re Korean Air Lines Co. Antitrust Litig.*,
    No. CV 07-01891, Master File No. CV 07-05107 SJO (GRx), 2010 WL 3184372
    (C.D. Cal. Aug. 2, 2010)...........................................................................28, 29

*In re Korean Airlines Antitrust Litig.*,
    No. CV 07-01891, 2008 U.S. Dist. LEXIS 111722 (C.D. Cal. 2008)....................................29

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp.2d 987 (E.D. Mich. 2010)...................................................................21

*In re Processed Egg Prods. Antitrust Litig.*,
    931 F. Supp. 2d 654 (E.D. Pa. 2013) ...................................................................18

*In re Rubber Chemicals Antitrust Litig.*,
    504 F. Supp. 2d 777 (N.D. Cal. 2007) ..............................................................19, 21

*In re Sagent Technology Inc., Derivative Litig.*,
    278 F. Supp. 2d 1079 (N.D. Cal. 2003) .................................................................17

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    No. 07-cv-1819 CW, 2010 WL 5477313 (N.D.Cal. Dec. 31, 2010) ........................................29

*In re Static Random Access Memory Antitrust Litig.*,
    580 F. Supp. 2d 896 (N.D. Cal. 2008) ..................................................................14

*In re Tableware Antitrust Litig.*,
    363 F. Supp. 2d 1203 (N.D. Cal 2005) ...................................................................7

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) .................................................................21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    785 F.Supp.2d 835, 839 (N.D. Cal. 2011) ................................................................4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    599 F.Supp.2d 1179 (N.D. Cal. 2009) ...............................................10, 15, 16, 27

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    822 F. Supp. 2d 953 (N.D. Cal. 2011) .......................................................... passim

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
    No. 07-05634 CRB, 2011 WL 1753738 (N.D. Cal., May 9, 2011)..........................................29

*In re Urethane Antitrust Litig.*,
    683 F.Supp.2d 1214 (D. Kan. 2010)......................................................................20

*Invamed, Inc. v. Barr Labs., Inc.*,
    22 F. Supp. 2d 210 (S.D.N.Y. 1998)................................................................16

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) .......................................................................10

*Kruman v. Christie's Intern*. PLC,
    284 F.3d 384 (2d Cir. 2002).........................................................................25

*Lee v. Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) .........................................................................8

*Lyshorn v. J.P. Morgan Bank, N.A.*,
    No. 12-cv-05490 JSW, 2013 WL 2606519 (N.D. Cal. June 11, 2013) ...................16

*Mangum v. Action Collection Serv., Inc.*,
    575 F.3d 935 (9th Cir. 2009) .......................................................................18

*Mendoza v. Zirkle Fruit Co.*,
    301 F.3d 1163 (9th Cir. 2002) .....................................................................10

*Minn-Chem, Inc., v. Agrium, Inc.*,
    683 F.3d 845 (7th Cir. 2012) .......................................................22, 26, 30, 31

*In re Optical Disk Drive Antitrust Litig.*,Case No. 3:10-md-2143 RS, 3:13-cv-04991-RS,
    2014 WL 3378336 (N.D. Cal., Jul. 10, 2014)..............................................23, 29

*In re Optical Disk Drive Antitrust Litig.*,
    No. 3:10-md-2143 RS, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) ...................16

*Olney v. Progressive Cas. Ins. Co.*,
    3:13-CV-2058-GPC-NLS, 2014 WL 294498 (S.D. Cal. Jan. 24, 2014) ...................8

*Paper Systems Inc. v. Nippon Paper Industries Co.*,
    281 F.3d 629 (7th Cir. 2002) .......................................................................17

*Ross v. Am. Exp. Co.*,
    14-cv-5723 WHP, 2014 WL 1396492 (S.D.N.Y. Apr. 10, 2014) ...........................11

*RSM Prod. Corp. v. Petroleos de Venezuela Societa Anonima*,
    338 F. Supp. 2d 1208 (D. Colo. 2004)...........................................................16

*Silvas v. E*Trade Mortg. Corp.*,
    514 F.3d 1001 (9th Cir. 2008) ........................................................................4

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
    622 F. Supp. 2d 890 (N.D. Cal. 2009) ...........................................................15

*Turicentro, S.A., v. Am. Airlines Inc.*,
    303 F.3d 293 (3d Cir. 2002)..........................................................................23

*U.S. v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ..................................................................................................6

*United Phosphorus Ltd. v. Angus Chem. Co.*,
    131 F. Supp. 2d 1003 (N.D. Ill. 2001) ...............................................................28

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945)...........................................................................31, 32

*United States v. Anderson*,
    326 F.3d 1319 (11th Cir. 2003) ..........................................................................23

*United States v. Hui Hsiung,*
    Nos. 12-10492, 12-10493, 12-10500, 12-10514, 2014 WL 3361084
    (9th Cir., Jul. 10, 2014) ..............................................................22, 23, 25, 26

*United States v. LSL Biotechnologies*,
    379 F.3d 672 (9th Cir. 2004) ...................................................................... passim

*Weinstein v. Saturn Corp.*,
    303 Fed. App. 424, 426 (9th Cir. 2008)...............................................................15

**FEDERAL STATUTES**

Foreign Trade Antitrust Improvement Act of 1982, 96 Stat. 1246,
    15 U.S.C. § 6a ("FTAIA") ..............................................................................2, 3

**RULES**

Federal Rule of Civil Procedure 8 .............................................................................4, 17

Federal Rule of Civil Procedure 11 ...................................................................................7

Federal Rule of Civil Procedure 12(b)(1) ........................................................................22

Federal Rule of Civil Procedure 12(b)(6) ................................................................ passim

**OTHER AUTHORITIES**

Art. 2-2 of the Korean "Monopoly Regulation and Fair Trade Act", available in English at the
    KFTC's website, http://eng.ftc.go.kr/bbs.do ............................................................6

H.R. Rep. 97-686 (1982)...................................................................................................24

Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs (collectively "Plaintiffs") submit this memorandum of points and authorities in opposition to the Defendants[1] Omnibus Motion to Dismiss ("Omnibus MTD Br.") [Dkt. No. 83], Samyang USA's Separate Motion To Dismiss [Dkt. No. 87], and Samyang Foods, Co., Ltd.'s Separate Motion To Dismiss [Dkt. No. 89] the respective Complaints.[2]

I.     **PRELIMINARY STATEMENT**

Plaintiffs have set forth ample evidence in both Consolidated Complaints ("Complaints") alleging the existence of a conspiracy to raise factory-level prices of Korean Ramen Noodle Products (the "Korean Noodles") sold in the United States and emphasizing that Defendants' unlawful price-fixing conduct directly targeted the U.S. market. Despite over one hundred paragraphs of direct evidence emphasizing the conspiracy—with many of these allegations were taken directly from the July 12, 2012 order by the Korean Fair Trade Commission ("KFTC"; the order is the "KFTC Order"), in which the Korean Defendants were fined $120 million and detailed specific actions taken by them in furtherance of the conspiracy—Defendants contend that both Complaints must be dismissed because they fail to sufficiently detail the impact of the conspiracy on the U.S. market.

Despite Defendants' arguments to the contrary, Plaintiffs have adequately pled how this unlawful conspiracy fixed prices, at the factory in Korea, and in the United States as well, where the noodles were consumed.  Plaintiffs have demonstrated this through (1) numerous quotations from representatives of the U.S. Defendants, as well as from wholesalers, confirming that when prices of Korean Noodles were artificially inflated at the factory in Korea as a result of Defendants' unlawful price-fixing conduct, the prices were increased in the United States soon thereafter; and (2) an expert

---

[1] Defendants Nong Shim Co., Ltd.; Ottogi Co. Ltd.; Samyang Foods Co. Ltd.; and Korea Yakult Co. Ltd. are referred to herein as the "Korean Defendants."  Defendants Nongshim America, Inc., Ottogi America, Inc., and Sam Yang (USA), Inc. are referred to herein as the "U.S. Defendants." Collectively, they are all "Defendants."  The Indirect Purchaser Plaintiffs' Consolidated Complaint [Dkt. No. 62] also named Paldo Company, Ltd. ("Paldo") as a defendant. Paldo is a wholly owned and controlled subsidiary of Korea Yakult. Since 2012, Paldo has imported into the United States and distributed Korean Noodles manufactured by Defendant Korea Yakult.

[2] "Complaints" refers collectively to the Consolidated Complaint by Direct Purchasers ("DPC") [Dkt. No. 61] and the Consolidated Complaint by Indirect Purchasers ("IPC") [Dkt. No. 62].

correlation analysis comparing price data obtained by direct purchasers with the announced price increases.  For pleading purposes, Plaintiffs have plausibly pled that the price fixing conspiracy caused prices to increase in the U.S. as well as Korea.

Moreover, Plaintiffs have sufficiently alleged that the U.S. Defendants, as well as the Korean Defendants, and, in the case of the Indirect Purchaser Plaintiffs, Defendant Paldo, participated in the conspiracy, as evidenced by: (1) the relationship between the Korean Defendants and their U.S. Defendant subsidiaries and distributors; (2) the fact that price fixing occurred at the factory level in Korea and the factory prices for Korean Noodles exported to the U.S. and sold in the United States by the U.S. Defendants were therefore unlawfully fixed; (3) the fact that the U.S. Defendants implemented price increases on Korean Noodles manufactured in the U.S. that were set at supracompetitive levels as a result of the claimed conspiracy and (4) the fact that certain U.S. Defendants publicly, and falsely, blamed rising input costs, rather than the conspiracy, for the price increases in a coordinated attempt to release misleading information.

Defendants' argument that Plaintiffs' claims should be barred under the statute of limitations fails because Plaintiffs could not have discovered the conspiracy until the issuance of the KFTC Order in 2012.  Plaintiffs' claims should be tolled under both the "discovery rule," which courts in this Circuit apply in such instances, and because Defendants engaged in "fraudulent concealment."

Finally, Defendants' assertion the Complaints fail to establish subject matter jurisdiction fails because the Foreign Trade Antitrust Improvement Act of 1982, 96 Stat. 1246, 15 U.S.C. § 6a ("FTAIA") does not apply when the conduct at issue involves U.S. commerce and involves goods that are imported to the United States.  Furthermore, Plaintiffs have adequately pled allegations which fall within the FTAIA's "domestic effects" test and the "common law effects test" under the Sherman Act.

For all of these reasons, Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss and allow this litigation to proceed to the discovery stage.

## II.   FACTUAL BACKGROUND

Starting at an initial meeting at the Renaissance Seoul Hotel in December 2000 or January 2001, the Korean Defendants conspired and agreed to a specific protocol that would lead to the

implementation of factory-level price increases on Korean Noodles products. DPC at ¶ 3; IPC at ¶ 2. As a direct result of this conspiracy, they inflated the prices for Korean Noodles between 2001 and 2008 by conspiring on six specific price increases during that period of time. *Id.* This conspiracy was hidden from the public until July 12, 2012, when the KFTC Order was released stating that the Korean Defendants had colluded to increase prices of Korean Noodles and keep such prices inflated. DPC at ¶ 4; IPC at ¶ 3. The collusion manifested itself in at least two formal in-person meetings between the Korean Defendants (in 2001 and 2008) and included excerpts of hundreds of email communications between and among the Korean Defendants regarding the details of future Korean Noodle price increases, including the timing and amounts of such price increases. DPC at ¶ 4; IPC at ¶ 3. During this time, the Defendants falsely blamed price increases on rising input costs, rather than on the existence of a price-fixing conspiracy. DPC at ¶¶ 195-215; IPC at ¶ 164.

