UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEPHEN FENERJIAN, et al.,

Plaintiffs,

v.

NONGSHIM COMPANY, LTD, et al.,

Defendants.

Case No.  13-cv-04115-WHO

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS**

Re: Dkt. Nos. 80, 83, 87, 89, 102, 110, 112

**INTRODUCTION**

On July 12, 2012, the Korean Fair Trade Commission found that four Korean companies conspired to fix the prices of Korean Noodles in Korea.  The following year, direct and indirect purchaser plaintiffs filed the present suits in the United States against the four Korean companies and their purported distributors in the United States, alleging that they conspired to fix the prices of Korean Noodles sold in the United States.  Defendants move to dismiss on the grounds that plaintiffs have not plausibly pleaded a conspiracy to fix prices of Korean Noodles in the United States.

Plaintiffs have plausibly pleaded that the conspiracy to raise prices in Korea also related to Korean Noodles imported to, and sold in, the United States.  But plaintiffs have not plausibly pleaded that all of the American distributors were controlled by their purported Korean counterparts or that all of defendants' Korean Noodles in fact increased in price in the United States.  Plaintiffs have therefore not plausibly pleaded that all defendants were involved in the conspiracy and defendants' motions are GRANTED IN PART and DENIED IN PART.

The motions of defendants Sam Yang USA, Yakult Korea, and Paldo Company LTD. are GRANTED and all claims against Sam Yang USA, Yakult Korea, and Paldo Company LTD. are

United States District Court
Northern District of California

1   DISMISSED WITH LEAVE TO AMEND.  The motions of Nongshim Korea, Nongshim USA,

2   Ottogi Korea, Ottogi USA, and Samyang Korea are GRANTED with respect to the state-law

3   claims for which no named plaintiff has standing.  The indirect purchaser plaintiffs' claims under

4   the laws of Arkansas, Arizona, the District of Columbia, Hawaii, Iowa, Kansas, Maine,

5   Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, North

6   Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West

7   Virginia and Wisconsin are DISMISSED WITH LEAVE TO AMEND.

8       The motions of defendants Nongshim Korea, Nongshim USA, Ottogi Korea, Ottogi USA,

9   and Samyang Korea are GRANTED with respect to the claims under New York's Deceptive

10   Practices Act and unjust enrichment under Michigan and New York law and DENIED with

11   respect to the Sherman Act claims and state-law antitrust and consumer protection claims under

12   the laws California, Massachusetts, Michigan, Florida, and New York, and with respect to the

13   unjust enrichment claim under Massachusetts law.

14   **BACKGROUND**[1]

15       Defendants Nongshim Co., Ltd., Ottogi Co. Ltd., Samyang Foods Co. Ltd., and Korea

16   Yakult Co. Ltd. (collectively, the "Korean Defendants") manufacture Korean Noodles in Korea.[2]

17   The Korean Noodles are sold in Korea as well as imported for sale elsewhere, including in the

18   United States.  On July 12, 2012, the Korean Fair Trade Commission ("KFTC") issued an order

19   finding the Korean Defendants conspired to increase the price of Korean Noodles in Korea.  Direct

20   Purchaser Consolidated Complaint, Dkt. No. 61 ("DPCC") ¶ 4; Indirect purchaser consolidated

21   complaint, Dkt. No. 62 ("IPCC") ¶ 3.  The KFTC fined the Korean Defendants 136 billion won

22   (approximately $120 million).  DPCC ¶ 5; IPCC ¶ 4.

23       Following the KFTC's order, between July and September 2013, various direct and

24

25       [1] I assume the truth of plaintiffs' allegations for purposes of these motions.

26       [2] For purposes of this case, Korean Noodles are instant noodle soup products made of noodles,

27   seasoning and/or vegetables.  Korean Noodles are typically sold in a package with seasoning and
   dehydrated vegetables in a packet, cup or bowl.  The consumer adds boiling water to the noodles

28   and mixes in any flavor packets to make an instant meal.  *See* DPCC ¶ 1; IPCC ¶ 44.

2

United States District Court
Northern District of California

indirect purchasers of defendants' Korean Noodles filed price-fixing conspiracy actions against the Korean Defendants and their alleged American counterparts: Nongshim America, Inc., Ottogi America, Inc., Sam Yang (USA), Inc., and Paldo Company, Ltd.[3] (collectively, the "U.S. Defendants"), alleging that the Korean and U.S. Defendants conspired to raise the price of Korean Noodles sold in the United States.  Plaintiffs allege that they paid more for Korean Noodles as a result of the price-fixing conspiracy than they would have paid in a competitive market.  The various actions were consolidated and plaintiffs filed two consolidated complaints: a direct purchaser consolidated complaint and an indirect purchaser consolidated complaint.  *See* Dkt. No. 61 (DPCC); Dkt. No. 62 (IPCC).

The direct purchaser plaintiffs are food retailers and distributors that purchased Korean Noodles directly from defendants.  DPCC ¶¶ 11-16.  The direct purchaser plaintiffs are The Plaza Market, Plaintiff Pacific Groservice, Inc. d/b/a/ Pitco Foods, Summit Import Corporation, Rockman Company U.S.A. Inc., Seoul Shopping,[4] and California Market, LLC d/b/a Gaju Market. *Id*.  They allege a cause of action for price-fixing conspiracy in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.  The direct purchaser plaintiffs seek to represent a class of:

> All Persons and entities in the United States and its territories who purchased Korean Noodles directly from any Defendant at any time from May 21, 2001 through December 31, 2010. The Class excludes the Defendants, co-conspirators, and any of their parents, subsidiaries or affiliates. The Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

DPCC ¶ 43.

The indirect purchaser plaintiffs, Stephen Fenerjian, Joyce Beamer, Kendal Martin, Nicholas Halloran, Anthony An, Eleanor Pelobello, Jill Bonnington, Kenny Kang, Christina Nguyen, and Thu-Thuy Nguyen, are individuals who purchased Korean Noodles manufactured by defendants from non-party food retailers in California, Massachusetts, Michigan, Florida, and

[3] Plaintiffs allege that Paldo Company, Ltd. distributes Korean Noodles in the United States on behalf of Korea Yakult.

[4] Seoul Shopping comprises, collectively, Seoul Shopping Inc., Hansfood I Corp., Hansfoods II Corp., and Met Foods.  *See* DPCC ¶ 15.

New York.  IPCC ¶¶ 10-19.  They allege causes of action for (i) price-fixing conspiracy in violation of Section 1 of the Sherman Act,[5] 15 U.S.C. § 1; (ii) price-fixing conspiracy in violation of California's Cartwright Act, Cal. Bus. & Code §§ 16700, et seq.; (iii) violations of antitrust and restraint of trade laws[6] of Arizona, California, District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin[7]; (iv) violations of state consumer protection laws of Arkansas, California, District of Columbia, Florida, Hawaii, Massachusetts, Missouri, Nebraska, New Hampshire, New Mexico, New York, Rhode Island, Utah, and Vermont; and (v) unjust enrichment and disgorgement under the common laws of Arizona, District of Columbia, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Mexico, New York, North Carolina, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

The indirect purchaser plaintiffs seek to represent the following class for their causes of action for price-fixing conspiracy in violation of the Sherman Act and California's Cartwright Act (first and second causes of action):

> All persons and entities that purchased Korean Ramen Noodle Products indirectly from one or more Defendants in the United States for their own use and not for resale from May 2001 to the present. Specifically excluded from this Class are any Defendant; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

DPCC ¶ 34(a).  The indirect purchaser plaintiffs seek to represent various subclasses in connection

---

[5] The indirect purchaser plaintiffs properly seek only an injunction, not damages, in connection with their cause of action for violation Section 1 of the Sherman Act.  IPCC ¶ 180.

[6] Defendants state that the "Indirect Purchaser Plaintiffs assert their antitrust claims under state law because federal antitrust law does not permit recovery by indirect purchasers."  Dkt. No. 83 at 4 n.7.

[7] Indirect purchaser plaintiffs only assert the third and fourth causes of action (state law violations) in the alternative, "[s]hould this Court determine that California law [the Cartwright Act] does not apply to the Class."  IPCC ¶ 193.

4

with their state-law claims in the alternative, in the event that I determine that the California

Cartwright Act does not apply to the class identified above.  *See* DPCC ¶¶ 35-36, 193, 199.

## I.      DEFENDANTS

### A.  Defendants Nongshim Korea and Nongshim America

Nongshim Co., Ltd. ("Nongshim Korea) is a leading food company in Korea.  It has had a

high market share of Korean Noodles in Korea since the 1990s.  Since 2010, its sales represent

approximately 70% of the Korean Noodles business in Korea.  DPCC ¶ 17; IPCC ¶ 20.

Nongshim Korea owns Nongshim Holdings USA, which in turn owns Nongshim America,

Inc.  Plaintiffs allege that Nongshim America is wholly owned and controlled by, and under the

direction of, Nongshim Korea.  DPCC ¶ 19; IPCC ¶ 25.  There is overlap between the leadership

of Nongshim Korea and Nongshim America.  Mr. Dong Wong Shin is vice chairman of the board

and co-chief executive officer of Nongshim Korea and also chairman of the board of Nongshim

America.  DPCC ¶ 20.  Mr. Jun Park is president and co-chief executive officer of Nongshim

Korea and is director of Nongshim America.  DPCC ¶ 21; IPCC ¶ 25.  Nongshim America, Inc. is

headquartered in Rancho Cucamonga, California, and has other locations in California, Texas,

New Jersey, Illinois, Georgia, and Maryland.  DPCC ¶ 19; IPCC ¶ 25.

During the Class Period, May 1, 2001 to December 31, 2010, Nongshim Korea

manufactured Korean Noodles in Korea and exported Korean Noodles to the United States, where

they were sold to plaintiffs.  DPCC ¶ 26; IPCC ¶ 20.  In 2005, Nongshim Korea established a

factory in Rancho Cucamonga, California, to manufacture Korean Noodles.  DPCC ¶ 27; IPCC ¶

25 n.1.  Nongshim Korea is the only one of the Korean Defendants to have a factory in the United

States.  Plaintiffs allege, upon information and belief, that Nongshim America held a dominant

share of the market for Korean Noodles in the United States during the Class Period.  DPCC ¶ 27;

IPCC ¶ 25.

### B.  Defendants Ottogi Korea and Ottogi America

Ottogi Co., Ltd. ("Ottogi Korea") is headquartered in Korea.  DPCC ¶ 28; IPCC ¶ 21.

Ottogi America, Inc. was formed in 2005 and is headquartered in Gardena, California.  Ottogi

Korea owns 100% of Ottogi America's stock.  DPCC ¶ 29; IPCC ¶ 27.  Plaintiffs allege that

United States District Court
Northern District of California

Ottogi America is under the direction and control of Ottogi Korea.  DPCC ¶ 29; IPCC ¶ 29.

The Korean Noodles sold by Ottogi America in the United States were manufactured by Ottogi Korea in South Korea and imported into the United States, where they were sold to plaintiffs.  DPCC ¶¶ 30, 32; IPCC ¶ 21..

**C.  Defendants Samyang Korea and Sam Yang USA**

Samyang Foods Co., Ltd. (Samyang Korea) is headquartered in Korea.  DPCC ¶ 33; IPCC ¶ 22.  Sam Yang (USA), Inc. is headquartered in Santa Fe Springs, California.  DPCC ¶ 34; IPCC ¶ 29.  Sam Yang USA sells and distributes Samyang Korea's Korean Noodles throughout the United States.  Plaintiffs allege, upon information and belief, that Sam Yang USA has a long-term exclusive distributorship agreement with Samyang Korea.  DPCC ¶ 34.  Plaintiffs contend that "[a]n entry on yellowpages.com indicates that Sam Yang (USA) is 'a part of Sam Yang Foods Co., LTD who manufactures soy sauce products, ice cream and fresh milk.'" DPCC ¶ 34; IPCC ¶ 29.  Plaintiffs allege that Sam Yang USA is under the direction and control of Samyang Korea.  DPCC ¶ 34; IPCC ¶ 29.  The Korean Noodles sold by Sam Yang USA in the United States were manufactured by Samyang Korea in Korea and imported into the United States, where they were sold to plaintiffs.  DPCC ¶¶ 30, 32; IPCC ¶ 22.

