UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN FENERJIAN, et al., | Case No.  13-cv-04115-WHO   (DMR) |
| Plaintiffs, | |
| v. | **ORDER GRANTING DIRECT PURCHASER PLAINTIFFS' MOTION TO COMPEL** |
| NONG SHIM COMPANY, LTD, et al., | |
| Defendants. | Re: Dkt. No. 229, 228, 256, 260, 272 |

Before the court is the Direct Purchaser Plaintiffs' motion to compel Defendant Nongshim Korea Co. Ltd. ("Nongshim") to provide the last known contact information for three former Nongshim employees.  Docket No. 229.  The court held a hearing on December 17, 2015.  At the court's request, the parties provided supplemental information about the former employees. Docket Nos. 254, 257, 261, 273.  The court now **grants** the Direct Purchaser Plaintiffs' motion to compel Nongshim to provide the last known telephone number, email and physical address for its three former employees.  Docket No. 229.[1]

## I.       BACKGROUND

### A.       Factual Allegations

Defendants Nongshim and Ottogi Company, Ltd.[2] manufacture and sell Korean ramen noodles in Korea, and also export ramen noodles for sale in the United States.  In this multidistrict litigation, various direct and indirect purchasers of Defendants' ramen noodles allege that

---

[1] The court also **grants** the parties' stipulated request for permission to submit a letter brief in excess of the page limit set by the court's standing order, as well as leave to attach copies of English translations of Korea's Personal Information Protection Act as exhibits to the joint letter brief.  Docket No. 228.

[2] Plaintiffs' claims against Sam Yang (USA), Inc., Yakult Korea and Paldo Company Ltd. were dismissed.  Docket 115.  Defendant Samyang Foods Company, Ltd. has reached a settlement with Plaintiffs.  Docket No. 227.

Defendants engaged in a price-fixing conspiracy to raise the prices of their ramen noodles sold in the United States.  Plaintiffs allege that they paid more for Korean ramen noodles in the United States as a result of the price-fixing conspiracy than they would have paid in a competitive market.  The Direct Purchaser Plaintiffs ("DPPs") are food retailers and distributors that purchased ramen noodles directly from Defendants.  The Indirect Purchaser Plaintiffs ("IPP") are individuals who purchased Korean noodles manufactured by Defendants from retailers in several states.

## II.   DISCUSSION

The DPPs have requested contact information for three former Nongshim employees who attended certain Ramen Conferences in Korea, which the DPPs contend were a vehicle for competitors to fix ramen noodle prices.  Nongshim has objected to providing contact information for its former employees, claiming that the Korean Personal Information Protection Act ("PIPA") prohibits Nongshim from doing so without the consent of the individuals.  The three former employees have expressly refused to consent to disclosure of their contact information.

The DPPs argue that Nongshim should be required to turn over the contact information based on two theories.  First, they contend that Nongshim waived any PIPA objection by agreeing to the terms of the May 7, 2015 Stipulation and Order, which expressly discusses the treatment of information covered by PIPA.  Docket No. 170.  Second, the DPPs assert that even if the stipulated order does not apply, the balance of the factors of the international comity analysis set forth in *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992), weigh in favor of compelling disclosure.

### A.  The May 7, 2015 Stipulation and Order

The purpose of PIPA is to "provide for the processing of the personal information for the purpose of enhancing the right and interest of citizens, and further realizing the dignity and value of individuals by protecting their privacy from the unauthorized collection, leak, abuse or misuse of personal information."  PIPA, Article 1.[3]   The parties agree that the contact information

---

[3] The DPPs and Nongshim both submitted English translations of PIPA.  Docket Nos. 229-2, 229-3.  The parties do not identify any differences in the translations that affect their arguments.  The court has reviewed both translations.  The two English translations relied upon by the parties

United States District Court
Northern District of California

1    requested by the DPPs qualifies as "personal information" under PIPA.  *See* PIPA, Article 2(1).

