UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROCKMAN COMPANY (USA), INC., et al.,

        Plaintiffs,

    v.

NONG SHIM COMPANY, LTD, et al.,

        Defendants.

Case No.  13-cv-04115-WHO

**ORDER DENYING PLAINTIFFS'
MOTIONS FOR SANCTIONS**

Re: Dkt. Nos. 413, 415, 416, 420,

## INTRODUCTION

Plaintiffs[1] want sanctions imposed on defendants[2] for the alleged spoliation of evidence following the inception in June 2008 of an investigation by the Korean Fair Trade Commission (KFTC) into allegations of price-fixing in the Korean Ramen Noodle market.  Defendants oppose, arguing that an obligation to preserve documents relevant to the antitrust claims asserted in this case arose only after the inception of this litigation in 2013, and that if any documents were destroyed, that destruction occurred without any intent on the part of defendants to deny plaintiffs access to them in this litigation.

The central issue that I decide on these motions is whether a duty to preserve arose in 2008 in light of the KFTC's investigation.  In other words, should that investigation have put these companies on notice that litigation in the United States was reasonably foreseeable such that they were required to depart from their normal course of conduct where ESI, including email, was

[1] These motions are brought by the Indirect Purchaser Plaintiffs (IPPs) and the Direct Purchaser Plaintiffs (DPPs).

[2] The defendants charged with spoliation are Nongshim Co. Ltd. (Nongshim Korea), Nongshim America, Inc. (Nongshim America, collectively Nongshim), Ottogi Corporation, Ltd. (Ottogi Korea) and Ottogi America, Inc. (Ottogi America, collectively Ottogi).

United States District Court
Northern District of California

routinely destroyed and hard copy documents were maintained for only a few years.   I conclude that given the case law and the facts alleged, defendants did *not* have a duty as of 2008 to preserve evidence for potential use in litigation in the United States.

Plaintiffs do not put forward any case law to support their argument that in the context of a foreign government's investigation focused primarily if not exclusively on domestic price fixing, defendants in Korea and their affiliates in the United States had a duty to preserve evidence that would normally otherwise be destroyed because litigation in the United States could someday be commenced.  In absence of apposite case law, I decline to reach that far.  While Nongshim and Ottogi may have had a duty not to interfere with or impede the KFTC's investigation – assuming the scope of that investigation was known by the defendants and that investigation imposed an affirmative duty to preserve evidence relevant to that investigation, matters very much in dispute – that duty ran to the KFTC and does not translate into a duty to preserve evidence that can be enforced through an award of sanctions by a court in the United States.

Plaintiffs may be able to argue in this action the negative implications of the evidence they believe they have uncovered, that Nongshim intentionally destroyed information relevant to the KFTC investigation and that Ottogi altered information in response to the KFTC's investigation.  I detail plaintiffs' allegations in this Order, and some raise questions.  But those alleged actions were not targeted, aimed, or done with knowledge that they might impede *this litigation*.  Therefore, they cannot support the sanctions plaintiffs seek.[3]

## BACKGROUND

## I.   INCPETION OF INVESTIGATION OF AND LITIGATION AGAINST NONGSHIM

### A.   KFTC's Investigation and Nongshim's Notice

On June 3, 2008, the KFTC conducted an onsite investigation at Nongshim Korea.  Declaration of Stephanie Cho [Dkt. No. 456-9], Ex. 20 p. 12.[4]  Nongshim employees and attorneys

---

[3] To be clear, I am not ruling at this juncture that plaintiffs' evidence of destruction or alteration of documents is admissible.  Admissibility of that evidence at summary judgment or trial will be addressed if plaintiffs seek to rely on it.

[4] Two more onsite investigations were conducted on January 20, 2010 and July 28, 2011.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1   were prevented from observing what the KFTC employees were doing and what information they

2   were gathering. *Id*. pgs. 12-13. Nongshim contends that the KFTC is not required to and did not

3   inform Nongshim about what documents it took or what it was investigating. Deposition of Joong

4   Rak Lee, Exs. 4A & 4C to Declaration of Joseph P. Grasser [Dkt. No. 436-1]. Nongshim Korea's

5   Vice President at the time, Joong Rak Lee, testified that he was asked about Nongshim's price

6   increases by the KFTC in connection with the onsite visits, *see id*., but that he was not aware that

7   alleged price collusion between Nongshim and the other defendants was the target of the KFTC

8   investigation until Nongshim received the KFTC's examination report in January 2012.

9   Declaration of Joong Rak Lee [Dkt. No. 432-10] ¶ 5.[5]

10       Plaintiffs allege that Nongshim had adequate notice that price-fixing *was* the focus of the

11   KFTC investigation in June 2008. Plaintiffs rely on a letter that they assert the KFTC sent

12   Nongshim Korea regarding its investigation on or around June 27, 2008. In that letter – whose

13   recipients are listed as Nongshim, Samyang, Ottogi, and Yakult Korea, and which was produced

14   in this litigation by Ottogi but not by Nongshim – the KFTC informed the recipients that its

15   "Service Cartel Department" was investigating potential violations of Korean antitrust law in the

16   "ramen market." Cho Decl., Ex. 12. The letter requested that Nongshim and the other recipients

17   produce 13 categories of ramen-related documents, including pricing documents. *Id*. Nongshim

18   Korea's executives, including Joong Rak Lee deny receipt of the June 27, 2008 letter. Joong Rak

19   Lee Decl. ¶ 7. Lee questioned the authenticity of the copy of the June 27, 2008 letter presented to

20   him at his deposition (Cho Ex. 12, OTGKR-0018191), because it was not produced by Nongshim,

21   the letter lacks information (*e.g.,* a blank "from" line), and the letter lacks a "chop," an official

22   KFTC seal or stamp. *Id*. ¶ 7.

23       Plaintiffs contend that other documents produced by Nongshim demonstrate that

24   Nongshim received the June 27th letter and Nongshim was, therefore, on notice of the

25   government's investigation into price collusion in the ramen market. For example, plaintiffs rely

26

27   _____

28   [5] Nongshim admits that it obtained a little more information as of May 30, 2011, when it was informed of Samyang's leniency petition and its employees were called in for questioning by the KFTC. Grasser, Ex. 27 pg. 12. At that point, Nongshim obtained legal counsel.

