Alan R. Plutzik (State Bar No. 77785)
Daniel E. Birkhaeuser (State Bar No. 136646)
BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER LLP
2125 Oak Grove Road
Walnut Creek, CA 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792
aplutzik@bramsonplutzik.com
dbirkhaeuser@bramsonplutzik.com

Mark P. Kindall (State Bar No. 138703)
Robert A. Izard (admitted *pro hac vice*)
IZARD, KINDALL & RAABE, LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290
mkindall@izardnobel.com
rizard@izardnobel.com

*Attorneys for Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE KOREAN RAMEN ANTITRUST LITIGATION | Case No. 3:13-cv-04115-WHO |
| | **DECLARATION OF DANIEL E. BIRKHAEUSER IN OPPOSITION TO OTTOGI DEFENDANTS' MOTIONS IN LIMINE** |
| This Document Relates to: | |
| ALL INDIRECT PURCHASER ACTIONS | |

I, Daniel E. Birkhaeuser, declare as follows:

I am a partner in the law firm of Bramson, Plutzik, Mahler, & Birkhaeuser, LLP, counsel for the Indirect-Purchaser Plaintiffs ("IPPs") in this matter.  I submit this declaration in opposition to the Ottogi defendants' motions in limine.  I have personal knowledge of the matters set forth herein and, if called as a witness, I would testify thereto.

1.      Attached hereto as Exhibit A are true copies of relevant pages of the deposition of Il-Nyum Kim dated April 26, 2016.

2.      Attached hereto as Exhibit B are true copies of relevant pages of the deposition of Ki-Soo Kim dated April 18, 2016.

3.      Attached hereto as Exhibit C are true copies of relevant pages of the deposition of Hyun-Gyoon Choi dated February 18, 2016.

4.      Attached hereto as Exhibit D are true copies of relevant pages of the deposition of Min Sang Chan dated March 28, 2016.

5.      Attached hereto as Exhibit E are true copies of relevant pages of the deposition of Joong-Rak Lee dated March 29, 2016.

6.      Attached hereto as Exhibit F are true copies of relevant pages of the deposition of Sung-Soo Park dated April 27, 2016.

7.      Attached hereto as Exhibit G is a true copy of the Third Amended Cross-Complaint in *Ottogi America, Inc. v. Stephan Y. Kang, et al.*, Los Angeles Superior Court Case No. YC 070 067.

8.      Attached hereto as Exhibit H are true copies of relevant pages of the deposition of Se Chang Lee dated April 5, 2016.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 22, 2017 at Walnut Creek, California.

1

2

3   _____
DANIEL E. BIRKHAEUSER

4

5   BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER LLP

6   2125 Oak Grove Road

7   Walnut Creek, CA 94598
Telephone: (925) 945-0200

8   Facsimile: (925) 945-8792
dbirkhaeuser@bramsonplutzik.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT

# A

Page 1

1

2   UNITED STATES DISTRICT COURT

    NORTHERN DISTRICT OF CALIFORNIA

3   SAN FRANCISCO DIVISION

4   Case No. 3:13-cv-04115-WHO

    ——————————————————————————————————

5   IN RE KOREAN RAMEN ANTITRUST

    LITIGATION

6   ——————————————————————————————————

7   THIS DOCUMENT RELATES TO

    ALL ACTIONS

8   ——————————————————————————————————

9

                    April 26, 2016

10                  9:04 a.m.

11

12     ***** HIGHLY CONFIDENTIAL *****

13     ***** ATTORNEYS' EYES ONLY *****

14

15

16              Videotaped deposition of

17   IL NYUN KIM, taken by Plaintiffs, pursuant

18   to Notice, held at the offices of Vertex,

19   S Tower, 82 Saermoonanro, Seoul, Korea,

20   before Sharon Lengel, a Registered

21   Professional Reporter, Certified Realtime

22   Reporter, and Notary Public.

23

24

25

Page 111

1   KIM - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY

2    and tell me when you have done so.

3        A.    (Witness perusing document.)

4              All right.

5        Q.    Do you recognize Exhibit 203?

6        A.    Yes.  I think this is correct as

7    to being that protocol of examination that

8    I was talking to you about.

9        Q.    And this was the protocol of

10   examination that resulted from your first

11   visit to the KFTC; is that true?

12       A.    That is right.  This is the

13   protocol of examination that is the result

14   of my answering questions and as was typed

15   up by the investigator himself.

16       Q.    If you look at the last page of

17   Exhibit 203, is that your signature that

18   appears on the document, on the last page?

19       A.    Yes.  That is correct.

20       Q.    And there's something that

21   appears to be a fingerprint on the last

22   page.

23             Do you recall placing your

24   fingerprint on Exhibit 203?

25       A.    I do have a recollection of

1    KIM - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY

2      placing my fingerprint following the

3      signing.

4         Q.    And do you recall placing your

5      fingerprint on other pages of Exhibit 203

6      as well?

7         A.    Yes.  I do have some

8      recollection of doing so towards the end

9      of the whole ordeal.

10                MR. BIRKHAEUSER:  I'm going to

11        mark as Exhibit 204 a document that

12        bears the Bates No. OTGKR-0001410.

13                And I'll give copies to the

14        interpreter and opposing counsel as

15        well.

16                (Exhibit 204, Bates

17        OTGKR-0001410, was hereby marked for

18        identification, as of this date.)

19        Q.    Can you tell me when you have

20      finished looking at Exhibit 204.

21        A.    Yes.  I've done so.

22        Q.    Do you recognize Exhibit 204?

23        A.    So this is what I was talking to

24      you about earlier about how, in the month

25      of October 2011, I had yet another visit

Page 216

1

2                        CERTIFICATION

3

4        I, SHARON LENGEL, a Notary Public for

5     and within the State of New York, do

6     hereby certify:

7        That the witness whose testimony as

8     herein set forth, was duly sworn by me;

9     and that the within transcript is a true

10    record of the testimony given by said

11    witness.

12       I further certify that I am not

13    related to any of the parties to this

14    action by blood or marriage, and that I am

15    in no way interested in the outcome of

16    this matter.

17       IN WITNESS WHEREOF, I have hereunto

18    set my hand this 29th day of April, 2016.

19

20

21          SHARON LENGEL, RPR, CRR

22

23

24

25

# EXHIBIT

# B

Page 1

1

2    UNITED STATES DISTRICT COURT

     NORTHERN DISTRICT OF CALIFORNIA

3    SAN FRANCISCO DIVISION

4    Case No. 3:13-cv-04115-WHO

     ————————————————————————————————

5    IN RE KOREAN RAMEN ANTITRUST

     LITIGATION

6    ————————————————————————————————

7    THIS DOCUMENT RELATES TO

     ALL ACTIONS

8    ————————————————————————————————

9

                    April 18, 2016

10                   9:47 a.m.

11

12     ***** HIGHLY CONFIDENTIAL *****

13     ***** ATTORNEYS' EYES ONLY *****

14

15

16              Videotaped deposition of

17   KISOO KIM, taken by Plaintiffs, pursuant

18   to Notice, held at the offices of Yoon &

19   Yang LLC, ASEM Tower, 517 Yeongdong-daero,

20   Gangnam-Gu, Seoul, Korea, before

21   Sharon Lengel, a Registered Professional

22   Reporter, Certified Realtime Reporter, and

23   Notary Public.

24

25

```
                                                Page 46
```

1    KIM - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY

2                THE WITNESS:  I have seen this.

3                MS. YU:  You should review the

4         document.

5         A.     (Witness perusing document.)

6                I have seen this before.

7         Q.     Okay.  Tell us what it is.

8         A.     So I think this is something

9    that entails my, say, being investigated,

10   interrogated, by the KFTC for about five

11   hours.

12        Q.     Okay.  And how come you came to

13   be interrogated by the KFTC, sir?

14               MS. YU:  Objection.  Lacks

15        foundation.  Calls for speculation.

16        A.     My recollection is I was being

17   investigated because I had previously

18   served as the head of Ottogi's sales HQ.

19        Q.     And what was the KFTC looking

20   into?

21               MS. YU:  Objection.  Lacks

22        foundation.  Calls for speculation.

23        A.     Say that again, please.

24        Q.     What was the KFTC looking into?

25               MS. YU:  Objection.  Lacks

Page 110

1

2                     CERTIFICATION

3

4       I, SHARON LENGEL, a Notary Public for

5    and within the State of New York, do

6    hereby certify:

7       That the witness whose testimony as

8    herein set forth, was duly sworn by me;

9    and that the within transcript is a true

10   record of the testimony given by said

11   witness.

12      I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage, and that I am

15   in no way interested in the outcome of

16   this matter.

17      IN WITNESS WHEREOF, I have hereunto

18   set my hand this 21st day of April, 2016.

19

20

21          SHARON LENGEL, RPR, CRR

22

23

24

25

# EXHIBIT

# C

Page 1

1

2    UNITED STATES DISTRICT COURT

     NORTHERN DISTRICT OF CALIFORNIA

3    SAN FRANCISCO DIVISION

4    Case No. 3:13-cv-04115-WHO

     ——————————————————————————————————

5    IN RE KOREAN RAMEN ANTITRUST

     LITIGATION

6    ——————————————————————————————————

7    THIS DOCUMENT RELATES TO

     ALL ACTIONS

8    ——————————————————————————————————

9

                       February 18, 2016

10                     9:17 a.m.

11

12     ***** HIGHLY CONFIDENTIAL *****

13    ***** ATTORNEYS' EYES ONLY *****

14

15

16              Continued videotaped

17   deposition of HYUN-GYOON CHOI, taken by

18   Plaintiffs, pursuant to Notice, held at

19   the offices of Vertex, S Tower, 82

20   Saermoonanro, Seoul, Korea, before Sharon

21   Lengel, a Registered Professional

22   Reporter, Certified Realtime Reporter, and

23   Notary Public.

24

25

```
 1   CHOI - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY
 2    I told you that I was once summoned to
 3    appear before the KFTC.  So I took a look
 4    at this document, which is around three
 5    pages.
 6              Going back to the circumstances
 7    at that time, I was in a closed room.  I
 8    was very stressed out.  And I must
 9    reiterate the fact that I'm not the one
10    who wrote this up.  This was typed out
11    like this by the two KFTC investigator
12    guys.
13              They were seated in front of me
14    or, rather, I was seated in front of them
15    with my attorney seated behind me who left
16    for a while.  There was no stenographer or
17    anything.  I would say 100 words; it would
18    all get cut down.  This is essentially a
19    summary by the investigators.
20              And I was there for probably a
21    little over an hour, after which they
22    immediately went and just printed this
23    out, stuck it in my face, saying, "Sign it
24    and leave."  So there I was thinking, Is
25    this what I said?  And, you know, the time
```

```
                                          Page 48
  1    CHOI - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY
  2    I got to spend on doing that was less than
  3    five minutes.  The thing is afterwards, I
  4    didn't even get a copy, get to have a
  5    copy.
  6              And whereas this says what it
  7    says in the title, the time when I first
  8    saw this was -- going by the date here of
  9    June 2011, the first time I thereafter got
 10    to see this was in 2013, I believe,
 11    when -- there before the High Court.  So
 12    we're talking about the -- after about a
 13    year and a half's passage of time when
 14    counsel showed me a printed-out copy of
 15    this.
 16              There's one more thing I would
 17    like to add to that, please, if I may.
 18    Going back to what I was getting at
 19    yesterday, I think I would have much more
 20    preferred that they showed me something
 21    and asked me about things.  But instead of
 22    that, they are saying, "What is this?"
 23    You know?
 24              I note here again that this is
 25    from 2011.  So when these guys were
```

Page 55

1   CHOI - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY

2     really wasn't in any kind of frame of mind

3     to carefully review things.

4            This was really like what you

5     see on TV.  All I wanted to do was just

6     get the darn thing over with and go home.

7     If, now, I were completely by myself, then

8     I suppose -- I'd like to believe that I

9     would have taken my time to carefully

10    review everything.  But the attorney who

11    said, you know, "Read this" and had left,

12    he -- well, the person came back.

13           And so in view of how there's

14    this attorney -- you know, I'm just a

15    nobody; right?  Here's a professional.  I

16    just thought it would be inappropriate for

17    me to do anything.  I mean, he's a

18    professional.  I'm just a salaried

19    employee of a company.  I sign if I am

20    asked to sign.  I place my thumbprint if

21    I'm asked to place my thumbprint.  The

22    entire time it took for that was less than

23    five minutes.

24           Thereafter, I left without being

25    provided a copy.  You know, I placed my

Page 150

1

2                    CERTIFICATION

3

4      I, SHARON LENGEL, a Notary Public for

5   and within the State of New York, do

6   hereby certify:

7      That the witness whose testimony as

8   herein set forth, was duly sworn by me;

9   and that the within transcript is a true

10  record of the testimony given by said

11  witness.

12     I further certify that I am not

13  related to any of the parties to this

14  action by blood or marriage, and that I am

15  in no way interested in the outcome of

16  this matter.

17     IN WITNESS WHEREOF, I have hereunto

18  set my hand this 1st day of March, 2016.

19

20

21

22           SHARON LENGEL, RPR, CRR

23

24

25

# EXHIBIT

# D

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Case No. 3:13-cv-04115-WHO

————————————————————————————

IN RE KOREAN RAMEN ANTITRUST

LITIGATION

————————————————————————————

THIS DOCUMENT RELATES TO

ALL ACTIONS

————————————————————————————

March 28, 2016

10:03 a.m.

***** HIGHLY CONFIDENTIAL *****

***** ATTORNEYS' EYES ONLY *****

Continued videotaped

deposition of MIN SANG CHANG, taken by

Plaintiffs, pursuant to Notice, held at

the offices of Vertex, S Tower, 82

Saermoonanro, Seoul, Korea, before Sharon

Lengel, a Registered Professional

Reporter, Certified Realtime Reporter, and

Notary Public.

Page 38

1   CHANG - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY

2       on which I went to testify as such, the

3       weather was rather warm.  It was hot.  And

4       I believe I arrived at the offices of the

5       KFTC at 8:30.  And the examination -- the

6       interrogation room happened to be on the

7       top floor of their building.  And, again,

8       the day was very hot, and the heat

9       radiating was immense.

10              And as I recall, there was this

11      investigator, one female investigator.

12      There was one desk, and there was a fan

13      but facing towards her.  Not even a bottle

14      of water.  I was rather flabbergasted,

15      frankly, such that I recall this quite

16      distinctly.  And, if memory serves, I

17      believe I was accompanied by counsel that

18      day.

19              So we go in together.  And what

20      this investigator lady says to the

21      attorney is, "You may sit in the back of

22      this gentleman, but you don't say

23      anything."  And upon that, this is what I

24      was thinking:  The fact that you have

25      counsel accompany you is, in fact, for you

Page 42

```
 1   CHANG - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY
 2              And so to my recollection,
 3       having begun at 8:30 a.m. and except for
 4       the one hour lunch break, we went until
 5       8:00 p.m. without pretty much any break.
 6       So that was quite -- quite a long while.
 7       Later on, in terms of what there was, I
 8       saw that this was the only thing that
 9       there was left.  So that is what I'm able
10       to recollect in terms of what had happened
11       on that day when this protocol was
12       drafted.
13              And this isn't just something at
14       the level of being a little perplexed,
15       bamboozled; it goes way beyond that.
16          Q.    Did you review the document
17       before you signed it?
18          A.    I really wasn't able to review
19       it fully.  She kept saying that she wanted
20       to go home soon and rushed me.
21              MS. KIM:  And, Mr. Translator,
22          you don't have to translate this.
23              But I'm going to object to these
24          affidavit -- or these protocol
25          statements, because, to the extent
```

Page 46

1    CHANG - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY

2         A.    Right.  I cannot.

3         Q.    May I ask you to turn to page

4    OTGKR-0001363, which is the second-to-last

5    page of the document.

6              Does your signature appear on

7    that page?

8         A.    No.  My signature is not there.

9         Q.    Can you look at the text that

10   appears on the sixth line from the bottom

11   of the page, please.

12        A.    Yes.

13        Q.    Is that your name?

14        A.    Yes.

15        Q.    And is that your signature that

16   follows your name?

17             MS. KIM:   Objection.  Asked and

18        answered.  And assumes facts not in

19        evidence.

20        A.    There is no signature of mine

21   there.

22        Q.    Do you know who wrote the text

23   that follows your printed name -- sorry --

24   strike.

25             Do you -- strike that, please.

1   CHANG - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY

2                  Do you know who wrote the

3   characters that make up your name on that

4   line?

5        A.     My recollection is that it was

6   I.

7        Q.     Is that your handwriting?

8        A.     Yes.   It looks like it's my

9   handwriting.

10       Q.     The line below that, whose name

11   appears there?

12       A.     It reads "Attorney Seung-Joon

13   Kang."

14       Q.     And did Attorney Seung-Joon Kang

15   write those characters?

16       A.     You know, I'm not exactly able

17   to recall because this is -- what -- six,

18   seven -- seven to eight years ago.   So --

19       Q.     And do you know whether that is

20   your finger or thumbprint that appears to

21   the right of those two names?

22              MS. KIM:   Objection.   Lacks

23       foundation.   Vague and ambiguous.

24       A.     I am not able to make any call

25   as to whether it is or isn't, just

Page 176

1

2                    CERTIFICATION

3

4        I, SHARON LENGEL, a Notary Public for

5    and within the State of New York, do

6    hereby certify:

7        That the witness whose testimony as

8    herein set forth, was duly sworn by me;

9    and that the within transcript is a true

10   record of the testimony given by said

11   witness.

12       I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage, and that I am

15   in no way interested in the outcome of

16   this matter.

17       IN WITNESS WHEREOF, I have hereunto

18   set my hand this 30th day of March, 2016.

19

20

21            SHARON LENGEL, RPR, CRR

22

23

24

25

# EXHIBIT

# E

Page 1

1

2  UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

3  SAN FRANCISCO DIVISION

4  Case No. 3:13-cv-04115-WHO

————————————————————————————

5  IN RE KOREAN RAMEN ANTITRUST

LITIGATION

6  ————————————————————————————

7  THIS DOCUMENT RELATES TO

ALL ACTIONS

8  ————————————————————————————

9

March 29, 2016

10                9:03 a.m.

11

12    ***** HIGHLY CONFIDENTIAL *****

13   ***** ATTORNEYS' EYES ONLY *****

14

15

16              Continued videotaped

17  deposition of JOONG RAK LEE, taken by

18  Plaintiffs, pursuant to Notice, held at

19  the offices of Vertex, S Tower, 82

20  Saermoonanro, Seoul, Korea, before Sharon

21  Lengel, a Registered Professional

22  Reporter, Certified Realtime Reporter, and

23  Notary Public.

24

25

```
 1   LEE - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY
 2   No bathroom break.  No water.  And I was
 3   being interrogated by these two
 4   individuals in a tag-team fashion.  I just
 5   wanted to basically just get out of there.
 6   What is most important here is the fact
 7   that I did not write this.  They typed it
 8   up.
 9        Q.    Did you sign it?
10        A.    I did.
11        Q.    Did you read it before you
12   signed it?
13             MS. KIM:  Objection.  Calls for
14        speculation.  Lacks foundation.  Asked
15        and answered.  And argumentative.
16        A.    No.  I was not able to read
17   through everything.  Basically, under the
18   circumstances, given the atmosphere there,
19   it wasn't like one could just take his
20   time reading through each passage.
21        Q.    Do you know what day of the week
22   that you were at KFTC headquarters
23   providing the answers to these questions?
24             MS. KIM:  Objection.  Calls for
25        speculation.
```

Page 193

## CERTIFICATION

1

2

3

4      I, SHARON LENGEL, a Notary Public for

5   and within the State of New York, do

6   hereby certify:

7      That the witness whose testimony as

8   herein set forth, was duly sworn by me;

9   and that the within transcript is a true

10  record of the testimony given by said

11  witness.

12     I further certify that I am not

13  related to any of the parties to this

14  action by blood or marriage, and that I am

15  in no way interested in the outcome of

16  this matter.

17     IN WITNESS WHEREOF, I have hereunto

18  set my hand this 5th day of April, 2016.

19

20

21        SHARON LENGEL, RPR, CRR

22

23

24

25

# EXHIBIT

# F

Page 1

1

2   UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

3   SAN FRANCISCO DIVISION

4   Case No. 3:13-cv-04115-WHO

————————————————————————————

5   IN RE KOREAN RAMEN ANTITRUST

LITIGATION

6   ————————————————————————————

7   THIS DOCUMENT RELATES TO

ALL ACTIONS

8   ————————————————————————————

9

                    April 27, 2016

10                   9:12 a.m.

11

12     ***** HIGHLY CONFIDENTIAL *****

13    ***** ATTORNEYS' EYES ONLY *****

14

15

16            Videotaped deposition of

17   SUNG SOO PARK, taken by Plaintiffs,

18   pursuant to Notice, held at the offices of

19   Vertex, S Tower, 82 Saermoonanro, Seoul,

20   Korea, before Sharon Lengel, a Registered

21   Professional Reporter, Certified Realtime

22   Reporter, and Notary Public.

23

24

25

```
                                          Page 8
 1   PARK - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY
 2    contemporary fellow of mine, Byung Hoon
 3    Lee.  I would say that perhaps he and I
 4    worked together most closely.
 5              And, of course, above me, there
 6    were quite a few senior fellows, one of
 7    whom -- let's see -- in terms of names --
 8    Sang Joon Lee.  And I guess, one way or
 9    another, you'd have to figure that I was
10    kind of hanging around with people who
11    were not too apart from me in terms of
12    age.
13       Q.    Okay.  And who was the boss of
14    the department?
15       A.    So at that time, the leader of
16    our unit was Hak Sung Kim, team leader.
17       Q.    All right.  And what were you
18    hired to do?
19       A.    So basically, we're talking
20    about a time when I was basically a
21    newbie.  And the kind of work that I was
22    performing was, I would report to work in
23    the morning, and by about 9:00 to
24    10:00 a.m., I would always be heading out
25    into the field.  I would return to the
```

```
 1   PARK - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY
 2        important thing is, the party writing
 3        this is the investigator, and the
 4        interpreter makes that note here, even
 5        though this is an on-the-fly thing,
 6        because the interpreter does remember
 7        seeing some courtesy translations of
 8        this very same passage in previous
 9        depositions which, unfortunately, was
10        off.  Okay?
11   BY MR. LEBSOCK:
12        Q.    Why, sir, did you sign a
13   document that contained statements that
14   you believed to be untruthful?
15             MS. KIM:  Objection.  Assumes
16        facts not in evidence.  And
17        mischaracterizes prior testimony.  And
18        argumentative.
19        A.    So if the truth be known, I
20   don't have an actual recollection of the
21   person asking me to review this.  Maybe
22   she did.  But I don't recall.  And I don't
23   recall the person asking me to sign this
24   either, for that matter.
25             As you can see, I did place my
```

1   PARK - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY

2   name here.  But there is no date here or

3   anything.  So I need to impress upon you

4   the fact that I was very fearful.  I was

5   youthful too.  I was a young man, a

6   younger man at this time.  And I was

7   simply doing what I was told to do.  And I

8   really didn't know what was going on here.

9          And, yes, I told you that that

10  is my handwriting.  It is in my own hand.

11  But it is not my signature.  I wrote it in

12  most likely because I was told to write in

13  my name.  That was this -- the atmosphere

14  of that moment.  This was a very fearful

15  moment, sort of an hour of terror.  And so

16  that's how this went.

17       Q.    You were 31 in June of 2011?

18       A.    20 --

19       Q.    -- 11?

20       A.    Well, yeah.  I probably was

21  somewhere around that.

22       Q.    You had worked for Nongshim for

23  four and a half years by the point you had

24  your interview with the KFTC?

25       A.    Well, it seems like that may

Page 171

1

2                   CERTIFICATION

3

4       I, SHARON LENGEL, a Notary Public for

5    and within the State of New York, do

6    hereby certify:

7       That the witness whose testimony as

8    herein set forth, was duly sworn by me;

9    and that the within transcript is a true

10   record of the testimony given by said

11   witness.

12      I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage, and that I am

15   in no way interested in the outcome of

16   this matter.

17      IN WITNESS WHEREOF, I have hereunto

18   set my hand this 29th day of April, 2016.

19

20

21         SHARON LENGEL, RPR, CRR

22

23

24

25

# EXHIBIT

# G

1   Michael McCarthy (SBN 89588)
2   James D. Hepworth (SBN 132910)
    NEMECEK & COLE
3   A Professional Corporation
    15260 Ventura Boulevard, Suite 920
4   Sherman Oaks, California 91403-5399
    Tel: (818)788-9500/Fax: (818)501-0328
5

6   Attorneys for Defendants/Cross-Complainants,
    NOMAAN K. HUSAIN, LAW OFFICES OF NOMAAN K.
7   HUSAIN, P.C., and YOUNG & HUSAIN P.L.L.C.

**FILED**
Superior Court of California
County of Los Angeles

MAY 10 2017

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
P. Schand

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9       **FOR THE COUNTY OF LOS ANGELES -- SOUTHWEST DISTRICT**

10

11   OTTOGI AMERICA, INC., a California   )   **Case No. YC070067**
    Corporation,                             )
12                                     )   Assigned to the Hon. Robert B. Broadbelt,
            Plaintiff,               )   Dept. B.
13       vs.                         )
                                    )
14                                     )
    STEVEN YOUNG KANG (a/k/a STEPHEN   )   **THIRD AMENDED CROSS-COMPLAINT**
15   KANG, STEPHEN YOUNG KANG, SR., and   )   **AGAINST STEPHEN YOUNG KANG;**
    SUNG Y. KANG); STEPHEN KANG,     )   **STEPHEN Y. KANG, P.L.L.C.; STEPHEN**
16   P.L.L.C.; STEPHEN YOUNG KANG,     )   **YOUNG KANG, PLLC; LAW OFFICES OF**
    P.L.L.C.; SK HOLDINGS; NOMAAN K.   )   **STEVEN KANG PC; SK HOLDINGS; SK**
17   HUSAIN (a/k/a NOMAAIN HUSAIN);     )   **HOLDING, LLC; GULF ENERGY**
    NOMAIN K. HUSAIN, P.C. (a/k/a LAW     )   **TECHNOLOGIES, INC.; GULF**
18   OFFICES OF NOMAAN K. HUSAIN, P.C.   )   **TECHNOLOGIES, INC.; GULF**
    and NOMAAN HUSAIN, P.C.); YOUNG &   )   **TECHNOLOGIES, LTD.; GULF**
19   HUSAIN P.L.L.C. (a/k/a YOUNG &       )   **TECHNOLOGY DKT, LTD.; FOR (1)**
    HUSAIN, LLP); and DOES 1-100, inclusive,   )   **INDEMNIFICATION; (2) BREACH OF**
20                                     )   **CONTRACT; (3) INDEMNITY AND**
            Defendants.             )   **CONTRIBUTION; (4) DECLARATORY**
21                                     )   **RELIEF; (5) FRAUD; (6) CONVERSION;**
                                    )   **(7) MONEY HAD AND RECEIVED; (8)**
22                                     )   **IDENTITY THEFT**
23                                     )
                                    )
24   _____ )
    YOUNG & HUSAIN, PLLC; LAW OFFICES   )
25   OF NOMAAN K. HUSAIN, PC; and       )
    NOMAAN K. HUSAIN,             )
26                                     )
            Cross-Complainants,       )
27                                     )
        vs.                         )
28

*NEMECEK & COLE*
*A PROFESSIONAL CORPORATION*
*15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344*
*TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328*

1
THIRD AMENDED CROSS-COMPLAINT

STEPHEN YOUNG KANG; STEPHEN Y.
KANG, P.L.L.C.; STEPHEN YOUNG KANG,
PLLC; LAW OFFICES OF STEVEN KANG
PC; SK HOLDINGS, INC. (aka SK
HOLDINGS); SK HOLDING, LLC; GULF
ENERGY TECHNOLOGIES, INC.; GULF
TECHNOLOGIES, INC.; GULF
TECHNOLOGY, LTD.; GULF
TECHNOLOGY DKT LTD.; and ROES 1-100,
inclusive,

Cross-Defendants.

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

Cross-complainants allege as follows:

1.    Cross-Complainant YOUNG & HUSAIN, P.L.L.C. is, and at all times mentioned herein was, a Texas professional limited liability company.

2.    Cross-Complainant LAW OFFICES OF NOMAAN K. HUSAIN, P.C. is, and at all times mentioned herein was, a Texas professional corporation.

3.    NOMAAN K. HUSAIN ("Husain") is, and at all times mentioned herein was, an individual and resident of Houston, Texas.

4.    Cross-Complainants YOUNG & HUSAIN, PLLC; LAW OFFICES OF NOMAAN K. HUSAIN, P.C.; and NOMAAN K. HUSAIN are collectively referred to herein as "Cross-Complainants" or the "Husain Cross-Complainants"

5.    Cross-Defendant STEPHEN YOUNG KANG ("Kang") was at all times mentioned herein was, an individual and resident of the State of California, County of Orange, but is now in a federal correctional institution in Kern County, California.  Kang is an attorney, who was licensed to practice in California, Texas and Massachusetts.  Cross-Defendant STEPHEN Y. KANG, P.L.L.C. is, and at all times mentioned herein was, a Texas professional limited liability company with Kang as its sole member, through which Kang practiced law.  Cross-Complainants are informed and believe that STEPHEN Y. KANG, P.L.L.C. is and was the alter ego of Kang.

THIRD AMENDED CROSS-COMPLAINT

6.     Cross-Defendant STEPHEN YOUNG KANG, P.L.L.C. is, and at all times mentioned herein was, a Texas professional limited liability company with Kang as its sole member, through which Kang practiced law.  Cross-Complainants are informed and believe that STEPHEN YOUNG KANG, P.L.L.C. is and was the alter ego of Kang.

7.     Cross-Defendant LAW OFFICES OF STEVEN KANG PC is, and at all times mentioned herein was, a Texas professional corporation, through which Kang practiced law. Cross-Complainants are informed and believe that LAW OFFICES OF STEVEN KANG PC is and was the alter ego of Kang.

8.     Cross-Defendant SK HOLDINGS, INC. is, and at all times mentioned herein was, a Texas corporation.  Cross-Complainants are informed and believe that SK HOLDINGS, INC. is and was the alter ego of Kang.

9.     Cross-Defendant SK HOLDINGS, LLC is, and at all times mentioned herein was, a limited liability company.  Cross-Complainants are informed and believe that SK HOLDINGS, LLC is and was the alter ego of Kang.

10.     Cross-Defendants STEPHEN KANG; STEPHEN Y. KANG, PLLC; STEPHEN YOUNG KANG, PLLC; LAW OFFICES OF STEVEN KANG PC; SK HOLDINGS, INC.; and SK HOLDINGS, LLC are collectively referred to herein as the "Kang Cross-Defendants."

11.     Cross-Defendant GULF ENERGY TECHNOLOGIES, INC. is, and at all times relevant hereto was, a Texas corporation.  Cross-Complainants are informed and believe that GULF ENERGY TECHNOLOGIES, INC. is and was the alter ego of Kang.

12.     Cross-Defendant GULF TECHNOLOGIES, INC. is, and at all times relevant hereto was, a Nevada corporation.  Cross-Complainants are informed and believe that GULF TECHNOLOGIES, INC. is and was the alter ego of Kang.

13.     Cross-Defendant GULF TECHNOLOGY LTD. is, and at all times relevant hereto was, a business of unknown form.  Cross-Complainants are informed and believe that GULF TECHNOLOGY LTD. is and was the alter ego of Kang.

14.     Cross-Defendant GULF TECHNOLOGY DKT LTD. is, and at all times relevant hereto was, a business of unknown form.  Cross-Complainants are informed and believe that

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

1   GULF TECHNOLOGY, DKT, LTD. is and was the alter ego of Kang.

2        15.     Cross-Defendants GULF ENERGY TECHNOLOGIES, INC., GULF

3   TECHNOLOGIES, INC., GULF TECHNOLOGY LTD., and GULF TECHNOLOGY DKT LTD.

4   are collectively referred to herein as the "Gulf Cross-Defendants."  Each of the Gulf Cross-

5   Defendants was and is the alter ego of each of the other Gulf Cross-Defendants and of Cross-

6   Defendant Kang.

7        16.     Cross-Complainants do not presently know the true names and capacities of the

8   Cross-Defendants sued herein as Roes 1 through 100, inclusive.  Cross-complainants will seek

9   leave of court to amend this Cross-Complaint to allege these Cross-Defendants' true names and

10  capacities when ascertained.

11                         **FACTUAL ALLEGATIONS**

12       17.     In May 2012, Ottogi America, Inc. ("Ottogi America") retained Kang and Stephen

13  Kang, P.L.L.C. to provide "asset protection planning," for Ottogi America.  According to Kang,

14  Ottogi needed to protect its assets from anticipated litigation to be filed against Ottogi Co., Ltd.

15  (the Korean parent company of Ottogi America) and Ottogi America regarding allegations of

16  price-fixing in the ramen noodle market.  See Case No. 3:13-cv-04115.  Part of Ottogi's strategy

17  for asset protection due to the pending litigation was to purchase assets and other real estate

18  through its several subsidiaries, including Ottogi America.  Kang was hired to assist in executing

19  this strategy for Ottogi America.

20       18.     Seung Yub Lee ("CEO Lee"), the director, President, Chief Executive Officer and

21  Chief Financial Officer of Ottogi America, as an authorized officer of Ottogi America, and

22  believed to be the only officer at the time, signed the retainer agreement dated May 9, 2012 hiring

23  Stephen Kang, Stephen Kang, P.L.L.C., and Young & Husain, LLP (a non-existent entity) as the

24  attorneys for Ottogi America.   Stephen Kang signed on behalf of himself and Stephen Kang,

25  P.L.L.C.  Stephen Kang, P.L.L.C. offered the attorney fee rate at $350.00 hour and all attorneys in

26  this contract were "duly licensed to practice law in the State of California."  Pursuant to the May

27  2012 contract for legal services, Kang submitted invoices for Stephen Kang, P.L.L.C. to Ottogi

28  America for the services Kang performed dated 4/30/2012, 10/31/2012, 12/26/2012, 5/31/2013,

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

THIRD AMENDED CROSS-COMPLAINT

1  6/30/2013, 7/31/2013, 8/31/2013, 9/30/2013, 10/31/2013 (redacted copies of which are attached

2  hereto as Exhibit 16).

3       19.    Husain was not a party to the May 2012 attorney-client agreement.  Husain did not

4  sign the May 2012 agreement.  Mr. Husain is in fact not licensed to practice law in the State of

5  California.  Mr. Husain is a board-certified personal injury lawyer licensed in the State of Texas,

6  and does not practice in the area of 'asset protection planning.'  Husain is the only authorized

7  representative who could have entered into such agreement on behalf of Young & Husain,

8  P.L.L.C. and Law Offices of Nomaan K. Husain, P.C.

9       20.    In or about October 2012, Husain was asked by Kang to use Husain's trust account

10  in Texas to assist one of Kang's clients (Ottogi America) in purchasing real property in California.

11  Ottogi America did not want to use a source that could be connected to Ottogi America as Ottogi

12  America was attempting to purchase property around their current California facility and Kang did

13  not have his own firm trust account set up for Ottogi's use.  As a part of Ottogi America's real

14  property purchase, Ottogi entered into two power of attorney agreements signed by CEO Lee and

15  GM Hong purporting to convey 'attorney-in-fact' authority to Nomaan Husain, P.C., Stephen

16  Kang, P.L.L.C. and Young & Husain, P.L.L.C. for Ottogi America's purchase of real property in

17  California.  Neither agreement was signed by or agreed to by Husain.  Furthermore, the agreements

18  do not set out any consideration by which the "attorneys" were to perform work on behalf of

19  Ottogi America, Inc.

20       21.    Husain was not even aware Kang had entered into such agreements with Ottogi

21  America, just as Husain was not aware of the many other documents Kang entered into and/or

22  forged without the permission, knowledge or authority of Husain.  In fact, Ottogi never met with or

23  communicated with Husain for over 18 months until after the start of this case in August 2014.

24       22.    Subsequently, from October 2012 to March of 2014, Ottogi America transferred

25  funds to Husain's trust account and Kang, as Ottogi America's attorney, provided Husain with

26  instructions on where to disburse the funds.  Husain complied with Kang's instructions.

27       23.    CEO Lee and Hangsik Hong ("GM Hong"), Ottogi America's General Manager

28  from 2012 to August 25, 2014, on behalf of Ottogi America, clearly trusted Kang enough to hire

NEMECEK & COLE

A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

THIRD AMENDED CROSS-COMPLAINT

1  him for "asset protection planning" and to transfer over $3.7 million to bank accounts of

2  individuals and law firms completely unknown to Ottogi America.  Unfortunately, Kang deceived

3  many individuals, including Husain.  Kang instructed Husain to disburse Ottogi America funds

4  from the escrow trust bank account, and in reliance on such instructions, Husain complied.  Instead

5  of using such funds for the purchase of real property, as was Kang's responsibility, Kang

6  converted $3,641,750 of Ottogi's money and caused it to be transferred to other bank accounts

7  Kang controlled.  Kang used such funds for his own personal benefit.

8       24.     In October 2015, Kang was indicted for wire fraud for Kang's scheme to defraud

9  clients whom Kang had agreed to provide legal or investment services, including Ottogi America,

10  and to obtain money from such clients for Kang's own personal use and benefit by means of

11  material false and fraudulent representations or the concealment of material facts.  Kang was also

12  indicted for knowingly using, without authority, Husain's name and forging Husain's signature on

13  documents.  Kang entered into a plea agreement, whereby Kang admitted he defrauded Ottogi

14  America and used Ottogi America's funds for his own benefit.  As a result, Kang is currently

15  serving time in a federal correctional institution in Kern County, California

16       25.     In March 2016, Kang and Stephen Kang, P.L.L.C. stipulated to a judgment in favor

17  of Ottogi America in this action in the amount of $5,222,733.20, which includes an amount for

18  punitive damages.  In the stipulated judgment, Kang admits he converted $3,641,750 of Ottogi

19  America, Inc.'s money by transferring such funds to Kang controlled bank accounts; that he

20  improperly billed Ottogi America, Inc.; that the allegations of Kang's cross-complaint are false

21  with respect to certain parties; that Kang filed false declarations in this action; and that he

22  committed other misconduct as it relates to the facts and circumstances regarding this action.

23       26.     Both Ottogi America and Husain were duped by Kang's extensive fraudulent

24  scheme to take money from individuals and use such money for Kang's own personal use and

25  benefit.  Many victims of Kang's crimes were affected by Kang's pervasive lies, forgeries and

26  manipulations, including Husain.

27       27.     The US Attorneys' Office, FBI and IRS criminal investigations ending with a

28  Kang's plea of guilt and subsequent order of restitution and jail time.  The same FBI and IRS

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

THIRD AMENDED CROSS-COMPLAINT

criminal investigations' found that Ottogi America *and* Husain were victims of Kang's fraud (as well as many others). Kang was indicted for stealing Nomaan K. Husain's identity in respect to Kang's work for Ottogi America. Kang judicially stipulated he converted Ottogi America's funds for his own personal use and benefit. Kang's further judicially stipulated that he forged and/or falsified documents provided to and relied upon by both Ottogi America and Husain. Husain returned all Ottogi America funds held in his escrow trust accounts within days of Ottogi America's notice of Kang's perpetuated fraudulent scheme.

## FIRST CAUSE OF ACTION

### (Indemnification against the Kang Cross-Defendants)

28.     Cross-Complainants reallege and incorporate by this reference each and every allegation contained in paragraphs 1 through 27, above.

29.     On or about September 2, 2014, the Kang Cross-Defendants and the Husain Cross-Complainants, and each of them, entered into a written Indemnification and Hold Harmless Agreement ("Indemnification Agreement") a true and correct copy of which is attached hereto as **Exhibit 1** and is incorporated herein as if set forth in full.

30.     Pursuant to the Indemnification Agreement, the Kang Cross-Defendants agreed to "fully defend, indemnify, and hold harmless" the Husain Cross-Complainants from any and all "claims, lawsuits, demands, causes of action, liability, loss, damage and/or injury, of any kind whatsoever" arising "by, through, or under" the Kang Cross-Defendants' representation of Ottogi America, Ottogi Korea or Ottogi Property Trust Fund (collectively "Ottogi").

31.     Ottogi America filed a complaint, first amended complaint, and second amended complaint in this action that allege causes of action against the Husain Cross-Complainants that arise out of the Kang Cross-Defendants representation of Ottogi and from which the Kang Cross-Defendants are required to defend and indemnify the Husain Cross-Complainants as set forth in the Indemnification Agreement.

32.     The Kang Cross-Defendants have failed and refused, despite demand therefor, to defend and indemnify the Husain Cross-Complainants as required by the Indemnification Agreement.

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

THIRD AMENDED CROSS-COMPLAINT

33.     The Kang Cross-Defendants are liable to the Husain Cross-Complainants for any and all sums which the Husain Cross-Complainants are adjudged to pay Ottogi America in this action, as well as the expenses, costs, and attorneys' fees incurred by the Husain Cross-Complainants in this action.

34.     The Indemnification Agreement provides that the prevailing party in any action brought in connection with the agreement is entitled to recover its attorneys' fees and costs. Accordingly, Cross-Complainants are entitled to such an award against the Kang Cross-Defendants, in an amount not less than $4 million.

35.     Pursuant to the Indemnification Agreement, the Kang Cross-Defendants, jointly and severally, are liable to the Husain Cross-Complainants and each of them, in an amount not less than $4 million for (1) amounts paid to Ottogi America in settlement of the complaint brought against the Husain Cross-Complainants; (2) expenses, costs, and attorneys' fees incurred by the Husain Cross-Complainants in defending this action; and (3) expenses, costs, and attorneys' fees incurred by the Husain Cross-Complainants in prosecuting this cross-complainant against the Kang Cross-Defendants and others.

## SECOND CAUSE OF ACTION

### (Breach of Contract against the Kang Cross-Defendants)

36.     Cross-Complainants reallege and incorporate by this reference each and every allegation contained in paragraphs 1 through 35, above.

37.     On or about September 2, 2014, the Kang Cross-Defendants and the Husain Cross-Complainants, and each of them, entered into the Indemnification Agreement.

38.     Pursuant to the Indemnification Agreement, the Kang Cross-Defendants agreed to "fully defend, indemnify, and hold harmless" the Husain Cross-Complainants from any and all "claims, lawsuits, demands, causes of action, liability, loss, damage and/or injury, of any kind whatsoever" arising "by, through, or under" the Kang Cross-Defendants' representation of Ottogi.

39.     Ottogi America filed a Complaint, as well as a First Amended Complaint and a Second Amended Complaint, in this action that alleges causes of action against the Husain Cross-Complainants that arise out of the Kang Cross-Defendants' representation of Ottogi and from

8

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSMILE (818) 501-0328

which the Kang Cross-Defendants are required to defend and indemnify the Husain Cross-Complainants as set forth in the Indemnification Agreement.  The Husain Cross-Complainants retained Nemecek & Cole, APC and Winston & Strawn, LLP to defend them against the claims asserted by Ottogi America and to prosecute the claims asserted in this cross-complaint.

40.    The Husain Cross-Complainants have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Indemnification Agreement.

41.    The Kang Cross-Defendants breached the Indemnification Agreement by failing to defend and indemnify the Husain Cross-Complainants as required by the Indemnification Agreement, despite a demand therefor.

42.    As a result of the Kang Cross-Defendants' breach of the Indemnification Agreement, the Husain Cross-Complainants have been damaged in at least the amount of $4 million, which includes the expenses, costs, and attorneys' fees the Husain Cross-Complainants have and are incurring to defend this action.

43.    The Indemnification Agreement provides that the prevailing party in any action brought in connection with the agreement is entitled to recover its attorneys' fees and costs. Accordingly, Cross-Complainants are entitled to such an award against the Kang Cross-Defendants in at least the amount of $3 million.

### THIRD CAUSE OF ACTION

### (Indemnity and Contribution against All Cross-Defendants)

44.    Cross-Complainants reallege and incorporate by this reference each and every allegation contained in paragraphs 1 through 43, above.

45.    The Husain Cross-Complainants have been sued in this action by Ottogi America for disbursing funds allegedly belonging to Ottogi America from Prosperity Bank account ending in xxxx3161, including $2,493,000.00 allegedly received by the Gulf Cross-Defendants.  The Kang Cross-Defendants and the Gulf Cross-Defendants are alleged to have received part of these funds, which were disbursed on the instructions of Kang, disbursed by Kang directly to them.  To the extent Cross-Defendants were not entitled to receive such funds, they received such funds by

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

fraud or mistake and are obligated to return such funds to Ottogi America or to the Husain Cross-Complainants and to defend and indemnify the Husain Defendants from the claims asserted by Ottogi America herein.

46.     In the event the Husain Cross-Complainants are found responsible to Ottogi America for the funds disbursed to any of the Cross-Defendants, such liability would be based solely on the receipt by Cross-Defendants of funds that did not belong to Cross-Defendants. Cross-Defendants are obligated to defend and indemnify Cross-Complainants for any losses, including returning the funds transferred to Cross-Defendants from Cross-Complainants' trust account, as well as expenses, costs and attorneys' fees incurred by Cross-Complainants defending this action, in at least the amount of $3 million.

## FOURTH CAUSE OF ACTION

### (Declaratory Relief against all Cross-Defendants)

47.     Cross-Complainants reallege and incorporate by this reference each and every allegation contained in paragraphs 1 through 46, above.

48.     The Husain Cross-Complainants contend as follows:

    a.    The Husain Cross-Complainants did not advise Ottogi to establish the Amegy Bank Trust Account; did not did not provide Ottogi with any documents to create the Amegy Bank Trust Account; did not provide any documents to Ottogi pertaining to the Amegy Bank Trust Account; did not have any interest in the Amegy Bank Trust Account; had no control over the Amegy Bank Trust Account or the funds deposited thereto; did not transfer any of the funds deposited to the Amegy Bank Trust Account; and had no other connection with the Amegy Bank Trust Account;

    b.    The Husain Cross-Complainants did not seek to engage any law firm on behalf of Ottogi, to file a bankruptcy petition on behalf of Ottogi, to sell Ottogi's assets, or otherwise;

    c.    Cross-Defendant Seung Yub Lee had actual and apparent authority to enter into binding agreements on behalf of Ottogi America;

10

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

d.   Cross-Defendant Kangsik Hong had actual and apparent authority to enter into binding agreements on behalf of Ottogi America;

e.   The Husain Cross-Complainants do not hold any funds belonging to Ottogi America;

f.   The Husain Cross-Complainants relied on the instructions of Kang regarding disposition of funds deposited to the Prosperity Bank account ending in xxxx3161;

g.   The Husain Cross-Complainants were entitled to rely on the instructions of Kang regarding disposition of funds deposited to the Prosperity Bank account ending in xxxx3161 at the direction of Kang;

h.   Kang was not a partner of Young & Husain, P.L.L.C.;

i.   Kang was not an employee of Young & Husain, P.L.L.C.;

j.   None of the Kang Cross-Defendants was an agent of any of the Husain Cross-Complainants;

k.   None of the Kang Cross-Defendants had the authority to act on behalf of any of the Husain Cross-Complainants, no authority to bind any of the Husain Cross-Complainants, and no authority to enter into any agreement on behalf of the Husain Cross-Complainants.

l.   Young & Husain, P.L.L.C. was not also known as Young & Husain, LLP, as Ottogi America contends;

m.   The Husain Cross-Complainants were not partners in any entity called Young & Husain, LLP, and had no affiliation with an entity called Young & Husain, LLP.  Kang did not have authority from the Husain Cross-Complainants to use the name Young & Husain, LLP, and had no authority to speak for the Husain Cross-Complainants, enter in to any agreements on behalf of the Husain Cross-Complainants, or otherwise bind the Husain Cross-Complainants;

n.   The Gulf Cross-Defendants have received $2,493,000.00 of the Ottogi

11

funds at issue in this case and have not returned those funds to the Husain Cross-Complainants, Ottogi, or anyone else;

o.    The Kang Cross-Defendants, or some of them, received at least $653,000 of the Ottogi funds at issue in this case and have not returned those funds to the Husain Cross-Complainants, Ottogi, or anyone else;

p.    Upon receipt of evidence that a demand for return of funds was being made by Ottogi officials authorized to do so in September 2014, $260,900 of undisbursed Ottogi funds were wired from the Law Offices of Nomaan K. Husain's bank account to Ottogi;

q.    The Power of Attorney agreements attached to Ottogi America's second amended complaint were not executed by Husain, Kang had no authority from the Husain Cross-Complainants to enter into such agreements, the Husain Cross-Complainants are not bound by such agreements, and such agreements are unenforceable against the Husain Cross-Complainants;

r.    The Husain Cross-Complainants are not and have never been the attorneys for Ottogi;

s.    Cross-Defendant Kang was an officer of the Gulf Cross-Defendants and was authorized to act for and on behalf of the Gulf Cross-Defendants and each of them;

t.    As an officer of the Gulf Cross-Defendants, Cross-Defendant Kang's knowledge and intent is imputed to the Gulf Cross-Defendants, and each of them.

u.    The purported Deed of Sale dated April 25, 2014, between Solo Gonzalez for Biaz Family Trust and Young & Husain, PLLC (a copy of which is attached hereto as Exhibit 2) is void and unenforceable, *ab initio*, including, without limitation, because it is obtained by fraud and/or is a forgery; the Husain Cross-Complainants did not incur any obligation thereunder and are not bound thereby;

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

12

NEMECEK & COLE

A PROFESSIONAL CORPORATION

15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344

TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

v.   The Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate dated October 25, 2012, by Nomaan K. Husain P.C. (a copy of which is attached hereto as Exhibit 3) is void and unenforceable, *ab initio*, including, without limitation, because it is obtained by fraud and/or is a forgery; the Husain Cross-Complainants did not incur any obligation thereunder and are not bound thereby;

w.   The Power of Attorney dated October 25, 2012, signed by Seung Yub Lee, CEO of Ottogi America (USA) and Kangsik Hong, Director of Ottogi Property Trust Company, L.L.C. (a copy of which is attached hereto as Exhibit 4) is void and unenforceable, *ab initio*, including, without limitation, because it was obtained by fraud; the Husain Cross-Complainants did not incur any obligation thereunder and are not bound thereby;

x.   The Addendum to the Power of Attorney of October 25, 2012, signed by Seung Yub Lee, CEO of Ottogi America (USA) and Kangsik Hong, Director of Ottogi Property Trust Company, L.L.C. (a copy of which is attached hereto as Exhibit 5) is void and unenforceable, *ab initio*, including, without limitation, because it was obtained by fraud; the Husain Cross-Complainants did not incur any obligation thereunder and are not bound thereby;

y.   The Power of Attorney of January 27, 2014 Per Purchase Offer on 1651 Gardena Lot 25 (a copy of which is attached hereto as Exhibit 6) is void and unenforceable, *ab initio*, including, without limitation, because it was obtained by fraud; the Husain Cross-Complainants did not incur any obligation thereunder and are not bound thereby;

z.   The Contract for Legal Services dated May 9, 2012 between Ottogi America, Inc. and Young & Husain, LLP (a copy of which is attached hereto as Exhibit 7) is void and unenforceable, *ab initio*, as to Cross-

13

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

Complainants, including, without limitation, because it was obtained by fraud and/or is a forgery; the Husain Cross-Complainants, and particularly Young & Husain, PLLC, did not incur any obligation thereunder, are not bound thereby, and have no liability pursuant thereto, particularly because the name "Young & Husain, LLP" is not Cross-Complainant "Young & Husain, PLLC" and Kang never had authority to use the name "Young & Husain, LLP" or the name "Husain" in any firm name or imply that Husain was a member of any law firm in California or was practicing law in California;

aa.    The Settlement Buy & Sell Agreement dated August 26, 2013 between Toltec Holdings, LLC and Marie Solymosi on the one hand, and Nomaan K. Husain, PC on the other hand (a copy of which is attached hereto as Exhibit 8) is void and unenforceable, *ab initio*, including, without limitation, because it was obtained by fraud and/or is a forgery; the Husain Cross-Complainants did not incur any obligation thereunder and are not bound thereby;

bb.    The Escrow Instructions and Acceptance dated August 27, 2013 re Escrow No. 5048885-KK between Toltec Holdings, LLC and Marie Solymosi on the one hand, and Nomaan K. Husain, PC on the other hand (a copy of which is attached hereto as Exhibit 9) is void and unenforceable, *ab initio*, including, without limitation, because it was obtained by fraud and/or is a forgery; the Husain Cross-Complainants did not incur any obligation thereunder and are not bound thereby;

cc.    The Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate dated January 4, 2013, by Nomaan K. Husain P.C. (a copy of which is attached hereto as Exhibit 10) is void and unenforceable, *ab initio*, including, without limitation, because it was obtained by fraud and/or is a forgery; the Husain Cross-Complainants did not incur any

obligation thereunder and are not bound thereby;

dd.   The Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate dated January 10, 2014, by Young & Husain, P.L.L.C. (a copy of which is attached hereto as Exhibit 11) is void and unenforceable, *ab initio*, including, without limitation, because it was obtained by fraud and/or is a forgery; the Husain Cross-Complainants did not incur any obligation thereunder and are not bound thereby;

ee.   The Amended Escrow Instructions dated April 10, 2013, between Toltec Holdings, LLC and Nomaan K. Husain, P.C. (a copy of which is attached hereto as Exhibit 12) is void and unenforceable, *ab initio*, including, without limitation, because it was obtained by fraud and/or is a forgery; the Husain Cross-Complainants did not incur any obligation thereunder and are not bound thereby;

ff.   The Escrow Instructions and Acceptance dated August 27, 2013, between Toltec Holdings, LLC and Marie Solymosi on the one hand, and Nomaan K. Husain, PC on the other hand (a copy of which is attached hereto as Exhibit 13) is void and unenforceable, *ab initio*, including, without limitation, because it was obtained by fraud and/or is a forgery; the Husain Cross-Complainants did not incur any obligation thereunder and are not bound thereby;

gg.   The Cancellation Escrow Instruction dated October 29, 2013 between Toltec Holdings, LLC and Nomaan K. Husain, P.C. (a copy of which is attached hereto as Exhibit 14) is void and unenforceable, *ab initio*, including, without limitation, because it was obtained by fraud and/or is a forgery; the Husain Cross-Complainants did not incur any obligation thereunder and are not bound thereby;

///

hh.   The Amended Escrow Instructions dated January 28, 2013, between

THIRD AMENDED CROSS-COMPLAINT

Toltec Holdings, LLC and Nomaan K. Husain, P.C. (a copy of which is attached hereto as Exhibit 15) is void and unenforceable, *ab initio*, including, without limitation, because it was obtained by fraud and/or is a forgery; the Husain Cross-Complainants did not incur any obligation thereunder and are not bound thereby.

49.     The Husain Cross-Complainants are informed and believe that Cross-Defendants deny the Husain Cross-Complainants' contentions and contend otherwise.

50.     Because a real, actual, and existing controversy exists between the Husain Cross-Complainants and all Cross-Defendants regarding the foregoing contentions, a prompt declaration of the rights and duties of the parties is necessary.

51.     Accordingly, the Husain Cross-Complainants seek orders from the Court declaring the rights and duties of the parties consistent with the Husain Cross-Complainants' contentions herein.

## FIFTH CAUSE OF ACTION

### (Fraud against all Cross-Defendants)

52.     Cross-Complainants reallege and incorporate by this reference each and every allegation contained in paragraphs 1 through 51, above.

53.     Cross-Defendant Kang represented to the Husain Cross-Complainants that he was authorized by Ottogi America to deposit and withdraw funds to and from the Prosperity Bank account ending in xxxx3161, including the funds identified in the Second Amended Complaint filed by Ottogi America in this action.  Kang later admitted that he knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud clients, including Ottogi America, and to obtain money and property by false and fraudulent pretenses, representations, and promises, and concealment of material facts.  Kang concealed this scheme from Cross-Complainants and concealed his true intent to fraudulently obtain money and property.

54.     Cross-Complainants did not know that Kang's representations were false and did not know the true facts concealed by Kang, but trusted that Kang was truthfully representing his authority.

THIRD AMENDED CROSS-COMPLAINT

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

55.     Cross-Defendant Kang's representations to the Husain Cross-Complainants and his concealment of material facts were made with the intent to deceive the Husain Cross-Complainants and induce them to transfer the funds allegedly belonging to Ottogi America to others, including Cross-Defendants named herein.  Cross-Complainants were not aware of Cross-Defendant Kang's intent to deceive Cross-Complainants.

56.     The Husain Cross-Complainants reasonably relied on Kang's representations by transferring funds allegedly belonging to Ottogi America to others, including Cross-Defendants named herein, solely at the express directions and instructions of Kang, who was retained by Ottogi America as its attorney and was acting pursuant to authority provided by CEO Lee.

57.     As a result of the Husain Cross-Complainants' reliance on the representations of Kang, funds allegedly belonging to Ottogi America were transferred from the Husain Cross-Complainants' trust account to persons and entities as instructed by Kang, and the Husain Cross-Complainants have been sued by Ottogi America as a result of such transfers.  Cross-Complainants have incurred, and continue to incur, expenses, costs, and attorneys' fees as a result of Ottogi America's claims in at least the amount of $3 million.  But for Cross-Defendant Kang's fraudulent representations and concealments as alleged herein, Cross-Complainants would not have been sued by Ottogi America and would not have incurred any expenses, costs, or attorneys' fees defending against such claims.

58.     Because Kang was an officer of each of the Gulf Cross-Defendants, his knowledge is imputed to the Gulf Cross-Defendants, to which funds allegedly belonging to Ottogi America were transferred.

59.     As set forth above, each of the Cross-Defendants named herein is guilty of oppression, fraud and malice such that an award of punitive damages is appropriate.

## SIXTH CAUSE OF ACTION

### (Conversion against all Cross-Defendants)

60.     Cross-Complainants reallege and incorporate by this reference each and every allegation contained in paragraphs 1 through 59, above.

17

61.     Cross-Complainants had and still have the right to possess the funds deposited to the Prosperity Bank account ending in xxxx3161.  Cross-Complainants received such funds from Ottogi America's retained attorney, Stephen Kang, PLLC, and authorized agent to be held in trust pending authorized instructions for the disbursement of such funds.

62.     Cross-Defendant Kang wrongfully and intentionally exercised dominion over funds which Cross-Complainants had the right to possess by fraudulently inducing Cross-Complainants to transfer funds to persons and/or entities that were not entitled to such funds, and by retaining such funds knowing that they were not entitled to such funds, including $2,493,000.00 allegedly received by the Gulf Cross-Defendants, and $250,000 allegedly received by Choon Ja Kim and Souk Ghee Kim.

63.     Each of the Cross-Defendants named herein conspired with Kang to convert funds to which Cross-Complainants had the right to possess by inducing Cross-Complainants to transfer funds from the Prosperity Bank account ending in xxxx3161 as alleged herein, and are jointly and severally liable with Kang for such conversion.  Moreover, because Kang was an officer of each of the Gulf Cross-Defendants, his knowledge is imputed to the Gulf Cross-Defendants, to which funds allegedly belonging to Ottogi America were transferred.

64.     Cross-Defendants, and each of them have failed and refused, despite demand therefor, to return to Cross-Complainants the funds transferred to them from the Prosperity Bank account ending in xxxx3161.

65.     As a result of Cross-Defendants' conversion, Cross-Complainants have suffered damage in at least the amount of $4 million.

66.     As set forth above, each of the Cross-Defendants named herein was guilty of oppression, fraud and malice such that an award of punitive damages is appropriate.

### SEVENTH CAUSE OF ACTION

### (Money Had and Received against all Cross-Defendants)

67.     Cross-Complainants reallege and incorporate by this reference each and every allegation contained in paragraphs 1 through 66, above.

68.     As set forth above, Cross-Defendants named herein, and each of them, received

18

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

money, unlawfully transferred to them from the Prosperity Bank account ending in xxxx3161. Cross-Defendants had no lawful right to possession of these funds.

69.     Cross-Defendants are obliged in equity and good conscience to restore to Cross-Complainants the money unlawfully received by Cross-Defendants.

70.     Despite demands therefor, Cross-Defendants, and each of them, have failed and refused to return money transferred to them from the Prosperity Bank account ending in xxxx3161.

71.     As a result of Cross-Defendants' refusal to return money transferred to them from the Prosperity Bank account ending in xxxx3161, Cross-Complainants have been damaged in at least the amount of $4 million.

## EIGHTH CAUSE OF ACTION

**(For Identity Theft -- Civil Code section 1798.92-198.97 – against All Cross-Defendants)**

72.     Cross-Complainants reallege and incorporate by this reference each and every allegation contained in paragraphs 1 through 71, above.

73.     Cross-Defendant Kang, with the knowledge, assistance, and agreement of CEO Lee and GM Hong, acting individually and as agents of Ottogi America, used the identities of Cross-Complainants without authorization to among other things, secure contracts for the purchase of real estate, obtain powers of attorney, enter into a settlement agreement, sign escrow documents, and obtain possession of funds that purportedly did not belong to him.

74.     As a result of the identity theft alleged herein, Cross-Complainants are entitled to (1) a declaration that they are not obligated to Ottogi America on the claims alleged in the Second Amended Complaint herein; (2) actual damages, attorney's fees, and costs, in an amount not less than $4 million, and any equitable relief that the court deems appropriate; and (5) a civil penalty, in addition to any other damages, of up to thirty thousand dollars ($30,000).

## PRAYER FOR RELIEF

WHEREFORE, Cross-Complainants pray for judgment against Cross-Defendants, and each of them, as follows:

1.     On each cause of action:

a.     For damages in at least the amount of $4 million;

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

b.      For expenses, costs, and attorneys' fees pursuant to contract in at least the amount

of $3 million;

c.      For prejudgment interest according to statute;

d.      For costs of suit;

e.      For such other and further relief as the Court deems just and proper.

2.      On the fifth and sixth cause of action:

a.      For an award of punitive damages according to proof.

Dated:  October 5, 2017                              NEMECEK & COLE

                                        By:      _____
                                                 MICHAEL MCCARTHY
                                                 JAMES D. HEPWORTH
                                                 Attorneys for Defendants/Cross-Complainants
                                                 NOMAAN K. HUSAIN, NOMAAN K.
                                                 HUSAIN, P.C., and YOUNG & HUSAIN, P.L.L.C.

THIRD AMENDED CROSS-COMPLAINT

### Indemnification and Hold Harmless Agreement

This INDEMNIFICATION AND HOLD HARMLESS AGREEMENT (this "Agreement") is between Young & Husain, PLLC; Nomaan K. Husain, PC; Law Offices of Nomaan K. Husain, PC; Nomaan K. Husain (hereinafter referred to as YH) and Stephen Y. Kang, PLLC; Stephen Young Kang, PLLC; Law Offices of Stephen Kang PC; SK Holdings; SK Holdings, LLC; and Stephen Kang (hereinafter referred to as SK).

WHEREAS, SK desires to indemnify and hold harmless YH from any claims and/or litigation arising by, through, under or out of his representation of Ottogi America and/or Ottogi Korea, or Ottogi Property Trust Fund (hereinafter referred to as Ottogi) in connection with or related to the negotiation, purchase, transfer, and/or sale of property located in the state of California, or any other matter related to or arising from his representation of Ottogi.

NOW THEREFORE, in consideration of the mutual covenants and conditions contained herein, SK and YH hereby agree as follows.

TERMS

**1. Indemnification and Hold Harmless:** SK shall fully defend, indemnify, and hold harmless YH from any and all claims, lawsuits, demands, causes of action, liability, loss, damage and/or injury, of any kind whatsoever (including without limitation all claims for monetary loss, property, damage, equitable relief, personal injury and/or wrongful death), whether brought by an individual or other entity, or imposed by a court of law or by administrative action of any government, federal, state, or legal governmental body or agency, arising by, through, or under SK's representation of Ottogi. This indemnification applies to and includes, without limitations, the payment of all penalties, fines, judgments, awards, decrees, attorneys' fees, expert fees and related costs of expenses, and any reimbursements to YH for all legal fees, expenses, and costs incurred by it. SK further agrees not to sue NH fir any cause or matter arising from or related to his representation of Ottogi.

**2. Authority to Enter Agreement:** Each party warrants that the individuals who have signed this Agreement have the actual legal power, right, and authority to make this Agreement and bind each respective Party.

**3. Amendment; Modification:** No supplement, modification, or amendment of this agreement shall be binding unless executed in writing and signed by both parties.

**4. Waiver:** No waiver of any default shall constitute a waiver of any other default or breach, whether of the same or other covenant or condition. No waiver, benefit, privilege, or service voluntarily given or performed by a party shall give the other Party any contractual right by custom, estoppel, or otherwise.

**5. Dispute Resolution:** Prior to the commencement of any legal action the parties agree to mediate this dispute with a mediator in Harris County, Texas within 20 business days upon the request of any party to this agreement.

**6. Attorney's Fees and Costs:** If any legal action or other proceeding is brought in connection with this Agreement, the successful or prevailing Party, if any shall be entitled to recover.

**7. Enforceability, Severability, and Reformation:** If any provision of this Agreement shall be held to be invalid and/or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a Court finds that any provision of this Agreement in invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited. The intent of the Parties is to provide as broad and indemnification as possible. In the event that any aspect of this Agreement is deemed unenforceable, the Court is empowered to modify this Agreement to give the broadest possible interpretation permitted under the law.

CONFIDENTIAL

NHPC 00100

Ex. 1

**8. Applicable Law:** This Agreement shall be governed by the laws if Texas.

**9. Exclusive Venue and Jurisdiction:** Any lawsuit or legal proceeding arising out of or relating to this Agreement in any way whatsoever shall be exclusively brought and litigated in state courts of Harris County, Texas. Each party expressly consents and submits to this exclusive jurisdiction and venue. Each party expressly waives the right to challenge this jurisdiction and/or venue for any reason including but not limited to asserting that it is improper or inconvenient. Each party consents to the dismissal of any lawsuit it brings in any other jurisdiction venue.

**10. Waiver of Jury Trial:** Any lawsuit or legal proceeding arising out of or relating to this Agreement in any way whatsoever shall be tried to Court. Each party expressly waives the right to try this matter before a jury and hereby expressly waives it right to a trial by jury arising out of or relating to this Agreement in any way whatsoever.

**11. Coverage:** Upon execution hereof, this Agreement shall remain in full force and effect for al past activities, actions, claims, demands, and shall apply to all future activities conducted by SK arising from or related to SK's representation of Ottogi. This Agreement shall not expire nor shall it be revoked.

**12. Signatories:** This agreement shall be signed on behalf of Stephen Kang, PLLC; Stephen Young Kang, PLLC; Law Offices of Stephen Kang PC; SK Holdings; SK Holdings, LLC; and Stephen Y. Kang, by Mr. Stephen Y. Kang and on behalf of Young & Husain, PLLC; Nomaan K. Husain, PC; Law Offices of Nomaan K. Husain, PC; Nomaan K. Husain by Mr. Nomaan K. Husain.

Mr. Stephen Y. Kang for and on behalf of Stephen Kang, PLLC;
Stephen Young Kang, PLLC; Law Offices of Stephen Kang PC;
SK Holdings; SK Holdings, LLC; and Stephen Y. Kang.   9-2-2014

Mr. Nomaan K. Husain for and on behalf of Young & Husain, PLLC;   9/2/14
Nomaan K. Husain, PC; Law Offices of Nomaan K. Husain, PC;
Nomaan K. Husain.

CONFIDENTIAL

# DEED OF SALE

This Deed of Sale (the "Agreement") is effective April 25, 2014,

BETWEEN:        **Solo Gonzalez for Blaz Family Trust** (the "Seller"), a family trust organized and existing under the laws of the State of California.

AND:          **Young & Husain, PLLC** (the "Purchaser"), a professional firm existing in the State of Texas.

## 1  SALE

The Seller does hereby sell, assign and make over, with legal warranty, to the Purchaser hereto present and accepting, the following immoveable property namely:

*Approximately 37,888 square feet of land commonly known by the street address of W. 130ᵗʰ St., Gardena, CA 90249*

An emplacement situated in the City of Gardena, State of California, known and designated as:

Assessor's Parcel Number: 6102-001-017

Bounded and described as follows:

Lot 25 in Block 5 of Panama Acres, in the City of Gardena, County of Los Angeles, State of California, as per map recorded in Book 15, Pages 138 and 139, of Maps, in the office of the County Recorder of said County.

## 2  TITLE AND POSSESSION

2.1.  The Seller per Acceptance of Escrow Instructions and General Provisions will transfer and sell the Property.

2.2.  The Purchaser shall be the absolute owner of the presently sold Property as and from this date and will take vacant possession thereof forthwith.

## 3  SELLER'S DECLARATIONS

3.1.  The Seller declares and warrants:

3.1.1. That the Property is free and clear of all hypothecs and encumbrances whatsoever, save and except the notes per Lawyers Title report;

3.1.2. That upon execution of the present Deed of Sale, the Purchaser shall have good and marketable title to the Property, free and clear of all encumbrances and rights;

Deed of Sale                                                       Page 1 of 5

Ex. 2

OTT_0000366

3.1.3. That all assessments, taxes and rates, both general and special, affecting the Property, have been paid to date per Lawyers Title report;

3.1.4. That the Property is in conformity with all municipal by-laws and regulations and any governmental regulations which may be applicable;

3.1.5. That it has not received any notice from any federal, provincial, municipal or other governmental authority, board, commission or agency having jurisdiction over the Property notifying the Seller or placing it in default to conform to any federal laws, by-law, ordinance or regulation relating to fire, health, zoning, police rules or otherwise and the Seller is not aware of any violation or infraction thereof nor has it received any notice advising it of a proposed acquisition of any portion of the Property by such statutory bodies whether "à l'amiable", or by expropriation, or in any way suggesting that a reserve is contemplated with respect to the Property;

3.1.6. That it has not received with respect to the Property, any notices, demands, orders or directions from any federal, provincial, municipal or other governmental authority, board, commission or agency, notifying the Seller or placing it in default or requiring it to conform or perform work pursuant to any federal laws, regulations or by-laws relating to the protection of the environment;

3.1.7. That to its knowledge, the Property is not and has not been insulated with Urea-Formaldehyde foam and that it did not and does not contain any hazardous or waste products whether as landfill or otherwise;

3.1.8. That there are no contracts, agreements, arrangements or understandings between Seller and/or its predecessors in title with any third parties affecting the Property or to which the Purchaser would be bound;

3.1.9. That there no claims, actions or judgments pending or outstanding which relate to the Property;

3.1.10. That the Property is in the state and as described in the location prepared by Lawyers Title report;

3.1.11. That the Seller is classified as a US Resident and not as a "non resident person" within the meaning of the Income Tax Act of the US and the Taxation Act, California Statutes, the Seller making this present declaration conscientiously believing it to be true and knowing that it is of the same force and effect as if made under oath and by and in virtue of the US Evidence Act; and

3.1.12. That the Seller declares that it has not contracted with any third party or real estate agent or broker and that no commissions or finder's fee and alike in relation to the present sale is due and holds harmless the Purchaser in relation thereto.

## 4  CONDITIONS

4.1.  The present sale is thus made subject to the following charges and conditions, to the fulfilment whereof the Purchaser binds and obliges himself, namely:

4.1.1. To pay the costs of this Deed, of its registration and of the required copies.

4.1.2. To pay all assessments taxes and rates, both general and special, already imposed or which may hereafter be imposed upon the Property, as and from the date hereof, as well as

Deed of Sale

OTT_0000367

all future installments of all assessments, payment whereof has been spread over a number of years; the escrow agent, Guinness & Atkinson, hereto hereby acknowledging that all adjustments will be made between the Seller and the Purchaser and to their mutual satisfaction, as and from the date of April 25, 2014.

4.1.3. Not to call upon the Seller to furnish any title deeds or certificates of search whatsoever, save and excepting those in his possession.

4.1.4. To take the Property in its present state and condition, having seen, viewed and examined the same and being therewith content and satisfied.

## 5  PRICE

5.1.  The present Sale has thus been made for and in consideration of the price or sum of Eight Hundred Ninety Five Thousand U.S. Dollars ($895,000.00), lawful money of US, on account of which and in deduction whereof the Seller acknowledges to have well and truly received of and from the Purchaser herein, partly before and partly at the execution hereof, the sum of Eight Hundred Ninety Five Thousand U.S. Dollars ($895,000.00), and whereof quit for so much.

5.2.  Guinness & Atkinson will handle the custodian work of transferring said price money between the Seller and the Purchaser.

**Place of payment and delivery of documents**

Any payment, repayment, or delivery of documents due hereunder shall be made to the Seller at the address designated herein below or at such other place as the Seller may designate in writing to the Purchaser.

~~Prepayment~~

~~Notwithstanding the term hereinabove stipulated, the Purchaser may prepay the said balance of price of sale, without notice or indemnity.~~

~~Principal hypothec~~

~~To secure the repayment of the balance of price of sale in capital, costs, accessories, and the performance of all the obligations of the Purchaser herein, the latter hereby hypothecates in favor of the Seller, in the amount of _____.~~

~~Insurance~~

~~The Purchaser binds and obliges himself to insure against loss by fire, and all other risks and perils normally covered by insurance, all the buildings which are or will be affected by the present hypothec for their full replacement value or, with the Seller's consent, to the extent of an amount which must never be less than the amount of present balance of price of sale plus all other sums secured by a higher ranking hypothec or a prior claim on the immovable property herein sold.~~

~~The Purchaser hereby binds and obliges himself to ensure, as the Seller's mandatory, that the policies include the usual hypothecary clause in favor of the Seller, to inform the insurer of the Seller's hypothecary rights, to deliver the policies to the Seller, which policies shall contain the clauses usually stipulated in policies covering the same kind of risks, to maintain the policies in effect until full repayment of the present balance of price of sale, and to deliver to the Seller, at least _____ days prior to the expiry of all such policies, receipts evidencing their renewal.~~

Deed of Sale                                                                                    Page 3 of 5

OTT_0000368

~~Should the Purchaser fail to fulfill any of these obligations, the Seller, without prejudice to any of his other recourses, may take out any new insurance policies on the Purchaser's behalf and claim the immediate repayment of premiums, with interest form the day of their payment at the rate stipulated hereinabove. The Seller may also, at the Purchaser's expense, notify any interested insurance company which has not yet received notice of the present hypothec, a copy or extract of these presents being sufficient for this purpose.~~

~~The Purchaser shall advise the Seller of any loss or dame without delay and shall not undertake repairs or reconstruction until the Seller has examined the premises and approved the proposed work.~~

**6 SPECIAL DECLARATION OF THE PURCHASER**

The Purchaser herein declares that he is not a Transferee within the meaning of the US LAND TRANSFER DUTIES ACT, the Purchaser making this present declaration conscientiously believing it to be true and knowing that it is of the same force and effect as if made under oath and by and in virtue of the US Evidence RULE.

**7. LAWYERS TITLE AND INSURANCE**

The Purchaser and the Seller have both reviewed and acknowledged the attached Lawyers Title report of April, 2014.

IN WITNESS WHEREOF, each party to this agreement has caused it to be executed on the date indicated above.

SELLER

Authorized Signature

1/25/2014

Solo Gonzalez for Blaz Family Trust
By: Solo Gonzalez

PURCHASER

Authorized Signature

April 25 2014

Nomaan Husian, Young & Husain, PLLC POA

Deed of Sale

Page 4 of 5

OTT_0000369

[Intentionally left blank]

See Attachments for Separate Cost Items Later – This is 100% Costs for Sale of the Deed, Land and Real Property in CashValue Only.

_____

**Deed of Sale**                                                                                    Page 5 of 5

OTT_0000370



### STANDARD OFFER, AGREEMENT AND ESCROW
### INSTRUCTIONS FOR PURCHASE OF REAL ESTATE
*(Non-Residential)*
American Industrial Real Estate Association

) st

October 25, 2012
(Date for Reference Purposes)

**1.   Buyer.**

1.1   Nomaan K. Husain, P.C. , hereinafter described, from the owner thereof ("Seller") (collectively, the "Parties" or individually a "Party"), ("Buyer")
hereby offers to purchase the real property, hereinafter described, from the owner thereof ("Seller") (collectively, the "Parties" or individually a "Party"),
through an escrow ("Escrow") to close on  or before Ten (10) days after the expiration of the Contingency Period
("Expected Closing Date") to be held by  Metro Escrow (Sunny Lee) ("Escrow Holder")
whose address is  3600 Wilshire Blvd.  Suite 336  Los Angeles CA 90010
, Phone No.  (213) 427-3600 , Facsimile No. (213) 427-3601 .
upon the terms and conditions set forth in this agreement ("Agreement").  Buyer shall have the right to assign Buyer's rights hereunder, but any such
assignment shall not relieve Buyer of Buyer's obligations herein unless Seller expressly releases Buyer.
1.2   The term "Date of Agreement" as used herein shall be the date when by execution and delivery (as defined in paragraph 20.2) of this document
or a subsequent counteroffer thereto, Buyer and Seller have reached agreement in writing whereby Seller agrees to sell, and Buyer agrees to purchase,
the Property upon terms accepted by both Parties.

**2.   Property.**

2.1   The real property ("Property") that is the subject of this offer consists of (insert a brief physical description) _____
Approximately 39,879 square feet land

is located in the City of  Gardena , County of  Los Angeles
State of  California , is commonly known by the street address of  1635 W. 130th street
Gardena  CA 90249
and is legally described as:  to be furnished in escrow

(APN:   6102-001-015 ).
2.2   If the legal description of the Property is not complete or is inaccurate, this Agreement shall not be invalid and the legal description shall be
completed or corrected to meet the requirements of  Chicago Title (Anna Ma)
("Title Company"), which shall issue the title policy hereinafter described.
2.3   The Property includes, at no additional cost to Buyer, the permanent improvements thereon, including those items which the pursuant to
applicable law are a part of the property, as well as the following items, if any, owned by Seller and at present located on the Property: electrical
distribution systems (power panel, bus ducting, conduits, disconnects, lighting fixtures); telephone distribution systems (lines, jacks and connections only);
space heaters; heating, ventilating, air conditioning equipment ("HVAC"); air lines; fire sprinkler systems; security and fire detection systems; carpets;
window coverings; wall coverings; and  N/A

_____ (collectively, the "Improvements").
2.4   The fire sprinkler monitor: ☐ is owned by Seller and included in the Purchase Price, or ☐ is leased by Seller, and Buyer will need to negotiate a
new lease with this fire monitoring company.
2.5   Except as provided in Paragraph 2.3, the Purchase Price does not include Seller's personal property, furniture and furnishings, and
N/A

**3.   Purchase Price.**

3.1   The purchase price ("Purchase Price") to be paid by Buyer to Seller for the Property shall be
$ 1,200,000.00 , payable as follows:

|  |  |  |
|---|---|---|
| | (a)   Cash down payment, including the Deposit as defined in paragraph 4.3 (or if an all cash transaction, the Purchase Price); | $ 1,200,000.00 |
| *(Strike if not applicable)* | (b)   Amount of "New Loan" as defined in paragraph 5.1, if any; | $ _____ |
| | ~~(c)   Buyer shall take title to the Property subject to the following existing deed(s) of trust ("Existing Deed(s) of Trust") securing the existing promissory note(s) ("Existing Note(s)"):~~ | |
| *(Strike if not applicable)* | ~~(i)   An Existing Note ("First Note") with an unpaid principal balance as of the Closing of approximately:~~ | $ _____ |
| | ~~Said First Note is payable at $ _____ per month,~~ | |
| | ~~including interest at the rate of $ _____ % per annum until paid (and/or the~~ | |
| | ~~entire unpaid balance is due on _____ );~~ | |
| | ~~(ii)   An Existing Note ("Second Note") with an unpaid principal balance as of the Closing of approximately:~~ | $ _____ |
| | ~~Said Second Note is payable at $ _____ per month,~~ | |
| | ~~including interest at the rate of _____ % per annum until paid (and/or the~~ | |
| | ~~entire unpaid balance is due on _____ );~~ | |
| *(Strike if not applicable)* 3 | ~~(d)   Buyer shall give Seller a deed of trust ("Purchase Money Deed of Trust") on the Property, to secure the promissory note of Buyer to Seller described in paragraph 6 ("Purchase Money Note") in the amount of~~ | $ _____ |
| | Total Purchase Price: | $ 1,200,000.00 |

~~3.2   If Buyer is taking title to the Property subject to, or assuming, and Existing Deed of Trust and such deed of trust permits the beneficiary to
demand payment of fees including, but not limited to, points, processing fees, and appraisal fees as a condition to the transfer of the Property, Buyer
agrees to pay such fees up to a maximum of 1.5% of the unpaid principal balance of the applicable Existing Note.~~

Initials ____

Initials ____

2000-American Industrial Real Estate Association

Form OFA-4-8/00E

Ex. 3

OTT 0001744

4.  **Deposits.**

4.1  ☐ Buyer has delivered to Broker a check in the sum of $ _____, payable to Escrow Holder, to be held by Broker until both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder, or ☑ Buyer shall deliver to Escrow Holder a check in the sum of $ __36,000.00__ when both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder. When cashed, the check shall be deposited into the Escrow's trust account to be applied toward the Purchase Price of the Property at the Closing. Should Buyer and Seller not enter into an agreement for purchase and sale, Buyer's check or funds shall, upon request of Buyer, be promptly returned to Buyer.

4.2  Additional deposits:

(a) Within 5 business days after the Date of Agreement, Buyer shall deposit with Escrow Holder the additional sum of $ _N/A_ to be applied to the Purchase Price at the Closing.

(b) Within 5 business days after the contingencies discussed in paragraph 9.1 (a) through (k) are approved or waived, Buyer shall deposit with Escrow Holder the additional sum of $ _N/A_ to be applied to the Purchase Price at the Closing.

4.3  Escrow Holder shall deposit the funds deposited with it by Buyer pursuant to paragraphs 4.1 and 4.2 (collectively the "Deposit"), in a State or Federally chartered bank in an interest bearing account whose term is appropriate and consistent with the timing requirements of this transaction. The interest therefrom shall accrue to the benefit of Buyer, who hereby acknowledges that there may be penalties or interest forfeitures if the applicable instrument is redeemed prior to its specified maturity. Buyer's Federal Tax Identification Number is _____. NOTE: Such interest bearing account cannot be opened until Buyer's Federal Tax Identification Number is provided.

6.  Financing Contingency. (Strike if not applicable)

~~6.1  This offer is contingent upon Buyer obtaining from an insurance company, financial institution or other lender, a commitment to lend to Buyer a sum equal to at least     N/A     % of the Purchase Price, at terms reasonably acceptable to Buyer. Such loan ("New Loan") shall be secured by a first trust or mortgage on the Property. If this Agreement provides for Seller to carry back junior financing, then Seller shall have the right to approve the terms of the New Loan. Seller shall have 7 days from receipt of the commitment setting forth the proposed terms of the New Loan to approve or disapprove of such proposed terms. If Seller fails to notify Escrow Holder, in writing, of the disapproval within said 7 days it shall be conclusively presumed that Seller has approved the terms of the New Loan.~~

~~6.2  Buyer hereby agrees to diligently pursue obtaining the New Loan. If Buyer shall fail to notify its Broker, Escrow Holder and Seller, in writing within         days following the Date of Agreement, that the New Loan has not been obtained, it shall be conclusively presumed that Buyer has either obtained said New Loan or has waived this New Loan contingency.~~

~~6.3  If, after due diligence, Buyer shall notify its Broker, Escrow Holder and Seller, in writing within the time specified in paragraph 6.2 hereof, that Buyer has not obtained said New Loan, this Agreement shall be terminated, and Buyer shall be entitled to the prompt return of the Deposit, plus any interest earned thereon, less only Escrow Holder and Title Company cancellation fees and costs, which Buyer shall pay.~~

6.  Seller Financing (Purchase Money Note): (Strike if not applicable)

~~6.1  The Purchase Money Note shall provide for interest on unpaid principal at the rate of     N/A     % per annum, with principal and interest paid as follows:~~
~~3~~

_____
_____
_____

_____; The Purchase Money Note and Purchase Money Deed of Trust shall be on the ~~current forms commonly used by Escrow Holder, and be junior and subordinate only to the Existing Note(s) under the New Loan expressly called for by this Agreement.~~

~~6.2  The Purchase Money Note and/or the Purchase Money Deed of Trust shall contain provisions regarding the following: (see also paragraph 10.3 (b)):~~

~~(a) Prepayment. Principal may be prepaid in whole or in part at any time without penalty, at the option of the Buyer.~~

~~(b) Late Charge. A late charge of 6% shall be payable with respect to any payment of principal, interest, or other charges, not made within 10 days after it is due.~~

~~(c) Due-On-Sale. In the event the Buyer sells or transfers title to the Property or any portion thereof, then the Seller may, at Seller's option, require the entire unpaid balance of said Note to be paid in full.~~

~~6.3  If the Purchase Money Deed of Trust is to be subordinate to other financing, Escrow Holder shall, at Buyer's expense prepare and record on Seller's behalf a request for notice of default and/or sale with regard to each mortgage or deed of trust to which it will be subordinate.~~

~~6.4  WARNING: CALIFORNIA LAW DOES NOT ALLOW DEFICIENCY JUDGEMENTS ON SELLER FINANCING. IF BUYER ULTIMATELY DEFAULTS ON THE LOAN, SELLER'S SOLE REMEDY IS TO FORECLOSE ON THE PROPERTY.~~

7.  Real Estate Brokers.

7.1  The following real estate broker(s) ("Brokers") and brokerage relationships exist in this transaction and are consented to by the Parties (check the applicable boxes):

☐ _____ represents Seller exclusively ("Seller's Broker");

☑ _Solomon Realty & Investment_ _____ represents Buyer exclusively ("Buyer's Broker"); or

☐ _____ represents both Seller and Buyer ("Dual Agency").

The Parties acknowledge that Brokers are the procuring cause of this Agreement. See paragraph 24 for disclosures regarding the nature of a real estate agency relationship. Buyer shall use the services of Buyer's Broker exclusively in connection with any and all negotiations and offers with respect to the Property for a period of 1 year from the Date of Agreement.

7.2  Buyer and Seller each represent and warrant to the other that he/she/it has had no dealings with any person, firm, broker or finder in connection with the negotiation of this Agreement and/or the consummation of the purchase and sale contemplated herein, other than the Brokers named in paragraph 7.1, and no broker or other person, firm or entity, other than said Brokers is/are entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of such Party. Buyer and Seller do each hereby agree to indemnify, defend, protect and hold the other harmless from and against any costs, expenses or liability for compensation, commission or charges which may be claimed by any broker, finder or other similar party, other than said named Brokers by reason of any dealings or act of the indemnifying Party.

8.  Escrow and Closing.

8.1  Upon acceptance hereof by Seller, this Agreement, including any counter-offers incorporated herein by the Parties, shall constitute not only the agreement of purchase and sale between Buyer and Seller, but also instructions to Escrow Holder for the consummation of the Agreement through the Escrow. Escrow Holder shall not prepare any further escrow instructions restating or amending the Agreement unless specifically so instructed by the Parties or a Broker herein. Subject to the reasonable approval of the Parties, Escrow Holder may, however, include its standard general escrow provisions.

8.2  As soon as practical after the receipt of this Agreement and any relevant counteroffers, Escrow Holder shall ascertain the Date of Agreement as defined in paragraphs 1.2 and 20.2 and advise the Parties and Brokers, in writing, of the date ascertained.

8.3  Escrow Holder is hereby authorized and instructed to conduct the Escrow in accordance with this Agreement, applicable law and custom and practice of the community in which Escrow Holder is located, including any reporting requirements of the Internal Revenue Code. In the event of a conflict between the law of the state where the Property is located and the law of the state where the Escrow Holder is located, the law of the state where the Property is located shall prevail.

8.4  Subject to satisfaction of the contingencies herein described, Escrow Holder shall close the escrow (the "Closing") by recording a general warranty deed (a grant deed in California) and the other documents required to be recorded, and by disbursing the funds and documents in accordance

Initials _____
2000-American Industrial Real Estate Association

Initials _____
Form OFA-4-8/00E

OTT 0001745

with this Agreement.

8.5 Buyer and Seller shall each pay one-half of the Escrow Holder's charges and Seller shall pay the usual recording fees and any required documentary transfer taxes. Seller shall pay the premium for a standard coverage owner's or joint protection policy of title insurance.

8.6 Escrow Holder shall verify that all of Buyer's contingencies have been satisfied or waived prior to Closing. The matters contained in paragraphs 9.1 subparagraphs (b), (c), (d), (e), (g), (i), (m), and (o), 9.4, 9.5, 12, 13, 14, 16, 18, 20, 21, 22, and 24 are, however, matters of agreement between the Parties and are not instructions to Escrow Holder.

8.7 If this transaction is terminated for non-satisfaction and non-waiver of a Buyer's Contingency, as defined in paragraph 9.2, then neither of the Parties shall thereafter have any liability to the other under this Agreement, except to the extent of a breach of any affirmative covenant or warranty in this Agreement. In the event of such termination, Buyer shall be promptly refunded all funds deposited by Buyer with Escrow Holder, less only Title Company and Escrow Holder cancellation fees and costs, all of which shall be Buyer's obligation.

8.8 The Closing shall occur on the Expected Closing Date, or as soon thereafter as the Escrow is in condition for Closing; provided, however, that if the Closing does not occur by the Expected Closing Date and said Date is not extended by mutual instructions of the Parties, a Party not then in default under this Agreement may notify the other Party, Escrow Holder, and Brokers, in writing that, unless the Closing occurs within 5 business days following said notice, the Escrow shall be deemed terminated without further notice or instructions.

8.9 Except as otherwise provided herein, the termination of Escrow shall not relieve or release either Party from any obligation to pay Escrow Holder's fees and costs or constitute a waiver, release or discharge of any breach or default that has occurred in the performance of the obligations, agreements, covenants or warranties contained therein.

8.10 If this Escrow is terminated for any reason other than Seller's breach or default, then at Seller's request, and as a condition for the return of Buyer's deposit, Buyer shall within 5 days after written request deliver to Seller, at no charge, copies of all surveys, engineering studies, soil reports, maps, master plans, feasibility studies and other similar items prepared by or for Buyer that pertain to the Property. Provided, however, that Buyer shall not be required to deliver any such report if the written contract which Buyer entered into with the consultant who prepared such report specifically forbids the dissemination of the report to others.

9.   Contingencies to Closing.

9.1 The Closing of this transaction is contingent upon the satisfaction or waiver of the following contingencies. IF BUYER FAILS TO NOTIFY ESCROW HOLDER, IN WRITING OF THE DISAPPROVAL OF ANY OF SAID CONTINGENCIES WITHIN THE TIME SPECIFIED THEREIN, IT SHALL BE CONCLUSIVELY PRESUMED THAT BUYER HAS APPROVED SUCH ITEM, MATTER OR DOCUMENT. Buyer's conditional approval shall constitute disapproval, unless provision is made by the Seller within the time specified therefore by the Buyer in such conditional approval or its fulfillment, whichever is later, for the satisfaction of the condition imposed by the Buyer. Escrow Holder shall promptly provide all Parties with copies of any written disapproval or conditional approval which it receives. With regard to subparagraphs (a) through (i) the pre-printed time periods shall control unless a different number of days is inserted in the spaces provided.

(a) Disclosure. Seller shall make to Buyer, through escrow, all of the applicable disclosures required by law (See American Industrial Real Estate Association ("AIR") standard form entitled "Seller's Mandatory Disclosure Statement") and provide Buyer with a completed Property Information Sheet ("Property Information Sheet") concerning the Property, duly executed by or on behalf of Seller in the current form or equivalent to that published by the AIR within 10 or _____ days following the Date of Agreement. Buyer has 10 days from the receipt of said disclosures to approve or disapprove the matters disclosed.

(b) Physical Inspection. Buyer has 10 or _____ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the physical aspects and size of the Property.

(c) Hazardous Substance Conditions Report. Buyer has 30 or _____ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the environmental aspects of the Property. Seller recommends that Buyer obtain a Hazardous Substance* Report concerning the Property and relevant adjoining properties. Any such report shall be paid for by Buyer. A "Hazardous Substance" for purposes of this Agreement is defined as any substance whose nature and/or quantity of existence, use, manufacture, disposal or effect, render it subject to Federal, state or local regulation, investigation, remediation or removal as potentially injurious to public health or welfare. A "Hazardous Substance Condition" for purposes of this Agreement is defined as the existence on, under or relevantly adjacent to the Property of a Hazardous Substance that would require remediation and/or removal under applicable Federal, state or local law.

(d) Soil Inspection. Buyer has 30 or _____ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the condition of the soils on the Property. Seller recommends that Buyer obtain a soil test report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any soils report that Seller may have within 10 days of the Date of Agreement.

(e) Governmental Approvals. Buyer has 30 or _____ days from the Date of Agreement to satisfy itself with regard to approvals and permits from governmental agencies or departments which have or may have jurisdiction over the Property and which Buyer deems necessary or desirable in connection with its intended use of the Property, including, but not limited to, permits and approvals required with respect to zoning, planning, building and safety, fire, police, handicapped and Americans with Disabilities Act requirements, transportation and environmental matters.

(f) Conditions of Title. Escrow Holder shall cause a current commitment for title insurance ("Title Commitment") concerning the Property issued by the Title Company, as well as legible copies of all documents referred to in the Title Commitment ("Underlying Documents") to be delivered to Buyer within 10 or _____ days following the Date of Agreement. Buyer has 10 days from the receipt of the Title Commitment and Underlying Documents to satisfy itself with regard to the condition of title. The disapproval of Buyer of any monetary encumbrance, which by the terms of this Agreement is not to remain against the Property after the Closing, shall not be considered a failure of this contingency, as Seller shall have the obligation, at Seller's expense, to satisfy and remove such disapproved monetary encumbrance at or before the Closing.

(g) Survey. Buyer has 30 or _____ days from the receipt of the Title Commitment and Underlying Documents to satisfy itself with regard to any ALTA title supplement based upon a survey prepared to American Land Title Association ("ALTA") standards for an owner's policy by a licensed surveyor, showing the legal description and boundary lines of the Property, any easements of record, and any improvements, poles, structures and things located within 10 feet of either side of the Property boundary lines. Any such survey shall be prepared at Buyer's direction and expense. If Buyer has obtained a survey and approved the ALTA title supplement, Buyer may elect within the period allowed for Buyer's approval of a survey to have an ALTA extended coverage owner's form of title policy, in which event Buyer shall pay any additional premium attributable thereto.

(h) Existing Leases and Tenancy Statements. Seller shall within 10 or _____ days of the Date of Agreement provide both Buyer and Escrow Holder with legible copies of all leases, subleases or rental arrangements (collectively, "Existing Leases") affecting the Property, and with a tenancy statement ("Estoppel Certificate") in the latest form or equivalent to that published by the AIR, executed by Seller and/or each tenant and subtenant of the Property. Seller shall use its best efforts to have each tenant complete and execute an Estoppel Certificate. If any tenant fails or refuses to provide an Estoppel Certificate then Seller shall complete and execute an Estoppel Certificate for that tenancy. Buyer has 10 days from the receipt of said Existing Leases and Estoppel Certificates to satisfy itself with regard to the Existing Leases and any other tenancy issues.

(i) Other Agreements. Seller shall within 10 or _____ days of the Date of Agreement provide Buyer with legible copies of all other agreements ("Other Agreements") known to Seller that will affect the Property after Closing. Buyer has 10 days from the receipt of said Other Agreements to satisfy itself with regard to such Agreements.

(j) Financing. If paragraph 5 hereof dealing with a financing contingency has not been stricken, the satisfaction or waiver of such New Loan contingency.

(k) Existing Notes. If paragraph 3.1(c) has not been stricken, Seller shall within 10 or _____ days of the Date of Agreement provide Buyer with legible copies of the Existing Notes, Existing Deeds of Trust and related agreements (collectively, "Loan Documents") to which the Property will remain subject after the Closing. Escrow Holder shall promptly request from the holders of the Existing Notes a beneficiary statement ("Beneficiary Statement") confirming: (1) the amount of the unpaid principal balance, the current interest rate, and the date to which interest is paid, and (2) the nature and amount of any impounds held by the beneficiary in connection with such loan. Buyer has 10 or _____ days from the receipt of the Loan Documents and Beneficiary Statements to satisfy itself with regard to such financing. Buyer's obligation to close is conditioned upon Buyer being able to purchase the Property without acceleration or change in the terms of any Existing Notes or charges to Buyer except as otherwise provided in this Agreement or approved by Buyer, provided, however, Buyer shall pay the transfer fee referred to in paragraph 3.2 hereof.

(l) Personal Property. In the event that any personal property is included in the Purchase Price, Buyer has 10 or _____ days from the Date of Agreement to satisfy itself with regard to the title condition of such personal property. Seller recommends that Buyer obtain a UCC-1 report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any liens or encumbrances affecting such personal property that it is aware of within 10 or _____ days of the Date of Agreement.

---

OTT 0001746

(m) *Destruction, Damage or Loss.* There shall not have occurred prior to the Closing, a destruction of, or damage or loss to, the Property or any portion thereof, from any cause whatsoever, which would cost more than $10,000.00 to repair or cure, if the cost of repair or cure is $10,000.00 or less, Seller shall repair or cure the loss prior to the Closing. Buyer shall have the option, within 10 days after receipt of written notice of a loss costing more than $10,000.00 to repair or cure, to either terminate this transaction or to purchase the Property notwithstanding such loss, but without deduction or offset against the Purchase Price. If the cost to repair or cure is more than $10,000.00, and Buyer does not elect to terminate this transaction, Buyer shall be entitled to any insurance proceeds applicable to such loss. Unless otherwise notified in writing, Escrow Holder shall assume no such destruction, damage or loss has occurred prior to Closing.

(n) *Material Change.* Buyer shall have 10 days following receipt of written notice of a Material Change which to satisfy itself with regard to such change, "Material Change" shall mean a change in the status of the use, occupancy, tenants, or condition of the Property that occurs after the date of this offer and prior to the Closing. Unless otherwise notified in writing, Escrow Holder shall assume that no Material Change has occurred prior to the Closing.

(o) *Seller Performance.* The delivery of all documents and the due performance by Seller of each and every undertaking and agreement to be performed by Seller under this Agreement.

(p) *Warranties.* That each representation and warranty of Seller herein be true and correct as of the Closing. Escrow Holder shall assume that this condition has been satisfied unless notified to the contrary in writing by any Party prior to the Closing.

(q) *Brokerage Fee.* Payment at the Closing of such brokerage fee as is specified in this Agreement or later written instructions to Escrow Holder executed by Seller and Brokers ("Brokerage Fee"). It is agreed by the Parties and Escrow Holder that Brokers are a third party beneficiary of this Agreement insofar as the Brokerage Fee is concerned, and that no change shall be made with respect to the payment of the Brokerage Fee specified in this Agreement, without the written consent of Brokers.

9.2 All of the contingencies specified in subparagraphs (a) through (p) of paragraph 9.1 are for the benefit of, and may be waived by, Buyer, and may be elsewhere herein referred to as "Buyer Contingencies."

9.3 If any Buyer's Contingency or any other matter subject to Buyer's approval is disapproved as provided for herein in a timely manner ("Disapproved Item"), Seller shall have the right within 10 days following the receipt of notice of Buyer's disapproval to elect to cure such Disapproved Item prior to the Expected Closing Date ("Seller's Election"). Seller's failure to give to Buyer within such period, written notice of Seller's commitment to cure such Disapproved Item on or before the Expected Closing Date shall be conclusively presumed to be Seller's Election not to cure such Disapproved Item. If Seller elects, either by written notice or failure to give written notice, not to cure a Disapproved Item, Buyer shall have the election, within 10 days after Seller's Election to either accept title to the Property subject to such Disapproved Item, or to terminate this transaction. Buyer's failure to notify Seller in writing of Buyer's election to accept title to the Property subject to the Disapproved Item without deduction or offset shall constitute Buyer's election to terminate this transaction. Unless expressly provided otherwise herein, Seller's right to cure shall not apply to the remediation of Hazardous Substance Conditions or to the Financing Contingency. Unless the Parties mutually instruct otherwise, if the time periods for the satisfaction of contingencies or for Seller's and Buyer's said Elections would expire on a date after the Expected Closing Date, the Expected Closing Date shall be deemed extended for 3 business days following the expiration of: (a) the applicable contingency, (b) the period within which the Seller may elect to cure the Disapproved Item, or (c) if Seller elects not to cure, the period within which Buyer may elect to proceed with this transaction, whichever is later.

9.4 Buyer understands and agrees that until such time as all Buyer's Contingencies have been satisfied or waived, Seller and/or its agents may solicit, entertain and/or accept back-up offers to purchase the subject Property.

9.5 The Parties acknowledge that extensive local, state and Federal legislation establish broad liability upon owners and/or users of real property for the investigation and remediation of Hazardous Substances. The determination of the existence of a Hazardous Substance Condition and the evaluation of the impact of such a condition are highly technical and beyond the expertise of Brokers. The Parties acknowledge that they have been advised by Brokers to consult their own technical and legal experts with respect to the possible presence of Hazardous Substances on this Property or adjoining properties, and Buyer and Seller are not relying upon any investigation by or statement of Brokers with respect thereto. The Parties hereby assume all responsibility for the impact of such Hazardous Substances upon their respective interests herein.

10.  Documents Required at or before Closing:

10.1  Five days prior to the Closing date Escrow Holder shall obtain an updated Title Commitment concerning the Property from the Title Company and provide copies thereof to each of the Parties.

10.2  Seller shall deliver to Escrow Holder in time for delivery to Buyer at the Closing:
(a)  Grant or general warranty deed, duly executed and in recordable form, conveying fee title to the Property to Buyer.
(b)  If applicable, the Beneficiary Statements concerning Existing Note(s).
(c)  If applicable, the Existing Leases and Other Agreements together with duly executed assignments thereof by Seller and Buyer. The assignment of Existing Leases shall be on the most recent Assignment and Assumption of Lessor's Interest in Lease form published by the AIR or its equivalent.
(d)  If applicable, Estoppel Certificates executed by Seller and/or the tenant(s) of the Property.
(e)  An affidavit executed by Seller to the effect that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to Internal Revenue Service such sum as is required by applicable Federal law with respect to purchases from foreign sellers.
(f)  If the Property is located in California, an affidavit executed by Seller to the effect that Seller is not a "nonresident" within the meaning of California Revenue and Tax Code Section 18662 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to the Franchise Tax Board such sum as is required by such statute.
(g)  If applicable, a bill of sale, duly executed, conveying title to any included personal property to Buyer.
(h)  If the Seller is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the sale of the Property.

10.3  Buyer shall deliver to Seller through Escrow:
(a)  The cash portion of the Purchase Price and such additional sums as are required of Buyer under this Agreement shall be deposited by Buyer with Escrow Holder, by federal funds wire transfer, or any other method acceptable to Escrow Holder as immediately collectable funds, no later than 2:00 P.M. on the business day prior to the Expected Closing Date.
(b)  If a Purchase Money Note and Purchase Money Deed of Trust are called for by this Agreement, the duly executed originals of those documents, the Purchase Money Deed of Trust being in recordable form, together with evidence of fire insurance on the improvements in the amount of the full replacement cost naming Seller as a mortgage loss payee, and a real estate tax service contract (at Buyer's expense), assuring Seller of notice of the status of payment of real property taxes during the life of the Purchase Money Note.
(c)  The Assignment and Assumption of Lessor's Interest in Lease form specified in paragraph 10.2(c) above, duly executed by Buyer.
(d)  Assumptions duly executed by Buyer of the obligations of Seller that accrue after Closing under any Other Agreements.
(e)  If applicable, a written assumption duly executed by Buyer of the loan documents with respect to Existing Notes.
(f)  If the Buyer is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the purchase of the Property.

10.4  At Closing, Escrow Holder shall cause to be issued to Buyer a standard coverage (or ALTA extended, if elected pursuant to 9.1(g)) owner's form policy of title insurance effective as of the Closing, issued by the Title Company in the full amount of the Purchase Price, insuring title to the Property vested in Buyer, subject only to the exceptions approved by Buyer. In the event there is a Purchase Money Deed of Trust in this transaction, the policy of title insurance shall be a joint protection policy insuring both Buyer and Seller.

IMPORTANT: IN A PURCHASE OR EXCHANGE OF REAL PROPERTY, IT MAY BE ADVISABLE TO OBTAIN TITLE INSURANCE IN CONNECTION WITH THE CLOSE OF ESCROW SINCE THERE MAY BE PRIOR RECORDED LIENS AND ENCUMBRANCES WHICH AFFECT YOUR INTEREST IN THE PROPERTY BEING ACQUIRED. A NEW POLICY OF TITLE INSURANCE SHOULD BE OBTAINED IN ORDER TO ENSURE YOUR INTEREST IN THE PROPERTY THAT YOU ARE ACQUIRING.

11.  Prorations and Adjustments.

11.1  Taxes.  Applicable real property taxes and special assessment bonds shall be prorated through Escrow as of the date of the Closing, based upon the latest tax bill available. The Parties agree to prorate as of the Closing, any taxes assessed against the Property by supplemental bill levied by reason of events occurring prior to the Closing. Payment of the prorated amount shall be made promptly in cash upon receipt of a copy of any supplemental bill.

11.2  Insurance.  WARNING: Any insurance which Seller maintained will terminate on the Closing. Buyer is advised to obtain appropriate insurance to cover the Property.

11.3  Rentals, Interest and Expenses.  Scheduled rentals, interest on Existing Notes, utilities, and operating expenses shall be prorated as of the date of Closing. The Parties agree to promptly adjust between themselves outside of Escrow any rents received after the Closing.

11.4  Security Deposit.  Security Deposits held by Seller shall be given to Buyer as a credit to the cash required of Buyer at the Closing.

11.5  Post Closing Matters.  Any item to be prorated that is not determined or determinable at the Closing shall be promptly adjusted by the Parties by

OTT 0001747

appropriate cash payment outside of the Escrow when the amount due is determined.

11.6 *Variations in Existing Note Balances.* In the event that Buyer is purchasing the Property subject to an Existing Deed of Trust(s), and in the event that a Beneficiary Statement as to the applicable Existing Note(s) discloses that the unpaid principal balance of such Existing Note(s) at the Closing will be more or less than the amount set forth in paragraph 3.1(c) hereof ("Existing Note Variation"), then the Purchase Money Note(s) shall be reduced or increased by an amount equal to such Existing Note Variation. If there is to be no Purchase Money Note, the cash required at the Closing per paragraph 3.1(c) shall be reduced or increased by the amount of such Existing Note Variation.

11.7 *Variations in New Loan Balance.* In the event Buyer is obtaining a New Loan and the amount ultimately obtained exceeds the amount set forth in paragraph 5.1, then any of the Purchase Money Notes, if any, shall be reduced by the amount of such excess.

**12.   Representation and Warranties of Seller and Disclaimers.**

12.1 Seller's warranties and representations shall survive the Closing and delivery of the deed for a period of 3 years, and, are true, material and relied upon by Buyer and Brokers in all respects. Seller hereby makes the following warranties and representations to Buyer and Brokers:

(a) *Authority of Seller.* Seller is the owner of the Property and/or has the full right, power and authority to sell, convey and transfer the Property to Buyer as provided herein, and to perform Seller's obligations hereunder.

(b) *Maintenance During Escrow and Equipment Condition At Closing.* Except as otherwise provided in paragraph 9.1(m) hereof, Seller shall maintain the Property until the Closing in its present condition, ordinary wear and tear excepted. The HVAC, plumbing, elevators, loading doors and electrical systems shall be in good operating order and condition at the time of Closing.

(c) *Hazardous Substances/Storage Tanks.* Seller has no knowledge, except as otherwise disclosed to Buyer in writing, of the existence or prior existence on the Property of any Hazardous Substance, nor of the existence or prior existence of any above or below ground storage tank.

(d) *Compliance.* Seller has no knowledge of any aspect or condition of the Property which violates applicable laws, rules, regulations, codes or covenants, conditions or restrictions, or of improvements or alterations made to the Property without a permit where one was required, or of any unfulfilled order or directive of any applicable governmental agency or casualty insurance company requiring any investigation, remediation, repair, maintenance or improvement be performed on the Property.

(e) *Changes in Agreements.* Prior to the Closing, Seller will not violate or modify any Existing Lease or Other Agreement, or create any new leases or other agreements affecting the Property, without Buyer's written approval, which approval will not be unreasonably withheld.

(f) *Possessory Rights.* Seller has no knowledge that anyone will, at the Closing, have any right to possession of the Property, except as disclosed by this Agreement or otherwise in writing to Buyer.

(g) *Mechanics' Liens.* There are no unsatisfied mechanics' or materialmens' lien rights concerning the Property.

(h) *Actions, Suits or Proceedings.* Seller has no knowledge of any actions, suits or proceedings pending or threatened before any commission, board, bureau, agency, arbitrator, court or tribunal that would affect the Property or the right to occupy or utilize same.

(i) *Notice of Changes.* Seller will promptly notify Buyer and Brokers in writing of any Material Change (see paragraph 9.1(m)) affecting the Property that becomes known to Seller prior to the Closing.

(j) *No Tenant Bankruptcy Proceedings.* Seller has no notice or knowledge that any tenant of the Property is the subject of a bankruptcy or insolvency proceeding.

(k) *No Seller Bankruptcy Proceedings.* Seller is not the subject of a bankruptcy, insolvency or probate proceeding.

(l) *Personal Property.* Seller has no knowledge that anyone will, at the Closing, have any claim to any personal property included in the Purchase Price nor knowledge of any liens or encumbrances affecting such personal property, except as disclosed by this Agreement or otherwise in writing to Buyer.

12.2 Buyer hereby acknowledges that, except as otherwise stated in this Agreement, Buyer is purchasing the Property in its existing condition and will, by the time called for herein, make or have waived all inspections of the Property Buyer believes are necessary to protect its own interest in, and its contemplated use, of the Property. The Parties acknowledge that, except as otherwise stated in this Agreement, no representations, inducements, promises, agreements, assurances, oral or written, concerning the Property, or any aspect of the occupational safety and health laws, Hazardous Substance laws, or any other act, ordinance or law, have been made by either Party or Brokers, or relied upon by either Party hereto.

12.3 In the event that Buyer learns that a Seller representation or warranty might be untrue prior to the Closing, and Buyer elects to purchase the Property anyway then, and in that event, Buyer waives any right that it may have to bring an action or proceeding against Seller or Brokers regarding said representation or warranty.

12.4 Any environmental reports, soils reports, surveys, and other similar documents which were prepared by third party consultants and provided to Buyer by Seller or Seller's representatives, have been delivered as an accommodation to Buyer and without any representation or warranty as to the sufficiency, accuracy, completeness, and/or validity of said documents, all of which Buyer relies on at its own risk. Buyer believes said documents to be accurate, but Buyer is advised to retain appropriate consultants to review said documents and investigate the Property.

**13.   Possession.**

Possession of the Property shall be given to Buyer at the Closing subject to the rights of tenants under Existing Leases.

**14.   Buyer's Entry.**

At any time during the Escrow period, Buyer, and its agents and representatives, shall have the right at reasonable times and subject to rights of tenants, to enter upon the Property for the purpose of making inspections and tests specified in this Agreement. No destructive testing shall be conducted, however, without Seller's prior approval which shall not be unreasonably withheld. Following any such entry or work, unless otherwise directed in writing by Seller, Buyer shall return the Property to the condition it was in prior to such entry or work, including the recompaction or removal of any disrupted soil or material as Seller may reasonably direct. All such inspections and tests and any other work conducted or materials furnished with respect to the Property by or for Buyer shall be paid for by Buyer as and when due and Buyer shall indemnify, defend, protect and hold harmless Seller and the Property of and from any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), damages, including those for injury to person or property, arising out of or relating to any such work or materials or the acts or omissions of Buyer, its agents or employees in connection therewith.

**15.   Further Documents and Assurances.**

The Parties shall each, diligently and in good faith, undertake all actions and procedures reasonably required to place the Escrow in condition for Closing as and when required by this Agreement. The Parties agree to provide all further information, and to execute and deliver all further documents, reasonably required by Escrow Holder or the Title Company.

**16.   Attorneys' Fees.**

If any Party or Broker brings an action or proceeding (including arbitration) involving the Property whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.

**17.   Prior Agreements/Amendments.**

17.1 This Agreement supersedes any and all prior agreements between Seller and Buyer regarding the Property.

17.2 Amendments to this Agreement are effective only if made in writing and executed by Buyer and Seller.

**18.   Broker's Rights.**

18.1 If this sale is not consummated due to the default of either the Buyer or Seller, the defaulting Party shall be liable to and shall pay to Brokers the Brokerage Fee that Brokers would have received had the sale been consummated. If Buyer is the defaulting party, payment of said Brokerage Fee is in addition to any obligation with respect to liquidated or other damages.

18.2 Upon the Closing, Brokers are authorized to publicize the facts of this transaction.

**19.   Notices.**

19.1 Whenever any Party, Escrow Holder or Brokers herein shall desire to give or serve any notice, demand, request, approval, disapproval or other communication, each such communication shall be in writing and shall be delivered personally, by messenger or by mail, postage prepaid, to the address set forth in this Agreement or by facsimile transmission.

19.2 Service of any such communication shall be deemed made on the date of actual receipt if personally delivered. Any such communication sent by regular mail shall be deemed given 48 hours after the same is mailed. Communications sent by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed delivered 24 hours after delivery of the same to the Postal Service or courier. Communications transmitted by facsimile transmission shall be deemed delivered upon telephonic confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If such communication is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

19.3 Any Party or Broker herein may from time to time, by notice in writing, designate a different address to which, or a different person or additional persons to whom, all communications are thereafter to be made.

**20.   Duration of Offer.**

20.1 If this offer is not accepted by Seller on or before 5:00 P.M. according to the time standard applicable to the city of

OTT  0001748

Los Angeles               on the date of October 31, 2012          , it shall
be deemed automatically revoked.
     20.2  The acceptance of this offer, or of any subsequent counteroffer hereto, that creates an agreement between the Parties as described in paragraph 1.2, shall be deemed made upon delivery to the other Party or either Broker herein of a duly executed writing unconditionally accepting the last outstanding offer or counteroffer.
21. LIQUIDATED DAMAGES.  (This Liquidated Damages paragraph is applicable only if initialed by both Parties).
THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO SIGNING THIS AGREEMENT, THE ACTUAL DAMAGES WHICH WOULD BE SUFFERED BY SELLER IF BUYER FAILS TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT. THEREFORE, IF, AFTER THE SATISFACTION OR WAIVER OF ALL CONTINGENCIES PROVIDED FOR THE BUYER'S BENEFIT, BUYER BREACHES THIS AGREEMENT, SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF $ 36,000.00          . UPON PAYMENT OF SAID SUM TO SELLER, BUYER SHALL BE RELEASED FROM ANY FURTHER LIABILITY TO SELLER, AND ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES SHALL BE PAID BY SELLER.

Buyer Initials              Seller Initials

22. ARBITRATION OF DISPUTES.  (This Arbitration of Disputes paragraph is applicable only if initialed by both Parties.)
     22.1  ANY CONTROVERSY AS TO WHETHER SELLER IS ENTITLED TO THE LIQUIDATED DAMAGES AND/OR BUYER IS ENTITLED TO THE RETURN OF DEPOSIT MONEY, SHALL BE DETERMINED BY BINDING ARBITRATION BY, AND UNDER THE COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("COMMERCIAL RULES"). ARBITRATION HEARINGS SHALL BE HELD IN THE COUNTY WHERE THE PROPERTY IS LOCATED. ANY SUCH CONTROVERSY SHALL BE ARBITRATED BY 3 ARBITRATORS WHO SHALL BE IMPARTIAL REAL ESTATE BROKERS WITH AT LEAST 5 YEARS OF FULL TIME EXPERIENCE IN BOTH THE AREA WHERE THE PROPERTY IS LOCATED AND THE TYPE OF REAL ESTATE THAT IS THE SUBJECT OF THIS AGREEMENT. THEY SHALL BE APPOINTED UNDER THE COMMERCIAL RULES. THE ARBITRATORS SHALL HEAR AND DETERMINE SAID CONTROVERSY IN ACCORDANCE WITH APPLICABLE LAW, THE INTENTION OF THE PARTIES AS EXPRESSED IN THIS AGREEMENT AND ANY AMENDMENTS THERETO, AND UPON THE EVIDENCE PRODUCED AT AN ARBITRATION HEARING. PRE-ARBITRATION DISCOVERY SHALL BE PERMITTED IN ACCORDANCE WITH THE COMMERCIAL RULES OR STATE LAW APPLICABLE TO ARBITRATION PROCEEDINGS. THE AWARD SHALL BE EXECUTED BY AT LEAST 2 OF THE 3 ARBITRATORS, IS RENDERED WITHIN 30 DAYS AFTER THE CONCLUSION OF THE HEARING, AND MAY INCLUDE ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY PER PARAGRAPH 16 HEREOF. JUDGMENT MAY BE ENTERED ON THE AWARD IN ANY COURT OF COMPETENT JURISDICTION NOTWITHSTANDING THE FAILURE OF A PARTY DULY NOTIFIED OF THE ARBITRATION HEARING TO APPEAR THEREAT.
     22.2  BUYER'S RESORT TO OR PARTICIPATION IN SUCH ARBITRATION PROCEEDINGS SHALL NOT BAR SUIT IN A COURT OF COMPETENT JURISDICTION BY THE BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE UNLESS AND UNTIL THE ARBITRATION RESULTS IN AN AWARD TO THE SELLER OF LIQUIDATED DAMAGES, IN WHICH EVENT SUCH AWARD SHALL ACT AS A BAR AGAINST ANY ACTION BY BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE.
     22.3  NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.

Buyer Initials              Seller Initials

23.  Miscellaneous.
     23.1  Binding Effect.  This Agreement shall be binding on the Parties without regard to whether or not paragraphs 21 and 22 are initialed by both of the Parties. Paragraphs 21 and 22 are each incorporated into this Agreement only if initialed by both Parties at the time that the Agreement is executed.
     23.2  Applicable Law.  This Agreement shall be governed by, and paragraph 22.3 is amended to refer to, the laws of the state in which the Property is located.
     23.3  Time of Essence.  Time is of the essence of this Agreement.
     23.4  Counterparts.  This Agreement may be executed by Buyer and Seller in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same Instrument. Escrow Holder, after verifying that the counterparts are identical except for the signatures, is authorized and instructed to combine the signed signature pages on one of the counterparts, which shall then constitute the Agreement.
     23.5  Waiver of Jury Trial.  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.
     23.6  Conflict.  Any conflict between the printed provisions of this Agreement and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.
24.  Disclosures Regarding The Nature of a Real Estate Agency Relationship.
     24.1  The Parties and Brokers agree that their relationship(s) shall be governed by the principles set forth in the applicable sections of the California Civil Code, as summarized in paragraph 24.2.
     24.2  When entering into a discussion with a real estate agent regarding a real estate transaction, a Buyer or Seller should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Buyer and Seller acknowledge being advised by the Brokers in this transaction, as follows:
        (a) Seller's Agent. A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or subagent has the following affirmative obligations: (1) To the Seller: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Seller. (2) To the Buyer and the Seller: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.
        (b) Buyer's Agent. A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the

OTT 0001749

Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations. (1) To the Buyer: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Buyer. (2) To the Buyer and the Seller. a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(c) *Agent Representing Both Seller and Buyer.* A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer. (1) In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Seller or the Buyer. b. Other duties to the Seller and the Buyer as stated above in their respective sections (a) or (b) of this paragraph 24.2. (2) In representing both Seller and Buyer, the agent may not without the express permission of the respective Party, disclose to the other Party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered. (3) The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect their own interests. Buyer and Seller should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(d) *Further Disclosures.* Throughout this transaction Buyer and Seller may receive more than one disclosure, depending upon the number of agents assisting in the transaction. Buyer and Seller should each read its contents each time it is presented, considering the relationship between them and the real estate agent in this transaction and that disclosure. Brokers have no responsibility with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees), of any Broker with respect to any breach of duty, error or omission relating to this Agreement shall not exceed the fee received by such Broker pursuant to this Agreement; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

24.3 *Confidential Information:* Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

25. **Construction of Agreement.** In construing this Agreement, all headings and titles are for the convenience of the parties only and shall not be considered a part of this Agreement. Whenever required by the context, the singular shall include the plural and vice versa. Unless otherwise specifically indicated to the contrary, the word "days" as used in this Agreement shall mean and refer to calendar days. This Agreement shall not be construed as if prepared by one of the parties, but rather according to its fair meaning as a whole, as if both parties had prepared it.

26 **Additional Provisions:**

Additional provisions of this offer, if any, are as follows or are attached hereto by an addendum consisting of paragraphs  27 _____ through __27__ . (if there are no additional provisions write "NONE".)

27. Current tenants shall be month to month lease.   Tenants have no lease agreement with Seller.

_____

_____

_____

_____

_____

_____

_____

---

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS AGREEMENT OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS AGREEMENT.
2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PROPERTY. SAID INVESTIGATION SHOULD
INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PROPERTY, THE INTEGRITY AND CONDITION OF ANY STRUCTURES AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PROPERTY FOR BUYERS INTENDED USE.

WARNING: IF THE PROPERTY IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THIS AGREEMENT MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED.

NOTE:
1. THIS FORM IS NOT FOR USE IN CONNECTION WITH THE SALE OF RESIDENTIAL PROPERTY.
2. IF THE BUYER IS A CORPORATION, IT IS RECOMMENDED THAT THIS AGREEMENT BE SIGNED BY TWO CORPORATE OFFICERS.
The undersigned Buyer offers and agrees to buy the Property on the terms and conditions stated and acknowledges receipt of a copy hereof.

BROKER:
Solomon Realty & Investment
_____
Attn: Austin Kim
_____
Title: _____
Address: 3807 Wilshire Blvd.  Suite 612
Los Angeles, CA 90010
Telephone:  213-386-9300
Facsimile:  213-386-0900
Federal ID No.  DRE Lic # 01340203

BUYER:
*Nomaan K Husain, P.C.*
By: *Stephen Kang Nomaan Husain PC*
Date: *Oct 26, 2012*
Name Printed: *Stephen Kang*
Title: *Attorney at Law*
Telephone/Facsimile:  713-621-8900

By: _____
Date: _____
Name Printed: _____
Title: _____
Address: _____
_____
Telephone/Facsimile: _____
Federal ID No. _____

_____
Initials
2000-American Industrial Real Estate Association

_____
Initials
Form OFA-4-8/00E

OTT  0001750

27.  Acceptance.
27.1  Seller accepts the foregoing offer to purchase the Property and hereby agrees to sell the Property to Buyer on the terms and conditions therein specified.
27.2  Seller acknowledges that Brokers have been retained to locate a Buyer and are the procuring cause of the purchase and sale of the Property set forth in this Agreement. In consideration of real estate brokerage service rendered by Brokers, Seller agrees to pay Brokers a real estate Brokerage Fee in a sum equal to _____ % of the Purchase Price divided in such shares as said Brokers shall direct in writing. This Agreement shall serve as an irrevocable instruction to Escrow Holder to pay such Brokerage Fee to Brokers out of the proceeds accruing to the account of Seller at the Closing.
27.3  Seller acknowledges receipt of a copy hereof and authorizes Brokers to deliver a signed copy to Buyer.

NOTE: A PROPERTY INFORMATION SHEET IS REQUIRED TO BE DELIVERED TO BUYER BY SELLER UNDER THIS AGREEMENT.

BROKER:                                                SELLER:

_____          _____
Attn: _____          By: _____
Title: _____          Date: _____
Address: _____          Name Printed: _____
_____          Title: _____
Telephone: _____          Telephone/Facsimile: _____
Facsimile: _____
Federal ID No. _____          By: _____
                                         Date: _____
                                         Name Printed: _____
                                         Title: _____
                                         Address: _____
                                         _____
                                         Telephone/Facsimile: _____
                                         Federal ID No. _____

These forms are often modified to meet changing requirements of law and needs of the industry. Always write or call to make sure you are utilizing the most current form: American Industrial Real Estate Association, 700 South Flower Street, Suite 600, Los Angeles, CA 90017. (213) 687-8777.

©Copyright 2000 By American Industrial Real Estate Association.  All rights reserved.
No part of these works may be reproduced in any form without permission in writing.

_____          Page 8 of 8          _____
Initials                                        Initials
2000-American Industrial Real Estate Association          Form OFA-4-8/00E

OTT  0001751

## POWER OF ATTORNEY

BY THIS POWER OF ATTORNEY given this 25th day of October 2012, I, Seung Yub Lee, a CEO of Ottogi America, Inc. of 1650 W. El Segundo Blvd., Gardena, California 90249, United States of America (USA) and Kangsik Hong, a Director of Ottogi Property Trust Company, L.L.C., of 1650 W. El Segundo Blvd., Gardena, California 90249, United States of America (USA) hereby appoint, nominate and constitute Nomaan Husain, PC and Stephen Kang, PLLC of Young & Husain, PLLC, a of 2700 Post Oak Blvd, Ste. 1220, Houston, Texas, USA (hereinafter called **"the Attorney"**) to act as my true and lawful attorney in fact to do and/or execute all or any of the acts and things hereinafter mentioned for and in my name and on my behalf, namely to:

1.      to act as my negotiator/legal representative in 1654 El Segundo and 1635 W 130th St. land acquisitions in the State of California, and to represent me in all negotiations, discussions and dealings between me in my official company capacity and Austin Kim, President of Solomon Realty & Investment of 3807 Wilshire Blvd., Ste. 612, Los Angeles, CA, 90010, relating to the establishment of an offer, negotiation and closing the above referenced lands in the Deed with the name, *"Ottogi Property Trust Company, LLC and/or Ottogi America, Inc."*, or such other name as is acceptable and approved by the said authority of this Power of Attorney, and the obtaining of a certificate and deed of such name and ownership at a simultaneous closing in connection therewith of this described transaction, and the obtaining of such other approvals, permits, licences and consents as may be necessary to acquire the lands described herewithin in good standing and title with the relevant local and/or federal authorities in 1654 El Segundo and 1635 W. 130th St. lands in the State of California (see attached detailed land descriptions and offer sheets aka Exhibit A);

2.      to conclude, sign and execute the Closing of the 1654 El Segundo and 1635 W. 130th St. lands in the State of California on my behalf in the official company capacity and any other contracts in connection with the said Closing following such negotiations with the above authorities and to pay all fees and expenses relating to the Closing and obtain good Deeds and titles therefor;

3.      to conclude, sign and execute all documents required in connection with opening, managing and closing an escrow trust bank account noted below as authorized by the Supreme Courts of the State of Texas with tax ID provided by the state governmental and regulatory agencies on behalf of the

1 | P a g e

S Y Lee

FSH

Ex. 4

OTT_0001459

law firm and the holder of this Power of Attorney and the offering party, Nomaan Husain, PC, to be used for these purposes on behalf of the grantors of this Power of Attorney, Seung Yub Lee, of Ottogi America, Inc. and Kangsik Hong, of Ottogi Property Trust Company, LLC and all final sums will be recorded in the Settlement at Closing and any and all funds that are short will be paid at Closing by the grantors of this Power of Attorney and any and all funds that are in surplus will be paid back to the grantors of this Power of Attorney at Closing. The fund need to be sent as follows by the grantors of this Power of Attorney:

Banking Information:

    Bank – Prosperity Bank, Statewide

    Route Number – 113122655

    Account Number – 1825083161

    Account – Nomaan K. Husain, PC, IOLTA – Texas Access to Justice   http://www.teajf.org/

Schedule of Payments:

- $350,000.00 on or before October 26, 2012
- $1,150,000.00 on or before November 2, 2012
- $980,000.00 on or before November 2, 2012

The checks and funds will be sent as Nomaan Husain, PC, to an escrow agent and third party vendors for the purposes of this Power of Attorney by both Nomaan Husain, PC, and Stephen Kang, PLLC, per the instructions on or before Closing and throughout the process of offer, due diligence, and Closing of this said transaction. No fees for the Attorneys will be paid out of this amount unless instructed to do so by the grantors of this Power of Attorney. Attorney and Client privilege will be in place and a relationship will be formed under this arrangement for this transaction via the use of the trust account.

The offer is made without any contingency conditions and as a cash buy, while some feasibility and due diligence will take place, the Closing will likely take place. Therefore, the Attorney will be fully released and indemnified if any and above Schedule of Payments are not made on time and Closing cannot take place. Also, in the event that the Closing does not take place through no fault of the offering party and Seung Yub Lee, of Ottogi America, Inc. and Kangsik Hong, of Ottogi Property Trust Company, LLC, then the held amount in trust and escrow will be returned to the grantors of this

2 | P a g e

*SYLee*

*KSH*

**OTT_0001460**

Power of Attorney as long as the escrow agent returns any and all funds to the Attorneys.

4.      to appoint and remove at the Attorney's discretion any substitute or agent under the Attorney (including advocates) and to delegate all or part of the foregoing powers to such person or persons.

5.      to receive full indemnity and release from the grantors as to the described transaction and its final results for both the Attorneys and Austin Kim, President of Solomon Realty & Investment, as the end results cannot be guaranteed and also the indemnity as to Austin Kim, President of Solomon Realty & Investment, from the grantors to any and all claims if filed by the sellers.

### AND IT IS HEREBY DECLARED THAT:

i)      I hereby undertake to ratify and confirm all and everything which the Attorney or any substitute or agent appointed by it under this Power of Attorney shall do, cause or purport to do by virtue of this Power of Attorney including in such confirmation whatsoever shall be done between the time of revocation thereof and the time of such revocation becoming known to the Attorney; and

ii)     I hereby authorize and empower the Attorney to acknowledge in the name, and as the act duly authorised by me, this Power of Attorney and to register and record the same in the proper office or registry in the United States of America and to do everything necessary for authenticating and giving full effect to this Power of Attorney; and

iii)    the Attorney in exercising the powers hereby conferred on it shall conform to the regulations and directions for the time being imposed on or given to it by me **PROVIDED ALWAYS** that no person dealing with the Attorney shall be concerned to see or enquire whether it is or is not acting in accordance with such regulations or directions and notwithstanding any breach of such regulations or directions committed by the Attorney in respect of any deed or instrument the same shall as between me and the person dealing with the Attorney be valid and binding on me to all intents and purposes; and

iv)     this Power of Attorney shall be valid for an indefinite period unless and until revoked by me in

3 | P a g e

S Y Lee

KSH

OTT_0001461

writing; and

v)     this Power of Attorney shall in all respects be interpreted in accordance with, and governed by, the laws of and applying in the State of Texas.

IN WITNESS WHEREOF  I have executed this Power of Attorney.

SIGNED by

10/26/2014

Seung Yub Lee
CEO
Ottogi America, Inc.

10-26-2014

Kangsik Hong
Director
Ottogi Property Trust Company, LLC

*[intentionally left blank]*

4 | P a g e

**OTT_0001462**

# CERTIFICATE OF ACKNOWLEDGMENT

State of California

)  SS.

County of Los Angeles

On _____October 26, 2012_____, before me, a Notary Public, DON HYUNG YOO, personally appeared _____Seung Yub Lee, a CEO of Ottogi America, Inc._____ and _____Kangsik Hong, a Director of Ottogi Property Trust Company, LLC, who proved to me on the basis of satisfactory evidence to be the persons who names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument,

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature of Notary Public                                        (Notary Seal)

DON HYUNG YOO
Commission # 1817090
Notary Public - California
Los Angeles County
My Comm. Expires Nov 6, 2012

+++++++++++++++++++++++++Additional Optional Information+++++++++++++++++++++++++++

Description of the Attached Document:  Power of Attorney plus Acknowledgment
Number of Pages: 5 including this page
Document Date: 10/25/2012

5 | P a g e

OTT_0001463

## ADDENDUM TO THE POWER OF ATTORNEY

### OF OCTOBER 25, 2012

This is an addendum to the Power of Attorney given by Seung Yub Lee of Ottogi America, Inc. and Kangsik Hong of Ottogi Property Trust Company, L.L.C. and only changes the provision indicated below and will not change any other terms and conditions to the original Power of Attorney aforementioned:

(1) The lands described as 1654 El Segundo and 1655 W. 130th St. will now be purchased only in the names of "*Ottogi America, Inc.*" and

(2) Provision 3 of the funding schedule in the original Power of Attorney will now change to reflect the following:

Bank: Prosperity Bank, Statewide

Route Number: 113122655

Account Number: 1525083161

Account Name: Nomaan K. Husain, PC, IOLTA -- Texas Access to Justice   http://www.txaccesstojustice/

Account Address: 2700 Post Oak Blvd., Ste. 1220, Houston, Texas, 77056, USA

Schedule of Payments:

$350,000.00 on or before October 25, 2012

$980,000.00 on or before November 2, 2012

$1,010,000.00 on or before January 3, 2013

This allows for the proper allocation of equally $1,170,000.00 for each lot of land with one (1) offer outstanding and new one (1) offer to be made with twenty-five (25) days of contingencies on or about January 3, 2013.   If both offers are not accepted by on January 28, 2013, then both offers will be cancelled and no closing will take place.  If both offers are accepted by January 28, 2013, then within ten (10) days or on or about February 7, 2013, the closing will take place to purchase the lands.

If this is in agreement, please sign below to indicate that the addendum terms are accurate.


Seung Yub Lee, CEO                                    Kangsik Hong, Director

Ottogi America, Inc.                                   Ottogi Property Trust Company, L.L.C.

EX. 5

OTT_0001464

## POWER OF ATTORNEY OF JANUARY 27, 2014 PER PURCHASE OFFER ON 1651 GARDENA LOT 25

BY THIS POWER OF ATTORNEY given this ___th day of January 2014, I, Seung Yub Lee, a CEO of Ottogi America, Inc. of 1650 W. El Segundo Blvd., Gardena, California 90249, United States of America (USA) and Kangsik Hong, a Director/General Manager of Ottogi America, Inc., of 1650 W. El Segundo Blvd., Gardena, California 90249, United States of America (USA) hereby appoint, nominate and constitute Nomaan Husain, PC and Stephen Kang, PLLC of Young & Husain, PLLC, a of 2700 Post Oak Blvd, Ste. 1220, Houston, Texas, USA (hereinafter called **"the Attorney"**) to act as my true and lawful attorney in fact to do and/or execute all or any of the acts and things hereinafter mentioned for and in my name and on my behalf, namely to:

1.    to act as my negotiator/legal representative in the 1651 Gardena, Land Lot 25 land acquisitions in the State of California, and to represent me in all negotiations, discussions and dealings between me in my official company capacity, relating to the establishment of an offer, negotiation and closing the above referenced lands in the Deed with the name *"Ottogi America, Inc."*, or such other name as is acceptable and approved by the said authority of this Power of Attorney, and the obtaining of a certificate and deed of such name and ownership at a simultaneous closing in connection therewith of this described transaction, and the obtaining of such other approvals, permits, licences and consents as may be necessary to acquire the lands described herewithin in good standing and title with the relevant local and/or federal authorities (see attached detailed purchase offer Exhibit A);

2.    to conclude, sign and execute the Closing of the above referenced land from the Clause 1 in the State of California on my behalf in the official company capacity and any other contracts in connection with the said Closing following such negotiations with the above authorities and to pay all fees, and expenses relating to the Closing and obtain good Deeds and titles therefor;

3.    to conclude, sign and execute all documents required in connection with opening, managing and closing an escrow trust bank account noted below as authorized by the Supreme Courts of the State of Texas with tax ID provided by the state governmental and regulatory agencies on behalf of the law firm and the holder of this Power of Attorney and the offering party, Nomaan Husain, PC, to be used for these purposes on behalf of the grantors of this Power of Attorney, Seung Yub Lee, of Ottogi

EX. 6

OTT_0001465

America, Inc. and Kangsik Hong, of Ottogi Property Trust Company, LLC and all final sums will be recorded in the Settlement at Closing and any and all funds that are short will be paid at Closing by the grantors of this Power of Attorney and any and all funds that are in surplus will be paid back to the grantors of this Power of Attorney at Closing.  The fund need to be sent as follows by the grantors of this Power of Attorney:

Banking Information:

　　　　Bank – Prosperity Bank, Statewide
　　　　Route Number – 113122655
　　　　Account Number – 1525083161
　　　　Account – Nomaan K. Husain, PC, IOLTA – Texas Access to Justice   http://www.teajf.org/

Schedule of Payments:
-   $300,000.00 on or before January 31, 2014.

The checks and funds will be sent as Nomaan Husain, PC, to an escrow agent and third party vendors for the purposes of this Power of Attorney by both Nomaan Husain, PC, and Stephen Kang, PLLC, per the instructions on or before Closing and throughout the process of offer, due diligence, and Closing of this said transaction.  No fees for the Attorneys will be paid out of this amount unless instructed to do so by the grantors of this Power of Attorney.  Attorney and Client privilege will be in place and a relationship will be formed under this arrangement for this transaction via the use of the trust account.

The offer is made with contingency conditions in the form of a loan and as a loan buy, while some feasibility and due diligence will take place, the Closing will likely take place only after the final approval of the loan to be guaranteed in the name of "**Ottogi America, Inc.**"  Therefore, the Attorney will be fully released and indemnified if any and above Schedule of Payments are not made on time or the loan is not approved and an expected Closing cannot take place.  Also, in the event that the Closing does not take place through no fault of the offering party and Seung Yub Lee, of Ottogi America, Inc. and Kangsik Hong, of Ottogi Property Trust Company, LLC, then the held amount in trust and escrow will be returned to the grantors of this Power of Attorney as long as the escrow agent returns any and all funds to the Attorneys.

OTT_0001466

4.      to appoint and remove at the Attorney's discretion any substitute or agent under the Attorney (including advocates) and to delegate all or part of the foregoing powers to such person or persons.

5.      to receive full indemnity and release from the grantors as to the described transaction and its final results for the Attorneys from the grantors.

### AND IT IS HEREBY DECLARED THAT:

i)      I hereby undertake to ratify and confirm all and everything which the Attorney or any substitute or agent appointed by it under this Power of Attorney shall do, cause or purport to do by virtue of this Power of Attorney including in such confirmation whatsoever shall be done between the time of revocation thereof and the time of such revocation becoming known to the Attorney; and

ii)     I hereby authorize and empower the Attorney to acknowledge in the name, and as the act duly authorised by me, this Power of Attorney and to register and record the same in the proper office or registry in the United States of America and to do everything necessary for authenticating and giving full effect to this Power of Attorney; and

iii)    the Attorney in exercising the powers hereby conferred on it shall conform to the regulations and directions for the time being imposed on or given to it by me **PROVIDED ALWAYS** that no person dealing with the Attorney shall be concerned to see or enquire whether it is or is not acting in accordance with such regulations or directions and notwithstanding any breach of such regulations or directions committed by the Attorney in respect of any deed or instrument the same shall as between me and the person dealing with the Attorney be valid and binding on me to all intents and purposes; and

iv)     this Power of Attorney shall be valid for an indefinite period unless and until revoked by me in writing; and

v)      this Power of Attorney shall in all respects be interpreted in accordance with, and governed by, the laws of and applying in the State of Texas.

OTT_0001467

IN WITNESS WHEREOF I have executed this Power of Attorney.

SIGNED by

Seung Yub Lee
CEO
Ottogi America, Inc.

Kangsik Hong
Director
Ottogi Property Trust Company, LLC

*[intentionally left blank]*

OTT_0001468

## CERTIFICATE OF ACKNOWLEDGMENT

State of California

County of Los Angeles ) ss

On ___January 30th 2014___, before me, a Notary Public, DOO HYUNG YOO, personally appeared ___Seung Yub Lee, a CEO of Ottogi America, Inc.___ and ___Kangsik Hong, a Director/General Manager of Ottogi America, Inc.___, who proved to me on the basis of satisfactory evidence to be the persons who names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

DOO HYUNG YOO
Commission # 1993707
Notary Public - California
Los Angeles County
My Comm. Expires Nov 8, 2016

(Notary Seal)

_____
Signature of Notary Public

+++++++++++++++++++++++++*Additional Optional Information*+++++++++++++++++++++++++

Description of the Attached Document:  Power of Attorney plus Acknowledgment

Number of Pages: 5 including this page

Document Date: 01/27/2014

OTT_0001469

## CONTRACT FOR LEGAL SERVICES

**DATE:**   This contract is made on the __9__ day of _____May_____, 2012.

**PARTIES:**   This contract is between __Ottogi America, Inc.__, who shall be called "Client" and Young & Husain, LLP, who shall be called "Attorneys".

**ATTORNEYS:**   Attorneys are duly licensed to practice law in the State of California.

**EMPLOYMENT:**   Client, by this contract, employs Attorneys to represent client in all matters pertaining ___asset protection planning_____.

**ACCEPTANCE OF EMPLOYMENT:**   Attorneys, by this contract, accept employment to represent Client in all matters pertaining to __asset protection planning__.

**SERVICE TO BE PERFORMED:**   Attorneys agree to represent Client in all matters pertaining to ___asset protection planning__.

Any other matters or causes of action will require the execution of a new and separate contract for legal services.

Attorneys shall perform the following services as and when necessary or advisable:

1. Advise Client of the legal rights, remedies and objectives at issue in the matter and make recommendations;
2. Prepare and file all necessary documentation, notaries, and other such legal papers;
3. Conduct such meetings as is necessary under the circumstances of the matter;
4. Conduct preparation, planning and execution of the matter as to any drafting and finalizing of the legal document needed; and
5. Prepare, have executed, and file all records, deeds and other official papers as are necessary to properly conclude the matter.

**COMMUNICATION WITH CLIENT:**   Attorneys shall keep Client reasonably informed about the matter by periodically advising Client of the status and progress of the case and by promptly complying with reasonable requests for information. Client understands that the attorney handling this matter will not always be immediately available because of other commitments, other business and other activities. Telephone calls will be returned by both Client and Attorney. Both Client and Attorneys recognize that it is often more efficient for both to communicate through the secretary of the attorney handling the case.

**ATTORNEYS DO NOT GUARANTEE ANY RESULT IN THIS CASE.** _S Y Lee_
                                                                        INITIAL

Ex. 7

OTT_0000382

CONSULTATION WITH EXPERTS;     It is recognized by both Client and Attorneys that it may become necessary or advisable in the handling of this case to consult with and employ experts such as accountants, appraisers, bankers and other professionals and attorneys in specialized fields. Additional fees for such consultations will be incurred by Attorneys only after consultation with Client and with the permission of Client. Fees charged by such experts shall be paid by Client either by payment directly or by reimbursing Attorneys for such expenses.

ASSISTANCE:     To the extent reasonably necessary to enable Attorneys to perform the duties under this agreement the Attorney shall be authorized to engage the services of such legal assistants, law clerks and other such assistants to assist in the proper performance of the duties set forth in this agreement. Fees for such assistants shall be charged at a lesser rate than that of Attorneys. Attorney Fee is $350.00 per hour in this matter as offered by Stephen Kang, PLLC, attorney in charge of this matter and Assistant Fee is $75.00 per hour.

FEES AND EXPENSES:     For services rendered in this case Attorneys shall be entitled to an upfront EARNED RETAINER of $_____3,500___.00. $___3,500____.00 of this retainer is to be paid immediately and the remaining $_____N/A___.00 is to be paid 30 days after initial meeting, plus a payment plan schedule of _____NONE_____.  S Y Lee INITIAL

After the retainer is used, then a further retainer will be asked periodically as long as the matter is continuing and not concluded. S Y Lee INITIAL

In addition, Client shall pay all case expenses as they are incurred, and attorneys shall be entitled to be reimbursed for out of pocket expenses. S Y Lee INITIAL

RIGHT TO WITHDRAWAL BY THE ATTORNEYS:     Attorneys have the right to withdraw from representing the Client at anytime if the Client does not make proper payments to attorneys pursuant to this Contract for Legal Services.

LAW GOVERNING AGREEMENT:     The validity of this agreement and any of its terms or provisions, as well as the rights and duties of the parties under this agreement shall be governed by the laws of the State of California.

AMENDMENTS:     This agreement may be amended by the mutual agreement of the parties in writing to be attached to and incorporated into this agreement.

SIGNED this ___9___ day of ___May_____, 2012.


By: _____          X _____
By: Stephen Kang                                        Client
Young & Husain, LLP                                 By:
Stephen Kang, PLLC                                   Ottogi America, Inc.

OTT_0000383

## SETTLEMENT BUY & SELL AGREEMENT

This Settlement Agreement ("Settlement Agreement") is entered into as of August 26th, 2013, and is by and among Toltec Holdings, LLC and Marie Solymosi ("Toltec & MS"), on the one hand, and Nomaan K. Husain, PC ("Husain"), on the other hand.

### Recitals

WHEREAS, Toltec & MS own that certain commercial real properties located at *1654 W. El Segundo Blvd., Gardena, California 90249, and 1635 W. 130th Street, Gardena, California 90249* (the "Property");

WHEREAS, on or about December 23, 2012, Austin Kim ("Kim"), a licensed real estate broker employed by Solomon Realty Investment (aka Solomon Realty & Investment, Inc.; hereinafter "Solomon"), acting as agent for Husain, approached Toltec & MS and expressed Husain's interest in purchasing the Properties;

WHEREAS, discussions ensued, and, on or about January 4, 2013, Toltec and Husain entered into an agreement whereby Husain agreed to purchase the Properties from Toltec & MS for a purchase price of one million two hundred eighty thousand dollars ($1,280,000.00) for 1654 W. El Segundo Blvd., Gardena, California 90249, and one million two hundred fifty thousand dollars ($1,250,000.00) for 1635 W. 130th Street, Gardena, California 90249, entitled Agreement and Escrow Instructions for Purchase of Real Estate (the "Agreement");

WHEREAS, in connection with the sale transaction, on or about January 4, 2013, Husain delivered to Central Escrow, Inc. a revised deposit of forty-four thousand one hundred dollars ($44,100.00; hereinafter, the "Deposit") and to Mara Escrow, Inc. a revised deposit of eighteen thousand seven hundred and fifty dollars ($18,750.00; hereinafter, the "Desposit");

WHEREAS, before the scheduled expiration of the contingency period, on or about January 28, 2013, Kim, on behalf of Husain, informed Toltec that the contingencies set forth in paragraph 9.1 of the Agreement could not be approved or waived due to an issue of soil contamination and, as a result, the sale closing would have to be delayed;

WHEREAS, in reliance upon Kim's representation, Toltec agreed to extend the deadline for the removal of contingencies pursuant to paragraph 9.1 of the Agreement to three weeks from the original contingencies removal date;

WHEREAS, thereafter, and on reliance on similar representations made by Kim, on behalf of Husain, regarding the existence of soil conditions (all of which were knowingly false when made), Toltec agreed to extend the deadline to waive contingencies at least three (3) additional times – most recently, to May 10, 2013;

Toltec _1/_        MS _mS_        Husain _N_

LA/1513949.1

Ex.8

OTT_0001156

WHEREAS, after Toltec agreed to the final extension, Kim, on behalf of Husain, made express assurances to Toltec that the sale contemplated by the Agreement would close on or before May 10, 2013;

WHEREAS, Toltec thereafter learned of the true reason for the delay in closing the sale transaction contemplated by the Agreement – that, unbeknownst to Toltec, Husain had no intention of going forward with the purchase of the Property unless and until Husain was able to secure the purchase of parcels adjacent to and neighboring Toltec's property belonging to MS (including but not limited to the adjoining property at 1635 130th Street, Gardena, California);

WHEREAS, Husain's intentions (which placed the transaction in high risk of failure), of which Kim was fully aware, were never disclosed to Toltec;

WHEREAS, on or about June 18, 2013, Toltec issued a Notice to Buyer to Perform under the Agreement;

WHEREAS, Husain did not thereafter take any action to close on the sale transaction until July 2013, by this Agreement along with MS's consent to close as well based on a side agreement allowing the Sellers to sue Kim in exchange for Husain closing on both lands which in turn would go to Husain's client per attached Deed and Settlement Exhibits;

WHEREAS, on or about July 10, 2013, Toltec and MS agreed to sell the lands to Husain in a cash transaction by this settlement under the Agreement and the related escrow closings by Toltec and MS and Husain;

WHEREAS, on August 20, 2013, Kim responded that he disputed the release of the Deposit in escrows and asserted a right to a commission payment for procuring buyer Husain;

WHEREAS, as of the above-stated effective date, Toltec and MS and Husain have agreed to settle disputes among them, pursuant to the terms and conditions stated herein; and

NOW, THEREFORE, in consideration of the mutual agreements and covenants hereinafter set forth, Toltec and MS and Husain (hereinafter, and where appropriate, collectively referred to as the "Settling Parties") agree as follows:

### Terms of Settlement Agreement

1.     The Recitals above are incorporated herein by this reference.

2.     In consideration for the fulfillment of the covenants and promises set forth herein, the Settling Parties have agreed as follows:

Toltec _____   MS ___mS___   Husain _____

LA/1513949.1

a.      Within three (3) calendar days of the full execution of this Settlement Agreement, Husain will pay Toltec and MS an one-time, lump sum of two million five hundred thirty thousand dollars ($2,530,000.00) in immediately available funds (e.g., cashier's check or money order or by a wire) and will deliver said sum to Toltec's counsels; and

b.      Toltec and MS hereby transfer any right title and interest it may have in the Properties to Husain and shall take any and all steps necessary to effectuate a transfer of the Title to Husain.  Husain will support and cooperate with any efforts on the part of Toltec and MS to release the Deposit from Central Escrow, Inc. and Mara Escrow, Inc., including but not limited to providing support and cooperation in any litigation that may arise between Toltec and MS, on the one hand, and any third party (including but not limited to Kim and/or Solomon), on the other hand relating in any manner to the Deposit and commission.

3.      Except for the rights and obligations created or preserved by this Settlement Agreement, and except as otherwise stated below, Toltec and MS fully and forever generally releases, acquits and discharges Husain, together with any and all of Husain's past and present affiliates, employees, agents, partners, insurers, attorneys, assigns, servants, spouses, children, heirs, executors and representatives (the "Husain Released Parties"), from any and all claims, demands, rights, rights to fees of all kinds, causes of action, damages, losses, attorneys' fees and expenses, and costs of every kind and nature whatsoever, known or unknown, fixed or contingent, which Toltec and MS ever had or now has against any one or more of the Husain Released Parties arising out of and/or relating to the sale transaction of the Property.

It is expressly agreed that nothing set forth herein shall be deemed to constitute a release, acquittal and/or discharge of Austin Kim, Solomon from any liability to Toltec and MS and Husain for any matters whatsoever, including but not limited to those matters arising out of and/or relating to the sale transaction of the Property and/or the Deposit and/or Commission.

4.      Except for the rights and obligations created or preserved by this Settlement Agreement, Husain fully and forever generally releases, acquits and discharges Toltec and MS, together with any and all of Toltec and MS's past and present affiliates, employees, agents, partners, members, managers, directors, officers, shareholders, owners, insurers, attorneys, assigns, servants, spouses, children, heirs, executors and representatives (the "Toltec and MS Released Parties"), from any and all claims, demands, rights, rights to fees of all kinds, causes of action, damages, losses, attorneys' fees and expenses, and costs of every kind and nature whatsoever, known or unknown, fixed or contingent, which Husain ever had or now has against any one or more of the Toltec and MS Released Parties, without limitation.

Toltec _____    MS _m S_    Husain _____

LA/1513949.1

5.     Toltec and MS and Husain acknowledge that they have read, considered and understand the provisions and significance of Section 1542 of the California Civil Code, which presently provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

Toltec and MS and Husain expressly waive any and all rights they have or may have under Civil Code § 1542, as now worded or hereafter amended, with respect to the releases set forth in Sections 3 and 4, above. In connection with this waiver, Toltec and MS and Husain acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected or facts in addition to or different from those which they now know or believe to be true with respect to the claims, matters and causes of action released by this Settlement Agreement. Nevertheless, Toltec and MS and Husain intend by this Settlement Agreement to release fully, finally and forever all matters released herein. In furtherance of such intention, the releases as set forth in this Settlement Agreement shall be and remain in effect as full and complete releases of such matters released herein notwithstanding the discovery or existence of any additional or different claims or facts relevant thereto. It is expressly understood and agreed that this waiver of Civil Code § 1542 and the releases set forth herein are material terms of this Settlement Agreement, and were negotiated between and among Toltec and MS and Husain.

6.     Toltec and MS and Husain hereby represent and warrant to one another that they have not previously assigned, transferred or granted, or purported to assign, transfer or grant, any claim, matter, or cause of action, which is being released herein.

7.     This Settlement Agreement shall bind and inure to the benefit of the respective successors and assigns of Toltec and MS and Husain.

8.     This Settlement Agreement is executed and delivered within the County of Los Angeles, State of California, and the rights and obligations of the Settling Parties hereunder shall be construed and enforced in accordance with, and governed by, the laws of the State of California.

9.     In any legal action or proceeding to enforce the terms of this Settlement Agreement, the prevailing party shall be entitled to recover his/her reasonable attorneys' fees actually incurred, together with other costs relating to any such legal action or proceeding.

Toltec ___     MS _ms_     Husain ___

LA/1513949.1

OTT_0001159

10.     This Settlement Agreement represents the entire agreement between the Settling Parties and supersedes all prior agreements and discussions. There are no warranties, representations, agreements, promises or terms other than set forth herein.

11.     The terms of this Settlement Agreement may be waived, novated, modified or amended only by a writing signed by the party against whom said waiver, novation, modification or amendment is asserted.

12.     Each natural person signing this Settlement Agreement on behalf of a business entity represents and warrants that he or she has the authority to bind such business entity to this Settlement Agreement.

13.     This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signatures transmitted by facsimile or e-mail may be used and shall be binding on all Settling Parties.

14.     The Settling Parties agree that, pursuant to California Code of Civil Procedure section 664.6, a court of competent jurisdiction may enforce the settlement until performance in full of the terms of the settlement.

**WHEREFORE** the Settling Parties have executed this Settlement Agreement as of the date set forth below.

Dated:                                              Dated:

Toltec Holdings, LLC                                Nomaan K. Husain, PC

By:                                                 By:

Print name: _Adrian Garcia_                         Print name: _Nomaan Husain_

A representative of Toltec Holdings, LLC            A representative of Nomaan K. Husain, PC
with authority to bind Toltec Holdings,             with authority to bind Nomaan K. Husain,
LLC to this Settlement Agreement                    PC to this Settlement Agreement

Marie Solymosi, Individually

By:

Print name:

Toltec _1_         MS _MS_         Husain

LA/1513949.1

OTT_0001160

 # CENTRAL ESCROW, INC.

3660 Wilshire Blvd., #108, Los Angeles, CA 90010
Tel:(213)925-5547 • Fax:(213)568-3918

## ESCROW   INSTRUCTIONS & ACCEPTANCE

Date:   August 27, 2013

Escrow No.   5048885-KK

Re:   1654 W El Segundo Blvd, Gardena, CA  90249 and

1635 W. 130th Street, Gardena, CA 90249 (Mara Escrow, Inc.)

To All:

Please find enclosed following instructions & aceptance for the above referenced escrow -

1.   The parties agree that per clause 4 of the purchase agreement with original contingencies removal date based on the soil and environment tests by August 15, 2013, due to due diligence on the feasibility study for company plan, the closing will take place for Properties referenced above. Buyer and Seller agree to indemnify, defend and hold Escrow Holder, its employees and officer of the corporation, real estate agents and/or brokers harmless from any liability or loss in connection with this instruction. Attached Instruction is to be used for wiring of the total sum of $2,530,000.00, for closing on or before August 28, 2013.

All other terms and conditions of this escrow shall remain the same.  All parties signing this instruction acknowledge receipt of a copy of same.

Wiring Instructions:

See attached.

END

SELLERS:

Toltec Holdings, LLC

By: Adrian Garcia De Alba, President

Marie Solymosi

Individually

BUYER:

Nomaan Husain, PC POA Third Party Entity

OTT_0001161

Ex.9



**STANDARD OFFER, AGREEMENT AND ESCROW
INSTRUCTIONS FOR PURCHASE OF REAL ESTATE**
*(Non-Residential)*
American Industrial Real Estate Association

2nd

January 4, 2013
(Date for Reference Purposes)

1.  Buyer.
    1.1  Nomaan K. Husain, P.C., hereinafter described, from the owner hereof ("Seller") (collectively, the "Parties" or individually, a "Party"), ("Buyer")
    hereby offers to purchase the real property, hereinafter described, from the owner hereof ("Seller") (collectively, the "Parties" or individually, a "Party")
    through an escrow ("Escrow") to close on ___ or before Ten(10) days after the expiration of the Contingency Period
    ("Expected Closing Date") to be held by  Central Escrow (Eddie Kang)                                                  ("Escrow Holder")
    whose address is   3660 Wilshire Blvd.  Suite 108  Los Angeles CA 90010
    _____ , Phone No. ___(213) 389-8300___ , Facsimile No. _(213) 389-1861___
    upon the terms and conditions set forth in this agreement ("Agreement").  Buyer shall have the right to assign Buyer's rights hereunder, but any such
    assignment shall not relieve Buyer of Buyer's obligations herein unless Seller expressly releases Buyer.
    1.2  The term "Date of Agreement" as used herein shall be the date when by execution and delivery (as defined in paragraph 20.2) of this document
    or a subsequent counteroffer thereto, Buyer and Seller have reached agreement in writing whereby Seller agrees to sell, and Buyer agrees to purchase,
    the Property upon terms accepted by both Parties.
2.  Property.
    2.1  The real property ("Property") that is the subject of this offer consists of (insert a brief physical description) _____
    Approximately 39,679 square feet land

    is located in the City of  Gardena                                                    , County of  Los Angeles
    State of  California            , is commonly known by the street address of  1654 W. El Segundo Blvd.
    Gardena  CA 90249
    and is legally described as:  to be furnished in escrow

    (APN:   6102-001-016                    ).
    2.2  If the legal description of the Property is not complete or is inaccurate, this Agreement shall not be invalid and the legal description shall be
    completed or corrected to meet the requirements of  Lawyers Title (Andy Yi)
    ("Title Company"), which shall issue the title policy hereinafter described.
    2.3  The Property includes, at no additional cost to Buyer, the permanent improvements thereon, including those items which the pursuant to
    applicable law are a part of the property, as well as the following items, if any, owned by Seller and at present located on the Property: electrical
    distribution systems (power panel, bus ducting, conduits, disconnects, lighting fixtures); telephone distribution systems (lines, jacks and connections only);
    space heaters; heating, ventilating, air conditioning equipment ("HVAC"); air lines; fire sprinkler systems; security and fire detection systems; carpets;
    window coverings; wall coverings; and  N/A

    _____ (collectively, the "Improvements").
    2.4  The fire sprinkler monitor: ☐ is owned by Seller and included in the Purchase Price, or ☐ is leased by Seller, and Buyer will need to negotiate a
    new lease with the fire monitoring company.
    2.5  Except as provided in Paragraph 2.3, the Purchase Price does not include Seller's personal property, furniture and furnishings, and
    N/A
3.  Purchase Price.
    3.1  The purchase price ("Purchase Price") to be paid by Buyer to Seller for the Property shall be
    $ 1,280,000.00         , payable as follows:
                        (a)  Cash down payment, including the Deposit as defined in paragraph 4.3 (or if an all cash
                             transaction, the Purchase Price):                                                $  1,280,000.00
    *(Strike if not*
    *applicable)*       (b)  Amount of "New Loan" as defined in paragraph 5.1, if any:                        $ _____

                        ~~(c)   Buyer shall take title to the Property subject to the following existing deed(s) of trust~~
                        ~~("Existing Deed(s) of Trust") securing the existing promissory note(s) ("Existing Note(s)"):~~
                        ~~(i)   An Existing Note ("First Note") with an unpaid principal balance as of the~~         $ _____
                              ~~Closing of approximately:~~
    *~~(Strike if not~~*        ~~Said First Note is payable at $ _____ per month;~~
    *~~applicable)~~*           ~~including interest at the rate of _____ % per annum until paid (and/or the~~
                              ~~entire unpaid balance is due on _____ );~~
                        ~~(ii)  An Existing Note ("Second Note") with an unpaid principal balance as of the~~          $ _____
                              ~~Closing of approximately:~~
                              ~~Said Second Note is payable at $ _____ per month;~~
                              ~~including interest at the rate of _____ % per annum until paid (and/or the~~
    *~~(Strike if not~~*        ~~entire unpaid balance is due on _____ )~~
    *~~applicable)~~*       ~~(d)   Buyer shall give Seller a deed of trust ("Purchase Money Deed of Trust") on the~~
                              ~~Property to secure the promissory note of Buyer to Seller described in paragraph 6~~
                              ~~("Purchase Money Note") in the amount of:~~
                             Total Purchase Price:                                                            $ 1,280,000.00

    ~~3.2  If Buyer is taking title to the Property subject to, or assuming, and Existing Deed of Trust and such deed of trust permits the beneficiary to~~
    ~~demand payment of fees including, but not limited to, points, processing fees, and appraisal fees as a condition to the transfer of the Property, Buyer~~
    ~~agrees to pay such fees up to a minimum of 1.5% of the unpaid principal balance of the applicable Existing Note.~~

    _____                          Page 1 of 8                                          _____
       Initials                                                                                              Initials
    2000-American Industrial Real Estate Association                                              Form OFA-4-5/00E

**4.   Deposits.**

4.1 ☐ Buyer has delivered to Broker a check in the sum of $ _____ , payable to Escrow Holder, to be held by Broker until both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder, or ☑ Buyer shall deliver to Escrow Holder a check in the sum of $ 38,400.00 or _____ when both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder.   When cashed, the check shall be deposited into the Escrow's trust account to be applied toward the Purchase Price of the Property at the Closing.   Should Buyer and Seller not enter into an agreement for purchase and sale, Buyer's check or funds shall, upon request by Buyer, be promptly returned to Buyer.

4.2   Additional deposits:

(a) Within 5 business days after the Date of Agreement, Buyer shall deposit with Escrow Holder the additional sum of $ N/A to be applied to the Purchase Price at the Closing.

(b) Within 5 business days after the contingencies discussed in paragraph 9.1 (a) through (k) are approved or waived, Buyer shall deposit with Escrow Holder the additional sum of $ N/A to be applied to the Purchase Price at the Closing.

4.3   Escrow Holder shall deposit the funds deposited with it by Buyer pursuant to paragraphs 4.1 and 4.2 (collectively the "Deposit"), in a State or Federally chartered bank in an interest bearing account whose term is appropriate and consistent with the timing requirements of this transaction. The interest therefrom shall accrue to the benefit of Buyer, who hereby acknowledges that there may be penalties or interest forfeitures if the applicable instrument is redeemed prior to its specified maturity.   Buyer's Federal Tax Identification Number is _____ .   NOTE: Such interest bearing account cannot be opened until Buyer's Federal Tax Identification Number is provided.

~~5.   Financing Contingency. (Strike if not applicable)~~

~~5.1   This offer is contingent upon Buyer obtaining from an insurance company, financial institution or other lender, a commitment to lend to Buyer a sum equal to at least N/A % of the Purchase Price, at terms reasonably acceptable to Buyer.  Such loan ("New Loan") shall be secured by a first trust or mortgage on the Property.  If this Agreement provides for Seller to carry back junior financing, then Seller shall have the right to approve the terms of the New Loan.  Seller shall have 7 days from receipt of the commitment setting forth the proposed terms of the New Loan to approve or disapprove of such proposed terms. If Seller fails to notify Escrow Holder, in writing, of the disapproval within said 7 days it shall be conclusively presumed that Seller has approved the terms of the New Loan.~~

~~5.2   Buyer hereby agrees to diligently pursue obtaining the New Loan.  If Buyer shall fail to notify its Broker, Escrow Holder and Seller, in writing within _____ days following the Date of Agreement, that the New Loan has not been obtained, it shall be conclusively presumed that Buyer has either obtained said New Loan or has waived this New Loan contingency.~~

~~5.3   If, after due diligence, Buyer shall notify its Broker, Escrow Holder and Seller, in writing, within the time specified in paragraph 5.2 hereof, that Buyer has not obtained said New Loan, this Agreement shall be terminated, and Buyer shall be entitled to the prompt return of the Deposit, plus any interest earned thereon, less only Escrow Holder and Title Company cancellation fees and costs, which Buyer shall pay.~~

~~6.   Seller Financing (Purchase Money Note). (Strike if not applicable)~~

~~6.1   The Purchase Money Note shall provide for interest on unpaid principal at the rate of N/A % per annum, with principal and interest paid as follows:~~

~~_____~~
~~_____~~
~~_____~~
~~_____~~

~~7.   The Purchase Money Note and Purchase Money Deed of Trust shall be on the current forms commonly used by Escrow Holder, and be junior and subordinate only to the Existing Note(s) and/or the New Loan expressly called for by this Agreement.~~

~~6.2   The Purchase Money Note and/or the Purchase Money Deed of Trust shall contain provisions regarding the following (see also paragraph 10.3 (b)):~~

~~(a)   Prepayment. Principal may be prepaid in whole or in part at any time without penalty, at the option of the Buyer.~~

~~(b)   Late Charge. A late charge of 6% shall be payable with respect to any payment of principal, interest, or other charges, not made within 10 days after it is due.~~

~~(c)   Due-On-Sale. In the event the Buyer sells or transfers title to the Property or any portion thereof, then the Seller may, at Seller's option, require the entire unpaid balance of said Note to be paid in full.~~

~~6.3   If the Purchase Money Note shall be subordinate to other financing, Seller shall, at Buyer's expense prepare and record an Seller's behalf a request for notice of default and/or sale with regard to each mortgage or deed of trust to which it will be subordinate.~~

~~6.4   WARNING. CALIFORNIA LAW DOES NOT ALLOW DEFICIENCY JUDGEMENTS ON SELLER FINANCING.   IF BUYER ULTIMATELY DEFAULTS ON THE LOAN, SELLER'S SOLE REMEDY IS TO FORECLOSE ON THE PROPERTY.~~

**7.   Real Estate Brokers.**

7.1   The following real estate brokers ("Brokers") and brokerage relationships exist in this transaction and are consented to by the Parties (check the applicable boxes).

☐ _____ represents Seller exclusively ("Seller's Broker");

☑ Solomon Realty & Investment _____ represents Buyer exclusively ("Buyer's Broker"); or

☐ _____ represents both Seller and Buyer ("Dual Agency").

The Parties acknowledge that Brokers are the procuring cause of this Agreement. See paragraph 24 for disclosures regarding the nature of a real estate agency relationship. Buyer shall use the services of Buyer's Broker exclusively in connection with any and all negotiations and offers with respect to the Property for a period of 1 year from the Date of Agreement.

7.2   Buyer and Seller each represent and warrant to the other that he/she/it has had no dealings with any person, firm, broker or finder in connection with the negotiation of this Agreement and/or the consummation of the purchase and sale contemplated herein, other than the Brokers named in paragraph 7.1, and no broker or other person, firm or entity, other than said Brokers is/are entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of such Party. Buyer and Seller do each hereby agree to indemnify, defend, protect and hold the other harmless from and against any costs, expenses or liability for compensation, commission or charges which may be claimed by any broker, finder or other similar party, other than said named Brokers by reason of any dealings or act of the indemnifying Party.

**8.   Escrow and Closing.**

8.1   Upon acceptance hereof by Seller, this Agreement, including any counter-offers incorporated herein by the Parties, shall constitute not only the agreement of purchase and sale between Buyer and Seller, but also instructions to Escrow Holder for the consummation of the Agreement through the Escrow. Escrow Holder shall not prepare any further escrow instructions restating or amending the Agreement unless specifically so instructed by the Parties or a Broker herein. Subject to the reasonable approval of the Parties, Escrow Holder may, however, include its standard general escrow provisions.

8.2   As soon as practical after the receipt of this Agreement and any relevant counteroffers, Escrow Holder shall ascertain the Date of Agreement as defined in paragraphs 1.2 and 20.2 and advise the Parties and Brokers, in writing, of the date ascertained.

8.3   Escrow Holder is hereby authorized and instructed to conduct the Escrow in accordance with this Agreement, applicable law and custom and practice of the community in which Escrow Holder is located, including any reporting requirements of the Internal Revenue Code. In the event of a conflict between the law of the state where the Property is located and the law of the state where the Escrow Holder is located, the law of the state where the Property is located shall prevail.

8.4   Subject to satisfaction of the contingencies herein described, Escrow Holder shall close this escrow (the "Closing") by recording a general warranty deed (a grant deed in California) and the other documents required to be recorded, and by disbursing the funds and documents in accordance

_____
Initials

_____
Initials

2000 American Industrial Real Estate Association

Form OFA-4-8/00E

OTT_0001753

with this Agreement.

8.5 Buyer and Seller shall each pay one-half of the Escrow Holder's charges and Seller shall pay the usual recording fees and any required documentary transfer taxes. Seller shall pay the premium for a standard coverage owner's or joint protection policy of title insurance.

8.6 Escrow Holder shall verify that all of Buyer's contingencies have been satisfied or waived prior to Closing. The matters contained in paragraphs 9.1 subparagraphs (b), (c), (d), (e), (g), (i), (n), and (o), 9.4, 9.9, 12, 13, 14, 16, 18, 20, 21, 22, and 24 are, however, matters of agreement between the Parties only and are not instructions to Escrow Holder.

8.7 If this transaction is terminated for non-satisfaction and non-waiver of a Buyer's Contingency, as defined in paragraph 9.2, then neither of the Parties shall thereafter have any liability to the other under this Agreement, except to the extent of a breach of any affirmative covenant or warranty in this Agreement. In the event of such termination, Buyer shall be promptly refunded all funds deposited by Buyer with Escrow Holder, less only Title Company and Escrow Holder cancellation fees and costs, all of which shall be Buyer's obligation.

8.8 The Closing shall occur on the Expected Closing Date, or as soon thereafter as the Escrow is in condition for Closing; provided, however, that if the Closing does not occur by the Expected Closing Date and said Date is not extended by mutual instructions of the Parties, a Party not then in default under this Agreement may notify the other Party, Escrow Holder, and Brokers, in writing that, unless the Closing occurs within 5 business days following said notice, the Escrow shall be deemed terminated without further notice or instructions.

8.9 Except as otherwise provided herein, the termination of Escrow shall not relieve or release either Party from any obligation to pay Escrow Holder's fees and costs or constitute a waiver, release or discharge of any breach or default that has occurred in the performance of the obligations, agreements, covenants or warranties contained therein.

8.10 If this Escrow is terminated for any reason other than Seller's breach or default, then at Seller's request, and as a condition to the return of Buyer's deposit, Buyer shall within 5 days after written request deliver to Seller, at no charge, copies of all surveys, engineering studies, soil reports, maps, master plans, feasibility studies and other similar items prepared by or for Buyer that pertain to the Property. Provided, however, that Buyer shall not be required to deliver any such report if the written contract which Buyer entered into with the consultant who prepared such report specifically forbids the dissemination of the report to others.

9.   Contingencies to Closing.

9.1 The Closing of this transaction is contingent upon the satisfaction or waiver of the following contingencies. IF BUYER FAILS TO NOTIFY ESCROW HOLDER, IN WRITING, OF THE DISAPPROVAL OF ANY OF SAID CONTINGENCIES WITHIN THE TIME SPECIFIED THEREIN, IT SHALL BE CONCLUSIVELY PRESUMED THAT BUYER HAS APPROVED SUCH ITEM, MATTER OR DOCUMENT. Buyer's conditional approval shall constitute disapproval, unless provision is made by the Seller within the time specified therefore by the Buyer in such conditional approval or by this Agreement, whichever is later, for the satisfaction of the condition imposed by the Buyer. Escrow Holder shall promptly provide all Parties with copies of any written disapproval or conditional approval which it receives. With regard to subparagraphs (c) through (l) the pre-printed time periods shall control unless a different number of days is inserted in the spaces provided.

(a) Disclosure. Seller shall make to Buyer, through escrow, all of the applicable disclosures required by law (See American Industrial Real Estate Association ("AIR") standard form entitled "Seller's Mandatory Disclosure Statement") and provide Buyer with a completed Property Information Sheet ("Property Information Sheet") concerning the Property, duly executed by or on behalf of Seller in its current form or equivalent to that published by the AIR within 10 or _____ days following the Date of Agreement. Buyer has 10 days from the receipt of said disclosures to approve or disapprove the matters disclosed.

(b) Physical Inspection. Buyer has 10 or _____ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the physical aspects and size of the Property.

(c) Hazardous Substance Conditions Report. Buyer has 30 or _____ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the environmental aspects of the Property. Seller recommends that Buyer obtain a Hazardous Substance Conditions Report concerning the Property and relevant adjoining properties. Any such report shall be paid for by Buyer. A "Hazardous Substance" for purposes of this Agreement is defined as any substance whose nature and/or quantity of existence, use, manufacture, disposal or effect, render it subject to Federal, state or local regulation, investigation, remediation, removal or removal as potentially injurious to public health or welfare. A "Hazardous Substance Condition" for purposes of this Agreement is defined as the existence on, under or relevantly adjacent to the Property of a Hazardous Substance that would require remediation and/or removal under applicable Federal, state or local law.

(d) Soil Inspection. Buyer has 30 or _____ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the condition of the soils on the Property. Seller recommends that Buyer obtain a soil test report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any soils report that Seller may have within 10 days of the Date of Agreement.

(e) Governmental Approvals. Buyer has 30 or _____ days from the Date of Agreement to satisfy itself with regard to approvals and permits from governmental agencies or departments which have or may have jurisdiction over the Property and which Buyer deems necessary or desirable in connection with its intended use of the Property, including, but not limited to, permits and approvals required with respect to zoning, planning, building and safety, fire, police, handicapped and Americans with Disabilities Act requirements, transportation and environmental matters.

(f) Conditions of Title. Escrow Holder shall cause a current commitment for title insurance ("Title Commitment") concerning the Property issued by the Title Company, as well as legible copies of all documents referred to in the Title Commitment ("Underlying Documents") to be delivered to Buyer within 10 or _____ days following the Date of Agreement. Buyer has 10 days from the receipt of the Title Commitment and Underlying Documents to satisfy itself with regard to the condition of title. The disapproval of Buyer of any monetary encumbrance, which by the terms of this Agreement is not to remain against the Property after the Closing, shall not be considered a failure of this contingency, as Seller shall have the obligation, at Seller's expense, to satisfy and remove such disapproved monetary encumbrance at or before the Closing.

(g) Survey. Buyer has 30 or _____ days from the receipt of the Title Commitment and Underlying Documents to satisfy itself with regard to any ALTA title supplement based upon a survey prepared to American Land Title Association ("ALTA") standards for an owner's policy by a licensed surveyor, showing the legal description and boundary lines of the Property, any easements of record, and any improvements, poles, structures and things located within 10 feet of either side of the Property boundary lines. Any such survey shall be prepared at Buyer's direction and expense. If Buyer has obtained a survey and approved the ALTA title supplement, Buyer may elect within the period allowed for Buyer's approval of a survey to have an ALTA extended coverage owner's form of title policy, in which event Buyer shall pay any additional premium attributable thereto.

(h) Existing Leases and Tenancy Statements. Seller shall within 10 or _____ days of the Date of Agreement provide both Buyer and Escrow Holder with legible copies of all leases, subleases or rental arrangements (collectively, "Existing Leases") affecting the Property, and with a tenancy statement ("Estoppel Certificate") in the latest form or equivalent to that published by the AIR, executed by Seller and/or each tenant and subtenant of the Property. Seller shall use its best efforts to have each tenant complete and execute an Estoppel Certificate. If any tenant fails or refuses to provide an Estoppel Certificate then Seller shall complete and execute an Estoppel Certificate for that tenancy. Buyer has 10 days from the receipt of said Existing Leases and Estoppel Certificates to satisfy itself with regard to the Existing Leases and any other tenancy issues.

(i) Other Agreements. Seller shall within 10 or _____ days of the Date of Agreement provide Buyer with legible copies of all other agreements ("Other Agreements") known to Seller that will affect the Property after Closing. Buyer has 10 days from the receipt of said Other Agreements to satisfy itself with regard to such Agreements.

(j) Financing. If paragraph 5 hereof dealing with a financing contingency has been stricken, the satisfaction or waiver of such New Loan contingency.

(k) Existing Notes. If paragraph 3.1(c) has been stricken, then within 10 or _____ days of the Date of Agreement provide Buyer with legible copies of the Existing Notes, Existing Deeds of Trust and related agreements (collectively, "Loan Documents") to which the Property will remain subject after the Closing. Escrow Holder shall promptly request from the holders of the Existing Notes a beneficiary statement ("Beneficiary Statement") confirming: (1) the amount of the unpaid principal balance, the current interest rate, and the date to which interest is paid, and (2) the nature and amount of any impounds held by the beneficiary in connection with such loan. Buyer has 10 or _____ days from the receipt of the Loan Documents and Beneficiary Statements to satisfy itself with regard to such financing. Buyer's obligation to close is conditioned upon Buyer being able to purchase the Property without acceleration or change in the terms of any Existing Notes or charges to Buyer except as otherwise provided in this Agreement or approved by Buyer, provided, however, Buyer shall pay the transfer fee referred to in paragraph 3.2 hereof.

(l) Personal Property. In the event that any personal property is included in the Purchase Price, Buyer has 10 or _____ days from the Date of Agreement to satisfy itself with regard to the title condition of such personal property. Seller recommends that Buyer obtain a UCC-1 report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any liens or encumbrances affecting such personal property that it is aware of within 10 or _____ days of the Date of Agreement.

_____                                     _____
Initials                                                   Initials
2000 American Industrial Real Estate Association    Page 3 of 6                    Form OFA-4-8/00E

OTT_0001754

(m) *Destruction, Damage or Loss.* There shall not have occurred prior to the Closing, a destruction of, or damage or loss to, the Property or any portion thereof, from any cause whatsoever, which would cost more than $10,000.00 to repair or cure. If the cost of repair or cure is $10,000.00 or less, Seller shall repair or cure the loss prior to the Closing. Buyer shall have the option, within 10 days after receipt of written notice of a loss costing more than $10,000.00 to repair or cure, to either terminate this transaction or to purchase the Property notwithstanding such loss, but without deduction or offset against the Purchase Price. If the cost to repair or cure is more than $10,000.00, and Buyer does not elect to terminate this transaction, Buyer shall be entitled to any insurance proceeds applicable to such loss. Unless otherwise notified in writing, Escrow Holder shall assume no such destruction, damage or loss has occurred prior to Closing.

(n) *Material Change.* Buyer shall have 10 days following receipt of written notice of a Material Change within which to satisfy itself with regard to such change. "Material Change" shall mean a change in the status of the use, occupancy, tenants, or condition of the Property that occurs after the date of this offer and prior to the Closing. Unless otherwise notified in writing, Escrow Holder shall assume that no Material Change has occurred prior to the Closing.

(o) *Seller Performance.* The delivery of all documents and the due performance by Seller of each and every undertaking and agreement to be performed by Seller under this Agreement.

(p) *Warranties.* That each representation and warranty of Seller herein be true and correct as of the Closing. Escrow Holder shall assume that this condition has been satisfied unless notified to the contrary in writing by any Party prior to the Closing.

(q) *Brokerage Fee.* Payment at the Closing of such brokerage fee as is specified in this Agreement or later written instructions to Escrow Holder executed by Seller and Brokers ("Brokerage Fee"). It is agreed by the Parties and Escrow Holder that Brokers are a third party beneficiary of this Agreement insofar as the Brokerage Fee is concerned, and that no change shall be made with respect to the payment of the Brokerage Fee specified in this Agreement, without the written consent of Brokers.

9.2  All of the contingencies specified in subparagraphs (a) through (p) of paragraph 9.1 are for the benefit of, and may be waived by, Buyer, and may be elsewhere herein referred to as "Buyer Contingencies."

9.3  If any Buyer's Contingency or any other matter subject to Buyer's approval is disapproved as provided for herein in a timely manner ("Disapproved Item"), Seller shall have the right within 10 days following the receipt of notice of Buyer's disapproval to elect to cure such Disapproved Item prior to the Expected Closing Date ("Seller's Election"). Seller's failure to give to Buyer within such period, written notice of Seller's commitment to cure such Disapproved Item on or before the Expected Closing Date shall be conclusively presumed to be Seller's Election not to cure such Disapproved Item. If Seller elects, either by written notice or failure to give written notice, not to cure a Disapproved Item, Buyer shall have the election, within 10 days after Seller's Election to either accept (lie to the Property subject to such Disapproved Item, or to terminate this transaction. Buyer's failure to notify Seller in writing of Buyer's election to accept (lie to the Property subject to the Disapproved Item without deduction or offset shall constitute Buyer's election to terminate this transaction. Unless expressly provided otherwise herein, Seller's right to cure shall not apply to the remediation of Hazardous Substance Conditions or to the Financing Contingency. Unless the Parties mutually instruct otherwise, if the time periods for the satisfaction of contingencies or for Seller's and Buyer's said Elections would expire on a date after the Expected Closing Date, the Expected Closing Date shall be deemed extended for 3 business days following the expiration of: (a) the applicable contingency period(s), (b) the period within which the Seller may elect to cure the Disapproved Item, or (c) if Seller elects not to cure, the period within which Buyer may elect to proceed with this transaction, whichever is later.

9.4  Buyer understands and agrees that until such time as all Buyer's Contingencies have been satisfied or waived, Seller and/or its agents may solicit, entertain and/or accept back-up offers to purchase the subject Property.

9.5  The Parties acknowledge that extensive local, state and Federal legislation establish broad liability upon owners and/or users of real property for the investigation and remediation of Hazardous Substances. The determination of the existence of a Hazardous Substance Condition and the evaluation of the impact of such a condition are highly technical and beyond the expertise of Brokers. The Parties acknowledge that they have been advised by Brokers to consult their own technical and legal experts with respect to the possible presence of Hazardous Substances on this Property or adjoining properties, and Buyer and Seller are not relying upon any investigation by or statement of Brokers with respect thereto. The Parties hereby assume all responsibility for the impact of such Hazardous Substances upon their respective interests herein.

10.  **Documents Required as of before Closing:**

10.1  Five days prior to the Closing date Escrow Holder shall obtain an updated Title Commitment concerning the Property from the Title Company and provide copies thereof to each of the Parties.

10.2  Seller shall deliver to Escrow Holder in time for delivery to Buyer at the Closing:

(a)  Grant or general warranty deed, duly executed and in recordable form, conveying fee title to the Property to Buyer,

(b)  If applicable, the Beneficiary Statements concerning Existing Note(s),

(c)  If applicable, the Existing Leases and Other Agreements together with duly executed assignments thereof by Seller and Buyer. The assignment of Existing Leases shall be on the most recent Assignment and Assumption of Lessor's interest in Lease form published by the AIR or its equivalent.

(d)  If applicable, Estoppel Certificates executed by Seller and/or the tenant(s) of the Property. ,

(e)  An affidavit executed by Seller to the effect that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to Internal Revenue Service such sum as is required by applicable Federal law with respect to purchases from foreign sellers,

(f)  If the Property is located in California, an affidavit executed by Seller to the effect that Seller is not a "nonresident" within the meaning of California Revenue and Tax Code Section 18662 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to the Franchise Tax Board such sum as is required by such statute.

(g)  If applicable, a bill of sale, duly executed, conveying title to any included personal property to Buyer.

(h)  If the Seller is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the sale of the Property.

10.3  Buyer shall deliver to Seller through Escrow:

(a)  The cash portion of the Purchase Price and such additional sums as are required of Buyer under this Agreement shall be deposited by Buyer with Escrow Holder, by federal funds wire transfer, or any other method acceptable to Escrow Holder as immediately collectable funds, no later than 2:00 P.M. on the business day prior to the Expected Closing Date.

(b)  If a Purchase Money Note and Purchase Money Deed of Trust are called for by this Agreement, the duly executed originals of those documents, the Purchase Money Deed of Trust being in recordable form, together with evidence of fire insurance on the improvements in the amount of the full replacement cost naming Seller as a mortgage loss payee, and a real estate tax service contract (at Buyer's expense), assuring Seller of notice of the status of payment of real property taxes during the life of the Purchase Money Note.

(c)  The Assignment and Assumption of Lessor's interest in Lease form specified in paragraph 10.2(c) above, duly executed by Buyer.

(d)  Assumptions duly executed by Buyer of the obligations of Seller that accrue after Closing under any Other Agreements.

(e)  If applicable, a written assumption duly executed by Buyer of the loan documents with respect to Existing Notes.

(f)  If the Buyer is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the purchase of the Property.

10.4  At Closing, Escrow Holder shall cause to be issued to Buyer a standard coverage (or ALTA extended, if elected pursuant to 9.1(g)) owner's form policy of title insurance effective as of the Closing, issued by the Title Company in the full amount of the Purchase Price, insuring title to the Property to Buyer, subject only to the exceptions approved by Buyer. In the event there is a Purchase Money Deed of Trust in this transaction, the policy of title insurance shall be a joint protection policy insuring both Buyer and Seller.

IMPORTANT: IN A PURCHASE OR EXCHANGE OF REAL PROPERTY, IT MAY BE ADVISABLE TO OBTAIN TITLE INSURANCE IN CONNECTION WITH THE CLOSE OF ESCROW SINCE THERE MAY BE PRIOR RECORDED LIENS AND ENCUMBRANCES WHICH AFFECT YOUR INTEREST IN THE PROPERTY BEING ACQUIRED. A NEW POLICY OF TITLE INSURANCE SHOULD BE OBTAINED IN ORDER TO ENSURE YOUR INTEREST IN THE PROPERTY THAT YOU ARE ACQUIRING.

11.  **Prorations and Adjustments.**

11.1  *Taxes.* Applicable real property taxes and special assessment bonds shall be prorated through Escrow as of the date of the Closing, based upon the latest tax bill available. The Parties agree to prorate as of the Closing any taxes assessed against the Property by supplemental bill levied by reason of events occurring prior to the Closing. Payment of the prorated amount shall be made promptly in cash upon receipt of a copy of any supplemental bill.

11.2  *Insurance.* WARNING: Any insurance which Seller maintained will terminate on the Closing. Buyer is advised to obtain appropriate insurance to cover the Property.

11.3  *Rentals, Interest and Expenses.* Scheduled rentals, interest on Existing Notes, utilities, and operating expenses shall be prorated as of the date of Closing. The Parties agree to promptly adjust between themselves outside of Escrow any rents received after the Closing.

11.4  *Security Deposit.* Security Deposits held by Seller shall be given to Buyer as a credit to the cash required of Buyer at the Closing.

11.5  *Post Closing Matters.* Any item to be prorated that is not determined or determinable at the Closing shall be promptly adjusted by the Parties by

OTT_0001755

appropriate cash payment outside of the Escrow when the amount due is determined.

11.6 *Variations in Existing Note Balances.* In the event that Buyer is purchasing the Property subject to an Existing Deed of Trust(s), and in the event that a Beneficiary Statement as to the applicable Existing Note(s) discloses that the unpaid principal balance of such Existing Note(s) at the Closing will be more or less than the amount set forth in paragraph 3.1(c) hereof ("Existing Note Variation"), then the Purchase Money Note(s) shall be reduced or increased by an amount equal to such Existing Note Variation. If there is to be no Purchase Money Note, the cash required at the Closing per paragraph 3.1(a) shall be reduced or increased by the amount of such Existing Note Variation.

11.7 *Variations in New Loan Balance.* In the event Buyer is obtaining a New Loan and the amount ultimately obtained exceeds the amount set forth in paragraph 5.1, then the amount of the Purchase Money Note, if any, shall be reduced by the amount of such excess.

12.   **Representation and Warranties of Seller and Disclaimers.**

12.1 Seller's warranties and representations shall survive the Closing and delivery of the deed for a period of 3 years, and are true, material and relied upon by Buyer and Brokers in all respects. Seller hereby makes the following warranties and representations to Buyer and Brokers:

(a) *Authority of Seller.* Seller is the owner of the Property and/or has the full right, power and authority to sell, convey and transfer the Property to Buyer as provided herein, and to perform Seller's obligations hereunder.

(b) *Maintenance During Escrow and Equipment Condition At Closing.* Except as otherwise provided in paragraph 9.1(m) hereof, Seller shall maintain the Property until the Closing in its present condition, ordinary wear and tear excepted. The HVAC, plumbing, elevators, loading doors and electrical systems shall be in good operating order and condition at the time of Closing.

(c) *Hazardous Substances/Storage Tanks.* Seller has no knowledge, except as otherwise disclosed to Buyer in writing, of the existence or prior existence on the Property of any Hazardous Substance, nor of the existence or prior existence of any above or below ground storage tank.

(d) *Compliance.* Seller has no knowledge of any aspect or condition of the Property which violates applicable laws, rules, regulations, codes or covenants, conditions or restrictions, or of improvements or alterations made to the Property without a permit where one was required, or of any unfulfilled order or directive of any applicable governmental agency or casualty insurance company requiring any investigation, remediation, repair, maintenance or improvement be performed on the Property.

(e) *Changes in Agreements.* Prior to the Closing, Seller will not violate or modify any Existing Lease or Other Agreement, or create any new leases or other agreements affecting the Property, without Buyer's written approval, which approval will not be unreasonably withheld.

(f) *Possessory Rights.* Seller has no knowledge that anyone will, at the Closing, have any right to possession of the Property, except as disclosed by this Agreement or otherwise in writing to Buyer.

(g) *Mechanics' Liens.* There are no unsatisfied mechanics' or materialmen's lien rights concerning the Property.

(h) *Actions, Suits or Proceedings.* Seller has no knowledge of any actions, suits or proceedings pending or threatened before any commission, board, bureau, agency, arbitrator, court or tribunal that would affect the Property or the right to occupy or utilize same.

(i) *Notice of Changes.* Seller will promptly notify Buyer and Brokers in writing of any Material Change (see paragraph 9.1(n)) affecting the Property that becomes known to Seller prior to the Closing.

(j) *No Tenant Bankruptcy Proceedings.* Seller has no notice or knowledge that any tenant of the Property is the subject of a bankruptcy or insolvency proceeding.

(k) *No Seller Bankruptcy Proceedings.* Seller is not the subject of a bankruptcy, insolvency or probate proceeding.

(l) *Personal Property.* Seller has no knowledge that anyone will, at the Closing, have any right to possession of any personal property included in the Purchase Price nor knowledge of any liens or encumbrances affecting such personal property, except as disclosed by this Agreement or otherwise in writing to Buyer.

12.2 Buyer hereby acknowledges that, except as otherwise stated in this Agreement, Buyer is purchasing the Property in its existing condition and will, by the time called for herein, make or have waived all inspections of the Property Buyer believes are necessary to protect its own interest in, and its contemplated use of, the Property. The Parties acknowledge that, except as otherwise stated in this Agreement, no representations, inducements, promises, agreements, assurances, oral or written, concerning the Property, or any aspect of the occupational safety and health laws, Hazardous Substance laws, or any other act, ordinance or law, have been made by either Party or Brokers, or relied upon by either Party hereto.

12.3 In the event that Buyer learns that a Seller representation or warranty might be untrue prior to the Closing, and Buyer elects to purchase the Property anyway then, and in that event, Buyer waives any right that it may have to bring an action or proceeding against Seller or Brokers regarding said representation or warranty.

12.4 Any environmental reports, soils reports, surveys, and other similar documents which were prepared by third party consultants and provided to Buyer by Seller or Seller's representatives, have been delivered as an accommodation to Buyer and without any representation or warranty as to the sufficiency, accuracy, completeness, and/or validity of said documents, all of which Buyer relies on at its own risk. Buyer believes said documents to be accurate, but Buyer is advised to retain appropriate consultants to review said documents and investigate the Property.

13.   **Possession.**

Possession of the Property shall be given to Buyer at the Closing subject to the rights of tenants under Existing Leases.

14.   **Buyer's Entry.**

At any time during the Escrow period, Buyer, and its agents and representatives, shall have the right at reasonable times and subject to rights of tenants, to enter upon the Property for the purpose of making inspections and tests specified in this Agreement. No destructive testing shall be conducted, however, without Seller's prior approval which shall not be unreasonably withheld. Following any such entry or work, unless otherwise directed in writing by Seller, Buyer shall return the Property to the condition it was in prior to such entry or work, including the recompaction or removal of any disrupted soil or material as Seller may reasonably direct. All such inspections and tests and any other work conducted or materials furnished with respect to the Property by or for Buyer shall be paid for by Buyer as and when due and Buyer shall indemnify, defend, protect and hold harmless Seller and the Property of and from any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), damages, including those for injury to person or property, arising out of or relating to any such work or materials or the acts or omissions of Buyer, its agents or employees in connection therewith.

15.   **Further Documents and Assurances.**

The Parties shall each, diligently and in good faith, undertake all actions and procedures reasonably required to place the Escrow in condition for Closing as and when required by this Agreement. The Parties agree to provide all further information, and to execute and deliver all further documents, reasonably required by Escrow Holder or the Title Company.

16.   **Attorneys' Fees.**

If any Party or Broker brings an action or proceeding (including arbitration) involving the Property whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.

17.   **Prior Agreements/Amendments.**

17.1 This Agreement supersedes any and all prior agreements between Seller and Buyer regarding the Property.

17.2 Amendments to this Agreement are effective only if made in writing and executed by Buyer and Seller.

18.   **Broker's Rights.**

18.1 If this sale is not consummated due to the default of either the Buyer or Seller, the defaulting Party shall be liable to and shall pay to Brokers the Brokerage Fee that Brokers would have received had the sale been consummated. If Buyer is the defaulting party, payment of said Brokerage Fee is in addition to any obligation with respect to liquidated or other damages.

18.2 Upon the Closing, Brokers are authorized to publicize the facts of this transaction.

19.   **Notices.**

19.1 Whenever any Party, Escrow Holder or Brokers herein shall desire to give or serve any notice, demand, request, approval, disapproval or other communication, each such communication shall be in writing and shall be delivered personally, by messenger or by mail, postage prepaid, to the address set forth in this Agreement or by facsimile transmission.

19.2 Service of any such communication shall be deemed made on the date of actual receipt if personally delivered. Any such communication sent by regular mail shall be deemed given 48 hours after the same is mailed. Communications sent by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed delivered 24 hours after delivery of the same to the Postal Service or courier. Communications transmitted by facsimile transmission shall be deemed delivered upon telephonic confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If such communication is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

19.3 Any Party or Broker hereto may from time to time, by notice in writing, designate a different address to which, or a different person or additional persons to whom, all communications are thereafter to be made.

20.   **Duration of Offer.**

20.1 If this offer is not accepted by Seller on or before 5:00 P.M. according to the time standard applicable to the city of

---

Initials _____

2000-American Industrial Real Estate Association

Initials _____

Form OFA-4-8/00E

OTT 0001756

Los Angeles _____ on the date of January 9, 2013 _____, it shall be deemed automatically revoked.

20.2 The acceptance of this offer, or of any subsequent counteroffer hereto, that creates an agreement between the Parties as described in paragraph 1.2, shall be deemed made upon delivery to the other Party or either Broker herein of a duly executed writing unconditionally accepting the last outstanding offer or counteroffer.

21. LIQUIDATED DAMAGES. *(This Liquidated Damages paragraph is applicable only if initialed by both Parties.)*
THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO SIGNING THIS AGREEMENT, THE ACTUAL DAMAGES WHICH WOULD BE SUFFERED BY SELLER IF BUYER FAILS TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT. THEREFORE, IF, AFTER THE SATISFACTION OR WAIVER OF ALL CONTINGENCIES PROVIDED FOR THE BUYER'S BENEFIT, BUYER BREACHES THIS AGREEMENT, SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF $ 38,400.00 _____. UPON PAYMENT OF SAID SUM TO SELLER, BUYER SHALL BE RELEASED FROM ANY FURTHER LIABILITY TO SELLER, AND ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES SHALL BE PAID BY SELLER.

_____ Buyer Initials          _____ Seller Initials

22. ARBITRATION OF DISPUTES. *(This Arbitration of Disputes paragraph is applicable only if initialed by both Parties.)*
22.1   ANY CONTROVERSY AS TO WHETHER SELLER IS ENTITLED TO THE LIQUIDATED DAMAGES AND/OR BUYER IS ENTITLED TO THE RETURN OF DEPOSIT MONEY, SHALL BE DETERMINED BY BINDING ARBITRATION BY, AND UNDER THE COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("COMMERCIAL RULES"). ARBITRATION HEARINGS SHALL BE HELD IN THE COUNTY WHERE THE PROPERTY IS LOCATED. ANY SUCH CONTROVERSY SHALL BE ARBITRATED BY 3 ARBITRATORS WHO SHALL BE IMPARTIAL REAL ESTATE BROKERS WITH AT LEAST 5 YEARS OF FULL TIME EXPERIENCE IN BOTH THE AREA WHERE THE PROPERTY IS LOCATED AND THE TYPE OF REAL ESTATE THAT IS THE SUBJECT OF THIS AGREEMENT. THEY SHALL BE APPOINTED UNDER THE COMMERCIAL RULES. THE ARBITRATORS SHALL HEAR AND DETERMINE SAID CONTROVERSY IN ACCORDANCE WITH APPLICABLE LAW, THE INTENTION OF THE PARTIES AS EXPRESSED IN THIS AGREEMENT AND ANY AMENDMENTS THERETO, AND UPON THE EVIDENCE PRODUCED AT AN ARBITRATION HEARING. PRE-ARBITRATION DISCOVERY SHALL BE PERMITTED IN ACCORDANCE WITH THE COMMERCIAL RULES OR STATE LAW APPLICABLE TO ARBITRATION PROCEEDINGS. THE AWARD SHALL BE EXECUTED BY AT LEAST 2 OF THE 3 ARBITRATORS, BE RENDERED WITHIN 30 DAYS AFTER THE CONCLUSION OF THE HEARING, AND MAY INCLUDE ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY PER PARAGRAPH 16 HEREOF. JUDGMENT MAY BE ENTERED ON THE AWARD IN ANY COURT OF COMPETENT JURISDICTION NOTWITHSTANDING THE FAILURE OF A PARTY DULY NOTIFIED OF THE ARBITRATION HEARING TO APPEAR THEREAT.
22.2   BUYER'S RESORT TO OR PARTICIPATION IN SUCH ARBITRATION PROCEEDINGS SHALL NOT BAR SUIT IN A COURT OF COMPETENT JURISDICTION BY THE BUYER FOR INJUNCTION AND/OR SPECIFIC PERFORMANCE UNLESS AND UNTIL THE ARBITRATION RESULTS IN AN AWARD TO THE SELLER OF LIQUIDATED DAMAGES, IN WHICH EVENT SUCH AWARD SHALL ACT AS A BAR AGAINST ANY ACTION BY BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE.
22.3   NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.

_____ Buyer Initials          _____ Seller Initials

23. Miscellaneous.
23.1   Binding Effect.   This Agreement shall be binding on the Parties without regard to whether or not paragraphs 21 and 22 are initialed by both of the Parties. Paragraphs 21 and 22 are each incorporated into this Agreement only if initialed by both Parties at the time that the Agreement is executed.
23.2   Applicable Law.   This Agreement shall be governed by, and paragraph 22.3 is amended to refer to, the laws of the state in which the Property is located.
23.3   Time of Essence.   Time is of the essence of this Agreement.
23.4   Counterparts.   This Agreement may be executed by Buyer and Seller in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Escrow Holder, after verifying that the counterparts are identical except for the signatures, is authorized and instructed to combine the signed signature pages on one of the counterparts, which shall then constitute the Agreement.
23.5   Waiver of Jury Trial.   THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.
23.6   Conflict.   Any conflict between the printed provisions of this Agreement and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.
24. Disclosures Regarding The Nature of a Real Estate Agency Relationship.
24.1   The Parties and Brokers agree that their relationship(s) shall be governed by the principles set forth in the applicable sections of the California Civil Code, as summarized in paragraph 24.2.
24.2   When entering into a discussion with a real estate agent regarding a real estate transaction, a Buyer or Seller should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Buyer and Seller acknowledge being advised by the Brokers in this transaction, as follows:
(a) Seller's Agent. A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or subagent has the following affirmative obligations: (1) To the Seller: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Seller. (2) To the Buyer and the Seller. a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.
(b) Buyer's Agent. A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the

_____ Initials          Page 6 of 8          _____ Initials
2000-American Industrial Real Estate Association          Form OFA-4-8/00E

OTT  0001757

Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations. (1) To the Buyer: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Buyer. (2) To the Buyer and the Seller: a. Diligent exercise of reasonable skill and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(c) Agent Representing Both Seller and Buyer. A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer. (1) In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Seller or the Buyer. b. Other duties to the Seller and the Buyer as stated above in their respective sections (a) or (b) of this paragraph 24.2. (2) In representing both Seller and Buyer, the agent may not without the express permission of the respective Party, disclose to the other Party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered. (3) The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect their own interests. Buyer and Seller should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(d) Further Disclosures. Throughout this transaction Buyer and Seller may receive more than one disclosure, depending upon the number of agents assisting in the transaction. Buyer and Seller should each read its contents each time it is presented, considering the relationship between them and the real estate agent in this transaction and that disclosure. Brokers have no responsibility with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees), of any Broker with respect to any breach of duty, error or omission relating to this Agreement shall not exceed the fee received by such Broker pursuant to this Agreement; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

24.3 Confidential Information. Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

25.   Construction of Agreement. In construing this Agreement, all headings and titles are for the convenience of the parties only and shall not be considered a part of this Agreement. Whenever required by the context, the singular shall include the plural and vice versa. Unless otherwise specifically indicated to the contrary, the word "days" as used in this Agreement shall mean and refer to calendar days. This Agreement shall not be construed as if prepared by one of the parties, but rather according to its fair meaning as a whole, as if both parties had prepared it.

26   Additional Provisions:

Additional provisions of this offer, if any, are as follows or are attached hereto by an addendum consisting of paragraphs __27__ through __27__ .   (If there are no additional provisions write "NONE".)

__27.__ This offer may be withdrawn on or before January 28th, 2013, after Twenty Three(23) days of due diligence
_____ on the feasibility study for company plans.
_____
_____
_____
_____
_____
_____

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS AGREEMENT OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1.   SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS AGREEMENT.
2.   RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PROPERTY. SAID INVESTIGATION SHOULD   3   INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PROPERTY, THE INTEGRITY AND CONDITION OF ANY STRUCTURES AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE.

WARNING: IF THE PROPERTY IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THIS AGREEMENT MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED.

NOTE:
1.   THIS FORM IS NOT FOR USE IN CONNECTION WITH THE SALE OF RESIDENTIAL PROPERTY.
2.   IF THE BUYER IS A CORPORATION, IT IS RECOMMENDED THAT THIS AGREEMENT BE SIGNED BY TWO CORPORATE OFFICERS.
The undersigned Buyer offers and agrees to buy the Property on the terms and conditions stated and acknowledges receipt of a copy hereof.

BROKER:
Solomon Realty & Investment
_____
Attn: Austin Kim
Title:
Address: 3807 Wilshire Blvd.   Suite 612
_____ Los Angeles,  CA 90010
Telephone:   213-386-9300
Facsimile:   213-386-0900
Federal ID No.  DRE Lic # 01340203

BUYER:
Nooman K. Husain, P.C.
By: _Stephen Kang, P.L.L.C._
Date: January 4, 2013
Name Printed:  Stephen Kang, P.L.L.C.
Title: Attorney at Law
Telephone/Facsimile:   713-621-8900

By: _____
Date: _____
Name Printed: _____
Title: _____
Address: _____

Telephone/Facsimile: _____
Federal ID No. _____

OTT  0001758

27.  Acceptance.

27.1  Seller accepts the foregoing offer to purchase the Property and hereby agrees to sell the Property to Buyer on the terms and conditions therein specified.

27.2  Seller acknowledges that Brokers have been retained to locate a Buyer and are the procuring cause of the purchase and sale of the Property set forth in this Agreement. In consideration of real estate brokerage service rendered by Brokers, Seller agrees to pay Brokers a real estate Brokerage Fee in a sum equal to _____ % of the Purchase Price divided in such shares as said Brokers shall direct in writing. This Agreement shall serve as an irrevocable instruction to Escrow Holder to pay such Brokerage Fee to Brokers out of the proceeds accruing to the account of Seller at the Closing.

27.3  Seller acknowledges receipt of a copy hereof and authorizes Brokers to deliver a signed copy to Buyer.

NOTE: A PROPERTY INFORMATION SHEET IS REQUIRED TO BE DELIVERED TO BUYER BY SELLER UNDER THIS AGREEMENT.

BROKER:                                                SELLER:

_____        _____

_____        _____
3

Attn: _____        By: _____

Title: _____        Date: _____

Address: _____        Name Printed: _____

_____        Title: _____

Telephone: _____        Telephone/Facsimile: _____

Facsimile: _____        By: _____

Federal ID No. _____        Date: _____

                                                          Name Printed: _____

                                                          Title: _____

                                                          Address: _____

                                                          _____

                                                          Telephone/Facsimile: _____

                                                          Federal ID No. _____

These terms are often modified to meet changing requirements of law and needs of the industry. Always write or call to make sure you are utilizing the most current form. American Industrial Real Estate Association, 700 South Flower Street, Suite 600, Los Angeles, CA 90017. (213) 687-8777.

©Copyright 2000-By American Industrial Real Estate Association.   All rights reserved.
No part of these works may be reproduced in any form without permission in writing.

OTT  0001759



**STANDARD OFFER, AGREEMENT AND ESCROW**
**INSTRUCTIONS FOR PURCHASE OF REAL ESTATE**
*(Non-Residential)*
American Industrial Real Estate Association

January 10, 2014
(Date for Reference Purposes)

**1.   Buyer.**

1.1   **Young & Husain, PLLC, with assignment to third party entity under POA, to be amended 1/10/2014**   ("Buyer") hereby offers to purchase the real property, hereinafter described, from the owner thereof ("Seller") (collectively, the "Parties" or individually, a "Party"), through an escrow ("Escrow") to close on **or before Three (3) days after the expiration of the Contingency Period(March 15, 2014)** ("Expected Closing Date") to be held by **escrow account to be held under above POA per escrow instructions**   ("Escrow Holder") whose address is **28202 Cabot Rd., Ste. 300, Laguna Niguel, CA, 92677**

_____, Phone No. **(949) 395-5628**_____, Facsimile No. **(949) 460-4518**_____ upon the terms and conditions set forth in this agreement ("Agreement"). Buyer shall have the right to assign Buyer's rights hereunder, but any such assignment shall not relieve Buyer of Buyer's obligations herein unless Seller expressly releases Buyer.

1.2   The term "Date of Agreement" as used herein shall be the date when by execution and delivery (as defined in paragraph 20.2) of this document or a subsequent counteroffer thereto, Buyer and Seller have reached agreement in writing whereby Seller agrees to sell, and Buyer agrees to purchase, the Property upon terms accepted by both Parties.

**2.   Property.**

2.1 The real property ("Property") that is the subject of this offer consists of (insert a brief physical description) _____
**Approximately 37,588 square feet land**

Is located in the City of **Gardena**_____, County of **Los Angeles**_____

State of **California**____, is commonly known by the street address of **1651 W. 130th St.**_____

**Gardena  CA 90249**

and is legally described as: **to be furnished in escrow**

(APN: **6102-001-017 (Lot No. 25)**____ ).

2.2   If the legal description of the Property is not complete or is inaccurate, this Agreement shall not be invalid and the legal description shall be completed or corrected to meet the requirements of **Lawyers Title (Orange County Licensor Keife Gorman)**_____ ("Title Company"), which shall issue the title policy hereinafter described.

2.3 The Property includes, at no additional cost to Buyer, the permanent improvements thereon, including those items which the pursuant to applicable law are a part of the property, as well as the following items, if any, owned by Seller and at present located on the Property: electrical distribution systems (power panel, bus ducting, conduits, disconnects, lighting fixtures); telephone distribution systems (lines, jacks and connections only); space heaters; heating, ventilating, air conditioning equipment ("HVAC"); air lines; fire sprinkler systems; security and fire detection systems; carpets; window coverings; wall coverings; and **N/A**

_____ (collectively, the "Improvements").

2.4   The fire sprinkler monitor: ☐ is owned by Seller and included in the Purchase Price, or ☐ is leased by Seller, and Buyer will need to negotiate a new lease with the fire monitoring company.

2.5   Except as provided in Paragraph 2.3, the Purchase Price does not include Seller's personal property, furniture and furnishings, and **N/A**

**3.   Purchase Price.**

3.1 The purchase price ("Purchase Price") to be paid by Buyer to Seller for the Property shall be
$ **890,000.00**_____, payable as follows:

|  |  |  |  |
|---|---|---|---|
| (a) | Cash down payment, including the Deposit as defined in paragraph 4.3 (or if an all cash transaction, the Purchase Price); | | $ **890,000.00** |
| **(Strike if not applicable)** | (b)   Amount of "New Loan" as defined in paragraph 5.1, if any; | | $ _____ |
| | ~~(c)   Buyer shall take title to the Property subject to the following existing deed(s) of trust ("Existing Deed(s) of Trust") securing the existing promissory note(s) ("Existing Note(s)"):~~ | | |
| | ~~(i)   An Existing Note ("First Note") with an unpaid principal balance as of the Closing of approximately:~~ | | $ _____ |
| **(Strike if not applicable)** | ~~Said First Note is payable at $ _____ per month,~~ ~~including interest at the rate of _____ %~~ ~~per annum until paid (and/or the~~ ~~entire unpaid balance is due on _____ );~~ | | |
| | ~~(ii)   An Existing Note ("Second Note") with an unpaid principal balance as of the Closing of approximately:~~ | | $ _____ |
| | ~~Said Second Note is payable at $ _____ per month,~~ ~~including interest at the rate of _____ %~~ ~~per annum until paid (and/or the~~ ~~entire unpaid balance is due on _____ );~~ | | |
| **(Strike if not applicable)** | ~~(d)   Buyer shall give Seller a deed of trust ("Purchase Money Deed of Trust") on the~~ ~~Property, to secure the promissory note of Buyer to Seller described in paragraph 6~~ ~~("Purchase Money Note") in the amount of:~~ | | $ _____ |
| | Total Purchase Price: | | $ **890,000.00** |

3.2   ~~If Buyer is taking title to the Property subject to, or assuming, and Existing Deed of Trust and such deed of trust permits the beneficiary to demand payment of fees including, but not limited to, points, processing fees, and appraisal fees as a condition to the transfer of the Property, Buyer agrees to pay such fees up to a maximum of 1.5% of the unpaid principal balance of the applicable Existing Note.~~

_____        _EC_
Initials                                    Page 1 of 8                                    Initials
2000 American Industrial Real Estate Association                                          Form OFA-4-6/00E

OTT_0006025

4.  Deposits.
4.1  ☐  Buyer has delivered to Broker a check in the sum of $ _N.A._____, payable to Escrow Holder, to be held by Broker until both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder, or ☑ Buyer shall deliver to Escrow Holder a check in the sum of $ _20,000.00_ when both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder. When cashed, the check shall be deposited into the Escrow's trust account to be applied toward the Purchase Price of the Property at the Closing. Should Buyer and Seller not enter into an agreement for purchase and sale, Buyer's check or funds shall, upon request by Buyer, be promptly returned to Buyer.

4.2  Additional deposits:
(a) Within 5 business days after the Date of Agreement, Buyer shall deposit with Escrow Holder the additional sum of $ _670,000.00_ to be applied to the Purchase Price at the Closing.
(b) Within a business days after the contingencies discussed in paragraph 9.1 (a) through (k) are approved or waived, Buyer shall deposit with Escrow Holder the additional sum of $ _200,000.00_ to be applied to the Purchase Price at the Closing.

4.3  Escrow Holder shall deposit the funds deposited with it by Buyer pursuant to paragraphs 4.1 and 4.2 (collectively the "Deposit"), in a State or Federally chartered bank in an interest bearing account whose term is appropriate and consistent with the timing requirements of this transaction. The Interest therefrom shall accrue to the benefit of Buyer, who hereby acknowledges that there may be penalties or interest forfeitures if the applicable instrument is redeemed prior to its specified maturity. Buyer's Federal Tax Identification Number is _to be provided by 1/20/2014_ . NOTE: Such interest bearing account cannot be opened until Buyer's Federal Tax Identification Number is provided.

5.  Financing Contingency. (Strike if not applicable)
5.1  This offer is contingent upon Buyer obtaining from an insurance company, financial institution or other lender, a commitment to lend to Buyer a sum equal to at least _N.A._ % of the Purchase Price, at terms reasonably acceptable to Buyer. Such loan ("New Loan") shall be secured by a first trust or mortgage on the Property. If this Agreement provides for Seller to carry back junior financing, then Seller shall have the right to approve the terms of the New Loan. Seller shall have 7 days from receipt of the commitment setting forth the proposed terms of the New Loan to approve or disapprove of such proposed terms. If Seller fails to notify Escrow Holder, in writing, of its disapproval within said 7 days it shall be conclusively presumed that Seller has approved the terms of the New Loan.

5.2  Buyer hereby agrees to diligently pursue obtaining the New Loan. If Buyer shall fail to notify its Broker, Escrow Holder and Seller, in writing within _N.A._ days following the Date of Agreement, that the New Loan has not been obtained, it shall be conclusively presumed that Buyer has either obtained said New Loan or has waived this New Loan contingency.

5.3  If, after due diligence, Buyer shall notify its Broker, Escrow Holder and Seller, in writing, within the time specified in paragraph 5.2 hereof, that Buyer has not obtained said New Loan, this Agreement shall be terminated, and Buyer shall be entitled to the prompt return of the Deposit, plus any interest earned thereon, less only Escrow Holder and Title Company cancellation fees and costs, which Buyer shall pay.

6.  ~~Seller Financing. (Purchase Money Note). (Strike if not applicable)~~
~~6.1  The Purchase Money Note shall provide for interest on unpaid principal at the rate of  N/A  % per annum, with principal and interest paid as follows:~~

~~_____~~
~~_____~~
~~_____~~

~~; The Purchase Money Note and Purchase Money Deed of Trust shall be on the current forms commonly used by Escrow Holder, and be junior and subordinate only to the Existing Note(s) and/or the New Loan expressly called for by this Agreement.~~
~~6.2  The Purchase Money Note and/or the Purchase Money Deed of Trust shall contain provisions regarding the following (see also paragraph 19.3 (b)):~~
~~(a)  Prepayment. Principal may be prepaid in whole or in part at any time without penalty, at the option of the Buyer.~~
~~(b)  Late Charge. A late charge of 6% shall be payable with respect to any payment of principal, interest, or other charges, not made within 10 days after its due.~~
~~(c)  Due On Sale. In the event the Buyer sells or transfers title to the Property or any portion thereof, then the Seller may, at Seller's option, require the entire unpaid balance of said Note to be paid in full.~~
~~6.3  If the Purchase Money Deed of Trust is to be subordinate to other financing, Escrow Holder shall, at Buyer's expense, prepare and record on Seller's behalf a request for notice of default and/or sale with regard to each mortgage or deed of trust to which it will be subordinate.~~
~~6.4  WARNING: CALIFORNIA LAW DOES NOT ALLOW DEFICIENCY JUDGEMENTS ON SELLER FINANCING. IF BUYER ULTIMATELY DEFAULTS ON THE LOAN, SELLER'S SOLE REMEDY IS TO FORECLOSE ON THE PROPERTY.~~

7.  Real Estate Brokers.
7.1  The following real estate broker(s) ("Brokers") and brokerage relationships exist in this transaction and are consented to by the Parties (check the applicable boxes):

☑  _Eram Keeligan, Licensed Broker, Gunnies & Atkinson_____ represents Seller exclusively ("Seller's Broker");

☑  _Stephen Kang, PLLC (no fee representation)_____ represents Buyer exclusively ("Buyer's Broker"); or

☐  _____ represents both Seller and Buyer ("Dual Agency").

The Parties acknowledge that Brokers are the procuring cause of this Agreement. See paragraph 24 for disclosures regarding the nature of a real estate agency relationship. Buyer shall use the services of Buyer's Broker exclusively in connection with any and all negotiations and offers with respect to the Property for a period of 1 year from the Date of Agreement.

7.2  Buyer and Seller each represent and warrant to the other that he/she/it has had no dealings with any person, firm, broker or finder in connection with the negotiation of this Agreement and/or the consummation of the purchase and sale contemplated herein, other than the Brokers named in paragraph 7.1, and no broker or other person, firm or entity, other than said Brokers is/are entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of such Party. Buyer and Seller do each hereby agree to indemnify, defend, protect and hold the other harmless from and against any costs, expenses or liability for compensation, commission or charges which may be claimed by any broker, finder or other similar party, other than said named Brokers by reason of any dealings or act of the indemnifying Party.

8.  Escrow and Closing.
8.1  Upon acceptance hereof by Seller, this Agreement, including any counter-offers incorporated herein by the Parties, shall constitute not only the agreement of purchase and sale between Buyer and Seller, but also instructions to Escrow Holder for the consummation of the Agreement through the Escrow. Escrow Holder shall not prepare any further escrow instructions restating or amending the Agreement unless specifically so instructed by the Parties or a Broker herein. Subject to the reasonable approval of the Parties, Escrow Holder may, however, include its standard general escrow provisions.

8.2  As soon as practical after the receipt of this Agreement and any relevant counteroffers, Escrow Holder shall ascertain the Date of Agreement as defined in paragraphs 1.2 and 20.2 and advise the Parties and Brokers, in writing, of the date so ascertained.

8.3  Escrow Holder is hereby authorized and instructed to conduct the Escrow in accordance with this Agreement, applicable law and custom and practice of the community in which Escrow Holder is located, including any reporting requirements of the Internal Revenue Code. In the event of a conflict between the law of the state where the Property is located and the law of the state where Escrow Holder is located, the law of the state where the Property is located shall prevail.

8.4  Subject to satisfaction of the contingencies herein described, Escrow Holder shall close this escrow (the "Closing") by recording a general warranty deed (a grant deed in California) and the other documents required to be recorded, and by disbursing the funds and documents in accordance

with this Agreement.

8.5 Buyer and Seller shall each pay one-half of the Escrow Holder's charges and Seller shall pay the usual recording fees and any required documentary transfer taxes. Seller shall pay the premium for a standard coverage owner's or joint protection policy of title insurance.

8.6 Escrow Holder shall verify that all of Buyer's contingencies have been satisfied or waived prior to Closing. The matters contained in paragraphs 9.1 subparagraphs (b), (c), (d), (e), (g), (h), and (o), 9.4, 9.5, 12, 13, 14, 16, 18, 20, 21, 22, and 24 are, however, matters of agreement between the Parties only and are not instructions to Escrow Holder.

8.7 If this Escrow is terminated for non-satisfaction and non-waiver of a Buyer's Contingency, as defined in paragraph 9.2, then neither of the Parties shall thereafter have any liability to the other under this Agreement, except to the extent of a breach of any affirmative covenant or warranty in this Agreement. In the event of such termination, Buyer shall be promptly refunded all funds deposited by Buyer with Escrow Holder, less only Title Company and Escrow Holder cancellation fees and costs, all of which shall be Buyer's obligation.

8.8 The Closing shall occur on the Expected Closing Date, or as soon thereafter as the Escrow is in condition for Closing; provided, however, that if the Closing does not occur by the Expected Closing Date and said Date is not extended by mutual instructions of the Parties, a Party not then in default under this Agreement may notify the other Party, Escrow Holder, and Brokers, in writing that, unless the Closing occurs within 5 business days following said notice, the Escrow shall be deemed terminated without further notice or instructions.

8.9 Except as otherwise provided herein, the termination of Escrow shall not relieve or release either Party from any obligation to pay Escrow Holder's fees and costs or constitute a waiver, release or discharge of any breach or default that has occurred in the performance of the obligations, agreements, covenants or warranties contained therein.

8.10 If this Escrow is terminated for any reason other than Seller's breach or default, then at Seller's request, and as a condition to the return of Buyer's deposit, Buyer shall within 5 days after written request deliver to Seller, at no charge, copies of all surveys, engineering studies, soil reports, maps, master plans, feasibility studies and other similar items prepared by or for Buyer that pertain to the Property. Provided, however, that Buyer shall not be required to deliver any such report if the written contract which Buyer entered into with the consultant who prepared such report specifically forbids the dissemination of the report to others.

9. Contingencies to Closing.

9.1 The Closing of this transaction is contingent upon the satisfaction or waiver of the following contingencies. IF BUYER FAILS TO NOTIFY ESCROW HOLDER, IN WRITING, OF THE DISAPPROVAL OF ANY OF SAID CONTINGENCIES WITHIN THE TIME SPECIFIED THEREIN, IT SHALL BE CONCLUSIVELY PRESUMED THAT BUYER HAS APPROVED SUCH ITEM, MATTER OR DOCUMENT. Buyer's conditional approval shall constitute disapproval, unless provision is made by the Seller within the time specified therefore by the Buyer in such conditional approval or by this Agreement, whichever is later, for the satisfaction of the condition imposed by the Buyer. Escrow Holder shall promptly provide all Parties with copies of any written disapproval or conditional approval which it receives. With regard to subparagraphs (e) through (l) the pre-printed time periods shall control unless a different number of days is inserted in the spaces provided.

(a) Disclosure. Seller shall make to Buyer, through escrow, all of the applicable disclosures required by law (See American Industrial Real Estate Association ("AIR") standard form entitled "Seller's Mandatory Disclosure Statement") and provide Buyer with a completed Property Information Sheet ("Property Information Sheet") concerning the Property, duly executed by or on behalf of Seller in its current form or equivalent to that published by the AIR within 10 or _____ days following the Date of Agreement. Buyer has 10 days from the receipt of said disclosures to approve or disapprove the matters disclosed.

(b) Physical Inspection. Buyer has 10 or _____ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the physical aspects and size of the Property.

(c) Hazardous Substance Conditions Report. Buyer has 30 or _____ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the environmental aspects of the Property. Seller recommends that Buyer obtain a Hazardous Substance Conditions Report concerning the Property and relevant adjoining properties. Any such report shall be paid for by Buyer. A "Hazardous Substance" for purposes of this Agreement is defined as any substance whose nature and/or quantity of existence, use, manufacture, disposal or effect, render it subject to Federal, state or local regulation, investigation, remediation or removal as potentially injurious to public health or welfare. A "Hazardous Substance Condition" for purposes of this Agreement is defined as the existence on, under or relevantly adjacent to the Property of a Hazardous Substance that would require remediation and/or removal under applicable Federal, state or local law.

(d) Soil Inspection. Buyer has 30 or _____ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the condition of the soils on the Property. Seller recommends that Buyer obtain a soil test report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any soils report that Seller may have within 10 days of the Date of Agreement.

(e) Governmental Approvals. Buyer has 30 or _____ days from the Date of Agreement to satisfy itself with regard to approvals and permits from governmental agencies or departments which have or may have jurisdiction over the Property and which Buyer deems necessary or desirable in connection with its intended use of the Property, including, but not limited to, permits and approvals required with respect to zoning, planning, building and safety, fire, police, handicapped and Americans with Disabilities Act requirements, transportation and environmental matters.

(f) Conditions of Title. Escrow Holder shall cause a current commitment for title insurance ("Title Commitment") concerning the Property issued by the Title Company, as well as legible copies of all documents referred to in the Title Commitment ("Underlying Documents") to be delivered to Buyer within 10 or _____ days following the Date of Agreement. Buyer has 10 days from the receipt of the Title Commitment and Underlying Documents to satisfy itself with regard to the condition of title. The disapproval of Buyer of any monetary encumbrance, which by the terms of this Agreement is not to remain against the Property after the Closing, shall not be considered a failure of this contingency, as Seller shall have the obligation, at Seller's expense, to satisfy and remove such disapproved monetary encumbrances at or before the Closing.

(g) Survey. Buyer has 30 or _____ days from the receipt of the Title Commitment and Underlying Documents to satisfy itself with regard to any ALTA title supplement based upon a survey prepared by American Land Title Association ("ALTA") standards for an owner's policy by a licensed surveyor, showing the legal description and boundary lines of the Property, any easements of record, and any improvements, poles, structures and things located within 10 feet of either side of the Property boundary lines. Any such survey shall be prepared at Buyer's direction and expense. If Buyer has obtained a survey and approved the ALTA title supplement, Buyer may elect within the period allowed for Buyer's approval of a survey to have an ALTA extended coverage owner's form of title policy, in which event Buyer shall pay any additional premium attributable thereto.

(h) Existing Leases and Tenancy Statements. Seller shall within 10 or _____ days of the Date of Agreement provide both Buyer and Escrow Holder with legible copies of all leases, subleases or rental arrangements (collectively, "Existing Leases") affecting the Property, and with a tenancy statement ("Estoppel Certificate") in the latest form or equivalent to that published by the AIR, executed by Seller and/or each tenant and subtenant of the Property. Seller shall use its best efforts to have each tenant complete and execute an Estoppel Certificate. If any tenant fails or refuses to provide an Estoppel Certificate then Seller shall complete and execute an Estoppel Certificate for that tenancy. Buyer has 10 days from the receipt of said Existing Leases and Estoppel Certificates to satisfy itself with regard to the Existing Leases and any other tenancy issues.

(i) Other Agreements. Seller shall within 10 or _____ days of the Date of Agreement provide Buyer with legible copies of all other agreements ("Other Agreements") known to Seller that will affect the Property after Closing. Buyer has 10 days from the receipt of said Other Agreements to satisfy itself with regard to such Agreements.

(j) Financing. If paragraph 5 hereof dealing with a financing contingency has not been stricken, the satisfaction or waiver of such New Loan contingency.

(k) Existing Notes. If paragraph 3.1(c) has not been stricken, Seller shall within 10 or _____ days of the Date of Agreement provide Buyer with legible copies of the Existing Notes, Existing Deeds of Trust and related agreements (collectively, "Loan Documents") to which the Property will remain subject after the Closing. Escrow Holder shall promptly request from the holders of the Existing Notes a beneficiary statement ("Beneficiary Statement") confirming: (1) the amount of the unpaid principal balance, the current interest rate, and the date to which interest is paid, and (2) the nature and amount of any impounds held by the beneficiary in connection with such loan. Buyer has 10 or _____ days from the receipt of the Loan Documents and Beneficiary Statements to satisfy itself with regard to such financing. Buyer's obligation to close is conditioned upon Buyer being able to purchase the Property without acceleration or change in the terms of any Existing Notes or charges to expenses as otherwise provided in this Agreement or approved by Buyer, provided, however, Buyer shall pay the transfer fee referred to in paragraph 3.2 hereof.

(l) Personal Property. In the event that any personal property is included in the Purchase Price, Buyer has 10 or _____ days from the Date of Agreement to satisfy itself with regard to the title condition of such personal property. Seller recommends that Buyer obtain a UCC-1 report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any liens or encumbrances affecting such personal property that it is aware of within 10 or _____ days of the Date of Agreement.

_____                                    _____
Initials                Page 3 of 8                Initials
2000 American Industrial Real Estate Association                Form OFA-4-8/00E

(m) *Destruction, Damage or Loss.* There shall not have occurred prior to the Closing, a destruction of, or damage or loss to, the Property or any portion thereof, from any cause whatsoever, which would cost more than $10,000.00 to repair or cure, If the cost of repair or cure is $10,000.00 or less, Seller shall repair or cure the loss prior to the Closing. Buyer shall have the option, within 10 days after receipt of written notice of a loss costing more than $10,000.00 to repair or cure, to either terminate this transaction or to purchase the Property notwithstanding such loss, but without deduction or offset against the Purchase Price, If the cost to repair or cure is more than $10,000.00, and Buyer does not elect to terminate this transaction, Buyer shall be entitled to any insurance proceeds applicable to such loss. Unless otherwise notified in writing, Escrow Holder shall assume no such destruction, damage or loss has occurred prior to Closing,

(n) *Material Change.* Buyer shall have 10 days following receipt of written notice of a Material Change within which to satisfy itself with regard to such change. "Material Change" shall mean a change in the status of the use, occupancy, tenants, or condition of the Property that occurs after the date of this offer and prior to the Closing. Unless otherwise notified in writing, Escrow Holder shall assume that no Material Change has occurred prior to the Closing.

(o) *Seller Performance.* The delivery of all documents and the due performance by Seller of each and every undertaking and agreement to be performed by Seller under this Agreement.

(p) *Warranties.* That each representation and warranty of Seller herein be true and correct as of the Closing, Escrow Holder shall assume that this condition has been satisfied unless notified to the contrary in writing by any Party prior to the Closing.

(q) *Brokerage Fee.* Payment at the Closing of such brokerage fee as is specified in this Agreement or later written instructions to Escrow Holder executed by Seller and Escrow Brokers ("Brokerage Fee"). It is agreed by the Parties and Escrow Holder that Brokers are a third party beneficiary of this Agreement insofar as the Brokerage Fee is concerned, and that no change shall be made with respect to the payment of the Brokerage Fee specified in this Agreement, without the written consent of Brokers.

9.2   All of the contingencies specified in subparagraphs (a) through (p) of paragraph 9.1 are for the benefit of, and may be waived by, Buyer, and may be elsewhere herein referred to as "Buyer Contingencies."

9.3   If any Buyer's Contingency or any other matter subject to Buyer's approval is disapproved as provided for herein in a timely manner ("Disapproved Item"), Seller shall have the right, within 10 days following the receipt of notice of Buyer's disapproval to elect to cure such Disapproved Item prior to the Expected Closing Date ("Seller's Election"), Seller's failure to give to Buyer within such period, written notice of Seller's commitment to cure such Disapproved Item on or before the Expected Closing Date shall be conclusively presumed to be Seller's Election not to cure such Disapproved Item. If Seller elects, either by written notice or failure to give written notice, not to cure a Disapproved Item, Buyer shall have the election, within 10 days after Seller's Election to either accept title to the Property subject to such Disapproved Item, or to terminate this transaction. Buyer's failure to notify Seller in writing of Buyer's election to accept title to the Property subject to the Disapproved Item without deduction or offset shall constitute Buyer's election to terminate this transaction, Unless expressly provided otherwise herein, Seller's right to cure shall not apply to the remediation of Hazardous Substance Conditions or to the Financing Contingency. Unless the Parties mutually instruct otherwise, if the time periods for the satisfaction of contingencies or for Seller's and Buyer's said Elections would expire on a date after the Expected Closing Date, the Expected Closing Date shall be deemed extended for 3 business days following the expiration of: (a) the applicable contingency period(s), (b) the period within which the Seller may elect to cure the Disapproved Item, or (c) if Seller elects not to cure, the period within which Buyer may elect to proceed with this transaction, whichever is later.

9.4   Buyer understands and agrees that until such time as all Buyer's Contingencies have been satisfied or waived, Seller and/or its agents may solicit, entertain and/or accept back-up offers to purchase the subject Property.

9.5   The Parties acknowledge that extensive local, state and Federal legislation establish broad liability upon owners and/or users of real property for the investigation and remediation of Hazardous Substances. The determination of the existence of a Hazardous Substance Condition and the evaluation of the impact of such a condition are highly technical and beyond the expertise of Brokers. The Parties acknowledge that they have been advised by Brokers to consult their own technical and legal experts with respect to the possible presence of Hazardous Substances on this Property or adjoining properties, and Buyer and Seller are not relying upon any investigation by or statement of Brokers with respect thereto. The Parties hereby assume all responsibility for the impact of such Hazardous Substances upon their respective interests herein.

10.   *Documents Required at or before Closing:*

10.1   Five days prior to the Closing date Escrow Holder shall obtain an updated Title Commitment concerning the Property from the Title Company and provide copies thereof to each of the Parties.

10.2   Seller shall deliver to Escrow Holder in time for delivery to Buyer at the Closing:

(a)   Grant or general warranty deed, duly executed and in recordable form, conveying fee title to the Property to Buyer.

(b)   If applicable, the Beneficiary Statements concerning Existing Note(s).

(c)   If applicable, the Existing Leases and Other Agreements together with duly executed assignments thereof by Seller and Buyer. The assignment of Existing Leases shall be on the most recent Assignment and Assumption of Lessor's Interest in Lease form published by the AIR or its equivalent.

(d)   If applicable, Estoppel Certificates executed by Seller and/or the tenant(s) of the Property.

(e)   An Affidavit executed by Seller to the effect that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to Internal Revenue Service such sum as is required by applicable Federal law with respect to purchases from foreign sellers.

(f)   If the Property is located in California, an affidavit executed by Seller to the effect that Seller is not a "nonresident" within the meaning of California Revenue and Tax Code Section 18662 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to the Franchise Tax Board such sum as is required by such statute.

(g)   If applicable, a bill of sale, duly executed, conveying title to any included personal property to Buyer.

(h)   If the Seller is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the sale of the Property.

10.3   Buyer shall deliver to Seller through Escrow:

(a)   The cash portion of the Purchase Price and such additional sums as are required of Buyer under this Agreement shall be deposited by Buyer with Escrow Holder, by federal funds wire transfer, or any other method acceptable to Escrow Holder as immediately collectible funds, no later than 2:00 P.M. on the business day prior to the Expected Closing Date.

(b)   If a Purchase Money Note and Purchase Money Deed of Trust are called for by this Agreement, the duly executed originals of those documents, the Purchase Money Deed of Trust being in recordable form, together with evidence of fire insurance on the improvements in the amount of the full replacement cost naming Seller as a mortgage loss payee, and a real estate tax service contract (at Buyer's expense), assuring Seller of notice of the status of payment of real property taxes during the life of the Purchase Money Note.

(c)   The Assignment and Assumption of Lessor's Interest in Lease form specified in paragraph 10.2(c) above, duly executed by Buyer.

(d)   Assumptions duly executed by Buyer of the obligations of Seller that accrue after Closing under any Other Agreements.

(e)   If applicable, a written assumption duly executed by Buyer of the loan documents with respect to Existing Notes.

(f)   If the Buyer is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the purchase of the Property.

10.4   At Closing, Escrow Holder shall cause to be issued to Buyer a standard coverage (or ALTA extended, if elected pursuant to 9.1(g)) owner's Form policy of title insurance effective as of the Closing, issued by the Title Company in the full amount of the Purchase Price, insuring title to the Property vested in Buyer, subject only to the exceptions approved by Buyer. In the event there is a Purchase Money Deed of Trust in this transaction, the policy of title insurance shall be a joint protection policy insuring both Buyer and Seller. IMPORTANT: IN A PURCHASE OR EXCHANGE OF REAL PROPERTY, IT MAY BE ADVISABLE TO OBTAIN TITLE INSURANCE IN CONNECTION WITH THE CLOSE OF ESCROW SINCE THERE MAY BE PRIOR RECORDED LIENS AND ENCUMBRANCES WHICH AFFECT YOUR INTEREST IN THE PROPERTY BEING ACQUIRED. A NEW POLICY OF TITLE INSURANCE SHOULD BE OBTAINED IN ORDER TO ENSURE YOUR INTEREST IN THE PROPERTY THAT YOU ARE ACQUIRING.

11.   *Prorations and Adjustments.*

11.1   *Taxes.* Applicable real property taxes and special assessment bonds shall be prorated through Escrow as of the date of the Closing, based upon the latest tax bill available. The Parties agree to prorate as of the Closing any taxes assessed against the Property by supplemental bill levied by reason of events occurring prior to the Closing. Payment of the prorated amount shall be made promptly in cash upon receipt of a copy of any supplemental bill.

11.2   *Insurance.* WARNING: Any insurance which Seller maintained will terminate on the Closing. Buyer is advised to obtain appropriate insurance to cover the Property.

11.3   *Rentals, Interest and Expenses.* Scheduled rentals, interest on Existing Notes, utilities, and operating expenses shall be prorated as of the date of Closing. The Parties agree to promptly adjust between themselves outside of Escrow any rents received after the Closing.

11.4   *Security Deposit.* Security Deposits held by Seller shall be given to Buyer as a credit to the cash required of Buyer at the Closing.

11.5   *Post Closing Matters.* Any item to be prorated that is not determined or determinable at the Closing shall be promptly adjusted by the Parties by

OTI_00050023

Initials

Page 4 of 8

Initials

2000-American Industrial Real Estate Association

Form OFA-4-8/00E

appropriate cash payment outside of the Escrow when the amount due is determined.

11.6 Variations in Existing Note Balances. In the event that Buyer is purchasing the Property subject to an Existing Deed of Trust(s), and in the event that a Beneficiary Statement as to the applicable Existing Note(s) discloses that the unpaid principal balance of such Existing Note(s) at the Closing will be more or less than the amount set forth in paragraph 3.1(c) hereof ("Existing Note Variation"), then the Purchase Money Note(s) shall be reduced or increased by an amount equal to such Existing Note Variation. If there is to be no Purchase Money Note, the cash required at the Closing per paragraph 3.1(a) shall be reduced or increased by the amount of such Existing Note Variation.

11.7 Variations in New Loan Balance. In the event Buyer is obtaining a New Loan and the amount ultimately obtained exceeds the amount set forth in paragraph 5.1, then the amount of the Purchase Money Note, if any, shall be reduced by the amount of such excess.

12. Representation and Warranties of Seller and Disclaimers.

12.1 Seller's warranties and representations shall survive the Closing and delivery of the deed for a period of 3 years, and are true, material and relied upon by Buyer and Brokers in all respects. Seller hereby makes the following warranties and representations to Buyer and Brokers:

(a) Authority of Seller. Seller is the owner of the Property and/or has the full right, power and authority to sell, convey and transfer the Property to Buyer as provided herein, and to perform Seller's obligations hereunder.

(b) Maintenance During Escrow and Equipment Condition At Closing. Except as otherwise provided in paragraph 9.1(m) hereof, Seller shall maintain the Property until the Closing in its present condition, ordinary wear and tear excepted. The HVAC, plumbing, elevators, loading doors and electrical systems shall be in good operating order and condition at the time of Closing.

(c) Hazardous Substances/Storage Tanks. Seller has no knowledge, except as otherwise disclosed to Buyer in writing, of the existence or prior existence on the Property of any Hazardous Substance, nor of the existence or prior existence of any above or below ground storage tank.

(d) Compliance. Seller has no knowledge of any aspect or condition of the Property which violates applicable laws, rules, regulations, codes or covenants, conditions or restrictions, or of improvements or alterations made to the Property without a permit where one was required, or of any unfulfilled order or directive of any applicable governmental agency or casualty insurance company requiring any investigation, remediation, repair, maintenance or improvement be performed on the Property.

(e) Changes in Agreements. Prior to the Closing, Seller will not violate or modify any Existing Lease or Other Agreement, or create any new leases or other agreements affecting the Property, without Buyer's written approval which will not be unreasonably withheld.

(f) Possessory Rights. Seller has no knowledge that anyone will, at the Closing, have any right to possession of the Property, except as disclosed by this Agreement or otherwise in writing to Buyer.

(g) Mechanics' Liens. There are no unsatisfied mechanics' or materialmens' lien rights concerning the Property.

(h) Actions, Suits or Proceedings. Seller has no knowledge of any actions, suits or proceedings pending or threatened before any commission, board, bureau, agency, arbitrator, court or tribunal that would affect the Property or the right to occupy or utilize same.

(i) Notice of Changes. Seller will promptly notify Buyer and Brokers in writing of any Material Change (see paragraph 9.1(n)) affecting the Property that becomes known to Seller prior to the Closing.

(k) No Tenant Bankruptcy Proceedings. Seller has no notice or knowledge that any tenant of the Property is the subject of a bankruptcy or insolvency proceeding.

(l) No Seller Bankruptcy Proceedings. Seller is not the subject of a bankruptcy, insolvency or probate proceeding.

(l) Personal Property. Seller has no knowledge that anyone will, at the Closing, have any right to possession of any personal property included in the Purchase Price nor knowledge of any liens or encumbrances affecting such personal property, except as disclosed by this Agreement or otherwise in writing to Buyer.

12.2 Buyer hereby acknowledges that, except as otherwise stated in this Agreement, Buyer is purchasing the Property in its existing condition and will, by the time called for herein, make or have waived all inspections of the Property Buyer believes are necessary to protect its own interest in, and its contemplated use of, the Property. The Parties acknowledge that, except as otherwise stated in this Agreement, no representations, inducements, promises, agreements, assurances, oral or written, concerning the Property, or any aspect of the occupational safety and health laws, Hazardous Substance laws, or any other act, ordinance or law, have been made by or either Party or Brokers, or relied upon by either Party hereto.

12.3 In the event that Buyer learns that a Seller representation or warranty might be untrue prior to the Closing, and Buyer elects to purchase the Property anyway then, and in that event, Buyer waives any right that it may have to bring an action or proceeding against Seller or Brokers regarding said representation or warranty.

12.4 Any environmental reports, soils reports, surveys, and other similar documents which were prepared by third party consultants and provided to Buyer by Seller or Seller's representative, have been delivered as an accommodation to Buyer and without any representation or warranty as to the sufficiency, accuracy, completeness, and/or validity of said documents, all of which Buyer relies on at its own risk. Seller believes said documents to be accurate, but Buyer is advised to retain appropriate consultants to review said documents and investigate the Property.

13. Possession.

Possession of the Property shall be given to Buyer at the Closing subject to the rights of tenants under Existing Leases.

14. Buyer's Entry.

At any time during the Escrow period, Buyer, and its agents and representatives, shall have the right at reasonable times and subject to rights of tenants, to enter upon the Property for the purpose of making inspections and tests specified in this Agreement. No destructive testing shall be conducted, however, without Seller's prior approval which shall not be unreasonably withheld. Following any such entry or work, unless otherwise directed in writing by Seller, Buyer shall return the Property to the condition it was in prior to such entry or work, including the recompaction or removal of any disrupted soil or material as Seller may reasonably direct. All such inspections and tests and any other work conducted or materials furnished with respect to the Property by or for Buyer shall be paid for by Buyer as and when due and Buyer shall indemnify, defend, protect and hold harmless Seller and the Property of and from any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), damages, including those for injury to person or property, arising out of or relating to any such work or materials or the acts or omissions of Buyer, its agents or employees in connection therewith.

15. Further Documents and Assurances.

The Parties shall each, diligently and in good faith, undertake all actions and procedures reasonably required to place the Escrow in condition for Closing as and when required by this Agreement. The Parties agree to provide all further information, and to execute and deliver all further documents, reasonably required by Escrow Holder or the Title Company.

16. Attorneys' Fees.

If any Party or Broker brings an action or proceeding (including arbitration) involving the Property whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.

17. Prior Agreements/Amendments.

17.1 This Agreement supersedes any and all prior agreements between Seller and Buyer regarding the Property.

17.2 Amendments to this Agreement are effective only if made in writing and executed by Buyer and Seller.

18. Broker's Rights.

18.1 If this sale is not consummated due to the default of either the Buyer or Seller, the defaulting Party shall be liable to and shall pay to Brokers the Brokerage Fee that Brokers would have received had the sale been consummated. If Buyer is the defaulting party, payment of said Brokerage Fee is in addition to any obligation with respect to liquidated or other damages.

18.2 Upon the Closing, Brokers are authorized to publicize the facts of this transaction.

19. Notices.

19.1 Whenever any Party, Escrow Holder or Brokers herein shall desire to give or serve any notice, demand, request, approval, disapproval or other communication, each such communication shall be in writing and shall be delivered personally, by messenger or by mail, postage prepaid, to the address set forth in this Agreement or by facsimile transmission.

19.2 Service of any such communication shall be deemed made on the date of actual receipt if personally delivered. Any such communication sent by registered or mail shall be deemed given 48 hours after the same is mailed. Communications sent by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed delivered 24 hours after delivery of the same to the Postal Service or courier. Communications transmitted by facsimile transmission shall be deemed delivered upon telephonic confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If such communication is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

19.3 Any Party or Broker hereto may from time to time, by notice in writing, designate a different address to which, or a different person or additional persons to whom, all communications are thereafter to be made.

20. Duration of Offer.

20.1 If this offer is not accepted by Seller on or before 5:00 P.M. according to the time standard applicable to the city of

OTT_0008029

Initials _____ _____

2000 American Industrial Real Estate Association

Page 5 of 8

Initials _____ _____

Form OFA-4-8/00E

Los Angeles _____ on the date of January 10, 2014 _____, it shall be deemed automatically revoked.

20.2 The acceptance of this offer, or of any subsequent counteroffer hereto, that creates an agreement between the Parties as described in paragraph 1.2, shall be deemed made upon delivery to the other Party or either Broker herein of a duly executed writing unconditionally accepting the last outstanding offer or counteroffer.

21. **LIQUIDATED DAMAGES.** *(This Liquidated Damages paragraph is applicable only if Initialed by both Parties).*

THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO SIGNING THIS AGREEMENT, THE ACTUAL DAMAGES WHICH WOULD BE SUFFERED BY SELLER IF BUYER FAILS TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT. THEREFORE, IF, AFTER THE SATISFACTION OR WAIVER OF ALL CONTINGENCIES PROVIDED FOR THE BUYER'S BENEFIT, BUYER BREACHES THIS AGREEMENT, SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF $ __NONE__ . UPON PAYMENT OF SAID SUM TO SELLER, BUYER SHALL BE RELEASED FROM ANY FURTHER LIABILITY TO SELLER, AND ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES SHALL BE PAID BY SELLER.

_____         _____
        *Buyer Initials*                        *Seller Initials*

22. **ARBITRATION OF DISPUTES.** *(This Arbitration of Disputes paragraph is applicable only if initialed by both Parties.)*

22.1   ANY CONTROVERSY AS TO WHETHER SELLER IS ENTITLED TO THE LIQUIDATED DAMAGES AND/OR BUYER IS ENTITLED TO THE RETURN OF DEPOSIT MONEY, SHALL BE DETERMINED BY BINDING ARBITRATION BY, AND UNDER THE COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("COMMERCIAL RULES"). ARBITRATION HEARINGS SHALL BE HELD IN THE COUNTY WHERE THE PROPERTY IS LOCATED. ANY SUCH CONTROVERSY SHALL BE ARBITRATED BY 3 ARBITRATORS WHO SHALL BE IMPARTIAL REAL ESTATE BROKERS WITH AT LEAST 5 YEARS OF FULL TIME EXPERIENCE IN BOTH THE AREA WHERE THE PROPERTY IS LOCATED AND THE TYPE OF REAL ESTATE THAT IS THE SUBJECT OF THIS AGREEMENT. THEY SHALL BE APPOINTED UNDER THE COMMERCIAL RULES. THE ARBITRATORS SHALL HEAR AND DETERMINE SAID CONTROVERSY IN ACCORDANCE WITH APPLICABLE LAW, THE INTENTION OF THE PARTIES AS EXPRESSED IN THIS AGREEMENT AND ANY AMENDMENTS THERETO, AND UPON THE EVIDENCE PRODUCED AT AN ARBITRATION HEARING. PRE-ARBITRATION DISCOVERY SHALL BE PERMITTED IN ACCORDANCE WITH THE COMMERCIAL RULES OR STATE LAW APPLICABLE TO ARBITRATION PROCEEDINGS. THE AWARD SHALL BE EXECUTED BY AT LEAST 2 OF THE 3 ARBITRATORS, BE RENDERED WITHIN 30 DAYS AFTER THE CONCLUSION OF THE HEARING, AND MAY INCLUDE ATTORNEYS FEES AND COSTS TO THE PREVAILING PARTY PER PARAGRAPH 16 HEREOF. JUDGMENT MAY BE ENTERED ON THE AWARD IN ANY COURT OF COMPETENT JURISDICTION NOTWITHSTANDING THE FAILURE OF A PARTY DULY NOTIFIED OF THE ARBITRATION HEARING TO APPEAR THEREAT.

22.2   BUYER'S RESORT TO OR PARTICIPATION IN SUCH ARBITRATION PROCEEDINGS SHALL NOT BAR SUIT IN A COURT OF COMPETENT JURISDICTION BY THE BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE UNLESS AND UNTIL THE ARBITRATION RESULTS IN AN AWARD TO THE SELLER OF LIQUIDATED DAMAGES, IN WHICH EVENT SUCH AWARD SHALL ACT AS A BAR AGAINST ANY ACTION BY BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE.

22.3   NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.

_____         _____
        *Buyer Initials*                        *Seller Initials*

23. **Miscellaneous.**

23.1   **Binding Effect.**   This Agreement shall be binding on the Parties without regard to whether or not paragraphs 21 and 22 are initialed by both of the Parties. Paragraphs 21 and 22 are each incorporated into this Agreement only if initialed by both Parties at the time that the Agreement is executed.

23.2   **Applicable Law.**   This Agreement shall be governed by, and paragraph 22.3 is amended to refer to, the laws of the state in which the Property is located.

23.3   **Time of Essence.**   Time is of the essence of this Agreement.

23.4   **Counterparts.**   This Agreement may be executed by Buyer and Seller in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Escrow Holder, after verifying that the counterparts are identical except for the signatures, is authorized and instructed to combine the signed signature pages on one of the counterparts, which shall then constitute the Agreement.

23.5   **Waiver of Jury Trial.**   THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

23.6   **Conflict.**   Any conflict between the printed provisions of this Agreement and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

24. **Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

24.1   The Parties and Brokers agree that their relationship(s) shall be governed by the principles set forth in the applicable sections of the California Civil Code, as summarized in paragraph 24.2.

24.2   When entering into a discussion with a real estate agent regarding a real estate transaction, a Buyer or Seller should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Buyer and Seller acknowledge being advised by the Brokers in this transaction, as follows:

(a) *Seller's Agent.* A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or subagent has the following affirmative obligations: (1) *To the Seller:* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Seller. (2) *To the Buyer and the Seller:* a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(b) *Buyer's Agent.* A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the

_____                                      _____
        Initials                                                                   Initials

2000-American Industrial Real Estate Association                         Page 6 of 8                         Form OFA-4-8/00E

Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations. (1) To the Buyer: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Buyer. (2) To the Buyer and the Seller: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(c) *Agent Representing Both Seller and Buyer.* A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer. In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Seller or the Buyer. b. Other duties to the Seller and the Buyer as stated above in their respective sections (a) or (b) of this paragraph 24.2. (2) In representing both Seller and Buyer, the agent may not without the express permission of the respective Party, disclose to the other Party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered. (3) The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect their own interests. Buyer and Seller should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(d) *Further Disclosures.* Throughout this transaction Buyer and Seller may receive more than one disclosure, depending upon the number of agents assisting in the transaction. Buyer and Seller should each read its contents each time it is presented, considering the relationship between them and the real estate agent in this transaction and that disclosure. Brokers have no responsibility with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees), if any Broker with respect to any breach of duty, error or omission relating to this Agreement shall not exceed the fee received by such Broker pursuant to this Agreement; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

24.3 *Confidential Information.* Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

25. **Construction of Agreement.** In construing this Agreement, all headings and titles are for the convenience of the parties only and shall not be considered a part of this Agreement. Whenever required by the context, the singular shall include the plural and vice versa. Unless otherwise specifically indicated to the contrary, the word "days" as used in this Agreement shall mean and refer to calendar days. This Agreement shall not be construed as if prepared by one of the parties, but rather according to its fair meaning as a whole, as if both parties had prepared it.

26 **Additional Provisions:**

Additional provisions of this offer, if any, are as follows or are attached hereto by an addendum consisting of paragraphs ___N/A___ through ___N/A___. (If there are no additional provisions write "NONE".)

None.

_____

_____

_____

_____

_____

_____

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS AGREEMENT OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1.   SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS AGREEMENT.
2.   RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PROPERTY. SAID INVESTIGATION SHOULD

INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PROPERTY, THE INTEGRITY AND CONDITION OF ANY STRUCTURES AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE.

WARNING: IF THE PROPERTY IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THIS AGREEMENT MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED.

NOTE:
1.   THIS FORM IS NOT FOR USE IN CONNECTION WITH THE SALE OF RESIDENTIAL PROPERTY.
2.   IF THE BUYER IS A CORPORATION, IT IS RECOMMENDED THAT THIS AGREEMENT BE SIGNED BY TWO CORPORATE OFFICERS.

The undersigned Buyer offers and agrees to buy the Property on the terms and conditions stated and acknowledges receipt of a copy hereof.

BROKER:
Stephen Kang, PLLC

Attn: Stephen Kang, PLLC
Title: _____
Address:  28202 Cabot Rd., Ste. 300
          Laguna Niguel, CA 92677
Telephone:   949-365-5628
Facsimile:   949-480-4518
Federal ID No.

BUYER:

By: _____
Date:  January 10, 2014
Name Printed: Young & Husain, P.L.L.C.
Title:  POA amended to be dated 01/10/2014
Telephone/Facsimile:  713-621-8900/713-621-8909

By: _____
Date: _____
Name Printed: _____
Title: _____
Address: _____

Telephone/Facsimile: _____
Federal ID No. _____

Initials _____                                    Initials  *ek*

2000-American Industrial Real Estate Association                Form OFA-4-8/00E

OTT_0006031

27. Acceptance.

27.1 Seller accepts the foregoing offer to purchase the Property and hereby agrees to sell the Property to Buyer on the terms and conditions therein specified.

27.2 Seller acknowledges that Brokers have been retained to locate a Buyer and are the procuring cause of the purchase and sale of the Property set forth in this Agreement. In consideration of real estate brokerage service rendered by Brokers, Seller agrees to pay Brokers a real estate Brokerage Fee in a sum equal to _____ % of the Purchase Price divided in such shares as said Brokers shall direct in writing. This Agreement shall serve as an irrevocable instruction to Escrow Holder to pay such Brokerage Fee to Brokers out of the proceeds accruing to the account of Seller at the Closing.

27.3 Seller acknowledges receipt of a copy hereof and authorizes Brokers to deliver a signed copy to Buyer.

NOTE: A PROPERTY INFORMATION SHEET IS REQUIRED TO BE DELIVERED TO BUYER BY SELLER UNDER THIS AGREEMENT.

| BROKER: | SELLER: |
|---|---|
| Same as Above. | |
| Attn: | By: |
| Title: | Date: January 10, 2014 |
| Address: | Name Printed: Eram Keelian c/o Solo Gonzalez |
| | Title: Licensed Broker, Gunnless & Atkinson |
| Telephone: | Telephone/Facsimile: 877-799-6332 |
| Facsimile: | |
| Federal ID No. | By: |
| | Date: |
| | Name Printed: |
| | Title: |
| | Address: |
| | |
| | Telephone/Facsimile: |
| | Federal ID No. |

These forms are often modified to meet changing requirements of law and needs of the industry. Always write or call to make sure you are utilizing the most current form: American Industrial Real Estate Association, 700 South Flower Street, Suite 600, Los Angeles, CA 90017. (213) 687-8777.

©Copyright 2000 By American Industrial Real Estate Association.  All rights reserved.
No part of these works may be reproduced in any form without permission in writing.

OTI_0006032



# CENTRAL ESCROW, INC.

3660 Wilshire Blvd., #108, Los Angeles, CA 90010
Tel: (213) 389-8300 • Fax: (213) 389-1881

## AMENDED ESCROW INSTRUCTIONS

Date:   April 10, 2013                                              Escrow No.   5048885-KK

Re:   1654 W El Segundo Blvd, Gardena, CA 90249

---

To:  Central Escrow, Inc. – Eddie Kang & Julia Kim

My previous instructions in the above numbered escrow are hereby modified – supplemented in the following particulars only.

1. The parties agree that the contingencies on item no. 9.1 c, d, and e shall be extended to May 10, 2013 from the original contingencies removal date, due to due diligence on the feasibility study for company plan. Buyer and Seller agree to indemnify, defend and hold Escrow Holder, its employees and officer of the corporation, real estate agents and/or brokers harmless from any liability or loss in connection with this instruction.

All other terms and conditions of this escrow shall remain the same.  All parties signing this instruction acknowledge receipt of a copy of same.

## END OF AMENDMENT

SELLER :

Toltec Holdings, LLC

_____
By: Adrian Garcia De Alba, President

BUYER :

_____
Nomaan K. Husain, P.C.

KANG0004120

Ex. 12



# CENTRAL ESCROW, INC.

3660 Wilshire Blvd., #108, Los Angeles, CA 90010
Tel:(213)925-5547 • Fax:(213)568-3918

## ESCROW  INSTRUCTIONS & ACCEPTANCE

Date:   August 27, 2013                                      Escrow No.    5048885-K.K

Re:     1654 W El Segundo Blvd, Gardena, CA  90249 and

        1635 W. 130th Street, Gardena, CA 90249 (Mara Escrow, Inc.)

---

To All:

Please find enclosed following instructions & acceptance for the above referenced escrow -

1.  The parties agree that per clause 4 of the purchase agreement with original contingencies removal date based on the soil
    and environment tests by August 15, 2013, due to due diligence on the feasibility study for company plant, the closing
    will take place for Properties referenced above. Buyer and Seller agree to indemnify, defend and hold Escrow Holder, its
    employees and officer of the corporation, real estate agents and/or brokers harmless from any liability or loss in connection
    with this instruction. Attached Instruction is to be used for wiring of the total sum of $2,530,000.00, for closing on or before
    August 28, 2013.

All other terms and conditions of this escrow shall remain the same. All parties signing this instruction acknowledge receipt of a copy
of same.

Wiring Instructions:

See attached.

END

SELLERS:

Toltec Holdings, LLC

By: Adrian Garcia De Alba, President

Marie Solymosi

Individually

BUYER:

Nomaan Husain, PC POA Third Party Entity

KANG0003098

Ex. 13



# CENTRAL ESCROW, INC.

8640 Wilshire Blvd., #105, Los Angeles, CA 90210
Tel: (213) 389-8300 • Fax (213) 389-1861

TO:  Central Escrow, Inc.

Date: October 29, 2013

Escrow No.: 5045885-KK

## CANCELLATION
## ESCROW INSTRUCTIONS

WHEREAS, the undersigned Purchaser  had agreed to purchase, and the undersigned Seller  had agreed to sell that certain property commonly known as 1654 W El Segundo Blvd, Gardena, CA  90249 and

WHEREAS, Purchaser  and Seller  mutually agree to cancel the escrow referred to above and Central  Escrow, Inc. is hereby authorized by Purchaser , Seller  and Broker(s) to disburse the deposit you now hold in the sum of $38,406.00  as follows:

| $ | 2,760.00 | to | Central Escrow, Inc. |
| $ | 114.00 | to | Property ID |
| $ | 2,500.00 | to | Solomon Realty & Investment |
| $ | 33,026.00 | to | Toltec Holdings, LLC |

IT IS FURTHER AGREED that Purchaser  and Seller  will hold the undersigned Broker(s) and Central  Escrow, Inc. harmless and free of any and all liability in connection with the release of funds as directed above and for the cancellation of the purchase and sale of property as referred to above.  Upon Escrow Holder's receipt of property executed cancellation instructions by all parties hereto, all documents shall be returned to the party(ies) depositing same.

Toltec Holdings, LLC

By: Adrian Garcia De Alba, President

Norman K. Husain, P.C.

KANG0000820

Ex. 14



# CENTRAL ESCROW, INC.

3660 Wilshire Blvd., #108, Los Angeles, CA 90010
Tel: (213) 389-8300 • Fax: (213) 389-1881

## AMENDED ESCROW INSTRUCTIONS

Date:  January 28, 2013                              Escrow No.    5048885-KK

Re:   1654 W El Segundo Blvd, Gardena, CA  90249

---

To: Central Escrow, Inc. - Julia Kim

My previous instructions in the above numbered escrow are hereby modified – supplemented in the following particulars only.

1.  The parties agree that the contingencies on item no. 9.1 c, d, and e shall be extended for 3 weeks from the original contingencies removal date, due to due diligence on the feasibility study for company plan, Buyer and Seller agree to indemnify, defend and hold Escrow Holder, its employees and officer of the corporation, real estate agents and/or brokers harmless from any liability or loss in connection with this instruction.

All other terms and conditions of this escrow shall remain the same.  All parties signing this instruction acknowledge receipt of a copy of same.

### END OF AMENDMENT

SELLER :

Toltec Holdings, LLC

_____
By: Adrian Garcia De Alba, President

BUYER :

_____
Nomaan K. Husain, P.C.

KANG0001946

Ex. 15

# Stephen Kang, PLLC   1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:  ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

### ORIGINAL INVOICE

| INVOICE NUMBER | 10-5557-KM |
| DATE | 04-30-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | | |
|---|---|---|---|---|
| | E Mails, Review, Phone Calls – 30 min  4/24   - No Charge | $350 per Hour | | |
| | Consultation – 1 hour  4/29   - No Charge | | No Charge | |
| | E Mails, Review, Phone Calls – 1 hour 5/2 - No Charge | | | |
| | Lunch Meeting – 1 hour 30 min  5/4 – No Charge | | | |
| | TOTAL : 4 hours (Special Client Discount) – No Charge - $1,400.00 Fee Waived | | Initial Retainer – $3,500.00 | |
| | Initial Retainer for Asset Protection & Trust Arrangements – Estimated - $5,000.00 – Client Discount on Retainer Amount - $3,500.00 | | | |

US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630

| | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|
| | | 0.00 | 0.00 | $3,500.00 |

WIRING INSTRUCTIONS:

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 666600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

Approval: _____

Employee: _____

Accounting: _____

Ex. 16

OTT_0000496

# Stephen Kang, PLLC
1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

*SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW*

BILL TO:  ATTN: Ottogi America, Inc.
**1650 W. El Segundo Blvd.
Gardena, CA 90249**

## ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 10-6233-KM |
| DATE | 05-31-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | 2.5 Hours – E Mails, Phone Calls and Discussions on Exclusive Agreement for Distributors, Security Agreement, Client Deposit Escrow/Trust Accounts | $350 per Hour X | $4,725.00 |
| | 1.5 Hours – E Mails, Drafting and Rewrite on Agreement for Bradcal Product Agreement | 13.5 Hours | Plus Expenses |
| | 1.0 Hours – In and Out Discussions, Legal Issues | | $750.00 $40.00 |
| | 3.5 Hours – Drafting and Finalizing Trust Agreement for Ottogi America, Inc. | | TOTAL = $5,515.00 |
| | 1.5 Hours – Filing of Delaware Ottogi Property Trust Company, LLC Expense of Filing Fee, Local Agent Appointment, Office Address - $750.00 | | Retainer ($3,500.00) *April 2012* |
| | 2 Hours – Meeting at Gardena Offices w CEO Lee | | |
| | 1.5 Hours Signing of Trust Agreement and Sunkist Discussion Expense of Notary - $40.00 | | |

| | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630 | | 0.00 | 0.00 | $2,015.00 |

**WIRING INSTRUCTIONS:**

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 666600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

Approval: _____

Employee: _____

Accounting: _____

OTT_0000498

# Stephen Kang, PLLC
1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To: Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO: ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

### ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 10-6234-KM |
| DATE | 05-31-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | Retainer for Mergers & Acquisition Matter Due Diligence –<br>$3,500.00 | $350<br>per<br>Hour | $3,500.00 |
| | | | |

| | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0963630 | | 0.00 | 0.00 | $3,500.00 |

WIRING INSTRUCTIONS:

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 666600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

Approval:

Employee:

Accounting:

OTT_0000499

# *Stephen Kang, PLLC* 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To: Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

*SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW*

BILL TO: ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

### ORIGINAL INVOICE

| INVOICE NUMBER | 10-7239-KM |
|---|---|
| DATE | 09-30-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
|  |  |
|  |  |
|  |  |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| 07/12<br>To<br>09/12 | 3.5 Hours – Phone Calls, E Mails and Letters – Various Collection Matters – R Ranch, Seattle, WA attorney correspondences and In and Out<br><br>5.5 Hours – E Mails, Research, Calls and Material Preparation for Sunkist Materials and PowerPoint Summary for Korea<br><br>1.0 Hours – In and Out Discussions, Legal Issues and Employment Handbook<br><br>2 Hours – Calls and Discussions, E Mails on Various Legal Matters<br><br>*Postages and Fees Waived* | $350 per Hour X 12.0 Hours | $4200.00<br><br>Plus Expenses<br><br>*None*<br><br>TOTAL = $4,200.00<br><br>Retainer<br>($3,500.00)<br><br>*June 2012*<br>TOTAL DUE = $700.00<br><br>*Advance Retainer for Next Representation*<br>$3,500.00 |

*[handwritten Korean annotations: 6월 / 이미 지불했음 / Payable은 / 지불해야될 금액임]*

| | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. -71-0963630 | | 0.00 | 0.00 | $4,200.00 |

WIRING INSTRUCTIONS:

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 656600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

Approval:

Employee:

Accounting:

*Stephen Kang, PLLC*   1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To: Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

*SEE INTERNATIONAL WIRING*
*INSTRUCTIONS BELOW*

BILL TO: ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

### ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 10-8241-KM |
| DATE | 10-31-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT | |
|---|---|---|---|---|
| 10/01/ 12 | 8.5 Hours – General meetings, Meeting w Austin Kim, Lunch Meetings, Review of Offer Contracts, Set Up POA and Escrows for the Land Acquisition | $350 per Hour X | $3850.00 | |
| To | 1.5 Hours – Start the Redraft of Employee Handbook | | Plus Expenses | |
| | 1.0 Hours – Miscellaneous Consultations, E Mails, Discussions on Various Legal Matters | 11.0 Hours | None | |
| 10/31/ 12 | | | TOTAL = $3,850.00 | |
| | *Postage and Fees Waived* | | Retainer Applied ($3,500.00) | |
| | Approval: | | Oct 2012 TOTAL DUE = $350.00 | |
| | Employee: | | *Advance Retainer for Next Representation $3,500.00 (Nov 7)* | |
| | Accounting: | | | |
| US CORPORATION – IRS EIN REGISTRATION NO. – 71-0983630 | | Subtotal | Tax 0.00 | 0.00 | TOTAL DUE $3,850.00 |

WIRING INSTRUCTIONS:

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 656600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

OTT_0000503

# Stephen Kang, PLLC
1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To: Suite C504
1001 Avenida Pico
San Clemente, CA
92573 U.S.A.

*SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW*

BILL TO: ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| INVOICE NUMBER | 12-6255-KM |
|---|---|
| DATE | 12-26-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| TERMS: | DUE UPON RECEIPT |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | 2.5 Hours – Austin Kim, Land Acquisition Processing, Offers and Terms and Conditions | $350 per Hour X 7.5 Hours | $2,625.00 |
| | 1.5 Hours – E Mails, Drafting and Rewrite on Agreements for Cartel, Other Miscellaneous Matters | | Plus Expenses Houston Trip $1108.70 Flight $89.00 Meals |
| | 1.0 Hours – Phone Calls, E Mails and Discussions and Drafting of Employee Termination | | = $3822.70 Apply $3,500.00 Retainer DUE $322.70 |
| | 2.5 Hours – Meetings in Houston, Texas | | Advance Retainer Jan – Mar 2013 Due $10,500.00 |
| | Approval: _____ | | TOTAL DUE: $10,822.70 |
| | Employee: _____ | | |
| | Accounting: _____ | | |

| | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. – 71-0983630 | | 0.00 | 0.00 | $10,822.70 |

WIRING INSTRUCTIONS:

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 666600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

OTT_0000506

# Stephen Kang, PLLC
1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
          1001 Avenida Pico
          San Clemente, CA
          92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:  ATTN: Ottogi America, Inc.
          **1650 W. El Segundo Blvd.**
          **Gardena, CA 90249**

## ORIGINAL INVOICE

| INVOICE NUMBER | 12-6255-KM |
|---|---|
| DATE | 12-26-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346367OK |
|  |  |
|  |  |
|  |  |
| TERMS: | DUE UPON RECEIPT |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
|  | 2.5 Hours – Austin Kim, Land Acquisition Processing, Offers and Terms and Conditions | $350 per Hour X 7.5 Hours | $2,625.00 |
|  | 1.5 Hours – E Mails, Drafting and Rewrite on Agreements for Cartel, Other Miscellaneous Matters |  | Plus Expenses Houston Trip |
|  | 1.0  Hours – Phone Calls, E Mails and Discussions and Drafting of Employee Termination |  | $1108.70 Flight $89.00 Meals |
|  | 2.5 Hours – Meetings in Houston, Texas |  | = $3822.70 Apply  $3,500.00 Retainer Due: $322.70 |
|  | Approval: |  | Advance Retainer Jan  –  Mar 2013 Due: |
|  | Employee: |  |  |
|  | Accounting: |  | TOTAL DUE: $10,822.70 |

| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630 | Subtotal | Tax 0.00 | 0.00 | TOTAL DUE $10,822.70 |
|---|---|---|---|---|

WIRING INSTRUCTIONS:

Wire Information:
**Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC**
**Account No: 0763 656600**
**Beneficiary Bank:**
**Wells Fargo, N.A.**
**Domestic Route: 111900659**
**SWIFT: WFBIUS6S**
**Account Type: USD Current Account**

OTT_0000508

## *Stephen Kang, PLLC* 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

*SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW*

BILL TO:  ATTN: Ottogi America, Inc.
**1650 W. El Segundo Blvd.
Gardena, CA 90249**

| ORIGINAL INVOICE | |
|---|---|
| INVOICE NUMBER | 13-6117-KM |
| DATE | 03-01-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | January 31 – February 28<br><br>Various matters with Land Acquisition / meetings / drafting of contracts / calls and environmental testing discussions<br><br>6.7 hours<br><br>Approval:<br>Employee:<br>Accounting: | $350 per Hour | 5.7 Hours x $350.00= $1,995.00<br><br>Retainer - $3,500.00- $1,995.00= $1,505.00 *Still in Retainer Balance* |

| | | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983639 | | | 0.00 | 0.00 | NONE |

**WIRING INSTRUCTIONS:**

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 656600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

OTT_0000510

# *Stephen Kang, PLLC*   1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

*Remit To: Suite C504*
*1001 Avenida Pico*
*San Clemente, CA*
*92673 U.S.A.*

*SEE INTERNATIONAL WIRING*
*INSTRUCTIONS BELOW*

BILL TO:   ATTN: Ottogi America, Inc.
**1850 W. El Segundo Blvd.**
**Gardena, CA 90249**

## ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 12-6255-KM |
| DATE | 12-26-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| TERMS: | DUE UPON RECEIPT |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | 2.5 Hours – Austin Kim, Land Acquisition Processing, Offers and Terms and Conditions | $350 per Hour X 7.5 Hours | $2,625.00 |
| | 1.5 Hours – E Mails, Drafting and Rewrite on Agreements for Cartel, Other Miscellaneous Matters | | Plus Expenses Houston Trip |
| | 1.0  Hours – Phone Calls, E Mails and Discussions and Drafting of Employee Termination | | $1108.70 Flight $89.00 Meals = |
| | 2.5 Hours – Meetings in Houston, Texas | | $3822.70 Apply  $3,500.00 Retainer |
| | Approval: | | ~~Total: $322.70~~ |
| | Employee: | | Advance Retainer Jan – Mar 2013 Due: $10,500.00 |
| | Accounting: | | TOTAL DUE: $10,822.70 |
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0563630 | | Subtotal | Tax |
| | | | 0.00 |

-$275-

| Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|
| | 0.00 | 0.00 | $10,822.70 |

**WIRING INSTRUCTIONS:**

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 656600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

OTT_0000513

# Stephen Kang, PLLC
1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To: Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO: ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| INVOICE NUMBER | 34-1100-RF |
|---|---|
| DATE | 04-30-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 348357OK |
| | |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | Various Matters – Review of Contracts, E Mails and Data on Land Inspections<br><br> - Retainer Recurring Billing | $300 per Hour | $3,500 |

| | | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. – 71-0963630 | | | 0.00 | 0.00 | $3,500.00 |

WIRING INSTRUCTIONS:

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 666600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900559
SWIFT: WFBIUS6S
Account Type: USD Current Account

OTT_0000514

# Stephen Kang, PLLC
1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To: Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

*SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW*

BILL TO: ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| INVOICE NUMBER | 34-4567-FG |
|---|---|
| DATE | 05-31-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT | | |
|---|---|---|---|---|---|
| | Various Matters – Review of Contracts, E Mails and Data on Land Inspections, Extensions of Contingent Offers for Lula Gardena, CA <br> - Retainer Recurring Billing | $300 per Hour | 3500.00 | | |
| | | | | | |
| | | Subtotal | Tax | | TOTAL DUE |
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630 | | | 0.00 | 0.00 | $3,500.00 |

WIRING INSTRUCTIONS:

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 656600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900559
SWIFT: WFBIUS6S
Account Type: USD Current Account

OTT_0000515

# *Stephen Kang, PLLC* 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
          1001 Avenida Pico
          San Clemente, CA
          92673 U.S.A.

**SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW**

BILL TO:  ATTN: Ottogi America, Inc.
          **1650 W. El Segundo Blvd.
          Gardena, CA 90249**

| ORIGINAL INVOICE | |
|---|---|
| INVOICE NUMBER | 34-5678-GE |
| DATE | 06-30-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | Various Matters — Meetings at Client Office, Insurance Set Up, Letters, Contract Reviews, Escrow Cos Discussions, Meetings with Sellers for Lots in Gardena, Arent and Fox Meetings, Austin Kim Meetings | $300 per Hour | $3500.00 |
| | - Retainer Recurring Billing | | |

| | | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630 | | | 0.00 | 0.00 | $3500.00 |

WIRING INSTRUCTIONS:

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 656600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

OTT_0000516

# *Stephen Kang, PLLC*   1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

*SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW*

BILL TO:  ATTN: Ottogi America, Inc.
**1650 W. El Segundo Blvd.
Gardena, CA 90249**

## ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 34-0994-VB |
| DATE | 07-31-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | Various Matters – Land Closings in Gardena, Lawsuit Drafting, Review of Class Action Matters, Research on Case Laws for Class Action, Documentation for Closing, Escrow Set-Ups for Land Closing Preparation, Letters, E Mails<br><br>• Retainer Recurring Billing | $300 per Hour | $3,500.00 |

| | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630 | | 0.00 | 0.00 | $3500.00 |

**WIRING INSTRUCTIONS:**

Wire Information:
**Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 655650
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account**

OTT_0000517

# Stephen Kang, PLLC

1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:   ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 34-5435-RT |
| DATE | 08-31-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | Various Matters -- Land Closings in Gardena, Insurance Claims, Collection, Proceeds for Land Closing Handling, Meeting with Solomon Attorney, Arent and Fox Meetings, Lawsuit Service, Land Lot Preparation, Vendor Escrow Set Up, Letters, E Mails, Phone Calls<br><br>Retainer Recurring Billing | $300 per Hour | $3,500.00 |

| | | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|---|
| US CORPORATION -- IRS EIN REGISTRATION NO. - 71-0983630 | | | 0.00 | 0.00 | $3500.00 |

WIRING INSTRUCTIONS:

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 656600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

OTT_0000518

# *Stephen Kang, PLLC*   1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

*SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW*

BILL TO:  ATTN: Ottogi America, Inc.
1660 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| INVOICE NUMBER | 12-8255-KM |
|---|---|
| DATE | 12-26-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| TERMS: | DUE UPON RECEIPT |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | 2.5 Hours – Austin Kim, Land Acquisition Processing, Offers and Terms and Conditions | $350 per Hour X 7.5 Hours | $2,625.00 |
| | 1.5 Hours – E Mails, Drafting and Rewrite on Agreements for Cartel, Other Miscellaneous Matters | | Plus Expenses Houston Trip $1108.70 Flight $89.00 Meals |
| | 1.0 Hours – Phone Calls, E Mails and Discussions and Drafting of Employee Termination | | = $3822.70 Apply  $3,500.00 Retainer |
| | 2.5 Hours – Meetings in Houston, Texas | | DUE: $322.70 ✓ |
| | Approval: | | Advance Retainer Jan – Mar 2013 DUE: $10,500.00 ✓ |
| | Employee: | | TOTAL DUE: $10,822.70 |
| | Accounting: | | |
| | US CORPORATION – IRS EIN REGISTRATION NO. - 71-0583630 | Subtotal | Tax 0.00 | 0.00 | TOTAL DUE $10,822.70 |

**WIRING INSTRUCTIONS:**

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 658600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

1/4/13 –322.70
1/16/13 – 3,500

7,000
11/5/13 – 275

Cleared balance  11/29/13  6,725

OTT_0000523

# *Stephen Kang, PLLC* 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:   ATTN: Ottogi America, Inc.
**1650 W. El Segundo Blvd.
Gardena, CA 90249**

## ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 12-345-GHT |
| DATE | 11-30-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | |
|---|---|---|---|
| | E Mails, Correspondences, Work on Mark Registrations, UCC Filings, Lawsuit Drafts for Eviction of B & G Rentals Tenants, Court Appearances, 11/19, 12/6, and Visits with 1631 W El Segundo Blvd, Gardena, Lot Seller and Meetings | $300 per Hour | 14.5 Hours |

Approved by

Dept. Mgr.

Requested by

Verified by

| | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630 | | 0.00 | 0.00 | $4,350.00 |

WIRING INSTRUCTIONS:

Wire Information:
**Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 656600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account**

OTT_0000524

# *Stephen Kang, PLLC* 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:  ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

| **ORIGINAL INVOICE** | |
|---|---|
| INVOICE NUMBER | 12-5467-FG |
| DATE | 02-03-14 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT | |
|---|---|---|---|---|
| | Various Matters – Land Closings Issues in Gardena, Ottogi America Trademark Filing, UCC filing for NJ, Property Tax and Eviction Issues for Gardena Lots, Letters, E Mails, Phone Calls, Purchase Offer for Land Lot in Gardena, Meetings, Court Hearing Attendances<br><br>Retainer Recurring Billing | $300 per Hour x 12.5 | $3,750.00 | |
| | Approved by | Verified by | | |
| | Dept. Mgr. | | | |
| | Requested by | | | |
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630 | | Subtotal | Tax 0.00 | 0.00 | TOTAL DUE $3,750.00 |

WIRING INSTRUCTIONS:

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 666600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

OTT_0000526

# *Stephen Kang, PLLC* 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:  ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| INVOICE NUMBER | N.A. |
| --- | --- |
| DATE | 05-31-14 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |
| | |

| LINE | DESCRIPTION | RATE | AMOUNT | | |
| --- | --- | --- | --- | --- | --- |
| | LOT 25 GARDENA, CA CLOSING COSTS & 2% FEES | | $5,000 Closing Costs | | |
| | | | $17,900.00 2% FEES | | |
| | | | | | |
| | | | | | |
| | | Subtotal | Tax | | TOTAL DUE |
| US CORPORATION ~ IRS EIN REGISTRATION NO. - 71-0963830 | | | 0.00 | 0.00 | $22,900.00 |

WIRING INSTRUCTIONS:

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 858600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

OTT_0000531

# *Stephen Kang, PLLC*

1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

*Remit To:* Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

*SEE INTERNATIONAL WIRING*
*INSTRUCTIONS BELOW*

BILL TO:   ATTN: Ottogi America, Inc.
**1650 W. El Segundo Blvd.**
**Gardena, CA 90249**

## ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 54-1256-RT |
| DATE | 06-04-14 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT | | |
|---|---|---|---|---|---|
| | Various Matters – Meetings, Phone Calls, E Mails, Reviews of Cases, Vendor Languages, Deed Recording, Handling Tenant Issues, Land Lot Vacating, Letters, Review of Contracts, San Diego Trip and Hearings, Court Attendances<br><br>Feb 1 – Feb 28, 2014 - 7.5 Hours<br><br>March 1 – March 31, 2014 - 4.5 Hours<br><br>April 1 – April 30, 2014 - 4.0 Hours<br><br>May 1-May 31, 2014- 3 Hours<br><br>Billed Litigation to Seller Per Agreement of Aug. 26, 2013 – 23 Hours (Waived for Ottogi Client) | $300 per Hour X<br><br>19 HRS | $5,700.00 | | |
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630 | | Subtotal | Tax 0.00 | 0.00 | TOTAL DUE $5,700.00 |

**WIRING INSTRUCTIONS:**

Wire Information:
Beneficiary: Stephen Kang, PLLC c/o Young & Husain, PLLC
Account No: 0763 655600
Beneficiary Bank:
Wells Fargo, N.A.
Domestic Route: 111900659
SWIFT: WFBIUS6S
Account Type: USD Current Account

| | | | |
|---|---|---|---|
| Approved by | *[signature]* | Verified by | |
| Dept. Mgr. | *[signature]* | | |
| Requested by | *[signature]* | | |

OTT_0000533

# *Stephen Kang, PLLC* 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

*Remit To:* *Suite C504*
*1001 Avenida Pico*
*San Clemente, CA*
*92673 U.S.A.*

*SEE INTERNATIONAL WIRING*
*INSTRUCTIONS BELOW*

BILL TO: ATTN: Ottogi America, Inc.
1660 W. El Segundo Blvd.
Gardena, CA 90249

### ORIGINAL INVOICE

| INVOICE NUMBER | 10-5557-KM |
| DATE | 04-30-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | | |
|---|---|---|---|---|
| | | $350 per Hour | | |
| | | | No Charge | |
| | | Initial Retainer – $3,500.00 | | |

REDACTED

| | | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. – 71-0983630 | | | 0.00 | 0.00 | $3,500.00 |

WIRING INSTRUCTIONS:

Approval:

Employee:

Accounting:

# *Stephen Kang, PLLC* 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente,CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:  ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| INVOICE NUMBER | 10-6233-KM |
| DATE | 05-31-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|------|-------------|---------|--------|
| | | $350 per Hour X 13.5 Hours | |
| | | | |

| | | Subtotal | Tax 0.00 | 0.00 | TOTAL DUE |
|--|--|----------|----------|------|-----------|

US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630

WIRING INSTRUCTIONS:

Approval:

Employee:

Accounting:

# *Stephen Kang, PLLC*   1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

*Remit To:*  *Suite C504*
*1001 Avenida Pico*
*San Clemente, CA*
*92673 U.S.A.*

*SEE INTERNATIONAL WIRING*
*INSTRUCTIONS BELOW*

BILL TO:   ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

| ORIGINAL INVOICE | |
|---|---|
| INVOICE NUMBER | 10-6234-KM |
| DATE | 05-31-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | | $350 per Hour | |
| | | | |
| | | | |

| | | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. – 71-0963630 | | | 0.00 | 0.00 | |

WIRING INSTRUCTIONS:

Approval: _____

Employee: _____

Accounting: _____

## *Stephen Kang, PLLC* 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

*SEE INTERNATIONAL WIRING*
*INSTRUCTIONS BELOW*

BILL TO:  ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

### ORIGINAL INVOICE

| INVOICE NUMBER | 10-7239-KM |
|---|---|
| DATE | 09-30-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT | |
|---|---|---|---|---|
| 07/12 | | $350 per Hour X | | |
| To | | | | |
| 09/12 | | 12.0 Hours | | |
| | | | | |
| US CORPORATION– IRS EIN REGISTRATION NO. – 71-0963630 | | Subtotal | Tax 0.00 | 0.00 | TOTAL DUE |

WIRING INSTRUCTIONS:

Approval:

Employee:

Accounting:

# Stephen Kang, PLLC
1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To: Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO: ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 10-8241-KM |
| DATE | 10-31-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| 10/01/12 | | $350 per Hour X | Plus Expenses |
| To | | 11.0 Hours | None |
| 10/31/12 | | | TOTAL = $3,850.00 |
| | Postage and Fees Waived | | Retainer Applied ($3,500.00) |
| | Approval: | | Oct 2012 TOTAL DUE = $350.00 |
| | Employee: | | Advance Retainer for Next ] Representation $3,500.00 (Nov ? ) |
| | Accounting: | | |
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0953630 | | Subtotal | Tax 0.00 | 0.00 | TOTAL DUE |

WIRING INSTRUCTIONS:

*Stephen Kang, PLLC*   1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

*SEE INTERNATIONAL WIRING*
*INSTRUCTIONS BELOW*

BILL TO:  ATTN: Ottogi America, Inc.
1550 W. El Segundo Blvd.
Gardena, CA 90249

| ORIGINAL INVOICE | |
|---|---|
| INVOICE NUMBER | 12-6255-KM |
| DATE | 12-26-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |
| TERMS: | DUE UPON RECEIPT |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | | $350 per Hour X 7.5 Hours | |

Approval:

Employee:

Accounting:

| | | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|---|
| US CORPORATION -- IRS EIN REGISTRATION NO. -- 71-0993630 | | | 0.00 | 0.00 | $10,822.70 |

WIRING INSTRUCTIONS:

# Stephen Kang, PLLC

1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:  ATTN: Ottogi America, Inc.
1660 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 12-6255-KM |
| DATE | 12-26-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| TERMS: | DUE UPON RECEIPT |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | | $350 per Hour X 7.5 Hours | |
| | Approval: | ✓ | |
| | Employee: | ✓ | |
| | Accounting: | | |

US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630

| | | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|---|
| | | | 0.00 | 0.00 | $10,822.70 |

WIRING INSTRUCTIONS:

*Stephen Kang, PLLC*  1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO: ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 13-6117-KM |
| DATE | 03-01-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | January 31 – February 28 | $350 per Hour | |
| | 5.7 hours | | |
| | Approval: | | |
| | Employee: | | |
| | Accounting: | | |

US CORPORATION – IRS EIN REGISTRATION NO. - 71-0903636

| | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|
| | | 0.00 | 0.00 | NONE |

WIRING INSTRUCTIONS:

# Stephen Kang, PLLC
1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To: Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO: ATTN: Ottogi America, Inc.
1660 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 12-6255-KM |
| DATE | 12-26-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| TERMS: | DUE UPON RECEIPT |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | | $350 per Hour X 7.5 Hours | $2,625.00 |
| | | | |
| | Approval: | | |
| | Employee: | | |
| | Accounting: | | |
| | | TOTAL DUE: $10,822.70 | |

$275

| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630 | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|
| | 0.00 | 0.00 | | $10,822.70 |

WIRING INSTRUCTIONS:

# Stephen Kang, PLLC
1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

**Remit To:** Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

*SEE INTERNATIONAL WIRING*
*INSTRUCTIONS BELOW*

**BILL TO:** ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 34-1100-RF |
| DATE | 04-30-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT | | | |
|---|---|---|---|---|---|---|
| | | $300 per Hour | $3,500 | | | |
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0963630 | | Subtotal | Tax 0.00 | | 0.00 | TOTAL DUE $3,500.00 |

**WIRING INSTRUCTIONS:**

# Stephen Kang, PLLC 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To: Suite C504
.1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW.

BILL TO: ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| INVOICE NUMBER | 34-4567-FG |
|---|---|
| DATE | 05-31-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346957OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | | $300 per Hour | 3500.00 |
| | | | |

| | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. – 71-0983630 | 0.00 | 0.00 | | $3,500.00 |

WIRING INSTRUCTIONS:

*Stephen Kang, PLLC*  1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To: Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO: ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| INVOICE NUMBER | 34-6678-GE |
|---|---|
| DATE | 06-30-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | | $300 per Hour | $3500.00 |
| | | | |

| | | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630 | | | 0.00 | 0.00 | $3500.00 |

WIRING INSTRUCTIONS:

## _Stephen Kang, PLLC_   1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite.C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:  ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

### ORIGINAL INVOICE

| INVOICE NUMBER | 34-0994-VB |
|---|---|
| DATE | 07-31-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | | $300 per Hour | $3,500.00 |
| | | | |

US CORPORATION -- IRS EIN REGISTRATION NO. - 71-0963630

| Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|
| | 0.00 | 0.00 | $3500.00 |

WIRING INSTRUCTIONS:

# Stephen Kang, PLLC
1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To: Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO: ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| INVOICE NUMBER | 34-5435-RT |
|---|---|
| DATE | 08-31-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | | $300 per Hour | $3,500.00 |
| | | | |

| | Subtotal | Tax | | | TOTAL DUE | |
|---|---|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630 | | 0.00 | 0.00 | | | $3500.00 |

WIRING INSTRUCTIONS:

## *Stephen Kang, PLLC* 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:   ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

### ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 22-567-78BB |
| DATE | 11-17-2013 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | | $300 per Hour | $5,000.00 |
| | | | |

| | | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|---|
| US CORPORATION -- IRS EIN REGISTRATION NO. - 71-0983630 | | | 0.00 | 0.00 | $5,000.00 |

WIRING INSTRUCTIONS:

## *Stephen Kang, PLLC* 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To: Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:  ATTN: Ottogi America, Inc.
1660 W. El Segundo Blvd.
Gardena, CA 90249

### ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 12-6255-KM |
| DATE | 12-26-12 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| TERMS: | DUE UPON RECEIPT |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | | $350 per Hour X 7.5 Hours | |
| | Approval: | ✓ | |
| | Employee: | ✓ | |
| | Accounting: | | TOTAL DUE: $10,822.70 |

| | | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. – 71-0963630 | | | 0.00 | 0.00 | $10,822.70 |

WIRING INSTRUCTIONS:

# Stephen Kang, PLLC

1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:   ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| | |
|---|---|
| INVOICE NUMBER | 12-345-GHT |
| DATE | 11-30-13 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | |
|---|---|---|---|
| | | $300 per Hour | 14.5 Hours |
| 5 | Approved by | | |
| | Dept. Mgr. | | |
| | Requested by | | |

| | | Subtotal | Tax | | | TOTAL DUE |
|---|---|---|---|---|---|---|
| U.S. CORPORATION – IRS EIN REGISTRATION NO. - 71-0993630 | | | 0.00 | 0.00 | | $4,350.00 |

WIRING INSTRUCTIONS:

# *Stephen Kang, PLLC* 1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
           1001 Avenida Pico
           San Clemente, CA
           92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:  ATTN: Ottogi America, Inc.
          1650 W. El Segundo Blvd.
          Gardena, CA 90249

## ORIGINAL INVOICE

| INVOICE NUMBER | 12-5467-FG |
|---|---|
| DATE | 02-03-14 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | | $300 per Hour x 12.5 | $3,750.00 |
| | Retainer Recurring Billing | | |

| Approved by | | Verified by |
|---|---|---|
| Dept. Mgr. | | |
| Requested by | | |

| | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. – 71-0983630 | | 0.00 | 0.00 | $3,750.00 |

WIRING INSTRUCTIONS:

# Stephen Kang, PLLC
1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
1001 Avenida Pico
San Clemente, CA
92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:  ATTN: Ottogi America, Inc.
1650 W. El Segundo Blvd.
Gardena, CA 90249

## ORIGINAL INVOICE

| INVOICE NUMBER | N.A. |
|---|---|
| DATE | 05-31-14 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |
| | |

| LINE | DESCRIPTION | RATE | AMOUNT |
|---|---|---|---|
| | | | $5,000 Closing Costs |
| | | | $17,900.00 2% FEES |
| | | | |

| | | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|---|
| US CORPORATION – IRS EIN REGISTRATION NO. – 71-0363830 | | | 0.00 | 0.00 | $22,900.00 |

WIRING INSTRUCTIONS:

# Stephen Kang, PLLC

1001 Avenida Pico, Ste. C504, San Clemente, CA 92673 USA

Remit To:  Suite C504
           1001 Avenida Pico
           San Clemente,CA
           92673 U.S.A.

SEE INTERNATIONAL WIRING
INSTRUCTIONS BELOW

BILL TO:  ATTN: Ottogi America, Inc.
          1650 W. El Segundo Blvd.
          Gardena, CA 90249

## ORIGINAL INVOICE

| INVOICE NUMBER | 54-1256-RT |
|---|---|
| DATE | 06-04-14 |
| DUE DATE | N.A. |
| ATTORNEY IN CHARGE | Stephen Kang, PLLC |
| CLIENT NO | 346357OK |
| | |
| | |
| | |
| | |

| LINE | DESCRIPTION | HR RATE | AMOUNT |
|---|---|---|---|
| | | $300 per Hour X 19 HRS | $5,700.00 |
| | | | |

US CORPORATION – IRS EIN REGISTRATION NO. - 71-0983630

| | Subtotal | Tax | | TOTAL DUE |
|---|---|---|---|---|
| | | 0.00 | 0.00 | $5,700.00 |

WIRING INSTRUCTIONS:

| Approved by | | Verified by |
|---|---|---|
| Dept. Mgr. | | |
| Requested by | | |

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                    January 2015 Grand Jury

11   UNITED STATES OF AMERICA,          CR No. 15-478(A)-GW

12              Plaintiff,              F I R S T
                                        S U P E R S E D I N G
13        v.                            I N D I C T M E N T

14   STEPHEN YOUNG KANG,                [18 U.S.C. § 1343: Wire Fraud;
                                        18 U.S.C. § 1957: Engaging in
15              Defendant.              Monetary Transactions in Property
                                        Derived from Specified Unlawful
16                                      Activity; 18 U.S.C. § 1028A(a)(1):
                                        Aggravated Identity Theft; 26
17                                      U.S.C. § 7201: Tax Evasion; 18
                                        U.S.C. §§ 981(a)(1)(C) and 982, 28
18                                      U.S.C. § 2461(c), and 26 U.S.C.
                                        § 7301: Criminal Forfeiture]
19

20        The Grand Jury charges:

21                 COUNTS ONE THROUGH TWENTY-TWO

22                      [18 U.S.C. § 1343]

23   A.   INTRODUCTORY ALLEGATIONS

24        1.   At all times relevant to this Indictment:

25             a.   Defendant STEPHEN YOUNG KANG ("defendant KANG")

26   resided in Newport Beach, California, in Orange County, within the

27   Central District of California.

28

                            Ex.17

1    b.    Defendant KANG was an attorney licensed to practice

2    law in the State of California and the State of Texas.

3    c.    Defendant KANG exercised control over the following

4    bank accounts:

5    i.    Wells Fargo Bank Account Number xxxxxx6600 in the

6    name of Stephen Kang, Attorney at Law ("Kang Account 6600");

7    ii.    Wells Fargo Bank Account Number xxxxxx8639 in the

8    name of Gulf Technologies, Inc. ("Gulf Account 8639"); and

9    iii.    Amegy Bank Account Number xxx2567 in the name of

10   SGK Holdings Inc. ("SGK Account 2567").

11   d.    Prosperity Bank Account Number xxxxxx3161 was an

12   Interest on Lawyer's Trust Account ("IOLTA") located in Texas in the

13   name of TEXAS ACCESS TO JUSTICE FDN and associated with the law

14   office of N.H. (the "Prosperity Trust Account 3161").

15   e.    C.K. and S.K. were a married couple who resided in

16   Laguna Woods, California.

17   f.    G.F. was an individual who worked in Laguna Hills,

18   California.

19   g.    M.B. was an individual who resided in Sugar Land,

20   Texas.

21   h.    J.S. was an individual who resided in Irvine,

22   California.

23   i.    Ottogi America, Inc. ("Ottogi") was a California

24   corporation, with its principal place of business in Gardena,

25   California.

26   j.    To obtain an EB-5 immigration visa, an individual must

27   invest $1,000,000 in a commercial enterprise in the United States (or

28   $500,000 in a targeted high unemployment or rural area) that would

2

1  create or preserve ten permanent full-time jobs for qualified United

2  States workers.

3  B.   THE SCHEME TO DEFRAUD

4       2.   Beginning as early as in or about June 2010, and continuing

5  through in or about at least September 2015, in Los Angeles and

6  Orange Counties, within the Central District of California, and

7  elsewhere, defendant KANG, knowingly and with intent to defraud,

8  devised, participated in, and executed a scheme to defraud clients to

9  whom defendant KANG had agreed to provide legal or investment

10 services, including, but not limited to, C.K., S.K., G.F., Ottogi,

11 M.B., and J.S., as to material matters, and to obtain money and

12 property from such victims by means of material false and fraudulent

13 pretenses, representations, and promises, and the concealment of

14 material facts.

15 C.   THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD

16      3.   The scheme to defraud operated, in substance, in the

17 following manner:

18      a.   In or about July 2011, defendant KANG agreed to

19 provide legal and investment services to C.K. and S.K. in connection

20 with the filing of an EB-5 immigration visa application.  Defendant

21 KANG represented to C.K. and S.K. that he would assist with the EB-5

22 visa process and invest C.K. and S.K.'s money in a manner that would

23 facilitate the filing of the EB-5 visa application.

24      b.   In reliance on defendant KANG's representation that he

25 would invest C.K. and S.K.'s money in manner that would facilitate

26 the EB-5 visa process and in accordance with defendant KANG's

27 instructions, between in or about July 2011 and in or about December

28

1    2011, C.K. and S.K. wired a total of approximately $1,015,000 to SGK

2    Account 2567.

3         c.   In truth and in fact, defendant did not invest C.K.

4    and S.K.'s money in a manner that would facilitate the filing of C.K.

5    and S.K.'s EB-5 visa application.  Instead, defendant KANG used all

6    or part of C.K. and S.K.'s money for his own personal and business

7    expenses, and to pay other individuals who had invested money with

8    defendant KANG, including G.F.  Defendant KANG also transferred

9    portions of C.K. and S.K.'s money to bank accounts held in the name

10   of defendant KANG's wife.

11        d.   To conceal the fact that he had diverted C.K. and

12   S.K.'s investment for his own purposes and to pay other individuals

13   who invested money with defendant KANG, when C.K. and S.K. demanded a

14   return of their investment funds, defendant KANG used money he

15   received from other clients, including Ottogi and G.F., to repay a

16   portion of C.K. and S.K.'s investment.

17        e.   Starting as early as August 2011 and continuing

18   through at least August 2013, defendant KANG represented to G.F. that

19   payments G.F. had received from SGK Account 2567 were purportedly

20   income from a prior investment G.F. made with defendant Kang.

21        f.   In truth and in fact, defendant KANG used money that

22   he obtained from other clients, including C.K., S.K., and Ottogi, to

23   make some or all of these investment payments to G.F.

24        g.   In or about June 2013, defendant KANG represented that

25   he would facilitate for G.F. an additional $200,000 investment in SGK

26   Holdings, Inc.  Defendant KANG instructed G.F. to transfer

27   approximately $200,000 to Kang Account 6600 and falsely represented

28   to G.F. that Kang Account 6600 was an attorney trust account.

1        h.   In reliance on defendant KANG's representation

2    regarding the additional $200,000 investment and defendant KANG's

3    false representations regarding the source of the prior payments to

4    G.F. in connection with G.F.'s previous investments, between on or

5    about June 26, 2013, and on or about July 8, 2013, G.F. transferred

6    approximately $200,000 to SGK Account 2567 from G.F.'s personal and

7    business accounts.  Defendant KANG also caused G.F. to be provided

8    with a false "Asset Purchase Agreement," which stated that G.F. had

9    purchased a $200,000 investment in SGK Holdings, Inc. from the "Moses

10   L. Butt Living Trust" and that $200,000 had been transferred to the

11   "Moses L. Butt Living Trust" from Kang Account 6600 on or about July

12   10, 2013.

13       i.   In truth and in fact, G.F.'s money was neither

14   invested in SGK Holdings, Inc. nor transferred to the "Moses L. Butt

15   Living Trust" from Kang Account 6600.  Instead, defendant KANG used

16   all or part of G.F.'s $200,000 for his own personal or business

17   expenses, and to pay other individuals who had invested money with

18   defendant KANG, including, but not limited to, a payment of

19   approximately $60,000 to C.K. and S.K. on or about June 28, 2013.

20       j.   Starting as early as October 2012 and continuing

21   through at least October 2014, defendant KANG agreed to act as

22   Ottogi's legal representative in connection with, among other things,

23   the purchase of certain real estate lots (the "target lots") in

24   Gardena, California on Ottogi's behalf.  To facilitate defendant

25   KANG's legal representation of Ottogi, defendant KANG caused Ottogi

26   executives to execute power of attorney agreements, which provided

27   defendant KANG and N.H. (an attorney in Houston, Texas) with

28

1   authority to use Ottogi funds in connection with the purchase of the

2   target lots on Ottogi's behalf.

3          k.   In reliance on defendant KANG's representations to

4   Ottogi and in accordance with the terms of the power of attorney

5   agreements that defendant KANG caused Ottogi's executives to execute,

6   between October 2012 and March 2014, Ottogi wired a total of

7   approximately $3.7 million from Ottogi's bank accounts at Shinhan

8   Bank America into Prosperity Trust Account 3161, which was associated

9   with the law office of N.H.  Based on defendant KANG's

10  representations, Ottogi believed that the funds transferred to

11  Prosperity Trust Account 3161 would be used for the purchase of the

12  target lots on Ottogi's behalf.

13         l.   In truth and in fact, defendant KANG did not use the

14  money that Ottogi transferred into Prosperity Trust Account 3161 to

15  purchase the target lots on Ottogi's behalf and did not purchase the

16  target lots on Ottogi's behalf.  Instead, after Ottogi wired money

17  into Prosperity Trust Account 3161, defendant KANG caused the vast

18  majority of Ottogi's money to be transferred from Prosperity Trust

19  Account 3161 to other bank accounts that defendant KANG controlled.

20  Defendant KANG then used all or part of the Ottogi money that was

21  diverted into the accounts that he controlled for his own personal

22  and business expenses, and to pay other individuals who had invested

23  money with defendant KANG, including C.K., S.K., and G.F., and

24  transferred portions of Ottogi's money to bank accounts held in the

25  name of defendant KANG's wife.  Defendant KANG also caused Ottogi

26  funds to be directly transferred from Prosperity Trust Account 3161

27  to C.K. to repay a portion of the EB-5 visa-related investment money

28  C.K. and S.K. provided to defendant KANG.

1        m.    To conceal and further the scheme to defraud Ottogi,

2  defendant KANG presented fabricated, forged, or falsified documents

3  to Ottogi, Ottogi executives, and other individuals, representing

4  that he was in the process of purchasing or had already purchased the

5  target lots.

6        n.    In or about August 2013, defendant KANG agreed to

7  assist Ottogi in establishing a trust account at Amegy Bank in

8  Houston, Texas, to deposit additional Ottogi funds.  Defendant KANG

9  then represented to Ottogi that an account at Amegy Bank had been

10  established on Ottogi's behalf and that Ottogi's executives were

11  signatories on the account.  Defendant KANG also provided Ottogi with

12  instructions for wiring Ottogi's funds into the purported Ottogi

13  trust account at Amegy Bank.  In reliance on defendant KANG's

14  representations, Ottogi transferred approximately $420,000 to the

15  purported Ottogi trust account at Amegy Bank.  Between in or about

16  August 2013 and in or about June 2014, defendant KANG caused

17  fabricated, forged, or false documents to be presented to Ottogi

18  indicating that there was a $420,000 balance in an account at Amegy

19  Bank in the name of "Ottogi Care of SK Holdings."

20        o.    In truth and in fact, a trust account for Ottogi was

21  never established at Amegy Bank.  Instead, defendant KANG had

22  provided Ottogi with the account information and wire transfer

23  information for SGK Account 2567.  Defendant KANG then used the money

24  that Ottogi transferred to SGK Account 2567 for his own personal and

25  business expenses, and to pay other individuals who had invested

26  money with defendant KANG, including G.F.

27        p.    In or about April 2013, defendant KANG agreed to

28  invest approximately $500,000 of M.B.'s money in a corporation

1  purportedly called Pegasus Capital Ltd., L.L.C. ("Pegasus").

2  Defendant KANG instructed M.B. to transfer the money to Kang Account

3  6600 and falsely represented to M.B. that Kang Account 6600 was a

4  trust account.   In reliance on defendant KANG's representations, on

5  or about April 30, 2013, M.B. transferred approximately $500,000 to

6  Kang Account 6600.

7        q.   In truth and in fact, defendant KANG did not invest

8  M.B.'s money in Pegasus.   Instead, defendant KANG used all or part of

9  M.B.'s money for his own personal or business expenses, and

10  transferred portions of M.B.'s money from Kang Account 6600 to other

11  individuals, including defendant KANG's wife, without M.B.'s

12  authorization.

13        r.   When M.B. requested that defendant KANG return the

14  approximately $500,000 investment to M.B., defendant KANG repeatedly

15  represented that he would repay the money M.B. invested and, in or

16  about June 2015, provided M.B. with a payment of $15,000.   On or

17  about September 3, 2015, in connection with the repayment of the

18  remaining portion of M.B.'s approximately $500,000 investment,

19  defendant KANG entered into a signed, written agreement to provide

20  M.B. with a "first priority security interest" in an AAA Life

21  Insurance Company term life insurance policy, number xxxxxx7455 (the

22  "AAA Life Insurance Policy 7455"), purportedly belonging to defendant

23  KANG's estate.   Defendant KANG represented to M.B., among other

24  things, that defendant KANG's wife and children would not have any

25  ability to make a claim on AAA Life Insurance Policy 7455.

26        s.   In truth and in fact, the sole beneficiary for AAA

27  Life Insurance Policy 7455 is defendant KANG's wife.   Additionally,

28  defendant KANG failed to disclose to M.B. that the death benefit for

1   AAA Life Insurance Policy 7455 was only $250,000, and that defendant

2   KANG's application for AAA Life Insurance Policy 7455 was first

3   applied for and approved on August 28, 2015.   Defendant KANG also

4   failed to disclose to M.B. that on or about August 31, 2015, he

5   caused J.S. to be presented with a similar written agreement signed

6   by defendant KANG, in which defendant KANG would agree to provide

7   J.S. with the same "first priority security interest" in AAA Life

8   Insurance Policy 7455.

9          t.   Between in or about April 2014 and in or about August

10  2014, defendant KANG and J.S. agreed that defendant KANG would invest

11  a total of approximately $345,000 of J.S.'s money in the oil and gas

12  industry.   Defendant KANG instructed J.S. to transfer his money to

13  Kang Account 6600 and falsely represented to J.S. that Kang Account

14  6600 was an attorney trust account.   Defendant KANG also represented

15  to J.S. that the money had been invested or would be invested in Gulf

16  Technologies, Inc.   In reliance on defendant KANG's representations,

17  between on or about April 25, 2014, and on or about August 7, 2014,

18  J.S. transferred approximately $345,000 to Kang Account 6600 for

19  defendant KANG to invest on his behalf.

20         u.   In truth and in fact, defendant KANG did not invest

21  J.S.'s money in Gulf Technologies, Inc.   Instead, defendant KANG used

22  all or part of J.S.'s money for his own personal or business

23  expenses, and transferred portions of J.S.'s money from Kang Account

24  6600 to other individuals without J.S.'s authorization.

25         v.   To conceal the fact that he had used J.S.'s investment

26  money for his own purposes, when J.S. requested that defendant KANG

27  return J.S.'s investment, defendant KANG continued to falsely

28  represent that J.S.'s money had been invested with Gulf Technologies,

1 | Inc. and promised that he would attempt to get J.S.'s money back for

2 | him from Gulf Technologies, Inc.

3 | D.   THE USE OF THE WIRES

4 |       4.   On or about the following dates, in Los Angeles and Orange

5 | Counties, within the Central District of California, and elsewhere,

6 | defendant KANG, for the purpose of executing the above-described

7 | scheme to defraud, transmitted or caused the transmission of the

8 | following items by means of wire communication in interstate and

9 | foreign commerce:

| COUNT | DATE | ACT |
|---|---|---|
| ONE | 7/28/2011 | Wire transfer of approximately $30,000 from the Shinhan Bank America account of C.K. held in Orange County, California, to SGK Account 2567 held in Houston, Texas |
| TWO | 10/26/2012 | Wire transfer of approximately $350,000 from the Shinhan Bank America account of Ottogi held in Los Angeles, California, to Prosperity Trust Account 3161 held in Houston, Texas |
| THREE | 10/29/2012 | Wire transfer of approximately $255,000 from Prosperity Trust Account 3161 held in Houston, Texas to Gulf Account 8639 held in Orange County, California |
| FOUR | 11/2/2012 | Wire transfer of approximately $980,000 from Shinhan Bank America account of Ottogi held in Los Angeles, California to Prosperity Trust Account 3161 held in Houston, Texas |
| FIVE | 11/5/2012 | Wire transfer of approximately $435,000 from Prosperity Trust Account 3161 held in Houston, Texas, to Gulf Account 8639 held in Orange County, California |
| SIX | 11/14/2012 | Wire transfer of approximately $210,000 from Prosperity Trust Account 3161 held in Houston, Texas, to Gulf Account 8639 held in Orange County, California |
| SEVEN | 11/19/2012 | Wire transfer of approximately $150,000 from Prosperity Trust Account 3161 held in Houston, Texas, to Gulf Account 8639 held in Orange County, California |
| EIGHT | 1/3/2013 | Wire transfer of approximately $1,010,000 from the Shinhan Bank America account of Ottogi held in Los Angeles, California, to Prosperity Account 3161 held in Houston, Texas |

| NINE | 1/4/2013 | Wire transfer of approximately $150,000 from Prosperity Trust Account 3161 held in Houston, Texas, to Gulf Account 8639 held in Orange County, California |
|---|---|---|
| TEN | 1/11/2013 | Wire transfer of approximately $200,000 from Prosperity Trust Account 3161 held in Houston, Texas, to Gulf Account 8639 held in Orange County, California |
| ELEVEN | 1/28/2013 | Wire transfer of approximately $170,000 from Prosperity Trust Account 3161 held in Houston, Texas, to Gulf Account 8639 held in Orange County, California |
| TWELVE | 2/12/2013 | Wire transfer of approximately $200,000 from Prosperity Trust Account 3161 held in Houston, Texas, to the Shinhan Bank America account of C.K. and S.K. held in Los Angeles, California |
| THIRTEEN | 2/12/2013 | Wire transfer of approximately $150,000 from Prosperity Trust Account 3161 held in Houston, Texas, to Gulf Account 8639 held in Orange County, California |
| FOURTEEN | 5/29/2013 | Wire transfer of approximately $406,000 from the Shinhan Bank America Bank account of Ottogi held in Los Angeles, California, to Prosperity Trust Account 3161 held in Houston, Texas |
| FIFTEEN | 5/29/2013 | Wire transfer of approximately $100,000 from the Shinhan Bank America account of Ottogi held in Los Angeles, California, to Prosperity Trust Account 3161 held in Houston, Texas |
| SIXTEEN | 5/30/2013 | Wire transfer of approximately $500,000 from Prosperity Trust Account 3161 held in Houston, Texas, to Gulf Account 8639 held in Orange County, California |
| SEVENTEEN | 6/28/2013 | Wire transfer of approximately $60,000 from Kang Account 6600 held in Houston, Texas, to the Shinhan Bank America account of C.K. held in Orange County, California |
| EIGHTEEN | 8/6/2013 | Wire transfer of approximately $420,000 from the Shinhan Bank America account of Ottogi held in Los Angeles, California, to SGK Account 2567 held in Houston, Texas |
| NINETEEN | 2/5/2014 | Wire transfer of approximately $300,000 from the Shinhan Bank America account of Ottogi held in Los Angeles, California, to Prosperity Trust Account 3161 held in Houston, Texas |
| TWENTY | 3/11/2014 | Wire transfer of approximately $570,000 from Shinhan Bank America account of Ottogi held in Los Angeles, California, to Prosperity Trust Account 3161 held in Houston, Texas |

| | | | |
|---|---|---|---|
| TWENTY-ONE | 4/25/2014 | | Wire transfer of approximately $249,975 from the BBCN Bank account for J.S.'s business held in Los Angeles, California, to Kang Account 6600 held in Houston, Texas |
| TWENTY-TWO | 9/3/2015 | | Interstate email from defendant KANG at stephenkang@earthlink.net, sent at approximately 9:34 a.m., to M.B. at [m.b.]@yahoo.com |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNTS TWENTY-THREE THROUGH TWENTY-FIVE

[18 U.S.C. § 1957]

5.   The Grand Jury realleges and incorporates by reference paragraphs 1 through 3 of this Indictment as though fully set forth herein.

6.   On or about the following dates, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant KANG, knowing that the funds involved represented the proceeds of some form of unlawful activity, engaged in the following monetary transactions, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, namely, wire fraud in violation of Title 18, United States Code, Section 1343:

| COUNT | DATE | TRANSACTION |
| --- | --- | --- |
| TWENTY-THREE | 2/10/2014 | Transfer of $11,800 from Kang Account 6600 by check number 4269, payable to E.M. |
| TWENTY-FOUR | 3/13/2014 | Transfer of $10,800 from Kang Account 6600 by check number 4297, payable to E.M. |
| TWENTY-FIVE | 3/14/2014 | Transfer of $15,000 from Kang Account 6600 by check number 4305, payable to M Bar Restaurant |

COUNT TWENTY-SIX

[18 U.S.C. § 1028A(a)(1)]

7.   The Grand Jury realleges and incorporates by reference paragraphs 1 through 3 of this Indictment as though fully set forth herein.

8.   On or about November 2, 2013, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant KANG knowingly transferred, possessed, and used, without lawful authority, a means of identification that defendant KANG knew belonged to another person, that is, the name and forged signature of N.H. on a settlement agreement purporting to relate to the purchase of two of the target lots on behalf of Ottogi, during and in relation to wire fraud, a felony violation of Title 18, United States Code, Section 1343, as charged in Counts Two, Four, Eight, and Fourteen of this Indictment.

14

COUNT TWENTY-SEVEN

[18 U.S.C. § 1028A(a)(1)]

9.    The Grand Jury realleges and incorporates by reference paragraphs 1 through 3 of this Indictment as though fully set forth herein.

10.    On or about November 4, 2013, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant KANG knowingly transferred, possessed, and used, without lawful authority, a means of identification that defendant KANG knew belonged to another person, that is, the name and forged signature of M.T. on a letter purportedly dated November 1, 2013, regarding the funds transferred from Ottogi to SGK Account 2567, during and in relation to wire fraud, a felony violation of Title 18, United States Code, Section 1343, as charged in Count Eighteen of this Indictment.

COUNT TWENTY-EIGHT

[26 U.S.C. § 7201]

11. The Grand Jury realleges and incorporates by reference paragraph 1 of this First Superseding Indictment as though fully set forth herein.

12. During the calendar year 2012 and continuing through on or about April 15, 2013, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant KANG had and received a taxable income of at least approximately $1,330,000 and upon that taxable income owed to the United States of America an income tax of at least approximately $446,657. Defendant KANG was required by law, on or before April 15, 2013, to prepare and file an income tax return with the Internal Revenue Service, reporting such taxable income, and to pay such income tax.

13. Beginning in or about January 2012, and continuing through on or about April 15, 2013, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant KANG willfully attempted to evade and defeat the assessment and payment of the income tax due and owing by him to the United States of America for calendar year 2012 by failing to file an income tax return on or before April 15, 2013, as required by law, to any proper officer of the Internal Revenue Service; failing to pay the income tax to the Internal Revenue Service; and concealing and attempting to conceal from all proper officers of the United States his true and correct taxable income by committing the following affirmative acts, amongst others:

a. Using Prosperity Trust Account 3161, which was associated with the law office of N.H., to receive money defendant

1  KANG obtained from his client, Ottogi, in order to make it appear

2  that this money would be used on Ottogi's behalf, when, in fact, as

3  defendant KANG knew, it would instead be transferred and used for

4  defendant KANG's own benefit;

5         b.   Causing the transfer of funds from Prosperity Trust

6  Account 3161 to Gulf Account 8639, which was a corporate account, to

7  make it appear that the funds would be used on the corporation's

8  behalf when, in fact, defendant KANG knew the money would not be used

9  for the corporation's benefit and would instead be transferred and

10  used for defendant KANG's own benefit; and

11         c.   Causing the transfer of funds from Gulf Account 8639,

12  to SGK Account 2567, another corporate account, to make it appear

13  that the funds would be used on the corporation's behalf when, in

14  fact, defendant KANG knew the money would not be used for the

15  corporation's benefit and would instead be transferred and used for

16  defendant KANG's own benefit.

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWENTY-NINE

[26 U.S.C. § 7201]

14.   The Grand Jury realleges and incorporates by reference paragraph 1 of this First Superseding Indictment as though fully set forth herein.

15.   During the calendar year 2013 and continuing through on or about April 15, 2014, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant KANG had and received a taxable income of at least approximately $1,516,000 and upon that taxable income owed to the United States of America an income tax of at least approximately $571,743.   Defendant KANG was required by law, on or before April 15, 2014, to prepare and file an income tax return with the Internal Revenue Service, reporting such taxable income, and to pay such income tax.

16.   Beginning in or about January 2013, and continuing through on or about April 15, 2014, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant KANG willfully attempted to evade and defeat the assessment and payment of the income tax due and owing by him to the United States of America for calendar year 2013 by failing to file an income tax return on or before April 15, 2014, as required by law, to any proper officer of the Internal Revenue Service; failing to pay the income tax to the Internal Revenue Service; and concealing and attempting to conceal from all proper officers of the United States his true and correct taxable income by committing the following affirmative acts, amongst others:

a.   Using Prosperity Trust Account 3161, which was associated with the law office of N.H., to receive money defendant

18

1  KANG obtained from his client, Ottogi, in order to make it appear
2  that this money would be used on Ottogi's behalf, when, in fact, as
3  defendant KANG knew, it would instead be transferred and used for
4  defendant KANG's own benefit;

5        b.   Using SGK Account 2567, which was a corporate account,
6  to receive money defendant KANG obtained from his client, Ottogi, in
7  order to make it appear that this money would be used for Ottogi's
8  benefit, when, in fact, as defendant KANG knew, it would instead be
9  transferred and used for defendant KANG's own benefit;

10        c.   Causing the transfer of funds from Prosperity Trust
11  Account 3161 to Gulf Account 8639, which was a corporate account, to
12  make it appear that the funds would be used on the corporation's
13  behalf when, in fact, defendant KANG knew the money would not be used
14  for the corporation's benefit and would instead be transferred and
15  used for defendant KANG's own benefit; and

16        d.   Causing the transfer of funds from Gulf Account 8639,
17  to SGK Account 2567, another corporate account, to make it appear
18  that the funds would be used on the corporation's behalf when, in
19  fact, defendant KANG knew the money would not be used for the
20  corporation's benefit and would instead be transferred and used for
21  defendant KANG's own benefit.

COUNT THIRTY

[26 U.S.C. § 7201]

17.  The Grand Jury realleges and incorporates by reference paragraph 1 of this First Superseding Indictment as though fully set forth herein.

18.  During the calendar year 2014 and continuing through on or about April 15, 2015, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant KANG had and received a taxable income of at least approximately $609,100 and upon that taxable income owed to the United States of America an income tax of at least approximately $212,125.  Defendant KANG was required by law, on or before April 15, 2015, to prepare and file an income tax return with the Internal Revenue Service, reporting such taxable income, and to pay such income tax.

19.  Beginning in or about January 2014, and continuing through on or about April 15, 2015, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant KANG willfully attempted to evade and defeat the assessment and payment of the income tax due and owing by him to the United States of America for calendar year 2014 by failing to file an income tax return on or before April 15, 2015, as required by law, to any proper officer of the Internal Revenue Service; failing to pay the income tax to the Internal Revenue Service; and concealing and attempting to conceal from all proper officers of the United States his true and correct taxable income by committing the following affirmative acts, amongst others:

a.  Using Prosperity Trust Account 3161, which was associated with the law office of N.H., to receive money defendant

20

1   KANG obtained from his client, Ottogi, in order to make it appear

2   that this money would be used on Ottogi's behalf, when, in fact, as

3   defendant KANG knew, it would instead be transferred and used for

4   defendant KANG's own benefit.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                   FORFEITURE ALLEGATION ONE

2          [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3       1.    Pursuant to Title 18, United States Code, Section

4  981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Rule

5  32.2(a), Fed. R. Crim. P., if defendant STEPHEN YOUNG KANG

6  ("defendant KANG") is convicted of any of the offenses set forth in

7  Counts One through Twenty-Two of this First Superseding Indictment,

8  he shall forfeit to the United States the following property:

9         a.    All right, title and interest in any and all property,

10  real or personal, constituting, or derived from, any proceeds

11  obtained, directly or indirectly, as a result of any offense charged

12  in each such Count; and

13         b.    A sum of money equal to the total value of the

14  property described in subparagraph a.

15       2.    Pursuant to Title 21, United States Code, Section 853(p),

16  as incorporated by Title 18, United States Code, Section 982(b) and

17  Title 28, United States Code, Section 2461(c), defendant KANG shall

18  forfeit substitute property, up to the total value of the property

19  described in the preceding paragraph if, as the result of any act or

20  omission of defendant KANG, the property described in the preceding

21  paragraph, or any portion thereof:  (a) cannot be located upon the

22  exercise of due diligence; (b) has been transferred, sold to or

23  deposited with a third party; (c) has been placed beyond the

24  jurisdiction of the court; (d) has been substantially diminished in

25  value; or (e) has been commingled with other property that cannot be

26  divided without difficulty.

27

28

1                             FORFEITURE ALLEGATION TWO

2                                 [18 U.S.C. § 982]

3      1.    Pursuant to Title 18, United States Code, Section 982, and

4 Rule 32.2(a), Fed. R. Crim. P., if defendant STEPHEN YOUNG KANG

5 ("defendant KANG") is convicted of any of the offenses set forth in

6 Counts Twenty-Three through Twenty-Five of this First Superseding

7 Indictment, he shall forfeit to the United States the following

8 property:

9         a.    Any property, real or personal, involved in such

10 offense, and any property traceable to such property.

11      2.    Pursuant to Title 21, United States Code, Section 853(p)

12 and Title 18, United States Code, Section 982(b)(2), the defendant

13 shall forfeit substitute property, if, by any act or omission of the

14 defendant, the property described in paragraph 1, or any portion

15 thereof, cannot be located upon the exercise of due diligence; has

16 been transferred, sold to, or deposited with a third party; has been

17 placed beyond the jurisdiction of the court; has been substantially

18 diminished in value; or has been commingled with other property that

19 cannot be divided without difficulty. Substitution of assets shall

20 not be ordered, however, where defendant acted merely as an

21 intermediary who handled but did not retain the property in the

22 course of the money laundering offense unless the defendant, in

23 committing the offense or offenses giving rise to the forfeiture,

24 conducted three or more separate transactions involving a total of

25 $100,000.00 or more in any twelve month period.

26

27

28

FORFEITURE ALLEGATION THREE

[26 U.S.C. § 7301 and 28 U.S.C. § 2461(c)]

1.   Pursuant to Title 26, United States Code, Section 7301, Title 28, United States Code, Section 2461(c), and Rule 32.2(a), Fed. R. Crim. P., if defendant STEPHEN YOUNG KANG ("defendant KANG") is convicted of any of the offenses set forth in Counts Twenty-Eight through Thirty of this First Superseding Indictment, he shall forfeit to the United States the following property:

a.   Any property sold or removed by defendant KANG in fraud of the internal revenue laws, or with design to avoid payment of such tax, or which was removed, deposited, or concealed, with intent to defraud the United States of such tax or any part thereof.

b.   All property manufactured into property of a kind subject to tax for the purpose of selling such taxable property in fraud of the internal revenue laws, or with design to evade the payment of such tax.

c.   All property whatsoever, in the place or building, or any yard or enclosure, where the property described in subsection (a) or (b) is found, or which is intended to be used in the making of property described in subsection (a), with intent to defraud the United States of tax or any part thereof, on the property described in subsection (a).

d.   All property used as a container for, or which shall have contained, property described in subsection (a) or (b).

e.   Any property (including aircraft, vehicles, vessels, or draft animals) used to transport or for the deposit or concealment of property described in subsection (a) or (b), or any property used to transport or for the deposit or concealment of property which is

24

1  intended to be used in the making or packaging of property described

2  in subsection (a).

3       2.    Pursuant to Title 21, United States Code, Section 853(p),

4  as incorporated by Title 18, United States Code, Section 982(b) and

5  Title 28, United States Code, Section 2461(c), defendant KANG shall

6  forfeit substitute property, up to the total value of the property

7  described in the preceding paragraph if, as the result of any act or

8  omission of defendant KANG, the property described in the preceding

9  paragraph, or any portion thereof:  (a) cannot be located upon the

10 exercise of due diligence; (b) has been transferred, sold to or

11 deposited with a third party; (c) has been placed beyond the

12 jurisdiction of the court; (d) has been substantially diminished in

13 ///

14 ///

15 ///

16

17

18

19

20

21

22

23

24

25

26

27

28

1  value; or (e) has been commingled with other property that cannot be

2  divided without difficulty.

3                                    A TRUE BILL

4

5                                    /s/
                                    _____
6                                    Foreperson

7  EILEEN M. DECKER
   United States Attorney

8  LAWRENCE S. MIDDLETON
   Assistant United States Attorney
9  Chief, Criminal Division

10

11
   SCOTT M. GARRINGER
12 Assistant United States Attorney
   Deputy Chief, Criminal Division
13
   RUTH C. PINKEL
14 Assistant United States Attorney
   Chief, General Crimes Section
15
   WILLIAM CROWFOOT
16 Assistant United States Attorney
   Acting Deputy Chief, General
17 Crimes Section

18 JULIAN L. ANDRÉ
   ANIL J. ANTONY
19 Assistant United States Attorneys
   General Crimes Section
20

21

22

23

24

25

26

27

28

                                    26

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 15260 Ventura Boulevard, Suite 920, Sherman Oaks, CA 91403.

On March 14, 2016, I served the document described as **FIRST AMENDED CROSS-COMPLAINT AGAINST STEPHEN YOUNG KANG; STEPHEN Y. KANG, P.L.L.C.; STEPHEN YOUNG KANG, PLLC; LAW OFFICES OF STEVEN KANG PC; SK HOLDINGS; SK HOLDING, LLC; GULF ENERGY TECHNOLOGIES, INC.; GULF TECHNOLOGIES, INC.; GULF TECHNOLOGIES, LTD.; GULF TECHNOLOGY DKT, LTD.; OTTOGI AMERICA, INC.; SEUNG YUB LEE; KANGSIK HONG; CHOON JA KIM FOR (1) INDEMNIFICATION; (2) BREACH OF CONTRACT; (3) INDEMNITY AND CONTRIBUTION; (4) DECLARATORY RELIEF; (5) FRAUD; (6) CONVERSION; (7) MONEY HAD AND RECEIVED; (8) NEGLIGENCE; (9) IDENTITY THEFT; AND (10 NEGLIGENT MISREPRESENTATION** upon the interested parties in this action in sealed envelopes addressed as follows:

SEE ATTACHED SERVICE LIST

X     **(By Mail)** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Sherman Oaks, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day of deposit for mailing contained in affidavit.

Executed on March 14, 2016, at Sherman Oaks, California.

X     (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

MICHELLE SHAPIRO

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500  FACSIMILE (818) 501-0328

SERVICE LIST

| | |
|---|---|
| **Attorneys for Plaintiff Ottogi America, Inc./ Cross-Defendants Kang Hoon Lee (erroneously named Gang Hoon Lee) and Young Joon Ham** <br> Hayward J. Kaiser <br> Elaine K. Kim <br> Andrew C. Spitser <br> Mitchell Silberberg & Knupp LLP <br> 11377 West Olympic Boulevard <br> Los Angeles, CA 90064-1683 <br> Tel: (310) 312-2000/ Fax: (310) 312-3100 <br> hjk@msk.com; ekk@msk.com; acs@msk.com | **Attorneys for Defendants Stephen Young Kang, Stephen Kang PLLC, and Stephen Young Kang PLLC;** <br> James W. Spertus <br> Ezra D. Landes <br> Spertus, Landes & Umhofer, LLP <br> 1990 S. Bundy Drive, Suite 705 <br> Los Angeles, CA 90025 <br> Tel:  (310) 826-4700 <br> ezra@spertuslaw.com; jim@spertuslaw.com; diane@spertuslaw.com |
| **Attorney for Cross-Defendant Kangsik Hong** <br> Jong Pil Pak, Esq. <br> Law Offices of J.P. Pak <br> 3600 Wilshire Blvd., Suite 720 <br> Los Angeles, CA 90010 <br> Tel: (213) 736-5100 / Fax: (213) 736-5303 <br> loojpp@yahoo.com | **Attorneys for Defendants Nomaan K. Husain, Nomaan K. Husain, P.C., and Young & Husain, PLLC;** <br> Gayle I. Jenkins <br> Winston & Strawn LLP <br> 333 South Grand Avenue, 38th Floor <br> Los Angeles, CA 90071-1543 <br> Tel: (213) 615-1700 / Fax: (213) 615-1750 <br> Gjenkins@winston.com |
| **Attorneys for Defendant GEORGE DOREMUS** <br> Marc S. Williams <br> Dordi Williams Cohen, LLP <br> 724 South Spring Street, Suite 903 <br> Los Angeles, CA 90014 <br> Tel:  (213) 232-5162 /Fax: (213) 232-5167 <br> mwilliams@dordiwilliamscohen.com | **Attorneys for Cross-Defendant Seung Yub Lee** <br> Pio S. Kim, Esq. <br> LIM, RUGER & KIM, LLP <br> 1055 West Seventh Street, Suite 2800 <br> Los Angeles, CA 90017 <br> Tel: (213) 955-9500 <br> Pio.Kim@limruger.com |
| Mr. Souk Ghee Kim <br> Ms. Choon Ja Kim <br> 189 Avenida Majorca, #D <br> Laguna Woods, CA 92637 | Todd Goetz, In Pro Per <br> 6475 East Pacific Coast Highway, #264 <br> Long Beach, CA 90803 <br> Tel: (562) 209-0106 <br> sosongeul@gmail.com |
| **Attorneys for Gulf Energy Technologies, Inc. (DOE 41)** <br> Registered Agent George Doremus <br> 13326 Brantonwood <br> Houston, Texas 77077 | **Attorneys for Gulf Technologies, Inc. (DOE 42)** <br> Registered Agent George Doremus <br> 1930 Village Center Cir. Ste.3 <br> Las Vegas, Nevada 89107 |

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

PROOF OF SERVICE



| Attorneys for Gulf Technology DKT, Ltd (DOE 49) | Attorneys for Gulf Technology, Ltd (DOE 43) |
|---|---|
| Registered Agent<br>19 Par-La-Ville Road<br>Hamilton HM 11<br>BERMUDA | Stephen Young Kang, Director<br>1001 Avenida Pico, C504<br>San Clemente, CA 92673 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NEMECEK & COLE
A PROFESSIONAL CORPORATION
16250 VENTURA BOULEVARD, SUITE 900, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

**PROOF OF SERVICE**

<u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

      I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 15260 Ventura Boulevard, Suite 920, Sherman Oaks, CA 91403.

      On July 18, 2016, I served the document described as **SECOND AMENDED CROSS-COMPLAINT AGAINST STEPHEN YOUNG KANG; STEPHEN Y. KANG, P.L.L.C.; STEPHEN YOUNG KANG, PLLC; LAW OFFICES OF STEVEN KANG PC; SK HOLDINGS; SK HOLDING, LLC; GULF ENERGY TECHNOLOGIES, INC.; GULF TECHNOLOGIES, INC.; GULF TECHNOLOGIES, LTD.; GULF TECHNOLOGY DKT, LTD.; OTTOGI AMERICA, INC.; SEUNG YUB LEE; KANGSIK HONG; CHOON JA KIM FOR (1) INDEMNIFICATION; (2) BREACH OF CONTRACT; (3) INDEMNITY AND CONTRIBUTION; (4) DECLARATORY RELIEF; (5) FRAUD; (6) CONVERSION; (7) MONEY HAD AND RECEIVED; (8) IDENTITY THEFT; AND (9) NEGLIGENT MISREPRESENTATION** upon the interested parties in this action in sealed envelopes addressed as follows:

<u>SEE ATTACHED SERVICE LIST</u>

X     **(By Mail)** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Sherman Oaks, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day of deposit for mailing contained in affidavit.

\_\_\_\_     **(By Overnight Delivery)** I deposited this document in the box or other facility located at 15260 Ventura Blvd., Suite 920, Sherman Oaks, CA 91403 regularly maintained by GSO Overnight, in an envelope designated by GSO Overnight, with delivery fees paid or provided for, addressed to the persons on whom it is to be served, for guaranteed next day delivery.

\_\_\_\_     **(By Facsimile Transmission)** I caused the foregoing document to be served by facsimile transmission to each of the interested parties at the facsimile machine telecopy number shown above.

\_\_\_\_     **(By Personal Service)** I delivered such envelope by hand to the offices of the addressee.

\_\_\_\_     **(By Electronic Service - to individual persons)** By electronically transmitting the document(s) listed above to the e-mail address(es) of the person(s) set forth on the attached service list from the e-mail address dgonzales@nemecek-cole.com. To my knowledge, the transmission was reported as complete and without error. *See, California Rules of Court, Rule 2.251.*

Executed on July 18, 2016, at Sherman Oaks, California.

X     **(State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

MICHELLE SHAPIRO

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

1

## SERVICE LIST

2

| **Attorneys for Plaintiff Ottogi America, Inc./ Cross-Defendants Kang Hoon Lee (erroneously named Gang Hoon Lee) and Young Joon Ham** Hayward J. Kaiser Elaine K. Kim Andrew C. Spitser Mitchell Silberberg & Knupp LLP 11377 West Olympic Boulevard Los Angeles, CA 90064-1683 Tel: (310) 312-2000/ Fax: (310) 312-3100 hjk@msk.com; ekk@msk.com; acs@msk.com | Stephen Young Kang, In Pro Per 1001 Avenida Pico, #C504 San Clemente, CA 92673 Tel: (949) 292-9371 stephenyoungkang@earthlink.net  **\*LEGAL MAIL\*** Stephen Kang Inmate Register 69430-112 Taft Correctional Institution 1500 Cedar Road Taft, CA 93268 |
|---|---|
| **Attorney for Cross-Defendant Kangsik Hong** Jong Pil Pak, Esq. Law Offices of J.P. Pak 3600 Wilshire Blvd., Suite 720 Los Angeles, CA 90010 Tel: (213) 736-5100 / Fax: (213) 736-5303 loojpp@yahoo.com | **Attorneys for Defendants Nomaan K. Husain, Nomaan K. Husain, P.C., and Young & Husain, PLLC;** Gayle I. Jenkins Winston & Strawn LLP 333 South Grand Avenue, 38th Floor Los Angeles, CA 90071-1543 Tel: (213) 615-1700 / Fax: (213) 615-1750 Gjenkins@winston.com |
| **Attorneys for Defendants and Cross-Complainants, Choon Ja Kim and Souk Ghee Kim** Edward J. Chong, Esq. Law Offices of Edward J. Chong & Assoc., Inc. 3325 Wilshire Blvd., Suite 1250 Los Angeles, CA 90010 Tel: (213) 386-1990 / Fax: (213) 386-1800 | **Attorneys for Cross-Defendant Seung Yub Lee** Pio S. Kim, Esq. LIM, RUGER & KIM, LLP 1055 West Seventh Street, Suite 2800 Los Angeles, CA 90017 Tel: (213) 955-9500 / Fax: (213) 955-9511 Pio.Kim@limruger.com |
| **Attorneys for Defendant GEORGE DOREMUS** Marc S. Williams Dordi Williams Cohen, LLP 724 South Spring Street, Suite 903 Los Angeles, CA 90014 Tel: (213) 232-5162 /Fax: (213) 232-5167 mwilliams@dordiwilliamscohen.com | **Attorneys for Gulf Technologies, Inc.** Registered Agent George Doremus 1930 Village Center Cir. Ste.3 Las Vegas, Nevada 89107 |
| **Attorneys for Gulf Energy Technologies, Inc.** Registered Agent George Doremus 13326 Brantonwood Houston, Texas 77077 | **Attorneys for Gulf Technology, LTD** Stephen Young Kang, Director 1001 Avenida Pico, C504 San Clemente, CA 92673 |
| **Attorneys for Gulf Technology DKT, LTD** Registered Agent 19 Par-La-Ville Road Hamilton HM 11 BERMUDA | |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NEMECEK & COLE
A PROFESSIONAL CORPORATION
15260 VENTURA BOULEVARD, SUITE 920, SHERMAN OAKS, CALIFORNIA 91403-5344
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

# EXHIBIT

# H

Page 1

1

2    UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

3    SAN FRANCISCO DIVISION

4    Case No. 3:13-cv-04115-WHO

————————————————————————————————

5    IN RE KOREAN RAMEN ANTITRUST

LITIGATION

6    ————————————————————————————————

7    THIS DOCUMENT RELATES TO

ALL ACTIONS

8    ————————————————————————————————

9

April 5, 2016

10                          10:53 a.m.

11

12       ***** HIGHLY CONFIDENTIAL *****

13       ***** ATTORNEYS' EYES ONLY *****

14

15

16                   Videotaped deposition of

17   SE CHANG LEE, taken by Plaintiffs,

18   pursuant to Notice, held at the offices of

19   Yoon & Yang LLC, ASEM Tower, 517

20   Yeongdong-daero, Gangnam-Gu, Seoul, Korea,

21   before Sharon Lengel, a Registered

22   Professional Reporter, Certified Realtime

23   Reporter, and Notary Public.

24

25

Page 5

1

2      Dunn & Crutcher for Ottogi Corporation

3      Limited and Ottogi America, Inc.

4           MS. LEE:  Hyeayoung Lee,

5      in-house counsel of Ottogi Corporation

6      Limited.

7           THE INTERPRETER:  Albert Kim,

8      interpreter.

9           THE VIDEOGRAPHER:  Thank you.

10           The court reporter will swear in

11      the interpreter and the witness.

12  A L B E R T    K I M,

13           the interpreter, having first

14           been duly sworn by Sharon Lengel,

15           the Notary Public, interpreted

16           the testimony as follows:

17  S E   C H A N G   L E E,

18           having first been duly sworn by

19           Sharon Lengel, the Notary Public,

20           was examined and testified as

21           follows:

22           MR. KINDALL:  Before we get

23      underway, does Counsel have a

24      statement regarding the

25      confidentiality of the transcript and

```
                                    Page 13
```

 1   LEE - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY

 2        There are a number of ways that it's

 3        referred to.  So I will hopefully be

 4        able to get this clarified.

 5        Q.    Do you know whether Ottogi Korea

 6   has an email server that is centralized

 7   and can be accessed by its employees

 8   regardless of what computer terminal they

 9   are using?

10        A.    Yes.  The company does.

11        Q.    Okay.  Who in the company is

12   responsible for maintaining the Ottogi

13   email server?

14        A.    So presently, the management

15   improvement team is responsible for that.

16        Q.    Okay.  Do you know whether the

17   Ottogi email server is used by employees

18   of other Ottogi entities besides Ottogi

19   Korea?

20        A.    Yes.

21        Q.    So employees of Ottogi Ramen,

22   Inc., would use the Ottogi Korea email

23   server; is that right?

24        A.    So there is actually a separate

25   company to which these functions were

                                        Page 14

 1   LEE - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY
 2    outsourced in terms of the mail server and
 3    such.  My understanding is that the --
 4    they make available the use of the email
 5    server to Ottogi Korea as well as Ramen
 6    and so forth.
 7         Q.    What is the name of that
 8    separate company that maintains the email
 9    server?
10         A.    It's called --
11               THE INTERPRETER:  Let's go
12         with --
13         A.    -- Poonglim Data Systems.
14         Q.    Do you know whether Poonglim
15    Data Systems is an affiliate of Ottogi
16    Korea?
17               MS. YU:  Objection.
18         A.    Yes.
19               MS. YU:  To the extent the
20         question calls for a legal conclusion.
21         But he may answer.
22         A.    Yes.  It is an affiliate.
23         Q.    Okay.  And do you know whether
24    the email server that is maintained by
25    Poonglim Data Systems that is used by

```
                                        Page 15
```

1    LEE - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY

2       Ottogi Korea is also used by employees of

3       Ottogi America?

4                MS. YU:  Wait.  Interpreter, did

5           you say "Ottogi Korea employees" or

6           "Ottogi America employees"?

7                THE INTERPRETER:  The

8           interpreter rendered it exactly as is

9           there.  Counsel's question involved

10          both.

11               MR. KINDALL:  It did.

12               THE INTERPRETER:  The import

13          was --

14               MS. YU:  Okay.  I thought he

15          said "Ottogi Korea" twice.  Sorry.

16               THE INTERPRETER:  If he did,

17          apologies.

18               MR. KINDALL:  Can you just

19          re-ask the question to make sure.

20               THE INTERPRETER:  He believes he

21          didn't, but not to second-guess

22          Counsel.

23               (The requested portion of the

24          record was interpreted to the witness

25          by the interpreter.)

```
                                    Page 16
```

 1   LEE - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY

 2        A.    Yes.

 3        Q.    Are there policies that are --

 4   strike.

 5              Does the management improvement

 6   team or its predecessor establish any

 7   policies concerning the retention of

 8   emails on the email server maintained by

 9   Poonglim Data Systems?

10        A.    Yes.

11        Q.    Do you know whether those

12   policies exist in written form?

13        A.    Depending on the, say, issue at

14   hand, some of it could be in written form;

15   some of it could be done in oral fashion.

16        Q.    Okay.  Are you aware of any

17   compilation of the written policies

18   related to email retention?

19        A.    And you're asking this in terms

20   of the preservation or retention of

21   emails; right?

22        Q.    I am.

23        A.    So offhand, I am not sure if I

24   can recall anything written, as such.  But

25   in terms of the, say -- say, the

Page 19

1   LEE - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY
2      document, such as an email, should be
3      retained?
4         A.    So in terms of what might be
5      termed "electronic files," I'm talking
6      about files.  There is no limitation
7      placed, based upon what my understanding
8      is.  When it comes to emails, however,
9      there is a one-month limitation for how
10     long you keep those.
11        Q.    So are employees required to
12     delete any emails that are older than one
13     month?
14        A.    No.  It's not the people
15     themselves who do that.
16        Q.    Okay.  How does it work?
17        A.    So that is a function of the
18     server itself.  So it basically retains
19     emails for a one-month period, after which
20     it, you know, deletes them.
21        Q.    Does it delete and then
22     overwrite the storage where they were, or
23     does it simply delete them?
24        A.    And so it gets --
25              THE INTERPRETER:  Strike.

Page 20

1   LEE - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY

2        A.     The system deletes it, and then,

3    for at least that particular day, we hold

4    on to that information.  And then the next

5    day, it gets overwritten.

6        Q.     If someone received an important

7    email that they thought needed to be

8    preserved, for one reason or another, is

9    there a mechanism that they would have to

10   do that?

11       A.     Well, within the tool itself,

12   there is a way for each individual to

13   basically personally store such things.

14       Q.     How much storage space would an

15   individual have, or is that limited?

16            THE INTERPRETER:  Did Counsel

17       say "unlimited" or "limited"?

18            MR. KINDALL:  Limited.

19            THE INTERPRETER:  Okay.

20       A.     So individuals store things not

21   on the server but on their own PCs.

22       Q.     So if you got an email that you

23   wanted to preserve, you would be able to

24   store it on your PC hard drive; is that

25   right?

```
                                          Page 21
 1   LEE - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY
 2        A.    Well, it's not that you store it
 3   on your hard drive.  Again, by way of the
 4   tool, you can download it onto your PC and
 5   store it that way.
 6        Q.    Where on your PC would you store
 7   it if not on the hard drive?
 8        A.    Well, of course, I suppose it
 9   would get stored on or in the hard drive
10   of the PC itself.  But my point was that
11   this storing onto the PC is not something
12   done at the PC level, but it is done by
13   way of that email tool that you employ.
14   There is such a functionality.
15        Q.    Do you know the name of the
16   email program that you're referring to
17   that has that tool?
18        A.    It's IBM Notes.
19        Q.    Okay.  Do you know where the
20   email server is physically located?
21        A.    The location of the email
22   server.
23        Q.    Yes.
24        A.    The physical location.
25              What -- you mean how an
```

```
                                            Page 28
 1    LEE - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY
 2              MR. KINDALL:  Sure.  Let's take
 3         a break.
 4              THE VIDEOGRAPHER:  We're going
 5         off the video.  The time is 11:40.
 6         (Recess)
 7              THE VIDEOGRAPHER:  We're back on
 8         the video.  The time is 11:59.
 9    BY MR. KINDALL:
10         Q.    Can you tell me when Ottogi
11    instituted the automatic monthly delete
12    system on its email server.
13         A.    I recall that as being sometime
14    around March of 2009.
15         Q.    What was the policy prior to
16    March of 2009?
17         A.    So before that, the email was
18    restricted in terms of the sizes of each
19    individual's boxes.
20         Q.    Okay.  Were they still
21    maintained on a central server?
22         A.    Yes.
23         Q.    Okay.  So if I understand
24    correctly, on the Ottogi email server,
25    each individual who had been issued an
```

```
                                        Page 40
 1   LEE - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY
 2    understand.  Do you mean to ask if I, say,
 3    gained access to those individuals'
 4    emails?  Or what are you asking?
 5         Q.    No.  No.
 6              Prior to that email being sent
 7    out to employees informing them about the
 8    new policy with respect to emails, did you
 9    review that email that was sent out?
10         A.    Oh.  Yes, I did.
11         Q.    Did that email indicate in any
12    way that employees should save emails that
13    might be relevant to an investigation
14    that's being conducted by the KFTC?
15              MS. YU:  Objection.  Assumes
16         facts not in evidence.
17         A.    Well, I personally don't know
18    anything about this KFTC matter.  And we
19    just basically pursued things along our
20    schedule.
21         Q.    Right.
22              But do you recall, having
23    reviewed that email that was sent out to
24    all employees concerning the new email
25    system, whether there was any reference in
```

```
                                        Page 41
 1   LEE - HIGHLY CONFIDENTIAL - ATTYS' EYES ONLY
 2     it to the KFTC -- to a KFTC investigation?
 3              MS. YU:   Same objection.
 4        A.     There wasn't anything in it to
 5     such effect, not at all.
 6        Q.     Did the email notification that
 7     went out to employees give any type of
 8     guidance about the sorts of emails that
 9     should be -- that they should try to
10     preserve?
11        A.     No.
12        Q.     Do you know whether any
13     subgroups of employees might have received
14     additional guidance concerning documents
15     that should be -- or emails that should be
16     preserved when the new system was put into
17     place?
18        A.     No, nothing at all.
19        Q.     Okay.  Is there a policy or
20     protocol that is followed by Nongshim
21     Korea concerning how to deal with
22     documents that are on an employee's email
23     at the time that they leave the company?
24              MS. YU:   Objection.  Outside the
25        scope.  The witness is not here to
```

Page 78

1

2                        CERTIFICATION

3

4        I, SHARON LENGEL, a Notary Public for

5     and within the State of New York, do

6     hereby certify:

7        That the witness whose testimony as

8     herein set forth, was duly sworn by me;

9     and that the within transcript is a true

10    record of the testimony given by said

11    witness.

12       I further certify that I am not

13    related to any of the parties to this

14    action by blood or marriage, and that I am

15    in no way interested in the outcome of

16    this matter.

17       IN WITNESS WHEREOF, I have hereunto

18    set my hand this 6th day of April, 2016.

19

20

21           SHARON LENGEL, RPR, CRR

22

23

24

25