UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**IN RE KOREAN RAMEN ANTITRUST LITIGATION**

Case No.  13-cv-04115-WHO

**ORDER ON PENDING MOTIONS**

Dkt. Nos. 541, 548, 564, 581, 602

There is ample (although hotly disputed) evidence of a conspiracy by the defendants[1] to fix the price of Korean ramen in Korea that was fraudulently concealed from consumers.  Defenses of the statute of limitations and international comity are not well taken.  The much closer question is whether there is sufficient evidence that the conspiracy impacted ramen prices in the United States, in particular for ramen manufactured in the United States.  On defendants' motions for summary judgment, I conclude that plaintiffs have established that material disputes of fact exist that a jury must resolve, and DENY defendants' motions.

The general background and history of this litigation is well known and laid out in my prior orders.  Dkt. Nos. 501, 502.  The facts material to the determination of these motions, both undisputed and disputed, will be addressed below.

### LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

---

[1] Defendants are Nongshim Co., Ltd., Nongshim America, Inc. (collectively Nongshim), Ottogi Co, Ltd., and Ottogi America, Inc. (collectively Ottogi).  The Nongshim and Ottogi entities separately move for summary judgment.  Dkt. Nos. 540-4, 544-5.

United States District Court
Northern District of California

the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* Conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

The permissible inferences to be drawn from evidence in an antitrust case at summary judgment are further qualified. As the Supreme Court explained in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), "antitrust law limits the range of permissible inferences from ambiguous evidence. . . ." *Id.* at 588. As a result, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.* "To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility" that the alleged conspirators acted independently. . . . Respondents [ ], in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents." *Id.*; *see also In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999) ("permitting the inference of conspiratorial behavior from evidence consistent with both lawful and unlawful conduct would deter pro-competitive conduct—an especially pernicious danger in light of the fact that the very purpose of the antitrust laws is to promote competition.").

In this context, "the defendant can 'rebut an allegation of conspiracy by showing a

plausible and justifiable reason for its conduct that is consistent with proper business practice' . . . The burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *In re Citric Acid Litig.*, 191 F.3d at 1094 (quoting *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987)).

## DISCUSSION

## I.     STATUTE OF LIMITATIONS

Both defendants move for summary judgment because plaintiffs' antitrust claims are barred by the Sherman Act's four year statute of limitations.  In ruling on the motions to dismiss earlier in this case, I determined that the "discovery rule" could toll the otherwise applicable four year statute of limitations.  *Fenerjian v. Nongshim Co.*, Ltd, 72 F. Supp. 3d 1058, 1078 (N.D. Cal. 2014).  I also concluded that plaintiffs pleaded sufficient facts showing that defendants took affirmative steps to fraudulently conceal the alleged conspiracy to raise prices.  *Id.* at 1078-79.

The issue is significant because only a small fraction of the sales at issue fell within the four year statute running from the 2013 filing of the first related action in this litigation.  As to those sales – *i.e.*, sales between July 22, 2009 and the end of the class period January 31, 2010 – those claims cannot be knocked out because under Ninth Circuit authority, "each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act."  *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014).  Therefore, conspiracy-inflated sales from July 22, 2009 through January 31, 2010 are within the express four year limitations period and not barred.  The significant question is whether sales occurring prior to the four year period are timely under other applicable theories.

### A.     Discovery Rule

Plaintiffs argue that my conclusion that the discovery rule can toll Sherman Act claims is "law of the case," and as defendants failed to move for reconsideration or otherwise show that reconsideration of that determination is appropriate, I should not revisit the issue.  Defendants, on the other hand, rely on language from the Order on the motions to dismiss that the discovery rule "tolled the otherwise applicable statutes of limitations, at least at this pleading stage."  Nongshim MSJ 10 n.14.  The question of *whether* plaintiffs pleaded sufficient facts to show that the

3

discovery rule applied to their claims (*e.g.*, whether plaintiffs were on notice of their injuries) is fact dependent. The determination that the discovery rule applies under the Sherman Act was a legal determination that was not fact dependent. What defendants seek to challenge here is the legal question, not the factually dependent one.

Defendants point out that following my November 2014 Order, the Hon. Lucy Koh expressly disagreed and followed what she deemed to be "clear U.S. Supreme Court authority and the overwhelming majority of Circuits [that] have explicitly held that antitrust claims are subject to a pure injury rule, not a discovery rule." *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1210 (N.D. Cal. 2015) (*Animation I*). While the Ninth Circuit has not directly addressed the question, plaintiffs do not dispute that only one circuit has applied the discovery rule to Sherman Act claims. *See In re Copper Antitrust Litigation*, 436 F.3d 782, 789 (7th Cir. 2006).

In their Opposition, plaintiffs spend much time dissecting the authorities Judge Koh relied on in support of her conclusion in *Animation I*. They argue that those authorities do not clearly reject application of the discovery rule under the Sherman Act, but simply apply the "pure injury rule" to situations where the plaintiff's injury is immediately known or question the application of the discovery rule to antitrust claims in *dicta*. Oppo. 7, n.2. Plaintiffs also rely on civil RICO cases, whose statute of limitations are likewise governed by 15 U.S.C. § 15b, that apply the discovery rule. *See, e.g.*, *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001) ("[w]e have continuously followed the 'injury discovery' statute of limitations rule for civil RICO claims"). Judge Koh rejected that line of argument by noting that the Supreme Court in *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188 (1997) distinguished the "pure injury accrual rule . . . [as] it applies in traditional antitrust cases[,]" from the discovery accrual rule in the civil RICO context where many claims sound in fraud. *See Animation I*, 87 F. Supp. 3d at 1209. Finally, plaintiffs contend that no circuit has rejected the discovery rule as applied to antitrust injuries where plaintiffs were unaware of their injuries at the time they occurred, and note the only circuit to have directly addressed those facts applied the discovery rule. *See In re Copper Antitrust Litigation*.

I need not choose a side on this split in authority. As discussed below, I conclude the fraudulent concealment exception to the four year statute of limitations applies.

### B. Fraudulent Concealment and Affirmative Acts

In their motions, defendants do not directly contest my prior conclusion that fraudulent concealment would toll the statute based on the allegations in plaintiffs' complaints. Nor do they attempt to undermine those allegations, based on the evidence that was adduced after that initial ruling. Instead, in their reply briefs, they attack plaintiffs' showing of affirmative acts in support of fraudulent concealment.

As I noted in my November 2014 Order, "[f]raudulent concealment tolls otherwise applicable statutes of limitation where (i) affirmative acts by defendants conceal their wrongful conduct from plaintiffs, (ii) plaintiffs are actually ignorant of the wrongful conduct, and (iii) there was reasonable diligence by the plaintiff to discover the misconduct in response to any information it may have about that conduct." *Fenerjian v. Nongshim Co., Ltd*, 72 F. Supp. 3d at 1078.

Plaintiffs' evidence of affirmative acts that defendants took to keep their conspiracy secret requires close analysis. On the next several pages, I indent the asserted facts one by one and discuss what the evidence actually shows:

- Defendants staggered their price increases to minimize the chance that their anticompetitive agreement would be detected. *See* Decl. of Russell W. Mangum III, Ph.D. in Support of DPPs' Mot. for Class Certification ¶ 40 ("Mangum Decl.") (Dkt. 363-6);

While Mangum analyzed in depth the price changes, and felt the pattern of price changes supported a conclusion of collusion – based in part on the fact that all defendants raised their prices following Nongshim's actions – the portion of the Mangum Declaration cited by plaintiffs says nothing about staggered prices or the intent behind that staggering. *See* Mangum Decl., ¶ 40.

- Defendants communicated by phone, rather than by email or fax, to conceal the frequency and content of their communications. Yu Decl., Ex. 37 at 34 (Kyung Ju Kim Tr., noting that price increase period information was exchanged over the phone or in person, but not by fax or email because "[t]here is a chance that someone may see it."); Decl. of Stephanie Cho ("Cho Decl."), Ex. 1, Dong Hee Kang Tr. at 54:21-55:25.

Kyung Ju Kim is a former Samyang Market Survey Team department head. Cho Decl. Ex. 15 (Kyung Ju Kim Confirmation Statement). He initially testified that he communicated about sales and promotions with Ottogi and Nongshim employees by fax, phone, and in person. Yu

Decl., Ex. 37 at 31, 34 (Dkt. No. 547-41) (Kyung Ju Kim Examination Report).  He later indicated that information about "price increase period" was "done over the phone" and "in person" if there was time, but "not at all" by fax or email because "[t]here is a chance that someone may see it, so we didn't do it like that."  *Id*. at 34.  Defendants point out that Kim also appeared to testify that he did *not* exchange non-public "price information" with competitors, and that he only asked his contacts for more details after he heard generally about competitor price increase "in the market."  *Id*. at 5, 6.

Kim's testimony as a whole is somewhat confusing and the parties have different glosses on it.  It suggests that while Kim may not have disclosed to competitors exactly when price increases were going to be imposed or what the specific price increases would be, he disclosed non-public information about the "price support period" through methods that would not leave a trail and sought more general information (if not the exact specifics) about otherwise non-public timing and price increase information from competitors.[2]

Dong Hee Kang, another Samyang employee, confirmed in his deposition that he had the cell phone numbers of at least one similarly situated employee from Nongshim (Yoon) and another from Ottogi (Seok Ho Hong) so he could call them "because it was easier," and that in 2005 Kang had phone calls with both Nongshim and Ottogi about ramen price increases.  Cho Decl., Ex. 1, Dong Hee Kang, Depo. Tr. at 21:6-22:15; 26:9-17, 36:3-25, 54:21-55:25.  At most, Kang's testimony establishes that phone calls were made to discuss pricing in 2005, not that employees were instructed to or otherwise avoided using email or faxes.

- Ottogi destroyed various pricing memos referring to competitor contacts after the Korea Fair Trade Commission ("KFTC") commenced its investigation and Ottogi altered other price memos to delete any reference to competitor information after the KFTC commenced its investigation. Mot. to Sanction Ottogi For Spoliation 4-12 (Dkt. 420); Decl. of Stephanie Cho In Support of Motion to Sanction Ottogi for Spoliation ¶¶ 11-62 ("Ottogi Sanctions Cho Decl."), and corresponding Exs. (Dkt. 420-1);

Although I concluded that there was an insufficient connection between the alleged

---

[2] Another Samyang employee testified that he didn't ask for "specific" information as to exact dates and levels of price increases, but more generally asked and "about general period or degree of increase."  Yu Decl., Ex. 36, Jong-Moon Yui Examination Report at 9-11.(Dkt. No. 547-40)

conduct in Korea and this litigation to support imposing sanctions in this action, the reasonable inferences drawn in plaintiffs' favor from the evidence presented on the sanctions motion support that Ottogi altered documents (specifically, a January 2004 memorandum and a 2005 memorandum) for production to the KFTC. Having reviewed in-depth the evidence presented by both sides on the sanctions motions and construing the evidence in plaintiffs' favor, there is a significant inference of intentional document alteration to remove evidence of conspiracy and attempt to convince KTFC of other justifications (raw material price increases) to hide the conspiracy.

For example, plaintiffs presented significant evidence regarding the "altered" 2004 and 2005 memoranda that Ottogi: (i) removed information evidencing the relationship between Nongshim and Ottogi's prices (*e.g.*, Ottogi following Nongshim's lead); (ii) removed a chart comparing Nongshim's to Ottogi's prices; (iii) deleted references to Samyang and Yakult; and (iv) "falsely" represented that the purpose of the price increases were to capture escalation in raw material prices. While Ottogi has explanations for the discrepancies between the older versions and the "recreated" versions of these documents (*e.g.*, they recreated at the request of the KFTC or the initial versions were merely drafts), it is a jury question to decide what the more credible explanations are.

- Nongshim and Ottogi destroyed competitor communications concerning price and other sensitive information. *See* Mot. to Sanction Ottogi For Spoliation 8-14 (Dkt. 420); Ottogi Sanctions Cho Decl. ¶¶ 11-62, and corresponding Exs. (Dkt. 420-1); Mot. to Sanction Nongshim for Spoliation 8-13 (Dkt. 416); Decl. of Stephanie Cho In Support of Mot. to Sanction Nongshim for Spoliation ¶¶ 92-106 ("Nongshim Sanctions Cho Decl.") (Dkt. 416-1), and corresponding Exs. As a result of this destruction, few or no documents from key witnesses were produced. Ottogi Sanctions Cho Decl. ¶¶ 47, 54; Nongshim Sanctions Cho Decl.¶¶ 80-105; and
- Ottogi implemented a rigorous "auto-delete" protocol on its email servers after the KFTC commenced its investigation that destroyed substantial quantities of relevant documents. Cho Decl., Ex. 5 (Se-Chang Lee Tr. (4-5-2016) at 13:5-16:2, 19:17-21:5; 28:10-19; 40:11-41-18); Ottogi Sanctions Cho Decl. ¶¶ 47, 54;

The evidence from the sanctions motions showed that both Nongshim and Ottogi had limited document preservation policies (more aptly described as "destruction" policies) in place

both before and during the KFTC investigation. Again, I did not find a sufficient connection between the defendants' failures to preserve documents and duties that might have run to the KFTC and this jurisdiction that would support sanctions. However, construing the evidence in plaintiffs' favor, there is an inference that defendants intended or otherwise benefitted from the destruction of adverse evidence under their existing or newly implemented document destruction policies.

- Nine days after the KFTC's onsite investigation, Nongshim employee Sung Soo Park began communicating with competitors via his personal email address, "pss0998@naver.com", to avoid detection. *See* Cho Decl., Ex. 2 (Nongshim's Supplemental Response to IPPs' Interrogatory No. 15); Cho Decl., Ex. 3 (Sung Soo Park Depo. Tr. at 41: 11-18); Cho Decl., Ex. 4 (SHD00003117-59T at 57-58); Vaughn Decl. ¶ 18;

The testimony and documents, according to plaintiffs' expert James Vaughn, shows Park communicating from a personal email account with employees at Ottogi, Yakult, Samyang, and other Nongshim employees (to their Nongshim email accounts) of pricing and sales information. Cho Decl., Ex. 4; Declaration of James Vaughn [Dkt. No. 567-2], ¶ 18. Defendants' forensic expert, Samuel Rubin, disputes whether the documents at issue are emails from Park, given the formatting issues. Declaration of Samuel S. Rubin [Dkt. No. 585-3] ¶¶ 21-23. Assuming that Vaughn is correct, the persuasiveness of this evidence as an affirmative act is still very limited, given that some of the emails were also apparently sent to other Nongshim employees at their work email accounts, presumably defeating any inference that the private email was used to hide the trail at Nongshim. Vaughn Decl. ¶ 18.

- The conspirators met each other away from their places of business to exchange information and used legitimate meetings of the Ramen Assembly as a cover for anticompetitive conduct. *See* Cho Decl., Ex. 6 (Soo Chang Ahn Depo. Tr. at 42:2-43:17; 67:10-18);

Soo Chang Ahn, a Samyang executive, testified that he attended the yearly Ramen Transaction Order Association (RTOA) meetings, and that at the March 2001 meeting pricing information was discussed between employees of Nongshim, Ottogi, and the other alleged conspirators. Cho Decl., Ex. 6, Soo Chang Ahn Deposition Tr. at 70:5-23, 73:4-74:2, 77:16 – 79:25 (Dkt. No. 567-4 at ECF 90). The cites relied on by plaintiffs, however, do not show Ahn admitting that these meeting took place "away" from places of business *other* than at the RTOA

8

meetings. Ahn also testified that his reports at Samyang would report to him information regarding price increases and timing from competitors, as well as the duration of old price support. Ex. 6 Ahn Dep. Tr. 90, 93, 94.

