Pages 1 - 82

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

IN RE KOREAN RAMEN ANTITRUST   )
LITIGATION,                      )
_____)  **NO. C 13-04115 WHO**

San Francisco, California
Monday, April 16, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Direct Purchaser Plaintiffs:
                         Hausfeld, LLP
                         600 Montgomery Street, Suite 3200
                         San Francisco, CA  94111
                         (415) 683-1908
                         (415) 358-4980 (fax)
          **BY:  STEPHANIE YUNJIN CHO**
              **CHRISTOPHER L. LEBSOCK**
              **BONNY E. SWEENEY**
              **BRUCE J. WECKER**

For Indirect Purchaser Plaintiffs:
                         Glancy Prongay & Murray LLP
                         122 East 42nd Street, Suite 2920
                         New York, NY  10168
                         (212) 682-5340
                         (212) 884-0988 (fax)
          **BY:  LEE ALBERT**
              **GREGORY BRADLEY LINKH**

For Indirect Purchaser Plaintiffs:
                         Bramson Plutzik Mahler & Birkhaeuser
                         2125 Oak Grove Road, Suite 120
                         Walnut Creek, CA  94598
                         (925) 945-0200
                         (925) 945-8792 (fax)
         **BY:  DANIEL E. BIRKHAEUSER**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

**APPEARANCES**:

For Indirect Purchaser Plaintiffs:
                            Izard, Kindall & Raabe, LLP
                            29 South Main Street, Suite 305
                            West Hartford, CT  06107
                            (860) 493-6294
                            (860) 493-6290 (fax)
                    BY:  **MARK P. KINDALL**
                         **CRAIG A. RAABE**

For Defendants Ottogi Company, Ltd.; Ottogi American, Inc.:
  Gibson Dunn
  2029 Century Park East
  Los Angeles, CA  90067-3026
  (310) 552-8500
  (310) 552-7041 (fax)
  BY:  **SCOTT ALAN EDELMAN**
     **MINAE YU**

For Defendants Ottogi Company, Ltd.; Ottogi American, Inc.:
  Gibson, Dunn & Crutcher, LLP
  555 Mission Street
  San Francisco, CA  94105-2933
  (415) 393-8200
  (415) 393-8206 (fax)
  BY:  **RACHEL S. BRASS**
     **JOSEPH A. GORMAN**
     **JULIAN WOLFE KLEINBRODT**

For Defendants Nongshim Company, Ltd.; Nongshim America, Inc.:
  Squire Patton Boggs (US) LLP
  2000 Huntington Center
  41 South High Street
  Columbus, OH  43215
  (614) 365-2700
  (614) 365-2499 (fax)
  BY:  **JOHN R. GALL**

For Defendants Nongshim Company, Ltd.; Nongshim America, Inc.:
  Squire Patton Boggs (US) LLP
  275 Battery Street, Suite 2600
  San Francisco, CA  94111
  (415) 954-0200
  (415) 393-9887 (fax)
  BY:  **MARK C. DOSKER**
     **JOSEPH P. GRASSER**
     **MARIA A. NUGENT**

1  **Monday - April 16, 2016**                                  **2:02 p.m.**

2                      **P R O C E E D I N G S**

3                           **---000---**

4        **THE COURT:**  So glad to see you all again.

5        **MR. EDELMAN:**  Do you mean that really?

6        **THE COURT:**  I do.  I do.

7        **THE CLERK:**  Calling Civil Matter 13-4115, In Re:

8  Korean Ramen Noodles.  Counsel, if you would, please enter your

9  appearances for the record.

10        **MS. SWEENEY:**  Good afternoon, Your Honor.

11  Bonny Sweeney, from Hausfeld, for the Direct Purchaser

12  Plaintiffs.  And with me I have Bruce Wecker, Chris Lebsock,

13  Lee Albert, Stephanie Cho, Greg Linkh.  I think that's it.

14        **THE COURT:**  Excellent.  Thank you.

15        **MR. BIRKHAEUSER:**  Good afternoon, Your Honor.

16  Dan Birkhaeuser, for the Indirect Purchaser Plaintiffs.  And

17  with me I have Mark Kindall and Craig Raabe.

18        **THE COURT:**  Great.  Good afternoon.

19        **MR. RAABE:**  Good afternoon.

20        **MR. EDELMAN:**  Good afternoon, Your Honor,

21  Scott Edelman, on behalf of the Ottogi Defendants.  And with me

22  I have my partner, Rachel Brass, Minae Yu, and Joe Kleinbrodt.

23        **THE COURT:**  All right.  Good afternoon.

24        **MR. DOSKER:**  Good afternoon, Your Honor.

25  Mark Dosker, on behalf of Nongshim Company, Limited, and

PROCEEDINGS

1  Nongshim America, Inc.  And with me are my colleagues

2  John Gall, Joe Grasser, and Maria Nugent.

3        **THE COURT:**  Great.  Good afternoon.

4     So let me tell you the few things that I want to convey to

5  you.  Then I'm going to go over the motions *in limine*.  And my

6  idea is that I'll give each of you -- each side -- 45 minutes

7  to argue whatever they want to argue, and respond to whatever

8  arguments are made.  And I'm going to start with the

9  plaintiffs, but I will give you a couple of tentatives besides

10 the ones that you already have.

11     But what I wanted to tell you first is:  Counsel for

12 Nongshim and the Direct Purchasers, after this hearing's over,

13 go down to Judge Kim's courtroom, please.

14        **MR. DOSKER:**  (Nods.)

15        **THE COURT:**  Then I have tried very hard to clear all

16 of the days that are scheduled for this trial, but because of

17 the RICO trial that I have had and will have right after this

18 one, on June 1st I may not be able to hold trial -- that's a

19 Friday -- or I may be able to do half a day; I'm not sure.  And

20 June 8th, the same thing.  So I was trying to clear all 100

21 hours for Mr. Edelman's schedule, and so that's where I am on

22 that.

23     For the trial, itself, I'm going to either seat 10 or 12

24 jurors.  And it will depend on my thinking about this over the

25 next couple of weeks, and also what kind of a venire we get;

PROCEEDINGS

1  but it is, I think, important.  I'm going to be somewhat

2  ruthless if there are jurors who need an excuse for a day

3  during the course of trial, because we need to get this trial

4  in.  So I think having the extras is going to matter.

5      And for your peremptories, I will either give you five or

6  six peremptories if we have ten or twelve jurors.

7      So with that, let's go to the motions *in limine*.  I have

8  not changed my tentatives, so argue on the basis, to the extent

9  that you want to, based on that.

10     As for the new motions, regarding J.S. Kim, I'm inclined

11 to grant the plaintiffs' motion that would preclude mention of

12 the 2018 Investigation, under Rule 608.  It seems to me to be

13 collateral, and preliminary, and postdate the events here.  So

14 I'm happy to hear argument on that.  I did read today's

15 statement, but that's where I am.

16     And I'm interested in what evidence of relevance there is

17 between this case and the 97 fraudulent transfer allegations in

18 the Central District, because I didn't quite understand them

19 from the briefing.  And I don't see what Ms. Kim would know in

20 any event with respect to the 97 transaction.

21     And with respect to the spoliation issues, my perspective

22 on it remains the same.  Whether there's a duty or not, I think

23 the plaintiffs are entitled to show changes in document

24 preservation around the time of the investigation -- the KFTC

25 investigation -- and to comment on the allegedly edited

1   documents sent to the KFTC by Ottogi.

2        On the legal issues, there are two things.  One is I'm

3   interested in hearing from the plaintiffs if they think that

4   *Royal Printing* applies to this case, if at all; and if it does,

5   do you have any cases where it was applied when the

6   Direct Purchasers asserted Sherman Act claims?

7        And with respect to the alter-ego argument, I think

8   control issues, if not in the name alter ego, have been in this

9   case forever, so I don't see what the prejudice is to the

10  defendants, particularly since the defendants have all of the

11  evidence on that.

12       So that's my summary of where I am.

13       So I'll start with the plaintiffs.  Do you want to argue

14  with respect to any of the motions *in limine*?  And if you want

15  to take a couple of minutes to organize your thoughts, that's

16  also okay.

17       **MR. KINDALL:**  Your Honor, I believe the only motion

18  *in limine* that we had a desire to ask you to reconsider has to

19  do with the *Daubert* motion with respect to our expert in Korean

20  law.  Really, the rest of it, we're fine with.  So it may make

21  sense to start with the defendants, because they have a lot

22  more issues, I'm sure.

23       **THE COURT:**  No.  You go ahead.  Go ahead with

24  Mr. Lee.

25       **MR. KINDALL:**  You're up.

1        **MS. CHO:**  Good afternoon, Your Honor.  So as --

2        **THE COURT:**  Would you state your appearance again?

3        **MS. CHO:**  Of course.  Stephanie Cho, from Hausfeld,

4  on behalf of the Direct Purchaser Plaintiffs.

5        So we'd like the Court to reconsider its tentative ruling

6  with respect to granting defendants' motion to exclude

7  Judge Sang-Hun Lee's testimony.  We'd like to emphasize that

8  his testimony -- or he's simply a rebuttal witness, and that

9  his testimony is limited in scope.  He is not being offered to

10  testify with respect to how the KFTC conducts their

11  investigation, but with respect to the Korean law, since

12  Professor Hong is testifying on the Korea Fair Trade Act.

13        And -- which brings us to why we believe that we --

14  Judge Sang Hun Lee is qualified to testify, since he has been

15  in the Bench for over 20 years.  And while he has been there,

16  it was his job to read and analyze and interpret Korean law,

17  and -- which is what he is being offered here to do.

18        In addition, Rule 702 permits an expert witness to educate

19  himself as to the topic of his testimony, which Judge Lee has

20  done here.  He has looked in to relevant KFTC resolutions,

21  where it's shown how the KFTC interprets their -- the KFTA.

22  He's looked at similar criminal law.  And he's also looked at

23  the entirety of -- the entirety of the KFTA, as well as the

24  relevant provisions to make his interpretation.  So --

25        **THE COURT:**  So he has no actual experience with this?

1  What he's done is studied up in order to provide testimony for

2  this trial?  Would that be fair?

3         **MS. CHO:**  Yes, that would be a fair characterization,

4  which is why we're not offering him to testify as to how the

5  KFTC conducts their investigation.

6         **THE COURT:**  Great.  Thank you, Ms. Cho.

7         **MS. CHO:**  Thank you.

8         **THE COURT:**  All right.  So, from the defendants, you

9  may either -- you can fold that into your argument with respect

10  to the Korean law, or do this any way you want to.  If you want

11  a couple of minutes to discuss how you want to proceed, take

12  that.

13  (Discussion off the record.)

14         **MR. EDELMAN:**  Your Honor, just before we get into it,

15  on the peremptories, am I correct in understanding that if

16  there are ten, it will be five per side?

17         **THE COURT:**  Yes.  Divide by two.

18         **MR. EDELMAN:**  Okay.  I just didn't know.  Right.

19  Good enough.

20         **THE COURT:**  That's my theory.

21         **MR. EDELMAN:**  Okay.

22  (Discussion off the record.)

23         **MS. YU:**  Your Honor, my name is Minae Yu.  And I just

24  wanted to address a couple of points raised by plaintiffs'

25  counsel.

**PROCEEDINGS**

1    She mentioned that Mr. Lee is a rebuttal witness.  Whether

2  you are a rebuttal witness or whether you are an expert,

3  testifying, you still need to meet the standards of

4  admissibility set forth under the Federal Rules of Evidence,

5  and also *Daubert* and its progeny.  And *Daubert* requires that an

6  expert testimony be reliable and relevant.  And first, an

7  expert who is going to testify about an area of law must be

8  qualified, and must base his opinion on sound grounds.

9    So, as the courts have recognized, you need an expertise

10  that goes beyond than just schooling in the law, or just being

11  a lawyer.  I'm a litigator.  I am not qualified to opine on

12  some merger-and-acquisition transactions.

13        THE COURT:  How about me, though?

14    (Laughter in the courtroom.)

15        THE COURT:  No.  Seriously, seriously.

16    MS. YU:  Your Honor.

17        THE COURT:  I mean, Mr. Lee is a Judge, so why

18  couldn't he do exactly what Ms. Cho described?

19    MS. YU:  Your Honor, I think that would be the case

20  if, number one, he actually based his opinion on sound grounds,

21  which I believe you would do if you were given the task of

22  opining on an issue of law that you did not know about; but

23  Mr. Lee made a very clear that there is no statute and no

24  Supreme Court case precedent on which he could rely on which he

25  could base his opinions on.

1    What his opinion was based on was his aspirational views

2    about what Korean law should be, and that was based on what he

3    thinks Korean -- the KFTC investigations are like.

4    For instance, he thinks, *Oh, I'm sure that the KFTC*

5    *investigators are not so secretive about how -- what they're*

6    *investigating their precise topics that they're investigating*,

7    but that is actually not true.  The defendants' expert,

8    Mr. Dae Sik Hong -- Professor Dae Sik Hong, who has extensive

9    experience actually in the area of law -- he has testified that

10   that is absolutely not how a KFTC investigation proceeds.

