UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE KOREAN RAMEN ANTITRUST
LITIGATION

Case No. 13-cv-04115-WHO

**ORDER FOLLOWING APRIL 16, 2018
PRETRIAL CONFERENCE**

Having heard argument at the April 16, 2018 Further Pretrial Conference, the following
pretrial legal issues and motions are resolved as follows.

I.  **REMAINING MOTIONS IN LIMINE**

   A.  **Plaintiffs' MILs**

   Plaintiffs' MIL No. 1 – Preclude Evidence Regarding DPPs' Ability, if Any, to Pass On
Defendants' Unlawful Overcharges and Suggestions of Multiple Liability.

   GRANTED in part.  Defendants are allowed, for IPP claims, to show that DPPs did not
pass on the full amount of overcharge, but defendants are not allowed to make a pass-on defense
against the DPPs or argue that DPP damages should be reduced because of the pass on.  Therefore,
the propriety of pass-on evidence will be determined on case-by-case basis and curative/limiting
instructions issued as necessary.

   Plaintiffs' MIL No. 2 – Exclude Evidence Regarding Plaintiffs' Failure to Mitigate Their
Damages

   GRANTED.  Mitigation is not normally an issue in horizontal price-fixing cases and given
plaintiffs' theory that defendants' positioned themselves as unique ramen products (at least during
the relevant timeframe); functionally identical supplier cases are inapposite.

Plaintiffs' MIL No. 5 – Exclude Any Reference to the Amount of the Samyang Foods Co., Ltd Settlement.

GRANTED. The fact of the settlement can be introduced by defendants to show bias. However, the amount of the settlement is not, in and of itself, so exceptionally low to make additional inferences regarding the amount of the settlement relevant to bias (unlike the cases relied on by defendants).[1] On the other hand, the risk of the jury using the settlement amount improperly is high per Federal Rule of Evidence 408.

Plaintiffs' MIL No. 6 – Exclude Witnesses From the Courtroom

GRANTED: Fact witnesses are excluded by Standing Order. Expert witnesses are not.[2]

Plaintiffs' MIL No. 9 – Issue a Finding That a Foundation Exists to Admit Statements Under the Co-Conspirator Exception (FRE 801(d)(2)(E))

GRANTED. Generally, a sufficient foundation of a "conspiracy" has been shown such that statements, if otherwise admissible, could be considered co-conspirator statements. Each statement sought to be introduced, however, will be analyzed on a case-by-case basis.

Plaintiffs' MIL No. 11 – Exclude References to Pornography on Samyang Hard Drive

DENIED. Defendants are allowed to challenge plaintiffs' characterization of and purpose of the SHD by noting the SHD contained pornography that was deleted by the Samyang auditor.

Plaintiffs' MIL No. 12 – Exclude Certain Statements of Daesik Hong

> "Ottogi searched the documents kept internally but was only able to locate a portion of the documents generated in the price-increase decisionmaking processes in 2002 and 2004." Hong Merits Report [ECF No. 620-4] at ¶18.

Plaintiffs argue Hong has no personal knowledge of what Ottogi did in response to receiving a subpoena from the KFTC and he should not be allowed to sponsor such evidence in

---

[1] Plaintiffs offer a host of unrebutted reasons why the amount of the Samyang settlement is so much lower than the amount of damages they seek from defendants at trial.

[2] In my February 2, 2018 Order, I addressed Plaintiffs' MIL No. 7/Ottogi's MIL No. 2 and granted Plaintiffs' MIL No. 8. I laid out the parameters of how the parties may refer to the KFTC investigation and provided a preliminary version of a jury instruction addressing the KFTC investigation and Korean Supreme Court decision. The final form of the jury instruction (which defendants address in Dkt. No. 727), will be determined on May 10, 2018.

1    the event that Ottogi declines to bring those with knowledge to testify before the jury.

2         DENIED without prejudice to being raised at trial.  Any objection will be GRANTED and

3    testimony excluded unless Hong's knowledge of and foundation for what Ottogi did and what

4    Ottogi found can be established.

5              "In light of the on-site investigation where KFTC conducted the
              investigation practically in a manner of search and seizure and did
6              not specify what documents they had in possession, Ottogi was
              neither incentivized nor capable of withholding documents or
7              discarding them." *Id.*

8         Plaintiffs argue Hong is not a psychologist or trained interrogator and he is not qualified to

9    testify about Ottogi's response to the KFTC subpoena (because he lacks personal knowledge), or

10   what motivated Ottogi to respond in the manner that it did (because he has no training as to what

11   "incentivizes" certain conduct).

12        DENIED as to "incentivized," as long as a foundation is laid at trial (*i.e.*, that the KFTC

13   typically does not disclose the aim of its investigation or what documents are taken).  GRANTED

14   as to "capable" because it is unclear what, if any, basis Hong has for that statement.

15             "By the time the relevant person at Ottogi received the request for
              document submission, the investigative official had already entirely
16             searched the PC of the relevant persons and Ottogi Korea was not in
              a position to know what documents the investigative officials
17             secured." Hong Merits Rebuttal [ECF No. 616-6] at ¶18.

18        Plaintiffs argue Hong has no personal knowledge of what Ottogi knew about the scope of

19   the KFTC's onsite investigation.

20        GRANTED in part.  This hearsay statement presumably serves as a basis for Hong's

21   opinion that Ottogi was not "incentivized" to withhold or destroy evidence.  Hong has explained

22   the basis for his understanding that, generally, companies being investigated do not know what

23   documents the KFTC has secured, but he cannot opine on what Ottogi in fact knew or didn't know

24   unless there is a basis for that opinion.

25             "Given the volume of materials to which the KFTC already had
              access, it does not make sense that Ottogi Korea would modify the
26             'unaltered' memoranda and attempt to pass them off as original,
              final memoranda, without informing the KFTC." Hong Merits
27             Rebuttal [ECF No. 620-4] at ¶18.

28        Plaintiffs argue Hong is not the proper vehicle for bringing before the jury what Ottogi's

subjective intent was in altering certain documents before submitting them to the KFTC. He's not a psychologist or trained interrogator, and the introduction of hearsay about why Ottogi thought it was proper to alter the documents is not substantially outweighed by the prejudicial effect of presenting these justifications to the jury.