The KFTC Order also required the Korean Defendants to pay a total of 136 billion won (approximately $120 million) in fines. DPC at ¶ 5; IPC at ¶ 4. Samyang Korea was the leniency applicant.[3]

The U.S. Defendants actively participated in the conspiracy, and as a result, Korean Noodles prices in the United States were directly impacted. The price of Korean Noodles in the United States often rose weeks or months after the price increases were announced in Korea. DPC at ¶¶ 173-94; IPC at ¶ 154. These price increases can be directly attributed to the conspiracy and did not track the increase in cost of goods sold. DPC at ¶¶ 216-17; IPC at ¶ 165.

III.  **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face," so as to permit a reasonable inference that the defendant is liable for the misconduct alleged. *In re Flash Memory Antitrust Litig.*, 643 F.Supp.2d 1133, 1141 (N.D. Cal. 2009) ("*Flash Memory*") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547, 570 (2007) ("*Twombly*")); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("*Iqbal*"). "Under

---

[3] *See* KFTC Order at ¶ 362 (determining that because Samyang "actively participated" in the KFTC's investigation by admitting the violations, submitting data, and offering statements by relevant personnel, the company's financial penalty would be mitigated by 30 %); *see also* DPC at ¶¶ 70-72; IPC at ¶¶ 59-62.

*Twombly's* construction of Rule 8," a plaintiff merely has to "nudge[] [its] claims ... 'across the line from conceivable to plausible,'" (*id.* at 680 (quoting *Twombly*, 550 U.S. at 570)), and "'[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged'" (*Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556)).  Determining plausibility is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  *Iqbal*, 556 U.S. at 663-64 (citing *Twombly*, 550 U.S. at 556).  The Supreme Court has reiterated that *Twombly* did not impose a probability requirement at the pleading stage, and that with the "sole exception" of "claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel", the court "must take the allegations as true, no matter how skeptical the court may be." *Iqbal,* 556 U.S. at 678, 696 ("the plausibility standard is not akin to a 'probability requirement.'") (citing *Twombly*, 550 U.S. at 556); *see also Flash Memory*, 643 F.Supp.2d at 1142  (citing *Twombly*, 550 U.S. at 556).

In evaluating a motion to dismiss, a court must also construe the pleadings in the most favorable light for the nonmoving party and accept all material allegations in the complaint as true. *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 785 F.Supp.2d 835, 839 (N.D. Cal. 2011) (finding that "the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor") (internal citations omitted).

## IV.   PLAINTIFFS' COMPLAINTS STATE A CLAIM UNDER *TWOMBLY*, *IQBAL*, AND RELEVANT NINTH CIRCUIT AUTHORITY

### A.   Direct Evidence Supports Plaintiffs' Claims

Both Complaints contain over one hundred paragraphs alleging the existence of a conspiracy to raise factory-level prices of Korean Noodles sold in the U.S., including specific details of meetings, documents, and communications concerning agreements to restrain trade through price fixing.[4]  *See* DPC at ¶ 66-167; IPC at  ¶ 54-143.  These allegations include specific facts concerning

---

[4]  Direct evidence of an antitrust conspiracy is rare.  *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.,* 906 F.2d 432, 439 (9th Cir. 1990).

1    Nongshim Co., Ltd.[5]; Ottogi Co., Ltd.[6]; Korea Yakult Co., Ltd.[7]; and Samyang Foods Co., Ltd.[8]

2    Plaintiffs' direct allegations stand in stark contrast to the "parallel conduct and a bare assertion of a

3    conspiracy" that failed to survive a motion to dismiss in *Twombly,* where no direct allegations were

4    made. *Twombly,* 550 U.S. at 556. Perhaps for this reason, Defendants do not even address, much

5    less contest, the existence of an unlawful conspiracy among those four competitors. Nor do

6    Defendants contest that price-fixing of the type alleged is *per se* illegal under the Sherman Act.

7    *Catalano, Inc. v. Target Sales*, Inc., 446 U.S. 643, 647 (1980) ("It has long been settled that an

8    agreement to fix prices is unlawful *per se*.").

9            In particular, Plaintiffs allege specific facts concerning the fixing of factory-level prices at

10   the very factories at which the U.S.-bound Korean Noodles were manufactured. And, Plaintiffs

11   allege that this price fixing had the actual effect of increasing prices in the United States. DPC at ¶

12   173-186; IPC  at ¶ 150.[9] Specifically, Plaintiffs quote a number of sources who explain that U.S.

13   prices of Korean Noodles followed factory price increases.[10] Whether specific anticompetitive

---

14   [5] DPC at ¶ 78, 82, 85-86, 90, 96, 104-06, 109, 114, 115-17; 122-23, 128-32, 135-37, 142, 144-45,
15   147-49, 150-52, 156-58, 166, 174; IPC at ¶ 58, 66, 68, 70, 72, 73-75, 77, 79, 80, 82-84, 86-89, 91-
     92, 94-95, 96-97, 98, 100, 104-05, 108-16, 119-20, 123-24, 126-32, 136-37, 139, 142.

16
17   [6] DPC at ¶ 78-79, 83, 87-88, 90, 93-95, 110, 112, 121, 123-24, 136, 139, 140-43, 150, 153-55, 178;
     IPC at ¶ 66-67, 74, 77, 79-81, 87, 93-94, 100, 103, 105-06, 110, 115, 117-18, 120-24, 130, 133-35.

18
19   [7] DPC at ¶ 78-79, 83, 91-3, 95, 100, 110-11, 118-20, 130, 132-34, 150, 156-58, 186; IPC at ¶ 58, 59,
     66, 67, 78, 79, 81, 86, 92, 93, 100, 110, 112-13, 118, 130, 136-37, 138.

20   [8] DPC at ¶  70, 72, 76, 78, 83, 86, 88, 89, 90, 93, 97-99,  107, 110, 111, 114, 116-17, 119, 121, 123-
21   25, 129-30, 132, 135-38, 141, 143-45, 147, 149-52,  154-55, 159, 165-66, 182; IPC at ¶ 59, 61, 64-
     66, 73, 75, 78-9, 83-85, 89-90, 92-3, 97-8, 99-103, 105-7, 109-10, 112, 114-17, 124-25, 129-32, 134-
22   35, 139, 141-42.

23   [9] Beginning in 2005, Nongshim Ltd. began to manufacture some of the Products in the U.S.  DPC at
24   ¶ 27.  Notably, Nongshim America, Inc., has twice before answered Plaintiff The Plaza Market's
     complaints in this matter.  *See* Plaza. Dkt. Nos. 43 and 58 in *Plaza Co. v. Nong Shim Co., Ltd*., No.
25   2:13-cv-5274 PA (RZx) (C.D. Cal.). Its decision to now move to dismiss under Rule 12(b)(6) is
     suspect in light of its earlier answers.

26   [10] *See* IPC at ¶ 154, DPC at ¶ 103 (quoting a supermarket manager who stated, in February 2003,
27   "always, after Nongshim increases its price [for Korean Noodles], approximately a week or two
     later, Ottogi and Binggrae increase their prices.  Therefore, I am expecting a market-wide ramen
28   price movement."); DPC at ¶ 113 ("In February 2004, Mr. Yong-Hoon Lee of Nongshim America

effects in the United States were the intended consequence of this conspiracy to fix factory-level prices is irrelevant.  *See U.S. v. U.S. Gypsum Co.,* 438 U.S. 422, 436 n.13 (1978) (intent to produce anticompetitive effects not an element of a civil antitrust suit, where a "violation can be established through proof of either an unlawful purpose or an anticompetitive effect").  Accordingly, Plaintiffs' detailed allegations concerning the agreement's effect on U.S. prices of Korean Noodles are sufficient.

Defendants completely ignore these specific allegations, further demonstrating the strength of Plaintiffs' claims.  Defendants' only response is that the KFTC issued a press release that purports to state that it did not find price-fixing on exported Korean Noodles.  However, the Court should ignore the force and effect of the KFTC's July 26, 2013 press release for the following reasons: (1) it is a press release, rather than a formal finding by the KFTC; (2) the formal findings of the KFTC establish price-fixing on "factory" prices (*see* DPC at ¶¶ 199-217; IPC at ¶¶ 154, 164), which would include Korean Noodles produced for export to the U.S. and sale by the U.S. Defendants; (3) the KFTC's jurisdictional mandate is limited to anticompetitive conduct impacting the Korean domestic market (*see* Art. 2-2 of the Korean "Monopoly Regulation and Fair Trade Act", available in English at the KFTC's website, http://eng.ftc.go.kr/bbs.do, "This Act shall apply to any extraterritorial conduct when it affects [the Korean] domestic market"); and (4) Plaintiffs' Complaints allege contemporaneous statements by the conspirators and others in the trade, and a confirmatory pricing study that factory price increases in Korea impacted the price of Korean Noodles in the United States

stated, 'Because Korea [Nong Shim Co., Ltd.] increased the ramen price by 6.5% on average, the import price [from Korea] also increased. … We decided to increase the ramen price [in the United States] by 8-9% starting in April.");  DPC at ¶ 124 ("On December 24, 2004, Korea Times stated, 'Based on the precedents where the price increase trails the price increase in Korea by 2-3 months, it is likely that the price increase will be implemented by next March at the latest for the products [including Korean Noodles] distributed to New York supermarkets and grocery stores.'"); DPC at ¶ 127 (explaining that Shi-Young Lee of Samyang USA stated, "…the impact of the ramen price increase by 8% in early March in Korea will each the U.S. around July."); DPC at ¶ 160 (On February 21, 2008, Mr. Myung-Chul Shin, Nongshim America's manager for the East Coast, stated, "Right now we are waiting for the announcement from the parent company in Korea.  In Korea, price increase becomes effective immediately after the announcement.  But, in the United States, there should not be any sudden price increase because, customarily, there is usually one or one and a half month waiting period.  But, we expect the price increase to become effective [in the United States] in March or April.").

1    (*see* DPC at ¶¶ 189-192, DPC Exhibit A; IPC at ¶¶ 150-156).

2         Moreover, the KFTC Order is not even mentioned in the over one hundred allegations of

3    facts concerning the alleged conspiracy to fix factory—i.e. wholesale—prices by the Defendants.

4    These factual allegations, which must be accepted as true, stand on their own independent of the

5    KFTC Order. The KFTC, whose enforcement mandate is to deter cartels causing injury to Korean

6    consumers, logically found that price-fixing of Korean Noodles existed in Korea. But this finding is

7    not dispositive on the anticompetitive effects the conspiracy had in the U.S. As the Sixth Circuit held

8    in virtually identical circumstances, Plaintiffs "should be free to draw facts from the [foreign]

9    decision to provide a 'starting point' and then use those facts to construct a theory that differs from

10   or even contradicts that of the [foreign tribunal]." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430,

11   442 (6th Cir. 2012) ("*Carrier*").[11]

12        Defendants also try to argue that the noodles manufactured for sale in Korea are materially

13   different from the Korean Noodles shipped into and sold in the U.S.  Omnibus MTD Br. at 8.  In so

14   doing, they completely ignore Plaintiffs' allegations that the price-fixed products, including, for

15   example, Nongshim's flagship noodle brand, Shin Ramen, were shipped into and/or manufactured in

16   the United States by its subsidiaries/exclusive distributors.  DPC at ¶¶ 26-27, 174, 178, 182, 186;

17   IPC at ¶ 151.  Moreover, the bulk of Defendants' argument focuses on the language of the packaging

18   and not the contents, which are identical, and the fact that the USDA and FDA have some regulatory

19

20   [11] *In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203 (N.D. Cal 2005), cited by Defendants in

21   support of their proposition that reference to an agency order is not sufficient to state a claim, serves

22   to *support* Plaintiffs' claims.  In that case, plaintiffs properly alleged specific actions taken by
     defendants and the effects of those actions. *Id*. at 1205-06.  The court explained, "[a] plaintiff may

23   surely rely on governmental investigations, but must also, under FRCP 11, undertake his own
     reasonable inquiry and frame his complaint with allegations of his own design."  *Id*. at 1205.