**D.  Defendants Yakult Korea and Paldo Company, Ltd.**

Korea Yakult Co., Ltd. ("Yakult Korea") is based in Korea.  DPCC ¶ 37; IPCC ¶ 23.  The Korean Noodles sold by Yakult Korea in the United States were manufactured by Yakult Korea in South Korea and imported into the United States, where they were sold to plaintiffs.  DPCC ¶ 39; IPCC ¶ 23.  Indirect purchaser plaintiffs allege that Paldo Company, Ltd. has imported and distributed Korean Noodles manufactured by Korea Yakult into the United States since 2012 and that Paldo is a wholly owned and controlled subsidiary of Korea Yakult.[8]  IPCC ¶ 28.  Before 2102, Yakult Korea distributed its Korean Noodles in the United States under the name Paldo America.  IPCC ¶ 23.

---

[8] Paldo Company, Ltd. is a defendant in the indirect purchaser complaint, not in the direct purchaser complaint.

## II.    THE PRICE-FIXING CONSPIRACY IN KOREA

Plaintiffs allege that starting at the end of 2000 or the beginning of 2001, defendants agreed to a specific protocol to raise factory-level (wholesale) prices for their Korean Noodles. DPCC ¶ 66; IPCC ¶ 55.  Nongshim,[9] as the market leader, would generally increase prices first, and the other defendants would raise prices shortly thereafter.  The price increases occurred initially in Korea and were followed by price increases in the United States "through, and with, the assistance and cooperation" of the U.S. Defendants.  DPCC ¶ 66; IPCC ¶ 54.

The Korean Defendants provided each other non-public pricing information to promote the conspiracy.  DPCC ¶ 67; IPCC ¶ 55.  They exchanged sensitive management and price-related information, including sales results, business support strategies, plans for new product releases, sales promotion and advertisement plans, in order to ensure that each company would agree to the price increases.  DPCC ¶ 67; IPCC ¶ 55.  According to plaintiffs, the KFTC Order "lists 341 emails among Defendants that detail the exchanges of information related to prices and sales." DPCC ¶ 67; IPCC ¶ 55.

The price increase was first discussed in December 2000 or January 2001 when representatives of each of the Korean Defendants met in the Renaissance Seoul Hotel and agreed to raise the prices of Korean Noodles.  DPCC ¶ 75; IPCC ¶ 63.  OO Choi,[10] the Chairman of Samyang Korea, reported the meeting to Samyang Korea's CEO.  He stated that "[w]e talked this and that . . . then someone brought up the topic, 'shouldn't be [sic] increase ramen price.' And it seemed that everyone agreed that once Nongshim increased the price, everyone would increase this price as well."  DPCC ¶ 76; IPCC ¶ 64.  OO Choi estimated that the price increases would provide Samyang Korea with 200-300 million Korean won per month.  DPCC ¶ 76; IPCC ¶ 64. On March 28, 2001, representatives from the Korean Defendants attended the Regular General Assembly of Ramen Conference at the Capital Hotel in Seoul, where they confirmed their

---

[9] When discussing the conspiracy, plaintiffs lump the Korean and American entities together, for example referring to "Nongshim" rather than Nongshim Korea or Nongshim America.

[10] Direct purchaser plaintiffs state that the KFTC Order "identified witnesses by their last name only, and included the designation of 'OO' presumably to mask the identity of certain of the individual participants in the conspiracy."  DPCC ¶ 70 n.4.

agreement to raise prices.  DPCC ¶ 78; IPCC ¶ 66.  Nongshim Korea announced price increases on May 10, 2011, and the other Korean Defendants announced that they were "contemplating" price increases as well.  DPCC ¶¶ 82-83; IPCC ¶¶ 70-71.  The Korean Defendants all decided to increase factory prices between May 14 and May 30, 2001.  DPCC ¶¶ 85-94; IPCC ¶¶ 72-78.  The Korean Defendants agreed on five subsequent price increased between October 2002 and April 2008.  DPCC ¶¶ 96-163; IPCC ¶¶ 83-139.

### III.    THE PRICE-FIXING CONSPIRACY IN KOREA LED TO PRICE INCREASES IN THE UNITED STATES

Plaintiffs allege that the six price increases agreed to by the Korean Defendants led to price increases of Korean Noodles in the United States.  DPCC ¶¶ 104, 114, 126, 146, 160; IPCC ¶¶ 82, 95, 107, 126, 139.  Plaintiffs have provided charts and tables reflecting the alleged correlation between prices increases in Korea and price increases in the United States.[11]  The charts and tables are based on the purchasing records of the direct purchaser plaintiffs.

Representatives of Nongshim America noted the connection between price increases in Korea and price increases in America.  In February 2004, Mr. Yong-Hoon Lee of Nongshim America stated, "Because [Nongshim Korea] increased the ramen price by 6.5% on average, the import price [from Korea] also increased. …. We decided to increase the ramen price [in the United States] by 8-9%, starting in April."  DPCC ¶ 113; IPCC ¶ 154(b)(i).  Plaintiffs allege that Mr. Yong-Hoon Lee was identified by KFTC as a participant in the conspiracy.  DPCC ¶ 113 n.8. They cite to notes created by a member of Yakult Korea, allegedly cited by the KFTC, which state that "[d]uring the price increase in 2001, OO Kang working for Yakult Marketing team shared advance information with *OO Lee from Nong Shim*, OO Kim from Samyang, and OO Hong from Ottogi."  DPCC ¶ 93 (emphasis added); *see also* IPCC ¶¶ 154 (representatives of Nongshim America noting connection between price increases in Korea and price increases in the United

---

[11] The price correlation charts are attached as Exhibits A-E to their direct purchaser consolidated complaint. Dkt Nos. 61-1 to 61-5.

United States District Court
Northern District of California

States).[12]

Plaintiffs allege that the price increases in Korea were also reflected in the Korean Noodles manufactured by Nongshim America in the United States.  In February 2008, Yong-Hoon Lee of Nongshim America announced, "As for the products manufactured in the United States, rather than the inflation in Korea, but in response to the increase in price for the main ingredients including flour and palm oil, the price will be increased before April at the latest."  DPCC ¶ 160. The following day, Nongshim America's manager for the East Coast, Mr. Myung-Chul Shin, stated, "Right now we are waiting for the announcement from the parent company in Korea. In Korea, the price increase becomes effective immediately after the announcement.  But, in the United States, there should not be any sudden price increase because, customarily, there is usually one or one and a half month of waiting period. But, we expect the price increase to become effective [in the United States] in March or April."  DPCC ¶ 161.

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  The court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," drawing all "reasonable inferences" from those facts in the nonmoving party's favor.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  A complaint may be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "a complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (quotation marks and brackets omitted).  "Threadbare recitals of the elements

---

[12] Defendants contend that the person with the surname "Lee" that was mentioned in the KFTC order is not Yong-Hoon Lee.  *See* Dkt. No. 112.  However, whether Yong-Hoon Lee was mentioned in the KFTC order is not determinative to this order.  Rather, as noted below, it is the overlapping leadership and control over the two Nongshim entities which renders plaintiffs' allegations that Nongshim USA participated in the conspiracy plausible.

United States District Court
Northern District of California

1    of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

2         If the court dismisses the complaint, it "should grant leave to amend even if no request to

3    amend the pleading was made, unless it determines that the pleading could not possibly be cured

4    by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

5                                  **DISCUSSION**

6         Defendants move to dismiss the direct purchaser and indirect purchaser complaints on the

7    grounds that (i) plaintiffs have not plausibly pleaded a conspiracy to fix prices in the United

8    States; (ii) the claims are barred by statutes of limitation; (iii) the Court lacks subject matter

9    jurisdiction over plaintiffs' claims pursuant to the Foreign Trade Antitrust Improvements Act; (iv)

10   the indirect purchaser plaintiffs lack standing to assert claims under the laws of states in which

11   they did not reside or purchase products; (v) the indirect purchaser plaintiffs' state-law consumer

12   protection and unfair competition claims fail because the underlying price-fixing claims fail; (vi)

13   the indirect purchaser plaintiffs' claim under New York's Deceptive Acts Law fails because they

14   have not pleaded deceptive conduct; (vii) the unjust enrichment claims fail because the indirect

15   purchaser plaintiffs did not confer a direct benefit on defendants, unjust enrichment is not a cause

16   of action, and unjust enrichment is not available where there are adequate remedies at law. *See*

17   Dkt. No. 83 (defendants' motion to dismiss federal claims); Dkt. No. 80 (defendants' motion to

18   dismiss state-law claims).

19        Defendant Sam Yang USA separately moves to dismiss on the additional grounds that it is

20   solely a distributor of Korean Noodles, not a manufacturer, and therefore could not have been

21   involved in a conspiracy to fix "factory-level" prices.  Dkt. No. 87.  Defendant Samyang Korea

22   separately moves to dismiss the direct purchaser plaintiffs' claims on the additional grounds that

23   no plaintiff purchased Korean Noodles directly from Samyang Korea.  Dkt. No. 89.

24        For the reasons stated below, defendants' motions to dismiss are GRANTED IN PART

25   and DENIED IN PART.

26

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

I.      **PLAINTIFFS HAVE SUFFICIENTLY STATED A SHERMAN ACT CLAIM AGAINST DEFENDANTS NONGSHIM KOREA, NONGSHIM USA, OTTOGI KOREA, OTTOGI USA, AND SAMYANG KOREA.**

Section 1 of the Sherman Act prohibits the creation and maintenance of any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.  Stating a Section 1 claim requires "a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.  However, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*  Moreover, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely." *Id.*  A conspiracy may result in parallel conduct by conspirators, but "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to state a Section 1 claim.  *Id.* at 556-57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").  Rather, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Id.* at 557.

Based largely on the KFTC Order, the complaints detail an alleged conspiracy by the Korean Defendants to fix "factory-level" prices for their Korean Noodles in Korea.  *See* DPCC ¶¶ 66-172; IPCC ¶¶ 54-147.  But the conspiracy by the Korean Defendants to fix prices *in Korea* is not actionable here and is not the object of plaintiffs' causes of action.  Rather, the question is whether the complaints adequately allege a conspiracy to fix prices of Korean Noodles *sold in the United States* and whether plaintiffs have pleaded that each defendant was a member of that conspiracy.

A.  **Plaintiffs' allegations plausibly suggest a conspiracy to raise prices of Korean Noodles sold in the United States.**

Defendants argue that plaintiffs' allegations of correlated and parallel price increases are insufficient to plausibly plead the existence of a conspiracy to raise prices on Korean Noodles sold

11

in the United States.[13]  *See* Dkt. No. 83 at 9-13.  Defendants are correct that mere allegations of correlated or parallel price increases alone would be insufficient to state a Sherman Act Section 1 claim.  But plaintiffs' allegations are not based merely on the correlated or parallel price increases.  Rather, plaintiffs allege that the Korean Defendants conspired to raise factory-level (wholesale) prices of Korean Noodles in Korea and that those same price-fixed Korean Noodles were imported to, and sold in, the United States by the U.S. Defendants.[14]  *See, e.g.*, DPCC ¶ 173 ("During the Class Period, the Korean Defendants shipped price-fixed Korean Noodles directly to the U.S. Defendants for resale in this country."); IPCC ¶ 151 ("During the Class Period, the Korean Defendants shipped price-fixed Korean Ramen Noodle Products directly to their respective Subsidiary/Affiliate Defendants in the United States for resale in this country.").