2    The parties do not otherwise agree about how PIPA applies to the requested information.

3         Article 17 addresses the provision of a data subject's personal information to third parties.

4    Nongshim points to Article 17(3), which applies to the provision of personal information to a

5    "third party overseas."  It requires that a personal information processor inform the data subject

6    about the specific information to be released, and "obtain consent."  PIPA, Article 17(3).

7    Nongshim argues that pursuant to Article 17(3), it must obtain the former employees' consent in

8    order to disclose the subject's personal information to third parties overseas.  It contends that

9    where, as here, the data subjects have denied consent, PIPA prevents Nongshim from disclosing

10   their personal information.

11        The DPPs, however, point to Article 17(1)(2), which permits disclosure pursuant to a legal

12   obligation.  Specifically, it allows a personal information processor to provide a third party with a

13   data subject's personal information where the information is provided "within the scope of

14   purposes for which personal information is collected under Subparagraphs 2, 3, and 5 of Article

15   15(1)."  PIPA, Article 17(1)(2).  In turn, Article 15(1)(2) permits disclosure "where special

16   provisions exist in laws or it is unavoidable so as to observe legal obligations."  PIPA, Article

17   15(1)(2).  The DPPs contend that Nongshim may properly release the contact information because

18   the disclosure would be pursuant to a legal obligation, namely, the May 7, 2015 Stipulation and

19   Order.  Pursuant to the parties' stipulation, the court ordered that "[w]hen any party or non-party

20   produces information in this litigation that is covered by the Data Privacy Laws [which include

21   PIPA]…, this Court Orders, notwithstanding any provision of the Data Privacy Laws to the

22   contrary, that such information be produced to the requesting party for use in this litigation,

23   provided however that any such production shall be subject to the terms of the Stipulated

24   Confidentiality Protective Order (Dkt. No. 161) on file in this litigation."  Docket No. 170 at 4.

25        While the parties may have intended to create a "legal obligation" through the May 7, 2015

26

27   contain minor differences which do not impact the court's ruling.  Citations in this order are to the
     translation of PIPA filed as Docket No. 229-2.

28

3

United States District Court
Northern District of California

1    Stipulation and Order to address PIPA concerns regarding the disclosure of personal information,

2    the parties' intent is irrelevant to the interpretation of PIPA.  This court finds that Article 17(3)

3    applies to the disclosure of the former employee contact information to the parties in this litigation

4    because that article specifically addresses the provision of "personal information to a third party

5    overseas."  Article 17(3) requires notice and consent for the overseas disclosure of personal

6    information; it does not reference Article 15(1)(2), or otherwise provide an exception to comply

7    with "legal obligations."  For this reason, the May 7, 2015 Stipulation and Order does not affect

8    the PIPA obligations under Article 17(3).

9         **B.       International Comity Analysis**

10        Invoking the doctrine of international comity, the DPPs next argue that Nongshim should

11   be compelled to provide the requested information notwithstanding any limitations imposed by

12   PIPA.  The Federal Rules of Civil Procedure authorize party-initiated discovery of any evidence

13   that is relevant and proportional to any party's claims or defenses.  Fed. R. Civ. P. 26(b)(1).  Rule

14   26 grants the court discretion to limit discovery on several grounds, including international

15   comity.  *See In re Rubber Chems. Antitrust Litig.,* 486 F. Supp. 2d 1078, 1081 (N.D. Cal. 2007)

16   (citing *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482

17   U.S. 522, 544 (1987)).

18        The Supreme Court and the Ninth Circuit agree that comity and foreign law alone are not

19   dispositive when a discovery dispute arises regarding a foreign law's protection of documents

20   sought in a United States court.  *See Aerospatiale,* 482 U.S. at 544 & n.29; *Societe Internationale*

21   *Pour Participations Industrielles et Commerciales v. Rogers,* 357 U.S. 197, 208 (1958); *Richmark*

22   *Corp. v. Timber Falling Consultants,* 959 F.2d 1468, 1474–75 (9th Cir. 1992).  "'Comity, in the

23   legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and

24   good will, upon the other.  But it is the recognition which one nation allows within its territory to

25   the legislative, executive or judicial acts of another nation, having due regard both to the

26   international duty and convenience, and to the rights of its own citizens or of other persons who

27   are under the protection of its laws.'"  *Aerospatiale*, 482 U.S. at 544 n.27 (quoting *Hilton v.*

28   *Guyot*, 159 U.S. 113, 163-164 (1895)).  Thus, foreign blocking statutes such as PIPA do not

automatically "'deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute,'" but instead require a case-by-case determination. *Richmark*, 959 F.2d at 1474 (footnote and citation omitted) (quoting *Aerospatiale*, 482 U.S. at 544 n.29).