United States District Court
Northern District of California

on a document with the filename "The Price Structure of Ramen for Overseas Regions (Planning Team_KFTC)," which lists prices (export, landing, and local sales) for export products and which, according to its metadata, was created in June 2008 and last modified in early July 2008 (prior to the date the KFTC's June 27th letter requested production of documents by).  Cho Exs. 14 & 15. Nongshim's former Vice President Lee argues that the "Price Structure" document could not have been created in response to the KFTC investigation because (i) that document is from Nongshim Korea's export department which in Lee's view was not a target of KFTC investigation and is separate from the unit that sets domestic prices, and (ii) the document does not indicate on its face that it was prepared in response to a request for information from the KFTC.  Lee Decl. ¶ 8.[6]

Plaintiffs point to a July 22, 2008 document (Cho Ex. 16), that noted that Lee was responsible for providing "additional materials upon the KFTC's 2nd request."  Lee responds that this document relates to a different KFTC investigation (of large ramen distributors, including E-mart mentioned in the entry at issue), and does not relate to the price-fixing allegations investigated by the KFTC.  Lee Decl. ¶ 10.

Plaintiffs next rely on a document they claim is from "August 2008," titled "2008 Planning Team Performance Review," which notes action items including a response to "KFTC's cartel investigation" and the "Cartel policy department's onsite investigation (June 3) and written investigations (July, August)."  Cho Ex. 17.  Nongshim responds by pointing to the deposition testimony of Nongshim witness Bo Gyoo Kim who testified (when shown a version of this document) that the document did not appear to be final because it lacked signatures, and was more likely a work in progress.  Kim Deposition at 149-151, Ex. 12 to Grasser Decl. [7]

Plaintiffs also rely on a March 2009 document (Cho Ex. 18), where Bo Gyoo Kim had the responsibility to "prepare materials regarding the main cause of price increase for noodle and

---

[6] Lee also declares that if the KFTC was seeking information from Nongshim, that request would have been made by the KFTC by telephone to him directly.  Lee Decl. ¶ 9

[7] Plaintiffs use a different version of this document, with a different bates stamp, as an exhibit. Defendants assert that plaintiffs' exhibit and the exhibit discussed by Bo Gyoo Kim are identical, except that plaintiffs' exhibit contains a date in the approval box which defendants claim is a translation error.  Oppo 8 at n.13.

United States District Court
Northern District of California

snack products" in response to a KFTC investigation.  However, Lee responds that the March 2009 document – on its face – relates to a different KFTC investigation into the drinks industry. Lee explains that investigation was highly publicized  and that the document at issue captures the fact that Nongshim Korea "contemplated" whether it should prepare materials relating to price increases for noodles and snack products in case it needed to respond to inquiries from the public or press.  Lee Decl. ¶ 11.[8]

In March 2010, plaintiffs assert that Nongshim was sent (along with Samyang, Ottogi, and Yakult) a letter from the KFTC "Cartel Investigation Department" requesting more ramen related price information.  Cho Ex. 22.  Lee says that Nongshim Korea did not receive a copy of this letter (Lee Decl. ¶ 13), and as it sought historical information on ramen prices, it could have been relevant to any number of KFTC's ongoing or potential investigations.  *See* Lee Decl. ¶ 14 (describing a number of other matters the KFTC was investigating with respect to Nongshim Korea during this time frame, including distribution and sales arrangements and corporate disclosures).

Plaintiffs also rely on a November 2010 "Nongshim Performance Review" drafted by CEO Sang Yoon Lee (allegedly generated following the KFTC January 20, 2010 onsite investigation and a February 2010 summons) to support their assertion that Nongshim knew about the price-fixing focus of the KFTC investigation.  In that document a main "implementation item" was the KFTC's "cartel investigation" whose "purpose" was "Ramen price collusion" based on sharing of price information with competitors and related to the January site visit and February summons. Nongshim's Lee describes the November 2010 document as a "summary" of Nongshim Korea's "speculation" as to whether the KFTC might be investigating price collusion based on employees who overheard comments by or had interactions with the KFTC's investigators during the January 2010 site visit.  Lee Decl. ¶ 12.  Although the KFTC asked Lee to appear at the KFTC's offices in

---

[8] Plaintiffs note this document was sent by Nongshim Korea to Kerry Lee a Senior Manager at Nongshim America's manufacturing plant, and was produced in this litigation by Nongshim America but not by Nongshim Korea.  Cho Decl. ¶ 85.  Plaintiffs rely on the existence of this one document to argue that Nongshim Korea kept Nongshim America informed about the status of the KFTC investigation.  Motion to Sanction Nongshim at 7.

February 2010, according to Lee the KFTC gave no clear indications of what they were investigating and only asked general questions about the business.  *Id.*

Plaintiffs next rely on a November 16, 2010 email reporting that the KFTC had requested about "100 pages of ramen industry information" and noting that Nongshim employees in various departments gathered responsive materials.   Cho Decl., Ex. 23.   Nongshim's Bo Gyoo Kim testified that this document didn't have anything to do with the KFTC price-fixing investigation, but was in response to materials that KFTC asked Kim to produce for an internal KFTC presentation on the industry.  Kim Depo. 193-196.

In reply, plaintiffs also rely on a "Nongshim 2008 PowerPoint."  Supplemental Declaration of Stephanie Cho [Dkt. No. 447-11], Ex. 3.  Plaintiffs point out that this PowerPoint document lists – in the exact same table format with the same table headers and categories – the exact information the KFTC requested in "Request No. 9" of the its June 27, 2008 letter addressed to Nongshim, that Lee claims Nongshim never received.  The metadata for this document shows it was last edited on July 2, 2008, four days before the KFTC requested a response.  Supp. Cho Decl., Ex. 4; Cho Supp. Decl. ¶ 8.  Plaintiffs argue that Nongshim could not have accidentally formulated this exact information, in the exact form that it was requested by the KFTC in the June 27, 2008 letter.

## B.    KFTC's Findings and Decision of the Supreme Court of Korea

According to Nongshim's expert declarant Hye Sook Seo (an antitrust lawyer in Korea who served on a committee of the KFTC), the KFTC's jurisdiction is limited to investigating Korean entities and has no authority to investigate or impose corrective measures based upon conduct occurring outside of Korea.  Seo Decl. ¶ 21.   Seo also explains that the KFTC issues an "examination report" if it finds, after the conclusion of its investigation, that "corrective measures" need to be taken.  Seo Decl. ¶ 23.  Here, the KFTC issued its examination report concluding that illegal price-fixing occurred in the Korean market to Nongshim, Ottogi, and the other defendants on January 31, 2012.  *Id.* ¶ 26.