- Nongshim justified its price increases by giving false and pretextual reasons that were materially misleading. *See*: (1) Cho. Decl., Ex. 7 (ROK000011-14, 16-18, 21, 23) (letters to customers stating that increase costs of goods were the reasons for prices); (2) Cho Decl., Ex. 8 (Krith Roth Depo. Tr. at 29:8-30:12) (when conveying price increases to certain customers, NSA employee did not provide the customers with Nongshim's actual COGS, but merely provided them with articles suggesting the ingredient costs went up); (3) Cho Decl. Ex. 9 (Sunny Kim Depo. Tr. at 45:23-46:3 and 46:20-21) ("when we get a price increase, we would generally say raw material costs went up in general. So then that's kind of the explanation to the customer, just try to- you know, say it in a nice way . . . We will try to say that to our customer. That's just kind of how it's been."); (4) Ottogi noted in an internal memo "Nongshim stated to the media regarding background of price increase that the main factors for prices increases were increases in the production costs. . . . However, the main reason for Nongshim's ramen price increases is that . . . sales growth can be achieved only by increasing prices, by launching new high priced products, and so on." Cho Decl., Ex. 10 (OTGKR-0018659T); (5) Cho Decl., Ex. 11 (RNA0001409T-1414T, 1416T-1422T and RNA0001402T-1404T) (newspaper articles in the U.S. stating that prices are going up due to increased costs); (6) Cho Decl., Ex. 96 at OTGAM-0040904T (Ottogi price lists to customers claiming it must raise prices due to increased material costs); and (7) prices of Korean Ramen increased substantially during the class period and that the delta between the cost of manufacture and the sales price doubled when compared to the pre-conspiracy benchmark period. *See* Decl. of Alan Cox ("Errata Cox Decl."), Ex. 12.2 (Dkt. 441-6, 441-8); Mangum Reply Decl. In Support of Class Certification ("Mangum Reply") (Dkt. 466-8), Ex. 29.1-R.

There is evidence that Nongshim America, Inc. ("NSA") publicly (at least to the Direct Purchasers) attributed its increased prices in imported products to increased raw materials (including oil, petroleum, and other costs), as well as currency exchange rates. *See, e.g.*, Cho Decl., Ex. 7 (May 8, 2005 customer letter; May 19, 2006 customer letter; April 2007 customer letter). Ottogi, in a price list provided to Direct Purchasers, ascribed the 2008 price increases to a rise in global grain prices and exchange rates. Cho Decl., Ex. 96.

If asked about price increases, NSA employees Krith Roth and Sunny Kim would respond by blaming increased raw material and fuel costs. Cho Decl., Ex. 8, Krith Roth Depo. Tr. at 29:8-30:12; Cho Decl., Ex. 9, Sunny Kim Depo. Tr. at 45:23-46:21. The explanations given by Nongshim for price rises (and the decrease in 2010) to the media from 2003 through 2010

United States District Court
Northern District of California

1  (contained in an Ottogi memo and in news reports from Korean-American media outlets) are raw

2  material costs and demand fluctuations. [3]

3         Generally, the sorts of affirmative acts described in the preceding pages– public pretextual

4  statements, alteration or destruction of documents, and evidence that employees used methods to

5  communication sensitive information that would not leave a "trail" – are sufficient to support

6  fraudulent concealment tolling statutes of limitations.  *See, e.g*., *In re Animation Workers Antitrust*

7  *Litig*., 123 F. Supp. 3d 1175, 1200-01 (N.D. Cal. 2015) (*Animation II*) ("the Court finds that

8  Plaintiffs have sufficiently alleged that both defendants made misleading, pretextual statements

9  and took affirmative steps to keep the alleged conspiracy a secret" with affirmative clandestine

10  steps including those made to "eliminate paper trail" of conspiracy)(internal quotations omitted);

11  *In re TFT–LCD (Flat Panel) Antitrust Litig*., 586 F.Supp.2d 1109, 1119-20 (N.D. Cal. 2008)

12  (finding sufficient allegations of pretextual explanations for price increase and affirmative efforts

13  to ensure secrecy of conspiracy).  Plaintiffs do not need to show at trial that raw materials prices

14  were totally irrelevant to the price increases to demonstrate pretext,[4] but rather that the level of

15  price increases were in excess of what was necessary because of the collusive conduct.  *See In re*

16  *Lithium Ion Batteries Antitrust Litig.,* No. 13-MD-2420 YGR, 2014 WL 309192, at *4, *16 (N.D.

17  Cal. Jan. 21, 2014) (where price increases were blamed on increases in raw materials, which was

18  in part true, pretext was still alleged where increase in raw materials was used a pretext for

19  "unwarranted" price increases by defendants).

20         In addition to contending that this evidence does not show what plaintiffs assert it does,

21  Ottogi makes a number of additional arguments.  First, Ottogi argues there is little to no evidence

22  of *its* affirmative acts.  Acts by Ottogi include, at the very least, document alteration in response to

23

24  _____

[3] Nongshim objects to consideration of the media reports as conveyed in the Ottogi memo and the
25  separate news articles as inadmissible hearsay.   Those objections will be addressed below.

26  [4] The evidence submitted by Ottogi that flour prices increased from 2006 through 2008 is,
    therefore, relevant but not by itself determinative.  *See* Supplemental Decl. from Kyung Ho Yoo
27  ¶¶ 3-5 (Dkt. No. 585-4).  As noted in ruling on the motions for class certification, plaintiffs'
    experts show that in the same time frame the delta between costs and profits almost tripled.  Ottogi
28  points to no evidence that would demonstrate that all of the allegedly collusive price increases
    were in fact due solely to the increases in the price of flour during the relevant time frame.

KFTC investigation as well as the 2008 price list conveying to DPPs allegedly false or substantially incomplete reasons for those price increases. More fundamentally, necessary "affirmative acts" may be established through the acts of Ottogi's alleged co-conspirators. *See Animation II*, 123 F. Supp. 3d at 1206 (citing cases).

Ottogi also argues that the affirmative acts to conceal the conspiracy must have been directed at these plaintiffs or intended to deflect litigation. Ottogi Mot. 25. I disagree. To the first argument, as Judge Koh explained: "[d]efendants cite no Ninth Circuit authority, or any authority for that matter, that requires Plaintiffs to show that Defendants' affirmative acts were for the purpose of misleading Plaintiffs. To the contrary, one court in this circuit has specifically held that '[t]he proper focus . . . is not whether the intent was to conceal the information from plaintiffs, but whether the 'concealment ... prevented [plaintiff] from being alerted.'" *Animation II*, 123 F. Supp. 3d at 1202 (quoting *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 782 F.Supp. 487, 490 (C.D. Cal. 1991)).

With respect to the second argument, Ottogi notes that in denying plaintiffs' motion for sanctions, I concluded that there was no evidence that Ottogi destroyed or altered documents to "impede this litigation." Ottogi Reply 15. Ottogi's argument is unpersuasive for two reasons. First, my point in the Order denying sanctions was that there was not sufficient evidence that Ottogi sought to frustrate litigation in this country in order for me to have jurisdiction or otherwise impose discovery-type sanctions based on conduct that at the time was possibly intended to impact the KFTC investigation and keep evidence regarding coordinated price setting hidden. Second, the Ninth Circuit has not adopted the "deflecting litigation" qualification to affirmative acts sufficient to show fraudulent concealment. Ottogi's source is merely a passing reference to a parenthetical cite in *Grimmett v. Brown*, 75 F.3d 506, 515 (9th Cir. 1996). In that parenthetically referenced case, *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp*., the Fourth Circuit found that defendant's failure to disclose its price fixing in response to a customer's question about pricing was insufficient to show fraudulent concealment. It explained that "'[f]raudulent concealment' implies conduct more affirmatively directed at deflecting litigation than that alleged here." 828 F.2d 211, 219 (4th Cir. 1987).

11

The evidence of affirmative acts identified above, when considered in its totality, is sufficient to toll the Sherman Act claims under a fraudulent concealment theory.[5]

## C. State Law Claims

Defendants argue that the state law claims – based on California, Massachusetts, Michigan, Florida, and New York law – should likewise be dismissed because they too are governed by four year (or three year) statutes. Nongshim Mot. 11; Ottogi Mot. 23-24. In their opening motions, defendants do not address whether the discovery rule or fraudulent concealment would apply to toll those statutes. Instead, they argue in their Replies that the actual injury rule (instead of the discovery rule) applies at least to plaintiffs' claims under the Cartwright Act. Ottogi Reply 13-14.

With respect to the Cartwright Act claims, plaintiffs place heavy weight on *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185 (2013), where the California Supreme Court held in a case involving California's Unfair Competition Law ("UCL") that when a statute fails to define accrual, the presumption of common law equitable tolling rules (like the discovery rule) will normally apply. Although *Aryeh* was not a Cartwright Act claim, the court based its holding in part on the lower court's erroneous application of *federal antitrust laws* to the tolling question, noting that while the Cartwright Act is often interpreted consistently with the Sherman and Clayton Acts, that is not conclusive with respect to the reach of the Cartwright Act. *Id.* at 1195. In addition, as plaintiffs point out, both the UCL and Cartwright Act are silent on accrual and use virtually identical wording as to the statute of limitations.

Defendants respond that following *Aryeh*, Judge Koh has applied the actual injury rule and rejected the discovery rule for Cartwright Act claims. That is not quite accurate. Defendants are correct that in *Ryan v. Microsoft Corp.*, No. 14-CV-04634-LHK, 2015 WL 1738352, at *16 (N.D.

---

[5] Plaintiffs also point out that their injunctive relief claim under the Sherman Act is not subject to a statute of limitations defense, because "there is no statute of limitations for injunctive relief claims under section 16." *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085 (9th Cir. 2014). Oppo. 13-14. However, the only stated basis for plaintiffs' injunctive relief claim is that because Nongshim and Ottogi are still oligarchs, they still have the power to fix prices. That may be. But, given that plaintiffs admit the conspiracy ended in 2010 and there is no evidence that these oligarchs conspired after 2010 or are *likely* to conspire together in the future, plaintiffs' injunctive relief claim is questionable.

Cal. Apr. 10, 2015), Judge Koh did not apply the discovery rule to the Cartwright claims in an antitrust case dealing with agreements to restrict employee solicitations. She concluded that *Aryeh* did not definitively answer the question of whether the discovery rule or fraudulent concealment would apply to either Cartwright or UCL claims, but rejected the application of any equitable tolling in the case before her because plaintiffs failed "to adequately allege an equitable exception or tolling doctrine that would render Plaintiffs' state law claims timely." Her decision was based on a failure of facts that would support equitable tolling, not a bright line rejection of it under California law.[6] For the reasons discussed above, fraudulent concealment applies to the Cartwright Act claims.

Defendants do not separately address in their briefs whether the discovery rule or fraudulent concealment apply under the other state laws at issue.[7] I have no basis to grant summary judgment on any of the state law claims as time-barred.

## II.     KOREAN SUPREME COURT DECISION AND INTERNATIONAL COMITY

Nongshim argues that principles of comity require that I defer to the Korean Supreme Court's decision in overturning the KFTC's conspiracy findings and fines. Nongshim also argues that the same principles counsel against finding a conspiracy in light of the Korean government's role in setting prices, a role explained and relied upon by the Korean Supreme Court in overturning the KFTC findings and fines.

International comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *In re Simon*, 153 F.3d 991, 998 (9th Cir.1998) (internal quotation omitted). "International comity is a doctrine of prudential abstention, one that 'counsels voluntary

---

[6] In *Animation I,* 87 F. Supp. 3d at 1217, the parties did not dispute "that resolution of Plaintiffs' Sherman Act claim would also resolve Plaintiffs' Cartwright Act claim." Therefore, Judge Koh applied the accrual rule and rejected the discovery rule on both sets of claims; she did not separately analyze the Cartwright Act claims.

[7] Plaintiffs argue that the discovery rule applies to claims under Massachusetts and New York law, while fraudulent concealment applies under Florida, Massachusetts, Michigan, and New York law. Oppo. 16.

forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law.'" *Mujica v. AirScan Inc.*, 771 F.3d 580, 598 (9th Cir. 2014) (quoting *United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 8 (1st Cir.1997)).

There are two doctrines recognized under "international comity." The first is "legislative or prescriptive comity," which "guides domestic courts as they decide the extraterritorial reach of federal statutes." *Mujica*, 771 F.3d at 598. The second "is referred to as 'comity among courts' or adjudicatory comity, which 'may be viewed as a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state.'" *Id*. at 599 (*quoting In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1047 (2d Cir.1996)). Considerations in determining whether to abstain for comity to an international tribunal include the strength of the various governments' interests, the adequacy of the foreign forum, any conflicts between the laws of the jurisdictions, and the extraterritorial reach of the laws at issue. *Id*. at 600-604. In looking to the various governmental interests, the critical factor is where the conduct in question took place, "conduct" including not only the actions of the defendants but the injury suffered by plaintiffs. *Id*. at 605 (citing *Torres v. S. Peru Copper Corp.,* 965 F.Supp. 899, 909 (S.D.Tex.1996), dismissing action under comity where the "activity *and the alleged harm* occurred entirely in Peru [and] Plaintiffs are all residents of Peru.") (emphasis added).

Nongshim argues that I should abstain under the adjudicatory comity doctrine and defer to the Korean Supreme Court decision that overturned the findings of the KFTC. The Korean Supreme Court concluded that the evidence of an express agreement being reached at the Representative's Meeting[8] was hearsay (the second-hand Samyang statements and inconsistent and not fully credible Ahn statements about whether he attended), and therefore the court could not "rule out a possibility that it was merely ambience of resonance for a desire for [Nongshim] to take an initiative and lead the price increase" given that the companies had been prevented by

---

[8] As discussed below, according to plaintiffs' theory, in late 2000 or early 2001 the initial agreement was formed at this Representatives' Meeting. That agreement was confirmed at the March 2001 RTOA meeting.

economic circumstances from increasing their prices in the past years. Korean Supreme Court decision (January 2016), Ex. 24 to Yu Decl. [Dkt. No. 547-27] at 7. The court noted that the degrees of difference in price increases made it "hardly possible" to specify any specific substance of agreement "beyond the point" that ramen prices should be increased in 2001. *Id*. The court concluded that it was "unclear" if "a definitive agreement that can impact competition in the long run" was agreed to at the Representative's Meeting, and as a result declined to find that subsequent exchanges of information were in furtherance of an agreement reached at the Representative's Meeting. *Id*.

As to whether there was a "tacit agreement" regarding the price increases following the initial 2001 increases, the court noted that some of the evidence was not consistent with an agreement and did not support an "inference" of "mutual connectivity of intention." *Id*. at 8. That evidence included the use of different percentage increases in price, a history in the industry of "follow the leader" pricing, the role of the Korean government in establishing *de facto* pricing for the leader, the product variations offered by the defendants, and use of the "old price" support system (which could be used either to support a collusive agreement or an "instrument to engage in aggressive mutual competition"). *Id*. at 8-9.[9]

The Korean Supreme Court weighed evidence (presumably consistent with principles of Korean law regarding admissibility and sufficiency), made credibility determinations, and determined what the inferences supported on a matter that was within its jurisdiction – whether the KFTC's order concluding there was a conspiracy and as a result imposing fines on defendants was adequately supported under Korean law. There is a different question before this Court: did defendants' conduct as it impacted sales of products *in the United States* violate federal and state antitrust and unfair competition laws? This is not a situation where, for example, Korean plaintiffs are trying to recover for injuries suffered in Korea at the hands of United States or Korean corporations. *See Mujica*, 771 F.3d at 609. The allegations (the evidence of which will be

---

[9] The "old price support system" was how long the Ramen companies would continue to sell either products labelled with the "old" price, after the new prices increases were announced, or in some instances sold new, newly labelled products at the old prices so as to minimize disruption to the market. Declaration of Bangwan Ku [Dkt. No. 545] ¶ 9.

weighed below) are that a conspiracy hatched in Korea was exported and impacted the prices of goods defendants sold in the United States. The injuries for which recovery is sought here occurred in the United States.