11   So all bases on which Mr. Lee's opinion is based -- it's

12   completely untrue, and is not a sound basis.  So I think that

13   is how it would be distinguished from you offering your

14   opinion.

15   **THE COURT:**  Okay.

16   **MS. YU:**  And to reiterate the point, Mr. Lee

17   confirmed repeatedly during his deposition that he has

18   absolutely no relevant expertise in this area of the law.  He

19   said he has never represented any clients in connection with an

20   investigation by the KFTC.  He has never represented any

21   clients in any matter involving the FTA and the KFTC.  He never

22   published anything on the KFTC or the FTA.  He has never

23   presided over any matters involving a KFTC investigation.  He

24   does not have any actual experience with KFTC investigation.

25   And he did not receive any education or training in the U.S.

1  law to even make a comparison with what the U.S. law requires

2  versus what the Korean law requires.

3       So, in sum, we believe that Mr. Lee's opinions should be

4  excluded, whether he's a rebuttal witness or whether he is,

5  himself, offering his opinions, because he still needs to meet

6  the standard for admissibility.  And clearly he lacks -- he

7  lacks the experience; and two, he lacks the basis on which he's

8  placing his opinions.

9            **THE COURT:**  All right.  Thank you.

10      Is that it?

11           **MR. GALL:**  Sorry.  About that.

12           **THE COURT:**  You can sit there as long as you want,

13  Mr. Gall, but you --

14           **MR. GALL:**  Thank you, Your Honor.

15      I got burned by sitting last time.  Short of time, so I'm

16  up next.

17      I'm in the unenviable position, I guess, Your Honor, of

18  arguing about something Your Honor's already indicated that

19  you're not going to buy.  So I'm going to back up, and tell you

20  what I know, and see if I can't make some headway here.

21      On the issue of Mrs. Kim, Your Honor has the briefs.  And

22  we've attached what we know about the situation from the press

23  releases in Korea, and some other sources.

24      We expected Mrs. Kim to be here live.  We were counting on

25  it.  The plaintiffs have the ability to bring her live, because

**PROCEEDINGS**

1   of the Settlement Agreement between Mrs. Kim's company,

2   Samyang, and the plaintiffs.  They reserve the right.  And

3   Samyang agreed to make two witnesses available; not her

4   husband, but two witnesses available.  And we were counting on

5   them bringing her here.

6        The press releases suggested to us -- and the reason why

7   we came to Your Honor was the press releases suggested to us

8   that there was a travel ban put on her, because of the

9   allegations in the investigation that the prosecutor's office

10   was conducting; serious allegations.  And the travel ban would

11   have prevented her from coming here.  That was two and a half

12   weeks ago.

13        This is a very fluid situation.  We learn things every

14   day.  Before Your Honor expressed an opinion about this, I was

15   going to urge Your Honor to defer any ruling for seven to ten

16   days, to allow us to see what transpires from here forward, so

17   that we can make an argument based on whether she's going to be

18   here or not, or whether she -- because I think that matters, in

19   terms of the evidentiary significance of the events in which

20   she's managed to get herself involved.  And it would allow us

21   to be more definitive, in terms of determining whether she's

22   going to be here or not.  So I was going to ask Your Honor,

23   first of all, to defer.

24            **THE COURT:**  So let me tell you that if -- I realize

25   that it's a fluid situation.  And if further facts are

1  developed after today that indicate that the basis for my

2  thinking ought to be adjusted in light of what's known, I'm

3  happy to take a look at that again before trial.

4          **MR. GALL:**  All right.

5          **THE COURT:**  So -- but I am planning to just proceed

6  with what we know at the moment.  So go ahead and argue.

7          **MR. GALL:**  Let me -- by way of elaboration, since the

8  brief was filed, we had read reports in the news media that an

9  actual indictment had been issued for embezzlement of something

10 on the order of magnitude of $5 million from Samyang, her

11 company; and for something called "breach of trust," which

12 involved endorsing loans to a subsidiary in circumstances where

13 it was clear the subsidiary would never be able to repay the

14 money.  The news media described this, and we understood that

15 an indictment had been issued.

16     Since yesterday -- actually, today, through my friends at

17 Gibson Dunn, Ms. Minae [sic] in particular, we actually have a

18 copy of the indictment now that says she's been charged.

19     The news media indicate that she has -- I'm not familiar

20 with the jargon in Korea law, but to me what they're describing

21 is she and her husband have pled guilty to these charges, and

22 that there will be a trial under Korean law, the purpose of

23 which will essentially be to determine the sentence.

24     I think the admission -- I think in the next seven to ten

25 days, it will be clear how much evidence I can present to

1   Your Honor.  I believe that that may make a difference, in

2   terms of the admissibility and relevance of this testimony,

3   because it would -- it would be clear evidence that bears upon

4   her character for truthfulness.

5        These charges involve the fabrication of documents to --

6   to support fake transactions.

7        In this case, as Your Honor knows, I think fair

8   interpretation of the expert testimony that the plaintiffs will

9   present to this jury is that the Samyang Hard Drive documents

10  were fabricated; were made up, and pieced together from parts

11  of other documents.

12       This conduct seems to be consistent with that.  It

13  certainly is consistent with her apparent disdain for the truth

14  and for honesty.

15       And I say that to Your Honor because I think there is case

16  authority out there; and in particular, *U.S. versus Locke*.  And

17  I cite Your Honor to *U.S. versus Amahia*, and *U.S. versus*

18  *Riggio*, both of which -- and I will give Your Honor additional

19  citations as we supplement the briefing.

20       There certainly are cases out there that support the

21  notion that the latitude of inquiry under Rule 608 into

22  character for truthfulness is very broad, and does not -- does

23  not depend upon there actually being a conviction.

24       How far out on the line you go -- it depends on what case

25  you read.  Different courts reach different conclusions about

1   this; but there clearly is healthy support for the notion that

2   where truthfulness and honesty are in play, the defendants in

3   this case should be given considerable latitude to develop that

4   with the jury.

5        I understand my friends, the plaintiffs, have footnoted

6   the rule against using extrinsic evidence.  I would like the

7   opportunity to address that in further briefing.

8        I realize that I would be stuck with her answer, except if

9   her answer directly contravenes some element of extrinsic

10  evidence, in which case I may be able to use it with her, and

11  show it to her and to the jury.

12       I think this -- this woman is the centerpiece of the

13  plaintiffs' case.  She's the one who supported -- is going to

14  give direct evidence that there was a conspiracy; that a dead

15  guy told her that, *We were all in the room together, and fixed*

16  *prices*.  There's no one else going to give testimony like that.

17  And her credibility, her truthfulness is at the center of this

18  case.

19       And as events unfold, I would like your Honor, if

20  Your Honor would indulge me, to give me the opportunity to

21  supplement the briefing.  And we'll bring Your Honor up to date

22  and cite some of these additional cases, because I think this

23  is critical.

24            **THE COURT:**  I'm happy to be brought up to date

25  Mr. Gall.

1    I take it from your argument that there is no connection

2   that you're aware of at the moment between the allegations in

3   the criminal matter that's pending now, and the underlying

4   facts if of this case, besides the issue of whether she's an

5   honest person or not?

6        **MR. GALL:**  Well, number one, I believe the parameters

7   of Rule 608 do not require that there be linkage.

8        **THE COURT:**  Just answer my question.  That's the one

9   that I'm interested in.

10        **MR. GALL:**  The only one I'm aware of today,

11   Your Honor, is the fact that the embezzlement scheme started in

12   2008, in which she began fabricating the documents and going

13   down the road on this scheme in 2008, during the Class Period.

14   So this conduct was going on, side by side, at least during

15   some portion of the Class Period.

16    I'm not aware of any connection between the embezzlement

17   and the breach of trust and the conspiracy to fix prices in

18   this case, other than the fact that the allegations emanate

19   from a person of dubious character.

20        **THE COURT:**  Right.  Okay.  That's --

21        **MR. GALL:**  The other one -- the Samyang (U.S.A.)

22   lawsuit -- that's not -- that is something that arose

23   subsequent to the close of discovery in her deposition,

24   certainly.

25    The principal allegations on which I would like to call

PROCEEDINGS

1   the Court's attention from that case occurred in filings in

2   connection with summary judgment in the fall of 2017 and early

3   2018.

4        There are certainly allegations in the answer.  There is

5   startling linkage between the concessions by Samyang -- her

6   company -- in that case, and what's going on here.

7        In that lawsuit -- and I don't know if Your Honor nose

8   about the background of it.  I know a little bit about it.  But

9   in that lawsuit, essentially, Samyang (U.S.A.) sued Samyang

10  Korea, trying to void a distribution agreement that Samyang

11  (U.S.A.) felt had been -- it had been forced to adopt as a sham

12  transaction by the parent, in order to have the parent protect

13  its assets from a then-looming bankruptcy proceeding in Korea,

14  and that there were features of the transaction -- of that

15  distribution agreement -- that were very unfavorable economic

16  to Samyang (U.S.A.).  So Samyang (U.S.A.) sued the parent to

17  void it.

18       And more recently -- I'll just -- I will supplement this,

19  too, because this is evolving at quite the pace, but it is

20  certainly evolving to a point where I think the relevance can

21  be demonstrated.

22       In response to that a lawsuit, Samyang Korea said two

23  things.  They said, first of all, no one is around now who knew

24  anything about that transaction in 1997, or --

25       I'm sorry.  When was the transaction?

1     MR. WECKER:  '97.

2         MR. GALL:  No one's around now who knew about the '97

3  transaction.  They're all dead.

4      A curious coincidence that a dead guy is there, and a dead

5  guy is here; but I'm not claiming linkage between the two

6  deaths yet.

7         THE COURT:  Thank you, Mr. Gall.

8         MR. GALL:  But they claim, *No one's around who knew*

9  *anything about it.  We didn't -- nobody's here now that knows*

10 *anything about that.  And it's not a bad agreement for the*

11 *subsidiary.*

12     The subsidiary responded and said, *Not only is it a*

13 *transaction that was a sham; you've breached the transaction.*

14 *And you've breached the transaction by making us buy* -- "us,"

15 the subsidiary -- *buy ramen from you* --

16     Apologies to my ramen-making colleagues.

17     -- *buy ramen from your at inflated prices, because of the*

18 *price-fixing conspiracy.  We didn't know that.  Now it comes*

19 *out, based on the case in front of Your Honor, that there was a*

20 *price-fixing conspiracy that elevated the prices of ramen you*

21 *were selling us, and therefore, you overcharged us.*

22     Samyang Korea responded, Your Honor.  Samyang Korea

23 responded by saying, *There was no price-fixing conspiracy.*

24 *Every price increase that we gave you was based upon increase*

25 *in our costs, our labor, and foreign-exchange criteria.  There*

**PROCEEDINGS**

1   *was no -- no effect from any conspiracy.*

2       And, if you put down their First Amended Complaint next to

3   their Answer, Samyang Korea -- Mrs. Kim's company -- denied

4   each and every factual allegation that appears in this case

5   about the existence of a conspiracy.  There were no --

6   according to Samyang Korea, no meetings, no secret

7   communications.  Nothing.  They've completely denied it.

8       And now Mrs. Kim, the President of Samyang Korea, and

9   Chief Operating Officer, would come into this court and testify

10  exactly the opposite.

11      I'm no evidence scholar, Your Honor, but there's something

12  wrong with that; and, given a little bit of advanced briefing,

13  I think I could persuade Your Honor that maybe we ought to get

14  some of that into evidence here.  I think that qualifies both

15  as evidence and grounds for impeachment of Mrs. Kim when she

16  shows up.  And I think they're going to have a difficult time

17  to explain that, and explain it to the jury and to Your Honor.

18      And I would like -- I would like to show Your Honor more

19  about that, including the specific allegations, to show you the

20  depth of the trouble they find themselves in over these

21  concessions.

22          **THE COURT:**  Well, so wouldn't the admissions that

23  you've just described -- wouldn't they be admissible anyway?

24          **MR. GALL:**  I believe they would.

25          **THE COURT:**  You'd like to cross-examine, though?

PROCEEDINGS

1          MR. GALL:  This is an issue -- I doubt that my

2   friends over here are going to concede that this is admissible.

3   I think we're going to have a big fight on that.  And the

4   briefing on that has not been tendered to Your Honor yet.

5          THE COURT:  All right.

6          MR. GALL:  That's a motion *in limine*; a motion that

7   we're going to have to resolve that I'm happy to address on an

8   expedited basis when Your Honor's ready; but I would be happy

9   to couple it with the present -- the additional information

10  about Mrs. Kim's troubles in Korea.  To me, they're related,

11  and reflective of the same kind of -- of difficulty that she

12  has coming in here and testifying.

13         But I think some additional briefing on whatever expedited

14  schedule Your Honor would give us would be much appreciated.