GRANTED in part. Hong can testify generally that because a company does not know what the KFTC has secured or has access to, it does not make sense that a company would alter documents. But he cannot opine on what Ottogi knew or did unless there is a basis for that testimony.

> "If Ottogi Korea intended to conceal that these approximations were composed based on draft memoranda, it would make no sense that these documents were still available and produced in this litigation."
> *Id.*

Plaintiffs argue Hong is not a psychologist or trained interrogator and cannot properly testify about Ottogi's intentions, or why it responded to the KFTC in the manner that it did. GRANTED in part. Hong can opine generally on what a company might do or intend to do, but not specifically on what Ottogi intended or did unless there is a basis for that testimony.

Plaintiffs' MIL No. 13 – Exclude Testimony of Sung-Joo Maeng Unless and Until Plaintiffs Offer Testimony Subject to Impeachment with Extrinsic Evidence

DENIED. If Kang is a witness for plaintiffs, defendants can challenge his credibility using his prior allegedly untruthful statements.

**B.  Nongshim's MILs**

Nongshim's MIL No. 1 – Exclude Reference to and Admission of SHD Documents because: (a) Unauthenticated; (b) Inadmissible Under the Rule of Completeness; (c) Inadmissible Under the Best Evidence Rule; (d) Inadmissible Hearsay Without Exception

DENIED. Admissibility will be determined on a case-by-case basis. Authentication may be provided by Samyang witnesses in conjunction with plaintiffs' expert Vaughn and forensic analysis. The rule of completeness and best evidence rule do not preclude admission. Hearsay will be determined on a case-by-case basis.

1    <u>Nongshim's MIL No. 2</u> – <u>Exclude Statements and Testimony by Certain Samyang</u>

2    <u>Employees as Inadmissible for Lack of Personal Knowledge and Hearsay Without Exception,</u>

3    <u>including (a) Testimony Regarding the Alleged Representatives' Meeting in Late 2000/ Early</u>

4    <u>2001; (b) Testimony About Alleged Information Exchanges Between Competitors; and (c)</u>

5    <u>Samyang Witness Statements Submitted to the Korean Fair Trade Commission</u>

6        DENIED.  Admissibility will be determined on a case-by-case basis.  Generally, as

7    discussed in the Order on the motions for summary judgment, the Samyang witnesses provide

8    some basis for their opinions (even if disputed or "walked back" in deposition).  The Samyang

9    witness statements also appear to be made adequately close in time to the at issue events, many

10   were subject to later adoption through deposition or otherwise under oath, and they may otherwise

11   be admissible under various hearsay exceptions.

12       <u>Nongshim's MIL No. 3</u> – <u>Exclude Statements of Alleged Co-Conspirators</u>

13       DENIED.  Admissibility, including applicability of hearsay exceptions, for alleged co-

14   conspirator statements will be determined on a case-by-case basis.

15       <u>Nongshim's MIL No. 4</u> – <u>Exclude Rhetoric or Generalizations about Korean or Asian</u>

16   <u>Business Culture, Including "Chaebol"</u>

17       DENIED in part.  Consistent with my prior ruling on defendants' motion to exclude the

18   testimony Professor Haggard, "plaintiffs should be careful when eliciting testimony on Korean

19   business 'culture' from Haggard at trial.  Attempts to suggest that Korean corporate culture

20   tolerates or encourages illegal activity (on behalf of its executives or lower-level employees) will

21   not be permitted."  Dkt. No. 668 at 49.

22       <u>Nongshim's MIL No. 5</u> – <u>Prohibit Counsel From Commenting On The Absence Of</u>

23   <u>Witnesses Who Are Not Within The Subpoena Power Of This Court</u>

24       GRANTED generally.  Counsel shall not comment about missing witnesses who are not

25   within the subpoena power of the court.

26

27

28

5

### C.      Ottogi's MILs

Ottogi's MIL No. 4 – <u>To Exclude References To Unrelated Business Practices, Corruption, And Politics</u>

GRANTED, as agreed.

Ottogi's MIL No. 5 – <u>Exclude Reference to Ottogi America, Inc.'s Former Attorney, Stephan Y. Kang, who is in litigation against Ottogi America in Superior Court in Southern California</u>

Plaintiffs argue the litigation in Superior Court might be relevant to level of managerial control exercised by Ottogi America (OA, as opposed to the more-distant Ottogi Korea, OK), and Cox's profitability analyses might be implicated by allegations in state court case that OA was significantly defrauded.

GRANTED, unless plaintiffs can show how testimony from the Superior Court case is directly relevant to specific issues in this trial.

## II.      DISPUTED LEGAL ISSUES

### 1.      Pass-on Defense

Generally, only evidence directed to showing what portion of the overcharge IPPs paid (consistent with the underlying state laws) is permissible and defendants shall not solicit evidence for the sole purpose of showing that DPPs "passed on" the overcharge or argue that the DPP damages should be reduced because of the pass-on defense. Jury instructions should be sufficient to avoid prejudice to the DPPs and ensure the jury awards only the damages available under the different sets of applicable law.

### 2.      Classwide/Aggregate Damages

Plaintiffs are allowed to pursue classwide/aggregate damages and defendants may not argue otherwise.

### 3.      Treble, Duplicative Damages

If the DPPs are awarded the full amount of the alleged overcharges and the IPPs are awarded the amount of damages available under the various state laws (*i.e.*, in at least some instances, the portion of the overcharges they paid), there is no due process problem with respect

to "duplicative" damages or trebling any awards.

### 4. Applicability and Scope of *Royal Printing*

In *Royal Printing*, the Ninth Circuit held that *Illinois Brick* "does not bar an indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-conspirator." *Royal Printing v. Kimberly Clark Corp*., 621 F.2d 323, 326 (9th Cir. 1980). The concern recognized by *Royal Printing* was that the direct purchasers (there, wholesalers) were owned or controlled by the parent conspirator and, therefore, the direct purchasers would not be inclined to sue and the injury would go unchallenged. In that limited exception, the Ninth Circuit has approved an action under federal antitrust laws by an otherwise indirect purchaser (and allowed Royal Printing to sue for the entire amount of the injury, even if some amount was passed on).