24   Plaintiffs have satisfied these obligations here. *In re Hawaiian & Guamanian Cabotage Antitrust*
     *Litig*., 647 F. Supp. 2d 1250 (W.D. Wash. 2009) also is inapposite because in that case, unlike here,

25   "plaintiffs provid[ed] no link" between the market at issue in the government investigation and
     the market at issue in the complaint. *Id*. at 1258.  Specifically, plaintiffs relied on guilty pleas by four

26   individuals relating to the Puerto Rico trade but plaintiffs failed to allege how the guilty pleas
     implicated the Hawaii or Guam trade. *Id*. Here, Plaintiffs sufficiently detail how price-fixed Korean

27   Noodles from Korea were exported to the U.S., where they were sold at artificially inflated prices
     pursuant to the conspiracy.

28

7

responsibilities when it comes to food destined for consumption in the U.S.  *See* DPC at ¶¶ 53-59 (describing efforts to target the U.S. market, particularly the Korean American market, with the "unique" taste of Korean Noodles) and ¶¶ 60-63 (Korean Noodles are fungible products).  In any event, this factual argument that is outside the four corners of the Complaints does not begin to rebut Plaintiffs' voluminous allegations of fixing factory-level prices for Korean Noodles sold in the U.S. market.[12]

**B.**  **Contemporaneous Industry Statements And Plaintiffs' Correlation Analysis Plausibly Demonstrate That The Conspiracy Affected U.S. Prices**

Plaintiffs allege that the conspiratorially set factory price increases resulted in increased prices in the United States shortly after price increases were announced at the factories.[13]  Moreover, Plaintiffs' correlation analysis demonstrates that factory price increases were highly correlated with price increases in the United States.  DPC at Exhibits B, D.

Defendants' argument that there is no correlation between the prices of Korean Noodles at the factory and the prices of those same noodles when subsequently sold in the U.S. is contrary to Economics 101—when prices increase at the factory, those same increases are passed down the line.  Indeed, the fact that these prices are correlated demonstrates that price increases were passed along from the factory to the U.S.  If the factory prices were affected by price-fixing but the U.S. consumer market was not, then the prices would diverge, not correlate, which is clearly not the case here.

---

[12] The argument cannot be resolved on a motion to dismiss; it can only be resolved through facts and expert testimony found nowhere in the complaint.  *See Olney v. Progressive Cas. Ins. Co.,* 3:13-CV-2058-GPC-NLS, 2014 WL 294498, at *5 (S.D. Cal. Jan. 24, 2014), *citing Lee v. Los Angeles,* 250 F.3d 668, 688–89 (9th Cir. 2001) ("[d]efendant may not seek dismissal based on facts outside the relevant complaint unless those facts are contained in documents attached to the complaint or subject to judicial notice.").

[13] *See* DPC at ¶ 104 (second price increase resulted in an increased export price of Nong Shim Co., Ltd.'s Shin Ramen product); DPC at ¶ 114, IPC at ¶ 95 (third price resulted in an increased export price of Nong Shim Co., Ltd. Shin Ramen and Samyang Foods Co., Ltd. Ramen products); DPC ¶ at 124, IPC at ¶ 107 (fourth price increase resulted in an increased export price of Samyang Foods Co., Ltd. Ramen product); DPC at ¶ 145, IPC at ¶ 126 (fifth price increase resulted in an increased export price of Nong Shim Ltd.'s Shin Ramen product); DPC at ¶158, IPC at ¶ 139 (sixth price increase resulted in increased export price of Nong Shim Co., Ltd.'s Shin Ramen product); *see also* DPC Exhibits A-E.

8

1  Since that divergence did not occur here, the fixed prices were passed along to and impacted the U.S.

2  market. [14]

3         Defendants mischaracterize Plaintiffs' exhibits and analysis when they argue that the limited

4  number of pricing observations available for study do not support an inference of conspiracy because

5  Plaintiffs' exhibits show that U.S. price increases happened between three and 18 months after the

6  prices increases in Korea. Omnibus MTD Br. at 11-12.

7         As demonstrated in the charts as Exhibits B through D, the various price increases are

8  correlated between 0.74 and 0.96. Additionally, as demonstrated in the charts, the data relating to the

9  timing of price increases only reflects the next price increase experienced by the named plaintiff in

10  question.  The 18-month gap between The Plaza Market's purchases of one specific product only

11  stands for the proposition that the Plaintiff in question experienced the price increase when it next

12  purchased that specific product—not, as defendants contend, that the U.S. price increase actually

13  happened 18 months after the price increase announcement in Korea.  *See* DPC Exhibit A.

14  Document requests, depositions, and other discovery will further clarify, with precision, the actual

15  time gaps between the Korea price increase announcement and the subsequent effect on U.S. prices.

16  *See D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 502, 504 (E.D. Pa. 2006)

17  (citing *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000) (finding that

18  "disputed claims of causation and injury cannot be decided on a Rule 12(b)(6) motion") and

19  *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002) (complex questions best addressed

20

21  [14]Defendants attempt to discredit Plaintiffs' correlation analysis by using a faulty analogy.
22  Defendants compare Korean Noodles sold at the factory and in the United States to cookies and
    Korean Noodles. Here, Plaintiffs are not comparing different products that share a few common
23  ingredients (such as cookies and ramen noodles), but rather, comparing the prices of the *same*
    product at two different levels of the distribution chain—at the factory and in the country of
24  consumption.  But even accepting Defendants' analogy as true, it *proves* Plaintiffs' point.  If the
    price of noodles—and cookies—made in Korea and sold in the United States should correlate since
25  they use the same ingredients, one would expect prices for these products to rise and fall in tandem
    ***unless,*** as Defendants suggest, there was a price-fixing conspiracy at the factory ***that had no impact***
26  ***on prices in the U.S. market.***  In that case, one would expect prices in the two markets to diverge.
27  But, as alleged in the Complaints, such divergence did not occur.

28
                                                                                                  9

1   by economic experts and other evidence "at a later stage in the proceedings")).

2          Further undercutting Defendants' argument, Defendants' own statements to the media

3   establish that Defendants knew that price increase announcements in Korea (which then led to price

4   increases in Korea—though sometimes delayed according to the KFTC—were passed on to the U.S.

5   market approximately two to three months after the price increase took effect in Korea.  *See* DPC at

6   ¶ 113 (Nongshim America announced an 8 to 9% price increase in the U.S. starting in April 2004,

7   following a Korean price increase in February 2004); DPC at ¶ 126 (published *Korea Times* article

8   in December 2004 reporting that precedents show that price increases in the U.S. trail price increases

9   in Korea by two to three months); DPC at ¶¶ 160-161 (in February 2008, Nongshim America

10  executive announced that U.S. prices would increase in April and another executive referred to a

11  "one or one and a half month of waiting period" for U.S. prices to rise following a Korea price

12  increase); IPC at ¶ 154.

13         Plaintiffs' allegations go far beyond the mere "if it happened there, it could have happened

14  here" allegations found insufficient to state a claim in *In re Elevator Antitrust Litig.,* 502 F.3d 47, 52

15  (2d Cir. 2007).  In that case, plaintiffs made only conclusory allegations to link the alleged

16  wrongdoing abroad to the United States market.  In fact, the court specifically noted that plaintiffs'

17  complaint lacked many of the specific allegations present in the Complaints here—including

18  allegations of fungible products and specific allegations of price impacts in the United States.  Here,

19  Defendants themselves make the link between the conduct in Korea and the effect in the U.S.

20         **C.      The U.S. Defendants Participated in the Conspiracy**

21         Defendants wrongly argue that Plaintiffs improperly "lump together" Defendants.  Omnibus

22  MTD Br. at 8-9.  Initially, Plaintiffs note that they have pled direct evidence of a conspiracy, as

23  described above.  Moreover, Defendants fail to recognize that "[c]ourts in this district do not require

24  plaintiffs in complex, multinational, antitrust cases to plead detailed, defendant-by-defendant

25  allegations; instead they require plaintiffs 'to make allegations that plausibly suggest that each

26  Defendant participated in the alleged conspiracy.'"  *In re Cathode Ray Tube (CRT) Antitrust Litig.,*

27  738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) ("*CRTs*")*; see also In re TFT-LCD (Flat Panel)*

28  *Antitrust Litig.,* 599 F.Supp.2d 1179, 1183 (N.D. Cal. 2009) ("*LCDs II*") (citing August 25, 2008

court order in which the court determined that "plaintiffs need not plead each defendant's involvement in the alleged conspiracy in elaborate detail"). Similarly, "'[o]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it.'" *Ross v. Am. Exp. Co.,* 14-cv-5723 WHP, 2014 WL 1396492, at *24 (S.D.N.Y. Apr. 10, 2014) (quoting *Apex Oil Co., v. DiMauro,* 822 F. 2d 246, 257 (2d Cir. 1987)). "Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,* 620 F.2d 1360, 1367 (9th Cir. 1980) ("*Beltz*").

In *CRTs*, Judge Conti sustained allegations against various defendant families, including their U.S. subsidiaries and affiliates in an antitrust conspiracy that impacted U.S. pricing for cathode ray tubes used in televisions and other display devices:

> Both complaints describe the relationships between the LG Electronics entities. Direct Compl. ¶¶ 41–45; Indirect Compl. ¶¶ 50–53. LG Electronics, Inc. is alleged to have dominated and controlled the finances, policies, and affairs of LG Electronics USA, Inc., and LG Electronics Taiwan Taipei Co., Ltd., in relation to the alleged violations. Direct Compl. ¶¶ 42, 43; Indirect Compl. ¶¶ 51, 52. The LG Electronics Defendants are alleged to have participated in a dozen bilateral meetings and over a hundred group meetings between 1995 and 2006. Direct Compl. ¶¶ 160, 175. To the extent that LG Electronics USA, Inc. distributed products in the United States, the complaints allege it wished to ensure prices for products would not undercut pricing agreements regarding CRTs. Direct Compl. ¶ 161. There are also allegations that the LG Electronics entities participated in meetings at trade associations and trade events that were used to further the conspiracy. Direct Compl. ¶¶ 176–80.

*CRTs*, 738 F. Supp. 2d. at 1020-22.

Similarly, in *Carrier*, the Sixth Circuit rejected the arguments that Defendants raise here:

> Outokumpu's U.S. entities . . . argue that there are insufficient allegations as to their specific involvement in the conspiracy. The two U.S. entities' argument stems from Carrier's frequent use of blanket references to the "Outokumpu defendants," without always specifying the role that each corporate entity played in the conspiracy. Outokumpu U.S.A. and Outokumpu Copper Franklin further note that neither EC decision mentions their involvement. In addition, the complaint does not specifically identify either company as a member of the Cuproclima conspiracy.
>
> Even in the absence of direct allegations that Outokumpu's U.S. entities were

11

coconspirators at Cuproclima, however, the court may look beyond those entities' corporate forms if the complaint presents facts to support a determination that the subsidiaries were alter egos of the parent corporation. . . .