Except as noted below, plaintiffs further allege that the U.S. Defendants are owned, controlled and directed by the Korean Defendants; that the prices of defendants' Korean Noodles in the United States did in fact rise in correlation with the price increases in Korea; and that representatives of the U.S. Defendants provided false public explanations for the price increases.  *See, e.g.,* DPCC ¶¶ 19-21, 29-30, 66, 214; IPCC ¶¶ 25-29, 150, 154, 164.

Defendants also contend that the Korean Noodles sold in Korea, which were the subject of the KFTC order, could not be sold in the United States because of United States laws on packaging and ingredients.  Dkt. No. 83 at 8.  Plaintiffs contradict that contention and allege that the same Korean Noodles that were price-fixed in Korea were shipped to the United States.[15]  At

---

[13] "Correlated" refers to allegations that the price increases in the United States correlated to price increases in Korea.  In contrast, "parallel price increases" refers to allegations that defendants increased prices in parallel, i.e., that Nongshim raised prices first and the other defendants followed suit.

[14] Plaintiffs allege that defendants participated in a price-fixing conspiracy, which is a *per se* violation of the Sherman Act.  Plaintiffs therefore need not establish that defendants intended to fix prices of Korean Noodles in the United States as well as those sold in in Korea, as long as the noodles were sold in the United States.  *See, e.g., United States v. Soc'y of Indep. Gasoline Marketers of Am.*, 624 F.2d 461, 465 (4th Cir. 1979) ("Since in a price-fixing conspiracy the conduct is illegal per se, further inquiry on the issues of intent or the anti-competitive effect is not required.").

[15] Or, in the case of Nongshim, also manufactured in the United States.

United States District Court
Northern District of California

1  this stage, I have to assume the truth of plaintiffs' allegations.  *See* DPCC ¶ 173-74, 178, 182, 186;

2  IPCC ¶ 151.

3        Defendants further assert that even assuming that the price correlation data attached to the

4  direct purchaser plaintiffs' complaint is accurate (defendants contend that it is not), the data

5  demonstrates the implausibility of plaintiffs' claims because the data shows that prices in the

6  United States increased anywhere from three to 18 months after a price increase in Korea.  Dkt.

7  No. 83 at 11.  Defendants argue that the implausibility of the claims is demonstrated by plaintiffs'

8  allegation that all these price increases, regardless of the timing, are due to price-fixing.  Plaintiffs

9  respond that their data is based on the dates when plaintiffs' purchased Korean Noodles, not when

10 the prices actually increased.  Dkt. No. 93 at 9.  In other words, the three to 18-month lags

11 between price increases in Korea and in the United States reflect when a direct purchaser plaintiff

12 *purchased* the Korean Noodles at an increased price, not when defendants actually increased the

13 prices.  At this stage plaintiffs have plausibly alleged a correlation between price increases of

14 Korean Noodles in Korea and in the United States.  The timing of the actual price increases will be

15 developed through evidence.

16        As the foregoing demonstrates, plaintiffs have placed their pricing allegations "in a context

17 that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as

18 well be independent action," as *Twombly* requires.  *Twombly*, 550 U.S. at 557.  Whether plaintiffs

19 can actually *prove* these allegations, even if improbable, is a separate matter not before me at this

20 stage.  *See id.* ("a well-pleaded complaint may proceed even if it strikes a savvy judge that actual

21 proof of those facts is improbable").

22        Defendants contend that courts in *In re Graphics Processing Units Antitrust Litig.*, 527 F.

23 Supp. 2d 1011 (N.D. Cal. 2007), *In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675

24 (N.D. Ohio Oct. 29, 2007) *aff'd,* 583 F.3d 896 (6th Cir. 2009), and *In re Late Fee & Over-Limit*

25 *Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007), dismissed Section 1 conspiracy claims based on

26 allegations containing significantly more details than are alleged here.  I disagree.  In *Graphics*

27 *Processing Units*, the plaintiffs alleged that representatives of the defendants attended the same

28 trade meetings, but there were no allegations that the representatives actually met or spoke with

United States District Court
Northern District of California

13

each other, and the plaintiffs' mere allegations of parallel action were insufficient to state a claim. *Graphics Processing*, 527 F. Supp. 2d at 1023.  Likewise, the plaintiffs in *Travel Agent* and *Late Fee* relied on allegations of parallel pricing and conclusory characterizations of the defendants' conduct, but did not place their allegations in a context which suggested a preceding agreement rather than independent action.  *Travel Agent*, 2007 WL 3171675, at *7-12; *Late Fee*, 528 F. Supp. 2d at 962-65.

Unlike *Graphics Processing*, *Travel Agent*, and *Late Fee*, here plaintiffs have placed their allegations in the context of a conspiracy between the Korean Defendants (which allegedly control and direct the U.S. Defendants) to raise factory-level (wholesale) prices of all Korean Noodles, irrespective of where those Korean Noodles were eventually shipped and sold to consumers.  The conspiracy described in the KFTC Order does not by itself support a claim for an alleged conspiracy to raise the prices of Korean Noodles sold in the United States, but it provides context which was lacking in *Graphics Processing*, *Travel Agent*, and *Late Fee* lacked.  In other words, defendants are correct that plaintiffs cannot rely solely on the KFTC Order, but nor can the KFTC Order be ignored.[16]  Plaintiffs allege that the conspirators identified by the KFTC sold the same price-fixed Korean Noodles in the United States through their controlled American counterparts, and that the prices did in fact increase in the United States in correlation to the unlawful price increases in Korea.  DPCC ¶¶ 175, 179, 183; IPCC ¶ 54.  In doing so, plaintiffs have "nudged their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

However, the question remains whether plaintiffs have sufficiently pleaded that each defendant was involved in the conspiracy to raise prices of Korean Noodles sold in the United

---

[16] Defendants assert that plaintiffs' reliance on the KFTC order is misplaced because the KFTC subsequently stated that it "determined that exported products [*e.g.,* products shipped to the United States] were not subject to price-fixing…."  Dkt. No. 83 at 7 (citing request for judicial notice, Dkt. No. 84).  The KFTC's subsequent statements are beyond the complaint and not proper subjects of judicial notice under Federal Rule of Evidence 201(b).  In any event, the statements do not render plaintiffs' allegations implausible.  Defendants' requests for judicial notice of the KFTC's subsequent statements are DENIED.  Dkt. Nos. 84, 95.

United States District Court
Northern District of California

1    States.[17]  To establish that a defendant is a member of a conspiracy, a plaintiff must "include

2    allegations specific to each defendant alleging that defendant's role in the alleged conspiracy, and

3    must make allegations that plausibly suggest that each Defendant participated in the conspiracy."

4    *In re Optical Disk Drive Antitrust Litig.*, 2014 WL 3378336 (N.D. Cal. July 10, 2014) (internal

5    citations omitted); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109,

6    1117 (N.D. Cal. 2008) (plaintiffs "must allege that each individual defendant joined the conspiracy

7    and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a

8    conscious decision by each defendant to join it").  I address in turn the allegations regarding each

9    defendant's participation in the alleged conspiracy to raise prices on Korean Noodles sold in the

10   United States.

## B.  Defendants Nongshim Korea and Nongshim America

12   Plaintiffs allege that representatives of Nongshim Korea met with representatives of the

13   other Korean Defendants in late December 2000 or early January 2001 at the Renaissance Seoul

14   Hotel and agreed to collectively raise the prices of Korean Noodles.  DPCC ¶ 75; IPCC ¶ 63.  The

15   Korean Defendants agreed that Nongshim Korea would raise its prices first and the other Korean

16   Defendants would follow suit.  DPCC ¶¶ 76-77; IPCC ¶¶ 64-65.  On March 28, 2001, this

17   agreement was confirmed by representatives of Nongshim Korea and the other Korean Defendants

18   at a meeting during the Regular General Assembly of Ramen Conference at the Capital Hotel in

19   Seoul.  DPCC ¶¶ 78-81; IPCC ¶¶ 66-69.  Nongshim and the other Korean Defendants

20   subsequently raised factory-level prices of its Korean Noodles on six occasions between 2001 and

21   2008.  DPCC ¶¶ 85-163; IPCC ¶¶ 70-139.  Plaintiffs claim that Nongshim Korea shipped its price-

22   fixed Korean Noodles to the United States where they were sold to plaintiffs.  *See, e.g.,* DPCC ¶¶

23   26, 173; IPCC ¶¶ 20, 151, 155.  Plaintiffs further assert that the prices of Nongshim's Korean

24   Noodles sold in the United States increased in correlation to the price increases in Korea.  DPCC

25

26   _____

27   [17] A defendant who joins a conspiracy is jointly and severally liable for any actions taken in
     furtherance of the conspiracy.  *See, e.g, In re TFT-LCD (Flat Panel) Antitrust Litig.*, 820 F. Supp.
     2d 1055, 1059 (N.D. Cal. 2011).  However, plaintiffs must still establish that a defendant is part of
28   the conspiracy in the first instance.

United States District Court
Northern District of California

¶¶ 174-77.  Based on the foregoing, plaintiffs have sufficiently pleaded that Nongshim Korea was a member of the conspiracy to raise the prices of Korean Noodles sold in the United States. Nongshim Korea's motion to dismiss the Sherman Act claims is DENIED.

Plaintiffs allege that Nongshim America participated in the conspiracy "by providing the same subterfuge for price increases in the United States (such as the increase in the price of raw materials) as the Korean Defendants offered for the price increases in Korea." [18]  DPCC ¶ 189. Specifically, on February 20, 2008, Mr. Yong-Hoon Lee of Nongshim America stated that prices in the United States for Nongshim products manufactured in both Korea and the United States were increasing due to the increase in the price of flour.  DPCC ¶ 214.  Plaintiffs also contend that Nongshim America participated in the conspiracy "by raising and otherwise conforming the prices of Korean Noodles in the U.S. to price levels similar to those set collusively in Korea pursuant to and at the direction of the Korean Defendants."  DPCC ¶ 190; *see also* IPCC ¶ 154.  In combination with the allegations that Nongshim Korea controlled and directed Nongshim America[19] and that the prices of Nongshim Korean Noodles sold in the United States did in fact increase in correlation to the increase in Korea, plaintiffs have plausibly alleged that Nongshim America was part of the conspiracy to fix prices on Korean Noodles sold in the United States. Nongshim America's motion to dismiss the Sherman Act claims is DENIED.

**C.  Defendants Ottogi Korea and Ottogi America**

Plaintiffs allege that representatives of Ottogi Korea met with representatives of the other Korean Defendants in late December 2000 or early January 2001 at the Renaissance Seoul Hotel

---

[18] Plaintiffs also allege that Nongshim Korea instituted a global "profitability management information system by product and business" and a "management infrastructure" in order to capture a greater share of the $540 million United States ramen market.  DPCC ¶ 187.

[19] As noted above, plaintiffs allege that Nongshim America is wholly owned by, and under the direction of, Nongshim Korea, that Nongshim Korea's vice chairman and co-chief executive officer, Mr. Dong Wong Shin, is also chairman of Nongshim America, and that Nongshim Korea's president and co-chief executive officer, Mr. Jun Park, is also director of Nongshim America.  DPCC ¶¶ 19, 20, 21, 73; IPCC ¶¶ 25, 153.  The parties dispute whether Mr. Park was identified in the KFTC order.  *See* Dkt. No. 112.  However, this order does not rely on Mr. Park being identified in the KFTC order.