In undertaking a comity analysis, a court must balance five competing factors:

> (1) the importance to the ... litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Aerospatiale,* 482 U.S. at 544 n.28.

In the Ninth Circuit, courts also consider "the extent and nature of the hardship that inconsistent enforcement would impose upon the person, . . . [and] the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state." *Richmark*, 959 F.2d at 1475 (brackets and ellipses in original) (citation and quotation marks omitted). "The party relying on foreign law has the burden of showing that such law bars production." *United States v. Vetco, Inc.*, 691 F.2d 1281, 1289 (9th Cir. 1981) (citing *Ohio v. Arthur Andersen & Co.*, 570 F.2d 1370, 1374 (10th Cir. 1978); *First Nat'l City Bank of N.Y. v. IRS*, 271 F.2d 616, 619-20 (2d Cir. 1959)).

### 1.     The Importance of the Information

"Where the outcome of litigation does not stand or fall on the present discovery order, or where the evidence sought is cumulative of existing evidence," courts generally will recognize foreign blocking statutes. *Richmark*, 959 F.2d at 1475 (citing *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d 992, 999 (10th Cir. 1977)) (quotation marks omitted); *accord In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d at 1082. Conversely, where the evidence is "directly relevant" to the case, the court will lean toward disclosure. *Richmark*, 959 F.2d at 1475 (citing *Vetco, Inc.*, 691 F.2d at 1290).

Here, the DPPs seek contact information for three individuals, each of whom attended one or more Korean Ramen Conferences on behalf of Nongshim during the time period relevant to this

United States District Court
Northern District of California

antitrust litigation.  The DPPs allege that Ramen Conferences were a key vehicle for the development and furtherance of the alleged price-fixing conspiracy.  Nongshim argues that the information is not important to the case, because the witnesses' knowledge is likely limited to pricing for Korean ramen noodle pricing, rather than pricing for noodles bound for the United States.

As the Honorable William H. Orrick has already recognized, pricing activity in the Korean market may be relevant to this case, even though Plaintiffs assert a price-fixing conspiracy for Defendants' ramen noodles sold in the U.S. market.  *See* Order Granting in Part and Denying in Part Motions to Dismiss [Docket No. 115 at 12, 15-19].  Plaintiffs allege, among other things, that Defendants' conspiracy to raise the factory-level prices for Korean ramen noodles led to price increases in Korea that were followed by price increases in the United States.  They also allege that six price increases agreed to by the Korean Defendants led to price increases of ramen noodles in the United States.  Plaintiffs also provided charts and tables, based on the purchasing records of the DPPs, reflecting the alleged correlation between prices increases in Korea and price increases in the United States.  For this reason, Plaintiffs' ability to obtain information about what Defendants' representatives said or heard about ramen noodle pricing at the Ramen Conferences is important to their case.

The court reviewed the information submitted by the parties regarding each of the three former Nongshim employees.  It is clear that they each attended Korean Ramen Conferences during the relevant time period, and participated in discussions about ramen noodle pricing on behalf of Nongshim with representatives of the other major Korean ramen noodle producers.  Because the three former employees appear to have important percipient knowledge about alleged price-fixing activity in the Korean market, this factor weighs in favor of production.

### 2.    Degree of Specificity of the Request

Courts do not favor compelling discovery when the moving party presents "burdensome," "[g]eneralized searches for information."  *Richmark*, 959 F.2d at 1475; *accord In re Rubber Chems. Antitrust Litig.*, 486 F. Supp 2d at 1083.  Here, the DPPs request the "last known telephone number, email, and physical address" for three former Nongshim employees.  The

request is very specific, and thus favors production.