According to Seo, the allegations discussed in the examination report were regarding price fixing of ramen in the domestic market, and the report did not indicate that KFTC's investigation

extended into Nongshim's prices in the United States.  *Id.* ¶ 26.  The examination report, according to Nongshim's former Vice President Lee, was the first time that "Nongshim Korea acquired meaningful knowledge or information regarding the KFTC's material allegations" against it.  Joong Rak Lee Decl. ¶ 5.  Therefore, at that point, Nongshim disclosed the existence of the investigation to the Korean Financial Supervisory Service (similar to the U.S. Securities and Exchange Commission).  *Id.* ¶ 6.

The examination report is the "initial step" in the KFTC's "deliberation process to determine whether any laws have been violated."  *Id.*  At the conclusion of the deliberation process, the KFTC makes a final determination as to whether laws have been violated and if so, imposes corrective measures on and issues a written resolution to the entities at issue.  Seo Decl. ¶ 24.  Therefore, according to Seo, at the initial examination report stage subsequent civil litigation is merely a possibility.  Moreover, each step of the KFTC process (examination report, written resolution) are appealable to Supreme Court of Korea.  *Id.* ¶¶ 24, 25.

In July 2012, the KFTC issued its final determination, assessing large fines on Nongshim, Samyang, Ottogi, and Yakult for illegal price-fixing in the Korean Ramen market.  Cho Decl., Ex. 2.  The KFTC concluded that starting in 2000, the defendants conspired to raise prices of ramen in Korea, and that pursuant to that agreement, prices were raised in 2001 and five times thereafter through December 2010.  *Id.* at 22.  Pursuant to their alleged agreement, Nongshim would raise prices first, and the other defendants would follow.  *Id.* at 23.   The final determination acknowledged that Nongshim followed government policy and as such, discussed with and got approval from the government prior to raising its prices on its main products, but that consultation was voluntary and Nongshim did not consult prior to raising its prices in 2008.  *Id.* at 26.  The final determination focused on the characteristics of the domestic market, although it noted in passing that Nongshim controls 6% of the global ramen market.  *Id.* at 11.

In December 2015, the Supreme Court of Korea reversed the KFTC's decisions and findings.  Seo Decl., Ex. 1.  The Korean Supreme Court determined that there was insufficient evidence of an express concerted agreement to fix prices (in light of hearsay evidence and lack of direct evidence regarding the initial meeting in 2000).  *Id.*  There was also insufficient evidence to

show a tacit agreement to fix prices, in light of the history of government regulation of the ramen market, the history of the market share-dominant company (here Nongshim) increasing its prices and competitors following suit ("follow-the-leader-pricing"), and the differences in the amount of price increases and the timing of the price increases by the "followers" after the leader Nongshim acted.  *Id.*  There is no discussion in the Supreme Court's decision of export markets or international markets.

In response to the Korean Supreme Court's ruling, in January 2016 the KFTC revoked and nullified its prior orders and holdings.  Seo Decl., Ex. 2.

### C.   Nongshim's Document Preservation and Obligations under Korean Law

Plaintiffs assert that the document preservation policy in place at Nongshim Korea in June 2008 was Nongshim Korea's January 2000 policy.  That policy required retention of KFTC-related documents for 10 years.  Cho Decl., Ex. 13.  However, Byung Chul Park (Nongshim Korea's Manager in its Legal Department) declares instead that a policy from March 12, 2007 policy was in effect as of 2008.  Declaration of Byung Chul Park [Dkt. No. 432-6], ¶ 6.[9]

The 2007 Policy did not require preserving documents related to KFTC investigations and did not address emails at all.  Park testified that generally, employees were responsible for deciding which documents (including emails) they needed to retain.  *Id.* ¶ 8.  Because of the limited email account capacity (30MB or less from 2000 through 2008, and 100MB from 2008 through 2014), employees had to carefully manage what emails were retained.  *Id.* ¶ 9.  Park declares that upon the "litigation hold" in 2013, all emails relevant to this litigation were preserved.  *Id.* ¶ 10.

During the relevant timeframe, Nongshim believes that when employees were issued new computers, data may have been lost.  Similarly, when an employee left the company, his or her computer data would not automatically be transferred to the successor.  Deposition Testimony of Hwan Oc Jeong at 23-27, 86-87 (Glasser Decl. Ex. 26).  Nongshim America had a policy whereby

---

[9] Plaintiffs dispute whether the 2007 Policy discussed by Park was put in place, because at least one page of the document discussed by Park is described as a "draft," although the cover page has a final approval stamp.

1  once an employee leaves, data already deleted would not have been recoverable until after 2010.

2  Deposition of Hosik Shin at 16-17, 27-28 (Grasser Decl. Ex. 28).

3          Plaintiffs rely on their expert declarant Jung Eun Choi [Dkt. No. 420-4] who asserts that

4  under Article 69-2(1) of the Korean Monopoly Regulation and Fair Trade Act (MRFTA) and

5  Article 30-2(2) of Korea's Fair Transactions in Subcontracting Act, business entities (and their

6  executives and employees) can be punished by the KFTC if they impair or impede KFTC

7  investigations.  Choi goes on to describe a number of cases where the KFTC has fined companies

8  and their employee for violation of those laws.  Choi Decl. ¶¶ 5-10.

9          Nongshim responds to Choi with Seo's declaration, who represented Nongshim in the

10 proceedings against the KFTC at the Seoul High Court and Supreme Court of Korea.  Declaration

11 of Hey Sook Seo [Dkt. No. 432-7] ¶¶ 1, 2.  Seo asserts that Korean companies and executives do

12 not have an obligation to preserve documents in anticipation of civil litigation or even during a

13 government investigation, and that while companies may be fined if the KFTC determines that

14 executives have intentionally and willfully hindered or evaded investigation by concealing or

15 destroying evidence, the KFTC never alleged Nongshim did so in its investigation (which

16 included forensic searching of Nongshim's workstations and emails).  *Id*. ¶¶ 3-8, 16.  Seo

17 distinguishes the Korean cases relied on by Choi, because in those cases the KFTC concluded

18 employers instructed employees to hide, discard, or destroy evidence or refused the KFTC access

19 to its systems; actions that Nongshim was not accused of.  *Id*. ¶¶ 10-15.