None of the cases cited by Nongshim in support of its comity argument address similar facts or connections to American plaintiffs injured by sales that occurred in the United States. Instead, the more apposite case is *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 165 (2004), where the Supreme Court recognized that:

> No one denies that America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs. But our courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress domestic antitrust injury that foreign anticompetitive conduct has caused.

While what the Korean Supreme Court did is similar to what a jury will be called upon to do here – weigh the evidence, make credibility determinations, determine which inferences are supported by the evidence – the jury may weigh the evidence and inferences differently, applying the law of the United States as instructed. The evidence may well exceed the amount and type of evidence that was before the Korean Supreme Court, such as the document alteration and destruction as well as expert economic analyses.

Also underlying this issue are the parties' different views of the role the Korean government played during the relevant time period in approving prices for some subset of the ramen market. Nongshim, generally, contends that the Korean government exercised tight control and made Nongshim seek approval prior to increasing prices on its leading products. Plaintiffs dispute whether Nongshim's prices were "controlled" by the Korean government, and point to evidence that at most Nongshim voluntarily included the Korean government on its contemplated price increases for some of the price increases at issue. Oppo. 54-55. According to plaintiffs, this voluntary and non-binding process cannot absolve Nongshim from its responsibility for price-fixing. Moreover, even if not technically or practically mandatory for Nongshim, at most the Korean government's role limited the top price Nongshim could charge and does not absolve

Nongshim from the consequences of agreeing with the conspirators that they should follow suit and raise prices within a reasonable time to protect everyone's market share. *See, e.g.*, Ahn Depo. Tr. [567-4 at ECF 90] at 165:6 -166:4 (describing his understanding of the process as a "discussion or negotiation" with the government and that Ramen companies are free to compete below the government approved price); Cho Decl., Ex. 12, Deposition Transcript of Jung Soo Kim [Dkt. No. 567-4] at 31:5-10.

Again, the jury will be tasked with determining disputes of fact, considering the admissible evidence and expert opinions. The principles of international comity do not require that I defer to the findings of the Korean Supreme Court on the question of whether defendants' sales in the United States harmed consumers in the United States as the result of an agreement to fix prices.

## III.   EVIDENCE OF CONSPIRACY IN KOREA

### A.   Direct Evidence: Witness Testimony

Plaintiffs rely on the testimony of three individuals who were Samyang executives or employees as direct evidence of the conspiracy: Jung Soo Kim, Soo Chang Ahn, and Jong Min Kim. I discuss the materiality of that testimony below.

#### 1.   Jung Soo Kim

Jung Soo Kim, Samyang's "Consultant Advisor" and President, testified that she was aware of a meeting of Ramen company executives that occurred in late 2000 or early 2001. Deposition Transcript of Jung Soo Kim [Dkt. No. 567-4] at 27:17-20. Kim recalls that Samyang executive Choi Don Joong attended. *Id*. at 37: 6-14. Joong reported back to Kim that at the meeting (hereafter "Representatives' Meeting"),[10] there was a conversation that because ramen prices could not be raised for two to three prior years, "if Nongshim raised the price, then we would follow Nongshim's act." *Id*. at 38:6-15. It was Kim's understanding that representatives from Nongshim, Ottogi, and Paldo were at that meeting, but she was "not certain." *Id*. at 39:18-25, 40:3-20. Kim testified, "I don't know if I can characterize it as they reached some kind of

---

[10] According the plaintiffs' theory, this "Representatives' Meeting" meeting took place in late 2000 or early 2001, and the representatives' agreement was solidified at the March 2001 RTOA meeting.

consensus," but Joong expressly confirmed that the discussion included that if Nongshim raised prices, then the others would follow. *Id*. at 42:22-25.

Later in Kim's testimony, after her recollection was refreshed with a prior written statement, she agreed that her understanding of what happened at the meeting was that the representatives "agreed to increase Ramen price by collaborating with one another." *Id*. at 56:2 - 57:4. She also testified that "information concerning sales or marketing or marketing research among Ramen companies were exchanged either in person or via email, and I would receive a report from my subordinates as to such information." *Id*. at 65:5-10. She stated that she saw "advance price information" collected by her employees for Nongshim prices, but not for Ottogi prices. *Id*. at 67:19-24. Kim also understood that her employees exchanged "advance price information" with both. *Id*. at 69:10 – 70:9. Even more specifically, it was her understanding that Samyang shared non-public price information with Nongshim, Ottogi, and Paldo before Samyang had publicly announced what its prices would be. *Id*. at 76:12-17. When Samyang initiated a price decrease in January 2010, it did so to eliminate the perception of price-fixing. Kim said, "[T]his indicates our determination or reflects our determination that we will not participate in any type of price-fixing activities, and we do not want to be investigated by Fair Trade Commission." *Id*. at 93:7021. Finally, she confirmed that she would receive information from Soo Chang Ahn (who was the head of sales at the time) and Kim Bong Hoon (who was in charge of marketing) about Nongshim's planned price increases and then Samyang would prepare for its price increases. *Id*. at 176:16 -177:24.

Defendants attack Kim's testimony as hearsay, speculative, and lacking in personal knowledge. They point out that the Korean Supreme Court disregarded her testimony regarding the initial Representatives' Meeting in March 2001because it was hearsay – she did not attend the meeting. Ottogi also notes that she offers essentially no testimony that Samyang received non-public price information *from* Ottogi, a point with which I agree. But her testimony does support a conclusion that Nongshim, Samyang, and Yakult were actively part of the conspiracy as she understood it; to effectuate that conspiracy, Samyang provided non-public price information *to*

18

Ottogi.[11]

## 2. Soo Chang Ahn

Soo Chang Ahn was the Deputy Division Head of Sales at Samyang during the relevant time. Ahn attended the March 2001 RTOA meeting on behalf of Samyang, and testified that representatives from Ottogi, Nongshim, and Paldo were there to the best of his recollection. Cho Decl., Ex. 6, Soo Chang Ahn Deposition Transcript [Dkt. No. 567-4 at 90] at 64:20-24, 67:2-9. The issue of price increases was discussed at that meeting, although there were no specifics at to exact prices given the vast number of products at issue. Ahn admitted that it "was possible that question concerning the increase of – percentage of price increase – something like that might have been asked." 69:5-70:7. While Ahn proposed a double-digit percentage increase and Ottogi concurred, Nongshim recommended exercising caution given "negotiations" underway, presumably with the Korean government. *Id*. at 70:20-72:13. According to Ahn, Nongshim's representative – Dong Gyun Yoon – suggested the end price increase to be initiated by Nongshim would be sufficient "so that we can have a profit." *Id*. at 73:20-74:2; 78:24-79:6.

Ahn confirmed that the employees of Samyang, Ottogi, and Yakult exchanged "advance information about price increase" and that the information came into Samyang's "market research department." *Id*. 80:11-81:19. Those exchanges included timing of price increases and periods of "old price support." *Id*. at 90:11-15; 91-93. Using that information from its competitors, Samyang would determine what its plan would be. *Id*. at 94:9-14.

Defendants attack Ahn's testimony as hearsay, lacking in personal knowledge, and contradictory. They note that the Korean Supreme Court disregarded Ahn's testimony because records of the March 2001 RTOA meetings did not show Ahn in attendance, and argue that plaintiffs have failed to adequately rebut that point. Yu Decl., Ex. 33 (March 2001 RTOA Minutes, not showing Ahn in attendance). But plaintiffs rely on Ahn's deposition testimony,

---

[11] Objections to the Kim testimony based on speculation and lacking in personal knowledge are OVERRULED. Objections based on hearsay, as discussed in more detail below, are OVERRULED.

19

where he testified that he personally attended that meeting.[12]  Deposition of Soo Chang Ahn [Dkt. No. 567-4 at ECF 90] at 43-44.  Ottogi argues that Ahn's testimony is also undercut by the Witness Examination of Guen Ho Choi, a representative of Ottogi who attended the March 2001 conference and testified that price was not discussed by the attendees. Yu Decl., Ex. 35 [Dkt. No. 547-39] at 2.  However, Choi's testimony,[13] even if admissible, does not definitively undercut Ahn's but instead raises a question of fact.

### 3. Jong Min Kim

Plaintiffs also rely on the testimony of Jong Min Kim, a Samyang employee who testified about meetings that occurred in March 2008.  At the first meeting, an "administrator's meeting" on March 19, 2008, participants discussed that Nongshim and Samyang had already raised their prices and what the status of Ottogi's and Yakult's expected price increases was.  Cho Decl., Ex. 13, Deposition Transcript of Jong Min Kim [Dkt. No. 567-4 at ECF 179] at 30:8-31:16.  A week later, at the 2008 RTOA meeting, prices were again discussed, including that once prices had been increased (which had occurred for all but Yakult), they were unable to lower them.  *Id*. at 71:16-72:14.  All of the alleged conspirators – Nongshim, Ottogi, Samyang, and Yakult – were at this meeting.  *Id*. at 43:4–44:5.

### B. Corroborating Evidence

Plaintiffs characterize the "follow the leader" pattern – where market leader Nongshim would raise its prices first and the other companies would follow – as being established following

---

[12] Defendants point to a portion of Ahn's deposition testimony where Ahn supposedly admitted to never having heard of the "Representatives Meeting" until preparing for the KFTC leniency petition.  The testimony is: "Q: Is it true that you had never known about the alleged representative meeting that supposedly occurred at the end of 2000 or early 2001 until you heard about it from someone else while preparing one of your statements to the KFTC? A: Yes. That is correct. And that's how I testified earlier." Yu Decl., Ex. 18, Ahn Depo. Tr. at 45:21-46:6.  But Ahn goes onto explain that "representative meeting" was also referred to as the "presidents meeting."  Ahn thereafter testified he attended the March 28, 2001 RTOA meeting.  It appears Ahn thought some *other* meeting was meant by the "representatives meeting."  The testimony plaintiffs rely on from Ahn is with respect to the March 28, 2001 RTOA meeting.  That Ahn allegedly signed over his voting rights for the March 28, 2001 RTOA meeting to a subordinate, Changwoon Kim, was significant to the KFTC in discrediting Ahn's testimony.  That issue is not directly addressed by plaintiffs, but again merely presents a dispute of fact.

[13] Plaintiffs object to Ottogi's reliance on this testimony as hearsay, and move to exclude the Choi Examination Statement because Choi was not disclosed by Ottogi as a witness.  *See infra*.

the March 2001 RTOA meeting.  Oppo. at 18.  Defendants counter, relying in part on the Korean Supreme Court decision, that the follow the leader pattern existed well before then (since the 1980s and including the time when Samyang was the market leader), and was a function of the *de facto* price controls imposed by the Korean government.  Nongshim MSJ at 5-6; Ottogi MSJ at 5.  Given the role the Korean government and the long-standing *de facto* follow the leader pricing, defendants contend that collusion *cannot* be inferred.  Nongshim MSJ at 28; Ottogi MSJ at 7.  Plaintiffs bolster their "express or tacit" agreement argument by relying on the information exchanges discussed below.  But in the end, whether or not there was an express or implicit agreement, or whether defendants were simply following old, established pricing patterns raises a dispute of fact.

### 1. Monitoring and Exchange of Information by Alleged Conspirators

As noted above, Jung Soo Kim and Ahn from Samyang testified regarding how their employees, particularly those in "market research," would exchange advance price information (including prices, timing, and length of old price support) with their competitors.  Plaintiffs rely also on testimony from other Samyang employees on the Market Research Team who explained how the "lower level" sales and marketing employees were generally friendly and would gather for drinks or meals.  These employees were trained by Samyang to exchange information with their competitors.  Yu Decl., Ex. 36, Jong Moon Yui Witness Examination [Dkt. No. 547-40] at 5-6, 15 (Samyang head of Market Research was expected to and trained to "keep[] in communication with the competitor companies and mutually request[] needed materials, and so on," and confirmed that Kyung Joo Kim at Samyang was in charge of "external" duties including exchanging price increase information with competitors).[14]  Jong Moon Yui confirmed that the Samyang email address marektone@hanmail.net email was used to exchange emails with competitor companies, including information about price increases but he was not personally aware of whether the competitors' price increase information was otherwise publicly known to

---

[14] In his Witness Examination, Jong Moon Yui confirmed that he asked his competitors about price information, such as about when prices might be increased and about "the general period or degree of increase," but not about specific prices.  *Id*. at 10-11.

others or had been disclosed at that time he received it and passed it along to his superiors. *Id.* at 13, 15-16.[15]

Plaintiffs also rely on Jong Moon Yui's 2010 affidavit to the KFTC. Yui stated that his boss, Kyung Ju Kim, would mostly handle the price information exchange "around the time" of price increases, but that he "exchanged the information at the time of the 2005 price increase," under Kim's direction. Cho Decl., Ex. 14, Jong Moon Yui KFTC Statement [Dkt. No. 567-4 at ECF 189] at ¶ 7. While defendants were successful in getting Yui to testify in his witness examination that as of 2016, he did not have an independent recollection of the facts in his KFTC statement (and he refused to confirm the "opinions" in that statement drafted by "lawyers" that collusion occurred), at most the testimony from the witness examination raises issues of fact about Yui's role and his understanding of Kim's role in securing, collecting, and passing up the chain of authority information regarding competitors' price changes and old price support.

Plaintiffs also rely on the Confirmation Statement of Kyung Ju Kim, a former Samyang Market Survey Team department head. Cho Decl. Ex. 15, Kyung Ju Kim KFTC Confirmation Statement [Dkt. No. 567-4 at ECF 213]. In his Confirmation Statement, Kyung Ju Kim testified that the most urgent information that needed to be exchanged with the competitors was about the price, the timing of the price increase and the duration of old price support system. *Id.* at 4, 6. As with Jong Moon Yui, the parties have differing views about the import and meaning of Kyung Ju Kim's *subsequent* testimony in his Witness Examination. Plaintiffs contend his subsequent testimony confirmed that *non-public* "price period" information was exchanged over the phone or in person (and not by fax or email because of the trail). Defendants contend that his testimony confirmed that only *public* "price increase" information was exchanged among the competitors. Drawing appropriate inferences in plaintiffs' favor, Kim seems to admit to exchanging non-public

---

[15] Jong Moon Yui could not clearly recall about the use of an external hard drive to save information received from competitors. *Id.* at 17. He also recalled that there was a plan to buy an external hard drive to back up data in case of computer malfunctions and "I remember that the work materials for the entire department were backed up along with the data for the person in charge of market research. We didn't just back up the data only specially for market research. I remember that materials for advertisement, BM, and more were all backed up." *Id.* at 17. But, he also admitted that he does not know who controlled or managed the external hard drive. *Id.* at 50-51.

information regarding the "price period" or old price support system in his witness examination although he does seem to deny circulating non-public "price information."

Stepping back to put this testimony (and the dueling interpretations offered by plaintiffs and defendants) in context, plaintiffs' theory is that Nongshim started the price-fixing process by spreading verbal rumors about price increases. Then its competitors' market research employees would reach out to Nongshim and figure out more about when the price increase might occur, the general parameters of the increase, and how long price support would last.[16] Kyung Joo Kim Witness Examination (Yu Decl. Ex. 37) [Dkt. No. 547-41] at 5, 6, 32; Cho Decl., Ex. 10 at OTGKR-0018660T (Ottogi price reaction memo from 2005) [Dkt. No. 567-4 at ECF 133]; *see also* Cho Decl., Ex. 19, Deposition Transcript of Bong Hoon Kim (Samyang's Marketing Team Leader) [Dkt. No. 567-4 at ECF 252] at 128:5-7 (noting that Samyang had information about Nongshim's December 2004 price increase "beforehand.").[17]

Defendants argue that the testimony of these low-level Samyang employees about conversations and information exchanges with their own low-level employees cannot prove an agreement to raise prices, especially when price setting is indisputably out of the control of these employees. But defendants misstate the point. These employees, according to some of the direct

---

[16] Nongshim argues that all that plaintiffs have established is what they admit; that the companies' representatives would readily find out competitors' planned price increases before the public became aware of them but *after* they were announced to distributors (who often sold more than one company's products) by contacting those distributors. *See, e.g.*, Nongshim MSJ at 24 n.28, 25 n.30; Nongshim Reply at 10-11. But plaintiffs have at least *some* evidence that price and price support information that was not public even to distributors was exchanged amongst the conspirators.