15         THE COURT:  Well, I seem incapable to stop the

16  briefing that comes in on this case.  So, Mr. Gall, I will give

17  you that opportunity.  And we'll talk about that at the end of

18  the day.

19         MR. GALL:  At the end of the day today?

20         THE COURT:  Today, yeah.

21         MR. GALL:  We did -- my friend, Ms. Yu, prepared a

22  series of slides that detail the state of our knowledge so far

23  about what's going on in Korea.  May I tender that to the Court

24  now, or would you rather I do that when we do the additional

25  briefing?

PROCEEDINGS

1           THE COURT:  Sure.  Just something for me to look at

2  when I get off the bench?

3           MR. GALL:  Yes.

4           THE COURT:  That's fine.  Just give a copy to the

5  plaintiffs.

6           MR. GALL:  Yes, sir.  I wouldn't think not to,

7  Your Honor.

8  (Whereupon a document was tendered to the Court.)

9           THE COURT:  You'd be surprised, Mr. Gall, about other

10 people.

11          MR. GALL:  How many do you need?  Here.  You want a

12 couple of those?

13          THE COURT:  Two is fine.  Thank you.

14          MR. GALL:  If I give you all of the rest.

15     I'll take back whatever you want.

16     Thank you, Your Honor.  That's all I have right now.

17 Thank you.

18          THE COURT:  Okay.  Thank you, Mr. Gall.

19     Ms. Brass, did you want to --

20          MS. BRASS:  I think --

21          THE COURT:  -- piggyback onto this?

22          MS. BRASS:  -- he meant that's all he had.  I wasn't

23 sure if you wanted --

24          THE COURT:  Oh, yeah.  No.  I wanted to hear the

25 response, and then we'll he go on.

1           **MS. BRASS:**  Yeah.  Perfect.

2           **MR. KINDALL:**  Okay.  So we actually think that it

3    would be useful to get as much guidance as you can give us

4    about what you intend to do with respect to this most recent

5    investigation.

6           As we said in our brief -- and it's still true today -- we

7    want Mrs. Kim to come as a live witness.  That is -- that's our

8    intent.  That is what we want.

9           Contrary to what Mr. Gall said, we don't actually have any

10   means of forcing her to come.  We have an agreement that says

11   that we get to request witnesses, but we can't compel anyone to

12   come from Korea.  So it is our intent to call her.  We want to

13   call her live.  Whether or not she comes is probably going to

14   be affected by what kind of guidance we get on what sort of

15   inquiry is going to be allowed on a current pending criminal

16   investigation, I imagine.

17          We have talked with Mrs. Kim's personal lawyer; not the

18   lawyer for Samyang.  And what we understand from the situation

19   doesn't entirely square up with what Mr. Gall understands based

20   on the reports that he's seen.  From what we're hearing, it

21   sounds like the indictment isn't quite the same thing as an

22   indictment here, but the difference is not clear to us; and

23   that he indicated that she has not pled guilty.

24          There is some question as to whether she tendered some

25   money as sort of a good-faith offer to -- to the prosecutor;

1   but we really don't know the status of all of that, or when

2   it's likely to be resolved.  His best guess when we spoke to

3   him was that it's not likely to be resolved for another six

4   months or so.

5        **THE COURT:**  So there was a suggestion in one of the

6   newspaper reports that she had admitted to facts.  Do you know

7   what she admitted to?

8        **MR. KINDALL:**  We really don't.  I mean, what we heard

9   was that she had not pled guilty; but whether and to what

10  extent she has admitted to anything, we really don't know.

11  We're getting this, obviously, you know, second-, third hand at

12  this point.

13       So what we do know, as Your Honor has indicated, is that

14  this investigation has nothing to do with the facts of this

15  case, other than sort of general impeachment testimony.  We're

16  the plaintiffs.  We aren't carrying a brief here for Mrs. Kim

17  or for Samyang.  We're not vouching for, you know, her being an

18  angel, saint, or anything like it.  We just want her testimony.

19  And we think that it's important testimony, and that we're

20  entitled to it.

21       Whether or not she comes is probably going to depend

22  somewhat on the advice that she gets from her personal counsel,

23  and from counsel in Korea as to whether or not she's likely to

24  create some sort of jeopardy for herself.  And it might very

25  well depend on the willingness of the government in Korea to

PROCEEDINGS

1   let her out of country.  We don't know.

2        But we do know that the issues that she raises in her

3   testimony here are important, and that that testimony should be

4   heard.  And if it can't be heard in person, there's no reason

5   that we should not be allowed to put in her deposition

6   testimony.

7        Mr. Gall indicated that the defendants were counting on

8   her testifying live.  They had no reason to count on her

9   testifying live at the time that we took her deposition.  The

10  Settlement Agreement provided that it was the plaintiffs'

11  choice to request that one of the deponents or possibly two of

12  the deponents that Samyang had offered would be required to

13  testify live.  We did not indicate at the time -- we did not

14  indicate until earlier this year who those -- who those people

15  would be.  So there was no reason at the time that the

16  defendants conducted their cross-examination of Mrs. Kim during

17  her deposition not to conduct as thorough a deposition

18  cross-exam and they could.

19       At the same time, they also -- she was also appearing in

20  response to one of their subpoenas, so they had a full and fair

21  opportunity to depose her.  That was two years ago.

22       That happens.  That happens in this case with respect to a

23  lot of witnesses.  I mean, for example, we deposed one of --

24  Ottogi's witnesses in the spring of 2016 -- or 2016.  And

25  subsequently he submitted a declaration on the question of

1  alteration of documents.  We would have loved to have deposed

2  him with respect to that, but that time has passed.  And if he

3  doesn't show up in live testimony, we just have to make do with

4  the transcripts that are available, however important we may

5  feel that testimony to be.  That's the -- that's the breaks in

6  this case, because we did have a long discovery period.  We did

7  have a lot of motions practice.  Everybody knew that, going in.

8      So I am not saying that we intend to rely on her

9  deposition testimony.  We very much want her to testify live;

10  but the likelihood of that happening will probably depend on

11  whether she's going to be required to sit for another

12  deposition when she comes, and whether or not she's going to be

13  compelled to testify about the current criminal investigation.

14      I think it might also matter as to whether -- if she has

15  to invoke her Fifth Amendment right, whether that has to be

16  done in the presence of the jury, or whether that would be

17  evidence taken outside of the presence of the jury.

18      So those are all things I think it would be useful to get

19  guidance from the Court on, because I expect that the people

20  who are advising Mrs. Kim on whether she's going to come, which

21  isn't anybody in this room, are going to want to know.

22          **THE COURT:**  All right.  Thank you.

23      Ms. Brass.

24  (Whereupon a document was tendered to the Court.)

25          **MS. BRASS:**  Your Honor, today I'd like to focus on

1    one aspect of the plaintiffs' expert reports.  I understand

2    Your Honor has tentatively ruled you're inclined to accept the

3    testimony and opinion regarding market definition, and I'd like

4    to speak to that briefly today.  And, of course, because I

5    can't help myself, I've handed you some slides.  And again, for

6    the Record, I'm Rachel Brass, from Gibson Dunn & Crutcher, on

7    behalf of the Ottogi Defendants.

8         If Your Honor looks at Slide 2, you'll see what is

9    fundamental economics and law; that there's no proof of damages

10   in an antitrust case without a proper market definition.

11   Market definition is the foundation for almost all of

12   Dr. Mangum and Dr. Ackerberg's opinions, including their

13   damages estimates.  Defendants simply could not have

14   artificially inflated U.S. prices without market power in the

15   U.S.  And to assess market power, an economist must properly

16   define the market.  It's like a fraction without a denominator.

17        What we have in this case, though, rather than a rigorous

18   economic examination of market power, is a litigation-driven

19   decision about how to define the market.  You can look at Slide

20   3, and you can see what market definitions each of them offers.

21   And you can see when each of them decided to offer an actual

22   market definition; and it's in their surrebuttal reports.

23   Throughout discovery, each refused to be pinned down to a clear

24   definition of what the market was.

25        Now they've dropped all pretense, and admitted it's simply

1  market -- litigation driven, but that is not an economically

2  rational basis for expert opinion, which Your Honor held is, of

3  course, the standard in the *Lidoderm* decision that's in our

4  papers at 2017 Westlaw 5068533, at page 24.

5      And if you look at page 4 of my slides, you can see that

6  it is -- by looking at market power, that each of them comes up

7  with their overcharge.  And this is so fundamental.  I think

8  it's worth looking at quickly; what that means specifically in

9  this case.

10      If you look at page -- Slide 5, you'll see that it's not

11  even really contested in this case that overcharge depends on

12  market power.  It's uncontroversial.  A single firm in a

13  Section 2 case or a conspiracy or cartel in a Section 1 case

14  must have market power to charge supercompetitive prices.  I

15  know that because the Indirect Purchasers' expert told me so.

16  No market power; no overcharge.

17      That's also what the ABA Model Jury Instructions tell us.

18  And while that's not an element of this case because it's a per

19  se case, it's still a fundamental part of the damages inquiry

20  and it's a core part of their Expert Report.  And as we know

21  under *Daubert*, each part of the Expert Report that is a

22  fundamental part of the Report must stand on its own two feet.

23  So we should look at the market-definition aspect carefully.

24      Now, there are really two core ways that we can think

25  about how to define a market.  And you can see some of this on

1   Slide 7.  The most well-regarded ways under the law are through

2   economic methods:  Cross-price elasticities, the hypothetical

3   monopolist or SSNIP test, consumer surveys, third-party market

4   analyses, critical loss analyses.

5       It is undisputed in this case that neither Dr. Mangum nor

6   Dr. Ackerberg even attempted to do any of these things.  They

7   just cast them aside as too hard, and impossible; but we know

8   that's not true, because Dr. Cox did do it a cross-market

9   elasticity study.  And, while they think that his is

10  insufficient, they never explain why they couldn't have done

11  any of these things:  Not done a consumer survey; not looked at

12  independent third-party market analysis; or why they couldn't

13  have done some checking of cross-price elasticities, even if

14  they're not as rigorous as they think they should be.

15      They don't even do an alternative version of their

16  regression model that puts in non-Korean Ramen makers as a

17  variable, to test to see if their model is reliable.  They just

18  say, *Well, our regression analysis computes an overcharge, so*

19  *we know it's enough*; but they don't engage in fundamental,

20  widely recognized means to economically test their market-share

21  analyses.

22      And the Ninth Circuit has explained in the *Twin Cities*

23  *Sportservice* decision at 676 F. 2d. 1291 at 1299 -- that's a

24  Ninth Circuit decision from 1982 -- this is the locus of

25  analysis for market share [sic].  This is -- market definition.

1  This is how you decide if it exists.

2          **THE COURT:**  Do you think there's any distinction

3  between a price-fixing case, and a monopoly case?

4          **MS. BRASS:**  I do.  I absolutely do.

5     In a monopoly case to prove the violation, you must prove

6  market power; and that's not the case here.

7     But they, themselves, acknowledge that to prove an

8  overcharge, they must use a reliable market definition.

9     And I'll explain why I don't think this is an area just

10  for cross-examination, or just for impeachment, or just for the

11  jury.  And it comes down to the fact that that is a market -- a

12  jury instruction in a Section 2 case, where you tell the jury,

13  "You're going to get a market definition.  And you have to

14  evaluate if it's reasonable.  And here's the elements under

15  *Brown Shoe* that you should consider.  And here are the other

16  bases under the law where we say, 'This is what makes it

17  reasonable; and this is what does not make it reasonable.'"

18     But in a Section 1 case there is no such instruction, so

19  it falls on the Court, in its *Daubert* and gatekeeping role, to

20  determine ahead of time whether or not the legal standard for

21  reliability for that market definition, as a legal matter --

22  not as a weighing-of-evidence matter -- is met.  And I know

23  Your Honor said in the tentative that you thought the practical

24  indicia were enough.

25     I would say, first, that practical indicia are never

1  enough.  You must use some econometric modeling.  And those

2  courts that have allowed simply using practical indicia have

3  either, like Judge Gonzalez Rogers in the *Apple* case, had an

4  opinion from the expert that cross-price elasticities or other

5  analyses were impossible; something we plainly don't have here,

6  because Dr. Cox has shown they are possible.

7       Or, like in the *In Re: Live Nation* case (phonetic), the

8  Court looks at whether or not the elements related to price and

9  price competition are at least addressed the

10  quantitative/qualitative *Brown Shoe* factors.  And here, Mangum

11  and Ackerberg acknowledge they don't even engage in one of

12  those two qualitative analyses.  If you look at Slide 7, you

13  can really see the paucity of the analysis here with the *Brown*

14  *Shoe* test.  And again, they've abandoned any type of

15  qualitative [sic] analysis.  So the least that you would expect

16  is that they would dive into these -- sorry -- abandoned a

17  quantitative analysis, so they would dive into the qualitative

18  factors with rigor; but instead, as this chart shows you -- you

19  can see the red boxes -- that's where they offer no analysis,

20  whatsoever.