Defendants argue first that the Ninth Circuit's exception is contrary to Supreme Court precedent and has been abrogated by *Kansas v. UtiliCorp United, Inc*., 497 U.S. 199 (1990), where the Supreme Court cautioned against the creation of exceptions to federal antitrust standing. *But see In re ATM Fee Antitrust Litigation*, 686 F.3d 741, 749 (9th Cir. 2012) (affirming that the *Royal Printing* exception is still controlling law in the Ninth Circuit).

Defendants also argue that the *Royal Printing* exception does not apply here because some of the sales went to direct purchasers not owned and controlled by the Korean companies (*e.g*., OK's use of domestic Korean exporters prior to 2005 [when OA was formed] and Nongshim Korea (NSK) sold to independent wholesalers who were not associated with Nongshim America, NSA). They also contend that even the Ninth Circuit in *Royal Printing* did not allow the indirect purchasers to sue the owned or controlled wholesalers – the liability remained with the defendant-manufacturers – and therefore *Royal Printing* cannot be used to make NSA or OA liable.

*Royal Printing* was primarily concerned with standing for entities who would (given a first sale to an owned/control subsidiary or other related entity) hold the right to assert Sherman Act claims as direct purchasers. It is unclear whether and how the *Royal Printing* standing exception might apply in this case. I conclude that *Royal Printing* is still valid and applicable precedent in this circuit, but I defer determining how and whether it might apply to the parties and claims in this case until I see how the evidence comes in and whether there is a need to issue a jury

instruction under *Royal Printing*.

### 5. Alter Ego

In the first round of pre-trial briefing, defendants argued that plaintiffs were belatedly attempting to assert alter ego as a "last ditch" theory to keep NSA and OA on the hook despite the lack of direct evidence of their participation in any alleged conspiracy. Plaintiffs responded that the operative complaint is replete with assertions that the Korean and American defendants has "interlocking control" and the American subsidiaries were "owned and controlled" by the Korean companies. Plaintiffs, however, seemed to acknowledge that alter-ego was not expressly pleaded by relying on cases and Rule 15(b)(1) suggesting they are allowed to raise issues and/or seek amendment (if necessary) up to the eve of trial. Plaintiffs also asserted that is no prejudice to defendants from their assertion of alter ego, noting that Professor Haggard opined extensively on ownership and control of NSA and OA by the Korean defendants and that defendants had the opportunity to depose him and counter those opinions with their own expert.

Following the first Pretrial Conference, I allowed the parties to file additional briefs on alter ego and heard argument at the Further Pretrial Conference. In defendants' supplemental briefing, they argue that plaintiffs' alter ego theory is based on "outside reverse corporate veil piercing" which does not exist under California law. Also, they contend that they have been prejudiced by plaintiffs' failure to plead and raise this theory as they have not identified an expert or prepared witnesses and exhibits to rebut it.

As to their first point, I agree with defendants that California courts have rejected attempts by outsiders to reach *corporate* assets based on the liability of a corporate *shareholder*. *See, e.g., Postal Instant Press, Inc. v. Kaswa Corp.*, 162 Cal. App. 4th 1510 (Cal. App. 4th Dist. 2008). The concerns that animate those decisions include protecting "innocent" shareholders and corporate creditors, preventing judgment creditors from avoiding "normal judgment collection procedures," and the availability of other remedies. *Id.* at 1513. However, the aim of plaintiffs' theory here is different; that the Korean defendants will still be liable for sales of ramen in America by their American subsidiaries, even if the American subsidiaries did not actively participate in the price-fixing conspiracy in light of the control and influence of the Korean parent companies over their

8

subsidiaries.  The concerns in the cases that have rejected outside reverse corporate veil piercing do not apply to this situation where both the parent and subsidiaries were directly involved in the transactions that gave rise to plaintiffs' claims (if not direct liability for all involved).  The allegations here are more akin to direct alter ego liability.  *See, e.g., Clark v. Dana Woody & Associates, Inc.*, 09CV2931-CAB DHB, 2013 WL 544030, at *3 (S.D. Cal. Feb. 12, 2013) ("Reverse corporate piecing has nothing to do with alter ego liability between parentsubsidiary or sister companies.").

As to prejudice, plaintiffs reiterate their argument that they have continually alleged corporate control by the Korean defendants over the American subsidiaries since the beginning of the case, and that Haggard opined extensively on the control as well as the overlap of personnel and evidence of the Korean companies making decisions for the American companies.  I recognize that defendants have not had the opportunity to retain an expert on alter ego – although experts on that issue are not typical, as alter ego is a question of law based on facts – but defendants do have Daesik Hong to rebut Haggard on the issues of control by the Korean defendants over the American defendants.  With respect to preparing witnesses or gathering documents, defendants did not make a persuasive showing that they would not be able to readily do so at this juncture.  If defendants need to designate additional witnesses and/or rely on as-yet unproduced documents that are directly relevant to the issue of alter ego, they may do so.[3]

As a final word on alter ego and the somewhat atypical theory plaintiffs raise, as defendants pointed out during the Further Pretrial Conference, almost all of the cases cited by both sides in their supplemental briefing are *post-judgment* collections cases.  This issue may be revisited post-trial as necessary.

### 6.    Discovery or Injury Statute of Limitations Rule

I will not rule on this issue pre-trial, but will address it post-trial as necessary.[4]

---

[3] And plaintiffs cannot complain, given that they failed to mention "alter ego" by its name until December 2017.

[4] The remaining two legal issues – No. 7, the scope of the duty, if any, to preserve documents and materials under Korean and No. 8, defendants' notice of intent to rely upon foreign law pursuant to F.R.C.P. 44.1 – will be addressed below.

### III.    MOTIONS TO EXCLUDE

#### A.    Motion to Exclude Mangum

Defendants move, again, to exclude Mangum's testimony arguing: (1) he fails to accurately define the product market, by defining Korean noodles as a distinct product without adequate support and by ignoring cross-price elasticities and consumer sensitivity to price changes; and (2) his overcharge model does not measure what it purports to measure.

**Relevant market**.  Defendants contend that Mangum's market definition is arbitrary and unsupported.  Defendants argue Mangum's limiting his analysis to Korean noodles, and excluding Japanese and Chinese products that dominated the broader market, cannot stand because it is not supported by a cross-elasticity or other economic analysis (the predominant tools used to define antitrust markets) and is based only his own "qualitative" assessments (based itself on a few instances of marketing statements made by defendants) and an inaccurate price-point analysis. Defendants argue that in his effort to carve out Korean Ramen from other ramen products being sold in the U.S., Mangum failed to conduct any cross-price elasticity study, consider SSNIP,[5] and rigorously consider the *Brown Shoe* "practical indicia."[6]  His opinions, according to defendants, are excludable under *Daubert*.