. . . Carrier has alleged that the various Outokumpu entities were operated and deliberately portrayed to the outside world as a "single global enterprise" in which key executives overlapped between the U.S. and European entities and vital management personnel rotated through positions on both sides of the Atlantic. Id. ¶¶ 27–30.  Under such circumstances, requiring Carrier to delineate in the complaint the role each subsidiary played in the conspiracy is unnecessary, and Carrier's allegations against Outokumpu's U.S. entities are sufficient to survive the motion to dismiss.

*Carrier*, 673 F.3d at 445-46.

### 1.   Allegations Set Forth In The Complaints

**Overarching Allegations**. Plaintiffs have adequately pled conduct by the U.S. Defendants that ensured that price increases in factory pricing would be passed along to the U.S. within a matter of months and then demonstrated that this, in fact, occurred through a correlation study of The Plaza Market's Korean Noodles purchases.  *See* DPC Exhibits A-E; DPC at ¶ 113, IPC ¶ at 154 (Nongshim America announced an 8 to 9% price increase in the U.S. starting in April 2004, following a Korean price increase in February 2004); DPC at ¶ 127 (Samyang USA executive commented that a March 2005 price increase in Korea would reach U.S. prices by July); DPC at ¶¶ 160-161, IPC ¶ 154 (In February 2008, Nongshim America executive announced that U.S. prices would increase in April and another executive referred to a "one or one and a half month of waiting period" for U.S. prices to rise following a Korea price increase).  *See In re Blood Reagents Antitrust Litig.,* 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) ("[p]laintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct . . . . Nor are they required to plead with specificity the price by which each [product] was increased at a particular time.").

Plaintiffs' Complaints further allege that the statements made by the U.S. Defendants about the reasons for price increases were materially misleading and false.  For example, "'[i] n February 2004, Mr. Yong-Hoon Lee of Nongshim America stated, "Because Korea [Nong Shim Co., Ltd.] increased the ramen price by 6.5% on average, the import price [from Korea] also increased. …. We decided to increase the ramen price [in the United States] by 8-9%, starting in April.' No mention of

12

an agreement to fix prices with competitors was provided." DPC at ¶ 207, IPC at ¶ 154; *see also* DPC at ¶ 214.  And "'[o]n March 15, 2005, Sam Yang (USA) stated that prices were being raised in the United States because, among other things, "the price for the main ingredients including flour and oil increased.'" No mention of an agreement to fix prices with competitors was provided." DPC at ¶ 210.  Accordingly, the DPP's Complaint alleges that "Nongshim America and Sam Yang USA participated in, and furthered the objectives of the conspiracy alleged herein by providing the same subterfuge for price increases in the United States (such as the increase in the price of raw materials) as the Korean Defendants offered for the price increases in Korea." DPC at ¶ 189; *see also* IPC at ¶ 154.  Plaintiffs also allege that "[t]he U.S. Defendants further participated in the conspiracy, and furthered its objectives, by raising and otherwise conforming the prices of Korean Noodles in the U.S. to price levels similar to those set collusively in Korea pursuant to and at the direction of the Korean Defendants." DPC at ¶ 190.  "It was important for the Defendants to maintain the pricing relationships between Korean and U.S. pricing of Korean Noodles in order to prevent arbitrage, and this required coordination between the U.S Defendants and the Korean Defendants to ensure that the conspiracy achieved its desired result of increased worldwide prices for consumers of Korean Noodles." DPC at ¶ 193; *see also* IPC at ¶ 154.  In addition, the Complaints also allege that "the Korean Defendants tightly oversaw the pricing policies of the U.S. Defendants." DPC at ¶ 187; IPC at ¶ 152 ("the Korean Defendants closely oversaw the pricing policies of their respective United States subsidiaries and affiliates").

Over and above these overarching allegations, there are also allegations specific to each U.S. Defendant.

**Additional Allegations Against Nongshim America**.  Nongshim Korea owns 100% of Nongshim America and directed and controlled its operations.  IPC at ¶ 25; DPC at ¶ 19.  Nongshim America's operations are interconnected with its parent's larger objectives for "targeting" and growing its presence in the US.  DPC at ¶¶ 54-58; IPC at ¶ 46.   In addition, "some upper management at the Korean Defendant parents have positions [in] the respective U.S. Defendant subsidiaries. For example, Mr. Dong Wong Shin, CEO of Nong-Shim Korea has been Chairman of Nong-Shim America Inc. since Oct. 28, 1994. Mr. Jun Park, President of Nong Shim Korea has been

Director of Nong-Shim America Inc. since Oct. 28, 1994. Mr. Park was named as a conspirator in the KTFC Order, and had a key role in the conspiracy . . . ." DPC at ¶ 192; *see also* IPC at ¶ 153.

**Additional Allegations Against Ottogi America**. Ottogi Korea owned 100% of Ottogi America and directed and controlled its operations. IPC at ¶ 27; DPC at ¶ 29. The website of Ottogi America, Inc., http://ottogiamerica.com/, represents the "history" and financial reports of the Korean parent entity as its own and is copyrighted by "Ottogi, Ltd.," the Korean entity; there is no attempt to segregate their actual or ostensible authorities or identities. *See* IPC at ¶ 27; DPC at ¶ 30.

**Additional Allegations Against Samyang USA.** Plaintiffs allege that "Sam Yang (USA) has a long-term exclusive distributorship agreement, as well as agreements concerning trademarks, service marks, and intellectual property, with Samyang Foods Co., Ltd." DPC at ¶ 34; IPC at ¶ 29. An entry on yellowpages.com indicates that Sam Yang (USA) is "a part of Sam Yang Foods Co., LTD who manufactures soy sauce products, ice cream and fresh milk." DPC at ¶ 34; IPC at ¶ 29. The fact that the two entities were publicly identified as "part of" each other (and was only changed after litigation was commenced), raises important questions about the actual relationship between these two entities that cannot properly be resolved without discovery.[15]

These allegations sufficiently state a claim against the U.S. Defendants directly. *Harkins Amusement Enters.*, *Inc. v. Gen. Cinema Corp.,* 850 F.2d 477, 484 (9th Cir. 1988) (quotation omitted) ("Concerted action may be inferred from circumstantial evidence of the defendant's conduct and course of dealings."); *In re Static Random Access Memory Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008) ("[a]lthough Plaintiffs will need to provide evidence of each Defendant's participation in any conspiracy, they now [at the pleading stage] only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy.").

**2. Plaintiffs Plausibly Set Forth Additional Allegations of Agency**

The Complaints also set out a claim based on principles of agency. *See American Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) ("*Hydrolevel*") (interrelated

---

[15] Korea Yakult—the Korean entity—operated directly in the US and did not use a subsidiary to conduct business here prior to 2012.

14

entities can be vicariously liable for antitrust law violations of their agents).[16] Common law

principles of vicarious liability, agency, master and servant, *respondeat superior*, and others, apply

to claims under the antitrust laws.  *Id.*; *see also Weinstein v. Saturn Corp.*, 303 Fed. App. 424, 426

(9th Cir. 2008) ("*Weinstein*") (an amended complaint that alleges a defendant exercised "substantial

control" over a subsidiary or joint venture, is sufficient pleading at this stage of the case); *Sun*

*Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 900-01 (N.D. Cal. 2009) ("the

question of agency is . . . highly fact specific," and should not be decided at the pleading stage);

*Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1241 (N.D. Cal. 2004) ("[w]hether an

agency relationship exists between a parent corporation and its subsidiary is normally a question of

fact.");  *Gilbert v. Concerta Health Servs., Inc.*, No. 03:07-CV-00264-LRH-VPC, 2008 WL 318356,

at *2 (D. Nev. Jan. 31, 2008) ("[b]ecause the specific facts will be revealed through discovery, it is

not necessary for Plaintiff's amended Complaint to set forth detailed allegations of agency.

Arguments as to whether the evidence supports the allegations are more appropriately considered in

a motion for summary judgment."); *Dion LLC v. Infotek Wireless, Inc.*, No. C 07-1431 SBA, 2007

WL 3231738, at *4 (N.D. Cal. Oct. 30, 2007) (plaintiff need only place the defendant on notice that

its claim is based on an agency theory.  In fact, it is unnecessary to allege agency or vicarious

liability to survive a Rule 12(b)(6) motion because "[a] person legally responsible for an act may be

alleged to have committed it without going into the theories which support that ultimate fact."

*Hernandez v. Hilltop Fin. Mortg., Inc.*, 622 F. Supp. 2d 842, 852 (N.D. Cal. 2007).

As Judge Illston concluded in *LCDs II*, the types of allegations made by Plaintiffs here

"sufficiently allege a complex, multinational price-fixing conspiracy and taken as a whole, . . .

---

[16] As the Court stated:

> We look to the general principles of the common law for guidance in deciding the scope
> of the antitrust cause of action, *see National Society of Professional Engineers v. United
> States*, 453 U.S. 679, 688 (1975), but our decisions are determined by the congressional
> intent that led to the enactment of the antitrust laws, a desire to enhance competition, *see
> id.* at 688, 691.  Here general agency principles would lead to a finding of liability . . . ."

*Hydrolevel*, 456 U.S. at 568 n.6.

sufficiently allege each defendants' participation, as well as present a factual basis for the allegations of agency." 599 F. Supp. at 1184-85. In that case, defendants argued that it was improper for complaints to "lump together" twenty-six defendants in general allegations that referred to them as "defendants" or in groups of defendants sorted by country or corporate family. The Court rejected defendants' arguments because the complaints, like the Complaints here, contained information about communications between Defendants, information about meetings where the price fixing took place, and discussions about pricing down the chain of distribution. And in the optical disk drive antitrust litigation, Judge Seeborg recently held that even "especially thin" allegations tying the multiple affiliated defendants in that case to the conspiracy were sufficient at the pleading stage to allow the complaint to proceed. *See In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2012 WL 1366718, at *7 (N.D. Cal. Apr. 19, 2012).

Indeed, Defendants' argument that it is improper to "lump [them] together" and refer to them by corporate family designations fails where, as here, Plaintiffs have pled numerous direct allegations that plausibly suggest all Defendants participated in the conspiracy. This case is a far cry from *Lyshorn v. J.P. Morgan Bank, N.A.,* No. 12-cv-05490 JSW, 2013 WL 2606519 (N.D. Cal. June 11, 2013), where the court held that Plaintiffs grouping of Defendants failed to provide Defendants with adequate notice of their claims after explaining that "despite the 40 pages and 155 paragraphs of allegations in the FAC, *the court cannot decipher the basic facts of what Plaintiffs allege happened.*" *Id*., at *3 (emphasis added). Defendants' citation to *RSM Prod. Corp. v. Petroleos de Venezuela Societa Anonima*, 338 F. Supp. 2d 1208, 1216 (D. Colo. 2004), is equally inapposite. There, the "*only* allegation concerning CITGO" was that it was "the wholly owned U.S. marketing arm of PDVSA." *Id*. (emphasis added). Finally, plaintiffs in *Invamed, Inc. v. Barr Labs., Inc.*, 22 F. Supp. 2d 210, 219 (S.D.N.Y. 1998), only alleged that "affiliated" companies were liable "solely due to their corporate affiliation with" the defendant that had engaged in the alleged conduct. Plaintiffs have obviously alleged far more here. The other cases cited by Defendants are not analogous because, unlike here, the plaintiffs there asserted only boilerplate allegations.[17]

---

[17] *See Brennan v. Concord EFS, Inc.,* 369 F. Supp. 2d 1127, 1136 (N.D. Cal. 2005) (explaining that because two defendants were mentioned only in the context of generalized allegations that grouped

In sum, Defendants' Motion to Dismiss improperly deconstructs Plaintiffs' allegations, arguing that each allegation, *analyzed individually*, fails to state a claim.  However, "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."  *Cont'l Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962).  Thus, contrary to their arguments, "[D]efendants may not 'cherry pick' specific allegations in the complaint that might be insufficient standing alone."  *In re Aftermarket Filters Antitrust Litig.*, No. 08-cv-4883, 2009 WL 3754041, at *3 (N.D. Ill. Nov. 5, 2009).