United States District Court
Northern District of California

and agreed collectively to raise the prices of Korean Noodles. DPCC ¶ 75; IPCC ¶ 63. Ottogi Korea and the other Korean Defendants agreed that Nongshim Korea would raise its prices first and the other Korean Defendants would follow suit. DPCC ¶¶ 76-77; IPCC ¶¶ 64-65. On March 28, 2001, this agreement was confirmed by representatives of Ottogi Korea and the other Korean Defendants at a meeting during the Regular General Assembly of Ramen Conference at the Capital Hotel in Seoul. DPCC ¶¶ 78-81; IPCC ¶¶ 66-69. Ottogi Korea and the other Korean Defendants subsequently raised factory-level prices of their Korean Noodles on six occasions between 2001 and 2008. DPCC ¶¶ 85-163; IPCC ¶¶ 70-139. Plaintiffs allege that Ottogi Korea shipped its price-fixed Korean Noodles to the United States where they were sold to plaintiffs. DPCC ¶ 32, 173; IPCC ¶¶ 21, 151, 155.[20] Plaintiffs further allege that the prices of Ottogi's Korean Noodles sold in the United States increased in correlation to the price increases in Korea. DPCC ¶¶ 178-81; IPCC ¶ 154. Based on the foregoing, plaintiffs have sufficiently alleged that Ottogi Korea was a member of the conspiracy to raise the prices of Korean Noodles sold in the United States. Ottogi Korea's motion to dismiss the Sherman Act claims is DENIED.

Plaintiffs allege that Ottogi America participated in the conspiracy "by raising and otherwise conforming the prices of Korean Noodles in the U.S. to price levels similar to those set collusively in Korea pursuant to and at the direction of the Korean Defendants." DPCC ¶ 190; *see also* IPCC ¶ 154. Given the control which Ottogi Korea allegedly asserted over Ottogi America[21] and that the prices of Ottogi's Korean Noodles sold in the United States did in fact purportedly

---

[20] Plaintiffs plead both that the Korean Defendants sold the Korean Noodles to direct purchaser plaintiffs in the United States and that the Korean Defendants shipped their Korean Noodles to the U.S. Defendants, who then sold the Korean Noodles to the direct purchaser plaintiffs. *Compare* DPCC ¶¶ 26, 32, 37 *with* DPCC ¶¶ 173-74, 178, 182. To the extent that the Korean Defendants sold the Korean Noodles to the U.S. Defendants, who in turn sold the Korean Noodles to the direct purchaser plaintiffs, direct purchaser plaintiffs would have *indirectly* purchased the noodles from the Korean Defendants. However, direct purchaser plaintiffs would still have standing to sue the Korean Defendants for damages under Section 1 if the U.S. Defendant middlemen were controlled or owned by the Korean Defendants. *See, e.g., In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 749 (9th Cir. 2012) ("an indirect purchaser may sue if the direct purchaser is a division or subsidiary of the price-fixing seller") *cert. denied,* 134 S. Ct. 257 (U.S. 2013).

[21] As noted above, plaintiffs allege that Ottogi America is under the direction and control of Ottogi Korea because Ottogi Korea owns 100% of Ottogi America's stock. DPCC ¶ 29; IPCC ¶ 27.

United States District Court
Northern District of California

increase in correlation to the increase in Korea, plaintiffs have plausibly alleged that Ottogi America was part of the conspiracy to fix prices on Korean Noodles sold in the United States. Ottogi America's motion to dismiss the Sherman Act claims is DENIED.

### D.  Defendants Samyang Korea and Sam Yang USA

Plaintiffs allege that representatives of Samyang Korea met with representatives of the other Korean Defendants in late December 2000 or early January 2001 at the Renaissance Seoul Hotel and agreed to collectively raise the prices of Korean Noodles.  DPCC ¶ 75; IPCC ¶ 63. Samyang Korea and the other Korean Defendants agreed that Nongshim Korea would raise its prices first and the other Korean Defendants would follow suit.  DPCC ¶¶ 76-77; IPCC ¶¶ 64-65. On March 28, 2001, this agreement was confirmed by representatives of the Korean Defendants at a meeting during the Regular General Assembly of Ramen Conference at the Capital Hotel in Seoul.  DPCC ¶¶ 78-81; IPCC ¶¶ 66-69.  Samyang Korea and the other Korean Defendants subsequently raised factory-level prices of their Korean Noodles on six occasions between 2001 and 2008.  DPCC ¶¶ 85-163; IPCC ¶¶ 70-139.  Plaintiffs have adequately pleaded that Samyang Korea was part of the conspiracy to raise prices of Korean Noodles in Korea.

However, as discussed in greater detail below, unlike with Nongshim Korea and Ottogi Korea, plaintiffs have not adequately pleaded that Samyang Korea owned, controlled or directed Sam Yang USA,[22] nor do plaintiffs allege that they purchased Korean Noodles directly from Samyang Korea.  Samyang Korea argues that the direct purchaser complaint should therefore be dismissed as to Samyang Korea for lack of standing.  Dkt. No. 89.  In their opposition brief, plaintiffs counter that Samyang Korea was part of the conspiracy to fix prices for Korean Noodles sold in the United States and is jointly liable for harm caused by the conspiracy, whether or not plaintiffs purchased the Korean Noodles from Samyang Korea directly.  Dkt. No. 93 at 17.

As noted, plaintiffs have plausibly pleaded that Samyang Korea participated in a conspiracy to fix factory-level prices of Korean Noodles.  Plaintiffs further allege that Samyang

---

[22] Plaintiffs allege that Sam Yang USA sells Samyang Korea's Korean Noodles in the United States.  DPCC ¶ 34.

United States District Court
Northern District of California

Korea shipped its price-fixed Korean Noodles to the United States and that the prices of Samyang Korean Noodles in the United States did indeed increase in correlation to the price increase in Korea.[23]  DPCC ¶¶ 173, 182-85.  Plaintiffs have accordingly plausibly pleaded that Samyang Korea was part of the conspiracy to fix prices of Korean Noodles sold in the United States. Samyang Korea is therefore jointly liable for any injury caused by the conspiracy, and it is beside the point that Samyang Korea did not itself sell directly to plaintiffs.  *See, e.g, Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 634 (7th Cir. 2002) ("If Nippon Paper participated in a cartel of thermal fax paper (something that remains to be determined) then it is jointly and severally liable for the cartel's entire overcharge. That plaintiffs did not buy from Nippon Paper directly, or at all, does not matter."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 820 F. Supp. 2d 1055, 1059 (N.D. Cal. 2011) ("A defendant who joins a conspiracy is jointly and severally liable for any actions taken in furtherance of the conspiracy.").  Samyang Korea's motion to dismiss the Sherman Act claims is DENIED.

Plaintiffs allege that Sam Yang USA participated in the conspiracy "by providing the same subterfuge for price increases in the United States (such as the increase in the price of raw materials) as the Korean Defendants offered for the price increases in Korea."  DPCC ¶ 189. Plaintiffs further allege that Sam Yang USA participated in the conspiracy "by raising and otherwise conforming the prices of Korean Noodles in the U.S. to price levels similar to those set collusively in Korea pursuant to and at the direction of the Korean Defendants."  DPCC ¶ 190. However, plaintiffs have not adequately pleaded that Samyang Korea owned, controlled or directed Sam Yang USA.  Plaintiffs' reference to a questionable entry on yellowpages.com is not

---

[23] At oral argument, counsel for Samyang Korea argued that Samyang Korea's inability to control or direct Sam Yang USA's activities or any activities in the United States means that it could not have participated in the conspiracy to raise prices in the United States.  But plaintiffs allege that Samyang Korea conspired *in Korea* to fix prices on Korean Noodles and that it imported price-fixed Korean Noodles into the United States.  It is accordingly beside the point that Samyang Korea could not control the Korean Noodles once they arrived in the United States; plaintiffs allege that the prices had already been fixed at that point.  As discussed above, whether plaintiffs can prove that that is the case is not presently before me.

United States District Court
Northern District of California

United States District Court
Northern District of California

compelling.[24]  The allegation that Sam Yang USA and Samyang Korea have a long-term exclusive distributorship agreement and agreements concerning intellectual property is likewise insufficient to plausibly allege that Samyang Korea controlled and directed Sam Yang USA.  Without plausible allegations of control or ownership, the mere allegation that Sam Yang USA announced price increases and that it did in fact raise prices is insufficient to plausibly allege that Sam Yang USA participated in the conspiracy to fix prices of Korean Noodles sold in the United States.  Sam Yang USA's motion to dismiss is GRANTED.  All causes of action against Sam Yang USA in both the direct purchaser plaintiffs' and indirect purchaser plaintiffs' complaints are DISMISSED WITH LEAVE TO AMEND.

### E.  Defendants Yakult Korea and Paldo Company, Ltd.

Plaintiffs allege that representatives of Yakult Korea met with representatives of the other Korean Defendants in late December 2000 or early January 2001 at the Renaissance Seoul Hotel and agreed to collectively raise the prices of Korean Noodles.  DPCC ¶ 75; IPCC ¶ 63.  Yakult Korea and the other Korean Defendants agreed that Nongshim Korea would raise its prices first and the other Korean Defendants would follow suit.  DPCC ¶¶ 76-77; IPCC ¶¶ 64-65.  On March 28, 2001, this agreement was confirmed by representatives of the Korean Defendants at a meeting during the Regular General Assembly of Ramen Conference at the Capital Hotel in Seoul.  DPCC ¶¶ 78-81; IPCC ¶¶ 66-69.  Yakult Korea and the other Korean Defendants subsequently raised factory-level prices of their Korean Noodles on six occasions between 2001 and 2008.  DPCC ¶¶ 85-163; IPCC ¶¶ 70-139.

Plaintiffs allege only that the prices of Yakult Korea's Korean Noodles in the United States

---

[24] Plaintiffs allege that an entry on yellowpages.com "indicates that Sam Yang (USA) is 'a part of Sam Yang Foods Co., LTD who manufactures soy sauce products, ice cream and fresh milk.'" DPCC ¶ 34.  Sam Yang USA responds that the entry is incorrect and "now correctly states that 'Sam Yang USA is privately owned and is unaffiliated with Samyang Foods Co., Ltd., a company based out of South Korea.'"  Dkt. No. 87 at 4 n.6.  Plaintiffs filed a statement with additional information about the relationship between Samyang Korea and Sam Yang (USA), which defendants dispute. Dkt. No. 110, 113.  Plaintiffs have leave to add these allegations in an amended complaint.  Since the information was not alleged in the complaint, plaintiffs' request to submit the additional information (Dkt. No. 110) is DENIED as moot.

"*were expected* to increase in the United States shortly following price increases in Korea," not that they actually increased.  DPCC ¶ 186.  Nor do plaintiffs plausibly allege that Yakult Korea participated in the conspiracy to fix prices of Korean Noodles in the United States in some other fashion.  The mere allegation that Yakult Korea conspired to fix prices in Korea is insufficient to plausibly plead that Yakult Korea participated in the conspiracy to fix prices of Korean Noodles sold in the United States.  Yakult Korea's motion to dismiss is GRANTED.  All causes of action against Yakult Korea in both the direct purchaser plaintiffs' and indirect purchaser plaintiffs' complaints are DISMISSED WITH LEAVE TO AMEND.