### 3.   Origination and Location of the Information

The third factor looks to whether the discovery sought originated in the United States.  *See Richmark*, 959 F.2d at 1475.  "The fact that all the information to be disclosed (and the people who will be deposed or who will produce the documents) are located in a foreign country weighs against disclosure, since those people and documents are subject to the law of that country in the ordinary course of business."  *Id.* (citing *Reinsurance Co. of Am. v. Administratia Asigurarilor de Stat (Admin. of State Ins.)*, 902 F.2d 1275, 1281 (7th Cir. 1990); *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d at 998).  This factor weighs against disclosure because, as the DPPs concede, the witnesses and information are in Korea.

### 4.   Alternative Means of Obtaining the Information

Courts rarely order a party to violate foreign law "[i]f the information sought can easily be obtained elsewhere."  *Richmark*, 959 F.2d at 1475 (citation omitted).  Any such alternative must be "substantially equivalent" to the discovery requested.  *Id.* (citing *Vetco, Inc.*, 691 F.2d at 1290; *SEC v. Minas de Artemisa, S.A.*, 150 F.2d 215, 219 (9th Cir. 1945)).  The burden of demonstrating alternative means of obtaining information falls upon the party invoking the blocking statute.  *See Vetco, Inc.*, 691 F.2d at 1290 (placing burden of proof on party invoking blocking statute to show existence of alternative means of obtaining discovery); *In re Air Crash at Taipei, Taiwan on Oct. 31, 2000*, 211 F.R.D. 374, 378 (C.D. Cal. 2002) (same).

The DPPs argue that they have no effective alternative method to track down the former employees because their first and last names are very common in Korea.  Nongshim does not dispute this.  Instead, Nongshim argues that the DPPs can obtain information about the Ramen Conferences from other witnesses.  This misses the point.  Presumably, the DPPs seek the contact information for the former employees so that they can interview or depose them about their percipient knowledge of what occurred or was discussed at the Ramen Conferences on the topic of ramen noodle pricing.  The DPPs' ability to obtain information from other Ramen Conference attendees does not replace or eclipse the knowledge of the three former employees, two of whom held significant positions at Nongshim ("managing director" and "department head.")

United States District Court
Northern District of California

The factor tilts towards compelling disclosure because Nongshim has not identified alternative and substantially equivalent means for obtaining the discovery.

### 5.      Balance of National Interests

The balance of national interests "is the most important factor" in determining whether a court should order discovery despite the presence of a blocking statute. *Richmark*, 959 F.2d at 1476.  In this analysis, the court must assess "the interests of each nation in requiring or prohibiting the disclosure, and determine whether disclosure would affect important substantive policies or interests" of either the United States or the foreign country involved. *Id*. (citing Restatement (Third) of Foreign Relations Law § 442 cmt. c) (quotation marks omitted).  In assessing the strength of a foreign country's interest, the court "will consider expressions of interest by the foreign state, the significance of disclosure in the regulation . . . of the activity in question, and indications of the foreign state's concern for confidentiality prior to the controversy."  *Id*. (citing Restatement (Third) of Foreign Relations Law § 442 cmt. c) (quotation marks and emphasis omitted) (ellipses in original).

The United States considers the enforcement of its antitrust laws through private civil actions as an interest of "fundamental importance to th[e] country's effort to encourage and maintain a competitive economy."  *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 2976220, at *2 (E.D.N.Y. July 23, 2010) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 634-35 (1985); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972)). The United States also "has a substantial interest in fully and fairly adjudicating matters before its courts" -- an interest "only realized if the parties have access to relevant discovery" --, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. at 54 (quoting *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v.Phillips Petroleum Co.*, 105 F.R.D. 16, 30 (S.D.N.Y. 1984)) (quotation marks omitted), and in vindicating the rights of American plaintiffs.  *Richmark*, 959 F.2d at 1477. It also has a "vital" interest in enforcing the judgment of its Courts.  *Id.*  (citation and quotation marks omitted).