20         Seo and Choi disagree on whether under Article 69-2(7) of the MFRTA companies are

21 obligated not to delete information related to an investigation in order not to interfere with the

22 KFTC's investigation.  *Compare* Seo Decl. ¶ 3 *with* Supplemental Declaration of Jung Eun Choi

23 [Dkt. No. 451] ¶ 4.  Both agree, however, that companies should not delete data or alter

24 documents with an intent to interfere with such an investigation.  Whether that occurred here is in

25 dispute.

26         **D.     Lack of Production by Nongshim in This Case**

27         Nongshim asserts that it issued litigation hold notices to its employees in September 2013

28 (after Nongshim America had been served in August 2013 with the first complaint in this action,

United States District Court
Northern District of California

but before Nongshim Korea received service in January 2014).  Plaintiffs claim that no litigation hold notices have been produced by Nongshim, and defendants rely only on their own discovery responses to establish the date to support their assertion.   Cho Decl. ¶ 89.  Nongshim has produced over 414,439 documents to plaintiffs, including 131,339 documents from Nongshim Korea, 128,349 of which were ESI documents.  Grasser Decl. ¶ 9.

Plaintiffs complain, however, that for at least fourteen custodians identified by plaintiffs, Nongshim was unable to produce *any* ESI because those employees were no longer employed by Nongshim (although they left the company after the 2008 start of the KFTC investigation).  Motion for Nongshim Sanctions at 8.  Those custodians include former CEO Sang-Yoon Lee.  Additionally four high-ranking current Nongshim employees, including Joon Rak Lee and Bo Gyoo Kim – whose testimony Nongshim relies extensively on to oppose this motion – produced no documents.  Motion for Nongshim Sanctions at 9.

Plaintiffs also allege that the Nongshim Distribution Research Team (DTR) was the body that communicated price information with its competitors, yet Nongshim produced zero emails from the majority of the DRT custodians identified by plaintiffs.  *Id*. at 11.   Plaintiffs have, however, secured emails sent from some of these Nongshim employees to Samyang employees from an external hard drive produced by Samyang.

Plaintiffs compare the paltry number of responsive ESI documents produced by Nongshim Korea, with the much higher number of ESI documents produced by Nongshim America.  However, plaintiffs also note that the documents from Nongshim American generally do not include ESI from Korean executives who were "dispatched" or "seconded" from Nongshim Korea to work for a time with Nongshim America.  Motion for Nongshim Sanctions at 14-15.

Finally, plaintiffs complain of Nongshim's failure to produce other documents, including documents found on the Samyang Hard Drive that metadata indicate were created by Nongshim, as well as a 2003 version of Nongshim's annual "Factbook," which plaintiffs secured from Nongshim's website prior to the start of this litigation but which was removed from the website

1  after the inception of this litigation and cannot now be located by Nongshim.  *Id*. at 16-17.[10]

2  ## II.   INCEPTION OF INVESTIGATION OF AND LITIGATION AGAINST OTTOGI

3  ### A.   Ottogi's Notice and Scope of KFTC Investigation at Ottogi

4  As with Nongshim, the KFTC performed an onsite visit at Ottogi Korea on June 3, 2008.

5  Managing Director of the Sales Office, Young Hyun Doh, declares that while the KFTC sought

6  out his department, as the department in charge of setting domestic ramen prices, he did not know

7  anything about the investigation at that time except that it related to ramen and assumed it was

8  related to the new South Korean President's effort to control food prices.  Declaration of Young

9  Hyun Doh [Dkt. No. 431-1] ¶ 6.  Ottogi does not dispute that it received the June 27, 2008 letter

10  from the KFTC requesting production of documents regarding pricing in the ramen market and

11  collected and provided to the KFTC the documents they requested regarding ramen price setting.

12  Doh Decl. ¶ 7.

13  According to Ottogi, all of the inquiries from the KFTC were about domestic prices and

14  domestic products.  It was not until July 2011 that the KFTC asked for data relating to export

15  products.  Doh Decl. ¶ 14.  Ottogi was told by the KFTC that the export information was needed

16  to exclude export products from the potential fines being considered by the KFTC.  *Id*. ¶ 15.[11]

17  ### B.   Ottogi's Document Preservation and Alleged Alterations

18  Ottogi's document retention policy required the preservation of hard copies of documents

19  "associated with any significant lawsuit."   The policy also required preservation of various hard

20  copy document for three years.  Doh Decl. ¶ 4.  Ottogi did not preserve documents for this case,

21  despite the KFTC investigation, until September 2013.[12]

22

23  [10] Nongshim criticizes plaintiffs for failing to specifically identify these "Nongshim" documents,
    and according to its analysis, the "vast majority" of documents with Nongshim metadata on the
24  Samyang Hard Drive are publicly distributed Nongshim documents.

25  [11] According to Doh, the fines levied by the KFTC in July 2012 were based exclusively on its
    domestic sales and did not include revenue from the sale of export products.  Doh Decl. ¶ 15.  To
26  support its position that the KFTC investigation did not address export pricing, Ottogi also relies
    on two KFTC documents where the KFTC admitted its investigation was focused on the domestic
27  market and it determined that export prices were not "subjected to price-fixing."  Dkt. No. 85-1
    (July 2013 press release); Dkt. No. 95-2 (2014 statement).

28  [12] Ottogi did not institute a litigation hold on information relevant to this lawsuit until September

United States District Court
Northern District of California

1   Both sides agree that when an employee's computer was replaced (or malfunctioned)

2 during the relevant time period, Ottogi Korea did not automatically preserve the data on the old

3 computer, but relied upon employees to select only the documents and information needed going

4 forward.  Deposition of Se Chang Lee (Ex. 8A to Declaration of Minae Yu, Dkt. No. 438-5) at 35-

5 37, 52.  Ottogi also admits that when an employee was assigned to a new division, most simply

6 discarded their old information. Declaration of Se Chang Lee [Dkt. No. 431-4] ¶ 8; and that

7 departing employees' equipment was most likely wiped. Se Change Lee Depo. at 49-50.  The

8 same policies applied at Ottogi America.  Declaration of Young Wook Ham [Dkt. No. 431-2] ¶ 3.

9 Ottogi Korea's email system was maintained and operated by a third-party, RDS (and affiliated

10 companies).  Declaration of Se Chang Lee [Dkt. No. 431-4] ¶ 4.