[17] Ottogi says that Samyang's witnesses confirmed that Ottogi was not involved in this exchange of information. Ottogi Reply 11. However, Samyang's Jong Moon Yui testified that he spoke with a specific Ottogi employee "occasionally" and that they exchanged a "few emails." Yu Decl., Ex. 36 at 12, 63 (admitted exchange information with Ottogi, just not as frequently as with Nongshim and Yakult). Yui also confirmed that he exchanged price information with Ottogi, although he could not say whether it was otherwise "undisclosed" at the relevant time, and that emails from Ottogi were sent to the marketone@hanmail.com account managed by Yui. *Id*. at 16, 20-21, 70. *See also* Yu Ex. 37, Kyung Joo Kim Witness Examination at 4 ("I was responsible for mutual and close exchange of information with competitors such as Nongshim, Paldo, and Ottogi, even including most sensitive pieces of information such as competitors' price increases, new product launching, sales strategies, organizational and personnel changes, and various market trends, and so on."); *see also id*. at 5-6 (rejecting the idea that specific price increase information was exchanged, but rather more general information was exchanged).

testimony, were tasked with gathering up price and price support system information (much of which had not yet been publicly disclosed) and passing it up the chain to those – at least at Samyang – who did have the power to set the prices.[18]  While defendants – through witness examinations – were successful in "walking back" and calling into question some of the testimony by some of these witnesses, those efforts do not fully undermine the testimony given to the KFTC.  There are issues of fact regarding whether the information exchanged between lower-level employees was non-public and collected and passed up to managers who did have the power to set prices.

## 2.    2001-2004 Price Increases

Plaintiffs rely on the KFTC Supplement Confirmation Statement of Kyung Ju Kim, whose role was to be the point of contact with competitors for the Marketing Department, the department involved in sharing "information regarding the price increase" of Samyang and its competitors, including the "most sensitive information."   Kim testified that he held that role from 2001 (upon the creation of the market survey team in 2001) until he resigned in 2006.  Cho Decl., Ex. 15, Kyung Ju Kim May 2011 Supplement Confirmation Statement at 3.  Kim's boss, Bong Hoon Kim testified that in May 2001, he received Nongshim price information from Kim.  Cho Decl., Ex. 17, Deposition Transcript of Bong Hoon Kim at 88:17-92:15.  He also testified that in late 2003, Kim passed along information about Nongshim's price increases ("he told me that prices will go up").

---

[18] Similarly, Ottogi relies on testimony from Ottogi's own witnesses who were high enough up in the structure that they were responsible for setting prices and point out that these employees all denied exchanging confidential or otherwise sensitive information with competitors.  Ottogi Reply 11.  For example, Bangwan Ku testified that from what he was able to learn, he did not know about meetings or emails between Ottogi and Nongshim or Samyang employees because "[b]ased upon what I was able to find out, I haven't seen anything like that with my own eyes."  Yu Decl., Ex. 3 at 138:17 – 140:8.  The people he asked at Ottogi confirmed that there was "there was no contact made with any of the competition."  *Id*. at 144; Ex. 4 at 19:17-20.  Similarly, Young Hyun Doh testified that he was "not aware of Ottogi Korea ever having possession, during the timeframe of 2000 to 2010, of nonpublic information regarding pricing plans of your competitors."  Yu Decl., Ex. 5 at 84:21 – 85:3.  Dae Gyo Suh testified that he did not believe that anyone on Ottogi's marketing team would have communicated with competitors about pricing and production, in part because he instructed them not to do so.  Yu Decl., Ex. 6 at 85:7 – 86:9, 90:10-14, 128:6-14.  These assertions, however, appear to be undermined by documents produced by Ottogi that were prepared for the higher-up decision makers and produced by the departments of these lower-level employees that allegedly contain non-public information about Ottogi's competitors.  Although some of the Ottogi witnesses who were questioned about these documents denied having seen them, there are material disputes of fact.

Bong Hoon Kim Depo. Tr. at 73:17-74:11. Also, a "draft" of Nongshim's 2003 price increases was located in the SHD as well as in the custodial files of a Nongshim employee. *Compare* Cho Decl., Ex. 20 *with* Ex. 21. Another Samyang employee met with a Yakult employee in 2003 and learned when the price of Yakult products would be raised and how long old price support would last. Cho Decl., Ex. 22, Deposition Transcript of Eui Ryul Kim at 17:25 -18:7.

Regarding Ottogi, plaintiffs rely on a January 2004 memo, where Ottogi's Kang Hoon Lee indicated that Ottogi would raise prices in response to Nongshim's increase and mentioned information from Samyang and Yakult about when those companies might increase price – showing that the companies were communicating on the subject in advance of their price increases – and commented on Nongshim's concern about critical reaction but determination to go ahead with its price increase anyway. Cho Decl., Ex. 23.[19] Ottogi contends that the only significant line in this January 2004 memo shows that Ottogi was determined to raise its prices because Nongshim did but in ways that would be efficient and facilitate sales. Ottogi Reply at 5-6. Ottogi, however, does not address the alleged non-pubic information in that memo from Samyang and Yakult.

### 3.    2004/2005 Price Increases

Plaintiffs allege that Nongshim circulated non-public price increase information to its competitors on December 10, 2004. *See* Bong Hoon Kim Depo. Tr. at 128:5-7 (Samyang had Nongshim December 2004 price increases "beforehand"). Nongshim received internal approval on December 20, 2004. Cho Decl., Ex. 25. It emailed its approved prices to Samyang on December 22, 2014 and implemented the price increase in December 24, 2014. Cho Decl., Ex. 14 (Jong Moon Yui April 1, 2010 KFTC Affidavit) at ¶ 28; Cho Decl., Ex. 25.

Plaintiffs note that when Samyang did not raise its prices within a month after Nongshim did in December 2004, *i.e.*, during the typical month-long Nongshim old price support period, Nongshim contacted Samyang to complain and demanded to know the date Samyang would increase its prices. Cho Decl., Ex. 19, Deposition Transcript of Bong Hoon Kim (Samyang's Marketing Team Leader) at 121:3 – 124:12; 128:5-23; Cho Decl., Ex. 1, Dong Hee Kang Depo.

---

[19] This January 2004 memo is one of the memos that plaintiffs contend Ottogi intentionally edited and removed the information about its competitors before the memo was produced to the KFTC.

Tr. at 20:20-22:16. Nongshim was forced to extend its normal one month old price support system through February and then through March (Cho Decl., Ex. 10; Cho Decl., Ex. 27 at OTGRM-0209-T), until Samyang and Ottogi "backed down" and announced price raises at the end of February.

According to Samyang employee Jong Moon Yui's April 1, 2010 KFTC Affidavit, Yakult emailed its price increase plan to Samyang on January 11, 2005 (and raised prices on January 15), and Ottogi emailed the date of its price increase plan to Samyang on February 25, 2005. Jong Moon Yui April 1, 2010 KFTC Affidavit at ¶ 28; Cho Decl., Ex. 30 (document from SHD authored by "Ottogi" with last modified date of February 25, 2005 "February 25 document"). Samyang delayed (until it succumbed to Nongshim's pressure) in order to expand sales in conjunction with its then lower-price and an ad campaign. *Id*.

Ottogi disputes the authenticity of the February 25 document found in the SHD, arguing that Samyang could have created it based on "guesswork." Ottogi Reply 13. However, not only does the February 25 document have document-level metadata indicating that it was created by Ottogi,[20] it also shows Ottogi's proposed before and after increased factory and retail prices for a leading product. Those price increases were actually implemented thereafter. Samyang would have had to have remarkable prescient abilities to get both of those data points correct.

Ottogi also attempts to reduce the impact of the February 25 document by relying on a declaration from Bangwan Ku that sometimes Ottogi sent to customers its "near final" price lists before they were finalized. Declaration of Bangwan Ku [Dkt. No. 545], ¶ 8. Plaintiffs argue that this testimony contradicts Ku's deposition testimony where he answered "no" when asked whether price lists were circulated prior to final approval. Cho Decl., Ex. 32, Deposition Transcript of Bangwan Ku at 23:6-24:4. The disputes over the interpretation and significance of Ku's deposition and declaration testimony, as well as the significance and genesis of the February 25 document, show that material disputes of fact have been raised by plaintiffs whether the documents regarding the 2004/2005 price increase support their theory of conspiracy.

---

[20] As discussed below, the significance of the different types of metadata associated with documents found in the SHD is a point of dispute between the experts.

Plaintiffs argue that in 2007, Samyang used the private marketone@hanmail.net email address to circulate competitor information, and that by this time Nongshim employee Yeo Won Yoon was likewise using a private email address to email Samyang employees price information at their own private email accounts. Cho Decl., Exs. 34 (emails from NSK) & 38 (SHD screenshots).[21] Samyang's marketing team leader (Jin Woo Seo) testified that he was confident that from July 2006 through September 2008, Samyang was receiving advance information about Nongshim's price intentions before it was public through Yui. Cho Decl., Ex. 18, Deposition Transcript of Jin-Woo Seo at 66:2-25.

As for documentary support, plaintiffs contend that Nongshim notified its distributors of the prospect of price increases on February 23, 2007. On March 1, Nongshim set its increases in prices and emailed its competitors a document detailing shipping dates and old price support periods. Cho Decl., Ex. 38 (from SHD).[22] According to a February 28, 2007 Ottogi memo, Ottogi had already been in touch with Samyang and Yakult to inquire about their plans for raising prices. Cho Decl., Ex. 39. According to the Ottogi memo, Samyang and Yakult informed Ottogi of the dates and scope of *their* contemplated price increases. Samyang disclosed its price increase plan to Nongshim and Ottogi on April 11, 2007, and raised its prices on April 16, 2007. Cho Decl., Ex. 40 (SHD email).

Plaintiffs allege that this time Ottogi was the company that attempted to delay its price increases. Around July 18, 2007, Samyang's Jong Moon Yui had a conversation with Ottogi to discuss the market's reaction to the price increases, according to an Ottogi memo of the same date. Cho Decl., Ex. 42. Ottogi sent a draft of its price increases to its competitors in second half of July (Cho Decl., Ex. 43 (SHD document)) and finalized its proposed price increases on July 23, 2007. Cho Decl., Ex. 44 (an Ottogi document that lists products in the same order as the SHD

---

[21] Defendants' computer forensic expert argues that none of the SHD emails are "authentic" emails because none of them were natively produced. *See infra*. As discussed below, given the other information provided about the creation and storage of "emails" on the SHD (through screen shots, compilations, etc.), this goes to their weight but not their admissibility.

[22] This SHD document's metadata shows that it was created by Nongshim with a "last author" who was a Yakult employee.

United States District Court
Northern District of California

document in Ex. 43). The effective date of Ottogi's increases was September 1, 2007. Cho Decl., Ex. 45.

During this timeframe, plaintiffs allege that the competitors continued to share market and sales information, including information about promotions, so that they could monitor the impact of Nongshim and then Samyang's price increases on the market. Cho Decl., Exs. 14, 34.[23] Ottogi also shared its quarterly sales performance. Cho Decl., Exs. 47, 48 (SHD documents, with Ottogi document-level metadata).

Defendants respond with the same objections to the evidence – primarily that the documents on the SHD are not authenticated or otherwise admissible – and that at most plaintiffs show that the information exchanged could have already been known by distributors. *See, e.g.*, Ottogi Reply at 8. However, as above, the testimony and documents create disputes of material fact.

### 5. 2008 Price Increase and Competitor Meetings

According to plaintiffs, the pattern of information sharing continued into 2008. Nongshim sent Ottogi its before and after factory and retail price increases on February 17, 2008, and informed them of the date when those increases would be implemented. Cho Decl., Ex. 50. Nongshim raised its prices on February 20, 2008, and sent its old price support information to Samyang and Ottogi. Cho Decl., Exs. 54 (Ottogi), 55 (SHD). Samyang used this information to draft its own report for the period covering February 22 – 28th. Cho Decl., Ex. 56. It then circulated its price increase details to its competitors on February 27 and 28th (Cho Decl., Exs. 33), raised its prices on March 1, 2008, and shared its price support information on March 3, 2008. Cho Decl., Ex. 33 (SHD). Ottogi sent its information to Samyang on February 29, 2008. Cho Decl., Exs. 14 (Ottogi), 57 (SHD).[24]

---

[23] Plaintiffs note that many of the Nongshim Korea ("NSK") documents produced from this time frame mirror ones found on the SHD. Oppo. 29.

[24] Ottogi in Reply does not discuss the February 29, 2008 date that plaintiffs contend Ottogi sent its non-public price information to Samyang, but instead argues over the date (and method) of the delivery of information from Nongshim to Ottogi. Ottogi Reply. at 8-9.

In sum, considering the testimony from Samyang witnesses and their KFTC statements (which, as acknowledged above, were somewhat "walked back" in subsequent examinations) and the documents, plaintiffs have some evidence – although on close inspection, not as overwhelming as plaintiffs contend – to corroborate their "direct evidence" of conspiracy.

### C.  Confirmatory Economic Analysis

Finally, plaintiffs rely on their experts' analyses that price collusion was in play.  Oppo. 36.  The conclusions of those experts were discussed extensively in my Order granting the motions for class certification.  The defendants, at this juncture, do not make a concerted attempt to persuade me that my conclusions on the prior Orders missed key points, facts, or contrary expert positions that should turn the summary judgment motions in their favor.

In Opposition, plaintiffs rely on their experts' conclusions that the delta between costs of goods sold and profit nearly tripled during the Conspiracy Period (when they moved in tandem in the Benchmark period).[25]  Plaintiffs also point out that during the Conspiracy Period, the market shares of the conspirators remained consistent, and only changed (with Ottogi surpassing Samyang) after the conspiracy ended in 2010.[26]  Their expert support strengthens (but is not the sole support of) the conclusion that plaintiffs have presented enough evidence of a conspiracy in Korea to survive summary judgment on this issue.[27]

---

[25] As acknowledged before, defendants contend that plaintiffs' experts unreasonably removed certain overhead costs that, in their view and as discussed extensively on the class certification motion, should be included and if included result in slim to negative profit margins for defendants during the conspiracy.

[26] Ottogi attributes this increased market share and overtaking Samyang to Ottogi's improvement of taste in its Jin Ramen product and the development of a new higher priced premium product. Declaration of Bangwan Ku [Dkt. No. 545] ¶ 15.

[27] The evidence in this case is markedly unlike that in *In re Chocolate Confectionary Antitrust Litigation*, 801 F.3d 383, 397 (3rd Cir. 2015), where the plaintiffs relied primarily on economic analysis and failed to offer testimony or documentary evidence to undermine the notion that in an oligopolistic market, prices will tend to move in tandem resulting in supra-competitive prices that *are not* the product of an anticompetitive agreement.  Here, plaintiffs do not rely alone on evidence of "conscious parallelism" to create a reasonable inference of a conspiracy; there is some direct evidence and additional corroborating evidence (but subject to dueling interpretations of significance and reliability) sufficient for plaintiffs to survive summary judgment on an issue of a conspiracy in Korea.  *Id*. at 398.

### D.       Summary

Reviewing all of the evidence – and considering defendants' objections to much of it and their contrary characterizations of some of it – I find that plaintiffs have shown "sufficiently unambiguous" evidence of a conspiracy; in other words that the inference of conspiratorial behavior reasonably drawn from the evidence is *more consistent* with unlawful conduct than lawful conduct.