21       The green boxes are those things they try to engage in.

22       And the orange boxes -- well, that's where I'm giving them

23  the real benefit of the doubt, and we'll say that they tried to

24  engage in those things.

25       Now, as I said, there's no precedent for allowing a market

1   definition to pass *Daubert* scrutiny with such little rigor; but

2   even if we did so, those areas they offer or that they try to

3   satisfy just aren't enough.

4        Let's look at Factor 1 on Slide 9.  In trying to defend

5   their experts' qualitative analysis, plaintiffs spend their

6   energy on this factor:  Industry or public recognition.  But

7   the Ninth Circuit, in the *IT&T Corp. versus Gen. Telephone and*

8   *Electronics Corp.* decision, at 518 F. 2d. 913, pin cite 932 --

9   and that's a Ninth Circuit decision from 1975 -- has instructed

10  that this one, alone, is insufficient.

11       But in any event, the evidence that they cite is totally

12  contrary to the opinions they extract from it.  For example,

13  Slide 9 is a page from a Nongshim document that Dr. Mangum

14  cites in his Rebuttal Report.  And it's a competitor analysis

15  looking at Maruchan, Nissin, Thai Kitchen, Simply Asia,

16  Annie Chun's; all companies that Dr. Mangum concludes are not

17  part of this product market, even though the very document he

18  relies on for this element shows that Nongshim is treating them

19  as competitors.

20       And if you look at Slide 10, we see the same thing,

21  Your Honor.  This is a document that both Mangum and

22  Dr. Ackerberg cite in their Rebuttal Reports and their Merits

23  Reports.  And here, once again, it's a Nongshim document.  And

24  we see the category is dominated by Maruchan and Nissin, which

25  control 94 percent of category sales.  And there again the

1    category, of course, is noodles; not some kind of Korean Ramen

2    market, which both of them acknowledge they adopted as their

3    market without vigorous economic analysis, because those are

4    the defendants named in this case or because they have market

5    power in Korea; but that's utterly irrelevant for the question

6    of whether or not they've reliably demonstrated, sufficient to

7    offer an overcharge analysis based on the market, that this is

8    a reliable market here.

9         The second factor is addressed on Slide 11.  That's

10   another one that they each try and engage with.  And that is

11   the peculiar characteristics and uses factor.  Early in this

12   case they both cited to spicy Korean flavorings as the peculiar

13   characteristics; but here, too, we see "spicy" and "Korean" are

14   not unique to the Korean Ramen market.  Nissin makes a Kimchi

15   bowl.  Annie Chun's makes a Kimchi bowl.  Nissin makes a ramen

16   bowl.  And Nissin makes a hot and spicy noodle bowl.  There's

17   simply no basis in this Record to decide that there is peculiar

18   characteristics and uses.

19        Indeed, the only standard either of them offers for this

20   is their own taste buds, and some Nongshim puffery, where they

21   talk about the unique taste of Nongshim products.  You know,

22   Coca-Cola says its product has a unique taste, too; but that's

23   not a product market, and it's certainly not economic science

24   sufficient to withstand *Daubert*.

25        The final factor that they attempt to make a showing of is

1    Factor 5:  Distinct prices.  And this is really the centerpiece

2    of Dr. Mangum's opinion, in particular, that Korean Ramen is a

3    premium-priced product, and that makes it a unique market.

4         But all you have to do is look at the data in -- that all

5    of the parties have access to.  And at every price point, the

6    Japanese ramen makers are dominant.  Even if they sell the

7    largest number of their own units at a lower price point, they

8    still widely outpace the Korean Ramen makers at these higher

9    price points.  Nothing here reliably suggests that there are

10   distinct prices that create a unique Korean-brand ramen market.

11   Instead, the evidence demonstrates just the opposite.

12        And then Factor 7 is specialized vendors.  And they make a

13   halfhearted attempt to say, *Well, this might go through*

14   *specialized vendors*.  *Let's look at the Korean market*.

15        Of course, as I've already said, the Korean market is just

16   not relevant to this analysis in this Court, when we're talking

17   about a U.S. overcharge to U.S. consumers.

18        And what you're looking at here is a picture from

19   Plaza Market, one of the named Direct Purchasers, where the

20   products are shown interchangeably.  It's certainly not a

21   specialized market.  And, as everyone concedes, Costco was

22   buying Korean ramen, as well as other ramens; not a specialized

23   chain.  There are Japanese distributors who were buying Korean

24   Ramen during the Class Period.  There's simply no evidence of

25   actual specialized vendors.

1        Finally -- and I won't tarry here long -- I would just

2    emphasize to look closely at the brief about the fundamental

3    problems with the plaintiffs' overcharge markets [sic].   There

4    are several -- overcharge models.   Excuse me.   There are

5    several aspects of the models they offer that are wholly

6    unprecedented, in terms of there is no precedent for admitting

7    a model with the degree of multicollinearity either Dr. Mangum

8    or Dr. Ackerberg's Reports show.

9        There is no court or literature precedent for the six

10   collusion dummy model that each of them has to use to somehow

11   come up with an overcharge in this case.

12       And there is no precedent for allowing in front of a jury

13   a model that's hard wired to produce a damages figure, no

14   matter what inputs are introduced to it.

15       And for those reasons, we believe Your Honor should

16   reconsider the motion, and exclude at least that part of

17   Dr. Mangum and Dr. Ackerberg's Report that involves market

18   definition.

19            **THE COURT:**  All right.   Thank you.

20       Response?

21       **MR. WECKER:**  Good afternoon, Your Honor.

22   Bruce Wecker, for the plaintiffs.

23       There was a lot there.   I -- seemed like a pretty good

24   closing argument.

25            **THE COURT:**  I don't know.   Ms. Brass said that

1  everything that the experts were producing was unprecedented,

2  so you could start there.

3      **MR. WECKER:**  I think Dr. Mangum submitted a Report

4  like the dozens of other reports he's done in antitrust cases.

5  I don't think there was anything at all unusual about this

6  Report or his techniques.

7      One point Ms. Brass made was that he didn't do any

8  quantitative analysis on relevant market.  And she says then

9  that he didn't say that it was impossible.

10      In fact, if you read the briefs, he did say it was

11  impossible.  What he said was that Dr. Cox's cross-elasticity

12  study was based on post-Class Period data.  There was no data

13  available to do a cross-elasticity study from the Class Period.

14      And what Dr. Mangum says about that post-Class Period

15  study is that it suffers from the *Cellophane* fallacy, which is

16  you've had, essentially, eight or ten years of price increases,

17  and you get up to a monopoly-level price.  And that distorts

18  all of the price substitutability that consumers might have,

19  depending on changes in prices.  And -- so that the study has

20  that problem to begin with, and cannot be used to establish

21  substitutability sufficient for the Japanese ramen products to

22  be included in some overall ramen-relevant market.

23      His primary evidence supporting his -- his opinion that

24  those Japanese companies didn't exert price constraint was

25  looking at the defendants' documents.  And so this case is very

PROCEEDINGS

1  similar to Your Honor's *Bazaarvoice* case, in which the

2  defendants, themselves, were defining who their main

3  competitors were.

4       Now, Mrs. Brass pulls out one or two documents, and takes

5  out of context a quote.

6       There's a wealth of evidence here that these companies

7  considered each other -- the four Korean companies -- to be

8  their prime competitors.

9            **THE COURT:**  In America?

10           **MR. WECKER:**  In America.

11      Something like 60 percent of the market, and even higher

12  percentages early in the Class Period, were of Korean-American

13  customers.  There's segments that Nongshim said out of the

14  market that they were trying to produce products for --

15  Hispanic market, the mainstream market -- but the vast bulk of

16  the customers in this case were Korean-American --

17  Korean-descent consumers.

18      And so Dr. Mangum has plenty of support for his

19  conclusions that -- he didn't make a conclusion about relevant

20  market, because this is a Section 1 case.  There's no

21  requirement.  It's not in the Verdict Form that the jury has to

22  find what the relevant market is.

23      And -- but he did address the argument that the Korean

24  Ramen companies would exert sufficient pricing constraint in

25  United States to prevent the overcharges.  And Dr. Mangum's

1    main point on that is that he doesn't need to define a market

2    and figure out market shares.  He's looking directly through

3    his regression model at the direct effects of the conduct that

4    we're complaining about.

5         So, in sum, all of the issues that I think are being

6    raised here are fine issues for cross-examination, but they're

7    not a basis to exclude the testimony.

8              **THE COURT:**  All right.  Thank you.

9              **MR. WECKER:**  Thank you.

10             **MR. RAABE:**  Good afternoon, Your Honor.  Craig Raabe,

11   for the Indirect Purchasers.  I'll be very brief.

12             **THE COURT:**  Okay.

13             **MR. RAABE:**  Obviously, I agree this is a price-fixing

14   case, not a monopolization case.  And so this -- trying to push

15   this market-power definition upon what we're doing here just

16   isn't appropriate.

17        And to the extent -- I couldn't tell whether Ms. Brass was

18   saying that Mr. Ackerberg has abandoned any direct quantitative

19   impact.  He has not.  It's in the briefs.  I won't belabor it.

20   But prices went up.  Market share went up at the same time,

21   which indicates that they were not getting pressure from other

22   products that would constrain the ability to fix them, and

23   raise prices.

24        The with regard to multicollinearity and all of that,

25   you've addressed it in the Class Certification ruling.  I don't

1  think we need to belabor that.

2      And just one final point on the -- on Chart 11, with all

3  of those products there.  I think we pointed this out in our

4  briefing; that the Nissin products that are listed there didn't

5  exist through most of the Class Period.  Even some didn't

6  exist, I think, at all during the Class Period.  So to say that

7  those were competitive products is just not accurate.

8          THE COURT:  Okay.  Thank you.

9      All right.  Anything further?

10         MR. GALL:  If it please Your Honor, again, I'm not

11  sure that I heard correctly what Your Honor said before.  Your

12  initial comments included a remark that you thought there was

13  enough evidence of control in this case to let the issue go to

14  the jury, or something like that.  And if that was an attempt

15  to -- if that was a statement about the alter-ego theory and

16  reverse veil piercing that we previously discussed, I'd like to

17  address that.

18         THE COURT:  Go ahead.

19         MR. GALL:  Thank you, sir.

20         THE COURT:  And it was.

21         MR. GALL:  I was afraid of that, Your Honor.

22      We have briefed this, and we have argued this before.  And

23  I would say, out of the gate, that I will address plaintiffs'

24  response.  We filed our briefs simultaneously the last time, so

25  I'll address some of the things that the plaintiffs have said,

1   but let me start out by saying a couple of things.

2       The law in California is, I think, fairly well established

3   in the cases that we've given Your Honor that reverse veil

4   piercing is not allowed in the context in which it's being

5   proposed in this case.  And I will -- the *Postal Instant Press*

6   case, which we have provided, is the case that started all of

7   this, and started my education about reverse outside veil

8   piercing.  And we have gone forward from there.

9       The plaintiffs have suggested in the briefing that there's

10  almost a split of authority within the Ninth Circuit or in

11  California on whether or not outside reverse veil piercing is

12  really effective, or an instrument that is usable in a

13  situation like this.  And I think that is not correct.

14      I think the vast majority of the cases involve similar if

15  not identical factual situations to the one presented here.

16  Certainly the Ninth Circuit has in a couple of decisions

17  adopted what it perceived as the California view.  Some of the

18  District Courts in California have also adopted that.  And the

19  California Appellate Courts have adopted that, as well, with a

20  caveat that I'll come back to in a minute.

21      There is no distinction in these cases, I believe.  The

22  plaintiffs suggest that because the upstream party in this case

23  is a corporation, and not an individual stockholder, that

24  somehow the doctrine of outside reverse veil piercing does not

25  apply.

**PROCEEDINGS**

1    I think that the choice of the word "individual" has to do

2  more with the facts of the case in front of the courts, and

3  much less with what the law is as it is perceived by the courts

4  in California.

5    I think there are cases.  For example, *FG Hemisphere, LLC*

6  *versus Unocal*; *He Nam You versus Japan* were a couple that we've

7  cited previously to the Court.  Those are both cases in which

8  the upstream entity was a parent, and the downstream entity was

9  a subsidiary, just exactly as it exists here.

10    There are lots of those cases within this Circuit, and

11  there are other cases that use the words "individual," but it's

12  not possible to divine from the ones that use the word

13  "individual" that the concept of a bar of -- of outside reverse

14  veil piercing should be limited to the cases where there's an

15  individual on the upstream side of the ladder.  There just is

16  no substantial authority for that, and there's plenty of

17  authority the other way.

18    Some of the cases that the plaintiffs have cited are

19  inexplicable.  The *Boeing* case relied on Delaware law, not

20  California law.  And in that case the Court actually

21  acknowledged that the upstream entity could be a parent, and

22  the downstream could be a corporate subsidiary.

23    The plaintiffs have attempted to distinguish the theory on

24  the basis that there's no innocent shareholder upstream here.