Plaintiffs respond that in a horizontal price-fixing case under Section 1 of the Sherman Act (as opposed to a monopoly case under Section 2) there is no need to define a relevant market within which defendants exercised market power. *Knevelbaard Dairies v. Kraft Foods, Inc*., 232 F.3d 979, 986 (9th Cir. 2000).  They assert, nonetheless, that Mangum looked to defendants' own documents and the concentrated nature of the market in Korea and addressed the *Brown Shoe* practical indicia.  They claim Mangum then went farther in his analysis of the relevant market to rebut Cox's belief – stated in Cox's reply report, the first time that "market" definition was fully

---

[5] As discussed in the DOJ & FTC Horizontal Merger Guidelines considering impacts of "small but significant and non-transitory increase in price" (SSNIP) on market.

[6] The *Brown Shoe* practical indicia are: (1) industry or public recognition of the market as a separate economic entity; (2) the product's peculiar characteristics and uses; (3) unique production facilities; (4) distinct customers; (5) distinct prices; (6) sensitivity to price changes; and (7) specialized vendors.  *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962).

engaged with by any expert – that competition from Nissin and Maruchan could restrain defendants' pricing. Finally, plaintiffs challenge Cox's own price-elasticity study, pointing out that Cox used products from *after* the conspiracy period, from a single geographic area, and for only 4 products; all errors that Mangum criticizes in his *Daubert* declaration submitted in opposition to *this* motion.[7]

Defendants' attacks on Mangum's market definition are, for purposes of this horizontal price fixing case, more appropriate for cross-examination than exclusion under *Daubert*. As a starting point, Mangum's opinions regarding the alleged overcharge on products sold in the U.S. were based not only on an analysis of defendants' market power (and related market definition) but more so on other, significant (albeit disputed) evidence. That evidence includes the strong institutional connections between the Korean and American companies (such that pricing in Korea necessarily, according to Mangum, impacted prices in the U.S.), price correlations between Korean price increases and increases in the U.S., and Mangum's regression analysis showing price increases outstripped cost increases (generally) by a significant margin.

In addition to these analyses, admittedly to bolster his other evidence of overcharge and damage, Mangum also looked to market power and relatedly market definition to confirm his view that the relevant market is limited to Korean ramen noodles. There is no dispute that Mangum did not perform any cross-elasticity of demand studies or show how the market reacted to SSNIP. But Mangum did consider some of the more significant – as relevant to the allegations in this case[8] – *Brown Shoe* practical indicia to support his belief that the relevant market is limited to Korean ramen noodles. That defendants believe Mangum ignored "third-party" market research that lumped all instant noodle manufacturers together, "cherry-picked" statements from defendants' own documents, or that some of the non-Korean instant noodle manufacturers started making "Korean-style" products (according to plaintiffs, only at the end of or after the relevant conspiracy

---

[7] Defendants separately move to exclude Mangum's "*Daubert*" declaration, because it allegedly asserts new opinions.

[8] Defendants point out that Mangum failed to consider some of the *Brown Shoe* indicia like "unique production facilities." But not all *Brown Shoe* factors apply in all cases.

period), can be explored on cross-examination.

**Overcharge Model.** Defendants argue, again, that Mangum's model is "misspecified" and exhibits "extreme" multicollinearity and absurd results such that it must be excluded under *Daubert*.[9] Defendants point out that Mangum made changes to his regression model after class certification and now includes new composite data series, 2010 through 2012 transaction data (despite his prior concerns), and changes to some of the explanatory variables. According to defendants, Mangum still fails to account for what they consider are "significant variables," including changes in taste, increased advertising, expansions into new markets, and global economic trends. Mangum also continues to include, according to defendants, problematic variables (including incorrect time trends and trans-pacific shipping costs), and continues to use only one Nongshim product (and no Ottogi products) to create his cost variable. These errors, among others, lead to defendants' characterized "severe multicollinearity" and implausibility (because, according to them, the consideration of the correct inputs shows that the defendants made essentially no profit during relevant timeframe).

Plaintiffs respond that I have already largely rejected these exact arguments at class certification and the question of whether the wrong data was used or variables not included or improperly included, goes to weight and is subject to attack at trial. The opposition then points to evidence that substantiates Mangum's opinions (chaebol/institutional arrangements, correlation between prices changes in Korea and U.S., and the fact that U.S.-produced products increased in price around the same time imported U.S.-sold products increased in price).

The essence of defendants' arguments is the same as the ones I have already rejected. Defendants' points about errors and failures incorporated into Mangum's model may be well-

---

[9] "Multicollinearity occurs when several variables are correlated with each other—that is, they overlap in the sense that they each capture some part of the same effect—such that it is impossible from the data set to objectively determine the influence of one variable as opposed to the influence of these others." *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 1282293, at *26 n.34 (S.D.N.Y. Mar. 28, 2014). As "predictors become more correlated, the estimate of individual regression coefficients become more unreliable and, thus, the effects of the individual independent variables become difficult to measure accurately." *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 834 n.13 (6th Cir. 2011).

taken by the trier of fact, but they go to weight and not admissibility.

**Non-Economic Opinions**. Finally, defendants move to exclude "non-economic opinions" outside of Mangum's expertise; specifically: (a) opinions on spoliation, (b) expectations of U.S. customers about whether Korean price increases would impact the U.S. market and (c) comments about chaebols. Plaintiffs contend Mangum should be allowed to opine that the "altered documents," the industry recognition that Korean prices would impact U.S. prices, and Professor Haggard's analysis about control in chaebols all support his economic theories and analyses.

These topics are not outside his expertise or bounds of the topics for which Mangum was disclosed and he can rely on them, as he relied on defendants' own documents and industry trends, to support his opinions.

The motion to exclude is DENIED.

**B.     Motion to Exclude Ackerberg**

Similar to the attacks on Mangum, defendants argue that Ackerberg failed to define the relevant market or employ a reliable economic analysis to do so, and they again attack his damages model because it does not reflect economic reality and is based on unsupported assumptions.