## V.   SAMYANG KOREA IS JOINTLY AND SEVERALLY LIABLE TO PLAINTIFFS

Samyang Korea's separate motion [Dkt. No. 89] fails to address the fact that Plaintiffs allege a conspiracy in which all Defendants participated.  It is axiomatic that each member of a conspiracy is jointly and severally liable to all plaintiffs for all harm caused by the conspiracy. As a consequence, each plaintiff injured by the conspiracy can recover from any or all members of the conspiracy for the harm inflicted—whether or not the plaintiff dealt directly with every defendant. *See Paper Systems Inc. v. Nippon Paper Industries Co*., 281 F.3d 629, 632-34 (7th Cir. 2002) (co-conspirator jointly and severally liable to each plaintiff injured by the conspiracy, even though co-conspirator did not deal directly with any of the plaintiffs); *Beltz*, 620 F.2d at 1367  ("[i]f Beltz can establish the existence of a conspiracy in violation of the antitrust laws and that appellees were a part of such a conspiracy, appellees will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of appellees' own actions."); *In re K-Dur Antitrust Litig*., 338 F. Supp. 2d 517, 538 (D.N.J. 2004) ("a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy").  For this reason, Samyang Korea is a proper defendant here.

---

together defendants, "there are no allegations in the complaint specifically connecting [two defendants] to the alleged conspiracy."); *In re Sagent Technology Inc., Derivative Litig.,* 278 F. Supp. 2d 1079, 1094-1095 (N.D. Cal. 2003) (Rule 8 was not satisfied where *thirteen* individual defendants were lumped together, and only three of these defendants were alleged to have been present for the entire period of events alleged.).

**VI.   PLAINTIFFS' ALLEGATIONS OF DEFENDANTS' EFFORTS TO CONCEAL THEIR CONSPIRACY ARE SUFFICIENT TO INVOKE THE DISCOVERY RULE AND TOLL THE APPLICABLE LIMITATIONS PERIOD**

Defendants contend that the applicable limitations period bars Plaintiffs' claims for injuries sustained more than four years before the filing of the first Complaint. *See* Omnibus MTD Br. at 20. This assertion is wholly without merit. Plaintiffs' Complaints allege both that Plaintiffs had no knowledge of the conspiracy or any facts that would have excited their suspicion of actionable wrongdoing before July 12, 2012, when the KFTC publicly issued its order and findings disclosing the existence of the Korean Noodle cartel, and that Defendants fraudulently concealed the existence of their unlawful scheme. *See* DPC, ¶¶ 4, 195-98, 199-221; IPC at ¶¶ 3, 144-147, 162-169.  The Complaints explain why the Korean Noodle market was, to all appearances, competitive, and details the affirmative acts of concealment which Defendants employed to further that false impression.

**A.   The "Discovery Rule" Applies Here, And Thus Plaintiffs' Claims Should Be Tolled Until The Revelation Of The Conspiracy In 2012**

As an initial matter, Defendants largely ignore the "discovery rule"—under this rule, a cause of action is tolled until a plaintiff discovers, or could reasonably discover, the cause of action.  *See In re Processed Egg Prods. Antitrust Litig.,* 931 F. Supp. 2d 654, 657 (E.D. Pa. 2013); *see also Mangum v. Action Collection Serv., Inc.,* 575 F.3d 935, 940 (9th Cir. 2009) ("[w]e have made it clear that, in general, the discovery rule applies to statutes of limitations in federal litigation . . ."); *In re Copper Antitrust Litig.,* 436 F.3d 782, 789 (7th Cir. 2006) (discovery rule applies in antitrust cases).

Here, Plaintiffs allege that from the outset, Defendants concealed and otherwise acted to keep secret the existence of the price-fixing conspiracy by various means, including the use of "secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings, the use of non-public emails, and concealing the existence and nature of their competitor price discussions from non-conspirators (including customers)." DPC at ¶ 220; IPC at ¶ 168. For example, Defendants met in secret around the end of 2000 or the beginning of 2001 and agreed to collectively raise the price of Korean Noodles. *See* DPC at ¶¶ 75-78; IPC at ¶¶ 63-39 (describing meetings at the Renaissance Seoul Hotel and the Regular General Assembly of Ramen Conference held at the Capital Hotel in Seoul); *see also* DPC at ¶¶ 164-67; IPC at ¶ 140 (describing agreement

among Defendants to fix prices reached at the Regular General Assembly of Ramen Conference in 2008. Following those initial meetings, Defendants exchanged amongst themselves sensitive non-public information, including forward-looking price and sales information, on a regular basis in an effort to simultaneously implement their conspiratorial scheme and to police the conspiracy by reinforcing the transparency of the Korean Noodle market. *See* DPC at ¶ 67; IPC at ¶ 55. Indeed, the KFTC Order lists 341 e-mail communications among Defendants exchanging information related to prices and sales. *See id.; see also* DPC at ¶¶ 68, 71, 78, 89, 93, 95, 97, 99, 106, 107, 111, 116, 117, 119, 121, 124, 129, 134, 136, 137, 143, 145, 147, 150, 152, 154, 155, 156; IPC at ¶¶ 73, 76, 78, 81, 83, 89, 90, 92, 97, 99, 101, 103, 109, 111, 113, 115, 116, 117, 123, 124, 125, 127, 129, 130, 132, 134, 135, 136, 137 (specific instances of Defendants exchanging via email and other communications forward-looking pricing information, including but not limited to "exact factory prices of products, which would not be known to the public," in furtherance of the six price increases identified in the DPC and IPC. Far from "simply labeling the alleged conspiracy as 'self-concealing'" (*see* Omnibus MTD Br. at 22), Plaintiffs allege facts sufficient to demonstrate that Defendants were in fact successful in hiding their conspiratorial scheme from the public at large. Given Defendants' success in this regard, there were no facts in existence to excite the inquiry of Plaintiffs until the KFTC's public disclosure of the Korean Noodle cartel on July 12, 2012. *See* DPC at ¶¶ 195-98; IPC at ¶ 162.[18]

### B.   Plaintiffs' Claims Would Still Be Tolled Until 2012 Under The "Fraudulent Concealment" Rule

While, as stated above, the "discovery rule" should toll Plaintiffs' claims, and Plaintiffs need not allege that Defendants took the affirmative step of fraudulently concealing their claims, Plaintiffs have also pled specific instances of fraudulent concealment. More specifically, and as discussed above, Plaintiffs' allegations reflect that Plaintiffs were unaware of the conspiracy until shortly after

---

[18] As such, Plaintiffs need not plead facts showing an attempt to investigate their claims. *See Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 504 (9th Cir. 1998), *cert. denied sub nom. VSL, Inc. v. Conmar Corp.*, 488 U.S. 1010 (1989) ("*Conmar*") ("[t]he requirement of diligence is only meaningful . . . when facts exist that would excite the inquiry of a reasonable person."); *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 788 (N.D. Cal. 2007) ("*Rubber Chemicals*") (same).

the KFTC publicly issued its Order in July 2012, and reasonably could not have been aware before

that time given Defendants successful efforts to maintain the secrecy of their unlawful agreement.

In addition, Plaintiffs allege various instances of Defendants' affirmative concealment of the

conspiracy by actively misleading the public about the price-fixing scheme. *See Conmar,* 858 F.2d

at 502. In various public statements, Defendants employed the pretext of input cost increases so as

to conceal the true nature of the Korean Noodle price increases. *See* DPC at ¶ 199; IPC ¶¶ 154, 164.

For example, Plaintiffs allege at least fifteen instances from 2001 through 2008 of Defendants

making public statements about the reasons for Korean Noodle price increases—all ostensibly the

result of price increases for main ingredients including flour, palm oil, and wheat starch. *See* DPC at

¶¶ 189, 201-15; IPC ¶¶ 154, 164. Not once did any Defendant mention an agreement to fix prices

with competitors as the reason for such price increases. *See* DPC at ¶ 200; IPC at ¶ 162. Pretextual

reasons for price-fixing can support an allegation of fraudulent concealment.[19]

For example, in *In re Urethane Antitrust Litig.*, 683 F.Supp.2d 1214 (D. Kan. 2010) the court

upheld allegations of fraudulent concealment in circumstances nearly identical from those here:

> Defendants also argue that these fraudulent concealment allegations cannot be
> plausible under *Twombly* in light of plaintiffs' failure to allege facts to refute the
> stated (and allegedly pretextual) reasons for the price increases. In essence,
> defendants are arguing that without such a refutation, plaintiffs have not alleged any
> facts to support a plausible claim of pretext. The Court rejects this argument as
> well. The fact that defendants had entered into an agreement to fix prices (as
> sufficiently alleged by plaintiffs, in part in reliance on information from a member
> of the conspiracy) gives rise to the reasonable inference that subsequent price
> increases resulted from that agreement—whether or not the increases might also
> have been justified in whole or in part by conditions such as rising costs. Perhaps
> costs were rising, but under these circumstances it is plausible that competitive
> pressures would have held prices down absent an agreement. Therefore, plaintiffs
> have plausibly alleged that defendants' pre–1999 statements were false and
> pretextual.

*Id.* at 1234. *See also CRTs.*, 738 F.Supp.2d at 1024 (the court noted that "Direct Purchaser

Plaintiffs allege that Defendants gave pretextual reasons for price increases, and coordinated their

misleading announcements"); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp.2d 987, 1018 (E.D.

Mich. 2010) (the court upheld fraudulent concealment claims based on allegations that "Defendants

affirmatively concealed their anti-competitive conduct from Plaintiffs . . . represented publicly, both to customers and otherwise, that their pricing activities were unilateral, rather than collusive, and based upon legitimate business purposes, such as increased costs"); *In re Catfish Antitrust Litig.*, 908 F. Supp. 400, 408 (N.D. Miss. 1995) (giving pretextual reasons to customers concerning why close prices between members of conspiracy qualifies as fraudulent concealment).