Indirect purchaser plaintiffs allege that Paldo Company, Ltd [25] has imported and distributed Korean Noodles manufactured by Korea Yakult into the United States since 2012 and that Paldo is a wholly owned and controlled subsidiary of Korea Yakult.  IPCC ¶ 28.  However, as noted above, plaintiffs do not plausibly plead that Yakult Korea participated in the conspiracy to fix prices of Korean Noodles sold in the United States.  Since Paldo was merely Yakult Korea's distributor, there are likewise no plausible allegations tying Paldo to the conspiracy.  Paldo's motion to dismiss is GRANTED.  All causes of action against Paldo in the indirect purchaser plaintiffs' complaint are DISMISSED WITH LEAVE TO AMEND.

## II.   PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED

The Sherman Act has a four-year statute of limitations.  15 U.S.C. § 15(b).  Defendants contend that the Sherman Act claims are time-barred because the alleged conspiracy ended in 2008, more than four years before plaintiffs' initial complaints were filed.[26]  Plaintiffs argue that their Sherman Act claims are not time-barred because the statute of limitations was tolled by the "discovery rule" and by defendants' fraudulent concealment of the conspiracy until the announcement of the KFTC's investigation in July 12, 2012.  For the reasons stated below, I find

---

[25] Paldo Company, Ltd. is a defendant in the indirect purchaser plaintiffs' complaint, not in the direct purchaser's complaint.  The indirect purchaser plaintiffs state a cause of action for violation Section 1 of the Sherman Act, but, as they are indirect purchasers, they seek only an injunction, not damages, in connection with that cause of action.  IPCC ¶ 180.

[26] The various plaintiffs filed their complaints between July and September 2013.  Those actions were subsequently consolidated into the present direct purchaser and indirect purchaser actions.

United States District Court
Northern District of California

that both the "discovery rule" and fraudulent concealment tolled the otherwise applicable statutes of limitation, at least at this pleadings stage. [27]

## A. The Discovery Rule

The discovery rule tolls the running of the statute of limitations until a plaintiff "knows or has reason to know of the injury which is the basis of the action." *Trotter v. Int'l Longshoremen's & Warehousemen's Union, Local 13*, 704 F.2d 1141, 1143 (9th Cir. 1983). The rule requires a plaintiff to inquire into the existence of a cause of action when the plaintiff has access to information that would prompt a reasonable party to do so. *See Aloe Vera*, 699 F.3d at 1159. The discovery rule applies broadly to federal litigation, including Sherman Act claims. *See, e.g., Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 940-41 (9th Cir. 2009) ("We have made it clear that, in general, the discovery rule applies to statutes of limitations in federal litigation."); *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006) (applying discovery rule to Sherman Act claims).

Plaintiffs argue that the discovery rule tolled the otherwise applicable statute of limitations until the KFTC's order on July 12, 2012 because no facts known before then should have informed plaintiffs of the alleged conspiracy or prompted them to inquire into its existence. DPCC ¶¶ 195-198; IPCC ¶ 162. Defendants counter that public information reasonably informed plaintiffs of the conspiracy before then. Specifically, defendants point to the following as evidence that plaintiffs had sufficient knowledge to "discover" the alleged conspiracy before the KFTC announcement: (i) plaintiffs' allegations that the conspiracy formed at a public industry meeting around the beginning of 2001; (ii) defendants' public announcements of price increases; (iii) defendants' public filing of business reports, including data on price increases, with the Korean government in 2002 and 2003; (iv) plaintiffs' knowledge of price increases in the ramen market in 2003; and (v) the publication of newspaper articles "at least since June 2008" covering

---

[27] Defendants argue that plaintiffs' state claims are time-barred for the same reasons as the Sherman Act claims. Defendants do not dispute that the "discovery rule" or fraudulent concealment are available to toll those statutes of limitation. The state law claims are therefore tolled for the same reasons as the Sherman Act claims.

United States District Court
Northern District of California

the KFTC's antitrust investigation.  Dkt. No. 94 at 16-17.

The information referenced by defendants is insufficient to demonstrate that plaintiffs knew or should have known of alleged conspiracy before the KFTC's July 2012 announcement. First, plaintiffs' contention that the conspiracy was formed at a public event, the General Assembly of Ramen Conference, does not mean that plaintiffs or members of the public had access to the conspiratorial discussions.  Second, knowledge of price increases alone, whether based on public announcements or corporate filings, does not inform a potential plaintiff of antitrust violations.  *See, e.g., Pension Trust Fund*, 730 F.3d at 275; *Gazal*, 647 F.3d at 838. Defendants have identified nothing about those announcements that should have alerted plaintiffs about a *conspiracy* to raise prices.  *See, e.g., Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 275 (3d Cir. 2013) ("'[A] fact is not deemed "discovered" until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . [that would] survive a motion to dismiss.'"). Finally, I cannot conclude, as a matter of law, that newspaper articles published in Korean-language newspapers about the KFTC's investigation gave Plaintiffs sufficient reason in 2008 to inquire into the existence of a conspiracy to raise prices in the United States.[28]  *See, e.g.,  Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 503-04 (9th Cir. 1988) (sparse media coverage and a related antitrust action did not definitively end tolling); *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 833 (11th Cir. 1999) (overturning statute of limitations-based summary judgment in antitrust action where newspaper article about bid-rigging, which included reports of a government investigation, showed "only that there was information . . . that *might* have led

---

[28] Defendants' reply brief attaches what defendants purport is a copy of an English-language article published by Korea Daily, dated June 11, 2008, "describing the KFTC's investigation of ramen manufacturers (including some of the Korean Defendants in this case) in Korea."  Dkt. No. 94-1, Ex. B.  The article is available on Korea Daily's website.  Plaintiffs filed an objection to this article, arguing that the article is not authenticated as required by Federal Rule of Evidence 901, is not accompanied by a request for judicial notice, and is not relevant because the court must accept all allegations in the complaint as true.  Dkt. No. 99.  I agree with the substance of plaintiffs' objection and have not incorporated the contents of the article into my decision.  However, even if the article were properly before me, it lacks sufficient detail to put plaintiffs on notice that they had a cause of action for price-fixing.

United States District Court
Northern District of California

1    plaintiffs to inquire") (emphasis in original).  Defendants have not met their burden in

2    demonstrating that plaintiffs knew or should have known of the alleged conspiracy before July 12,

3    2008.

4           **B.  Fraudulent Concealment**

5           Fraudulent concealment tolls otherwise applicable statutes of limitation where (i)

6    affirmative acts by defendants conceal their wrongful conduct from plaintiffs, (ii) plaintiffs are

7    actually ignorant of the wrongful conduct, and (iii) there was reasonable diligence by the plaintiff

8    to discover the misconduct in response to any information it may have about that conduct.

9    *Conmar*, 858 F.2d at 502-03; *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250

10   (9th Cir. 1978).  It is often inappropriate to reject fraudulent concealment allegations at the

11   pleadings stage because of the fact-intensive analysis.  *See, e.g., In re Cathode Ray Tube (CRT)*

12   *Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024 (N.D. Cal. 2010); *In re Rubber Chemicals Antitrust*

13   *Litig.,* 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007).

14          Plaintiffs have adequately pleaded that defendants' alleged pretextual public statements

15   about Korean Noodles price increases constitute affirmative acts to mislead the public about the

16   price-fixing scheme.  Specifically, plaintiffs point to public statements that defendants made about

17   the rising costs of Korean Noodles ingredients. *See* DPCC ¶¶ 189, 201-15; IPCC ¶¶ 154, 164.  The

18   fact that costs of manufacturing Korean Noodles may actually have been rising does not mean that

19   those statements were not intended to conceal the wrongful conduct.  *See, e.g., In re Urethane*,

20   683 F. Supp. 2d at 1235-36 (noting the "reasonable inference" that price increases subsequent to

21   the inception of a properly-alleged price-fixing conspiracy were due to that conspiracy, even if

22   other forces also increased the price at the same time).

23          For the same reasons stated above with respect to the discovery rule, plaintiffs have

24   sufficiently pleaded that they were not aware of the alleged conspiracy, and should not reasonably

25   have been aware of it, until the KFTC's announcement in July 2012.  The Sherman Act claims are

26   therefore tolled by defendants' fraudulent concealment of the alleged conspiracy.

27

28

United States District Court
Northern District of California

24

### III.   THE CONDUCT AT ISSUE INVOLVES IMPORT TRADE OR COMMERCE AND IS THEREFORE NOT SUBJECT TO THE FTAIA

The Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ("FTAIA"), limits the Sherman Act's application to foreign commerce.  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 169 (2004).  It provides that:

> Sections 1 to 7 of [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
>
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect--
>
>> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>>
>> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>
> (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.
>
> If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. § 6a.

The Supreme Court has explained that "[t]his technical language initially lays down a general rule placing all (nonimport) activity involving foreign commerce outside the Sherman Act's reach."[29]  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004) (internal punctuation and citation omitted).  The FTAIA "then brings such conduct back within the Sherman Act's reach provided that the conduct *both* (1) sufficiently affects American commerce, *i.e.,* it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful,

---

[29] The parties dispute whether the FTAIA is a jurisdictional matter or a substantive issue.  The Ninth Circuit addressed the issue this year, stating that "the FTAIA is not a subject-matter jurisdiction limitation on the power of the federal courts but a component of the merits of a Sherman Act claim involving nonimport trade or commerce with foreign nations."  *United States v. Hui Hsiung*, 758 F.3d 1074, 1087 (9th Cir. 2014).

United States District Court
Northern District of California

*i. e.,* the "effect" must "give rise to a Sherman Act claim."[30] *Id.* (emphasis in original, citation and internal punctuation omitted).

Defendants argue that FTAIA applies to, and bars, plaintiffs' claims because the only conspiracy that has been properly alleged relates to price-fixing in Korea, *not in the United States*, and therefore the conduct at issue was not "directed at", and does not involve, import commerce market.  Defendants further argue that the conduct at issue does not fit within the "direct, substantial, and reasonably foreseeable effect" exception in subsections (1) and (2).

I am not persuaded.[31]  Plaintiffs allege that the Korean Defendants manufactured Korean Noodles in Korea, imported the noodles into the United States, and sold them to plaintiffs in the United States.[32]  *See* DPCC ¶¶ 26, 32, 36, 39.  That is sufficient to establish that the conduct at issue relates to import commerce and is therefore outside the scope of the FTAIA (and within the reach of the Sherman Act).  *See, e.g., Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 855 (7th Cir. 2012) ("The defendant members of the cartel are all located outside the United States.  Those

---

[30] The Supreme Court also explained that the FTAIA "make[s] clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets."  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004).  The Ninth Circuit has also sought to distill the meaning of the FTAIA, stating that:

> Although the statute is a web of words, it boils down to two principles.  First, the Sherman Act applies to "import trade or import commerce" with foreign nations.  Put differently, the FTAIA does not alter the Sherman Act's coverage of import trade; import trade is excluded from the FTAIA altogether.  Second, under the FTAIA, the Sherman Act does not apply to nonimport trade or commerce with foreign nations, unless the domestic effects exception is met.

*United States v. Hui Hsiung*, 758 F.3d 1074, 1086 (9th Cir. 2014)

[31] As stated above, plaintiffs have adequately pleaded a conspiracy to fix prices of Korean Noodles sold in the United States with respect to defendants Nongshim Korea, Nongshim USA, Ottogi Korea, Ottogi USA, and Samyang Korea.

[32] Plaintiffs also allege that the U.S. Defendants distributed Korean Noodles, manufactured in Korea, across the United States on behalf of the Korean Defendants.  *See* DPCC ¶¶ 30, 34, 37, IPCC ¶ 28.  But to the extent that the commerce at issue is directly between plaintiffs and the U.S. Defendants, then the commerce is not "with foreign nations" and the FTAIA would not apply in the first instance.  15 U.S.C. § 6a.