By its own terms, the purpose of PIPA is to protect the privacy of Korean citizens "from the unauthorized collection, leak, abuse or misuse of personal information."  PIPA, Article 1.  In

8

United States District Court
Northern District of California

1   this case, the court has entered a stipulated protective order that specifically provides for the

2   confidential treatment of personal information protected by PIPA.  Stipulated Amended

3   Confidentiality Protective Order [Docket No. 172] at §2.2.  Under the protective order, the

4   personal information can only be used in the present litigation; access to the information is strictly

5   limited.  *Id.* at §§ 8.1, 8.2.  The court finds that the protective order adequately addresses the

6   privacy concerns expressed in PIPA, and safeguards against the unauthorized collection, leak,

7   abuse or misuse of the personal information it protects.

8        Weighing the countries' interests, the court finds that this factor favors disclosure because

9   the Unites States' interest in disclosure of the information in this antitrust litigation outweighs the

10  privacy concerns articulated in the PIPA, which are mitigated through the protective order in this

11  case.

12                    **6.        Hardship to Nongshim Korea**

13       The court also must consider a discovery order's likely effect on the foreign party.

14  *Richmark*, 959 F.2d at 1477.  For example, "fear of criminal prosecution constitutes a weighty

15  excuse for nonproduction."  *Societe Internationale Pour Participations Industrielles et*

16  *Commerciales, S.A. v. Rogers*, 357 U.S. 197, 211 (1958).

17       PIPA provides that if a person violates Article 17's prohibitions on disclosure "shall be

18  punished by imprisonment for not more than five years or by a fine not exceeding 50 million won."[4]

19  PIPA, Article 71(1).  DPPs contend that Nongshim cannot credibly argue that it will be subject to

20  criminal or civil penalties for PIPA violations, and indeed, Nongshim has admitted that it is not aware

21  of any enforcement action under PIPA.   Docket No. 229 at 9; 14 n.11.

22       While the existence of these sanction provisions under PIPA initially weigh against disclosure,

23  the court also considers that likelihood of enforcement, which in this case alleviates the potential

24  hardship on Nongshim.  *See Air Cargo*, 2010 WL 2976220, at *2 (finding that the prospect that

25  defendants would be subject to sanctions was "speculative at best" when defendants had "cited no

26

27  ────────────────────

28  [4] The court notes that the maximum statutory fine is equivalent to approximately $41,125 at current exchange rates.  *See* Xe, http://www.xe.com (last visited Jan. 19, 2016).

United States District Court
Northern District of California

instance in which such sanctions have ever been imposed") (citing *Minpeco, S.A.* v. *Conticommodity Services, Inc.*, 116 F.R.D. 517, 529-30 (S.D.N.Y. 1987).

### 7.   Likelihood of Compliance

If a discovery order is "likely to be unenforceable" and therefore "have no practical effect," this factor will counsel the court against ordering discovery. *Richmark*, 959 F.2d at 1478. Nongshim is subject to this court's jurisdiction and does not assert that it will refuse to comply with a court order compelling discovery.

## III.   SEALING MOTIONS

In conjunction with their supplemental submissions to the court, Plaintiffs and Nongshim moved to seal information from certain witness statements provided to Korea Fair Trade Commission ("KFTC") in conjunction with the KFTC's investigation of alleged price-fixing of Korean ramen noodles.  Docket Nos. 256, 260, 272.  Plaintiffs', Nongshim's and Ottogi's supporting declaration establish good cause.  Therefore, Plaintiffs' and Nongshim's motions to seal are **granted**.

## IV.   CONCLUSION

The DPPs' motion to compel is **granted.**

The balance of factors in the comity analysis tilts toward compelling Nongshim Korea to disclose the discovery. The court therefore orders Nongshim Korea to produce the last known telephone number, email, and physical address for the three former Nongshim employees **within five days of this order**.  The disclosure is subject to the amended stipulated confidentiality protective order in this case.

**IT IS SO ORDERED.**

Dated: January 21, 2016

_____
Donna M. Ryu
United States Magistrate Judge

10