11   Prior to 2009, each email account had a limit of 150 MB and an auto-delete of emails older

12 than 3 months.  Lee Decl. ¶ 5.  Emails transmitted after the storage limit was exceeded or that

13 were older than 3 months could only be saved if downloaded to a local hard drive.  *Id*.  Both sides

14 agree that in March 2009, RDS shortened the auto-delete timeframe on its central email server so

15 that all emails older than 30 days would be automatically deleted unless the employee downloaded

16 the email to his or her local system.  Lee Decl. ¶ 5.  At that time, neither the employees working

17 with RDS or RDS were aware of the KFTC investigation.  Lee Decl. ¶ 7.

18   Plaintiffs also allege that while Ottogi was preparing its document production in response

19 to the June 27 KFTC requests, senior Ottogi executives and other employees intentionally

20 tampered with years-old internal pricing memoranda to cover up the motives and coordination of

21 the price increases it made as part of the alleged conspiracy.  Plaintiffs rely on two specific

22 documents: (i) a January 2004 Memorandum and (ii) a 2005 Internal Memorandum.

23   According to plaintiffs, the "original" January 2004 Memoranda was emailed to Ku by a

24 subordinate (Jung), and Ku forwarded that original January 2004 memo to a different subordinate

25 (Jun).  The following day Jun emailed a "revised_doc" (which plaintiffs refer to as the falsified

January 2004 memorandum) back to Ku.  Motion for Ottogi Sanctions at 4-5.  In the revised

memorandum,  all language was removed evidencing the relationship between Nongshim and

Ottogi's prices (*e.g.*, Ottogi following Nongshim's lead), a chart comparing Nongshim to Ottogi

prices, deleted references to Samyang and Yakult, and according to plaintiffs "falsely" represented

that the purpose of the price increases was capture escalations in raw material pricing.  *Compare*

Cho Decl. Ex 14 (original) *with* Ex. 15 (altered); *see also* Declaration of James Vaughn [Dkt. No.

421-1] ¶¶ 14-20 (discussing the metadata of the versions of the memoranda).

Ottogi responds that with respect to the January 2004 Memoranda, following the June

2008 onsite visit, Ottogi informed the KFTC that it had discarded the original hard copies of their

price increase "RFA packages,"[13] and at the KFTC's prompting and with their knowledge, Ottogi

attempted to "approximate" the original documents for the KFTC's use.  Doh Decl. ¶ 8;

Declaration of Bangwan Ku [Dkt. No. 431-3] ¶¶ 6-7.  Ku describes reducing the 2004

Memorandum down from seven to three pages, because the final memorandum (which was

missing and which would have been signed off on by the President in hard copy) would only have

been approximately 3 pages in length.  Ku Decl. ¶¶ 5, 7.

In reply, plaintiffs fault Ku for his "incredible" and unsubstantiated story, note that he does

not provide the names of whom he spoke with at the KFTC and provides no contemporaneous

documents to support his story, and asserts the "original" memo was in fact the original memo.

According to plaintiffs, the 2005 Internal Memoranda was originally created by Byung

Bak Cho of "Marketing Team 3" and saved as "Ramen Price Increase Review Plan (05.1.21).doc,"

and last modified on March 2, 2005.  Cho Ex. 18.  On July 4, 2008, plaintiffs contend Doh sent Ku

a falsified version of the memo, with a last modified date of July 4, 2008.  The "falsified" memo

blamed price increases on the increase in raw material costs as opposed to competitor increases,

---

[13] Ottogi intended to produce all copies of its pricing memoranda in hard copy because the KFTC had requested "final documents with all of the approval stamps and signatures."  Doh Decl. ¶ 7. The RFA packages – which were created for all prices increases – consisted of (i) a formal request for approval of a price increase, with a memorandum; (ii) a request for cooperating in implementing the price increase, which was sent to all Ottogi divisions; and (iii) a notice of price change, sent to all sales branches.  Ku Decl. ¶ 4.

United States District Court
Northern District of California

1    omitted references to competitors' price increases, and shortened the memo from five pages to

2    three. Cho Ex. 21; *see also* Vaughn Decl. ¶¶ 21-25 (discussing metadata and content of 2005

3    memoranda). Plaintiffs contend that Ottogi printed the falsified memo, inserted a chop, and

4    provided it to the KFTC as part of the 2005 RFA package. Cho Ex. 23 (SoGap 106).[14]

5         With respect to the 2005 Internal Memoranda, Doh declares only that he did not make any

6    changes to it because Ottogi had a complete hard copy it could produce to the KFTC, which is

7    reflected as SoGap 106. Doh admits that he received an electronic copy of that memo from his

8    subordinate Bangwan Ku, which Doh saved on his computer for reference. Doh Decl. ¶ 9.

9         In reply, plaintiffs note that the metadata of the electronic version kept by Doh shows it

10   was edited by Doh with a modified file name, and while both are "authored" by B. Cho and dated

11   February 28, 2005, the "original" version is 4.5 pages long and the "edited" version submitted to

12   the KFTC is only 2.5 pages long. Reply for Ottogi Sanctions at 13. In its brief, Ottogi attempts to

13   argue that the date change in this document can be explained by the fact that Doh saved it on his

14   computer in 2010. Ottogi Opp. at 24. However, in a supplemental declaration, plaintiffs' forensic

15   expert, James Vaughn, explains why that action (saving the memo onto Doh's local drive) would

16   not account for evidence showing the memo had been permanently altered in 2008. Supplemental

17   Declaration of James Vaughn [Dkt. No. 447-7] ¶ 18.

18        Plaintiffs also believe that Ottogi altered a November 2002 Memorandum submitted to the

19   KFTC and Korean Courts (which they believe was modified as late as February 2010), but

20   plaintiffs do not have an "unspoliated" version of that memorandum, so cannot say how it was

21   altered. Vaughn Decl. ¶¶ 26-27. In response, Doh declares that following the 2010 onsite visit,

22   the KFTC asked Ottogi to produce their 2001 and 2002 RFA packages. Doh's subordinate Ku

23   found some documents from those packages, but was again required (at the KFTC's insistence) to

24   submit an "approximation" of the 2002 memorandum. *Id.* ¶¶ 10-11. Ku informed the KFTC he

25   would provide a "close approximate" of the 2002 memorandum, and did so by relying on

26   descriptions of the original memo's contents provided by the former Ottogi employee who had

27   ――――――――――――――――――

28   [14] In its Decision, the KFTC identified documents it relied on in reaching its Decision by a
     "SoGap" designation.