Nongshim attempts to dismiss the evidence as hearsay (for Samyang testimony generally), as subsequently contradicted (as a few of the Samyang witnesses in 2016 could not recall the bases for some of the statements made in their KFTC statements in 2010 and 2011), and as unreliable (for the SHD documents). It blames "lazy low-level" employees for exchanging information. These lines of defense may be persuasive to a jury, but do not get them to summary judgment on the issue of a conspiracy in the Korean market.

Ottogi's attacks on the evidence of a conspiracy are similar. But Ottogi also ignores the import of their memos, which support a reasonable inference that it had advance access to its competitors' price and old price support information and used that information in shaping its own plans. Moreover, plaintiffs have evidence that Ottogi omitted information from some of the "recreated" memos it submitted to the KFTC – which Ottogi contends it was asked to do by the KFTC – that supports plaintiffs' conspiracy and collusion theory. Ottogi also points to its separate testimony and documents showing that the prices it ultimately selected "differed" from its competitors. Ottogi Reply 16. That, however, was plausibly explained in plaintiffs' favor by the experts on class certification (*i.e.*, the exact prices did not and do not have to match, but the percentage moves and timing does line up with a conspiracy). Ottogi also points to evidence that it engaged in extensive analysis and strategizing before any price changes. Ku Decl. ¶ 16 & Exs. A-Q (attaching pricing memos considering market dynamics and options for price increases and old product support). That may be so, but plaintiffs have likewise shown evidence that there was analysis in *that process* of at least some allegedly non-public competitor price and price support information.

## IV.  IMPACT OF CONSPIRACY IN THE UNITED STATES

That plaintiffs have come forward with sufficient evidence to raise a dispute of material fact regarding the existence of a conspiracy to raise prices in a coordinated fashion in Korea does not mean plaintiffs have cleared the hurdle of defendants' motions for summary judgment. Defendants argue that there is insufficient evidence that the Korean conspiracy (if it existed) impacted purchasers in the United States.

Defendants are correct that the existence of a conspiracy overseas does not, by itself, evidence a conspiracy impacting the United States.  There must be "some linkage" between the conduct overseas and sales (or other injury) in the United States.  *See, e.g., In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) ("Allegations of anticompetitive wrongdoing in Europe-absent any evidence of linkage between such foreign conduct and conduct here-is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here.'"); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003) (requiring evidence of "some palpable tie between [] overseas activities and [] pricing actions in the United States.").

As an initial matter, there is no direct evidence that the conspirators *expressly aimed* the alleged collusive conduct towards products destined for export to the United States or products manufactured in the United States.[28]  Plaintiffs argue they have supplied the necessary linkage through indirect evidence: namely, the connections between and the control exercised by the Korean parent companies over their wholly-owned subsidiaries, Ottogi American and NSA.  The linkage depends in part on the nature of NSK and Ottogi Korea.  Plaintiffs' expert, Dr. Stephen Haggard, describes them as "chaebols," diversified family business entities that (even if publicly traded and separately organized under corporate law) are dominated by one family or extended family.  *See* Declaration of Professor Stephan Haggard [Dkt. No. 567-1] ¶¶ 12-13.[29]  According to

---

[28] Defendants rely on "public statements" from the KFTC that the alleged conspiracy did not involve products for the United States.  Ottogi MSJ at 20, citing Dkt. No. 85-1 (a KFTC request for clarification to a news article); Dkt. No. 95-2 (communication from KFTC to law firm clarifying that "the export item (ramen) was not the target of price-fixing").  However, these statements by the KFTC do not bind my determination or resolution of that issue.

[29] As discussed below, defendants object to and move to exclude the Declaration and testimony of

Haggard, the family domination and control extends to subsidiaries and affiliated companies. *Id*. ¶ 17. Subsidiaries of Korean chaebols generally are run as "integrated business units" to service the interests of the founding families and the flagship organization. *Id*. ¶¶ 36, 47.

Standing alone, however, opinions regarding the integrated operations of chaebols generally, including overlap between and "sharing" of executives between parent and subsidiary corporations, would be insufficient to demonstrate linkage in *this* case. Haggard goes slightly further and relies on information about the specific operations of NSK and Ottogi Korea and their American subsidiaries NSA and Ottogi America – including organizational charts, lists of employees and executives, and other documents produced in this case – as bases for his opinions about integrated control over subsidiaries exercised by NSK and Ottogi Korea. Haggard Decl. ¶¶ 38-39, 49-62 (Nongshim), ¶¶ 63-68 (Ottogi).[30]

In addition to this overarching, somewhat generalized theory of chaebols operation from Haggard, plaintiffs rely on evidence showing that directors and upper-level management were shared between the Korean parents and American subsidiaries. Plaintiffs also offer evidence showing that Ottogi America and NSA sold products produced in Korea by the parent corporations engaged in the conspiracy and that the pricing of those export products were based on Korean domestic prices. Even for NSA products produced in the U.S., plaintiffs claim that documents show that their pricing was also controlled by NSK and impacted by the conspiracy. Defendants counter that plaintiffs' generalizations and a few mischaracterized documents cannot carry plaintiffs' weight to show a dispute of material fact that the Korean conspiracy had any impact on the pricing decisions made by NSA and Ottogi America.[31]

---

Haggard.

[30] As one specific example, Haggard points out that Jun (or Joon) Park simultaneously acted as Chairman of the Board and President of NSA and as NSK's overseas sales team. Haggard Decl. ¶ 52.

[31] Following the hearing on these motions, Nongshim submitted a request to file an "appendix" of supplemental citations regarding lack of causation and impact in the United States. Dkt. No. 599. That appendix did not simply include supplemental citations, but also excerpts of expert testimony and Nongshim's characterization of the competing testimony. *Id*. Not surprisingly, plaintiffs then filed their response to Nongshim and their own supplemental memorandum re causation, supported by a supplemental declaration. Dkt. Nos. 602, 603. Ottogi and Nongshim then filed

### A.    Ottogi

It is undisputed that Ottogi's products were manufactured by Ottogi Ramen and exported to the United States by Ottogi Korea, initially through sales to DPPs and Korea-based exporters and then after Ottogi America was formed in 2005, through sales to Ottogi America.

Ottogi argues that plaintiffs' alleged evidence of impact in the United States is insufficient – at least for its products – because:

- Ottogi manufactured different products for the U.S. market.  Prior to creation of Ottogi American in 2005, the U.S. products were sold to U.S.-based DPPs or exporters in Korea (and both those entities were responsible for importing the product to the U.S.) at the "export price."  The export price was not increased, and was below the Korean-domestic price, through 2003.

As to the differences in the domestic and export products, plaintiffs argue that there is no evidence that minor differences in packing or ingredients – which are the only differences – had any impact on pricing.  Plaintiffs note that Ottogi conceded there were no differences in the manufacturing process, although there could be differences in ingredients.  Cho Decl., Ex. 59, Deposition Transcript of Kyu Tae Kim [Dkt. No. 567-4 at ECF 472] at 28:23-29:24.  As to the pre-2003 period, plaintiffs do not dispute from that 1999 – 2003, Ottogi's Overseas Business division did not raise its export price, and the export price remained much lower than its domestic price.  Declaration of Heung Duck Seo [Dkt. No. 548-3] ¶ 4.  However, as the class period does not start until 2003, this fact is of limited relevance (other than a piece of evidence Ottogi can use to argue that the Korean prices didn't impact the U.S. prices).[32]

---

briefs opposing plaintiffs' filings, but also addressing (really readdressing) the evidence and arguments made by plaintiffs.  Dkt. Nos. 605, 606.  The parties' attempts to submit further evidence and briefing on these issues – after having been provided excess pages to make their arguments initially – contravenes this District's Local Rules.  Nonetheless, because all parties have now had the opportunity to respond to each other, the motions to supplement are GRANTED and I will consider the evidence and arguments raised therein.  Dkt. Nos. 599, 602.

[32] Plaintiffs will, presumably, argue that Ottogi intentionally kept the U.S. price low during this period to help it "break into" the U.S. market.  Plaintiffs also rely on their expert, Mangum, who ascribed the lag in part to the initial focus of at least Nongshim on the Korean conspiracy which, following that success, was then exported to the U.S. and other markets.  Mangum Decl. [Dkt. No. 363-6] ¶ 98.

The significant issue here is the determination of the "export price" (the price Ottogi Korea set for products destined for the United States); how it was determined and who determined it. If the export price was inflated due to the conspiracy, then products with an inflated price were sent into the U.S. market and sold by Ottogi America. Ottogi contends that extensive evidence shows that different entities were involved in setting their own prices, including:

- Ottogi Ramen (which manufactured the products and sold them to the separate-but-related Ottogi Korea entity at the "procurement price"); Ottogi Korea Overseas Business Division (which set the export price;[33] the Ottogi Korea Product Planning Team, Marketing Team 3, and Sales Planning Teams (which set domestic prices, *see* Bangwan Ku Decl. [Dkt. No. 545] ¶ 6); and then Ottogi America (formed in 2005). Yu Decl., Appx A [Dkt. No. 547 at ECF pg. 8].

As an initial matter, that Ottogi America (from 2005 on) or the exporters (who prior to the formation of Ottogi America imported the products into the U.S.) may have "discounted" their prices to attempt to gain a stronger foothold in the States or in discrete regions and therefore charged different end-prices to each DPP depending on base price, shipping distance, and discounts, at most provides an argument as to the amount of damage suffered by plaintiffs. It does not mean that the conspiracy did not reach or impact consumers in the United States.

Ottogi relies heavily on the testimony of Bangwan Ku[34] that the Overseas Business Division set the export prices and argues there was no overlap between the narrow-category of individuals who were "responsible" for setting the different divisions' prices. Yu Decl., Appx A. Plaintiffs, in response, point out that Ottogi America's board of directors and upper-level management were "filled" with Ottogi Korea board members and high-level executives. Haggard Decl., ¶¶ 67, 68 (identifying family members of Ottogi Korea's founder who held positions at

[33] Ottogi's witnesses testified that the export price was determined based on procurement price only plus export factors (margin, exchange rate) and was not set with respect to the domestic price. Yu Decl., Ex. 10, Deposition Tr. Min Hwan Choi [Dkt. No. 547-12] 10:9 – 11:17:17.

[34] Bangwan Ku is currently Ottogi's Deputy Senior Sales Manager for Ottogi Korea. From 2000 through 2015, he was an associate in the Sales Planning Office, which set prices for products produced for the Korean domestic market. Bangwan Ku Decl. ¶¶ 1, 2.

Ottogi America and other individuals who held concurrent Board or employment positions at Ottogi Korea and Ottogi America from February 2008 through March 2011). They also emphasize that many Ottogi Korea employees were "dispatched" to oversee the day-to-day operations for Ottogi America. Oppo. at 38 n.54. According to plaintiffs and their expert (Haggard), this allowed Ottogi Korea to oversee and participate in Ottogi America's operations with the ultimate goal of protecting the profits and carrying out the aims of the parent corporation.

As additional support, plaintiffs point to documents evidencing that export prices and Ottogi America's sales prices were influenced by Korean domestic prices. That evidence to show that Ottogi Korea was exercising control over the export prices includes a 2002 price approval document, circulated to both the Korean domestic division and the "Overseas Sales – Export Office" along with deposition testimony from Bangwan Ku that these sorts of price adjustment notifications were sent to departments who needed to know. Cho Decl. Ex. 81 (price approval form), 82 (Bangwan Ku Depo. Tr. [Dkt. No. 566-24] at 117:15-23). Plaintiffs also rely on evidence from 2008 that after Ottogi Korea increased factory and retail prices, the head of the Overseas Sales Team emailed that document to the Overseas business department to notify them that price increases for exports "would be" 10%. Cho Decl., Exs. 85-86; *see also* Supp. Cho Decl. [Dkt. No. 603-5], Ex. 8 ("Ottogi American Export Price Computation" from November 2007).[35]

Weighed together, plaintiffs have some (albeit slim) evidence that the Ottogi America prices were impacted by the prices set by Ottogi Korea that were inflated because of the conspiracy. The domestic-Korean and U.S. products were *produced* in Korea by a related-company, Ottogi Ramen, purchased by Ottogi Korea, and then sold by Ottogi Korea to Ottogi America (after Ottogi America's creation). Construing the evidence in plaintiffs' favor, the linkage between the Korean market and the products produced in Korea and sold in the U.S. market has been established.

---

[35] Plaintiffs also rely on documents showing that after Ottogi Korea decreased its prices in 2010 based on directions from the KFTC, the Overseas Sales Team informed Ottogi America of that, and Ottogi America reduced its prices accordingly just nine days later. Cho Decl., Exs. 84, 87, 88.

### B.    NSA Arguments

Nongshim argues that partial summary judgment must be entered for NSA because there is no evidence that NSA was part of the conspiracy.[36]   Relatedly, Nongshim also moves for partial summary judgment seeking a "bar" order under Rule 56(g) carving out the U.S.-produced products from the scope of the case.

Nongshim argues that it declarants uniformly testified that NSA's pricing decisions for products sold in the U.S. – both those produced in the U.S. and those imported from Korea – were "wholly independent" of NSK.  Declaration of Young Lee [Dkt. No. 540-6], ¶ 6; Declaration of Won Joon Lee [Dkt. No. 541-30] ¶ 9.  It is undisputed that prior to the opening of NSA's Rancho Cucamonga factory in 2005, NSA's products sold in the U.S. were manufactured by and purchased from NSK in Korea.  After the NSA factory started domestic U.S. production in 2005, the majority of product sold by NSA was domestically produced by NSA.  Over the class period, 65% of the relevant product was manufactured in the U.S.  Y. Lee Decl., ¶ 5.

#### 1.    NSK-Produced Products

As to the NSK-produced products sold by NSA, Nongshim admits that the products were priced in part by reference to what NSK charged NSA for them (plus freight, duty, customs and other import-related costs as well as profit margin, and depended in part on the exchange rate).  Young Lee Decl. ¶ 8; Declaration of Won Joon Lee [Dkt. No. 541-30] ¶ 7.  However, Nongshim contends, because the prices were ultimately the result of negotiations between NSA and NSK (Y. Lee Decl. ¶ 8), there is no evidence the alleged-conspiracy led to higher prices for the products NSA sold.  NSK's Won Joon Lee likewise states the NSK employees involved in the negotiations with NSA operated "entirely separately" from the NSK employees in the "different unit" of NSK who set the Korean-domestic price.  Won Joon Lee Decl. ¶ 7.  And NSK had no role in

---

[36] Plaintiffs identify one instance of an NSK employee emailing a "dispatched" NSK employee on assignment at NSA an NSK "weekly report," detailing information about Samyang, Ottogi, and Yakult's market share.  Cho Decl., Ex. 49 (NSK emails).  Plaintiffs also argue that because NSA destroyed their copy of the Factbook (that had been available from NSA's website but was taken down after the inception of the litigation), there is an inference that other documents showing NSA's role in the conspiracy were likewise destroyed.  Oppo. 51.  This "evidence" is mere speculation and not sufficient to show that NSA played a direct role in the conspiracy emanating from Korea.

1    determining the ultimate price NSA charged DPPs.  *Id*.