25    If Your Honor examines it, as I know you have -- the

1   *Postal Instant Press* case and its progeny -- whether there's an

2   innocent shareholder upstream or not is certainly not the only

3   factor.  There are other factors that the courts have

4   considered in analyzing whether the concept should be applied,

5   including, most notably, whether there are innocent creditors

6   whose business relations with the subsidiary in question will

7   be disturbed by short-circuiting the collection process and

8   seizing the subsidiary's assets to satisfy the liability of the

9   parent.

10      There are other factors, including whether or not there is

11  an available alternative remedy; a legal remedy that would

12  satisfy the needs that usually originate in a collection

13  process.  Fraudulent conveyance.  Conversion.  *Respondeat*

14  *superior*.  A couple of the ones that these cases mention as

15  being the other factors.

16      It is -- it would be the plaintiffs' burden to show that

17  there are no adequate legal remedies available to support an

18  expedited collection process in this case.  And there's been no

19  such showing here; no such showing.

20      When we were together with Your Honor the last time, we

21  highlighted the complete lack of notice.  And I want to spend

22  just a second on that here.  Reverse veil piercing -- outside

23  reverse veil piercing is a complicated concept, and it involves

24  an analysis of the elements that usually attend an alter-ego or

25  veil-piercing analysis.  And one of the cases that the

**PROCEEDINGS**

1  plaintiffs cited, which I will come back to, is the *Greenspan*

2  *versus LADT, LLC* case.

3      I would call Your Honor's attention to, essentially,

4  paragraph 12 at page 11 of that.  And on the bottom of -- and

5  on the top, again, of page 13, the Court goes through almost

6  two pages of the factors that have to come into play, both

7  alleged and proven, to substantiate this upstream piercing of

8  the corporate veil.

9      None of those factors --

10      Control, itself, is not enough.  No case says that

11  control, itself, is enough.  These factors have to be

12  satisfied.  There were no allegations of any of these factors

13  here.

14      Listen to some of these, Your Honor.

15      Commingling of funds and other assets.

16      Failure to segregate funds of the separate entities.

17      Failure to obtain authority to issue stock, or to

18  subscribe or issue the same.

19      The holding out by an individual or a corporation that he

20  is personally liable for the debts of the corporation.

21      The failure to maintain minutes or adequate corporate

22  records, and the confusion the records of the separate

23  entities.

24      The identical equity ownership of the two entities.

25      The identification of the equitable owners thereof with

1  the domination/control of the two entities.

2      Identification of the directors and officers of the two

3  entities, and the responsible supervision and management of the

4  companies.

5      Sole ownership of all of the stock in the corporation by

6  one individual or members of a family.

7      The use of the same office or business location.

8      The employment of the same employees or attorney.

9      Failure to adequately capitalize the total assets, absence

10 of corporate assets, and undercapitalization.

11     The use of the corporation as a mere shell,

12 instrumentality, or conduit.

13     The concealment and misrepresentation of the identity of

14 the responsible ownership, management, and financial interest,

15 or concealment of personal business activities.

16     The disregard of legal formalities.

17     This goes on for another page and a half.

18     There is no allegation in the Complaint on any of these

19 factors.  None.

20     As I pointed out to Your Honor before, there's nothing

21 asserted in the Complaint, other than in a single paragraph of

22 the Complaint -- an allegation that the parent, Nongshim Korea,

23 controlled -- owned and controlled the subsidiary.  That's the

24 only allegation in the Complaint, other than the, "and such

25 other and further relief" at the end of the Complaint.

1      We went through the discovery period, the identification

2   of experts.  There was no suggestion of this.  No filing

3   mentioned alter ego until -- until --

4          **THE COURT:**  Well, they didn't mention alter ego, but

5   the chaebols, as an example.

6          **MR. GALL:**  Yeah.

7          **THE COURT:**  It's similar concept.  And all of the

8   things, all of the factors that you just described are ones

9   where the evidence is very much in your control.  So I was

10  interested.  I understand what your legal argument is, and I

11  will consider it one more time; but for the prejudice argument,

12  tell me what the prejudice is.

13         **MR. GALL:**  Well, I can tell you one right away,

14  Your Honor.  First of all, I would have identified, prepared,

15  and gotten ready to put on the stand the people necessary to go

16  through each of these factors, and say it isn't so.

17      I would have hired an expert.  I would have gotten

18  somebody from Berkeley, across the river here, to come in and

19  say, *I've looked at this structure, and it is not an alter ego.*

20  *There is no domination.  There is no control.  This is a*

21  *standard corporate relationship.*  And that would be an

22  important expert to put in front of the jury.

23      I've been deprived of the opportunity to do that.

24      Professor Haggard is going to testify about chaebols.

25  Professor Haggard said this is a chaebol for the sole purpose

1   of allowing the jury to implicate that, because of that fact,

2   they were in control of the pricing decisions of the

3   subsidiary.

4       There -- there is no -- that's the only thing that's in

5   his opinion.

6       He isn't expressing an opinion about whether Nongshim

7   Korea controlled Nongshim America, to the extent that would

8   support an alter-ego relationship.  He says it's a chaebol; and

9   because it's a chaebol, we should infer that the parent had the

10  ability to control prices.

11      I don't believe his testimony should be allowed on that

12  basis, because it's highly prejudicial, and not supportive of

13  any -- it isn't evidence of anything, other than his opinion

14  that that must have happened, because this is a chaebol.

15      There's no one to come in here from our side of the case

16  at this point and tell the ladies and gentlemen of the jury as

17  an expert, like a Professor Haggard, from across the river here

18  or across the bay or anywhere else, that there is -- none of

19  these 15 indicia have been met or addressed here.

20      We haven't been able to ask anybody on their side, *What*

21  *evidence do you have that there's -- do you know if there's any*

22  *books and records?*

23      We haven't been able to ask any of those questions,

24  because the concept of alter ego was not put into this case

25  until the plaintiffs discovered very late in the game that they

1   could really -- they could conceivably tag the parent, and lose

2   the subsidiary; and they'd better come up with a way to get the

3   subsidiary's assets without going through a lot of trouble.

4   That's why this surfaced late in the game.

5       So many people have said and Your Honor has said the

6   evidence of a connection between the effect in the U.S. is

7   thin.  I think you actually said "extremely thin."

8       But the real prospect exists, I think, in their minds --

9   in the plaintiffs' minds -- that they could tag the parent, and

10  lose the subsidiary.  And that will -- that's why this

11  alter-ego theory is here.  That's why this agency theory is

12  here.  They want a shorthand way to get at it.

13      The evidence is not there to put in front the of the jury.

14  And we have been deprived of the opportunity to marshal the

15  evidence; and particularly the evidence necessary to persuade

16  the jury otherwise.

17      Thank you, sir.

18          **THE COURT:**  All right.  Thank you, Mr. Gall.

19          **MR. GALL:**  This (indicating) isn't mine.  Is this

20  yours?

21          **MR. BIRKHAEUSER:**  Good afternoon, Your Honor.

22      When we were last before you, we did hear about a theory

23  called "reverse outside veil piercing."  It had not been

24  briefed.  Since that time, we did brief it to you.

25      It is true that reverse outside veil piercing is a concept

1    that exists unto the law, but it is also true that it is

2    limited to situations where -- and someone is seeking to

3    enforce an individual's debt by going to corporate assets.  And

4    that makes sense, because there may be other shareholders

5    involved in the corporation -- innocent shareholders -- that

6    would be affected by attempting to pierce the veil in that

7    situation.

8         We've cited to the Court a case from the Central District.

9    I believe it's the *Clark* case.  I'm sorry.  We've cited a

10   California case, *Circe* (phonetic), as well as a case from the

11   Central District, to say it doesn't have any application in a

12   situation where you're looking at a parent subsidiary

13   relationship.  And that's what we have here.  And that makes

14   sense.  It just makes all of the sense in the world.

15        This issue of control, as Your Honor noted, has been at

16   issue in this case since the filing of the Complaint, where

17   such control was alleged.  And it's been the subject of intense

18   discovery.  We have offered Professor Haggard as a witness,

19   who's -- as an expert witness, who has gone through chaebol;

20   but also all of the facts that we have adduced during discovery

21   that demonstrate that kind of control.

22        And Mr. Gall said that, you know, *What was the prejudice?*

23   *Well, Nongshim would have hired an expert witness*; but they

24   did.  Mr. Dae Sik Hong has been proffered as an expert witness

25   on Nongshim's behalf, who intends to rebut Dr. Haggard's --

**PROCEEDINGS**

1   Professor Haggard's opinions regarding the chaebol.

2       The factors that he spoke of in the *Greenspan* case --

3   those are nonexclusive factors that have -- they're not

4   specific to outside reverse veil piercing.  Those are factors

5   that deal with alter ego generally.  And we've adduced those

6   facts during discovery, and we've set them forth in our

7   briefing to this Court.  Many of them are found in the Linkh

8   Declaration, which is at Docket Entry 680, I believe, dash 9.

9       And they show pervasive control by the parent over the

10  subsidiary in minute detail.  Weekly reports going up to the

11  subsidiary about minute managerial decisions.  Somebody got

12  their driver's license.  Who.  What customer was contacted.

13  Then monthly reports on, you know, many different topics.

14  Separate reports going up:  Financial, sales performance, you

15  know, the status of meetings.

16      I mean, these were very, very, very controlled

17  subsidiaries.  And that evidence is before you.  And the jury

18  should be able to draw conclusions from that.

19          **THE COURT:**  So I think I asked this the last time,

20  but I'll ask it again, because my memory's not as good as it

21  should be.  The first time that the plaintiffs mentioned the

22  term "alter ego" -- when was that?  And did any expert ever use

23  that term?

24          **MR. BIRKHAEUSER:**  Well, I would say that

25  Professor Haggard set forth all of the facts and opinions --

PROCEEDINGS

1      THE COURT:  Right.

2      MR. BIRKHAEUSER:  -- necessary.  He did not mention

3  alter ego in his report, I don't believe.  And I would wonder

4  whether that would be -- you know, he's not making that legal

5  determination.  That's really for the jury to make.

6      THE COURT:  No.  And often those legal determinations

7  are laid out in the Complaint, so that people know what they're

8  shooting at.

9      MR. BIRKHAEUSER:  But it wasn't until discovery in

10  this case showed the extreme nature of the control by the

11  parents over the subsidiaries that those facts were adduced.

12      THE COURT:  And when was the first time that the term

13  was used?  Do you know?

14      MR. BIRKHAEUSER:  It was at least as early as summary

15  judgment.  It may have been earlier.  I really -- I really

16  don't know.

17      THE COURT:  All right.  Anything else on this?

18      MR. BIRKHAEUSER:  I think that's all I have.

19      THE COURT:  All right.  Thank you.

20      MR. BIRKHAEUSER:  Thank you.

21      MR. GALL:  May I --

22      THE COURT:  Mr. Gall.

23      MR. GALL:  -- for two minutes, Your Honor?

24      THE COURT:  That's about what you've got, so go

25  ahead.

PROCEEDINGS

1          MR. GALL:  I must have at least, like, 80 seconds

2    left.

3          THE COURT:  Go ahead.

4          MR. GALL:  Two things.

5      I think this did come up the last time, and I think we ran

6    it down.  I believe it's in the briefs.  I think the first time

7    the word "alter ego" was used was in December of 2017.  It was

8    not anything recent.  There's no -- there's no opinion in

9    Professor Haggard's Report that previews it.  There certainly

10   are no allegations in the Complaint.

11     I want to raise one other thing that was triggered by

12   something Counsel said.  It had to do with the *Circe* (phonetic)

13   case.

14     A lot of the several decisions that find an exception and

15   state that they're carving out something from the reverse alter

16   ego doctrine involve post-judgment proceedings, and California

17   Civil Code 187, and the Court's exercise of equitable

18   jurisdiction to manage post-judgment proceedings.

19     And the cases -- those cases say we're not really -- what

20   those -- the gist of those cases.  And I'm not quoting here,

21   but the gist of those cases -- *Circe* (phonetic) is -- and there

22   are some others, as well, Your Honor.  The *Greenspan versus*

23   *LADT* case that's in the plaintiffs' brief, and the *Clark versus*

24   *Dana* case -- if Your Honor looks at those, you'll see this

25   discussion.  The Court says, *This isn't really reverse alter*

1  *ego.  I'm -- all I'm doing here --* in both cases the Court

2  says, *All we're really doing here is substituting a real*

3  *defendant for the one that's in front of the court.  And we're*

4  *empowered to do that, because California -- the State Court*

5  *cases -- California Civil Code 187 says the Judge can amend the*

6  *judgment at any time to put the real party at interest at risk.*

7       And there's a discussion in these cases about the

8  California -- about the Court's -- the exercise of the Court's

9  equitable power to accomplish a fair and just result, and do

10 the same thing.  It's a combination of the two things.  That's

11 what the discussion is.  All of those post-judgment cases

12 involve that overlay.