**Market Definition**. Ackerberg relies on similar practical indicia as Mangum to argue Korean Noodles are a distinct market. Defendants challenge Ackerberg's reliance on these qualitative indicators without "rigorously" reviewing the *Brown Shoe* indicia and note that he did not consider SSNIP or perform a cross-elasticity analysis.

Plaintiffs respond, as above, that because proving the relevant market is not an element of their claim, they did not need to perform a cross-elasticity test or determine the impact of SSNIPs. Instead, Ackerberg "as part of his qualitative evaluation of injury and damages" considered any restraints on defendants' ability to raise prices. Plaintiffs admit that Ackerberg did not do a cross-elasticity of demand analysis. However, he analyzed data to show that prices for the Korean ramen increased 3 to 5 times the amount of non-Korean "noodles" in the general noodle market, yet demand still grew by 3 times during the same period. This indicates no cross-elasticity of

demand and supports plaintiffs' position that the relevant market is Korean Noodles.[10]  Finally, as above, plaintiffs note alleged weaknesses in Cox's last-minute cross-elasticity study – it relies on post-class period data, is of limited geographic scope, and concerns limited products.

As with Mangum, in light of the nature of the claim here and Ackerberg's other evidence of overcharge and damage, defendants' attacks on Ackerberg go to weight and not admissibility; they are appropriate for cross-examination, not exclusion.

**Damages Model**.  Defendants initially challenge the collusion coefficient variables on which Ackerberg relies, arguing that as a result his model behaves "bizarrely" and contains highly correlated variables.  Plaintiffs respond that high multicollinearity itself is not problematic where the underlying standard error is within range, as all variables were in Ackerberg's model.  These challenges are repeats of the arguments made with respect to Mangum (and on class certification) and are rejected.

Particular to Ackerberg's analysis, however, defendants additionally challenge: (a) the way Ackerberg determined the "pass-through" rate of 100% (looking at data from two distributors and four retailers and ignoring Ottogi data); and (b) how he estimated the volume by state of end-purchaser purchasers, based on Korean-population and using incomplete sales data that post-dated the class period multiplied by All-Commodity-Volume (ACV) percentage data across all states. Defendants point out that Ackerberg didn't even have ACV data for six states plus the District of Columbia (so he used the percentage of people identifying as Korean, Hispanic, or Chinese in 2010 as a basis for his calculations for those states).

Plaintiffs respond that, with respect to the pass-through argument, I found Ackerberg's analysis robust enough at class certification and should conclude the same now, as defendants do not put forward new or additional arguments.  With respect to the second argument, plaintiffs acknowledge that Ackerberg had to create a model (given the lack of data) and argue that his model utilized reasonable data to estimate the state-by-state percentages of sales.  While defendants make much of the fact that Ackerberg's regression analysis for sales predicts twenty

---

[10] Defendants argue the "noodle market" is flooded by less expensive products and Ackerberg should have made a more refined analysis of comparable products.

14

1    five instances of negative sales per capita, plaintiffs argue that is the result of extremely low sales

2    in three states (Alabama, Arkansas and Wyoming) and statistically speaking is insignificant

3    "noise" that Ackerberg appropriately corrected to zero (instead of negative).

4      Defendants' attacks, again, go primarily to the weight of Ackerberg's opinions and not

5    their admissibility. The motion to exclude is DENIED.

6          **C.**      **Motion to Strike Mangum and Ackerberg's *Daubert* Declarations**

7      As noted above, in opposing the motions to exclude their testimony, Mangum and

8    Ackerberg filed "*Daubert*" declarations in opposition. Defendants move to exclude those

9    declarations, arguing that plaintiffs are using the *Daubert* motions as an excuse to "shore up" and

10    offer new "opinions." The allegedly new Mangum opinions address his use of pricing variables,

11    benchmark data, additional analysis based on newly produced documents, and analysis of Ottogi

12    data. Dkt. No. 650 at 3. Allegedly new Ackerberg opinions address his thoughts on cross-

13    elasticity, why he failed to perform a quantitative analysis of market definition, and a discussion of

14    Horizontal Merger Guidelines. *Id*.

15      Defendants argue that many (but admittedly, not all) of these topics were addressed in

16    Cox's opening merits report, giving Mangum and Ackerberg sufficient opportunity to redress

17    them in their rebuttal merits reports. Plaintiffs respond that because the parties filed simultaneous

18    reports and defendants' first relied on some of Cox's opinions in their *Daubert* motions, they

19    should be allowed to rely on the Mangum and Ackerberg *Daubert* declarations. They argue that

20    the most significant arguments – about cross-elasticity and SSNIP and regarding the antitrust

21    market definition – were not included in Cox's opening merits report but only in rebuttal and so

22    they should be allowed to respond as they are the prime basis of the *Daubert* motions. They also

23    argue that any other opinions are responses to defendants' reliance on new or fleshed out opinions

24    in Cox's reply and raised in the *Daubert* motions.

25      In light of the way the reports were sequenced in this litigation, the motion to strike is

26    DENIED. The Mangum and Ackerberg declarations submitted in support of plaintiffs'

27    oppositions to the motions to exclude were filed primarily (but not solely) in response to the

28    defendants' expert (Cox) addressing market definition and cross-elasticity in the U.S. ramen

market for the first time in his rebuttal declaration. Mangum and Ackerberg are entitled to address Cox's new opinions, whether through the *Daubert* declarations or at trial. As to the other allegedly new information in Mangum's *Daubert* declaration (pricing variables, benchmark data, additional analysis based on newly produced documents, and further analysis of Ottogi data), these opinions are not obviously new, although perhaps refined in light of additional information, and are certainly not outside the scope of the opinions and topics about which he has already opined and been deposed.

### D.   Motion to Exclude Vaughn

Defendants move to exclude the opinions of Vaughn (plaintiffs' computer forensic investigator) regarding: (a) how NSK responded to the KFTC investigation (Vaughn Report ¶¶ 100-107); (b) his view as to the credibility of Ottogi Korea testimony regarding preservation of documents (*Id.* ¶¶ 36-39); and (c) his opinions as to why Ottogi documents did not appear in the production in this case given his lack of knowledge of Ottogi's document retention policies. *Id.* ¶¶ 33-35. Defendants argue Vaughn's background in forensics and limited experience with U.S. law enforcement do not qualify him to opine on whether NSK and OK employees' conduct was suspicious and whether those employees or companies should have been required to keep and/or produce documents for this case.