Defendants dismiss these allegations out of hand, claiming that "there is no reason to think that statements made by the Defendants regarding cost increases are false or fraudulent." *See* Omnibus MTD Br. at 22. Defendants are wrong. "As determined by the KFTC, the truth is that Korean Noodle prices had little correlation with input costs, and often substantially exceeded increased input costs." *See* DPC at ¶ 216; IPC ¶ at 165. Plaintiffs include in their Complaints a chart, which was included in the KFTC Order, reflecting that the Korean Noodle "price increase often was greater than the raw materials increase." *See* DPC at ¶¶ 216-17. As such, Defendants statements to the contrary served to mislead the public and are sufficient to plead fraudulent concealment to toll the applicable limitations period. *See In re TFT-LCD (Flat Panel) Antitrust Litig. ("LCDs I")*, 586 F. Supp. 2d 1109, 1119-20 (N.D. Cal. 2008) (sustaining allegations of fraudulent concealment where plaintiffs alleged defendants provided pretextual reasons for inflated LCD prices and defendants kept conspiracy secret).

Furthermore, Plaintiffs respectfully submit that the Court should decline to entertain Defendants attempt to characterize such statements as benign. *See* Omnibus MTD Br. at 21 (claiming Plaintiffs are "attempt[ing] to fashion fraudulent concealment out of statements made in the ordinary course of business"). "[I]t is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators." *See CRTs,* 738 F. Supp. 2d at 1024 (citing *Rubber Chemicals,* 504 F. Supp. 2d at 789); *see also In re LCDs I*, 586 F. Supp. 2d at 1120 (same). Here, Plaintiffs have alleged facts sufficient to preclude a determination as a matter of law that the statute of limitations bars any part of their claims. Defendants' motion should, therefore, be denied.

21

## VII.    THE COMPLAINTS MAY NOT BE DISMISSED PURSUANT TO THE FTAIA

Defendants next assert that the FTAIA shields them from antitrust liability.  They are mistaken.

### A.    The FTAIA Is Not A Limit On The Court's Subject Matter Jurisdiction

As an initial matter, Defendants move for dismissal on FTAIA grounds under Rule 12(b)(1), arguing that the FTAIA is a jurisdictional limitation on the Court's power to hear this dispute. Defendants rely on *United States v. LSL Biotechnologies*, 379 F.3d 672, 683 (9th Cir. 2004) ("*LSL*"), but that case is no longer the law of this Circuit with respect to the question of whether the FTAIA is jurisdictional.  *See United States v. Hui Hsiung,*  Nos. 12-10492, 12-10493, 12-10500, 12-10514, 2014 WL 3361084, at * 10-11 (9th Cir., Jul. 10, 2014) ("*Hsiung*") ("the FTAIA is not a subject-matter jurisdiction limitation on the power of federal courts but a component of the merits of a Sherman Act claim involving nonimport trade or commerce with foreign nations. . . . To the extent *LSL Biotechnologies* signaled the contrary, intervening Supreme Court precedent clarifies that the issue of 'what conduct [the FTAIA] prohibits' is a merits question, not a jurisdictional one."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F. Supp. 2d 953, 959 (N.D. Cal. 2011) ("*LCDs III*") ("the FTAIA does not affect subject matter jurisdiction . . ."); *see also Minn-Chem, Inc.*, *v. Agrium, Inc.*, 683 F.3d 845, 852 (7th Cir. 2012) ("*Minn-Chem*"); *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 467-69 (3d Cir. 2011) ("*ASPI II*").

Accordingly, Defendants' dismissal motion with respect to the FTAIA must proceed under Rule 12(b)(6) and not under Rule 12(b)(1).  This difference is material because under Rule 12(b)(6), the Sherman Act's reach is a merits issue that is not appropriate for dismissal unless a defect is plainly apparent on the face of the Complaints and, importantly, Plaintiffs do not have the burden of establishing jurisdiction under the FTAIA.

### B. The FTAIA Does Not Bar Damages Claims For Transactions Arising In Domestic U.S. Commerce And Those Involving Imports To The United States

The FTAIA provides that:

[The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless

(1) such conduct has a direct, substantial, and reasonably foreseeable effect

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of [the Sherman Act], other than this section l5 U.S.C. § 6a.

As discussed more fully below, Defendants' importation of Korean Noodles to the U.S. "involve[s] ... import trade or import commerce" and therefore is not excluded by the FTAIA.  *In re Air Cargo Shipping Servs. Antitrust Litig.*, MDL No. 1775, Case No. 06-md-1775 (JG)(VVP), 2009 WL 3443405, at *1 (E.D.N.Y., Aug. 21, 2009); *In re Air Cargo Shipping Servs. Antitrust Litig.*, Case No. 06-md-1775 (JG) (VVP), 2008 WL 5958061, at *12 (E.D.N.Y. Sept. 26, 2008) ("the Section 6(a) language makes clear that not only import commerce, but conduct involving import commerce, is never removed from the reach of the Sherman Act").

Stated differently, the FTAIA does not apply—and thus Sherman Act does apply—when commercial activities abroad "adversely affect . . .  imports to the United States." *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004) ("*Empagran I*"); *United States v. Anderson*, 326 F.3d 1319, 1330 (11th Cir. 2003) (the FTAIA does not bar prosecution, even when defendants and other conspirators formulated the conspiracy overseas, because the FTAIA only applies "to conduct involving trade or commerce . . . with foreign nations[.]"); *Turicentro, S.A., v. Am. Airlines Inc.*, 303 F.3d 293, 303 (3d Cir. 2002) (the FTAIA as "generally denot[ing] a product (or perhaps a service) has been brought into the United States from abroad."); *Hsiung*, 2014 WL 3361084, at *15 ("[i]mportation of this critical component of various electronic devices [TFT-LCDs] is surely "import trade or import commerce." To suggest, as the defendants do, that AUO was not an "importer" misses the point.  The panels were sold into the United States, falling squarely within the scope of the Sherman Act."); *In re Optical Disk Drive Antitrust Litig.*, Case No. 3:10-md-2143 RS, 3:13-cv-04991-RS, 2014 WL 3378336, *2 (N.D. Cal., Jul. 10, 2014) ("*ODDs*") (FTAIA does not apply where "[e]ach plaintiff alleges that it made ODD purchases pursuant to negotiations that took place in California, with purchase orders issued in California, and where they took possession of the ODDs in California."); *see also* H.R. Rep. 97-686, 9 (1982) (FTAIA legislative history stating that the Act has "no effect on the application of antitrust laws to imports" and that the "import trade or

import commerce" exclusion to the FTAIA was added to the legislation so that "there [would] be no misunderstanding that import restraints, which can be damaging to American consumers, remain covered by the [Sherman Act].").

Plaintiffs' claims are plainly grounded in U.S. commerce and import trade and import commerce with the United States. The challenged transactions—Plaintiffs' purchase of Korean Noodles—occurred in the United States, as defined in the Complaints. DPC at ¶¶ 1-2 ("all persons and entities who directly purchased Korean Noodles from Defendants in the United States"); IPC at ¶ 34 ("all persons and entities that purchased Korean Ramen Noodle Products indirectly from one or more Defendants in the United States . . ."). Plaintiffs are U.S. businesses. DPC at ¶¶ 11-16, IPC at ¶¶ 10-19. Three or four[20] of the defendants had U.S.-based headquarters during the Class Period. DPC at ¶¶ 19, 29, 34; IPC ¶¶ at 25, 27, 28, 209. The other four defendants exported Korean Noodles to the United States. DPC at ¶¶ 26, 32, 36, 37, IPC at ¶¶ 20, 21, 22, 23. The amount of Defendants' sales[21] of Korean Noodles, and the existence of the U.S.-based corporate headquarters of the Korean defendants' subsidiaries, illustrate that the Korean Defendants specifically targeted the U.S. market.

The named U.S. Defendants, which serve as subsidiaries or distributors for the Korean Defendants, import Korean Noodles into the United States and distribute the product across the country.[22] The Korean Noodles imported into the United States were sold to class members. *See* DPC at ¶ 26; IPC at ¶ 20 (alleging that Defendant Nong Shim Co., Ltd. manufactured Korean Noodles in South Korea, exported the product to the United States, and then sold the products to members of the class in the United States);  DPC at ¶ 27; IPC at ¶ 25 (alleging that Nong Shim Co.

---

[20] Indirect Purchaser Plaintiffs also name Paldo Co., Ltd. as a Defendant.

[21] *See* DPC at ¶ 25 (emphasizing that U.S. sales of Nong Shim's Korean Noodles accounted for 15 % of the company's consolidated sales and 7 % of the total profit in 2010).

[22] *See* DPC at ¶ 30; IPC at ¶ 27 (Ottogi America distributes Ottogi Co. Ltd. products all over the United States); DPC at ¶ 34; IPC at ¶ 29 (Sam Yang USA sells and distributes Samyang Foods Co. Ltd.'s Korean Noodles products throughout the United States and publicly conveyed information concerning the false and misleading reasons for price increases of Samyang products); DPC at ¶ 37; IPC at ¶ 23 (Korea Yakult distributed its Korean Noodles products throughout the United States as Paldo America until year 2010); IPC at ¶ 28 (Paldo has imported into the U.S. and distributed Korean Noodles manufactured by Korea Yakult since 2012).

Ltd. established a factory in California to manufacture Korean Noodles, produced approximately 200 million pounds of instant noodles at that U.S. factory in 2008, and sold the Korean Noodles in U.S. commerce); DPC at  ¶ 29; IPC at ¶ 27 (alleging that Ottogi America, as a subsidiary of Ottogi Co., Ltd., sells and distributes Ottogi's Korean Noodles throughout the United States); DPC at ¶ 36; IPC at ¶ 22 ("During the Class Period, Samyang manufactured all of its Korean Noodles in South Korea, imported the Korean Noodles to the United States, and sold them to members of the Class in the United States."); DPC at ¶¶ 38-39; IPC at ¶ 23 (alleging that Defendant Korea Yakult's Korean Noodles are all manufactured in Korea but imported to the United States and sold to class members). Thus, this case involves conventional U.S. commerce, and the limitations of the FTAIA have no application here. *Hsiung*, 2014 WL 3361084, at *15.

Defendants' reliance on *Kruman v. Christie's Intern.* PLC, 284 F.3d 384 (2d Cir. 2002) ("*Kruman*") for the proposition that foreign price-fixing conduct cannot be considered import trade or import commerce is entirely misplaced.  Omnibus MTD Br. at 26-27.  In *Kruman*, the court was confronted with allegations that London auction houses fixed commissions at auctions that occurred in London and, thereafter, some auction buyers returned to the United States with merchandise purchased at the London auctions.  The Second Circuit held that the auction houses, themselves, were not engaged in import trade or import commerce: "As the district court aptly observed, '[t]he commerce that is the focus of this case is the charging of fixed commissions on the purchase and sale of goods at foreign auctions, not the trade in and subsequent movement of the goods that were purchased and sold.' While some of the goods purchased in those auctions may ultimately have been imported by individuals in the United States, the object of the conspiracy was the price that the defendants charged for their auction services . . . .'" (internal citation omitted). *Kruman* is therefore distinguishable from this case because, here, Defendants were involved in the importation of the Korean Noodles, which serve as the subject of Plaintiffs' claims.