United States District Court
Northern District of California

transactions that are directly between the plaintiff purchasers and the defendant cartel members *are* the import commerce of the United States in this sector.") *cert. dismissed,* 134 S. Ct. 23 (U.S. 2013); *Hui Hsiung*, 758 F.3d at 1091. Because I find that the conduct involves import commerce, the FTAIA does not apply and there is no need to address the "direct, substantial, and reasonably foreseeable effect" exception in subsections (1) and (2).[33]

The cases cited by defendants, *Turicentro, S.A. v. American Airlines, Inc.,* 303 F.3d 293 (3d Cir. 2002) and *Kruman v. Christie's International, PLC,* 284 F.3d 384, 395 (2d Cir. 2002), are inapposite. In those cases, the plaintiffs alleged that the defendants manipulated foreign markets for services rendered by foreign entities with minimal or no effect on U.S.-based markets. *See, e.g., Turicentro*, 303 F.3d at 303 ("Defendants were allegedly involved only in unlawfully setting extra-territorial commission rates. Their actions did not directly increase or reduce imports into the United States."); *Kruman*, 284 F.3d at 395 ("The commerce that is the focus of this case is the charging of fixed commissions on the purchase and sale of goods at foreign auctions, not the trade in and subsequent movement of the goods that were purchased and sold.") (internal citations and quotations omitted). In contrast, here plaintiffs have alleged that the Korean Defendants fixed the price for goods they shipped into the United States for sale to American retailers and consumers. *See* DPCC ¶ 173; IPCC ¶ 151.

In their reply brief, defendants argue that the import commerce exclusion only removes plaintiffs' claims from the scope of the FTAIA if the alleged conspiracy "adversely affected" imports to the United States. Defendants contend that plaintiffs have not satisfied this requirement because the "conclusory, speculative and ambiguous allegations" insufficiently allege that the price-fixing conspiracy in Korea spread across the Pacific to "adversely affect" U.S. imports. This

---

[33] Import activity is not covered by the FTAIA, whether or not the import activity satisfies the exception in subsections (1) and (2). *See, e.g., United States v. Hui Hsiung*, 758 F.3d 1074, 1090 (9th Cir. 2014) ("Under its plain terms, the FTAIA does not affect import trade."); *Dee-K Enters., Inc. v.Heveafil Sdn. Bhd.*, 299 F.3d 281, 285-86 (4th Cir. 2002) ("Because this case involves importation of foreign-made goods . . . the FTAIA standard obviously does not directly govern this case."). The exception is only relevant if the trade or commerce with foreign nations at issue is something "*other* than import trade or import commerce."

argument dovetails with defendants' principal argument: that plaintiffs have insufficiently pleaded a conspiracy to fix prices *in the United States*. My analysis likewise dovetails with that analysis. As stated above, plaintiffs have adequately pleaded a conspiracy to fix prices of Korean Noodles sold in the United States with respect to Nongshim Korea, Nongshim USA, Ottogi Korea, Ottogi USA, and Samyang Korea. Accordingly, accepting defendants' contention that the alleged conduct must "adversely affect" import commerce to fall outside of the FTAIA, that requirement is met with respect to those defendants.[34]

## IV. THE INDIRECT PURCHASER PLAINTIFFS LACK STANDING TO ASSERT CLAIMS UNDER THE LAWS OF STATES IN WHICH THEY DO NOT RESIDE OR PURCHASE PRODUCTS

The named indirect purchaser plaintiffs are residents of, and purchased defendants' Korean Noodles, in California, Massachusetts, Michigan, Florida, and New York. IPCC ¶¶ 10-19. They nonetheless assert antitrust, consumer protection, and unjust enrichment claims under the laws of 24 other states where no plaintiff resides or purchased Korean Noodles.[35]

Defendants move to dismiss these state law claims, arguing that the indirect purchaser plaintiffs lack standing to assert claims based on the laws of states where no named plaintiffs

---

[34] For purposes of this motion, and because it does not affect my determination, I accept defendants' position that the conduct at issue must "adversely affect" import commerce to fall within the import exclusion to the FTAIA. However, I am not convinced that this is a correct statement of the law. By its own terms, the FTAIA does not apply to "import trade or import commerce." 15 U.S.C. § 6a. As the Supreme Court explains, the FTAIA "lays down a general rule placing all (*nonimport*) activity involving foreign commerce outside the Sherman Act's reach." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004) (emphasis added). The FTAIA accordingly has no impact on *import* commerce, whether or not the import commerce has an "adverse" effect. *See, e.g., Hsiung*, 758 F.3d at 1086 ("import trade is excluded from the FTAIA altogether"). Simply put, the FTAIA does not apply to import commerce. But just because the FTAIA does not apply, that does not mean that plaintiffs have stated a claim: plaintiffs must still adequately allege the elements of their underlying Sherman Act claims to withstand a motion to dismiss. The sufficiency of plaintiffs' price-fixing conspiracy allegations are addressed above.

[35] The indirect purchaser plaintiffs assert claims under the laws of the following states in which no named plaintiff resides or purchased the noodles: Arkansas, Arizona, the District of Columbia, Hawaii, Iowa, Kansas, Maine, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin. IPCC ¶¶ 192-215.

reside or suffered injuries.  In response, the indirect purchaser plaintiffs assert that whether they

can represent class members based on the laws of other states relates to class certification, not

standing, and should be addressed at the class certification stage.  The indirect purchaser plaintiffs

also contend that the Court can certify a class that asserts claims based on laws of states other than

the states where the named plaintiffs reside or purchased products.

　　　　Class allegations are typically tested on a motion for class certification, not at the pleading

stage.  However, the Ninth Circuit has stated that standing should be addressed before class

certification.  *See, e.g., Easter v. Am. W. Fin.*, 381 F.3d 948, 962 (9th Cir. 2004) ("The district

court correctly addressed the issue of standing before it addressed the issue of class

certification."); *Lee v. State of Or.*, 107 F.3d 1382, 1390 (9th Cir. 1997) ("Standing is a

jurisdictional element that must be satisfied prior to class certification.") (citation omitted); *Nelsen

v. King Cnty.*, 895 F.2d 1248, 1250 (9th Cir. 1990) (If the litigant fails to establish standing, he

may not 'seek relief on behalf of himself or any other member of the class.'") (quoting *O'Shea v.

Littleton*, 414 U.S. 488, 494 (1974)).  Accordingly, where it is clear from the pleadings that class

representatives lack standing to assert class claims, courts in this District routinely dismisses those

claims at the pleadings stage.[36]  *See, e,g,. Pardini v. Unilever United States, Inc.*, 961 F. Supp. 2d

1048, 1061 (N.D. Cal. 2013) (granting motion to dismiss state law claims based on laws of states

where no named plaintiff resided or was injured); *In re Apple & AT & TM Antitrust Litig.*, 596 F.

Supp. 2d 1288, 1309 (N.D. Cal. 2008) (same); *In re Graphics Processing Units Antitrust Litig.*,

527 F. Supp. 2d 1011, 1027 (N.D. Cal. 2007) (same).

　　　　In this case, it is clear from the pleadings that the indirect purchaser plaintiffs lack standing

to assert claims for which no named plaintiff has standing.  As the Supreme Court explained,

---

[36] Plaintiffs cite only one case from within the Ninth Circuit, *In re Hydroxycut Marketing and
Sales Practices Litig.*, 801 F. Supp. 2d 993 (S.D. Cal. 2011), in support of their argument that the
Court should defer ruling on the standing issue until the class certification stage.  *Hydroxycut* has
subsequently been criticized for ignoring controlling precedent.  *See Morales v. Unilever U.S.,
Inc.*, 2014 WL 1389613, *5 n.5 (E.D. Cal. Apr. 9, 2014) ("*Hydroxycut'* s suggestion that courts
should defer questions of standing for class certification is inconsistent with controlling Ninth
Circuit precedent.").  I likewise find *Hydroxycut* inconsistent with controlling precedent.

United States District Court
Northern District of California

1  "[t]hat a suit may be a class action adds nothing to the question of standing, for even named

2  plaintiffs who represent a class must allege and show that they personally have been injured, not

3  that injury has been suffered by other, unidentified members of the class to which they belong and

4  which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal citation and

5  punctuation omitted).  In addition, "at least one named plaintiff must have standing with respect to

6  each claim the class representatives seek to bring." *In re Ditropan XL Antitrust Litig.*, 529 F.

7  Supp. 2d 1098, 1107 (N.D. Cal. 2007) (citing *Griffin v. Dugger,* 823 F.2d 1476, 1483 (11th Cir.

8  1987)).

9      None of the named indirect purchaser plaintiffs resides in, or suffered an injury in, the 24

10  states identified above.  The named indirect purchaser plaintiffs' therefore lack standing to assert

11  claims based on those states' laws.  *See, e.g., Pardini*, 961 F. Supp. 2d at 1061 ("there is only one

12  named plaintiff and she has not alleged that she purchased ICBINBS outside of California. Thus,

13  Plaintiff does not have standing to assert a claim under the consumer protection laws of the other

14  states named in the Complaint."); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1164

15  (N.D. Cal. 2009) ("Where, as here, a representative plaintiff is lacking for a particular state, all

16  claims based on *that* state's laws are subject to dismissal."); *In re Graphics Processing Units*

17  *Antitrust Litig.*, 527 F. Supp. 2d 1011, 1027 (N.D. Cal. 2007) ("there is no named plaintiff from

18  those states who has suffered injury as a result of defendants' conduct, so those claims must be

19  dismissed"); *In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1309 (N.D. Cal.

20  2008) ("Since named Plaintiffs here only reside in California, New York, and Washington, but

21  have alleged violations of the consumer protection laws of forty-two states and the District of

22  Columbia, the Court GRANTS Defendant Apple's Motion to Dismiss Plaintiffs' consumer

23  protection claims for all jurisdictions except for California, New York, and Washington.").  The

24  indirect purchaser plaintiffs' state-law claims based on the laws of Arkansas, Arizona, the District

25  of Columbia, Hawaii, Iowa, Kansas, Maine, Minnesota, Mississippi, Missouri, Nebraska, Nevada,

26  New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South

27  Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin are DISMISSED WITH

28  LEAVE TO AMEND.

United States District Court
Northern District of California

**V.   THE INDIRECT PURCHASER PLAINTIFFS' STATE-LAW CONSUMER PROTECTION AND UNFAIR COMPETITION CLAIMS AGAINST SAM YANG USA, YAKULT KOREA, AND PALDO FAIL BECAUSE THE UNDERLYING PRICE-FIXING CLAIMS FAIL**

The parties agree that indirect purchaser plaintiffs' state-law unfair competition and consumer protection claims are based on the same allegations as the price-fixing conspiracy and therefore should face the same fate as those claims.[37]  *See* Dkt. No. 80 at 5; Dkt. No. 92 at 4 n.4. Because the price-fixing claims are dismissed as to defendants Sam Yang USA, Yakult Korea, and Paldo, the state-law unfair competition and consumer protection claims against Sam Yang USA, Yakult Korea, and Paldo are also DISMISSED WITH LEAVE TO AMEND.

**VI.   NEW YORK DECEPTIVE ACTS AND PRACTICES ACT, GENERAL BUSINESS LAW § 349**

Indirect purchaser plaintiffs assert a claim under the New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349, *et seq.*  IPCC ¶ 208(k).  To satisfy the elements of a claim under Section 349, plaintiffs must plead that defendants' acts or practices (1) were materially misleading or deceptive, (2) were oriented or directed at consumers, and (3) caused actual harm to the plaintiff, whether pecuniary or otherwise.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744-45 (N.Y. 1995).  The plaintiff does not need to prove reliance on the deception, but the act or practice must have caused the plaintiff's harm.  *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 897 (N.Y. 1999).