United States District Court
Northern District of California

prepared the original memorandum.  Ku Decl. ¶¶ 9, 10.

In reply, plaintiffs point out that the approximated 2002 memorandum that was produced to the KFTC (identified as SoGap 81 by the KFTC) was captioned "Ramen Product Price Increase Review" and "dated" November 20, 2002, but there is no indication on the version of the document referenced by the KFTC that it was "approximated" or that it was "recreated" in 2010.

Ottogi's Korean law expert declarant, Song Ryu, asserts that Ottogi did not have an affirmative duty to prevent the destruction of documents potentially relevant to the KFTC investigation, and could not be expected to stop the destruction of documents as a normal course of business.   Declaration of Song Ryu [Dkt. No. 431-5] ¶¶ 4-7.  Ryu, like Nongshim's declarant Seo, distinguishes the cases relied on by Choi (where the KFTC fined companies or their employees for deleting, altering or preventing access to documents to interfere with or impede KFTC investigations) on the grounds that only interferences that occurred during onsite KFTC investigations are sanctionable.  Ryu Decl. ¶ 9.  Choi, however, argues that distinction is without support and that Article 69-2(1) of the MFRTA is not limited to interferences with onsite investigations, but with the KFTC's broader investigation; therefore, it would apply to any attempt to destroy information in an effort to interfere with or impede a KFTC investigation.  Choi Supp. Decl. ¶ 6.

### C.     Lack of Production by Ottogi in This Case

Plaintiffs argue that 18 of the custodians they identified produced no documents because they had either left Ottogi, changed job functions, or had their equipment changed.  Ottogi deleted ESI and personal files of employees who left the company, and those employees included the executive who approved the Ottogi price increase in 2008 and who was subject to a summons of investigation issued by the KFTC and Jung, who communicated with the division of Samyang responsible for setting prices.  Motion for Ottogi Sanctions at 8-9.

Plaintiffs also complain of a lack of (or nonexistent production) from at least six current employees who switched positions or changed equipment and whose documents may have been lost because they did not specifically elect to save certain files.    Motion for Ottogi Sanctions at 9-10.

United States District Court
Northern District of California

1  Finally plaintiffs identify specific documents they contend Ottogi has not produced,

2  including documents from Ottogi attached as exhibits to the KFTC July 2012 decision, and

3  documents produced by Samyang which were authored by Ottogi.  Motion for Ottogi Sanctions at

4  12-13.

5  **LEGAL STANDARD**

6  "There are two sources of authority under which a district court can sanction a party who

7  has despoiled evidence: the inherent power of federal courts to levy sanctions in response to

8  abusive litigation practices, and the availability of sanctions under [Federal Rule of Civil

9  Procedure] 37 against a party who fails to obey an order to provide or permit discovery." *Leon v.*

10  *IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006) (quotation marks omitted).  A trial court's discretion

11  in selecting the form of a spoliation sanction is broad, and can range from comparatively minor

12  sanctions, such as awarding attorney's fees, to more severe sanctions, such as dismissal.  The

13  determination of an appropriate sanction "is assessed on a case-by-case basis." *Io Grp. Inc. v.*

14  *GLBT Ltd.*, 10-cv-1282-DMR, 2011 WL 4974337, at *3 (N.D. Cal. Oct. 19, 2011) (internal

15  quotation marks omitted).

16  To determine whether spoliation occurred, the majority of courts use some variation of a

17  three-part test: "(1) that the party having control over the evidence had an obligation to preserve it

18  at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind;'

19  and (3) that the evidence was 'relevant' to the party's claim or defense such that a reasonable trier

20  of fact could find that it would support that claim or defense." *Apple Inc. v. Samsung Elecs. Co.*,

21  888 F. Supp. 2d 976, 989 (N.D. Cal. 2012) (citing cases).

22  As courts in this district have recognized, "there is no question that the duty to preserve

23  relevant evidence may arise even before litigation is formally commenced."  *Apple Inc. v.*

24  *Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 990 (N.D. Cal. 2012).  Instead, the duty arises when,

25  objectively, a party reasonably should have foreseen litigation.  *Id.* (citing cases).  As Judge Koh

26  recognized, "[a]lthough the Ninth Circuit has not precisely defined when the duty to preserve is

27  triggered, trial courts in this Circuit generally agree that, '[a]s soon as a potential claim is

28  identified, a litigant is under a duty to preserve evidence which it knows or reasonably should

United States District Court
Northern District of California

16

know is relevant to the action.' *In re Napster, Inc. Copyright Litig.*, 462 F.Supp.2d at 1067; *see*

*Hynix Semiconductor*, 591 F.Supp.2d at 1061 (determining that future litigation is reasonably

foreseeable when it is "more than a possibility"); *AmeriPride Servs.*, 2006 WL 2308442, at *4

(anticipated litigation date is when a potential claim is identified); *see also Hynix Semiconductor*

*Inc. v. Rambus Inc.*, 645 F.3d 1336, 1346–47 (Fed.Cir.2011) (litigation need only be reasonably

foreseeable, not immediate or certain)." *Id.* at 990-991.

If spoliation is found, then courts generally consider three factors to determine whether and

what type of sanctions to issue: "(1) the degree of fault of the party who altered or destroyed the

evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a

lesser sanction that will avoid substantial unfairness to the opposing party." *Apple Inc. v.*

*Samsung Elecs. Co.*, 888 F. Supp. 2d at 992.

Plaintiffs seek the following sanctions against Nongshim and Ottogi: (i) terminating

sanctions (striking the answers of defendants and entering default); or (ii) monetary sanctions to

compensate plaintiffs for costs plaintiffs incurred because of the alleged spoliation.

## DISCUSSION

## I.    DUTY TO PRESERVE

The main question I must address – as framed by plaintiffs' motions – is whether a duty to

preserve information enforceable by plaintiffs here arose when the KFTC started its investigation

in Korea.  Defendants do not dispute that documents relevant to the antitrust theories asserted by

plaintiffs in these cases were destroyed in 2008 and thereafter.  Instead, they argue they were

under no obligation to preserve those documents until the first lawsuit was filed in the United

States.