2         As with Ottogi, that NSA had some flexibility to negotiate its purchase price from related-

3    NSK and then could discount and set its *own* prices for DPPs does not mean that the price NSA

4    paid for *imported* NSK products were not inflated by the conspiracy or that the conspiracy did not

5    impact the prices ultimately charged by NSA.  Plaintiffs have significant evidence that the export

6    price of NSK-produced products was directly set in conjunction with Korean "factory price"

7    levels.  Cho Decl. [Dkt. No. 566, 567], Ex. 60 (Sales System Setup for US subsidiary); Ex. 65 (as

8    maintained by Jae Chan Lee, a manager of American exports, Ex. 66); Ex. 72 (import price set off

9    of factory price and selling price set off of domestic-Korea price);  Ex. 67 (describing formula in

10   April 2007); Ex. 68 (2003 export price increase); Ex. 73 (2008 price increase); *see also* Supp. Cho

11   Decl. [Dkt. No. 603-5], Exs. 5-6.[37]  There are also emails between NSK and NSA indicating that

12   prices NSA charged in the United States for at least Korean-export products should be increased *in*

13   *light of* the increased prices in Korea.  *Id*., Exs. 72, 75.[38]

14        There is sufficient, albeit disputed, evidence that for the NSK-produced products, the

15   alleged-conspiracy-inflated prices in Korea *impacted* the export-priced products sold by NSA.

16   This direct evidence, combined with the evidence of shared directors and employees and

17   Haggard's opinions about control by NSK over NSA, raises at least a question of fact as to NSA's

18   participation in and liability for the alleged conspiracy.  In other words, NSA may have not only

19

20   [37] Nongshim argues that these documents discuss export pricing to areas *other* than the United
21   States, because products for the United States had to be "localized" to comply, for example, with
     FDA requirements.  *See, e.g.*, Nongshim Reply [Dkt. No. 607-1].  But that is not clear from the
22   face of the documents or the limited testimony regarding the documents and simply demonstrates
     there are disputes of material fact.

23   [38] Plaintiffs rely on two "Approval Request" forms and attached documents from 2003 and 2008
24   which they contend contradict Young Lee's position that NSA independently set prices without
     any input from NSK.  Plaintiffs point out that those requests, proposing changes to "transfer"
25   pricing between NSK and NSA, include attachments regarding NSK export and factory prices, as
     well as NSA's market supply prices.  Cho Decl. Exs. 69, 73.  The forms required sign offs by both
26   NSA and NSK executives.  One of the signatories, Joon Park, was the director and President of
     NSA at the same time he was a director and President of the International Business Division of
27   NSK.  Cho Decl., Ex. 95; Pls. Oppo. 50.  The signoffs, according to plaintiffs, further contradict
     Lee's statements, and add support to Haggard's conclusions that NSA did not operate
28   independently of NSK given the shared control.  Haggard Decl. ¶¶ 16-21, 72.

paid conspiracy-inflated prices for the NSK-produced products, but also allowed input if not control by NSK for the prices it charged on those products, knowingly furthering the goals of the conspiracy.[39]

### 2. U.S.-Produced Products and Rule 56(g) Order

In the alternative, NSK and NSA seek a Rule 56(g) partial judgment excluding from plaintiffs' case any products produced and sold by NSA in the United States. Nongshim MSJ at 18.[40] As to the U.S.-produced products, NSA's Young Lee declares that the prices were set by considering NSA's costs plus sales/administrative expenses plus a gross profit, and without any role from NSK. Y. Lee Decl. ¶¶ 6, 11.

As to overlap between NSA and NSK – to rebut plaintiffs' argument that NSK exercised some degree of control over its wholly-owned subsidiary NSA – Young Lee declares that at all times during the class period and since, NSA "was a wholly independently operated and managed entity: there is little overlap between the employees, managers, and offices of NSA and NSK," and there was no overlapping personnel between NSK and NSA "in charge of pricing decisions." Young Lee Decl. ¶¶ 12-13. Won Joon Lee declares that there was no overlap between personnel in NSK's domestic pricing and export pricing decision-makers. Won Joon Lee Decl. ¶ 8.

In response, plaintiffs rely heavily again on evidence that while the discrete individuals in charge "of pricing" at NSK and NSA did not overlap, there was concurrent overlap between directors and high-level managers of both organizations during the relevant timeframe and high–level employees worked for one company and then the other (in other words, were "seconded" to NSA from NSK) during the relevant timeframe. Haggard Decl. ¶¶ 56-60. The overlap of these

---

[39] Plaintiffs contend that even if I grant defendants' motions as to NSA and Ottogi America based on insufficient evidence of NSA and Ottogi America's participation in the conspiracy, the DPPs would still have standing to assert their Sherman Act damages claims – presumably against NSK and Ottogi Korea – because of the "control exception." *See, e.g., Costco Wholesale Corporation v. AU Optronics Corporation*, 2015 WL 11529919, at *1 (W.D. Wash., June 4, 2015) (standing to seek damages for purchases whose prices were inflated by conspiracy, even if not purchased from a conspirator as long as the seller was "controlled" by a conspirator). Given that I have found a question of fact as to the subsidiaries' participation in the conspiracy, I need not address it now.

[40] Nongshim argues the exact amount of damages at issue does not need to be resolved; those sales can simply be excluded from the case. Nongshim MSJ at 18 n.25.

directors and employees, according to plaintiffs, is evidence of the "control" NSK asserted over the prices that NSA charged, even for its U.S.-produced products. Haggard Decl. ¶¶ 53-55.

To show that NSK's domestic prices – allegedly inflated as a result of the conspiracy – played a role in the price of NSA U.S.-produced products, plaintiffs rely on an email exchange between Young Lee ("USA Resident Nongshim Co. Officer") and Krith Roth (at NSA), to the effect that because prices had been increased in Korea in March 2007, the prices at NSA would have to be increased "as soon as possible," Cho Decl., Ex. 74,. That document does not address whether the price increase would be for imported (Korean-produced) or U.S.-produced products. Plaintiffs also identify an October 2010 "Overseas Business Strategy Meeting," where NSA planned to "increase the prices of all imported products and the prices of all the products that are produced in America." *Id*., Ex. 76. But that document does not indicate on what basis any of the prices are being increased (*e.g*., because of direction from NSK or increase in Korean-domestic prices) and in 2010, as all parties agree, the conspiracy ended with a *decrease* in prices.

Plaintiffs then rely on one undated NSA price list allegedly showing that the prices NSA charged for U.S.-produced products were identical to the prices NSK charged for equivalent products in Korea. Cho Decl., Ex. 97. They also cite to deposition testimony from the director of NSA sales that products sold by NSA that were the same type, even if not the same flavor, and were priced similarly because they were the "same product" despite one being produced in the U.S. and the other being produced in Korea. Cho Decl., Ex. 9, Deposition Tr. Kim at 66:23-67:25. The Kim testimony is not clear or persuasive on the point of matched pricing between products imported from Korea and the U.S., but plaintiffs expert Mangum bolsters that point by testifying that it "made sense" for NSA to price U.S. and Korean imported product similarly, to keep the same "value proposition" between the products. Mangum Decl. [Dkt. No. 363-6] ¶ 131.[41] Finally, plaintiffs rely on evidence that the 2007 and 2008 price increases implemented by NSK for

---

[41] *See* Mangum Decl. ¶ 131 ("That is, if NSK increases the price of cup Shin Ramyun, but NSA does not similarly begin selling bag Shin Ramyun at higher prices, the relative value proposition between these two products is muddled, which weakens the company's ability to price discriminate and attract different types of purchasers.").

1  Korean domestic products were, mere months later, followed by price increases by NSA for *both*

2  imported and U.S.-produced products.  Mangum Decl. ¶ 47.[42]

3       Unlike the documentary evidence regarding NSK-produced product, the documentary

4  evidence regarding the impact of the Korean-based conspiracy on U.S.-produced product is

5  extremely thin.[43]  Plaintiffs attempt to shore it up with testimony from Mangum and, almost as an

6  aside, argue that NSA employees gave "false" information to the U.S. market about the cause of

7  the NSA price increases (blaming it on raw material costs) when plaintiffs' experts have shown

8  (according to plaintiffs and based on disputes of fact) that rising costs do not adequately account

9  for the price increases.  Cho Decl., Ex. 8 Deposition Tr. of Krith Roth [Dkt. No. 566-2] 29:8-30:12

10  (stating that he provides customers with articles from the internet discussing cost increase for raw

11  material); Ex. 9, Deposition Tr. of Sunny Kim [Dkt. No. 566-3], 45:23-46:21 (Kim would explain

12  to customers generally that price increases were due to raw material cost increases).  But, as with

13  the documents, it is unclear how far this testimony extends and whether it was given to justify cost

14  increases in imported (from Korea) products *as well as* U.S.-produced products.

15       In sum, other than the very weak documentary showing, the evidence regarding whether

16  prices for the U.S.-produced products were impacted by the Korean-based conspiracy is the

17  somewhat generalized chaebol argument as supported by the opinions of Haggard that NSK

18  exercised control over the pricing decisions of NSA generally.  There is also the testimony from

19  Mangum that keeping prices of similar products the same (despite the fact one was imported from

20  Korea and one was manufactured in the United States) makes sense and identifying price increases

21  that were implemented by NSA for both the imported and U.S.-produced product.

22  _____

23  [42] Plaintiffs also rely on an email from NSK to NSA that in light of "domestic" price increases
there will increases in export products.  Pls. Oppo. at 53; Cho Decl., Ex. 75.  Yet Ex. 75 is

24  characterized first by plaintiffs as a document explaining that Korean-export prices will be set off
of "'domestic' (*i.e.*, Korean)" increased prices.  Then plaintiffs attempt to redefine "domestic" as

25  used in that document to mean U.S. manufactured product.  *Compare* Pls. Oppo. at 40 *with id*. at
53.  Plaintiffs cannot rely on the same document for two different propositions.

26  [43] Perhaps intentionally, plaintiffs do not separately identify the documentary evidence supporting

27  their argument that NSA set the prices for U.S.-produced products with reference to NSK prices or
under NSK control, and instead cite evidence generally for that proposition *and* the separate

28  proposition that NSK influenced the price of the products NSA sold that were exported from
Korea.

Plaintiffs also seek to avoid the fact that the U.S.-produced product evidence is not fulsome by arguing that because NSK's conduct artificially raised prices across all markets for its products (including the United States), damages can still be recovered for those sales.[44] Plaintiffs rely on *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, 2016 WL 6246736, at *1 (N.D. Cal., Oct. 26, 2016). There, the plaintiffs alleged a conspiracy to fix prices on "smaller-sized" cathode ray tubes but sought damages for products containing "larger-sized" CRTs, arguing that the conspiracy to fix the smaller CRTs distorted the price of the larger CRTs as well. This "price ladder" theory of recovery was allowed to proceed. Plaintiffs argue here that even if there is not sufficient evidence that NSA itself participated in the conspiracy, the U.S.-produced products should remain because their prices were matched off of and impacted by the Korean-price conspiracy, as shown by their experts' hedonic regression analyses.

## C.  Economic Analyses

Defendants argue that plaintiffs' experts' analyses showing that prices in the United States correlated with the increase prices imposed in Korea (allegedly inflated due to the conspiracy) is not sufficient in and of itself to show that the alleged conspiracy had an impact in the United States. Nongshim MSJ 34; Ottogi MSJ 22-23. Defendants point out that in the Ninth Circuit (in considering the *opposite* situation; whether a U.S.-based conspiracy could provide standing for claims arising overseas), the court cut out foreign injuries from the scope of a case under the FTAIA, because of insufficient evidence that "higher U.S. prices proximately caused its foreign injury of having to pay higher prices abroad. Other actors or forces may have affected the foreign prices." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 988 (9th Cir. 2008).

Defendants contend that prices in the United States, even if correlated, could have been

---

[44] Plaintiffs, somewhat relatedly, oppose any grant of judgment as to NSA because NSA did not own the U.S. factory until 2009. They assert the factory was initially owned by a separate NSK subsidiary (Nongshim Foods, Inc.) and NSA didn't own any portion of the factory until Nongshim Foods and NSA merged in 2009. Cho Decl., Ex. 100, Deposition Transcript of Young Hoon Lee at 47:20-48:13. It is unclear how this cuts in favor or against plaintiffs. However, NSA remains in this case given the evidence, discussed above, that NSA played some role in passing on NSK-influenced conspiracy-inflated prices.

caused by the increased costs of raw materials. I rejected the same argument in granting the motions for class certification, finding that the plaintiffs' experts had controlled for raw material price fluctuations in conducting their regression and correlation analyses. Dkt. No. 501 at 5. Defendants again argue that the correlation analyses by plaintiffs' experts were deficient. Nongshim MSJ at 34; Ottogi MSJ at 23. I found the admittedly limited correlation analyses performed by plaintiffs' experts generally sufficient at class certification. Dkt. No. 501 at 22-24.

Defendants also argue that plaintiffs' experts correlation analyses are faulty concerning the issue of impact in the United States because: (1) they fail to examine whether NSA and Ottogi America's prices were raised "in unison" to show an active conspiracy in the U.S.; and (2) in order to avoid data that would contradict their theories, plaintiffs' experts failed to include all of the necessary transactional data in their analyses by excluding Samyang's data that (when considered by defendants' expert Cox) confirmed there was no correlation between the price movements in the U.S. Defendants' Supplemental Citations [Dkt. No. 599].

Plaintiffs' experts say that they did not use the Samyang sales data in their regression models or in their confirmatory correlation analyses (despite the fact that Samyang was an alleged coconspirator) because of: (1) incomplete Samyang sales data from the benchmark period; (2) the "family relationship" between Samyang Korea and Samyang USA and the "potential implications for pricing"; (3) the existence of a "most-favored nation" clause in the exclusive agreement between Samyang Korea and Samyang USA; and (4) highly irregular and unexplained price series found in the Samyang sales data. Reply Declaration of Mangum [Dkt. No. 466-8] ¶ 150; *see also* Rebuttal Declaration of Daniel A. Ackerberg [Dkt. No. 473-2] at 25.[45] As plaintiffs point out, while Cox indicates that inclusion of the Samyang data shows no "correlation" as to price changes in the U.S., there is no evidence that Cox separately analyzed the Samyang data as part of his attempts to undermine plaintiffs' experts' regression analyses, which is what the plaintiffs' rely on

---

[45] In their Response to Plaintiffs' Sur-Reply, the Nongshim defendants argue that there was sufficient benchmark Samyang data for plaintiffs' experts to consider and cite a particular spreadsheet that was reviewed by Cox. Dkt. No. 607-1 at 10. However, there is no explanation in Cox's declaration or in Appendix C itself to substantiate that argument.

to show impact of the conspiracy on prices in the United States.

Plaintiffs do not dispute that they did not conduct any correlation between NSA and Ottogi America's prices.[46] Instead, they argue that their experts' hedonic regression analyses (discussed extensively on class certification) are more robust and reliable than a correlation analysis of defendants' U.S. prices. *See* Declaration of Daniel A. Ackerberg [Dkt. No. 362-4] at 27[47]; Declaration of Russell W. Mangum [Dkt. No. 363-6] ¶ 18.[48]

Perhaps if plaintiffs had no affirmative evidence of a conspiracy (which as discussed above, there is), if they had no affirmative evidence that the prices of the products exported to the U.S. were influenced or based off of the Korean prices (which as discussed above, there is), if there was no evidence of control or input from Korea in the activities of the American subsidiaries (which as discussed above, there is), and if there was no evidence from plaintiffs' experts' regression models showing artificially high prices in the U.S. (which there is, even though the assumptions in those models provide ripe grounds for dispute), then the failure of plaintiffs' experts to conduct a correlation analysis between prices charged by NSA and Ottogi America might be more problematic. On this record, and for purposes of summary judgment, it is not.

### D.    Standing/Proximate Causation

Related to the argument that plaintiffs have failed to show impact of the alleged conspiracy in the U.S., Nongshim relies on the established proposition that an antitrust plaintiff must show her or his alleged injuries were proximately caused by defendants' conduct. Nongshim MSJ at 31-34. Nongshim cites the Ninth Circuit's decision in *In re DRAM* where (as noted above) the court concluded that it could not stretch liability for a price fixing conspiracy in the United States to

---

[46] Plaintiffs point out only that their experts found correlations between the Korean defendants' domestic prices and their subsidiaries' U.S. prices.