13      This isn't post judgment.  We're talking here about

14 letting the issue of alter ego go to the jury, without really

15 any advance notice or fair warning to us.  My friends in Texas

16 would say that's laying behind the lick-log.  That's --

17           **THE COURT:**  Say that again, Mr. Gall.

18           **MR. GALL:**  Laying behind the lick-log.

19           **THE COURT:**  What is a lick-log?

20           **MR. GALL:**  Bushwhacking.   Sandbagging.

21      I have no idea what a lick-log is, Your Honor.  I'll ask

22 my friend, Mr. Head, from Fort Worth.

23           **THE COURT:**  Would you please let me know the next

24 time you're here?

25           **MR. GALL:**  He always says that to me.

1    But it's just an ambush.  It's an ambush, plain and

2  simple.  They had the time to do this.  They could have done

3  it.  They didn't do it.  And it's an attempt to gain an unfair

4  advantage here.  And it's probably unnecessary anyway, because

5  Your Honor does have the equitable power to do things.  And I'm

6  not suggesting that Your Honor should, but Your Honor exercises

7  plenty of discretion over post-judgment proceedings if the need

8  arises.  And that would involve Your Honor -- not the jury --

9  and an opportunity to hear for yourself what the items of

10  control are.

11    Thank you, Your Honor.

12         **THE COURT:**  Thank you very much.

13    Mr. Edelman.

14         **MR. EDELMAN:**  Your Honor.

15         **THE COURT:**  You're standing up at 45 minutes.  What

16  is it?

17         **MR. EDELMAN:**  Your Honor, I will promise to be brief.

18  Just a couple of issues to address with you.

19    I noted your tentative with respect to the plaintiffs

20  being entitled to show the defendants changes in the

21  document-retention policy, and the change in documents that

22  were send to the KFTC.

23    Has Your Honor had the opportunity to consider the papers

24  that were filed with respect to Rule 44.1?

25         **THE COURT:**  Yes.

1          MR. EDELMAN:  Okay.

2          THE COURT:  Yes.

3          MR. EDELMAN:  Okay.  So I'm not sure where the Court

4    is on that particular issue.  We've asked for Jury Instructions

5    with respect to the defendants' obligations or lack thereof

6    concerning document-retention policies at the time of the KFTC

7    investigation.  We've submitted testimony from an Expert Report

8    from Professor Hong.

9          It's our strongly held view that if the plaintiffs are

10   going to be allowed to argue inferences and innuendos that they

11   believe arise from whatever the defendants did or didn't do

12   with respect to their document-retention policies upon

13   instigation of the KFTC investigation, and with respect to

14   attempting to provide the KFTC with documents that they were

15   requesting, even those exact documents didn't exist at the

16   time; that the jury -- that if it's anything, it's a question

17   of Korean law, and that the jury needs to be instructed on this

18   point.

19         And so I'm not sure what the Court is thinking in that

20   regard.

21         THE COURT:  So what I'm thinking about is if it is

22   mandatory, because the issue is so central to the Defense, that

23   I provide an instruction on Korean law, I would cabin it with a

24   statement of what I think the potential relevance is, depending

25   on what the jury would determine.

1     So there may not be a duty to preserve, but if the jury

2  thought that the conduct was shown to be trying to conceal

3  information from the investigation, or change things, or

4  somehow reflect on the lack of trustworthiness of the

5  defendants' presentation, I think that's fair game, duty or no

6  duty, so I would probably do that.

7     I haven't come to ground on, first of all, whether I need

8  to make a finding on the preservation issue, as opposed to

9  having your expert, unrebutted, talk about it; but if that's

10  something that I need to do, I think I would try to -- I'd put

11  that in perspective with the way that I've thought about this

12  issue for the last two years or two and a half years, which

13  I've expressed, I think, often.

14     **MR. EDELMAN:**  So look.  I think it's not easy for us

15  in the United States to step back from our understanding and

16  thoughts about discovery, and put our minds in a civil-law

17  country that doesn't impose document-retention obligations and

18  discovery obligations like we have in the United States, but

19  that is the situation we have here.  And it's evidenced not

20  only by Professor Hong's testimony, but by the fact that the

21  plaintiffs, as well equipped as they are, could not find a

22  qualified expert who could rebut Professor Hong on these

23  points.

24     And if the jury is going to be allowed to make any -- even

25  consider an inference, it has to be -- I mean, we don't think

PROCEEDINGS

1   it's relevant.  I know you've ruled against us on that, so I'm

2   not reiterating that point.  We reserve our objections.  But if

3   the jury's going to be allowed to consider this testimony and

4   the arguments that the plaintiffs are going to make, it has to

5   be against the background of what Korean law does or does not

6   require.

7        I hear what you're saying.  And, you know, it's a

8   difficult issue in the case, I guess; but I don't understand

9   how the jury can consider -- how there's even an issue as to

10  whether what the defendants might have done is wrong if it's

11  not precluded by Korean law.  Right?  I mean, we're not talking

12  about American obligations.  We're talking about an

13  investigation way before American litigation was on anybody's

14  minds.

15       And so Professor Hong establishes that there's no duty to

16  retain documents upon implementation of the investigation.  He

17  is very clear -- citations to statutes -- that the obligation

18  on a Korean company in the context of an investigation is not

19  to interfere with that investigation, and to provide documents

20  that are available and requested.  And there's really no

21  dispute that the defendants did not interfere, and that they

22  provided the documents that they were requested.

23       So I just -- we just would ask the Court to please

24  carefully consider this issue.  If I might -- I've passed it

25  out to my colleagues on the other side -- we have a PowerPoint

1   that summarizes these that I'll leave with Your Honor.

2           THE COURT:  Great.

3   (Whereupon a document was tendered to the Court.)

4           MR. EDELMAN:  And the other point I would just make,

5   which Professor Hong makes, as well, is that the KFTA does not

6   have extraterritorial reach.  Right?  So we're talking also in

7   this case about two American companies -- Ottogi America, and

8   Nongshim America -- who were never the subject of any

9   investigation in Korea, and have to be looked at with the

10  concept of lack of extraterritorial reach of any obligations to

11  the KFTC.

12       The other topic that I wanted -- there are two other

13  topics I briefly want to address.  One is the instruction that

14  Your Honor has suggested you will give -- either that

15  instruction, or some variant of it -- with respect to the KFTC

16  and the Korean Supreme Court.

17       I don't think we need to go through it line by line,

18  because we've submitted a detailed brief.

19           THE COURT:  I saw it.

20           MR. EDELMAN:  And I appreciate that.

21       I would just ask Your Honor to -- I have a practical

22  question on how you want us to proceed at trial; and then just

23  some key points that I would ask you to consider when you look

24  at that instruction.

25       One is the fact that the KFTC was very clear that export

1    prices were not the subject of the alleged conspiracy or the

2    investigation.  And so to the extent you talk about an

3    investigation and characterize it, I think it needs to be

4    clarified to indicate that export prices were not even part of

5    that investigation.

6         The second is that the Supreme Court reversed the KFTC,

7    and did so for specific reasons.  And one of the concerns we

8    have is that if you simply say, as you did, or propose, or

9    potentially do in the Draft Order, that the Supreme Court

10   overturning the decision and the fines, without any explanation

11   as to why, the jury may conclude it was based on some sort of

12   technicality, as opposed to the very substantive decision that

13   the Supreme Court made with respect to lack of evidence of any

14   price-fixing.  And so we think that that's important; that if

15   you're going to speak on this topic, and if it's going to come

16   into the province of the jury, that they have a full and

17   complete instruction.

18        I won't go through all of the other things that are

19   detailed in our papers, but I do have a practical question for

20   you.

21            THE COURT:  Okay.

22            MR. EDELMAN:  You indicate in your tentative that

23   your thinking is that the parties will not -- they may refer to

24   the KFTC investigation and use materials generated as part of

25   that investigation, but the parties may -- neither party may

1  refer to the findings and judgment of the KFTC or the

2  Supreme Court.  And you're going to instruct them.

3      I've never encountered a situation where the Court is

4  instructing the jury on something in the case, and then the

5  parties can't either argue about that instruction, or address

6  it as part of the case.

7          THE COURT:  Well, haven't you just been addressing

8  it?  I mean --

9          MR. EDELMAN:  I mean to the jury.

10          THE COURT:  -- you've submitted a brief.  And you've

11  submitted a proposed instruction.

12          MR. EDELMAN:  No, no, no.  I don't mean to the Court.

13  I don't mean to you.

14      I mean for the Court to instruct the jury, and then we

15  can't talk about the Court's instruction or about -- you know,

16  you're going to tell the Supreme Court [sic] -- you're going to

17  tell the jury what the Korean Supreme Court did, and then we

18  can't even address that in our argument to the jury.

19          THE COURT:  Well, you can say the exact thing that my

20  instruction says.

21      But you're right.  I am carving out your ability to talk

22  about the specifics of all of the decisions, because it's going

23  to, I think, be confusing to the jury.  The issues that are in

24  this case are going to be the issues that are tried here, which

25  is not going to be what was tried in Korea.  And so that's

1    where the line's going to be.

2             MR. EDELMAN:  So your point is that we can talk about

3    your instruction, but not go further when we argue to the jury?

4             THE COURT:  Right.  You can't make substantive

5    arguments that aren't otherwise stated in the instruction.

6             MR. EDELMAN:  All right.

7             THE COURT:  And I will look at -- I have looked at

8    and I will think further about the instruction that -- the

9    revisions that you've suggested.

10            MR. EDELMAN:  Okay.  I would just, you know, ask you

11   to keep in mind what I still believe is the really difficult

12   prejudice to us with the fact that this investigation is coming

13   in.  I don't think there's any evidence in the case that cannot

14   be brought into the case without reference to the actual

15   investigation.

16        And we've given some thought about that.  We've gone

17   through the various items that have been cited by the

18   plaintiffs as things that they think are inextricably part of

19   the KFTC investigation, whether it's the examination protocols

20   or the statements that are at issue that were submitted in the

21   KFTC investigation.  And I think there's a way in each instance

22   that that testimony can still be brought in, without reference

23   to the fact that there was a KFTC investigation.

24        And there are so many cases, Your Honor, that hold that

25   putting into evidence the existence of an investigation is

1  prejudicial to the defendant; that we would -- and I would ask

2  for permission to submit a brief on this to address the

3  particular issues that the plaintiffs believe have to come into

4  this case because they're so inextricably intertwined with the

5  investigation, and try to show you how those issues can still

6  be brought into the case without getting into the KFTC

7  investigation.

8      Part of what you're saying I agree with, which is that --

9  that, you know, we have a very limited time to try this case.

10 It's a --

11          THE COURT:  It seems generous to me, Mr. Edelman.

12          MR. EDELMAN:  Well, and I understand certainly from

13 the Court's docket and from Your Honor's time how it might seem

14 that way, but when you consider how many defendants, two

15 defendants, we divide it up, et cetera -- we're really cutting

16 and trimming to try to comply with that Order, and it's

17 extremely difficult to do so.

18     We would like nothing more than not to have to get into

19 the distraction of trying a different case than the one that

20 should be tried in this case, which is the impact of this

21 alleged conspiracy on prices in the United States.

22     And the collateral issue of an investigation in Korea -- a

23 discredited investigation, overturned by the Supreme Court,

24 which never had one concern about the document production to

25 the KFTC, never an issue --

1     With all of the hard drives that were imaged, all of the

2  interviews that took place, we have not heard one single peep

3  out of any government regulator in Korea saying they had a

4  problem with anything that was produced or not produced, or

5  which was "created," to use the plaintiffs' words.  It's only

6  in this case that we're supposed to sit here, and hear about

7  something that happened in Korea.

8     So, with Your Honor's permission, I'd like to submit a

9  brief that shows the Court how we believe the issues that the

10 plaintiffs want to bring up can be brought into this case in a

11 way that would excise any mention of not just the

12 investigation, but the Supreme Court decision overturning that

13 investigation.  Keep it all out, so we can just try the issues

14 that really should be front and center in this jury trial.

15         **THE COURT:**  All right.  So you can present a brief on

16 it.  Make it five pages, and do it in a week.

17         **MR. EDELMAN:**  Okay.

18         **THE COURT:**  And then the plaintiffs can respond to it

19 a week later.

20         **MR. EDELMAN:**  Thank you, Your Honor.  I appreciate

21 that.

22     And the last thing I wanted to ask you is, you have two

23 different versions of jury questionnaires.  Ours is 49

24 questions.  The plaintiffs' is 29 questions.

25     We have included -- we met and conferred.  We've included

1    all of the plaintiffs' questions in our questions, with the

2    exception of a question about whether the prospective jurors

3    has a strong feeling about class-action lawsuits.  Our view is

4    that jurors don't know what class-action lawsuits are, and

5    that's something that can be covered in *voir dire*; but to put

6    it in a vacuum of a questionnaire, we didn't think was

7    appropriate.