In paragraphs 33-35 (re Ottogi document production) Vaughn opines:

> **Ottogi Memos Produced by the KFTC Show Communication and Involvement of Ottogi and Samyang, but Ottogi Failed to Produce these Original Memos to Plaintiffs**.
>
> 33. The documents OTGKR-0001011T and OTGKR-0001014T are Ottogi memos dated June 2007 and July 2007 respectively, which I understand were KFTC exhibits because these documents have the KFTC's "SoGap" marking. I understand that these memos were introduced into evidence against Ottogi in a KFTC proceeding that was pending in the Korean court system.
>
> 34. OTGKR-0001011T (which is marked as SoGap 132), drafted by Jae-Hwan Jung, purports to "analyze the market trends and sales reaction after the ramen price increase of Nongshim and Samyang to determine the timing of our price increase." Among other discussions concerning Nongshim and Samyang, this memo suggests that the author had communicated with "the Samyang Marketing Office" regarding sales and giveaway products. OTGKR-0001014T (marked as SoGap No. 133), which was authored by an

unnamed member of "Marketing Team 3", states that the author had a "Phone conversation with Jong-Moon Yui, Assistant Manager of Samyang – Reaction following the price increase".

35. I was interested in reviewing the metadata of the natives of OTGKR-0001011 and OTGKR-0001014 and requested that counsel search for them in Ottogi's document production and provide them to me. I was informed that the natives of these documents were not located in the Ottogi production. I was provided with the testimony from Bang-Wan Ku—a witness that Ottogi designated as its person most knowledgeable on a number of subjects, including the KFTC investigation. Mr. Ku stated that he deleted emails from his computer starting from June 3, 2008: "There's just too many things. I can't recall them specifically one by one." Bang-Wan Ku Tr. (4-8-2016) at 85:11-86:21. Ku further testified that deletion of documents by Ottogi's Marketing Team during the KFTC investigation was "entirely possible within the company." Id. at 90:6-23. Ottogi's inability to produce these documents in native format means that I am not able to analyze who is recorded as the Author and/or Last Author in the metadata.

Vaughn Report, ¶¶ 33-35.

There is nothing in these paragraphs that is outside of Vaughn's area of expertise. He states facts regarding what Ku said and facts of what was produced or not produced, as shown by plaintiffs' view of the record in this case. He does not opine on why documents weren't produced.

In paragraphs 36-39 (credibility of Ottogi witnesses), Vaugh states:

**Declarations from Ottogi Korea Employees, Counsel Attempt to Explain the Altered Memos**

36. I have read the Declarations from Young-Hyun Doh and Bang-Wan Ku of Ottogi Korea. They state that when asked for historical pricing information by the Korea Fair Trade Commission, they could not find the final versions of the 2004 and 2002 memos, and instead they sent their "best approximations" of the memos to the KFTC. My understanding is that by "best approximations" they are referring to the altered memos that were identified. As stated above, the difference in content and length between the Unaltered Jan. 2004 Memo and the Altered Jan. 2004 Memo was roughly half – the Unaltered Jan. 2004 Memo is twice as long as its Altered 2004 counterpart. In Paragraph 7 of his Declaration, Mr. Ku states that the length of the 2004 Memo was "reduced in length from seven pages to three pages, in order to conform to the length and style similar to the final memoranda used in other years."

37. While the overall length of the memo was certainly changed, it is also clear that substantial edits and deletions were also made – whole product pricing table summaries were removed along with each of the nineteen references to "Nongshim." The Altered Feb. 2005 Memo removed every reference to Samyang and Paldo (aka Yakult), and only maintained 1 reference to Nongshim, but not in the "Purpose" statement where Nongshim had been listed in the

Unaltered Feb. 2005 Memo. I believe this calls into question whether the edits and deletions were entirely based on memo "length and style." When one considers that the stated "Purpose" in the altered memos were changed – the unaltered memos specifically mentioned the price increase of Ottogi's competitor(s) as being the cause for price increases whereas the altered memos make no mention of these companies as the reason, and instead refer only to "raw material" prices – it begs the question as to whether the alterations made were based on document length. Again, the letter from the KFTC explicitly indicated that submitting false information would result in fines.

38. As a retired law enforcement investigator, these discrepancies raise suspicion. During my 16-year career, I investigated many matters and have reviewed many documents containing conflicting statements. I was also assigned to the fraud unit as a full-time investigator during the final years of my law enforcement career. In my investigative capacity, the underlying nature of the investigation is not for me to ultimately opine on, but it was common practice for me to point out discrepancies of this nature.

39. I have an understanding that the general nature of the dispute in this matter is an alleged conspiracy to increase pricing. I also understand that the KFTC was investigating this allegation and as such received these altered memos rather than the draft memos. The timing of the alteration of these memos, combined with the removal of all references to companies Nongshim, Samyang, and Yakult, removal of certain pricing charts, and the changing of the purpose of the memos all seem suspect.

Vaughn's testimony in paragraphs 36 and 37 are permissible and within the scope of his expertise. As to paragraphs 38 and 39, Vaughn's characterization of the edits as "suspicious" or "suspect" is not apparently supported by his prior experience. He can opine on discrepancies between versions of documents that call into question the "editing" justification, given the nature and significance of the information removed.

In paragraphs 100-107 (how NSK responded to KTFC investigation), Vaughn states:

The Statements of Nongshim's Joong-Rak Lee Regarding Knowledge of the 2008 KFTC Letter and Investigation

100. I have reviewed a translation of OTGKR-0018191T which is a translated letter from the KFTC dated June 27, 2008. This letter requests that materials be submitted by July 6, 2008 and goes on to detail the documents that are being requested.

101. I have also reviewed the Declaration of Joong-Rak Lee. In it, Mr. Lee indicates he had "…never seen or otherwise heard about Plaintiffs' Exhibit 12, which is dated June 27, 2008 and bears a marking of OTGKR-0018191…". Mr. Lee also says that it was not until January 31, 2012 that "…Nongshim Korea acquired meaningful knowledge or information regarding the KFTC's

18

United States District Court
Northern District of California

material allegations…". I have also reviewed Mr. Lee's deposition transcript in which he denies that Nongshim Korea received a letter from the KFTC "Nongshim America first learned of an investigation by the KFTC concerning companies in the food industry in Korea in or around June 2008."