Tacitly acknowledging the lack of legal support for their position, Defendants unilaterally seek to recast Plaintiffs' allegations as pleading a "foreign conspiracy to fix the prices of a foreign product sold in a foreign market."  Omnibus MTD Br. at 26.  This argument, however, cannot override the plain allegations of the Complaints, which at this stage, must be taken as true.  *LSL*, 379

1    F.3d at 699 n. 12 (allegations in a complaint "must be taken as correct for Rule 12(b)(6) purposes.").

2    The Ninth Circuit's holding in *Hsuing* is directly on point and conclusively establishes that the

3    FTAIA does not apply.

4    **C.      Alternatively, Plaintiffs' Claims Fall Within The FTAIA's Domestic Effects Test**

5           Moreover, Defendants' fixing of Korean Noodle prices sold into the U.S. also meets the

6    exception set forth in Section 6a(1)(A) and 6a(2)—*i.e.*, Defendants' conduct has "direct, substantial,

7    and reasonably foreseeable effects" on domestic "trade or commerce" and  "such effect gives  rise to

8    a claim under the provisions of[the Sherman Act]."  "Where price-fixing activity constitutes

9    'conduct involving trade or commerce ... with foreign nations,' such conduct 'nonetheless [may fall]

10   within a domestic-injury exception to the general rule, an exception that applies (and makes the

11   Sherman Act nonetheless applicable) where the conduct (1) has a 'direct, substantial, and reasonably

12   foreseeable effect' on domestic commerce, and (2) 'such effect gives rise to a [Sherman Act]

13   claim.'"  *Empagran I*, 542 U.S. at 158-59; *see also Hsiung*, 2014 WL 3361084, at *15 ("Unlike

14   import trade, which is exempted from the FTAIA altogether, if the government proceeds on a

15   domestic effects theory, which it did here, the government must plead and prove the requirements

16   for the domestic effects exception to the FTAIA.").

17          Plaintiffs' allegations fall squarely within the domestic injury exception to the FTAIA

18   because Defendants' conduct in shipping Korean Noodles to the United States (1) had a direct,

19   substantial, and reasonably foreseeable effect on domestic commerce, and (2) that effect—the

20   overcharges associated with the sale of the Korean Noodles imported into and sold in the U.S.—

21   gives rise to the Sherman Act claim asserted by class members. *See Empagran I*, 542 U.S. at 159

22   ("[T]his case involves vitamin sellers around the world that agreed to fix prices, leading to higher

23   vitamin prices in the United States and independently leading to higher vitamin prices in other

24   countries such as Ecuador. We conclude that, in this scenario, a purchaser in the United States could

25   bring a Sherman Act claim under the FTAIA based on domestic injury."); *Minn-Chem*, 683 F.3d at

26   854 ("[f]oreigners who want to earn money from the sale of goods and services in American markets

27   should expect to have to comply with U.S. law."); *In re Dynamic Random Access Memory (DRAM)*

28   *Antitrust Litig.*, 546 F.3d 981, 986 (9th Cir. 2008) ("*DRAM*") ("[t]he FTAIA thus clarifies that U.S.

antitrust laws concern the protection of 'American consumers and American exporters, not foreign consumers or producers.'") (internal citations omitted).

In addition to Paragraph 10 of the DPC and Paragraph 9 of the IPC, which expressly plead that Defendants' "conduct had a direct, substantial, and reasonably foreseeable effect on U.S. trade or commerce," numerous additional allegations support that assertion. As noted above, three or four of the Defendants are headquartered in the U.S. and were either wholly owned subsidiaries of their Korean parents or acted as the exclusive U.S. distributor for Korean Noodles (Samyang USA). DPC at ¶¶ 19, 29, 34; IPC at ¶¶ 20-23. Defendant Korea Yakult, registered to do business in the United States as Paldo America until 2012, distributed and sold its Korean Noodles products in the United States. DPC at ¶ 37; IPC at ¶ 23. Moreover, the Korean Defendants' overall business model included considerable reliance on the U.S. market. For example, Defendant Nong Shim Co., Ltd.'s 2008 Factbook recounted how it "targeted" the U.S. market by increasing efforts to promote its products to 1.4 million ethnic Koreans living in the United States, and the company's 2009 Factbook described an "accelerated globalization" of the Shin brand of Korean Noodles, as evidenced by $32 million in sales. DPC ¶¶ 57, 58; *see also* IPC at ¶ 46 (explaining that Nong Shim Co., Ltd.'s 2003 Factbook targeted Korean Americans and locals in the United States) . The Complaints reference price-fixing on the "factory"—or wholesale—prices of Korean Noodles. DPC  at ¶¶  124, 128, 133, 142, 160; IPC at ¶¶ 2, 55, 57, 75, 80, 83, 86, 94, 108, 114, 131, 138. Moreover, the Complaints cite news articles and other reports that trace increased prices in the United States to the Defendants' price-fixing activity in Korea.[23]

In assessing direct effects, courts have determined that it would be "too narrow" to limit the proposed definition of "direct effect" to only the first sale of the product. *See In re TFT-LCD*, 822 F. Supp. 2d at 964. In this specific case within the overarching *TFT-LCD* litigation, LCD panels were first sold to foreign entities, which incorporated them into finished products at foreign manufacturing facilities, and then potentially resold them several times before the products arrived in the United States. *Id*. at 962. The plaintiffs successfully argued that the location of the "first sale" of the price-

---

[23] *See* note 10, *supra*.

fixed product does not matter when a product moves "without deviation or interruption" from a foreign defendant to a U.S. indirect purchaser.  *Id*. at 964.  Similarly, here, because the price-fixed Korean Noodles reached U.S. indirect purchasers "without deviation or interruption," *see* IPC at ¶¶ 155, 157, at and the primary injury to plaintiffs was not foreign but occurred in the United States,[24] Defendants' price-fixing conduct had undeniably direct effects on the United States.

Despite this legal authority and the allegations contained in the Complaints, Defendants assert that Korean-U.S. pricing correlations (*see* DPC ¶¶ 177 (Nongshim-branded Korean Noodles), 181 (Ottogi-branded Korean Noodles), and 185 (Samyang-branded Korean Noodles)) do not sufficiently establish that U.S. prices followed as a "direct" consequence of Defendants' price-fixing activity, and thus fall outside of the direct effects exception to the FTAIA.  *See* Omnibus MTD Br. at 29.  Defendants cite two inapposite cases—*DRAM* and *Korean Air*—for this proposition.  In both cases, the relevant plaintiffs were *foreign buyers in a foreign market* who sought to bring a Sherman Act claim against the defendants.  To satisfy the FTAIA's effects test, plaintiffs alleged that the prices they paid were correlated to the prices paid by U.S. purchasers in the United States.  In both cases, the courts found that this pricing relationship between United States and foreign pricing was insufficient to state a Sherman Act claim by these foreign buyers.  *See In re DRAM*, 546 F.3d at 989 ("[n]otably, Centerprise is a foreign consumer that made its purchases entirely outside of the United States.  It has recourse under its own country's antitrust laws. . . . .   Centerprise's indirectly linked foreign injury is not of the type that Congress intended to bring within the Sherman Act's reach when it enacted the FTAIA . . . ."); *In re Korean Air Lines Co. Antitrust Litig.,* No. CV 07-01891, Master File No. CV 07-05107 SJO (GRx), 2010 WL 3184372 at *1 (C.D. Cal. Aug. 2, 2010)

---

[24] Only when plaintiffs' injuries occur overseas, and only through "somewhat tortured theories of causation," do courts generally find that there is no evidence linking foreign anticompetitive conduct to purported domestic effects. *See  LCDs III*, 822 F. Supp. 2d at 966-967 (citing *United Phosphorus Ltd. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003 (N.D. Ill. 2001) (Indian company attempts to convert foreign injury into a matter of domestic concern by asserting that its exclusion from the market led to higher prices in the United States); *Eurim-Pharm GmbH v. Pfizer Inc.*, 593 F.Supp. 1102 (S.D.N.Y. 1984) (rejecting German company's attempt to bring suit in the United States by claiming that the monopoly causing its foreign injury also harmed consumers in the United States)). These cases are inapposite to the facts of this case, where plaintiffs have suffered a domestic injury that is directly traceable to defendants' anticompetitive conduct.  *See  LCDs III*, 822 F. Supp. 2d at 967.

28

1    ("*Korean Air*") (citing *DRAM*, the court held that "[a]t best, Plaintiffs' briefing, as well as the

2    Declaration and Report of Dr. Gloria Hurdle, suggests a correlation between higher U.S.-purchase

3    prices and higher Korea-purchase prices. Such a correlation or interdependence of markets does not

4    suffice to show that the effect in the United States actually gives rise to Plaintiffs' Korea-purchase

5    claims.")

6          Defendants fail to discuss the *Korean Air* court's prior holding, where the court found that

7    there were direct effects with respect to *U.S. purchases.  In re Korean Airlines Antitrust Litig.,* No.

8    CV 07-01891, 2008 U.S. Dist. LEXIS 111722, at *20 (C.D. Cal. 2008)("[a] conspiracy to fix the

9    prices charged for the service of flying passengers between Korea and the U.S. has a direct,

10   substantial, and reasonably foreseeable effect on domestic commerce: higher prices in the U.S."); *see*

11   *also LCDs III*, 822 F. Supp. 2d at 963-64 (narrow interpretation of "direct" would "exclude from the

12   Sherman Act's reach a significant amount of anticompetitive conduct that has real consequences for

13   American consumers" because, in today's world, "modern manufacturing takes place on a global

14   scale"); *ODDs,* 2014 WL 3378336, at *3 (declining to resolve applicability of direct effects

15   exception at pleading stage) (citing *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No.

16   07-cv-1819 CW, 2010 WL 5477313 (N.D.Cal. Dec. 31, 2010)); *In re Transpacific Passenger Air*

17   *Transp. Antitrust Litig.,* No. 07-05634 CRB, 2011 WL 1753738, at *5 (N.D. Cal., May 9, 2011)

18   ("Plaintiff's other allegation of a direct effect—that 'U.S. residents and citizens paid more for air

19   passenger transportation' is fairly indisputable.").

20         Defendants also cite *LSL* for the proposition that an effect is "direct" if it "follows as an

21   immediate consequence of the defendant's activity."  In *LSL*, the Ninth Circuit concluded that there

22   was no direct effect on domestic commerce where the defendant allegedly restrained a foreign

23   competitor from entering the North American tomato seeds market.  The court explained that the

24   allegedly restrained competitor had not actually succeeded in producing competitive seeds, had not

25   demonstrated that it could even do so without violating a U.S. patent, and had not demonstrated that

26   it could compete effectively in the U.S. marketplace even if it had a competitive product.  In the end,

27   the court concluded that "[a]n effect cannot be 'direct' where it depends on such uncertain

28   intervening developments." 379 F.3d at 680-81.  It bears noting that even in *LSL*, the Ninth Circuit

29

stated:

> We can imagine a situation where the exclusion of a potential foreign competitor would satisfy the "direct" requirement. One such scenario might be where the foreign competitor already has the good in hand. It might also be possible for a "direct" effect to exist where the potential foreign competitor does not yet have the product in hand. A potential foreign competitor might be able to demonstrate that its exclusion already has an effect on the American market. For example, the competitor might be able to demonstrate that its exclusion is causing existing market players to invest less in the research and development of new products.

*Id.* at 681. Here, unlike in *LSL*, Defendants actually manufactured and distributed the relevant product—Korean Noodles—in the United States.

Finally, the Defendants cite *Animal Sci. Prods., Inc. v. China Nat'l Metals & Minerals Imp. & Exp.t Corp.*, 596 F. Supp. 2d 842, 863 (D. N.J., 2008) ("*Animal Science*") (U.S. purchasers of magnesite sued Chinese suppliers for price-fixing) for the general proposition that mere ripple effects may be too attenuated to be considered "direct" under the FTAIA. However, they fail to note that the Third Circuit *reversed* the district court's subsequent dismissal order on grounds that are particularly relevant here—where Defendants do not seriously dispute that there was a price-fixing agreement. The Third Circuit explained that "the [FTAIA's] effects test may be satisfied by [U.S. purchasers'] allegations that the domestic injury is direct, substantial, and reasonably foreseeable, without regard to whether United States consumers are alone in suffering that injury." *ASPI II,* 654 F.3d at 471 n. 12.