Defendants move to dismiss the Section 349 claim on the grounds that (i) the conduct at issue was not deceptive within the meaning of Section 349; (ii) the alleged acts were not "directed at" consumers; and (iii) the indirect purchaser plaintiffs' alleged harm was caused by the alleged price-fixing, not any separate deception, as required under Section 349.

In their opposition, indirect purchaser plaintiffs argue that defendants' statements to media outlets that "misrepresented the reasons for price increases in the United States and concealed their price fixing conspiracy" constitute deceptive acts within the meaning of Section § 349.  Dkt. No. 92 at 4-5.

---

[37] Except for the claim under New York's Deceptive Acts and Practices Act, which is addressed below.

The statements at issue were directed at consumers and satisfy the requirement that the conduct at issue be oriented or directed at consumers. *Cf Oswego*, 85 N.Y.2d at 25 (to satisfy consumer-oriented requirement, plaintiffs "must demonstrate that the acts or practices have a broader impact on consumers at large"). However, the purported harm suffered by plaintiffs— paying extra for price-fixed Korean Noodles—was caused by the alleged price-fixing, not by the alleged misrepresentations that defendants made to media outlets, and is therefore not actionable under Section 349.

*Small v. Lorillard Tobacco* is instructive. In that case, New York's highest court rejected the argument that "consumers who buy a product that they would not have purchased, absent a manufacturer's deceptive commercial practices, have suffered an injury under General Business Law § 349." *Lorillard Tobacco*, 720 N.E.2d at 898. The plaintiffs alleged that they would not have purchased cigarettes but for the defendants' concealment of the addictiveness of nicotine. The court explained, "Plaintiffs' definition of injury is legally flawed. Their theory contains no manifestation of either pecuniary or "actual" harm; plaintiffs do not allege that the cost of cigarettes was affected by the alleged misrepresentation, nor do they seek recovery for injury to their health as a result of their ensuing addiction." *Id*.

Likewise, in this case, indirect purchaser plaintiffs do not allege that prices of the Korean Noodles increased *because* of the pretextual statements to the media. Rather, the price increased because of the alleged price-fixing, and would have risen even if defendants had not made the allegedly pretextual statements to the press. Accordingly, under *Lorillard Tobacco*, which is controlling, plaintiffs' allegations cannot support a Section 349 claim because their alleged harm

1   was not caused by the alleged misrepresentations.[38]

2          Plaintiffs' Section 349 claim separately fails because there is no allegation that any of the

3   indirect purchaser plaintiffs actually saw the alleged misrepresentations.  If plaintiffs did not see

4   the misrepresentations, the misrepresentations could not have caused the plaintiffs' injury.  *See,*

5   *e.g., Gale v. Int'l Bus. Mach. Corp.,* 781 N.Y.S.2d 45, 45 (2004) (dismissing § 349 claim and

6   noting that "[i]f the plaintiff did not see any of these statements, they could not have been the

7   cause of his injury, there being no connection between the deceptive act and the plaintiff's

8   injury.").

9          Defendants' motion to dismiss the Section 349  claim is GRANTED.  The Section 349

10  claim is DISMISSED WITHOUT LEAVE TO AMEND.

## VII.   INDIRECT PURCHASER PLAINTIFFS' STATE UNJUST ENRICHMENT CLAIMS

12         Indirect plaintiffs Fenerjian, Beamer and Halloran allege a cause of action for unjust

13  enrichment on behalf of a Count V Subclass or, in the alternative, on behalf of Massachusetts,

14  Michigan, and New York subclasses.  IPCC ¶ 212.  Defendants move to dismiss any unjust

15  enrichment claims under Massachusetts, Michigan, or New York laws on the grounds that: (i) the

16  Indirect Purchaser Plaintiffs did not confer a *direct* benefit on defendants, as required to state a

17  claim for unjust enrichment in those states; (ii) adequate remedies at law preclude unjust

---

[38] Plaintiffs cite *In re Graphics Processing Units Antitrust Litig.,* 527 F. Supp. 2d 1011 (N.D. Cal. 2007) and *In re TFT –LCD (Flat Panel) Antitrust Litig.,* 2011 WL 4501223 (N.D. Cal. Sept. 28, 2011), in which the Court denied motions to dismiss or for summary judgment on Section 349 claims based on price-fixing allegations.  However, in those cases the Court apparently found that the defendants' deceptive acts caused the plaintiffs' injury.  That is not the case here.  In addition, those decisions did not address *Lorillard Tobacco,* in which New York's highest court held that deception in itself does not constitute an injury under Section 349.  *See Lorillard Tobacco,* 94 N.Y.2d at 56; *In re Processed Egg Products Antitrust Litig.*, 851 F. Supp. 2d 867, 909 (E.D. Pa. 2012) (citing *Lorillard Tobacco* and dismissing Section 349 claim where the complaint "does not plausibly suggest that the purported pretextual explanations for the rising egg prices are the actual cause of the Plaintiffs' alleged harm of paying artificially-inflated prices for eggs.").  As Judge Wilken explained in rejecting a Section 349 claim, "price fixing by manufacturers, without more, does not have a deceptive impact on consumers and IP Plaintiffs have not produced evidence that the allegedly inflated prices materially misled consumers."  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5094289, at *9 (N.D. Cal. Dec. 8, 2010).

United States District Court
Northern District of California

enrichment under Massachusetts and New York law; (iii) unjust enrichment is not a cause of action under Massachusetts law; and (iv) plaintiffs may not circumvent antitrust laws by repackaging their antitrust theories as unjust enrichment claims.

The doctrine of unjust enrichment broadly provides that "a person who is unjustly enriched at the expense of another is subject to liability in restitution." Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011). The availability and elements of a claim for unjust enrichment are governed by state law. I have accordingly looked to state law to determine the viability of plaintiffs' unjust enrichment claims under Massachusetts, Michigan, and New York law.

### A. The relationship between the parties supports an unjust enrichment claim under Massachusetts law, but is too attenuated to state an unjust enrichment claim under Michigan and New York law.

The parties dispute whether unjust enrichment under Massachusetts, Michigan, and New York law requires that the plaintiff confer a direct benefit on the defendant. For the reasons discussed below, I conclude that the relationship between defendants' increased revenues and the increased prices paid by the indirect purchaser plaintiffs is not too attenuated to state an unjust enrichment claim under Massachusetts law, but is too attenuated to state unjust enrichment claims under Michigan and New York law.

#### i. Massachusetts

In Massachusetts, a claim for unjust enrichment requires "unjust enrichment of one party and unjust detriment to another party." *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009). The parties do not cite any cases addressing whether indirect purchasers' relationships to manufacturers of price-fixed products are too attenuated to state a claim for unjust enrichment under Massachusetts law.

Defendants cite *Estate of Johnson v. Melvin Rose, Inc.*, 2007 WL 1832029 (Mass. Super. May 9, 2007), an unpublished superior court opinion relating to allegations that a general partner made decisions of financial significance contrary to the terms of the partnership agreement and contrary to the interests of the limited partners. Defendants also cite *Taylor Woodrow Blitman Const. Corp. v. Southfield Gardens Co.*, 534 F. Supp. 340, 347 (D. Mass. 1982), in which a construction contractor sued the Department of Urban Development following default of the

owner of a housing project that the contractor was retained to construct.  The court found that the plaintiff had an adequate remedy at law, which precluded recovery for unjust enrichment.  The court also found that the plaintiff's ability to recover from the owner itself precluded recovery based on unjust enrichment.  Plaintiffs cite *Massachusetts v. Mylan Labs.*, 357 F. Supp. 2d 314 (D. Mass. 2005), which involved Medicaid fraud, and *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380 (E.D. Pa. 2010), in which the plaintiffs asserted causes of action under various state antitrust statutes, including Massachusetts. *Sheet Metal Workers* did not cite any Massachusetts cases regarding indirect purchasers.

None of the cases cited is analogous to this case, or even instructive.  At best, they stand for the general proposition that some relationships are too attenuated to state a claim for unjust enrichment under Massachusetts law.  Plaintiffs have pleaded unjust enrichment of defendants and unjust detriment to the indirect purchaser plaintiffs, which is what is required to state a claim for unjust enrichment under Massachusetts law, and there is apparently no case that holds the relationships as alleged are too attenuated under Massachusetts law.  Accordingly, they should be allowed to proceed.

Defendants make two other arguments that fail.  First, they contend that plaintiffs must allege that plaintiffs lack an adequate remedy at law, which they cannot do here because plaintiffs allege that they are entitled to remedies under the antitrust or consumer protection laws of Massachusetts and New York.  Whether plaintiffs lack an adequate remedy at law remains to be seen.  It is premature to dismiss the unjust enrichment claims on that basis at this point.  *Cf Massachusetts v. Mylan Labs.*, 357 F. Supp. 2d 314, 324 (D. Mass. 2005) ("[a] remedy at law cannot be considered adequate so as to prevent equitable relief, unless it covers the entire case made by the bill in equity") (citation omitted).  In addition, as the cases discussed above demonstrate, plaintiffs may simultaneously state unjust enrichment and other legal claims.  Plaintiffs may be required to elect a remedy eventually, but I will not force them to do so at this stage.  *See, e.g., id.* ("The Court need not resolve these issues at this stage of the proceeding, since Massachusetts may have to elect only one theory of recovery eventually, and will not force Plaintiff to choose its remedy at this stage of the litigation.").

35

1    Second, defendants argue that unjust enrichment is not a cause of action under

2    Massachusetts law.  However, the cases discussed above demonstrate that courts do recognize a

3    cause of action for unjust enrichment under Massachusetts law.

4    Defendants' motion to dismiss the unjust enrichment claim under Massachusetts law is

5    DENIED.

6         ii.   Michigan

7    The elements of unjust enrichment under Michigan law are (1) receipt of a benefit by the

8    defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the

9    benefit by defendant.  *Dumas v. Auto Club Ins. Ass'n,* 437 Mich. 521 (Mich. 1991).  Defendants

10   rely on *Lipov v. Louisiana-Pac. Corp.*, 2013 WL 3805673, at *6 (W.D. Mich. July 22, 2013) and

11   *A & M Supply Co. v. Microsoft Corp.*, 2008 WL 540883 (Mich. Ct. App. Feb. 28, 2008) to argue

12   that indirect purchaser plaintiffs' injury and defendants' benefit are too attenuated to state a claim

13   for unjust enrichment claim under Michigan law.

14   In *Lipov*, a homeowner sued the manufacturer of a type of building trim that was allegedly

15   defective.  The plaintiff had the trim installed by builders who had purchased the trim through

16   distributors or wholesalers.  The court held that the plaintiff could not state a claim for unjust

17   enrichment against the manufacturer because the manufacturer sold the trim through distributors

18   and wholesalers to builders who then installed it, and "these indirect transactions do not state a

19   claim that Plaintiff conferred a direct benefit on Defendant."[39]  *Id.* at *6.

20   In *A & M Supply Co. v. Microsoft Corp.*, 2008 WL 540883 (Mich. Ct. App. Feb. 28, 2008),

21   the plaintiffs filed an indirect purchaser antitrust complaint, alleging that they were damaged by

22   Microsoft's monopolistic pricing of its Windows operating systems and Internet Explorer

23

---

24   [39] *Lipov* is a federal case, but it cites *W.C. Ducomb Co., Inc. v. Ann Arbor Mach. Co.,* 2012 WL

25   516089, at *3 (Mich. Ct. App. Feb.16, 2012), for the proposition that an unjust enrichment claim
     cannot lie where any benefit to the defendant came from a third-party.  *See W.C. Ducomb*, 2012

26   WL 516089, at *3 ("Assuming that retaining the money from Chrysler was a benefit, it is
     undisputed that those funds came from Chrysler, not plaintiff. Accordingly, plaintiff cannot

27   establish the first element of unjust enrichment.").  The facts of *W.C. Ducomb* are not analogous to
     those alleged here.  *W.C. Ducomb* is nonetheless helpful for its holding that benefits conferred by

28   a third party cannot support a claim for unjust enrichment.