As an initial matter, there are two disputed issues that I need not resolve in order to rule on

plaintiffs' motions: (i) whether Nongshim had adequate knowledge of the scope of the KFTC's

investigation as of 2008; and (ii) whether under Korean law defendants had a duty to alter their

normal business routines in order preserve documents in light of the KFTC's investigation, or

whether their duty was simply not to affirmatively attempt to hinder or interfere with that

investigation.  For purposes of ruling on this motion, I will assume that Nongshim (like Ottogi)

1   had knowledge of the scope of the KFTC's investigation.  But my resolution of plaintiffs' motions

2   does not hinge on Nongshim's knowledge regarding the scope of the KFTC's investigation.  I will

3   also assume that a duty to preserve records relevant to a KFTC investigation exists under Korean

4   law.  But my resolution of plaintiffs' motions does not hinge on any duties arising under Korean

5   law either.

6        Instead, the resolution of plaintiffs' motions turns on plaintiffs' failure to identify a basis

7   either in law or on the facts to hold defendants liable for failing to preserve documents when

8   defendants became aware of the KFTC investigation in 2008.  Plaintiffs cite no authority that

9   would impose a duty of preservation on defendants *enforceable* by a court in the United States

10   when a foreign government agency investigates alleged price collusion in *their own* domestic

11   market and no complaints or lawsuits have been filed in the United States.  Nor do plaintiffs

12   identify any authority that would allow plaintiffs to move for sanctions in lawsuits pending in the

13   United States based on a defendant's alleged violation of duties under Korean law to preserve

14   documents in light of a government investigation in Korea.

15        It is this lack of authority, combined with the absence of any evidence showing that the

16   alleged conspiracy was *specifically directed* at the United States and the absence of evidence

17   showing that the KFTC's investigation extended to the impact of the alleged collusion on the

18   United States, that leads to the denial of plaintiffs' motions.[15]

19        There are a number of cases which have held that a government investigation in the United

20   States *does not* create a duty to preserve evidence with respect to later civil litigation in the United

21   States.  In *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299 (N.D. Ga.

22   2011), defendants received a Civil Investigatory Demand from the United States Department of

23   Justice Antitrust Division in February 2009, related to alleged collusive activities in setting bag

24   fees.  The plaintiffs, who filed a civil antitrust lawsuit regarding the same matter a few months,

25   argued that Delta spoliated evidence because "even though Delta received the CID on February 2,

26

27   _____

28   [15] To be clear, I am not foreclosing any merits argument that the Korean-based conspiracy was effectuated in part in the United States or that the impacts of the Korean-based conspiracy violated United States antitrust laws when price increases were implemented in the United States.

United States District Court
Northern District of California

2009, it waited until May" to suspend its standard electronic document destruction policy.  *Id*. at 1305-06.  The court rejected plaintiffs' "sweeping and novel theory of spoliation," and concluded that even if defendant owed a duty not to spoliate evidence to the DOJ with respect to the information sought in the CID, "the Court is unwilling to conclude that upon service of a DOJ-issued CID, a duty to Plaintiffs to preserve documents devolved upon Delta even though Plaintiffs did not file this action until three months later."  *Id*. at 1308.  Plaintiffs attempt to distinguish *Delta*, arguing that as alternate findings, the court also concluded that plaintiffs there failed to show prejudice and bad faith by Delta, but the first and central holding of *Delta* is clear.  The position of plaintiffs here is even further afield than that in *Delta*, because the investigation was being conducted overseas by a foreign government agency.

In *Point Blank Sols., Inc. v. Toyobo Am., Inc*., No. 09-61166-CIV, 2011 WL 1456029, at *1 (S.D. Fla. Apr. 5, 2011), the court denied a motion for spoliation sanctions despite defendants' failure to preserve evidence covered by government subpoenas.  The court recognized defendants' "lackluster adherence to their nebulous oral instruction" to preserve documents after the government subpoenas were received, but where "the alleged destruction of evidence arose primarily when Defendants were under a duty to others (such as government officials who issued subpoenas), but not necessarily these Plaintiffs," and where the "other litigants" who defendant owed a duty of preservation to were not parties to the litigation at issue and had not sought sanctions in their own right, the court was "reluctant to create a new legal precedent which would establish some type of free-floating or shifting duty which other parties could latch onto in order to seek the sanctions which the parties with standing choose not to pursue."  *Id*.  So too here, any rights to the documents allegedly destroyed or tampered with by defendants ran to the KFTC.  But there is no evidence that despite extensive forensic searches of defendants' computer systems and follow up meetings, the KFTC was concerned (much less contemplated sanctioning) defendants for failure to preserve or produce documents.

Finally, defendants rely on *FTC v. Lights of Am. Inc*., No. SACV 10-1333 JVS, 2012 WL 695008 (C.D. Cal. Jan. 20, 2012), where the defendants argued that the FTC itself spoliated evidence when the FTC failed to implement a litigation hold on its own attorneys at the

commencement of the full-phase investigation or upon the issuance of the CID.  The court rejected that argument in large part because litigation was not "reasonably foreseeable" at that point. "Commencement of an internal investigation does not, per se, put an institution on notice of potential litigation."  *Id*. at *3; *see also id*. ("Because many FTC investigations involve the use of a CID conclude without litigation, the issuance of a CID does not make litigation 'probable.'"); *Kitsap Physicians Serv*., 314 F.3d at 1001 (9th Cir.2002) (finding that a health care provider's initiation of an internal investigation did not put the provider on notice of a "specific, future ... lawsuit," and thus the provider's failure to keep records from that point on did not constitute spoliation).  Here, there was an investigation of collusion in the domestic Korean Ramen market. These is no evidence presented that that investigation explicitly covered collusion directed to foreign markets or even in the export market.[16]  The KFTC investigation itself could not have triggered a duty to preserve enforceable in the United States by future litigants.

Plaintiffs rely on two inapposite cases where prior litigation and a history of consumer complaints created a duty to preserve.  In *Williams v. Basf Catalysts LLC*, No. CV111754JLLJAD, 2016 WL 1367375 (D.N.J. Apr. 5, 2016), the court concluded that when defendant faced a lawsuit over asbestos in its talc product in 1979, the defendant had a duty to preserve evidence related to lawsuits filed over the course of the next 20 years.  *Id*. at *7 ("Here, not only were Defendants 'sensitized' to a need to preserve, the SAC alleges that they fully understood that preserving evidence would subject them to significant liability, yet they entered into a scheme to intentionally destroy evidence in order to frustrate reasonably foreseeable litigation involving substantially the same subject matter and issues. Defendants had a clear duty to preserve that ran to a specific civil plaintiff, and then allegedly destroyed the evidence that would be required by similar individuals in the numerous lawsuits that were reasonably foreseeable.").  Not only was there prior litigation regarding the same general subject matter in *Williams*, there were numerous claims about the same

---

[16] I recognize there is some dispute over whether the KFTC's investigation focused in part on whether the collusion impacted the export market or whether the KFTC simply sought information about the export market in order to exclude that portion of the market from the fines it eventually assessed.  But whether or not export sales were in fact investigated by the KFTC, no one disputes that the focus of the KFTC investigation was on the domestic market.