[47] "[T]here is statistical evidence of the collusive agreement resulting in higher prices in each of the six subperiods, controlling for demand and cost factors that might be changing over time. In summary, econometric tests of price fixing conduct using Defendants' sales data indicate that the collusive agreement caused higher prices across all (or most) product groups." *Id*.

[48] At class certification I recognized that the sufficiency of the experts' measures to control for raw material cost increases and the plaintiffs' experts' assumptions about the delays (and time periods used to show correlation) were contested by defendants' experts. Those disputes, however, should be presented to the jury and resolved at trial.

injuries occurring outside the United States under the FTAIA. *In re DRAM*, 546 F.3d at 988. In reaching that conclusion, the court applied well-settled requirements for standing under antitrust precedent and concluded that foreign plaintiffs had not shown that higher U.S. prices had proximately caused their injuries abroad. *Id*. The DRAM court concluded that evidence of the U.S.-based conspiracy plus evidence of price correlation between the markets at issue was insufficient to establish proximate cause. *Id*. at 989.

As further support for their argument that causation has not been shown here, Nongshim notes that in *In re Online DVD Rental Antitrust Litigation*, No. M 09-2029 PJH) 2011 WL 1629663, at *1 (N.D. Cal., Apr. 29, 2011), the Hon. Phyllis Hamilton concluded that plaintiffs could not establish separate antitrust standing against non-conspirator Blockbuster even though Blockbuster and Netflix's movie rentals were in a closely connected market and Blockbuster matched Netflix's pricing following Netflix's alleged antitrust agreement with Walmart. Nongshim seeks to export that conclusion to the different posture here: arguing that even though NSK and NSA's markets are "linked," plaintiffs cannot rely on the fact that NSA matched its prices with any conspiracy-driven NSK prices to have standing against NSA. Under Nongshim's argument, simply because NSA linked its prices to NSK to some degree, without separate proof that NSA's prices were actually constrained by NSK (as opposed to simply voluntarily followed), NSA cannot be liable. Nongshim Mot. 33. However, as noted above with respect to products exported from Korea, plaintiffs have significant evidence showing direct impact and linkage between the pricing of domestic Korean product and Korean-produced exported product.[49] That there may have been minor differences (according to plaintiffs) between the products destined for the U.S. market and destined elsewhere does not, on this record, make the products so fundamentally different that the differences undermine plaintiffs' ability to sue over alleged impacts suffered in the U.S. market.

---

[49] As plaintiffs note, this case is closer to (albeit still significantly different from) the one presented in *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, 2016 WL 6246736, at *1 (N.D. Cal., Oct. 26, 2016). There, the market linkage was based on allegations and corroborating evidence that a conspiracy to fix prices on "smaller-sized" cathode ray tubes impacted the prices charged by conspirators on "larger-sized" CRTs. This "price ladder" theory of recovery was allowed to proceed.

Nongshim's final argument is that the weaknesses in plaintiffs' theory of why NSA sales should be included are shown by plaintiffs' limitation of the class to sales from 2003 onward. Plaintiffs allege the Korean conspiracy, which NSK allegedly directed and intended to be carried out worldwide, started in 2001. Plaintiffs admit (as they must) that NSA did not raise its prices from 2001 through part of 2003, showing (according to defendants) the logical weakness in plaintiffs "all price increases in Korea were mandated and followed by price increases in the United States" theory. But plaintiffs' explanations for this – obviously disputed by defendants – are that NSA and Ottogi America were trying gain bigger footholds in the U.S. (and therefore kept U.S. prices lower for a period of time) and that there was lag in implementation of the conspiracy from Korea to the U.S. *See, e.g*., Oppo. at 43.

The resolution of these issues rests on disputes of material fact. For example, a jury may well find it significant that U.S. prices did not increase prior to 2003 to discount plaintiffs' theories that a conspiracy existed and that the conspiracy impacted the U.S. market. Or it might not. These disputes preclude summary judgment.

## V.  STATE LAW CLAIMS

Defendants argue that because the Sherman Act claims fail, so too do the state law antitrust and unfair competition claims. However, as noted above, the Sherman Act claims survive summary judgment.

## VI.  DEFENDANTS' MOTION TO EXCLUDE HAGGARD DECLARATION

Separately, defendants move to exclude the declaration of Professor Stephan Haggard. Dkt. No. 581; Dkt. No. 584-2. Professor Haggard has been retained by plaintiffs to offer "testimony on the corporate structure and organizational features of Korean business groups known as *chaebol*, the corporate governance setting in which they operate, and to provide expert analysis and opinions with respect to whether and to what extent these factors are germane to understanding the organization and operations of the Ottogi and Nongshim groups in particular." Declaration of Stephan Haggard [Dkt. No. 567-1] ¶ 8 (emphasis in original).

Defendants argue that Haggard's testimony: (1) lacks critical foundation to extrapolate academic literature about Korean chaebols to U.S. pricing decisions by Nongshim America and

Ottogi America; (2) relies on irrelevant allegations that have nothing to do with how prices were set by these companies in the U.S.; and (3) crosses the line into impermissible legal opinion on Korean law and the strength of the parties' arguments. Plaintiffs oppose. Dkt. No. 593.

### A. Legal Standard

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.
>
> Fed. R. Evid. 702.

Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown,* 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation marks omitted).

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* at 564. These factors are "helpful, not definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case." *Id.* (internal quotation marks and footnotes omitted). "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

The inquiry into the admissibility of expert testimony is "a flexible one" where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 Advisory Cttee. Notes.

### B. Reliability and Methodology

Defendants' first challenge to Haggard's testimony – regarding how pricing decisions were made by Nongshim American and Ottogi America and how those decisions were controlled and/or influenced by the parent Korean corporations – is that Haggard's methodology is unreliable. That is because (according to defendants) Haggard: (1) reviewed only documents on subjects selected by him (to support his theory) and found by his Korean-speaking assistant; (2) ignored deposition testimony that was contradictory to his opinions; (3) relied on several incorrect assumptions and guesses (about the setting and impact of "export prices" and the timeframes when the Korean parent and domestic subsidiaries had relatives employed); and (4) relied on counter-factual and *ipse dixit* assumptions (*e.g.*, assumed subsidiaries are "controlled" by the parent corporations).

However, as disclosed in his declaration, Haggard based his opinions on his extensive personal study of Korean chaebols and academic and business publications regarding the same as well as numerous documents produced in this case. Dkt. No. 567-1 ECF Pg. 49-51. That Haggard did not address (or review) deposition testimony where defendants' employees testified to matters that purportedly undermine some of his opinions or assumptions does not make his testimony excludable. Those are grounds for cross-examination.

As a separate reason to exclude Haggard's testimony, defendants contend that it is based on nothing more than impermissible national-origin based stereotypes; *i.e.*, that Korean employees

47

and executives follow "deeply rooted" notions of hierarchy and have a culture of "obeisance to elders," implying that lower-level employees would lie under oath to protect the company. Defendants rely on *Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993 (9th Cir. 2001), where the Ninth Circuit concluded that the district court abused its discretion by admitting expert testimony "about Korean law and the business practices of Korean companies—particularly their alleged propensity to engage in fraudulent activity, including the avoidance of Korean currency laws." *Id*. at 1001. The Ninth Circuit concluded that the testimony at issue (given by a private investigator based in Korea) was not reliable because it was based on "impressionistic generalizations." *Id*. at 1006. The same cannot be said of Haggard, whose academic qualifications and reliance on extensive literature go unchallenged by defendants.

The Ninth Circuit also held the testimony was unduly prejudicial under Rule 403 because it was so tinged with ethnic bias and stereotyping and "generalize[d] that most Korean businesses are corrupt, are not to be trusted and will engage in complicated business transactions to evade Korean currency laws" and that testimony was "tantamount to ethnic or cultural stereotyping, inviting the jury to assume the Korean litigant fits the stereotype." *Id*. at 1007. Reviewing the portions of the Haggard Declaration objected-to by defendants on this point – paragraphs 47, 69-72, Haggard Mot. at 9-10 –Haggard does not similarly use racial or ethnic stereotyping to generalize that Korean businesses are corrupt or willing to violate laws. In his own words, Haggard relies on the "cultural dimension" of Korean culture and corporate culture to support his conclusions that the "twin cultural dimensions of hierarchy and familism thus play an important role in supporting chaebol cohesion, hierarchy and centralized control across all of the chaebol subsidiaries." *Id*. ¶ 71.

Haggard does not, contrary to defendants' characterization, accuse lower-level employees of being so obedient that they would lie. While Haggard does state that "it would not be surprising that lower level managers would deny participating in price-fixing, or any other managerial decision-making," he explains that is because "[i]t is likely that they would conceive of their task as simply gathering information and passing it up the chain of command for the top management – usually family leadership – to make." Haggard Decl. ¶ 69. His testimony here is

48

similar to that which he gave in *In re Cathode Ray Tube (CRT) Antitrust Litigation*, 2017 WL 2616916 (N.D. Cal., Apr. 5, 2017), where his testimony was admitted to provide background on chaebols and "some of the mechanisms that chaebol use to control intra-group corporate entities" because intragroup corporate control was directly at issue. *Id*. at *1.

However, plaintiffs should be careful when eliciting testimony on Korean business "culture" from Haggard at trial. Attempts to suggest that Korean corporate culture tolerates or encourages illegal activity (on behalf of its executives or lower-level employees) will not be permitted.

### C.    Materiality

Relatedly, defendants argue that paragraphs 61-62 of the Haggard Declaration discussing procurement of raw materials, must be excluded because Haggard makes clear that he was taking no position on the effect of raw material prices on pricing decisions. Those paragraphs comment on evidence of the interconnectedness of the Nongshim-related firms and the connection in decision-making between NSK and NSA. These paragraphs are material.

Defendants also object to paragraphs 55-56 and 66-68 because those paragraphs suggest only that chaebols use a top-down, market-free approach to pricing but are not connected to any specific evidence regarding the defendants here, and his opinions about overlapping appointments (between Korean parent and subsidiary companies) and secondments of employees uninvolved in pricing are irrelevant when this case is about pricing. However, these paragraphs too are material to his testimony.

Finally defendants criticize Haggard's opinions about the form, organization, and characteristics of NSA and Ottogi America as "besides the point" when under U.S. law parent corporations and subsidiaries are presumed to operate independently. However, the "piercing the corporate veil" cases cited by defendants go to a different issue and one that does not make immaterial Haggard's points. While Haggard does opine on generalizations regarding chaebols, he then reviews specifics regarding the defendants to support the relevance of those generalizations to this case.

### D.    Inadmissible Legal Conclusions

Finally, defendants object that Haggard crosses the line into impermissible legal conclusions in paragraphs 25 and 34 when discussing the strength of Korean corporate-governance laws and the scope of a 2015 law.  The discrete references to Korean law, however, are not material legal conclusions or outside the scope of Haggard's expertise.

Objections are also made to paragraphs 50 and 63-64 as impermissible legal conclusions about U.S. law.  Haggard's characterizations of the claims made in defendants' summary judgment motions are not impermissible legal conclusions (nor are they particularly helpful).  He is simply articulating his opinion on why some of the arguments made by defendants are not persuasive.  He is not impermissibly opining on ultimate legal questions and will not be able to do so at trial if he attempts it.

The motion to exclude Haggard's testimony is DENIED.

## VII.    EVIDENTIARY OBJECTIONS

### A.    Defendants' Objections

Defendants object to numerous pieces of evidence that plaintiffs rely on in support of their Opposition.  *See generally* Nongshim Evid. Objs. [Dkt. No. 584]; Ottogi Evid. Objs. [Dkt. No. 585-5].  I will not rule on every objection made in the over 200 pages of objections submitted by defendants, but will address objections to the evidence I have relied on above and explain my rulings on certain categorical objections below.[50]

_____

[50] Defendants reiterate (to preserve) and make additional objections to the declarations of plaintiffs' experts Dr. Russell Mangum III and Danial A. Ackerberg, that were submitted by plaintiffs in support of their motions for class certification.  Ottogi Evid. Obj. [Dkt. No. 585-5] 3-6.  In my prior Order, I addressed defendants' apposite and timely raised objections to these experts' declarations.  *See generally* Class Certification Order [Dkt. No. 501].  I will not reconsider the same objections, or new objections that should have been raised before, in conjunction with the motions for summary judgment.  Defendants' objections to plaintiffs' experts are OVERRULED.  Similarly, defendants object to plaintiffs' reliance on evidence they submitted in conjunction with plaintiffs' motions for sanctions.  Ottogi Evid. Obj. 6-7.  The fact that these materials were not resubmitted in connection with the motions for summary judgment is not a problem and defendants' objections to those materials on this basis is OVERRULED.

Defendants also make repeated objections to documentary and declaration evidence as lacking in personal knowledge, incomplete, and unreliable.  Those objections are OVERRULED.  Holes in the documentary or declaration evidence can be exposed and challenged at trial.

### 1. Co-Conspirators and Hearsay

Defendants assert that numerous documents relied on by plaintiffs, including all of the Samyang Hard Drive (SHD) documents (discussed below) and the statements by Samyang's Kim and Ahn, contain inadmissible hearsay. *See* Nongshim Evid. Objs. 3-10; Ottogi Evid. Objs. 11-13. Plaintiffs respond, generally, that statements from Samyang are admissible under Fed. R. Evid. 801(d)(2)(E), as co-conspirator statements when offered against Nongshim and Ottogi.

Defendants' main argument against the applicability of the co-conspirator hearsay exception is that plaintiffs cannot rely it because they have failed to show other proof (*i.e.,* proof besides the alleged co-conspirator statements) that substantiates the existence of a conspiracy. *See* Nongshim Evid. Objs. 4-10; Ottogi Evid. Objs. 11-12; *see also In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 906 F.2d 432, 459 (9th Cir. 1990) (recognizing that the offering party must present "some evidence" aside from the "proffered co-conspirator's statements" to show the non-offering party knowingly participated in the alleged conspiracy). However, as recognized above, the evidence of the conspiracy is not derived solely from the objected-to Samyang documents and statements, but also defendants' own conduct and the economic analyses provided by the experts.[51] The documents allegedly exchanged between the conspirators and the statements regarding the same are admissible at this juncture because a basic showing has been made that "the declarants were all employees acting within the scope of their employment, the evidence that their employer participated in the conspiracy is strong independent evidence of their own participation." *United States v. AU Optronics Corporation*, 2012 WL 12036080, at *2 (N.D. Cal., Jan. 11, 2012).

### 2. Samyang Hard Drive and Vaughn Declaration

Defendants challenge the admissibility of any of the Samyang Hard drive (SHD) documents. Ottogi Evid. Obj. 7-9; Nongshim Evid. Obj. Nos.94-96, 98, 100, 103, 106, 108, 111, 112, 113, 116, 117, 120-123. The hard drive was, during the KFTC leniency petition phase, kept by an auditor at Samyang (who admitted deleting pornographic and foreign movie files to keep the

---

[51] Of course, defendants have different reads on the import or significance of the non-Samyang evidence of conspiracy plaintiffs rely on. *See* Nongshim Evid. Objs. at 7-10

storage device from failing) and then by Samyang's attorneys.  Yu Decl., Ex. 7, Deposition Transcript of Sung Chul Yoon [Dkt. No. 547-7] at 17, 23-27.

Defendants' primary argument (aside from hearsay, addressed above) is that plaintiffs cannot authenticate any of the documents contained on the SHD, or show that any of the documents originated with Nongshim and Ottogi.  Generally, the proponent of evidence need "only make a prima facie showing of authenticity 'so that a reasonable juror could find in favor of authenticity or identification.' [] Once the prima facie case for authenticity is met, the probative value of the evidence is a matter for the jury." *U.S. v. Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996) (quoting *United States v. Chu Kong Yin*, 935 F.2d 990, 996 (9th Cir.1991)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) ("[w]hile the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence.").