8          And then the only other --

9          And that was their Question 25.

10         The only other thing we objected to was Question 26; words

11   to the effect of, *Would you sue if you believed you were*

12   *wronged?*

13         We'll withdraw our concern about 26, but what I wanted to

14   give you -- I know time doesn't permit us to address it today,

15   but in case it's helpful to the Court, because it was helpful

16   to me in trying to understand the differences, we prepared a

17   couple of charts that show the similarities and the differences

18   between the two questionnaires.

19         **THE COURT:**  Okay.  And I looked at those when they

20   came in, and I haven't looked at them since.

21         **MR. EDELMAN:**  It's understandable.  So we thought

22   this might be helpful.

23         What you will see -- the primary difference between their

24   questions and our questions is that we have additional

25   questions at the end, where we try to ferret out

1  biases/preconceived notions on the part of the jurors with

2  respect to antitrust cases.  So there are a series of questions

3  by us about -- that we propose be in the questionnaire about

4  whether they believe conspiracies are common; agreements not to

5  compete are common; whether they think there are too many

6  monopolies; things like that, which we would then be able to

7  follow up on in *voir dire*.

8      And I know Your Honor gave us fairly limited time for the

9  *voir dire*.  From the last pretrial conference we had, I believe

10 you said 20 minutes per side.  Is that --

11         **THE COURT:**  Did I give you that much?

12     (Laughter in the courtroom.)

13         **MR. EDELMAN:**  So I was going to ask you for

14 additional time.

15         **THE COURT:**  So it depends.  So I've learned that it

16 helps to have outer limits.  And when people are actually

17 asking good questions and getting substantive responses from

18 jurors, I may let them go a little longer than the time.

19     But between whatever I allow the jury questionnaires and

20 the *voir dire* that I do, I think the ground will be fairly well

21 plowed, so you can be specific with individual people and be

22 quick.

23         **MR. EDELMAN:**  Okay.

24         **THE COURT:**  So think on 20 minutes as an outside

25 limit.  And it may be longer, depending on how you're doing.

1           **MR. EDELMAN:**  All right.  Thank you, Your Honor.

2       Then I'll just pass up these questionnaires -- the

3   comparisons of the juror questionnaires, in case it's useful to

4   the Court.

5   (Whereupon a document was tendered to the Court.)

6           **MR. EDELMAN:**  And with that, Your Honor, let me just

7   check with my side, but that completes my remarks.

8           **THE COURT:**  All right.  I will take a look at these.

9           **MR. EDELMAN:**  Okay.  Thank you, Your Honor.  That's

10  all I have.

11          **THE COURT:**  Thank you very much.

12          **MS. SWEENEY:**  Thank you, Your Honor.  Bonny Sweeney,

13  for the plaintiffs.

14      We have -- a couple of us are going to be responding to

15  Mr. Edelman's arguments.

16          **THE COURT:**  Okay.

17          **MS. SWEENEY:**  I'm going to be addressing the Jury

18  Instruction that Your Honor identified in the Order.  And I

19  have something to hand out to the defendants (indicating).  And

20  I'll hand it up to Your Honor, as well, if that's okay.

21          **THE COURT:**  Okay.  Please.

22  (Whereupon a document was tendered to the Court.)

23          **THE COURT:**  Mr. Edelman used up a lot of your time,

24  though, Ms. Sweeney.

25          **MS. SWEENEY:**  So the defendants have made a

1   counterproposal to Your Honor's proposed Jury Instruction.  And

2   as we understood Your Honor's Order, Your Honor granted

3   Plaintiffs' Motion *in Limine*, and denied Ottogi's Motion *in*

4   *Limine* Number 2, and then said that Your Honor would address

5   these issues with the jury in the wording that you suggested,

6   unless the parties agreed to an alternative.

7       Well, so the defendants proposed this alternative.  And we

8   have a specific response to it, which I handed up to

9   Your Honor.  And in particular, we plaintiffs agree that some

10  of the small changes that the defendants made in the beginning

11  of the proposed instruction are acceptable.  They add a little

12  bit of clarity and precision.

13      For example, we can have the shorthand for the "Korean

14  Fair Trade Commission."  That makes sense.

15      The defendants also asked that the specific parties that

16  were investigated be identified; and we agree with that, as

17  well.

18      In addition, they made minor wording changes with respect

19  to changes to "regarding."  That's fine.

20      And we also accepted defendants' proposal that this

21  instruction specifically say that the investigation pertained

22  to Korean Ramen Noodles sold in the Korea domestic market.  And

23  we believe that that satisfies the defendants' objection that

24  that investigation was limited to the Korean domestic market.

25      That said, we don't believe that that needs to be repeated

1  later in the instruction, which defendants do.

2      We also agree that the adjective "U.S." can be inserted

3  before "federal and state antitrust and unfair competition

4  laws."

5      But that is the limit of our agreement to defendants'

6  proposal.  Many of the other proposals by the defendants go way

7  beyond what would be acceptable in a Jury Instruction.  They're

8  not in any way neutral.  They put a very heavy thumb on the

9  scale in terms of what the Korean Supreme Court did.

10     For example, they say that they want to make this more

11 specific; but in fact, they have distilled a fairly lengthy

12 document into a very loaded, one-sentence description of what

13 the Korean Supreme Court concluded.  We believe that that is

14 unfairly and unduly prejudicial, and we object to that.

15     And then with respect to -- I guess we're going to be

16 briefing it again, Your Honor, but I would just like to point

17 out that plaintiffs did describe in our -- in our motion *in*

18 *limine*, the kinds of evidence that -- there is no way to make

19 sense of that evidence without some mention of the KFTC

20 investigation.

21     How, for example, can we put in context the alteration of

22 the Ottogi memos that were submitted to the KFTC, without

23 mentioning that investigation?  And we're happy to brief this

24 again, Your Honor, but we think it is simply not feasible,

25 possible, or fair to leave out any discussion of the KFTC

1    investigation.

2              **THE COURT:**  All right.  Thank you, Ms. Sweeney.

3              **MS. SWEENEY:**  Thank you, Your Honor.

4              **MR. KINDALL:**  Mark Kindall, for the plaintiffs again,

5    Your Honor.  Let me address briefly the Rule 44.1 issue that

6    Mr. Edelman raised.

7         The tentative that you were exploring in your colloquy

8    with Mr. Edelman makes a certain degree of sense.  If this

9    issue is to be raised at all, it has to be in the context of

10   the situation where we're presenting evidence that documents

11   were altered; we're presenting evidence that document-retention

12   policies were changed.  And obviously, we're -- we're often at

13   lack of documentary evidence from certain of the defendants.

14        The defendants want to come in and say, *Understand that it*

15   *was legal for us to destroy our documents*.

16        That's not the point we're making.  We have consistently

17   said, *Our point is, legal or not, if you destroy documents*

18   *under circumstances that might be suspicious, we're entitled to*

19   *point to that*.

20        So we think it's kind of a sideshow to have this

21   foreign-law argument about whether it is or isn't legal to

22   destroy your documents, because it's simply not the argument

23   we're making.

24        The issue is a little bit different with respect to the

25   alteration and submission of false documents, which I think,

**PROCEEDINGS**

1    you know -- if you look at the materials that Mr. Edelman

2    handed up, you know, paragraph 7 of Article 69 talks about

3    forging or altering documents.  Paragraph 6 of Article 69,

4    Section 2, Provision 1, talks about filing a false report, or

5    presents false materials or things.

6         The document request that the KFTC sent to Ottogi, which

7    was the cause for them to submit what we claim are altered

8    documents, specifically highlighted the provisions, and said

9    you could be liable under these provisions if you submit false

10   materials.  So, you know, I don't think that there's really any

11   question as a matter of law under Korean law that you aren't

12   allowed to do that.

13        We have a factual issue, though, with respect to whether

14   or not this was an alteration of documents.  The defendants in

15   their brief say, *No, no, that's not what happened*.  We have a

16   very different take on that, but that's fundamentally a factual

17   issue.  It's not an issue of law that -- that, you know, could

18   be really resolved under Rule 44.1.

19        And the other element is -- that's in their brief is the

20   question of whether there should be some sort of an instruction

21   under Rule 44.1 relating to the Supreme Court of Korea's

22   determination.  Their one-liner in their decision about de

23   facto price control.

24        A couple of things about that.  One is:  This is

25   essentially an administrative appeal on a record, and there

1  were facts that were admitted into that record, and they're not

2  the same facts that are going to be admitted into this Record.

3  So when the Supreme Court says "de facto price control," this

4  isn't a finding of what Korean law is.  It's not a Rule 44.1

5  finding.

6      I was thinking of an appropriate analogy this afternoon,

7  and I thought, well, if you had a judicial opinion, for

8  example, that said, *In Maricopa County in Arizona, there is a*

9  *de facto policy of racial profiling*, that would be something

10 you might find in a judicial opinion.  It wouldn't be a finding

11 of law in Arizona that you're supposed to racially profile.

12 It's a finding that this practice is taking place, and the

13 government is having to deal with it.  Again, that is a factual

14 finding.  It's something that is dependent upon the record

15 before the court.

16     The other thing to note is that anything -- any sort of

17 instruction that could be crafted about this de facto price

18 control wouldn't really be very helpful for the jury, because

19 what does it mean?  Does it mean all of the firms were required

20 to meet a certain price?

21     Well, the evidence doesn't suggest that.

22     Does it mean some firms had to?  Or does it mean that they

23 were required to meet whatever price Nongshim negotiated with

24 the government?

25     That's not what the evidence shows.

1       So throwing this language out there wouldn't be remotely

2   helpful to the jury, and would only lead to confusion fusion as

3   well as not being a proper 44.1 topic.  So really the only

4   topic is that is addressed in the brief that could be

5   considered a Rule 44.1 topic is this question of whether or not

6   it's legal under Korean law to destroy documents.  And, for the

7   reasons that we've set out, that's not really the claim that

8   we're making.

9       And if there is an instruction on that, I think it would

10  be appropriate to cabin it in such a way that it made it clear

11  that that's not the claim we're presenting.

12          **THE COURT:**  Thank you.  All right.

13          **MR. EDELMAN:**  Super brief, Your Honor.  I just want

14  to point out with respect to the points that they've now

15  accepted on our revised Jury Instruction, and counsel's

16  comments about how we characterized the Supreme Court decision,

17  to the extent the Court does not believe that how we

18  characterized it was accurate, we are entirely comfortable

19  relying on the way Your Honor characterized it in your prior

20  rulings.  You've addressed the Korean Supreme Court decision in

21  various orders; I think, in particular, your spoliation order.

22  You summarized it.  And that would be acceptable to us, too.  I

23  think the way we characterized it here was accurate; but if

24  it's a question of making sure we accurately convey that, we're

25  confident that that can be accomplished.

1       THE COURT:  All right.

2       MR. EDELMAN:  The other point I just want to address

3   is this concept of "suspicious."  You know.  Maybe it doesn't

4   violate Korean law, but it's suspicious.

5       I don't think that's the appropriate way to think about

6   this, because it's not suspicious in a civil-law country that

7   says there's no obligation to retain these documents.  If -- if

8   we're in a society that just doesn't have the rules that we

9   have, and they aren't expected to retain documents or do

10  anything except in accordance with certain statutory dictates,

11  we can't argue to a jury that they're doing something other

12  than what their civil law requires is suspicious.

13      And that's what I think the fallacy is in the plaintiffs'

14  reasoning.  And that's why I don't think, if Your Honor

15  instructs on Rule 44.1, and the law is as Professor Hong

16  suggests, and as they can't otherwise find an expert to say,

17  then the defendants not implementing a document-retention

18  policy, or even changing their document-retention policy nine

19  months after the dawn raid, and doing it across 18 different

20  divisions with the assistance of a third party that didn't even

21  know about the KFTC investigation -- there is nothing that's

22  suspicious about that.  And we need to orient ourselves in

23  Korean law when we analyze that question.

24      THE COURT:  All right.  Thank you, Mr. Edelman.  All

25  right.

1          **MR. ALBERT:**  I feel like it's a *déjà vu*.

2          **THE COURT:**  Just one more thing.  Go ahead.

3          **MR. ALBERT:**  Good afternoon, Your Honor.  Lee Albert.

4     I just wanted to briefly address Mr. Edelman's discussion

5  with regard to the plaintiff questionnaires.  You were handed

6  up by Mr. Edelman --

7          **THE COURT:**  Okay.

8          **MR. ALBERT:**  -- a list of areas where the questions

9  seem to be similar, and some where it wasn't addressed at all.

10    Let's make it short.  The plaintiffs' questionnaire is

11  four pages long.  It's 29 questions, with a minimal number of

12  subparts.  The defendants' questionnaire is 10 pages long, 49

13  questions with a lot more subparts, which I'm just going to

14  briefly speak about for a second.

15    I would note when I took a look at the *Lidoderm*

16  questionnaire just prior to when that case was getting ready

17  for trial, that was 4 pages long, and only 21 questions.