102. I have reviewed Defendant's response to IPP's Interrogatory Number 15, which states "Nongshim America first learned of an investigation by the KFTC concerning companies in the food industry in Korea in or around June 2008."

103. Included as Nongshim's response to Request #9 of the June 2008 KFTC letter was document NSK00776374T which includes the "Breakdown of employees involved in the determination of ramen price" at various points in time. This document contains the exact information requested in the June 2008 letter from the KFTC. Below is an example of NSK00776374T:
. . .

104. For comparison, below is #9 from the June 2008 Letter from the KFTC (example below) which included the #9 chart/request:
. . .

105. A declaration from Stephanie Cho confirms that the Korean characters used in the heading of the #9 chart in both OTGKR-0018191 and NSK0076374 are identical to one another.

106. I have examined the native instance of NSK0076374 which is a PowerPoint document. When viewing the document using a computer set to Pacific Daylight time, the Created date of the document was July 1, 2008 10:06 PM and the Last Modified date of the document was July 1, 2008 11:29 PM. As indicated in the above paragraphs, this date is just a few days before the requested deadline of material submissions to the KFTC of July 6, 2008.

107. These observations lead to me to believe that NSK0076374 is a document Nongshim prepared in response to KFTC's June 27, 2008 letter. This is significant as an investigator in that the documents and metadata squarely contradict what Mr. Lee has testified to under oath.

These statements are within his area of expertise. Although some opinion may be based on assumptions (*e.g.*, that OTGKR-0018191T is a translated letter *from the KFTC* as opposed to a letter "purporting" to be), he supports them with details and evidence from his forensic review and the record, and can be challenged on cross-examination. However, his testimony as to the "significance" of different versions of documents (*e.g.*, paragraph 107) goes too far.

In sum, the motion is DENIED as to paragraphs 33-35; DENIED as to paragraphs 36-37; GRANTED as to opinions of "suspicious" or "suspect" activities given the lack of foundation; DENIED as to paragraphs 100-106; and GRANTED in part as to paragraph 107, limiting Vaughn's testimony to pointing out contradictions in witness testimony given metadata in

documents.

### E.    Motion to Exclude Haggard

Defendants' motion to exclude the testimony of Professor Haggard is DENIED because it simply repeats grounds already rejected on summary judgment.  As I held in the summary judgment Order, Dkt. No. 668, Haggard's opinions are generally admissible, but "plaintiffs should be careful when eliciting testimony on Korean business "culture" from Haggard at trial.  Attempts to suggest that Korean corporate culture tolerates or encourages illegal activity (on behalf of its executives or lower-level employees) will not be permitted."  *Id*. at 49.

### F.    Motion to Exclude Lee

Defendants move to exclude the opinions of attorney and former Judge San Hun Lee, who is offered by plaintiffs to rebut the opinions of defendants' Korean-law expert Professor Daesik Hong regarding what, if any, responsibilities the Korean defendants had in light of the KFTC investigation.

Defendants argue that plaintiffs are attempting a "second bite at the apple" after I denied plaintiffs' sanctions motions by relying on Lee to support an inference that defendants acted contrary to Korean law in not preserving/destroying documents during the pendency of the KFTC investigation.  Defendants argue that Lee has no experience in KFTC investigations (unlike their expert Hong) or in litigating cases under the Korean Fair Trade Act (FTA), and that his opinions are unsupported by Korean law; therefore, his opinions must be excluded because they are without foundation.

In their written opposition, plaintiffs do not address Lee's lack of experience or expertise.  Instead, they point to Lee's conclusions that Hong's position as to duties of preservation prior to, during, and after a KFTC investigation makes no sense under Korean law when the provisions of the Korean Monopoly Regulation and Fair Trade Act (FTA) are read in full and in context of the purpose of KFTC investigations.  Plaintiffs also note that Lee relies on KFTC resolutions and general provisions of criminal law regarding criminal investigations (where he does have experience).  During the Further Pretrial Conference, plaintiffs argued that despite his inexperience with the KTA and KFTC investigations, Lee should nonetheless be able to testify

1    based on his status as a former judge in Korea who was frequently required to understand and

2    apply Korean law.

3         The question here is whether Lee will provide necessary assistance to the jury or under

4    Rule 44.1, discussed below, to me.  Given his total lack of experience with the FTA and the

5    KFTC, I GRANT defendants' motion to exclude Lee's testimony in full.

6         **G.    Motion to Exclude Use of Deposition Transcripts of J.S. Kim**

7         Following the initial Pretrial Conference, defendants sought and were granted leave to file

8    a new motion; to exclude the use of deposition transcripts of J.S. Kim, the president of Samyang

9    Korea.  Kim is a central witness for plaintiffs' efforts to show the creation and existence of a

10   conspiracy to fix prices in Korea.  Kim has been identified by plaintiffs as one of the two Samyang

11   witnesses they intended to bring live to testify in the trial of this case.[11]

12        Kim's videotaped deposition was taken in Korea.  Since that time, she has been subject to

13   a criminal investigation and (apparently) within the past few weeks was indicted on claims of

14   embezzlement and breach of trust.  The current Korean investigation ("2018 Investigation") is

15   apparently centered on allegations that starting in 2008 and continuing through 2017, Kim and her

16   husband (the Samyang Korea chairman) created false companies and false transactions between

17   legitimate Samyang affiliates and the false companies in order to enrich themselves.

18        Defendants argue these breach of trust and falsification allegations and charges are directly

19   relevant to the attack they have and will continue to make against Kim's credibility and

20   trustworthiness.  They contend testimony about these recent events from Kim will be key to

21   defendants' efforts to portray Samyang and its executives as willing to lie and engage in fraud

22   (*e.g*., they lied to KFTC to avoid fines/bankruptcy and continue to lie here, that they fabricate

23   documents).  Defendants note that Kim is the exclusive witness on the inception of the alleged

24   conspiracy in Korea and the only witness who will testify about the "Representatives Meeting"

25   where the conspiracy was allegedly hatched.  Kim and others' willingness to use fraudulent

26   documents will be used to attack the legitimacy of the SHD documents.