Defendants' motion is altogether silent regarding whether the Complaints claimed that Defendants' conduct had a "substantial" or "reasonably foreseeable" effect on U.S. commerce. In *Minn-Chem*, the Seventh Circuit specifically examined the "substantial" and "reasonably foreseeable" effects of Defendants' conduct in determining that: "[F]oreign sellers allegedly created a cartel, took steps outside the United States to drive the price up of a product that is wanted in the United States, and then (after succeeding in doing so) sold that product to U.S. customers. The payment of overcharges by those customers was objectively foreseeable, and the amount of commerce is plainly substantial." 683 F.3d at 860-61. The same issues relating to the substantial and reasonably foreseeable effect of increased prices of Korean Noodles on the U.S. market are evident in the Complaints. *See* DPC at ¶ 27 (Nong Shim's California factory produces 200 million

packs of instant noodles per year); ¶ 113 (Nongshim America executive states that because Nong Shim Co. Ltd. raised prices by 6.5 % on average in February, the U.S. price would increase 8-9% in April 2004); ¶ 127 (Samyang USA executive stated that the 8% price increase in Korea in March 2005 would impact the price of Korean Noodles sold in the U.S. by July 2005); ¶ 146 (*Korea Times* report that Korea Yakult would increase the price of Korean Noodles being shipped to the U.S. market in June 2007 as a result of Nongshim America's price increase).

In sum, Defendants' motion wrongly asserts that the Complaints fail to adequately allege a "direct" effect on U.S. commerce. Under Rule 12(b)(6), these issues go to the merits of Plaintiffs' claims and are not amenable to resolution at this stage of the proceedings. *LCDs III*, 822 F. Supp. 2d at 967 (denying defendants' motion to dismiss indirect purchaser claims based on the domestic effect exception to FTAIA and finding that, at the motion to dismiss stage, plaintiffs adequately established that a "material question of fact exists" regarding whether defendants' conduct had a direct effect on U.S. commerce).

### D.   Defendants' Contention That The Complaint Also Fails To Satisfy A Common Law Effects Test Under The Sherman Act Is Equally Without Merit

Defendants suggest that the Ninth Circuit might continue to recognize a distinct common law effects test enunciated in *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 444 (2d Cir. 1945) ("*Alcoa*").  Omnibus MTD Br. at 29-30.  This is not the case.  In *LSL*, the Ninth Circuit explained that the Congress' enactment of the FTAIA superseded the *Alcoa* effects test, and in fact, narrowed the application of the Sherman Act by requiring a "direct" effect that was not present in the existing common law. The Ninth Circuit held:

> The government contends that the FTAIA merely codified the existing common law regarding when the Sherman Act applies to foreign conduct and that we should continue to employ the *Alcoa* effects test. We reject this contention.

> Our task when interpreting legislation is to give meaning to the words used by Congress; we strive to avoid constructions that render words meaningless. *See United States v. Fiorillo*, 186 F.3d 1153 (9th Cir. 1999).  The FTAIA states that the Sherman Act shall not apply to foreign conduct unless it has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce. 15 U.S.C. § 6a(1). The Supreme Court reads the *Alcoa* test as conferring jurisdiction so long as the conduct creates "some substantial effect in the United States." *Hartford Fire*, 509 U.S. at 796, 113 S.Ct. 2891. Unlike the FTAIA, the *Alcoa* test does not

require the effect to be "direct."

379 F.3d at 679.  In short, even if the effects test articulated in *Alcoa* survived the enactment of the FTAIA, it is clear that Plaintiffs have adequately pled it here.  *See* DPC at ¶ 176 (alleging four price increases in the U.S. of Nong Shim Korea Noodles, with prices increasing by 2.5% in 2003, 0.4% in 2004, 5.7% in 2007, and 7.7% in 2008, corresponding to Korean price increases in the same periods); ¶ 180 (alleging a 4.6% increase in the price of Ottogi's Korean Noodles sold in the United States in 2008, corresponding to a Korean price increase); ¶ 184 (alleging two price increases in the U.S. of Samyang Korean Noodles, with price increasing by 4.3% in 2005 and by 5% in 2007-08); ¶ 186 (prices of Korea Yakult Korean Noodles were expected to increase in the United States directly following price increases in Korea); IPC at ¶¶ 154-55.

## VIII.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.  If the Court dismisses one or more claims, Plaintiffs request leave to amend.


DATED:          August 6, 2014

_____/s/ Christopher L. Lebsock_____
Michael P. Lehmann
Christopher L. Lebsock
**HAUSFELD LLP**
44 Montgomery Street, 34th Floor
San Francisco, CA 94104
TEL:  415-633-1908
EMAIL: mlehmann@hausfeldllp.com
clebsock@hausfeldllp.com

Michael Hausfeld (*pro hac vice*)
Mindy Pava *(pro hac vice)*
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington D.C.  20006
TEL: 202-540-7200
EMAIL: mhausfeld@hausfeldllp.com
        mpava@hausfeldllp.com

Lionel Z. Glancy
Michael M. Goldberg
**GLANCY BINKOW & GOLDBERG LLP**
1925 Century Park East, Suite 2100

Respectfully submitted,

_____/s/ Alan R. Plutzik_____
Alan R. Plutzik (State Bar No. 77785)
Michael S. Strimling (State Bar No. 96135)
**BRAMSON, PLUTZIK, MAHLER
& BIRKHAEUSER LLP**
2125 Oak Grove Road
Walnut Creek, CA 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792
aplutzik@bramsonplutzik.com
mstrimling@bramsonplutzik.com

*Interim Liaison Counsel For the Indirect
Purchaser Plaintiffs*

Mark P. Kindall (State Bar No. 138703)
Robert A. Izard (admitted pro hac vice)
Jeffrey S. Nobel (admitted pro hac vice)
Nicole A. Veno (admitted pro hac vice)
**IZARD NOBEL LLP**
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290
mkindall@izardnobel.com

Los Angeles, CA 90067
TEL: (310) 201-9150
EMAIL: lglancy@glancylaw.com
mgoldberg@glancylaw.com

Lee Albert (*pro hac vice*)
Gregory B. Linkh (*pro hac vice*)
**GLANCY BINKOW & GOLDBERG LLP**
122 East 42nd Street, Suite 2920
New York, NY 10168
TEL: (212) 682-5340
EMAIL: lalbert@glancylaw.com
glinkh@glancylaw.com

Susan G. Kupfer
Joseph M. Barton
**GLANCY BINKOW & GOLDBERG LLP**
One Embarcadero Center, Suite 760
San Francisco, CA 94111
TEL: (415) 972-8160
EMAIL: skupfer@glancylaw.com
jbarton@glancylaw.com

*Interim Co-Lead Counsel for the Direct Purchaser Plaintiffs*

YoungKi Rhee (*pro hac vice*)
**WE THE PEOPLE LAW GROUP**
15F The Salvation Army Bldg., 476
Chungjeongro 3-Ka
Seodaemun-Ku, Seoul 120-837, Korea
TEL: 822-2285-0062 (Dir.)
FAX: 822-2285-0071
EMAIL: ykrhee@wethepeople.co.kr

Seok Young Shin
**DR & AJU Law Firm**
7/11/12/13F, Donghoon Tower
702-19, Yeoksam-dong,
Gangnam-gu, Seoul
135-513 Korea

Barbara J. Hart (*pro hac vice*)
**LOWEY DANNENBERG COHEN & HART, P.C.**
One North Broadway, Suite 509
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
E-Mail: bhart@lowey.com

rizard@izardnobel.com
jnobel@izardnobel.com

*Interim Lead Counsel for the Indirect Purchaser Plaintiffs*

Marc Gene Reich
Byron Seho Ahn
**REICH RADCLIFFE AND KUTTLER LLP**
4675 MacArthur Court, Suite 550
Newport Beach, CA 92660
Telephone: (949) 975-0512
Email: mgr@reichradcliffe.com

Thomas Henry Bienert , Jr.
**BIENERT, MILLER AND KATZMAN, PLC**
903 Calle Amanecer
Suite 350
San Clemente, CA 92673
Telephone: (949) 226-6776
Email: tbienert@bmkattorneys.com

Young W Ryu
**LAW OFFICES OF YOUNG W RYU**
9595 Wilshire Boulevard Suite 900
Beverly Hills, CA 90212
Telephone: (888) 365-8686
Email: young.ryu@youngryulaw.com

Steven M. Sherman
**SHERMAN BUSINESS LAW**
220 Montgomery Street, Suite 1500
San Francisco, CA 94104
Telephone: (415) 403-1660
Email: steven@shermanbusinesslaw.com

Gerald S Ohn
**LAW OFFICES OF GERALD S OHN**
1875 Century Park East Suite 700
Los Angeles, CA 90067
Telephone: (310) 407-8655
Email: gerald@ohnlaw.com

*Additional Counsel for the Indirect Purchaser Plaintiffs*

33

Steven N. Williams
**COTCHETT PITRE & McCARTHY LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
E-Mail: swilliams@cpmlegal.com

Solomon B. Cera
**GOLD BENNETT CERA & SIDENER**
LLP595 Market Street, Suite 2300
San Francisco, CA 94105-2835
Telephone: (415) 777-2230
Facsimile: (415) 777-5189
E-Mail: scera@gbcslaw.com

Manuel J. Dominguez
**COHEN MILSTEIN SELLERS & TOLL PLLC**
New York Avenue, NW., Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
E-Mail: jdominguez@cohenmilstein.com

Joseph R. Saveri
**JOSEPH SAVERI LAW FIRM INC.**
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Telephone: (415) 500-6800
E-Mail: jsaveri@saverilawfirm.com

Guido Saveri
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813
E-Mail: guido@saveri.com

Steven A. Kanner
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4510
E-Mail: skanner@fklmlaw.com

Eugene A. Spector

**SPECTOR ROSEMAN KODROFF & WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
E-Mail: espector@srkw-law.com

Vincent J. Esades
**HEINS MILLS & OLSON, P.L.C.**
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
E-Mail: vesades@heinsmills.com

*Additional Plaintiffs' Counsel for the Direct Purchaser Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Christopher L. Lebsock, declare that I am over the age of eighteen (18) and not a party to the entitled action.  I am a partner in the law firm of HAUSFELD LLP, and my office is located at 44 Montgomery Street, Suite 3400, San Francisco, California 94104.

On August 6, 2014, I caused to be filed the following:

1) **PLAINTIFFS' OPPOSITION TO (1) DEFENDANTS' OMNIBUS MOTION TO DISMISS; (2)  SAM YANG USA'S MOTION TO DISMISS; AND (3) SAMYANG KOREA'S MOTION TO DISMISS**

2) **[PROPOSED] ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT; DENYING SAM YANG USA'S MOTION TO DISMISS; AND DENYING SAMYANG FOODS CO., LTD'S MOTION TO DISMISS**

with the Clerk of the Court of the United States District Court for the Northern District of California, using the official Court Electronic Document Filing System which served copies on all interested parties registered for electronic filing.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Christopher L. Lebsock*
Christopher L. Lebsock