United States District Court
Northern District of California

software, which the plaintiffs indirectly purchased when they purchased computers pre-installed with Microsoft software.[40]  The Michigan Court of Appeal held that the "unjust enrichment doctrine does not apply under the facts alleged by plaintiff here" because there was no "direct contact between Microsoft and the indirect purchasers," nor could the plaintiffs show "that Microsoft received any direct payment or other benefit from those purchasers."  *A & M Supply*, 2008 WL 540883, at *2.

Indirect purchaser plaintiffs respond that their injury and the defendants' benefit are sufficiently related to state an unjust enrichment claim.  They cite two cases from this District, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) and *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5094289 (N.D. Cal. 2010), in which indirect purchaser plaintiffs in price-fixing cases were allowed to state unjust enrichment claims under Michigan law.  In turn, those cases relied on *Kammer Asphalt Paving Co., Inc. v. East China Tp. Schools*, 443 Mich. 176 (1993), *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187 (2006), and *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 670–71 (E.D. Mich. 2006).  Neither *Kammer* nor *Morris Pumps* involved indirect purchaser antitrust claims and the parties have not cited any cases in which Michigan courts allowed indirect purchaser plaintiffs to state unfair enrichment claims based on price-fixing or other antitrust claims.

In *Kammer*, the plaintiff was a subcontractor who performed construction and renovation work for defendant school district's facilities.  *Kammer*, 443 Mich. at 179.  The plaintiff was allowed to state an unjust enrichment claim against the school district because the school district assured the subcontractor that it would receive payment for its work after the general contractor failed to pay the subcontractor, and failed to notify the subcontractor that it was cancelling its contract with the general contractor.  The Michigan Court of Appeal in *A & M Supply* explicitly distinguished its facts from *Kammer*, noting that "the facts of that case [*Kammer*] clearly show that the defendant and the plaintiff were in contact with one another during the course of plaintiff's

---

[40] The claims are set forth in *A & M Supply Co. v. Microsoft Corp.*, 252 Mich. App. 580 (2002).

paving activities at athletic facilities owned by the defendant, and the defendant certainly benefited directly from plaintiff's work on those facilities." *A & M Supply Co.*, 2008 WL 540883, at *2.

Similarly, in *Morris Pumps,* the plaintiff a subcontractor conferred a direct benefit to defendant by specially delivering equipment and supplies to defendant's construction site, which defendant then used to complete its construction project without paying for them. *Morris*, 273 Mich. App. at 196-97.

In *In re Cardizem CD Antitrust Litig*., 105 F. Supp. 2d 618, 670–71 (E.D. Mich. 2006), indirect purchasers of heart medication were allowed to state unjust enrichment claims against the manufacturer based on allegations of collusion between manufacturer and prospective manufacturer of cheaper generic version of the heart medication. *Cardizem* jointly analyzed unjust enrichment claims under 10 states' laws and, like the federal courts in *TFT-LCD (Flat Panel)* and *Static Random Access Memory (SRAM)*, did not cite any Michigan state cases involving unjust enrichment claims by indirect purchaser plaintiffs based on price-fixing or other antitrust claims.

*Lipov* and *A & M Supply* are instructive and persuasive as they involved plaintiffs whose interactions or transactions with the defendants were indirect.  In contrast, the cases cited by defendants, *Kammer* and *Morris Pumps*, are less instructive because they involved situations where the parties' contacts or transactions with each other were direct.  *Cardizem* is not instructive because did it not cite any Michigan state authority involving indirect purchasers or transactions. Under the reasoning of *Lipov* and *A & M Supply*, the transactions and relationships between the indirect purchaser plaintiffs and the defendants are too attenuated to state an unjust enrichment claim under Michigan law.  Defendants' motion to dismiss the unjust enrichment claim under Michigan law is GRANTED and the unjust enrichment claim under Michigan law is DISMISSED WITHOUT LEAVE TO AMEND.

### iii. New York

To state a claim for unjust enrichment under New York law, a plaintiff must show that (i) the defendant was enriched, (ii) at the plaintiff's expense, and (iii) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.  *Mandarin*

1   *Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (citation omitted).  As with the unjust

2   enrichment claim under Michigan law, defendants argue that indirect purchaser plaintiffs' injury

3   and defendants' benefit are too attenuated to state a claim for unjust enrichment claim under New

4   York law.

5          Defendants cite two New York state cases involving indirect purchasers in antitrust

6   actions.  In *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215 (2007), New York's highest court stated

7   that unjust enrichment under New York law does not require privity between the parties.  *Sperry*

8   nonetheless held that the relationship between indirect purchasers of tires and defendants who

9   fixed prices for chemical additives in the tires was too attenuated for an unjust enrichment claim.

10  *Id.* at 215.  Similarly, in *State ex rel. Spitzer v. Daicel Chem. Indus., Ltd.*, 42 A.D.3d 301 (N.Y.

11  App. Div. 2007), the court held that the relationship between indirect purchasers of sorbates (food

12  additives used to extend the shelf life of food products) and manufacturers of sorbates that

13  allegedly conspired to fix the price of sorbates, was too attenuated for an unjust enrichment claim.

14  The court stated that "[w]hile privity is not required for an unjust enrichment claim, the end-users

15  of the products, in whose interest plaintiff is acting, are too attenuated from the producers of the

16  chemicals which are among the ingredients of those products."[41]  *Id.* at 304.

17         In opposition, plaintiffs cite *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40 (N.Y. App. Div.

18  2004), in which the court held that indirect purchasers of Microsoft's software products, pre-

19  installed on computers purchased by the plaintiffs, could state an unjust enrichment claim against

20  Microsoft based on allegations that Microsoft's monopolistic practices caused plaintiffs to pay

21  artificially inflated prices for its products.  However, *Cox* predates *Sperry* and *Daicel* and is

22  contradicted by them.  In addition, *Cox* was issued by New York's intermediate court while *Sperry*

23

24  ───────────────

25  [41] Defendants also cite *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511 (N.Y. 2012), in
    which New York's highest court reaffirmed the rule that an unlawful enrichment claim cannot lie
26  where the relationship between the parties is too attenuated.  However, *Georgia Malone* did not
    involve indirect purchasers or price-fixing claims and therefore does not shed light on whether the
27  relationship between the parties is too attenuated in this case.  *Mandarin Trading Ltd. v.
    Wildenstein*, 944 N.E.2d 1104 (N.Y. 2011), also cited by defendants, is likewise inapposite and
28  not instructive here.

United States District Court
Northern District of California

1    was issued by the Court of Appeals of New York, which is New York's highest court and is

2    controlling.

3            Plaintiffs also argue that *Sperry* and *Daicel* do not bar plaintiffs' unjust enrichment claim

4    because in those cases the indirect purchasers purchased products that merely *contained* the price-

5    fixed product, whereas in this case the indirect purchasers purchased the price-fixed product itself:

6    Korean Noodles.  In support, plaintiffs cite *Waldman v. New Chapter, Inc.*, in which a federal

7    court in New York held that "a product's indirect purchaser cannot assert an unjust enrichment

8    claim against an entity that manufactured one of that product's *ingredients*.  But the indirect

9    purchaser can assert such an unjust enrichment claim against the manufacturer of the *product*

10   itself."  714 F. Supp. 2d 398, 403-04 (E.D.N.Y. 2010) (emphasis in original, citations omitted).

11   However, *Waldman* does not cite any persuasive authority for distinguishing *Sperry* or *Daicel* on

12   that basis.  *Waldman* relies on *Cox*, which, as I have stated above, predates *Sperry* and *Daicel* and

13   appears contrary to those cases.  Moreover, the relevant discussion in *Cox* comprises one sentence

14   and *Cox* itself did not reference any distinction between price-fixed products and price-fixed

15   ingredients of products.[42]

16           For the reasons stated, under the reasoning of *Sperry* and *Daicel*, the transactions and

17   relationships between the indirect purchaser plaintiffs and the defendants are too attenuated to

18   state an unjust enrichment claim under New York law.  Defendants' motion to dismiss the unjust

19   enrichment claim under New York law is GRANTED and the unjust enrichment claim under New

20   York law is DISMISSED WITHOUT LEAVE TO AMEND.

21

22

23

24   [42] The minimal discussion in *Cox* makes it difficult to analogize the facts there to those present
     here and in *Sperry* and *Daicel*.  However, it appears that the products at issue in *Cox*—Microsoft's
25   operating systems—were incorporated into computers which were purchased by the plaintiffs.
     *See, e.g., Cox*, 8 A.D.3d at 41 (noting that Microsoft's "prime customers" were computer
26   manufacturers and distributors, not the plaintiffs).  Accordingly, like in *Sperry* and *Daicel*, the
     price-fixed product was merely an *ingredient* of the larger product—computers—purchased by the
27   plaintiffs, rendering the manner in which *Waldman* distinguished *Cox* from *Sperry* and *Daicel*
     questionable.
28

United States District Court
Northern District of California

United States District Court
Northern District of California

**B. Plaintiffs are not circumventing antitrust laws by repackaging their antitrust theories as unjust enrichment claims.**

Defendants argue that all the unlawful enrichment claims fail because indirect purchaser plaintiffs "appear to be merely seeking an alternative remedy for their antitrust claims."  Dkt. No. 80 at 9.  But the only unjust enrichment claim going forward is under Massachusetts law, which allows for recovery by indirect purchasers.  *See, e.g., Ciardi v. F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 66-67 (2002) ("We read the language of G.L. c. 93A as a clear statement of legislative policy to protect Massachusetts consumers through the authorization of such indirect purchaser actions.").  Indirect purchaser plaintiffs are therefore not circumventing antitrust laws.

## CONCLUSION

Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART.

All the direct purchaser plaintiffs' and indirect purchaser plaintiffs' claims against Sam Yang USA, Yakult Korea, and Paldo Company LTD. are DISMISSED WITH LEAVE TO AMEND.  The indirect purchaser plaintiffs' claims under the laws of Arkansas, Arizona, the District of Columbia, Hawaii, Iowa, Kansas, Maine, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin are DISMISSED WITH LEAVE TO AMEND.  The indirect purchaser plaintiffs' claims under the New York Deceptive Acts and Practices Act are DISMISSED WITHOUT LEAVE TO AMEND.  The indirect purchaser plaintiffs' unjust enrichment claims under New York and Michigan law are DISMISSED WITHOUT LEAVE TO AMEND.

The motions are DENIED with respect to the Sherman Act claims, the state-law antitrust and consumer protection claims under the laws of California, Massachusetts, Michigan, Florida, and New York[43], and the unjust enrichment claim under Massachusetts law, against Nongshim Korea, Nongshim USA, Ottogi Korea, Ottogi USA, and Samyang Korea.

---

[43] Plaintiffs allege a cause of action under New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, which is distinct from the New York Deceptive Acts and Practices Act.  Defendants seek to dismiss the Donnelly Act claim only on the grounds that it is time-barred.  I reject that argument as discussed above.

1      A case management conference is set for Tuesday, November 25, 2014 at 2:00 pm.  The

2   parties shall file a joint case management statement proposing a case management schedule (or

3   competing schedules if agreement cannot be reached) by November 20, 2014.  If plaintiffs choose

4   to amend either or both of the consolidated complaints, they shall do so by December 3, 2014.

5      **IT IS SO ORDERED**.

6   Dated: November 4, 2014

7   _____

8   WILLIAM H. ORRICK
    United States District Judge