United States District Court
Northern District of California

1  issue over the intervening years which also supported a finding of duty.  *See also Stinson v. City of*

2  *N.Y.*, No. 10 CIV. 4228 (RWS), 2016 WL 54684, at *4 (S.D.N.Y. Jan. 5, 2016) (duty arose when

3  *prior lawsuit* "hotly contested" same issue presented in subsequent litigation).

4          Perhaps the most analogous case that supports plaintiffs' theory – but still far from the

5  facts presented here – is *M & T Mortg. Corp. v. Miller*, No. CV2002-5410(NG)(MDG), 2007 WL

6  2403565, at *2 (E.D.N.Y. Aug. 17, 2007).  There, the duty to preserve evidence arose when a state

7  agency "commenced an enforcement action" in court against the defendants.  Private litigants filed

8  suit, prior to the settlement of the first action, but given the overlap between the claims alleged and

9  the relevant discovery, the district court concluded the duty to preserve arose when the first, state

10  action lawsuit was commenced.  *Id.* at *6.  Here, however, not only was there no litigation

11  initiated by the government, there is no evidence of complaints from potential litigants in the

12  United States regarding the eventually challenged conduct.  *See, e.g., Phillip M. Adams &*

13  *Associates, LLC v. Winbond Elecs. Corp.*, No. 1:05-CV-64 TS, 2010 WL 3767318, at *3 (D. Utah

14  Sept. 16, 2010) (company put on notice of duty to preserve evidence by complaints of customer

15  about defective product, as well as litigation against other companies in the industry over the same

16  defective product); *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 48 (S.D.N.Y. 2014) (duty arose

17  when employee filed EEOC complaint and EEOC complaint served on defendant); *Adorno v. Port*

18  *Auth. of N.Y. & New Jersey*, 258 F.R.D. 217, 228 (S.D.N.Y. 2009)(same).  Here there was simply

19  an investigation in Korea by a Korean governmental agency into the Korean market.[17]

20          Given the posture of this case, and the facts alleged, I cannot find that litigation in the

21  United States was reasonably foreseeable in 2008 when the KFTC began its investigation.[18]

22

23  [17] *Lunkenheimer Co. v. Tyco Flow Control Pac. Party Ltd.*, No. 1:11-CV-824, 2015 WL 631045
    (S.D. Ohio Feb. 12, 2015) is instructive.  There, the court determined that a foreign corporation

24  could not have reasonably anticipated litigation in the United States until it was sued in the United
    States.  In that case, a licensee based in Australia operated under a license with an Australian

25  forum selection clause and had no significant sales in the United States or presence in the United
    States.  *Id.* at *6.  However, the parties had been in constant dispute over the terms of the license

26  for over nine years.  *Id.*  While plaintiffs attempt to distinguish *Lunkenheimer* because the foreign
    corporation there had no significant United States sales or presence – and both Nongshim and

27  Ottogi have that here – there, the foreign defendant was in constant dispute with the actual party
    who eventually filed suit in the United States.  Facts not present here.

28  [18] Plaintiffs' motions are premised on the argument that defendants' duty arose in 2008.

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.    OTHER POTENTIALLY SANCTIONABLE CONDUCT

Plaintiffs also argue that Nongshim has engaged in additional sanctionable conduct, namely:  (i) Nongshim's Managing Director Joong Rak Lee's "false narrative" regarding whether Nongshim received the June 27, 2008 letter and when Nongshim gained actual knowledge about the scope of the KFTC's investigation, Reply ISO Sanctions on Nongshim at 9; (ii) that Nongshim destroyed documents after the inception of this litigation, namely the 2003 Nongshim Factbook, that Nongshim was unable to produce but plaintiffs were able to secure a copy of from Nongshim's website prior to the inception of this litigation;[19] (iii) telephone records regarding inter-corporate communications and expense reports for employee trips to meet with competitors; and (iv) other evasive or incomplete discovery responses.

With respect to the telephone records and the evasive or incomplete discovery responses, those issues should have been raised with Magistrate Judge Ryu, who has been overseeing the discovery in this case.  I will not rule on them in the first instance.  With respect to the 2003 Factbook, because plaintiffs secured a copy of it there is no prejudice from Nongshim's failure to produce it.  Plaintiffs do not specifically identify any other allegedly unproduced documents with particularity or show why they have been prejudiced by Nongshim's failure to produce copies of specific documents contained in the Samyang Hard Drive.  If issues with respect to authentication arise with respect to the documents from the Samyang Hard Drive (allegedly created by Nongshim, but not produced by Nongshim in discovery), they will be addressed at the appropriate time.

With respect to the allegedly false narrative of Lee and others at Nongshim about Nongshim's notice of the scope of the KFTC's investigation, a determination of whether that narrative is false depends upon facts in dispute.  Plaintiffs characterize the explanations of Lee and others at Nongshim as incredible – and that characterization may be persuasive to the trier of fact given various documents plaintiffs have uncovered in Nongshim's production – but that determination is neither necessary nor appropriate on this motion.

---

[19] Plaintiffs also complain about but fail to specifically identify Nongshim-created documents that Nongshim failed to produce but were found on the Samyang Hard Drive.  Motion ISO Nongshim Sanctions at 16.

Similarly, plaintiffs complain of Ottogi's evasive or misleading discovery responses, as well as their failure to produce expense reports and telephone bills. Motion ISO Ottogi Sanctions at 14. Those issues should have been raised with Judge Ryu and I will not address them in the first instance.

## III.   ADMINISTRATION MOTIONS TO SEAL

The parties have filed a number of motions to seal in conjunction with their filings in support or of or in opposition to the sanctions motions. These motions will be addressed in a separate order.

### CONCLUSION

For the foregoing reasons, plaintiffs' motions for sanctions against the Nongshim and Ottogi defendants are DENIED.

**IT IS SO ORDERED**.

Dated: January 19, 2017



WILLIAM H. ORRICK
United States District Judge