Plaintiffs rely primarily on their expert – James Vaughn [Dkt. No. 567-2] – who points out that for a number of the documents at issue, the document metadata indicates that they were authored or last edited by Nongshim or Ottogi employees (as well as the dates the documents were allegedly created or edited by those employees.).  Vaughn Decl. ¶¶ 4-16.[52]  Nongshim's expert, Rubin, argues that nothing can be assumed from this "document level" metadata because the "author" and "last author" metadata can be manipulated by the person creating the document. Rubin Decl. ¶¶ 18-19.  Rubin does not address that the "author" and "last author" document-level metadata is created at the same time the document is created and, therefore, whoever purported to create these documents would have had to know the individuals in 2005, 2006, 2007, and 2008 to attribute them to Nongshim and Ottogi employees; *i.e.*, prior to Samyang becoming a leniency petitioner with the KFTC and prior to the KFTC investigation.

Relatedly, Rubin argues that none of the SHD documents that plaintiffs purport to be

---

[52] Vaughn's declaration and explanations as to document creation information undermine Nongshim's argument that because the documents at issue may have been "saved" to the Samyang HD in 2009, they were not "created" at or near the time of the conspiratorial events and, therefore, cannot fall within the business records hearsay exception.  Plaintiffs' testimony from Jeong Eun Park and Jong Moon Yui explain how (and why) the records were kept in the form in which they were kept as part of a regularly conducted business practice by Samyang.

emails are "authentic emails," because while "native emails" typically contain embedded metadata (IP addresses and dates) that can help establish their authenticity, none of the "emails" on the SHD have that sort of metadata. Rubin Decl. ¶¶ 22, 24. Similarly, Ottogi's contractor at Deloitte Korea testified that the SHD contains no emails because none of the file extensions on the SHD documents purporting to be emails contain any typical email extensions. Declaration of Tae Hoon Yeo [Dkt. No. 548-6] ¶ 5.

Plaintiffs characterize defendants' objections as objections to the way emails were captured and stored on the SHD, issues that go to the weight of the evidence, not their admissibility. Oppo. 33 n. 49. They also point to Samyang employee Jong Moon Yui's testimony that he recognized some "screen captures" in the SHD production as ones he made of emails on orders from superiors, although he had trouble recollecting which screen shots he might have taken himself. Yu Decl., Ex. 36 [Dkt. No. 547-40], Witness Examination of Jong Moon Yui at 17, 49 – 52. And they show how various documents found on the SHD and allegedly authored by Nongshim or Ottogi match documents produced by Nongshim and Ottogi in this litigation, supporting the testimony from Samyang's witnesses that the SHD contained documents and information received from its competitors. Oppo. 29 (comparing Cho Decl., Ex. 34 [NSK0001383] with Cho Decl., Ex. 47 [SHD00002538]).

Defendants' motion is DENIED with respect to the SHD documents plaintiffs rely on in these motions. Plaintiffs have brought forth sufficient testimony about the creation and maintenance of the SHD and explanations about why some of the "emails" were captured in the way they were (without native metadata).[53]

Relatedly but separately, Ottogi objects to the Vaughn Declaration on the grounds of relevance (generally and to Ottogi specifically), reliability, and speculation. Ottogi Evid. Obj. [Dkt. No. 585-5] 1-3. Nongshim also objects to portions of the Vaughn Declaration on the basis of relevance, improper expert testimony, and improper opinion testimony. Nongshim Evid. Obj.,

---

[53] Authenticity objections regarding *specific* SHD documents that plaintiff intend to rely on at trial that have unique characteristics that raise questions about their authenticity may be challenged pretrial after the parties have identified their proposed exhibits.

Appendix A [Dkt. No. 584-1], Nos. 165-168. Defendants' objections are OVERRULED. The strength of Vaughn's opinions that documents on the SHD were either authored by employees of Nongshim or Ottogi or represent "emails" can be tested on cross-examination.

As a separate challenge to the SHD documents (in addition to hearsay and lack of authentication), Nongshim argues that documents from the SHD violate the "rule of completeness" encompassed by Federal Rule of Evidence 106 and the Best Evidence Rule of Rule 1002, 1003. Nongshim Evid. Obj. 22-26. Nongshim admits its Rule 106 argument is not the typical rule of completeness argument (seeking introduction of *additional* testimony to cure any incomplete statements), but argues that allowing plaintiffs to present "cut and pasted" emails from the SHD which on their face are incomplete violates the purpose of the rule, to prevent taking statements out of context or making misrepresentations to the jury. Absent apposite case law, these SHD documents (purported emails or others) will not be excluded under Rule 106. Defendants may, of course, attack plaintiffs' (and their experts') characterization of the documents as emails. The Best Evidence Rule hinges on well-founded challenges to the authenticity of documents, which I address below.

### 3.    Authentication

In addition to the challenged to the SHD documents, Nongshim challenges the authentication of a number of documents that were produced from their or from Ottogi's own files. *See, e.g.*, Nongshim Evid. Objs. 33, 35. To the extent the documents were produced by Nongshim or Ottogi in discovery in this action, and are offered by plaintiffs, their authenticity is established for purposes of these motions. *See, e.g., Orr v. Bank of America, NT &SA*, 285 F.3d 764, 777 n.20 (9th Cir. 2002) (recognizing case law holding that documents produced by a party in discovery were deemed authentic when offered by a party opponent).

### 4.    Hearsay

In addition to the hearsay objections address above, defendants also object separately to plaintiffs' submission of newspaper articles, particularly those attached as Exhibits 11, 29, 90 and 94 to the Cho Declaration. Nongshim Evid. Objs. 26- 30; Ottogi Evid. Objs. 12. Defendants object to plaintiffs' attempt to rely on any of the articles for the truth of the matters asserted (as

any statements in the articles by defendants would constitute double hearsay), only one of the many reporters for the many different articles has been made available to testify, three of the four articles have not been authenticated as business records, and for the one article authenticated by a reporter (Jae Hee Lee), the reporter did not provide sufficient foundation for how she recorded the defendants' statements.

As to at least one level of hearsay (the statements by the defendants, as opposed to the publication of them in a newspaper and the accuracy of how they were reported), plaintiffs point out that the statements by defendants fall within the co-conspirator hearsay exception, as offered against defendants and made to further the conspiracy. Plaintiffs' Responses to Evidentiary Objections [Dkt. No. 591-1], *see, e,g*., Response to Nongshim No. 37. As to the second level of hearsay, plaintiffs point out that defendants have not disputed the accuracy of the reporters' characterization of the statements. Plaintiffs also do not rely on the defendants' alleged admissions in the articles for the truth of the matters asserted (for example that costs were in fact raised due to raw material cost increases). Instead, they rely on those statements to show that defendants were making public statements that other evidence will demonstrate were pre-textual, to hide or cover up their conspiracy. *See, e.g*., Plaintiffs' Responses to Evidentiary Objections [Dkt. No. 591-1], Nongshim Nos. 37, 154. And finally, at least with respect to the articles authored by Jae Hae Lee, the defendants who were questioned about the statements included by Ms. Lee in her articles did not deny their accuracy. At this juncture, plaintiffs can rely on the newspaper articles for the limited purpose of showing defendants' steps to conceal the alleged conspiracy.

## B.   Plaintiffs' Objections

Plaintiffs' objections to the evidence relied on by defendants are much more limited. Plaintiffs object and move to exclude Ottogi's declarations from Young Joon Ham and Shin Gook Kang, as well as the witness examination protocol from Guen Ho Choi, because (1) these individuals were not disclosed as potential witnesses on defendants' initial disclosures or in any supplement thereto and (2) plaintiffs' requests to include these individuals as custodians were rejected. Dkt. No. 564 at 1. Plaintiffs separately move to strike the Choi examination as hearsay

when offered by defendants.  Ottogi responds that they did not need to disclose these individuals because their testimony is solely for impeachment and any failure to disclose was harmless. Ottogi Opp. To Strike [Dkt. No. 582].

### 1. Legal Standard

Rule 26(a) requires a party to provide "the name . . . of each individual likely to have discoverable information . . . that the party may use to support its claims or defenses . . . ."  Rule 37(c)(1) provides that "[if] a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Courts have applied this sanction even when a litigant's entire cause of action or defense has been precluded and courts have wide latitude to exclude even in absence of bad faith or willfulness. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

Under Rule 37(c)(1), the party whose evidence may be excluded has the burden of proving that its failure to disclose was substantially justified or is harmless.  *R & R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1246 (9th Cir. 2012). "The determination of whether a failure to disclose is justified or harmless is entrusted to the broad discretion of the district court." *San Francisco Bay Area Rapid Transit Dist. v. Spencer*, No. 04-04632-SI, 2007 WL 421336, at *4 (N.D. Cal. Feb. 5, 2007). Nondisclosure is harmless if it does not prejudice the other party. *Yeti*, 259 F.3d at 1106.  In assessing harmlessness, I may consider a number of factors, including "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Unionamerica Ins. Co., Ltd. v. Fort Miller Grp., Inc.*, No. 05-01912-BZ, 2009 WL 275104, at *1 (N.D. Cal. Feb. 4, 2009).

### 2. Ham and Kang

Young Joon Ham is a current member of Ottogi Korea's board of directors and from March 2000 through March 2010 was one of two Ottogi Korea CEOs.  Declaration of Young Joon Ham [Dkt. No. 548-5], ¶ 1.  Shin Gook Kang was the other CEO, who served alongside Young

Joon Ham from March 2000 through March 2008.  Declaration of Shin Good Kang [Dkt. No. 548-7] ¶ 1.  The declarations of the two former executives are submitted to dispute plaintiffs' position that a "Representative's Meeting" occurred in 2000 or 2001, as well as to dispute the existence of any price fixing agreement.  Ham and Kang each testify that neither of them attended a meeting with other ramen company executives in 2000 or 2001, neither of them met Don Jong Choi from Samyang, and neither of them entered into a price fixing agreement or authorized any employee to do so.

Plaintiffs move to exclude the declarations from Ham and Kang because they were not disclosed as witnesses by Ottogi and were not included as custodians based on Ottogi's misrepresentations or destruction of evidence.  Declaration of Stephanie Cho in Support of Motion To Exclude [Dkt. No. 564-1] ¶ 2, Ex. 1.  Plaintiffs knew of these individuals' existence and roles at Ottogi and sought to include them as "custodians" whose files would be searched.  Ham's files, however, were not included because Ottogi represented that Ham had no relevant information or documents (the truth of which is now belied by Ham's declaration).  Cho Decl. to Exclude, ¶ 4, Ex. 2.  With respect to Kang, Ottogi responded that he had left Ottogi and "no documents" existed.  *Id*. ¶¶ 4-5.  In light of these representations and Ottogi's failure to identify these two in their disclosures, plaintiffs did not pursue discovery (documents or depositions) from them.  Plaintiffs' Mot. to Exclude 5.  Plaintiffs argue that given Ottogi's now-central reliance on this testimony – in an attempt to undermine the Samyang executives' statements – inclusion of this untested testimony prejudices them and should be excluded.

Ottogi responds, first, that they did not need to disclose Ham and Kang under Rule 26(a) because their testimony is merely impeachment evidence, introduced to show that the Samyang executives' testimony was wrong.  Ottogi Opp. to Strike at 1-2.  This argument is not well taken.  The testimony at issue goes to the heart of Ottogi's defense (no conspiracy) and includes factual assertions that go far *beyond* the Samyang executives' testimony.  *See, e.g*., Ham Decl. ¶ 3 & Kang Decl. ¶ 3 (discussing when they first heard of the alleged 2000 or 2001 meeting, what they did with respect to the KFTC questionnaire, what they did in response to the KFTC investigation, and whether they personally authorized any collusive agreement).

57

Ottogi also argues that the non-disclosure of these two individuals was substantially justified and harmless because these individuals, and their roles at Ottogi, were made known to plaintiffs during discovery by (1) interrogatory responses identifying them as Ottogi executives, (2) in the KFTC Report (released in 2015), and (3) disclosed in Ottogi's response to the KFTC (that was produced in discovery).[54] These disclosures, however, did not indicate that Ham and Kang had access to the specific information now disclosed in their declarations filed in support of Ottogi's motion for summary judgment.

Ottogi's failure to disclose Kang and Ham as witnesses and its rejection of plaintiffs' request to include them as custodians precludes it from calling them as witnesses on such a central part of this case. Their testimony is STRUCK.

### 3. Choi

Plaintiffs also move to exclude the Witness Examination Protocol of Geun Ho Choi [Dkt. No. 549-35], another former Ottogi executive who claims he attended the 2001 RTOA meeting but did not discuss pricing there. Ottogi relies on this testimony to contradict the Samyang executives' testimony that pricing was discussed at that conference. Plaintiffs object to this testimony as inadmissible hearsay. They also note that Choi was not disclosed as a witness in Ottogi's initial disclosures and when plaintiffs attempted to identify him as a custodian, plaintiffs were told by Ottogi that he had likewise left the company and had no documents. *See* Cho Decl. to Exclude ¶¶ 4, 5.[55]

As with respect to Ham and Kang, Ottogi argues that Choi's testimony was submitted to rebut plaintiffs' claim that prices were discussed at the 2001 Ramen Conference. The Choi

---

[54] Ottogi argues that Ham and Kang were identified in deposition testimony by other witnesses, but the three instances Ottogi relies on simply identified Ham as a relative of a deponent (ECF 437-7 at 54:9-17), mention Kang and Ham in passing as executives involved in approving price increases (Yu Decl., Ex. B), and identified that another deponent confirmed that Kang had no knowledge of a meeting in 2000 - 2001. Yu Decl., Ex. C.

[55] The hearsay objection is not well-taken to the extent of Choi's recollection that prices were not discussed at the 2001 RTOA meeting because the Witness Examination Protocol of Choi is sworn and given under penalty of perjury. *See, e.g., Gulf USA Corp. v. Federal Ins. Co*., 259 F.3d 1049, 1056 (9th Cir. 2001) (finding that "sworn deposition testimony" from another matter may be used on summary judgment as an affidavit pursuant to Federal Rule of Civil Procedure 56(c)).

testimony was filed with but not cited in Ottogi's opening brief, which disputed plaintiffs' evidence regarding the "confirmation" of the price fixing agreement at the 2001 RTOA meeting. Choi's testimony was only cited in Ottogi's Reply. Dkt. No. 585 at 3 n.3. As to substantial justification and harmlessness, Ottogi argues that Choi's existence and knowledge were adequately disclosed in the KFTC Report (disclosing that Choi was Ottogi's representative at the 2001 RTOA meeting), and his position and leave date were disclosed in interrogatory responses. Ottogi Opp. to Strike 2-3.

Ottogi knew that plaintiffs' theory was that the price fixing agreement was confirmed at the 2001 RTOA meeting, yet failed to disclose as a witness their representative at that conference on whom they now rely. This testimony is not simply rebuttal, but central to a point in dispute between the parties. Ottogi's failure to disclose Choi as a person with information that would be used to support Ottogi's defense of this action was neither substantially justified nor harmless. Choi's testimony (as contained in the Witness Examination Protocol) is STRUCK.[56]

### CONCLUSION

Defendants' motions for summary judgment are DENIED. Defendants' motion to exclude the Haggard testimony is DENIED. Plaintiffs' motions to strike the testimony of Ham, Kang and Choi are GRANTED.

**IT IS SO ORDERED.**

Dated: December 28, 2017

William H. Orrick
United States District Judge

---

[56] In Reply, plaintiffs note another new Ottogi witness that was not disclosed but is relied upon by Ottogi in its Reply; Kyung Ho Yoo [Dkt. No. 585-4]. Plaintiffs' Mot. Exclude Reply at 4 n.2. Because plaintiffs do not present the same evidentiary showing as to Yoo that they did with respect to Ham, Kang and Choi, I will not strike evidence from Yoo at this time, but plaintiffs may raise this issue again in a motion *in limine* prior to trial.