18    A lot of the questions between the plaintiffs'

19  questionnaire and the defendants' questionnaire are fairly

20  similar, but the defendants' questionnaire breaches -- broaches

21  out into an area which I think is sort of designed to push the

22  story or push the evidence that they're going to be showing in

23  trial.  And -- and just, like, for instance, rather than just

24  questions about, Where did you go to college?  And what were

25  your majors?  If you can take a look at Question 39 and 40,

1    there's a lot of subparts to that.

2         Have you ever eaten ramen noodles?

3         And then there are Subparts A through F.  What kinds?

4    What brands?  What did the packaging look like?

5         Same thing with Question Number 40.  Have you ever

6    purchased ramens?  Where did you purchase it?  What did the

7    packaging look like?

8         Question Number 41.  Are you familiar with ramen

9    manufactured by --

10        And then they list the defendants, but it also lists

11   Nissin and Maruchan.

12        And again, they're trying to put forth their story to the

13   jury before the jury sees it.

14        And the point that I'm -- I guess I'm trying to make is

15   the fact that jury doesn't need to be overburdened with a bunch

16   of questions that -- that could be asked during the *voir dire*,

17   if the defendant's really interested in that.  And I'd ask the

18   court to accept the plaintiffs' questionnaire.

19             **THE COURT:**  Okay.  Thanks, Mr. Albert.

20             **MR. ALBERT:**  Okay.  Thank you.

21             **MR. LEBSOCK:**  One more.

22             **THE COURT:**  I didn't realize that you were saving

23   your 45 minutes to --

24        Go ahead, Mr. Lebsock.

25             **MR. LEBSOCK:**  You asked an earlier question.

1     On your tentative, when you were talking about your

2 tentatives, about *Royal Printing*; and no one has raised that.

3 So I thought --

4     We don't see any *Royal Printing* issues in this case, at

5 all.

6          **THE COURT:**  Okay.

7          **MR. LEBSOCK:**  It's an issue of standing.  And we are

8 either a Direct Purchaser -- there are four defendants:  Two

9 Koreans, two U.S.

10     So hypothetically, there could be a situation where the

11 jury would come back and find that there was a finding of

12 liability against the Koreans, but not the U.S. companies.

13     In that case, *Royal Printing* stands for the proposition

14 that because those U.S. subs are owned and controlled under

15 *Royal Printing* rubric, that we would have standing as the

16 holder of the Sherman Act -- our clients.  And so there is no

17 standing issue, which is what *Royal Printing* was about.  Either

18 we get all four defendants, or we get two of the four; but

19 either way, our clients would still hold the Sherman Act claim.

20 Okay.

21          **THE COURT:**  Okay.  Ms. Brass.

22          **MS. BRASS:**  We were waiting for them to use their 45

23 minutes to address the *Royal Printing*.  When we didn't, I

24 assumed that's because he conceded that only their actual

25 direct purchases were in the claim.

1    We have no *Royal Printing* issues here, Your Honor, because

2    we're fully claiming the benefits of *Royal Printing*.  I mean, I

3    think that's a little internally inconsistent.  They even

4    include *Royal Printing* in multiple of the Jury Instructions

5    they've submitted to Your Honor, including Number 31 and 34.

6    Sort of oddly, in their Pretrial Conference Statement,

7    none of the cases that they cite in the *Royal Printing* section

8    actually involve *Royal Printing* issues.  So I can see where

9    Your Honor's confusion arises from.

10    And as we've explained in both the objections to their

11    Jury Instructions and in our briefing, we do think that this --

12    well, we are claiming *Royal Printing* because we get it as a

13    direct purchase from the parent if it's from the parent.  And

14    we get it -- even if there's no finding of liability from the

15    U.S. sub, we still get the -- the claim through *Royal Printing*

16    to the parent.

17    We think that is wrong.  That is the issue that we're

18    raising.  We think that that decision is irreconcilable with

19    the law in *Royal Printing*, which says explicitly, *We recognize*

20    *this exception, because there is no one else to pursue the*

21    *claim, and otherwise, no one would recover*.

22    I respectfully submit that Mr. Birkhaeuser and

23    Mr. Kindall's clients are seeking to recover for that same

24    sale.  And Mr. Lebsock's clients cannot recover for that sale.

25    That's the issue that we lay out in the Pretrial Conference

1    Statement.

2        I -- I just don't understand the position here that there

3    is no *Royal Printing* issue.  Clearly, there is.  We think

4    Mr. Lebsock is not entitled to most of the damages he seeks,

5    because the *Royal Printing* exception is not available, because

6    there are other claimants seeking those exact same sales.

7        Thank you, Your Honor.

8        **THE COURT:**  Okay.  Mr. Lebsock, do you have anything

9    further to add?

10        **MR. LEBSOCK:**  I don't have anything further to add,

11    Your Honor.  The Ninth Circuit just revisited this issue in *ATM*

12    *Fees*, and reaffirmed the vitality of the ownership and control

13    exception that gives the first purchaser outside of the

14    conspiracy or the family of the conspiracy, through the own and

15    control exception, the right to the Sherman Act claim.

16        So our clients -- we call them "Direct Purchasers."  They

17    may be, if all four of the companies are found liable; or they

18    are in -- technically Indirect Purchasers, in the sense that

19    there was a sale from the Korean parent to the U.S. subsidiary,

20    and then on to our client.  That hundred percent owned

21    relationship gives our client, as the first purchaser outside

22    of the family, the Sherman Act claim.

23        The Indirect Purchasers are suing under state law.  And

24    they have their own claims under state law, which we are not --

25    that's not our claim.  Okay.

1      **THE COURT:**  So is your answer to my question in the

2  beginning about whether there are any Direct Purchaser cases

3  where they asserted the Sherman Act claims -- would be *ATM*?

4      **MR. LEBSOCK:**  So I am not --

5      The only cases that I am aware of are -- and repeatedly

6  this has been the law in this District and elsewhere, like

7  LCDs, CRTs, all of those cases, and had a component of the

8  Sherman Act claim; the Direct Purchaser claim -- purchases of

9  products containing the price-fixed product from an entity that

10 may have been a participants in the conspiracy, or may not have

11 been, but they were in an ownership or control relationship

12 with the price fixer.  So in all of those cases, the first

13 person outside of the conspiracy holds the Sherman Act claim,

14 or the family of the conspirators holds that Sherman Act claim.

15     That is the black-letter law in this Circuit.  It's *Royal*

16 *Printing*.  It's *ATM Fees*.  It's been reaffirmed over and over

17 again in all of these antitrust cases that are in this District

18 and elsewhere.

19         **THE COURT:**  All right.

20         **MR. LEBSOCK:**  Okay.

21         **THE COURT:**  Great.  Thank you.  All right.

22         **MR. RAABE:**  May I ask a couple logistical questions?

23         **THE COURT:**  Sure.

24         **MR. RAABE:**  So, I guess first, are we trying the case

25 in this courtroom?

1          THE COURT:  We are.

2          MR. RAABE:  Okay.

3          THE COURT:  Oh, no, we're not.  I take it back.

4    We're going to be upstairs, I'm afraid, on 19, because this

5    courtroom's going to be -- they're going to be putting in 21st

6    century technology.

7          MR. RAABE:  Okay.

8          THE COURT:  I think we'll be in Courtroom -- what is

9    it?  Twelve?  Eight?

10         THE CLERK:  Eight, on nineteen; what used to be

11   Judge Alsup's courtroom.

12         MR. RAABE:  Great.  Thank you.

13      With regard to the use of the clock, can we just get a

14   clarification?  When a party is cross-examining a witness --

15         THE COURT:  When you're in control of the podium, the

16   clock is ticking.

17         MR. RAABE:  Excellent.  And Your Honor probably knows

18   there's going to be deposition testimony presented.  And there

19   are a couple of issues with regard to that.

20      I think both parties would agree:  Right now each has

21   designated way too much testimony.  So I think we both -- and

22   the Court -- would benefit from setting a schedule to resolve

23   that, for two reasons.  One, so you don't get sandbagged at the

24   end with objections; and so the technical people can actually

25   cut the tapes.

1    So what we would propose is that we redesignate by next

2  Friday; the defendants redesignate by the Friday after that --

3  by this Friday.  The defendants would redesignate by next

4  Friday.  And then perhaps if the Court has time either after

5  jury selection or the day after jury selection to resolve any

6  objections at that point, if that would work --

7         **THE COURT:**  All right.  How do the defendants respond

8  to that?

9  (Discussion off the record.)

10         **MR. GALL:**  Well, I'm in favor of it, Your Honor.

11    Apparently, there's some further discussion going on.

12         **MS. BRASS:**  I think we're okay with that on the

13  Ottogi side, as well, Your Honor.

14         **THE COURT:**  Seems like a good idea.  So why don't we

15  do that?

16    And as far as resolving things, maybe on Thursday, while

17  we're waiting for the jury, if I give the voluminous

18  questionnaire that is being proposed, or at the end of the day,

19  once we've got a jury, we'll go through it.

20         **MR. RAABE:**  Terrific.  A related issue.  We are going

21  to work as best we can to minimize the time that the jury has

22  to watch video deposition testimony.  We made a proposal, like

23  a month or so ago, to the defendant; but haven't gotten any

24  clarity.  So we're going to ask Your Honor for permission to

25  essentially edit the deposition testimony.  So there will be an

 1    English question; and then a short snippet, a few seconds of

 2    Korean answer, just so the jurors will see that there was

 3    actually an answer; and then the English translation of the

 4    answer, for couple of reasons.

 5           **THE COURT:**  You don't have to explain the reasons.

 6    That seems so obvious.  Can we all agree?

 7           **MS. BRASS:**  Your Honor, there are some limited

 8    circumstances that we're happy to -- we've talked some to the

 9    plaintiffs about -- I'm happy to talk with them further

10    about -- where we think that the body language during the

11    answer in Korean is part and parcel of the answer, for

12    completeness, because it is so contrary to what the words

13    coming out of their mouths are.

14         We would at least like the ability to, on both sides,

15    counterdesignate such testimony where we do believe that the

16    video of the answer is necessary, for completeness for the

17    answer.

18         I don't have authority on behalf of Nongshim to offer

19    this, but we think if something like that were arranged, and it

20    was, you know, in mutual on both sides, we could probably get

21    to some kind of compromise.

22           **MR. DOSKER:**  Your Honor, speaking for Nongshim, yeah,

23    there was a recall on Saturday; but I was oversees and I

24    couldn't participate in it.

25         What Ms. Brass said is fine.  And I think with further

1  discussion with the plaintiffs, we can resolve it down; but we

2  have no desire to subject the jury to long videos of people

3  speaking a language that the jurors don't understand.

4        THE COURT:  It just makes sense, particularly since

5  I've apparently shortchanged you on time.

6        (Laughter in the courtroom.)

7        THE COURT:  That's good.  All right.  So work

8  together to make that happen.  And you obviously have to do

9  that very quickly, so that all of this can be technologically

10  produced by the time of the trial.

11        MR. RAABE:  Great.

12        Chris, do you have any?

13        Thank you, Your Honor.

14        THE COURT:  All right.  Anything else?

15        I will look forward to seeing you on May 10th.

16        Oh, Mr. Gall, I thought you were getting up to say, "Thank

17  you very much."

18        MR. GALL:  I beg you to file something supplemental

19  as we get more information about Mrs. Kim, and to support the

20  evidence that we would present on the other lawsuit.

21        THE COURT:  Yes.  So I will give you that, because I

22  have no idea what it is that's coming in, or when it's going to

23  come in; but the sooner -- there's -- there would be immediacy

24  required once an event occurs that makes you think that my view

25  of the evidence will change as a result of what's going on in

1    Korea.

2              **MR. GALL:**  All right.

3              **THE COURT:**  So I don't know when that's going to be,

4    but I would think that --

5              **MR. GALL:**  It won't be any more -- we'll do --

6    whatever the situation is, in seven to ten days.  We can't wait

7    any longer than that, certainly.  So we'll come back to the

8    Court with something short in that time frame.

9              **THE COURT:**  Yeah.  Don't feel that you have to, but

10   if you do --

11             **MR. GALL:**  I think this is important, Your Honor,

12   so --

13             **THE COURT:**  Go ahead.  And I'm sure it's important I

14   have no idea what's going to happen in the next ten days.  So

15   do make it short.  And then the plaintiffs will have -- I don't

16   know how much time.

17             **MR. KINDALL:**  Your Honor, we'll react very quickly.

18   And we realize we're under the gun.

19             **THE COURT:**  Yeah.

20             **MR. GALL:**  Thank you.

21             **THE COURT:**  Thank you.  And people who have to go

22   down to see Judge Kim, please do.

23             **MR. BIRKHAEUSER:**  Thank you, Your Honor.

24             **THE COURT:**  Thank you.

25       (At 4:06 p.m. the proceedings were adjourned.)

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3

4

5    _____    April 17, 2018
     Signature of Court Reporter/Transcriber    Date
6    Lydia Zinn

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25