27

28   ───────────────
     [11] Under plaintiffs' settlement agreement with Samyang, plaintiffs are able to call two Samyang
     witnesses to testify at the trial in this case.

Defendants ask that if Kim is able to travel to the U.S. to testify live, Kim be produced 48 hours prior to her live testimony so that she can be deposed regarding the 2018 Investigation and, perhaps, allegations of fraud that have been recently asserted in a case pending in the Central District of California between Samyang USA and Samyang Korea. If Kim is not going to appear live (because plaintiffs decline to call her or because she is prevented or dissuaded from leaving Korea in light of the 2018 Investigation and pending criminal matters), then defendants want to prevent plaintiffs from using Kim's deposition transcripts in the trial.

Plaintiffs acknowledge that the situation with respect to Kim in Korea is fluid. During the Further Pretrial Conference, they confirmed that it is still their intent to call her live and expect she will appear live. They state that defendants had a full opportunity to challenge Kim's veracity and credibility during her deposition on the matter that is factually relevant to this case – Samyang's leniency petition with the KFTC – so that jurors can adequately assess her demeanor and her credibility. They argue that the 2018 Investigation and the Central District litigation have nothing *factually* to do with the claims in this case and that allowing defendants to delve into those matters in a second deposition is not only unnecessary but would devolve into a prejudicial side-show. Plaintiffs assert the purpose of this motion is to intimidate or bully Kim into not testifying in this case by threatening to depose her on matters subject to an ongoing investigation. Plaintiffs, therefore, seek a ruling under Rule 608 precluding defendants from making any mention of the 2018 Investigation with any Samyang witness or otherwise at trial, unless at trial they are able to show a factual connection between that investigation and the facts in this case and with prior court approval.

On the record before me, defendants' motion is DENIED. Extrinsic evidence to prove specific instances of a witness's conduct to attack credibility is inadmissible and creates real risks under Federal Rule of Evidence 403 of confusion, delay, and waste of time. However, as mentioned in the Further Pretrial Conference defendants may submit – as soon as practicable – supplemental evidence regarding the scope of the 2018 Investigation and I will revisit this issue (after plaintiffs file a prompt response) if that evidence shows a *factual connection* between the allegations in this case and the 2018 Investigation. At this juncture, that type of connection has

22

not been shown with respect to the 2018 Investigation or the Central District litigation. Further Defendants have sufficient information to use to undermine her credibility and Samyang's and to show bias, such as the KFTC leniency petition and Samyang's settlement with plaintiffs, without venturing into unrelated allegations.[12]

## IV.    KOREAN LAW

Defendants seek a ruling under Rule 44.1 that they complied with all document-related obligations under Korean law. Part of their motion appears to seek a somewhat narrow ruling on document preservation under Korean law in general and more specifically after the inception of the KFTC investigation. However, in their motion papers defendants also argue (yet again) that plaintiffs should be precluded from "suggesting" or making inferences to the jury about spoliation or failures to preserve documents.

On the more general issue, I have already held and continue to hold that plaintiffs may elicit testimony and argue to the jury adverse inferences from the fact that defendants may have changed document preservation policies following the inception of the KFTC investigation, that defendants edited and altered memos for submission to the KFTC to remove information suggesting a coordinated price-fixing conspiracy, and that defendants submitted false information to the KFTC.

On the more specific issue, as framed by defendants at the Further Pretrial Conference, defendants seek rulings confirming the following issues of Korean law:

- That Korean law does not impose a general duty to suspend routine document retention practices and preserve documents upon the commencement of a KFTC investigation.

- The KFTC imposes two specific and limited duties on companies under investigation: (a) to not interfere with onsite investigations and witness interviews and (b) to submit information or documents specifically requested by the KFTC to the extent they existed at the time of the request.

---

[12] In the event Kim does testify live and I allow a question to which she would assert her right against self-incrimination, she may do so outside the presence of the jury after a timely objection.

- The KFTA does not have a general extraterritorial reach. Therefore it does not impose any obligations on Nongshim America and Ottogi America.

After reviewing the parties' briefing on these issues, as well as the expert declaration of Daesik Hong and the FTA provisions at issue, I agree that the Korean defendants were not under a duty imposed by the FTA to implement document preservation policies to prevent the destruction of documents in the normal course of business upon the inception or during the KFTC onsite investigations. I also agree that the FTA imposes, at least, the following duties on companies under investigation: (a) to not interfere with onsite investigations and witness interviews and (b) to submit information or documents specifically requested by the KFTC. Jury instructions will be issued consistent with these determinations of Korean law.

However, these rulings do not reach the issue of what duties are imposed on companies in response to "Paragraph 9" "requests for submission of documents," *see* Hong Report ¶¶ 8, 11, Dkt. No. 700-7), including duties of preservation for specifically requested documents that Hong indicates lasts until the "termination of the investigation." *Id*. ¶ 20. It similarly does not reach the question of the scope of duties with respect to submitting false or altered information to the KFTC in response to "requests for submission of documents" or otherwise. *Id*. ¶ 8. Following the introduction of evidence at trial, including testimony from Hong, I will make additional determinations under Rule 44.1 as necessary.

As to the extraterritorial reach of the FTA, both parties seem to agree that under its express terms, the FTA does not reach conduct that emanates from abroad unless that foreign conduct affects the Korean domestic market. That issue does not seem to fit the evidence to be presented in this trial. But the provisions of the FTA cited by defendants do not support their requested determination that the FTA imposed no duties on the American subsidiaries, as the alleged control of those subsidiaries by the Korean companies might (or might not) be an issue. After the evidence has come in and Hong has testified, I will consider the scope of what instruction about Korean law is necessary.

Finally, to the extent defendants seek a determination under Korean law that the Korean government "exercised price controls" over ramen sold in the domestic market, their request is

DENIED.  Defendants appear to rely solely on the decision of the Korean Supreme Court, which used the undefined term "de facto control" to characterize the Korean government's role with respect to its discussions with Nongshim over the top price Nongshim could allegedly charge in Korean for certain products.  Absent some statute, regulation, or expert testimony, this issue is not appropriate for a determination as a matter of law under Rule 44.1 on this record.

**IT IS SO ORDERED.**

Dated: April 24, 2018

William H. Orrick
United States District Judge