1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

IN RE KOREAN RAMEN ANTITRUST

LITIGATION

-------------------------------------------------------

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Civil Action No. C-13-04115-WHO

**DECLARATION OF GREGORY
B. LINKH**

Date: November 14, 2018
Time: 2:00 p.m.
Judge: Honorable William H. Orrick

1.      I am counsel for the Direct Purchaser Plaintiffs ("DPPs"). I have personal knowledge of the following facts and could and would testify competently thereto if called as a witness. I submit this Declaration in support of Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Striker the Expert Report of Professor Michael Klausner.

2.      On October 9, 2018, the parties had a meet-and-confer in an attempt to resolve or at least limit the issues in this motion. At that meet-and-confer, Defendants again refused Plaintiffs' request to produce a complete set of board actions, including meeting minutes/ board actions, meeting notices.

3.       Attached as Exhibit A is the Expert Report of Professor Michael Klausner, served on October 4, 2018.

4.      Attached as Exhibit B is an email from Christopher Lebsock, dated October 5, 2018.

5.      Attached as Exhibit C is an email from Gregory Linkh, dated October 5, 2018.

6.      Attached as Exhibit D is an email from Rachel Brass, dated October 5, 2018.

7.      Attached as Exhibit E are excerpts from the transcript of the January 26, 2018 pretrial conference.

8.      Attached as Exhibit F are excerpts from the transcript of the April 16, 2018 pretrial conference.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief and that this declaration was executed at New York, New York, on the 10th day of October, 2018.

/s/ Gregory Linkh
Gregory Linkh

DECLARATION OF GREGORY LINKH, CASE NO. 13-CV-4115-WHO-DMR

1

# Exhibit A

## *IN RE: KOREAN RAMEN ANTITRUST LITIGATION*

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

Civil Action No. C-13-04115-WHO

**EXPERT REPORT**

**OF**

**PROFESSOR MICHAEL KLAUSNER**

October 4, 2018

*HIGHLY CONFIDENTIAL — ATTORNEYS' ONLY*

# TABLE OF CONTENTS

I.      QUALIFICATIONS ........................................................................................... 2

II.     ASSIGNMENT.................................................................................................. 3

III.    SUMMARY OF OPINIONS .......................................................................... 4

IV.     OVERVIEW OF HOW FOREIGN COMPANIES OPERATE IN THE US .................... 6

        A.   FOREIGN COMPANIES THAT EITHER MANUFACTURE GOODS OR DISTRIBUTE GOODS IN
             THE US TYPICALLY SET UP SUBSIDIARIES IN THE US TO CONDUCT THOSE
             OPERATIONS ...................................................................................................... 6
        B.   COMMON REASONS FOR FOREIGN COMPANIES TO SET UP US SUBSIDIARIES TO
             CONDUCT US OPERATIONS INCLUDE TAXES, REGULATION, AND LIMITED LIABILITY
             PROTECTION ...................................................................................................... 9
        C.   PARENT COMPANIES ARE EXPECTED TO EXERT SOME DEGREE OF CONTROL OVER
             THEIR SUBSIDIARIES ........................................................................................ 12

V.      OPINIONS REGARDING NONGSHIM AMERICA AND OTTOGI AMERICA ........ 14

        A.   OPINIONS REGARDING THE FORMATION OF NONGSHIM AMERICA AND ITS FORMAL
             AND OPERATIONAL SEPARATION FROM NONGSHIM KOREA ........................... 14
        B.   OPINIONS REGARDING THE FORMATION OF OTTOGI AMERICA AND ITS FORMAL AND
             OPERATIONAL SEPARATION FROM OTTOGI KOREA ...................................... 32

VI.     PROFESSOR HAGGARD'S CHARACTERIZATION OF THE NONGSHIM AND
        OTTOGI GROUPS AS "CHAEBOLS" HAS NO BEARING ON MY OPINIONS....... 48

VII.    MISCELLANEOUS ...................................................................................... 52

APPENDIX A. Curriculum Vitae of Michael Klausner

APPENDIX B. Prior Testimony of Michael Klausner in the Past Four Years

APPENDIX C. Documents Relied Upon

APPENDIX D. List of Interviews

## I.      Qualifications

1.      I am the Nancy and Charles Munger Professor of Business and Professor of Law at Stanford Law School. From 2004 to 2005, I was Associate Dean for Academic Affairs at Stanford Law School. From 1991 to 1997, I was on the faculty of New York University School of Law.

2.      I have taught the following courses at Stanford Law School:

- Corporations

- Corporate Governance Seminar

- Deals: The Economic Structure of Business Transactions.

3.      I am a co-director of Directors' Consortium, an executive education program operated by the University of Chicago Booth Graduate School of Business and the Stanford University Graduate School of Business and Law School. Directors' Consortium provides training to corporate directors. I have taught courses on the following topics at Directors' Consortium: corporate governance, the board's role in a merger transaction, and directors' fiduciary duties and liability risk.

4.      I have taught these topics at two other executive education programs at Stanford: Directors' College at the law school and Directors' Forum at the business school. I have also spoken on numerous panels on corporate governance and directors' duties, including programs sponsored by the National Association of Corporate Directors and the Professional Liability Underwriting Society.

5.      I have served as an expert witness or a consultant in numerous cases on issues of corporate governance, corporate structure, the structure of business transactions, mergers and acquisitions (M&A), disclosure, and other related topics.

6.      Prior to entering academia, I was in private law practice where I specialized in corporate and banking law. In addition, I was a White House Fellow and a law clerk to Judge David Bazelon, on the Court of Appeals for the District of Columbia Circuit, and Justice William Brennan, on the United States Supreme Court. I received a B.A. from the University of Pennsylvania in 1976 and a J.D. and M.A. (jointly) in economics from Yale University in 1981.

7.      I have served in the following positions in the Association of American Law Schools: Co-chair, Law and Economics Committee; Executive Board, Business Law Committee; and Executive Board, Financial Institutions Committee.

8.      I have published numerous articles on corporate governance, corporate law, and related topics. I am currently writing a book and producing an online course, both entitled *Deals: The Economic Structure of Business Transactions*.

9.      My curriculum vitae, which lists all my publications, and a list of prior testimony in the previous four years are attached in Appendix A and Appendix B, respectively.

## II.    Assignment

10.    Counsel for Nongshim Co., Ltd. ("Nongshim Korea") and Nongshim America, Inc. ("Nongshim America") and counsel for Ottogi Co. Ltd ("Ottogi Korea") and Ottogi America, Inc. ("Ottogi America") have asked me to provide expert opinions and testimony regarding the structure and relationship (1) between Ottogi Korea and Ottogi America, and (2) among Nongshim Korea, Nongshim America, and Nongshim Korea's other US subsidiaries.[1] I was asked specifically to opine on the extent to which the two South Korean parent companies and their respective US subsidiaries maintained formal and operational separation during the class period of March 1, 2003 to January 31, 2010 and subsequent to the class period.[2] The questions I was asked to address are the following:

- Is it common for foreign companies that either manufacture goods or distribute goods in the US to set up subsidiaries in the US to conduct those operations?

- What are the typical reasons for foreign companies to set up US subsidiaries to conduct US operations?

- Is a parent company expected to exert a degree of control over its wholly owned subsidiary, and is a subsidiary expected to report on its operations to its parent?

---

[1] The focus of this report with respect to the Nongshim companies is on the relationship between Nongshim America and Nongshim Korea. To the extent the relationships between Nongshim Korea's other US subsidiaries could have an indirect impact on that relationship, I have analyzed those subsidiaries as well.

English language documents I reviewed use two spellings: Nong Shim and Nongshim. I will use "Nongshim" throughout as in the Court documents.

[2] "Motion Hearing Order on Motion to Amend/Correct," November 15, 2017. "[Proposed] Order Amending Direct Purchaser Plaintiffs' Class Period," October 11, 2017.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*      **3**

- With respect to each of Nongshim America and Ottogi America:
    - Whether the reasons for setting up US subsidiaries were consistent with those that generally motivate foreign firms to set up US subsidiaries;
    - Whether the subsidiaries observed the corporate formalities expected of corporate entities in their formation and operation;
    - Whether the parent companies exercised control over their US subsidiaries beyond that expected in parent-subsidiary relationships; and
    - Whether the parents and subsidiaries maintained operational separation, as expected in parent-subsidiary relationships.

11.     In preparing this report, I have been assisted by the staff of NERA Economic Consulting, working under my direction. I have reviewed academic literature, deposition transcripts of witnesses, minutes of board meetings of Nongshim America and Ottogi America, as well as other documents produced in this litigation. In addition, I have conducted interviews with individuals currently and/or formerly employed by or otherwise associated with Nongshim America, Nongshim Korea, Ottogi America, and Ottogi Korea.

12.     The list of documents that I relied upon in forming my opinions is attached as Appendix C. The list of interviews I conducted is attached as Appendix D. If I receive new or additional information relevant to my opinions expressed below, I may supplement or revise this report as permitted by the Court.

13.     I am being compensated at a rate of $1,100 per hour. My compensation is not contingent upon the outcome of this action or my opinions expressed herein.

III.     **Summary of Opinions**

14.     On the basis of my prior knowledge of the topics covered in this report and on the basis of my review of testimony, interviews and documentation in the record and otherwise provided to me, I have formed the following opinions:

- It is common for foreign companies that either manufacture goods or distribute goods in the US to set up subsidiaries in the US to conduct those operations.
- Common reasons for foreign companies to set up US subsidiaries to conduct US operations include:
    - Tax advantages;

- o Ease of compliance with government regulations either in the US or their home country;
- o Facilitation of access to credit in the US by limiting foreign risk exposure;
- o Limited liability protection provided to corporations; and
- o Management autonomy.
- A parent company is expected to exert a degree of control over its subsidiary and a subsidiary is expected to report on its operations to its parent.
- With respect to each of Nongshim America and Ottogi America:
  - o The reasons for setting up US subsidiaries were consistent with those that generally motivate foreign firms to set up US subsidiaries;
  - o The US subsidiaries observed the corporate formalities expected of corporate entities in their formation and operation;
  - o The parent companies did not exercise control over the US subsidiaries any more than one would expect of a parent company, and the US subsidiaries maintained the independence one would expect of a subsidiary; and
  - o The US subsidiaries maintained operational separation from their respective parent corporations in South Korea consistent with that expected of a subsidiary.
- Classification of a company as a "chaebol" is irrelevant to the question whether a parent company and its subsidiary maintained formal and operational separation.

15.    The opinions I offer focus on whether Nongshim America and Ottogi America were formed and maintained in conformity with formal legal requirements, and managed in a way that is expected of separate parent and subsidiary corporations. Although I understand that my opinions relate to whether Nongshim America or Ottogi America was an alter ego of its respective parent corporation, I offer no opinion regarding that specific legal conclusion or any other legal conclusion.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*        **5**

## IV.      Overview of How Foreign Companies Operate in the US

### A.      Foreign companies that either manufacture goods or distribute goods in the US typically set up subsidiaries in the US to conduct those operations

16.      As I describe more fully below, foreign firms doing business in the US commonly form US subsidiaries to conduct that business. To document this fact, I have selected a sample of recognizable South Korean, Japanese, Chinese, and German companies across several industries with available information on their operations and management in the US: Pulmuone, Aurora World, Nikon, Sanyo, Huawei, and Bayer. For each company, I looked at whether it operated through a US subsidiary or a branch.

17.      **Pulmuone.** Pulmuone Co., Ltd. is a South Korean manufacturer and distributor of food products that operates through subsidiaries abroad.[3] It operates in the US through a wholly owned subsidiary named Pulmuone Foods USA, Inc. based in California. Pulmuone Foods USA, Inc. has manufacturing facilities in California and New York.[4]

18.      **Aurora World.** Aurora World Corp. is a South Korean company that produces and develops online games, movies, and shows, in addition to plush toy products based on animated characters.[5] It operates in the US through its wholly owned subsidiary Aurora World, Inc., a California-based toy and gift manufacturer that sells through third party retailers.[6] Mr. K. S. ("Gi Seon") Hong is the President and Chief Executive Officer of Aurora World, Inc. and is also currently the co-Chief Executive Officer and Director of Aurora World Corp., the South Korean parent company.[7]

---

[3] "Pulmuone Co., Ltd (017810-KR)," FactSet.

[4] "Company Overview of Pulmuone Foods USA, Inc.," Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapid=6907972, accessed September 20, 2018.

[5] "Aurora World Corporation (039830-KR)," FactSet.

[6] "Company Overview of Aurora World, Inc.," Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=6929629, accessed July 7, 2018. "Aurora World, Inc. (064CB5-E) – Subsidiary," FactSet. Aurora World Corporation (039830-KR) Annual Report for 2017, p. 11.

[7] "Aurora World, Inc. (064CB5-E) – Subsidiary," FactSet. "Aurora World Corp (039830.KQ)," Reuters, https://www.reuters.com/finance/stocks/company-officers/039830.KQ, accessed July 8, 2018.

19.  **Nikon.** Nikon Corporation is a Japanese photographic equipment company that manufactures and sells optical instruments in Japan and internationally.[8] It acquired Ehrenreich Photo-Optical Industries, Inc., the sole distributor of Nikon products in the US, in 1981 and renamed it Nikon Inc.[9] Mr. Bo Kajiwara is the President & Chief Executive Officer of Nikon Inc.[10] Previously, he was the Senior General Manager of Sales and Marketing for Nikon Europe and the General Manager for the Communications Department at the parent company Nikon Corp.[11]

20.  **Sanyo.** Sanyo Foods Co., Ltd. is a Japanese manufacturer of noodle products.[12] It operates through its US subsidiary, Sanyo Foods Corp. of America, to produce and distribute instant noodles in the US. Sanyo Foods Corp. of America is based in Garden Grove, California.[13]

21.  **Huawei.** Huawei Investment & Holding Co., Ltd., headquartered in Shenzhen, China, develops, manufactures, and sells information technology, telecommunications, and mobile devices and products.[14] It operates in the US through its subsidiary, Huawei Device USA, Inc., which was founded in Texas in 2001 and manufactures communication products such as GPS and handheld devices.[15] The President of Huawei Device USA, Inc. is Mr. Zhendong 'Robin'

---

[8] "Company Overview of Nikon Corporation," Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapid=874168, accessed August 1, 2018.

[9] "Company Overview of Nikon Inc.," Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapid=4277998, accessed July 6, 2018.

[10] "Nikon, Inc. (0894JX-E) – Subsidiary," FactSet.

[11] "Bo Kajiwara Appointed to President and Chief Executive Officer, Nikon Inc. to Guide Imaging Leader's Growth and Focus on Innovation," November 14, 2017, NikonUSA, https://www.nikonusa.com/en/about-nikon/press-room/press-release/j9g6dqu6/Bo-Kajiwara-Appointed-to-President-and-Chief-Executive-Officer%2C-Nikon-Inc.-to-Guide-Imaging-Leader%E2%80%99s-Growth-and-Focus-on-Innovation.html, accessed July 9, 2018.

[12] "Company Overview of SANYO FOODS.Co.,Ltd.," Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapid=5487612, accessed September 21, 2018.

[13] "Company Overview of Sanyo Foods Corp. of America," Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=4629150, accessed September 21, 2018.

[14] "Company Overview of Huawei Investment & Holding Co., Ltd.," Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=1259829, accessed July 9, 2018.

[15] "Huawei Device Co., Ltd. (0BVR1Z-E) – Subsidiary," FactSet. "Company Overview of Huawei Device USA, Inc.," Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapid=228379546, accessed July 9, 2018.

Zhu.[16] He has served as the President of Huawei Device Latin America Region from 2011 to 2015 and the Vice President of Global Product Sales in Shenzhen, China from 2008 to 2010.[17]

22.     **Bayer.** Bayer AG is a German life sciences company with pharmaceuticals, consumer health, crop science and animal health segments.[18] It operates in the US through its subsidiary, Bayer Corporation (also known as Bayer U.S.), a health care products, agriculture products, and high-tech polymer materials manufacturing firm based in New Jersey. Bayer AG acquired Miles Laboratories Inc. in 1978 and changed its name to Bayer Corporation in 1995.[19] Mr. Phil Blake is the President of Bayer Corporation and is Bayer AG's Senior Bayer Representative, U.S., "responsible for all U.S. activities of the worldwide Bayer Group."[20] He was the former President and Chief Executive Officer of Bayer, Inc. and Head of Bayer Healthcare in Canada.[21] Mr. Jan Heinemann is the Head of U.S. Law, Patents & Compliance and held a similar position as Head of LP&C for Mergers & Acquisitions at the parent company, Bayer AG.[22]

23.     US companies also commonly establish foreign subsidiaries to conduct business outside the US. For example, Starbucks Corporation operates through subsidiaries internationally, including Starbucks Coffee Korea Co., Ltd. in South Korea and Starbucks Coffee France S.A.S. in France.[23] Similarly, The Coca-Cola Company has subsidiaries in India (Coca-Cola India Private Limited) and South Africa (Coca-Cola Beverages Africa (Pty) Ltd.), among others.[24]

---

[16] "Huawei Watch 2 Classic Makes The Right Statement," May 30, 2017, Huawei, http://usahuawei.com/2017/05/huawei-watch-2-classic-makes-the-right-statement/, accessed August 2, 2018.

[17] "Zhendong (Robin) Zhu," LinkedIn, https://www.linkedin.com/in/zhendong-robin-zhu-4100aa6b, accessed August 9, 2018.

[18] "Company Overview of Bayer Aktiengesellschaft," Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=103375, accessed August 1, 2018.

[19] "History – Oil Crisis and Consolidation (1974-1988)," Bayer AG, https://www.bayer.com/en/1974-1988.aspx, accessed August 10, 2018. "Company Overview of Bayer Corporation," Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=432063, accessed July 9, 2018.

[20] "People Behind the Brands," Bayer US, https://www.bayer.us/en/about-bayer/leadership/, accessed July 8, 2018.

[21] "Phil Blake," Bayer US, https://www.bayer.us/en/about-bayer/leadership/phil-blake/, accessed July 8, 2018.

[22] "Jan Heinemann," Bayer US, https://www.bayer.us/en/about-bayer/leadership/jan-heinemann/, accessed August 2, 2018.

[23] Starbucks Corporation SEC 10-K filing for the fiscal year ended October 1, 2017.

[24] The Coca-Cola Company SEC 10-K filing for the fiscal year ended December 31, 2017.

Other examples of US firms that operate through foreign subsidiaries include NIKE, Inc., DowDuPont Inc., and Intel Corporation.[25]

**B.    Common reasons for foreign companies to set up US subsidiaries to conduct US operations include taxes, regulation, and limited liability protection**

24.    There are multiple reasons why firms doing business in the US establish US subsidiaries rather than having a foreign corporate entity conduct that business directly through a branch office.[26]

25.    One reason is based on tax law. A subsidiary is a separate corporate entity and is taxed as such. In contrast, a branch office is part of the foreign company operating in the US.[27] A branch is subject to corporate tax on its US-source income just as a subsidiary is, but the rules governing taxation of a branch are more complex and can entail providing the IRS with information regarding the foreign parent's worldwide finances.[28] For this reason, tax compliance can be less complicated and less costly when US business is carried out through a US subsidiary. To effectively do so, the parent company needs to maintain separate financial accounts for the US subsidiary and properly price transactions between the US subsidiary and its foreign affiliates.[29] In addition, a branch is subject to a branch profits tax, which can result in a branch being taxed at a higher rate than a subsidiary.[30] As one commentator has pointed out, "[t]he more burdensome

---

[25] NIKE, Inc. SEC 10-K filing for the fiscal year ended May 31, 2018. DowDuPont Inc. SEC 10-K filing for the fiscal year ended December 31, 2017. Intel Corporation SEC 10-K filing for the fiscal year ended December 30, 2017.

[26] "Establishing a Business Presence in the USA," UK Government, Department for International Trade, p. 5. https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/301343/Establishing_a_Business_Presence_in_the_USA.pdf, accessed August 3, 2018.

[27] "The Inbound Guide to US Corporate Tax," 2014, EY, p. 7. https://www.ey.com/Publication/vwLUAssets/EY_US_Inbound_brochure_en/%24FILE/EY-US-Inbound-brochure-en.pdf, accessed August 1, 2018.

[28] "Branch Profit Tax Concepts," September 3, 2014, IRS, pp. 3-11. https://www.irs.gov/pub/int_practice_units/RPWCUP_08_2_01.PDF, accessed August 1, 2018.

[29] "The Inbound Guide to US Corporate Tax," 2014, EY, p. 12. https://www.ey.com/Publication/vwLUAssets/EY_US_Inbound_brochure_en/%24FILE/EY-US-Inbound-brochure-en.pdf, accessed August 1, 2018.

[30] Brown, Fred B., "Federal Income Taxation of US Branches of Foreign Corporations: Separate Entity or Separate Rules," *Tax Law Review* Volume 49 Issue 1 (Fall 1993), pp. 133-208, at pp. 134-137 and 149-151. Lee, Eui Young, "Apportionment of Profits to a Permanent Establishment: Similarities and Differences in the UK, the US and the Republic of Korea," *Journal of Korean Law* Volume 12 Issue 1 (December 2012), pp. 1-54, at pp. 27-34.

nature of the branch profits tax appears to create a tax bias in favor of operating in the United States through U.S. subsidiaries."[31]

26.     A second reason for doing business in the US through a separate subsidiary is to facilitate compliance with either US or home-country regulations. My understanding is that US regulations were not a factor with respect to the companies involved in this case. I understand, however, that South Korean regulation of cross-border currency transfers made setting up a subsidiary more attractive than operating a US business through a South Korean corporation. I understand that the South Korean government monitored foreign currency transactions during the class period and required the submissions of reports and documentation concerning payments of funds to a foreign entity. If a South Korean company conducted business through a branch office in the US, the parent would have had to submit a report to the South Korean Foreign Exchange Bank for each transfer of funds, such as a vendor payment. The report would document the reason for the transaction and would have to include the parent's business plans for the next three years. The parent would also have had to comply with any additional information requests from the Foreign Exchange Bank, costing time and money. By setting up a subsidiary, rather than a branch, a company could make a single capital investment for which it went through this process. If instead the company set up a branch, it could have to go through this process on a recurring basis while conducting the US business.[32]

---

[31] Brown, Fred B., "Reforming the Branch Profits Tax to Advance Neutrality," *Virginia Tax Review* Volume 25 Issue 4 (Spring 2006), pp. 1219-1294, at p. 1222.

[32] I learned about these regulations from my interview with Ottogi Korea executives, Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo on July 16, 2018, and my interview with a Nongshim Korea executive, Mr. Won Joon Lee on August 9, 2018. They told me that this was one of the reasons for the parent companies setting up subsidiaries rather than branches. I have since confirmed the nature of these regulations with secondary sources.

"Enforcement Decree of the Foreign Exchange Transaction Act (Sep 16, 2000)," September 16, 2000, Republic of Korea Ministry of Economy and Finance, http://english.moef.go.kr/pc/selectTbPressCenterDtl.do?boardCd=N0001&seq=1010, accessed August 3, 2018.

"The Second Stage of Foreign Exchange Liberalization (Apr 9, 2001)", April 9, 2001, Republic of Korea Ministry of Economy and Finance, http://english.moef.go.kr/pc/selectTbPressCenterDtl.do?boardCd=N0001&seq=840, accessed August 3, 2018.

"Government to Reform Foreign Exchange Transaction Regulations," June 29, 2015, Republic of Korea Ministry of Economy and Finance, http://english.moef.go.kr/pc/selectTbPressCenterDtl.do?boardCd=N0001&seq=3869, accessed August 3, 2018.

27.     A third reason for doing business in the US through a separate subsidiary is that doing so limits the risk that a lender must consider in financing the US business.[33] By lending to a US subsidiary, the US lender will be subject only to risk associated with the US business. In contrast, if a foreign firm does business directly in the US through a branch and seeks financing for its US business, the lender would be exposed to risk associated with the firm's business in the US and abroad. For some lenders, this exposure would be unattractive. By carrying out its US business through a subsidiary, therefore, a borrower may be able to obtain credit more easily and on better terms. If a lender wants support from the parent company, it can get that with a guarantee.

28.     A fourth reason to operate in the US through a subsidiary rather than a branch is the limited liability provided to corporations. By setting up a limited liability entity, a foreign corporation protects its non-US assets and can plan its home-country or worldwide operations based the fact that the capital in the US entity will be the limit of its downside financial risk.

29.     A fifth reason to operate in the US through an independent subsidiary is to develop local leadership and management with a deep understanding of the local market. The managers can operate independently, without having to wait for approval from the parent company. The parent company could be several time zones away, leading to a lag in decision-making, and would be less knowledgeable and informed than the US subsidiary. A subsidiary's management, in contrast, would be able to react to local conditions in a timely and appropriate manner based on experience from operating in the US market. These five common reasons are most significant here, but depending on the circumstances, other factors may influence the choice of the corporate form.

30.     A drawback of operating through a US subsidiary rather than a branch is that a subsidiary must comply with corporate formalities. It must file articles of incorporation, adopt bylaws, pay franchise fees, hold board meetings or have the board act by written consent, and hold shareholder meetings. Certain decisions must be made through formal approval of the subsidiary's board of directors rather than by a division manager. In addition, transfers of assets and capital between a parent and subsidiary must be documented and priced. Especially for a

---

[33] Hansmann, Henry and Reinier Kraakman, "The Essential Role of Organizational Law," *Yale Jaw Journal* Volume 110 Issue 3 (December 2000), pp. 387-440, at pp. 399-400. Hansmann, Henry and Reinier Kraakman, "Organizational Law as Asset Partitioning," *European Economic Review* Volume 44 Issues 4-6 (May 2000), pp. 807-817, at p. 811.

large, well-advised company, however, these drawbacks may well be minor in relation to the benefits of operating through a subsidiary.

### C. Parent companies are expected to exert some degree of control over their subsidiaries

31.     A parent company is expected to exercise some control over its wholly owned subsidiary with respect to setting general business strategies and policies and facilitating coordination in achieving the parent's overall business objectives. In order for a parent firm to perform this role and to protect the interests of its shareholders, a subsidiary is expected to report regularly to the parent, as the parent may require.[34]

32.     The fundamental fact of a parent-subsidiary relationship is that the parent is the subsidiary's shareholder. In the case of a wholly-owned subsidiary, the parent is the sole shareholder. The parent ultimately has a claim to the subsidiary's profits, it has the power to nominate and elect the subsidiary's board of directors, and through its power to select the board it, in effect, has the power to appoint the subsidiary's management. In short, the parent owns the subsidiary and has powers associated with ownership. It follows that the parent will use its power over the subsidiary's board and management to have the subsidiary contribute to the maximization of the corporate group's profits. If the parent did not do so, it would violate its obligation to its shareholders. The parent may achieve that goal by maximizing the subsidiary's profits, or having the subsidiary play a role in servicing the overall corporate group. That is a matter of the business judgment of the parent corporation's management.

33.     A parent's appropriate control over a subsidiary, however, does not extend to day-to-day management. Because a subsidiary is a separate corporate entity, day-to-day management is the job of the subsidiary's managers. A parent's control is instead directed toward the subsidiary's strategy and business policies. To the extent a subsidiary fails to follow the parent's strategy and policy, or if the subsidiary's management falters, one would expect the parent to step in and

---

[34] Puri, Poonam, "Best Practices in Parent and Subsidiary Governance," In *The Handbook of Board Governance: A Comprehensive Guide for Public, Private, and Not-for-Profit Board Members*, edited by Richard Leblanc, pp. 269-282, Wiley, 2016, at pp. 278-279. "Subsidiary Management: A Guide for the Corporate Secretary," May 2016, Society of Corporate Secretaries & Governance Professionals, https://higherlogicdownload.s3.amazonaws.com/GOVERNANCEPROFESSIONALS/a8892c7c-6297-4149-b9fc-378577d0b150/UploadedImages/2017%20Topical%20Pages/Quarter_4/Subsidiary_Management_May_2016_Final__1_.pdf, accessed September 18, 2018.

make a correction. As the subsidiary's shareholder, the parent formally exercises its control through the nomination and election of the subsidiary's board of directors, which in turn provides direction to the CEO and others on the subsidiary's management team. Parent corporations typically put their own executives or board members on a subsidiary's board.[35] When course corrections are needed, a parent could well initiate processes that result in the replacement of the subsidiary's CEO or other management personnel. This relationship between shareholders and boards is common in other contexts as well. For example, venture capitalists and private equity firms typically put their executives on the boards of companies in which they invest, and they replace management when a company is not performing up to expectations.

34.    The subsidiary's management would be expected to provide information to the parent on a regular basis regarding the subsidiary's operations, either directly or through the subsidiary's board. The necessity for this reporting follows from the fact that the parent is the subsidiary's shareholder and needs information to effectively oversee the subsidiary's business. Again, this is typical of other shareholding relationships. Venture capital and private equity investors continuously monitor their portfolio companies.

35.    While operating for the benefit of the parent, a subsidiary is expected to be operationally independent of the parent. Its own management is expected to conduct the company's day-to-day operations, including for example, generating business, developing and maintaining client

---

[35] Examples include Sprint, Acushnet Holdings Corp., and Volkswagen.

**Sprint:** Mr. Masayoshi Son and Mr. Raul Marcelo Claure are on the board of Sprint Corp., a subsidiary of SoftBank Group Corp. Mr. Son is the founder, CEO, and Chairman of the board of SoftBank Group Corp. Mr. Claure is the COO and a director of SoftBank Group Corp. while also serving as the Executive Chairman of Sprint Corp.

 "Corporate Governance," Sprint, http://investors.sprint.com/corporate-governance/default.aspx, accessed July 12, 2018.

**Acushnet Holdings Corp.:** Mr. Yoon Soo (Gene) Yoon is on the board of Acushnet Holdings Corp., a subsidiary of Fila Korea Ltd. Mr. Yoon is the Chairman of Fila Korea Ltd. and has served as the chairman of the board of Acushnet Holdings Corp.

 "Acushnet Holdings Corp. (GOLF)," FactSet. "Corporate Governance Documents," Acushnet Holdings Corp., https://www.acushnetholdingscorp.com/investors/governance/default.aspx, accessed August 10, 2018.

**Volkswagen:** Mr. Bernd Osterloh is on the board of Volkswagen Group of America, Inc., a subsidiary of Volkswagen AG (also known as Volkswagen Group). Mr. Osterloh is a member of the Supervisory Board of Volkswagen AG and the Chairman of the General and Group Works Councils of Volkswagen AG.

"Company Overview of Volkswagen Group of America, Inc.," Bloomberg, https://www.bloomberg.com/research/stocks/private/people.asp?privcapId=4217234, accessed August 2, 2018.

"Executive Bodies," Volkswagen AG, http://www.volkswagenag.com/en/group/executive-bodies html, accessed August 2, 2018.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*     **13**

relationships, negotiating sales, performing market research, defining and executing advertising and promotion strategy, determining prices, determining regional sales territories, managing logistics, making hiring, firing, and promotion decisions regarding employees, setting employee compensation, and taking any other actions to compete effectively. Manufacturing subsidiaries also make manufacturing decisions such as production scheduling and negotiating and acquiring production inputs. Subsidiary managers, along with other subsidiary employees, are expected to be on the subsidiary's payroll. As discussed below, having the subsidiary bear the cost of its own operations is an element of separation that is expected of a subsidiary. However, it is not unusual, nor is it improper, for members of the subsidiary's management team and other employees to come from the parent or from other affiliates, or to hold concurrent positions with the subsidiary and the parent or other affiliates. As I have pointed out above, the US subsidiaries of Aurora World Corp, Nikon Corporation, Huawei Investment & Holding Co., Ltd., and Bayer AG have executives who have served or concurrently serve as executives for those companies' parent company or other subsidiaries of the parent outside the US.

36.    As separate corporate entities, subsidiaries must be formally separate from their parents. They must file a corporate charter in the state in which they incorporate, adopt bylaws, have a board of directors that meets at least annually and whose members are elected annually.[36]

## V.    Opinions Regarding Nongshim America and Ottogi America

### A.    Opinions regarding the formation of Nongshim America and its formal and operational separation from Nongshim Korea

#### 1.    Background to the formation of Nongshim America

37.    Prior to 1994, Nongshim operated a branch office in the US.[37] In 1994, Nongshim Korea incorporated Nongshim America as a California corporation with Nongshim Korea as its sole shareholder.[38] Nongshim Korea initially capitalized Nongshim America with $300,000 for which

---

[36] Audero, Maria A. and Brent A. Olson, *California Business Law Deskbook* (December 2017 Update), Sections 2.1, 2.2, and 2.12.

[37] "Around the World," Nongshim America Inc., https://www.worldofshin.com/our-story/around-the-world/, accessed September 28, 2018.

[38] Nongshim America, Inc. "Financial Statements for the Year Ended December 31, 2004 and Independent Auditors' Report," January 26, 2005, NSA0370013-NSA0370026 at NSA0370019.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*                    **14**

it received 3,000 shares.[39] Nongshim America was formed to sell instant noodles and snacks in North America.[40] Nongshim America sells ramen, among other items, to distributors and directly to stores.[41] When it began operations, Nongshim America primarily supplied Asian supermarkets in the US, but during the 2000s it expanded its marketing efforts to large and mainstream customers such as Costco and Wal-Mart.[42]

38.     During the early years, Nongshim America sold products manufactured by Nongshim Korea and affiliates in South Korea.[43] Then, in 2003, Nongshim Korea established Nongshim Foods, Inc, ("Nongshim Foods"), as another wholly owned US subsidiary "for the purpose of establishing a United States-based manufacturing facility."[44] Nongshim Korea invested $28 million in Nongshim Foods in 2003 and $22 million more in 2004 in exchange for 280,000 and 220,000 shares of Nongshim Foods, respectively.[45] Nongshim Foods used these funds to construct a manufacturing plant in Rancho Cucamonga, CA, which was completed and began operating in 2005.[46]

39.     In 2005, Nongshim Korea restructured its US subsidiaries. Nongshim Foods changed its name to Nongshim Holdings USA, Inc. ("Nongshim Holdings").[47] At the same time, Nongshim

---

[39] Notice of Transaction Pursuant to Corporations Code Section 25102(f) for Nongshim America, December 3, 1994. Nongshim America, Inc., Stock Certificate Number 1, November 30, 1994.

[40] Nongshim America, Inc. "Financial Statements for the Year Ended December 31, 2004 and Independent Auditors' Report," January 26, 2005, NSA0370013-NSA0370026 at NSA0370019.

[41] Nongshim America, "Global MI USA," 2008, NSK0091453-NSK0091493 at NSK0091465. Nongshim America, "Mid- to Long-Term Strategy for the U.S. (Proposal) March 2008," NSA0030708_TRANSL, pp. 53-54.

[42] Nongshim America, "Global MI USA," 2008, NSA0018894-NSA0018933, at NSA0018902. Nongshim America, "Nongshim America Communication Strategy (Proposal)," December 3, 2009, NSA0075033_TRANSL, p. 3. Nongshim America, "Mid- to Long-Term Strategy for the U.S. (Proposal) March 2008," NSA0030708_TRANSL, pp. 30 and 47-48.

[43] Declaration of Young Lee in Support of Nongshim Co., Ltd.'s and Nongshim America, Inc.'s Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment, March 29, 2017, ¶¶ 5-8.

[44] Nongshim Foods, Inc (a company in the developmental stage), "Report on Audited Financial Statements For the Year Ended December 31, 2004 and the Period from March 4, 2003 (Date of Inception) through December 31, 2003," January 18, 2005, NSKHC-A00003560-NSKHC-A00003574 at NSKHC-A00003567.

[45] Nongshim Foods, Inc (a company in the developmental stage), "Report on Audited Financial Statements For the Year Ended December 31, 2004 and the Period from March 4, 2003 (Date of Inception) through December 31, 2003," January 18, 2005, NSKHC-A00003560-NSKHC-A00003574 at NSKHC-A00003573.

[46] Nongshim Korea 2006 Annual Report, pp. 33 and 53, http://image.nongshim.com/non/cir/1379870342703.pdf, accessed July 7, 2018.

[47] Nongshim Holdings USA, Inc., "Financial Statements for the Year Ended December 31, 2005 and Independent Auditors' Report," January 25, 2006, NSA0294414-NSA0294429 at NSA0294421.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*

Holdings acquired all of Nongshim America's shares from Nongshim Korea and formed a new Nongshim Foods, Inc. ("Nongshim Foods Second") as a wholly owned subsidiary.[48] (This is a second corporate entity with the name "Nongshim Foods" in the US, so I will refer to it as "Nongshim Foods Second.") Nongshim Holdings capitalized Nongshim Foods Second with $4 million for which it received 40,000 shares.[49] Over the course of 2005, Nongshim Korea invested an additional $9.6 million in Nongshim Holdings for which it received 96,000 shares.[50]

40.     The result of this reorganization was as follows:

- Nongshim Holdings was a direct subsidiary of Nongshim Korea. Nongshim Holdings, in turn, had two direct subsidiaries in the US: Nongshim Foods Second and Nongshim America. Nongshim Holdings engaged in leasing the building it had just built, leasing machinery, and leasing equipment to its subsidiaries, Nongshim Foods Second and Nongshim America.[51] Nongshim Holdings also functioned as a holding company for its subsidiaries. This is a common structure; it allowed the three companies to file a consolidated US tax return and to separate potential liabilities into different business functions.[52]

- Nongshim Foods Second manufactured ramen, which it sold to Nongshim America.

- Nongshim America distributed ramen and other products to wholesalers, distributors, and directly to retailers in the US.[53]

- Nongshim Korea was the ultimate parent of all three companies, and as a functional matter performed the role of parent. I will therefore refer to Nongshim Korea as the

---

[48] Nongshim Holdings USA, Inc., "Financial Statements for the Year Ended December 31, 2005 and Independent Auditors' Report," January 25, 2006, NSA0294414-NSA0294429 at NSA0294421 and NSA0294426.

[49] Nongshim Holdings USA, Inc., "Financial Statements for the Year Ended December 31, 2005 and Independent Auditors' Report," January 25, 2006, NSA0294414-NSA0294429 at NSA0294429. Nongshim Foods [Second], Inc., "Financial Statements for the Year Ended December 31, 2005 and Independent Auditors' Report," January 25, 2006, NSA0295091-NSA0295105 at NSA0295094 and NSA0295102.

[50] Nongshim Holdings USA, Inc., "Financial Statements for the Year Ended December 31, 2005 and Independent Auditors' Report," January 25, 2006, NSA0294414-NSA0294429 at NSA0294426.

[51] Nongshim Holdings USA, Inc. "Financial Statements for the Year Ended December 31, 2005 and Independent Auditors' Report," January 25, 2006, NSA0294414-NSA0294429 at NSA0294421.

[52] Nongshim Holdings USA, Inc. and Subsidiaries, "Consolidated Financial Statements for the Year Ended December 31, 2005," February 16, 2006, NSA0037896-NSA0037911 at NSA0037902.

[53] Nongshim Holdings USA, Inc., "Business Report," July 2008, NSA0035447_TRANS (Trial Exhibit 231).

***HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY***          **16**

parent company of each subsidiary in the Nongshim group of companies unless otherwise indicated specifically or by context.

41.    In January 2010, Nongshim America merged with Nongshim Foods Second.[54]

> **2.    Nongshim Korea's reasons for setting up Nongshim America and other US subsidiaries were consistent with those that generally motivate foreign firms to set up US subsidiaries**

42.    Based on my review of the record, other documents provided to me and the interviews I conducted, I have concluded that Nongshim Korea's reasons for establishing Nongshim America and its other US businesses as subsidiaries were consistent with the common reasons that generally motivate foreign firms to set up US subsidiaries, which I describe above. I have seen no evidence that Nongshim Korea established Nongshim America, Nongshim Holdings, Nongshim Foods, or Nongshim Foods Second for an improper purpose or as sham corporations.

43.    When Nongshim Korea established Nongshim America, it planned to have its US operations grow and potentially list shares on a US stock exchange.[55] With those plans, it would follow that setting up a corporate entity would be preferable to setting up a branch. To the extent the company might finance its growth with debt, separate incorporation of its US business could be advantageous, as I explain above. In addition, if the US business of Nongshim Korea were to list shares on a US exchange, that business would have to be separately incorporated.

44.    Nongshim Korea expected Nongshim America and its other US subsidiaries to operate separately from Nongshim Korea and to have their own management structures that operated separately from the Nongshim Korea management structure. Nongshim America's management had autonomy and was expected to run the company to generate profits, expand to gain market share, and react to local market conditions. If Nongshim Korea had chosen to operate through a branch office instead, Nongshim America's decision making and planning process would have had to be integrated into Nongshim Korea's processes, which Nongshim Korea's executives considered inefficient and ineffective. Nongshim Korea viewed separate incorporation as part

---

[54] Nongshim America, Inc. "Financial Statements for the Six Months Ended June 30, 2012 and 2011 and Independent Accountants' Review Report," NSA0367654-NSA0367680 at NSA0367662.

[55] Nongshim Holdings USA, Inc., "Business Report," July 2008, NSA0035447_TRANS (Trial Exhibit 231).

and parcel of having the management of Nongshim America and its other US subsidiaries operate largely independently.[56]

45.     In addition, as I explain above, the tax treatment of US-source income earned by a branch and income earned by a subsidiary weighed in favor of a subsidiary.[57]

46.     Finally, Nongshim Korea valued the liability protection of incorporating its US businesses. They were specifically concerned about the potential cost of product liability class actions, a mode of litigation that I understand does not exist in South Korea.[58]

47.     As I describe above, Nongshim Holdings was originally established for the purpose of constructing its manufacturing plant. Nongshim Holdings then became the holding company for Nongshim Korea's manufacturing subsidiary, Nongshim Foods Second, and its distribution subsidiary, Nongshim America. Nongshim Holdings' management and finances were separate from those of Nongshim America. Nongshim Holdings owned the group's one major US asset, the newly built plant, which it leased to Nongshim Foods Second. Nongshim Korea incorporated separate companies to perform these functions in order to have management of each function operate independently and to limit potential liability to each separate function.[59]

48.     Nongshim America and the other US subsidiaries established their own banking and financing relationships in the US. Nongshim Korea is not itself a lender to and provides no ongoing financial support to Nongshim America or to its other US subsidiaries. At various times, Nongshim America had a mortgage loan, auto loan, capital leases, loans, and multiple secured lines of credit. For example, in 2003, Nongshim America took out loans with Woori Bank and Wells Fargo of $100,000 and $105,925, respectively, and had an outstanding mortgage note

---

[56] Interview with Mr. Michael Kim of Nongshim Foods Second and Nongshim America on July 19, 2018. Interview with Mr. Young Lee of Nongshim America on July 23, 2018. Interview with Mr. Christopher Park, auditor for Nongshim America, Mr. Ray Kim of Nongshim Holdings and Nongshim America, Mr. Jae Yoo of Nongshim America, and Mr. Eric Lindquist, outside general counsel of Nongshim America, on August 6, 2018. Interview with Mr. Won Joon Lee of Nongshim Korea on August 9, 2018.

[57] Interview with Mr. Eric Lindquist and Mr. Rufus Rhoades, outside general counsel of Nongshim America, on July 25, 2018. Interview with Mr. Christopher Park, auditor for Nongshim America, Mr. Ray Kim of Nongshim Holdings and Nongshim America, Mr. Jae Yoo of Nongshim America, and Mr. Eric Lindquist, outside general counsel of Nongshim America, on August 6, 2018. Interview with Mr. Won Joon Lee of Nongshim Korea on August 9, 2018.

[58] Interview with Mr. Eric Lindquist and Mr. Rufus Rhoades, outside general counsel of Nongshim America, on July 25, 2018.

[59] Interview with Mr. Eric Lindquist and Mr. Rufus Rhoades, outside general counsel of Nongshim America, on July 25, 2018 and Interview with Mr. Won Joon Lee of Nongshim Korea on August 9, 2018.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*      **18**

payable to Hanvit Bank of $1,709,992.[60] By 2009, Nongshim America was renewing secured lines of credit on year-to-year basis and had $8 million due in 2010.[61] As I explain above, the fact that Nongshim America and its US affiliates were separate corporate entities meant that their lenders did not have to take into account Nongshim Korea's risks in extending loans to them. I have seen no evidence that Nongshim Korea guaranteed Nongshim America's debt or otherwise held itself out as being responsible for the debt of the US subsidiaries.

### 3. Nongshim Korea followed corporate formalities in forming Nongshim America and other US subsidiaries and in transacting business with them

49.     Based on my review of the record and other documents provided to me, I have concluded that Nongshim Korea followed appropriate corporate formalities in forming and maintaining Nongshim America and its other US subsidiaries.

50.     Each of these subsidiaries filed articles of incorporation in California, adopted bylaws, adopted a form of share certificate, issued share certificates, made board decisions by written consent, and elected boards of directors annually by written consent.

51.     On October 21, 1994, Nongshim America filed articles of incorporation in California, and on October 30, 1994, it held an organizational meeting with Mr. Dong Y. Shin and Mr. James S. Hong present. Mr. Shin served as the Temporary Chairman and Mr. Hong served as the Temporary Secretary. Mr. Dong W. Shin, Mr. Joon Park, and Mr. Choon H. Shin were elected as directors, Mr. Park was appointed President and Secretary, and Mr. Dong Y. Shin was appointed CFO. During the organizational meeting, the directors authorized the issuance of 3,000 shares to Nongshim Korea in exchange for $300,000. The directors also adopted bylaws and authorized the officers to pay incorporation and organizational expenses. Mr. Hong served as the incorporator.[62]

---

[60] Nongshim America, Inc., "Financial Statements December 31, 2003," January 16, 2004, NSA0384174-NSA0384187 at NSA0384178 and NSA0384182.

[61] Nongshim America, Inc., "Financial Statements for the Years Ended December 31, 2009 and 2008 and Independent Auditors' Report," February 10, 2010, NSA0300372-NSA0300389 at NSA0300383 and NSA0300384.

[62] Nongshim America, Inc., "Minutes of Organizational Meeting," October 30, 1994.

52.     Nongshim America's board of directors held annual meetings and took actions, including the appointment of officers, by written consent.[63] In addition, its sole shareholder took action by written consent, including the election of directors.[64]

53.     The 2005 restructuring among the US subsidiaries was authorized through written consent.[65]

54.     The 2010 merger of Nongshim America and Nongshim Foods Second was also authorized by written consent and was documented in a merger agreement.[66]

### 4.     Nongshim America maintained operational separation from Nongshim Korea and Nongshim Korea's other US subsidiaries

55.     Based on my review of the record, additional documents that Nongshim America provided to me, and on my interviews with Nongshim America's management, I have concluded that Nongshim America maintained operational independence and separation from Nongshim Korea from 2003 to 2010. I base that conclusion on the following: (a) the financial statements that Nongshim America prepared and had audited indicate that Nongshim America was economically viable, (b) Nongshim America's management made decisions independent of Nongshim Korea, (c) the reports that Nongshim America made to Nongshim Korea were consistent with what one would expect of a wholly-owned subsidiary, (d) Nongshim America paid all expenses incurred in its business and did not share any assets or services with Nongshim Korea or any other affiliate, and (e) Nongshim America's purchases from Nongshim Korea and

---

[63] *See*, for example, Nongshim America, Inc., "Unanimous Written Consent To Actions Of Board of Directors," February 1, 2006.

[64] *See*, for example, Nongshim America, Inc., "Consent To Actions of Sole Shareholder Taken In Lieu Of Annual Meeting," February 1, 2006.

[65] Nongshim Foods [Second], Inc., "Consent to Actions by Unanimous Written Consent of Board of Directors, Consent to Actions of Board of Directors by Sole Shareholder and Consent to Action by Sole Shareholder," June 30, 2005. Nongshim Holdings, Inc., "Consent to Actions by Unanimous Written Consent of Board of Directors, Consent to Actions of Board of Directors by Sole Shareholder and Consent to Action by Sole Shareholder," July 1, 2005.

[66] Agreement of Merger between Nongshim Foods [Second] and Nongshim America, November 20, 2009. Certificate of Approval of Merger Agreement from Nongshim Holdings, November 20, 2009. Certificate of Approval of Agreement of Merger from Nongshim America, November 20, 2009. Certificate of Approval of Agreement of Merger from Nongshim Foods [Second], November 20, 2009.

Nongshim America, Inc., "Resolution of the Board of Directors of Nongshim America," November 20, 2009. Nongshim Holdings, Inc., "Unanimous Written Consent of the Shareholders of Nongshim America, Inc. to the Merger Agreement," November 20, 2009. Nongshim Holdings, Inc., "Unanimous Written Consent of the Shareholders of Nongshim Foods [Second], Inc. to the Merger Agreement," November 20, 2009.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*                    **20**

other affiliates were at fair prices and were reflected on its financial statements. I have also concluded that Nongshim America maintained formal and operational separation from its US affiliates and that those US affiliates maintained formal and operational separation from Nongshim Korea.

*Financial Statements and Economic Viability*

56.    As I note above, Nongshim Korea initially capitalized Nongshim America in 1994 with $300,000. A year later, Nongshim Korea invested another $300,000 for 3,000 additional shares.[67] Nongshim Korea has not made any further capital investments since the formation of Nongshim America.

57.    Nongshim America prepared audited financial statements for the years 2003 to 2010, as well as for the years preceding and following the class period. Nongshim Korea's other US subsidiaries did so as well, beginning at the time of their formation. The tables below show Nongshim America's balance sheet and income statement figures for the years ending 2003 to 2010.

**Select Balance Sheet Financial Information of Nongshim America, Inc.**

| Year (1) | Cash (2) | Total Assets (3) | Common Stock (4) | Retained Earnings (5) | Total Equity (6) |
|---|---|---|---|---|---|
| 2003 | $   726,423 | $   4,488,246 | $  600,000 | $   650,776 | $ 1,250,776 |
| 2004 | 4,586,488 | 17,680,545 | 600,000 | 1,483,509 | 2,117,880 |
| 2005 | 2,686,437 | 21,733,027 | 600,000 | 2,271,966 | 2,941,693 |
| 2006 | 529,226 | 20,329,515 | 600,000 | 2,477,596 | 3,169,330 |
| 2007 | 1,078,252 | 25,162,906 | 600,000 | 4,060,579 | 4,911,162 |
| 2008 | 1,584,867 | 27,278,926 | 600,000 | 4,857,929 | 4,956,895 |
| 2009 | 4,180,188 | 30,717,163 | 600,000 | 7,125,321 | 8,206,098 |
| 2010 [1] | 4,347,118 | 43,490,314 | 600,000 | 8,300,522 | 9,645,516 |

**Notes and Sources:**
   Data are from Nongshim America, Inc.'s audited financial statements.
   Common stock, Nongshim Korea's investment, was $600,000 from 2003 to 2010.

   [1] In 2010, Nongshim America merged with Nongshim Foods Second.

---

[67] Notice of Transaction Pursuant to Corporations Code Section 25102(f) for Nongshim America, November 10, 1995. Nongshim America, Inc., Stock Certificate Number 2, December 6, 1995.

**Select Income Statement Financial Information of Nongshim America, Inc.**

| Year<br>(1) | Net Sales<br>(2) | Salaries<br>and Wages<br>(3) | Operating<br>Income<br>(4) | Net<br>Income<br>(5) |
|---|---|---|---|---|
| 2003 | $  22,777,757 | $   467,520 | $    (12,909) | $    127,869 |
| 2004 | 57,125,910 | 753,984 | 774,821 | 455,483 |
| 2005 | 68,612,648 | 1,547,093 | 1,981,445 | 866,921 |
| 2006 | 74,956,339 | 2,202,961 | 238,791 | 205,630 |
| 2007 | 81,129,966 | 2,793,943 | 3,180,022 | 1,582,983 |
| 2008 | 90,935,011 | 2,636,799 | 2,361,541 | 797,350 |
| 2009 | 102,239,195 | 2,939,775 | 4,849,329 | 2,267,392 |
| 2010 [1] | 119,211,787 | 6,265,582 | 5,759,880 | 2,879,511 |

**Notes and Sources:**

Data are from Nongshim America, Inc.'s audited financial statements.

[1] In 2010, Nongshim America merged with Nongshim Foods Second.

58.     Nongshim America's financial statements for fiscal years 2003 to 2010 reflect the following, each of which is consistent with its operational separation from Nongshim Korea and its economic viability:

- A corporation that was economically self-sufficient, generating revenues and profits, and re-investing those profits in its business.

- An ability to pay its debts and expenses with its own cash flows without financial assistance from Nongshim Korea.

- Book value of equity of $1,250,776 and net income $127,869 as of year end 2003,[68] and an equity balance of $9,645,516 and net income of $2,879,511 as of year end 2010.[69]

- Ownership of its own equipment, inventory, and other items.

- A capital lease, mortgage loans, auto loans, and secured lines of credit with unrelated parties.

---

[68] Nongshim America, Inc., "Financial Statements December 31, 2003," January 16, 2004, NSA0384174-NSA0384187.

[69] Nongshim America, Inc., "Financial Statements for the Years Ended December 31, 2010 and 2009 and Independent Auditors' Report," February 10, 2011, pp. 3-4.

- Payments to affiliates for products, along with freight costs, customs and duty, and financing charges associated with the cost of goods sold.
- Payment of operating expenses, including advertising, payroll, employee pension benefits, lease and rental expense, telephone charges, travel expenses and many more items.
- Arm's-length related-party transactions, reflecting the fact that Nongshim America was a distributor of products manufactured by its affiliates. From 2004 to 2010, Nongshim America paid Nongshim Korea amounts ranging from $13,478,917 to $43,982,624 for product, and from 2005 to 2009, it paid Nongshim Foods Second amounts ranging from $5,336,603 to $50,643,430.
- Other arm's-length related-party transactions, including a lease of a warehouse from Nongshim Holdings for lease payments ranging from $163,200 to $705,825 from 2005 to 2009.[70] Lease payments in 2010 were $4,651,030 subsequent to the merger with Nongshim Foods Second in January.
- Nongshim Korea's equity investment in Nongshim America.

59. These points and others in the financial statements show that Nongshim America was a fully functioning, successful company that was operating in a financially independent manner, covering its costs and making a profit, with both inter-affiliate and unrelated party transactions consistent with its business purpose of being a food distribution company serving the North American market, and with no financial assistance from Nongshim Korea. Nongshim America did not pay any dividends or otherwise repatriate profits back to Nongshim Korea. Nongshim America instead re-invested its profits in its own operations and growth.

*Decision Making*

60. As I explained above, the board of a wholly owned subsidiary is typically comprised of directors or officers of the parent. This was true of Nongshim America throughout the class period. Nongshim America's board had three members before July 1, 2005, after which the

---

[70] *See*, for example, Nongshim Holdings USA, Inc, "Financial Statements for the Years Ended December 31, 2007 and 2006 and Independent Auditors' Report," January 31, 2008, NSA0294902-NSA0294917 at NSA0294916.

bylaws were amended to authorize two directors.[71] The board had members of Nongshim Korea's management as well as executives from Nongshim America, Nongshim Holdings, and Nongshim Foods Second. The chart below shows the company's directors from 2004 to 2010.



Nongshim America's Directors from 2004 to 2010

Notes and Sources: Data are from corporate documents from Nongshim America.

61.   Nongshim Korea and the board of Nongshim America gave Nongshim America's management autonomy to manage the company. At Nongshim America, the General Manager made day-to-day decisions, and the General Manager and CEO made major decisions together, including hiring, firing and compensation decisions. Nongshim America's management decided when and where to expand and which distribution channels to target. They also developed packaging suitable for the US market and US consumers. They did not need or seek approval from Nongshim Korea and did not consult with anyone at Nongshim Korea.

---

[71] Nongshim America, Inc., "Consent to Actions by Unanimous Written Consent of Board of Directors, Consent to Actions of Board of Directors by Sole Shareholder and Consent to Action by Sole Shareholder," June 30, 2005.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*          **24**

62.     The Sales Department set prices for ramen and other products sold in the US
independently of Nongshim Korea.[72] This was the case both with respect to ramen made in South
Korea and imported into the US and ramen made in the US starting in 2005.[73] Nongshim
America negotiated prices directly with its US customers with no involvement or direction from
Nongshim Korea.[74] These prices varied over time and across buyers as US market conditions and
customer situations warranted.[75]

63.     There was no overlap in personnel involved in pricing decisions between Nongshim
Korea and Nongshim America.[76] Nongshim America did not consult Nongshim Korea about
price increases and was not expected to, and did not, inform Nongshim Korea of the prices it
charged to US customers.[77]

64.     Nongshim Foods Second was also managed independently. Nongshim Foods Second's
management set the company's production schedule, business plans, and projections, consistent
with Nongshim America's needs and independent of Nongshim Korea.[78]

65.     Nongshim Foods Second also had autonomy in purchasing and procuring ingredients and
other inputs. Nongshim Foods Second made purchasing decisions based on its own cost and
quality judgments with no involvement or direction from Nongshim Korea. Nongshim Foods

---

[72] Deposition of Young Lee, March 31, 2016, Volume 2, pp. 237–238. Declaration of Young Lee in Support of
Nongshim Co., Ltd.'s and Nongshim America, Inc.'s Motion for Summary Judgment, or, in the Alternative,
Partial Summary Judgment, March 29, 2017, ¶¶ 6-13. Declaration of Won Joon Lee in Support of Nongshim
Co., Ltd.'s and Nongshim America, Inc.'s Motion for Summary Judgment, or, in the Alternative, Partial
Summary Judgment, March 29, 2017, ¶¶ 6-9. Interview with Mr. Young Lee of Nongshim America on July 23,
2018 and Interview with Mr. Won Joon Lee of Nongshim Korea on August 9, 2018.

[73] Deposition of Young Lee, March 30, 2016, Volume 1, pp. 90-93 and 109-111.

[74] Deposition of Young Lee, March 31, 2016, Volume 2, pp. 166-167 and 181. Declaration of Young Lee in Support
of Nongshim Co., Ltd.'s and Nongshim America, Inc.'s Motion for Summary Judgment, or, in the Alternative,
Partial Summary Judgment, March 29, 2017, ¶¶ 6-13. Declaration of Won Joon Lee in Support of Nongshim
Co., Ltd.'s and Nongshim America, Inc.'s Motion for Summary Judgment, or, in the Alternative, Partial
Summary Judgment, March 29, 2017, ¶¶ 6-9.

[75] Declaration of Young Lee in Support of Nongshim Co., Ltd.'s and Nongshim America, Inc.'s Motion for
Summary Judgment, or, in the Alternative, Partial Summary Judgment, March 29, 2017, ¶¶ 6 and 8.

[76] Declaration of Young Lee in Support of Nongshim Co., Ltd.'s and Nongshim America, Inc.'s Motion for
Summary Judgment, or, in the Alternative, Partial Summary Judgment, March 29, 2017, ¶ 13. Declaration of
Won Joon Lee in Support of Nongshim Co., Ltd.'s and Nongshim America, Inc.'s Motion for Summary
Judgment, or, in the Alternative, Partial Summary Judgment, March 29, 2017, ¶¶ 8-9.

[77] Interview with Mr. Young Lee of Nongshim America on July 23, 2018. Deposition of Young Lee, March 31, 2016, Volume 2, pp. 166-167 and 172-173.

[78] Interview with Mr. Michael Kim of Nongshim Foods Second and Nongshim America on July 19, 2018.

Second sourced what it could locally and purchased from international vendors when it could not obtain items locally. Nongshim Foods Second did not favor Nongshim affiliates in making purchases and was not asked to do so by Nongshim Korea. Where it did purchase from an affiliate, Nongshim Foods Second negotiated prices as it would with an unrelated party.[79]

66.     When selling to Nongshim America during the years 2003 to 2010, Nongshim Foods Second's policy was to disclose its production costs and, with Nongshim America, set prices that allowed for roughly a 1% margin for Nongshim Foods Second. In the fourth quarter of each year, if Nongshim Foods Second projected a loss for the year, it was understood that Nongshim America would make a payment to Nongshim Foods Second to eliminate the loss. No such payment was made between 2003 and 2010.[80]

67.     Nongshim America and Nongshim Foods Second had separate bonus incentives based on profitability measures and volume.[81]

*Reporting and Communications with Nongshim Korea*

68.     As I explain above, a subsidiary is expected to report on a regular basis to its parent regarding its operations. This was true of Nongshim America. Nongshim America's CEO met with Nongshim Korea once or twice a year in person to discuss financial performance and to review the current business plan.[82] One of those annual meetings was part of a Nongshim group-wide CEOs' meeting.

69.     In addition, Nongshim America sent periodic reports to Nongshim Korea's Overseas Sales Department with information on sales, profits, and business plans. Nongshim Korea would review the information provided and sometimes offer guidance.[83] This is consistent with how one would expect a subsidiary to report to its parent company.

---

[79] Interview with Mr. Michael Kim of Nongshim Foods Second and Nongshim America on July 19, 2018.

[80] Interview with Mr. Young Lee of Nongshim America on July 23, 2018. Phone call with Mr. Young Lee of Nongshim America on September 26, 2018.

[81] Interview with Mr. Christopher Park, auditor for Nongshim America, Mr. Ray Kim of Nongshim Holdings and Nongshim America, Mr. Jae Yoo of Nongshim America, and Mr. Eric Lindquist, outside general counsel of Nongshim America, on August 6, 2018.

[82] Interview with Mr. Young Lee of Nongshim America on July 23, 2018.

[83] Interview with Mr. Young Lee of Nongshim America on July 23, 2018.

70.     Before the US production facility was built, Nongshim America communicated with Nongshim Korea regarding prices and product requirements, just as it would with any supplier.[84]

71.     After local production began, there was less communication by Nongshim America with Nongshim Korea, as over 80% of the products that Nongshim America sold were manufactured by Nongshim Foods Second in the US. At that point purchase-related communications were with Nongshim Foods Second.[85]

*Separation of Assets and Administrative Services*

72.     Nongshim America and Nongshim Korea did not share any physical facilities, assets, employees, or services. Nongshim America maintained its own human resources, information technology, and legal functions. Nongshim America fully paid the salaries and expenses of its employees.[86]

73.     Nongshim America and Nongshim Foods Second leased space in the same building from Nongshim Holdings, and each paid rent separately. Nongshim America and Nongshim Foods Second separately negotiated leases with Nongshim Holdings. It was, and remains, Nongshim Holdings' policy to charge market rates for these leases. To set rents, Nongshim Holdings reviewed rents at comparable buildings in the area.[87] The building leases and equipment, furniture, and vehicle leases are documented in lease agreements. For example, Nongshim America signed a three-year lease with Nongshim Holdings, starting September 1, 2005, for over 67,000 square feet of building space in the Rancho Cucamonga property at a rate of $30,800 a month.[88] At the same time, Nongshim Foods Second also signed a three-year lease with Nongshim Holdings, starting September 1, 2005, for over 198,000 square feet of building space in the Rancho Cucamonga property at a rate of $88,000 a month.[89]

---

[84] Interview with Mr. Young Lee of Nongshim America on July 23, 2018.

[85] Interview with Mr. Young Lee of Nongshim America on July 23, 2018.

[86] Interview with Mr. Young Lee of Nongshim America on July 23, 2018.

[87] Interview with Mr. Christopher Park, auditor for Nongshim America, Mr. Ray Kim of Nongshim Holdings and Nongshim America, Mr. Jae Yoo of Nongshim America, and Mr. Eric Lindquist, outside general counsel of Nongshim America, on August 6, 2018.

[88] Lease Agreement between Nongshim Holdings and Nongshim America, Rancho Cucamonga, California, December 1, 2005.

[89] Lease Agreement between Nongshim Holdings and Nongshim Foods [Second], Rancho Cucamonga, California, December 1, 2005.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*          **27**

74.     Nongshim America initially maintained its own books and records and processed customers' orders using off-the-shelf software. When Nongshim Foods Second's manufacturing facility became operational, Nongshim America began using an SAP system to manage the business.[90]

75.     For income tax purposes, Nongshim Holdings filed consolidated income tax returns.[91]

*Related-Party Transactions*

76.     As a distributor for Nongshim Korea and affiliates, Nongshim America engaged in related-party transactions. Nongshim America accounted for and disclosed those transactions in its financial statements.

77.     Nongshim America's primary, ongoing related-party transaction was its purchase of product from Nongshim Korea initially, and then from Nongshim Foods Second. In addition, Nongshim America sourced some ingredients for Nongshim Korea, leased the building from which it operated from Nongshim Holdings, and engaged in a few additional related-party transactions with various affiliates.

78.     The IRS requires an evaluation of transfer prices for purposes of determining the taxable income of a US subsidiary. Nongshim America's auditor performed these evaluations on the prices at which Nongshim America purchased products from Nongshim Korea throughout the class period. The auditor formalized this analysis in written transfer pricing studies beginning in 2008.[92] Those formal studies followed the approach that the auditor had taken in earlier analyses of transfer prices. The auditor compared the operating margins for Nongshim America, which are largely driven by the cost of products purchased from Nongshim Korea and Nongshim Foods Second, to those of comparable companies. On the basis of this comparison, the auditor

---

[90] Interview with Mr. Young Lee of Nongshim America on July 23, 2018.

[91] Interview with Mr. Christopher Park, auditor for Nongshim America, Mr. Ray Kim of Nongshim Holdings and Nongshim America, Mr. Jae Yoo of Nongshim America, and Mr. Eric Lindquist, outside general counsel of Nongshim America, on August 6, 2018.

[92] I have not reviewed the transfer pricing studies from the class period, for the years 2008, 2009, and 2010, as they were not available from Nongshim America or the auditor. I have received and reviewed the transfer pricing studies for 2014 through 2017 and have been told that these reports, the reports from during the class period, and the preceding less formal analyses all follow the same methodology. Interview with Mr. Christopher Park, auditor for Nongshim America, Mr. Ray Kim of Nongshim Holdings and Nongshim America, Mr. Jae Yoo of Nongshim America, and Mr. Eric Lindquist, outside general counsel of Nongshim America, on August 6, 2018.

concluded that the transfer prices were fair market prices. Nongshim America did not alter any procedures or pricing as a result of the written transfer pricing reports.[93]

79.    The table below shows Nongshim America's purchases and accounts payable from 2004 to 2010.

### Related-Party Transactions of Nongshim America, Inc.
### Purchases and Accounts Payable

| | Purchases | | Accounts Payable | |
| --- | --- | --- | --- | --- |
| Year | Nongshim Korea | Nongshim Foods Second | Nongshim Korea | Nongshim Foods Second |
| (1) | (2) | (3) | (4) | (5) |
| 2004 | $    43,982,624 | | $  10,988,816 | |
| 2005 | 43,364,295 | $    5,336,603 | 392,235 | $    1,602,741 |
| 2006 | 16,553,585 | 33,897,788 | 2,298,878 | 3,209,122 |
| 2007 | 14,735,373 | 43,088,499 | 540,201 | 5,053,784 |
| 2008 | 14,160,503 | 46,643,009 | 486,612 | 5,687,307 |
| 2009 [1] | 13,478,917 | 50,643,430 | 244,732 | 6,948,119 |
| 2010 [2] | 21,377,157 | n/a [3] | 6,665,811 | n/a [3] |

**Notes and Sources:**

Data are from Nongshim America, Inc.'s audited financial statements.

[1] In 2009, Nongshim America purchased from two other affiliates, Shanghai Nongshim Foods, Ltd. ($551,377) and Shenyang Nongshim Foods, Ltd. ($1,260,000). Nongshim America had accounts payable with those affiliates, Shanghai Nongshim Foods, Ltd. ($154,244) and Shenyang Nongshim Foods, Ltd. ($414,000).

[2] In 2010, Nongshim America purchased from three other affiliates, Shanghai Nongshim Foods, Ltd. ($1,604,827), Shenyang Nongshim Foods, Ltd. ($326,550), and Qingdao Nongshim Foods Co., Ltd. ($171,143). Nongshim America had accounts payable with those affiliates, Shanghai Nongshim Foods, Ltd. (834,800) and Qingdao Nongshim Foods Co., Ltd. ($131,314).

[3] In 2010, Nongshim America merged with Nongshim Foods Second.

80.    The table below shows Nongshim America's sales to Nongshim Korea from 2004 to 2010.

---

[93] Interview with Mr. Christopher Park, auditor for Nongshim America, Mr. Ray Kim of Nongshim Holdings and Nongshim America, Mr. Jae Yoo of Nongshim America, and Mr. Eric Lindqvist, outside general counsel of Nongshim America, on August 6, 2018.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*    **29**

**Related-Party Transactions of Nongshim America, Inc.**
**Sales**

| Year | Sales Nongshim Korea |
|---|---|
| (1) | (2) |
| 2004 | $ 10,621,633 |
| 2005 | 8,811,180 |
| 2006 | 9,731,647 |
| 2007 | 8,406,166 |
| 2008 | 12,063,940 |
| 2009 | 8,911,672 |
| 2010 [1] | 0 |

**Notes and Sources:**
Data are from Nongshim America, Inc.'s audited
financial statements.

[1] In 2010, Nongshim America merged with
Nongshim Foods Second.

81.　　As I describe above, Nongshim America leased its office facilities, equipment, and furniture and fixtures from Nongshim Holdings under operating leases. For purposes of sales tax compliance, the auditor evaluated the rates Nongshim Holdings charged for leases of equipment and concluded that the rates were fair market rates.[94] The table below shows the related-party transactions of rental expenses from 2005 to 2010.

---

[94] Interview with Mr. Christopher Park, auditor for Nongshim America, Mr. Ray Kim of Nongshim Holdings and Nongshim America, Mr. Jae Yoo of Nongshim America, and Mr. Eric Lindquist, outside general counsel of Nongshim America, on August 6, 2018.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*

**Related-Party Transactions of Nongshim America, Inc.**
**Rental Expenses**

| Year | Rental Expenses Nongshim Holdings |
|---|---|
| (1) | (2) |
| 2005 | $   163,200 |
| 2006 | 560,924 |
| 2007 | 705,825 |
| 2008 | 674,328 |
| 2009 | 672,046 |
| 2010 | 4,651,030 [1] |

**Notes and Sources:**
Data are from Nongshim Holdings USA, Inc.'s audited financial statements.

[1] In 2010, Nongshim America merged with Nongshim Foods Second.

82.      In addition, Nongshim Foods Second entered into trademark license contracts and technology assistance and license contracts with Nongshim Korea. The company's auditor analyzed the royalty rates that Nongshim America paid using comparable market prices and concluded that the rates were market rates.[95] The trademark license royalty was 2% of net sales in July 2006 and the remainder of the class period.[96] The technology assistance and license royalty was 1% of net sales in July 2006 and the remainder of the class period.[97]

83.      Nongshim America retained its profits, as evidenced by its retained earnings account on the balance sheet, and did not distribute any dividends during the class period.

---

[95] Interview with Mr. Christopher Park, auditor for Nongshim America, Mr. Ray Kim of Nongshim Holdings and Nongshim America, Mr. Jae Yoo of Nongshim America, and Mr. Eric Lindquist, outside general counsel of Nongshim America, on August 6, 2018.

[96] Trademark License Contract between Nongshim Korea and Nongshim Foods [Second], July 1, 2006. Trademark License Contract between Nongshim Korea and Nongshim America, January 1, 2010.

[97] Technology Assistance and License Contract between Nongshim Korea and Nongshim Foods [Second], July 1, 2006. Technology Assistance and License Contract between Nongshim Korea and Nongshim America, January 1, 2010.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*          **31**

### 5. Did Nongshim America's operations and procedures dramatically change after the end of the class period in 2010?

84.    Based on my review of Nongshim America's financial statements and board minutes and on my interviews with Nongshim America employees, it is my opinion that the management of Nongshim America has remained consistent in maintaining formal and operational separation from Nongshim Korea since the end of the class period in 2010.[98]

### B. Opinions regarding the formation of Ottogi America and its formal and operational separation from Ottogi Korea

#### 1. Background to the formation of Ottogi America

85.    Prior to 2005, Ottogi Korea sold its products, including ramen, in the US through independent distributors.[99] Ottogi Korea's Overseas Sales Department was responsible for selling export-bound products to third-party distributors.[100] As sales in the US grew, Ottogi Korea began exploring the possibility of establishing its own business operations in the US. In 2005, after conducting several studies of the US market, Ottogi Korea established Ottogi America in the US as a wholly-owned subsidiary.[101] The advantages it envisioned in doing so included (a) gaining a better understanding of local market conditions, (b) establishing a marketing plan tailored to Ottogi's products and local market conditions, (c) instituting a more independent decision making structure that would be responsive to local conditions, (d) expanding the sale and distribution of Ottogi-brand products in the US and (e) growing and diversifying Ottogi's

---

[98] Interview with Mr. Michael Kim of Nongshim Foods Second and Nongshim America on July 19, 2018 and Interview with Mr. Young Lee of Nongshim America on July 23, 2018. Declaration of Young Lee in Support of Nongshim Co., Ltd.'s and Nongshim America, Inc.'s Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment, March 29, 2017, ¶¶ 6 and 9-13.

[99] Declaration of Heung Duk Seo in Support of Ottogi Corporation, Ltd. and Ottogi America, Inc.'s Motion for Summary Judgment, March 29, 2017, ¶ 3. Deposition of Min Hwan Choi, April 8, 2016, Volume 1, pp. 34-36.

[100] Deposition of Min Hwan Choi, April 8, 2016, Volume 1, pp. 34-36.

[101] Ottogi America, Inc., "Financial Statements for the Year Ended December 31, 2005 and Independent Auditors' Report," February 22, 2006, OTGAM-0042716-OTGAM-0042728 at OTGAM-0042722 and OTGAM-0042726. Deposition of Dong Soo Lim, February 14, 2018, pp. 51-56. Deposition of Dong Soo Lim, March 5, 2018, pp. 142-147.

business in the US by building local manufacturing capabilities and/or acquiring or merging with other businesses in the US.[102]

86.     Consistent with these goals, Ottogi America was established as a wholly-owned subsidiary under the laws of California on May 5, 2005. Ottogi Korea made a capital contribution of $1,000,000 to Ottogi America, for which it received 10,000 shares of common stock.[103] Ottogi America then hired Mr. Sae Hoon Lee, an American resident with no prior connection to Ottogi Korea, as its President.[104] In May 2005, Ottogi America began its operations.[105]

87.     Since then, Ottogi America has been engaged in distributing food products throughout the US.[106] Ottogi America distributes food products that it purchases from its parent, other overseas affiliates, and unrelated companies.[107]

88.     Ottogi America initially leased a warehouse in Commerce, CA and then moved its operations to Bell, CA a year later.[108] In 2009, Ottogi America purchased a building in Gardena, CA to serve as its office and warehouse.[109] Ottogi America financed the purchase with an additional equity investment of $2,000,000[110] from Ottogi Korea and a loan for $3,000,000 from Ottex Corporation, which was then a joint venture between Ottogi Korea and an unrelated company.[111] The loan had a 5 percent interest rate, with a provision that the interest rate would

---

[102] Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018.

[103] Ottogi America, Inc., "Minutes of Organizational Meeting," May 5, 2005.

[104] Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018. Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018.

[105] Deposition of Young Wook Ham, March 10, 2016, Volume 2, p. 199.

[106] Ottogi America, Inc., "Financial Statements for the Year Ended December 31, 2005 and Independent Auditors' Report," February 22, 2006, OTGAM-0042716-OTGAM-0042728 at OTGAM-0042722.

[107] Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018 and Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

[108] Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

[109] Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018. Ottogi America, Inc., "Financial Statements for the Years Ended December 31, 2009 and 2008 Independent Auditors' Report," February 10, 2010, OTGAM-0042774-OTGAM-0042789 at OTGAM-0042783.

[110] Ottogi America, Inc., "Minutes of the Meeting of Boards," September 30, 2009.

[111] "Promissory Note" received by Ottogi America (Borrower) from Ottex Corporation (Lender), July 15, 2009. Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*          33

increase to 10 percent if Ottogi America did not repay the loan according to a specified schedule.[112] Ottogi America continues to operate out of its location in Gardena today.[113]

### 2. Ottogi Korea's reasons for setting up Ottogi America were consistent with those that generally motivate foreign firms to set up US subsidiaries

89.    Based on my review of the record, other documents provided to me and the interviews I conducted, I have concluded that Ottogi Korea's reasons for establishing Ottogi America were consistent with the common reasons that generally motivate foreign firms to set up US subsidiaries, which I describe above. I have seen no evidence that Ottogi Korea established Ottogi America for an improper purpose or as a sham corporation.

90.    Ottogi Korea envisioned a substantial presence in the US when it formed Ottogi America. In addition to direct sales to the US market, the parent company had the goal of establishing manufacturing locally and growing through mergers and acquisitions. The US entity was the starting point of a vision of global expansion.[114]

91.    It followed that Ottogi America would be established as a subsidiary rather than a branch. With ambitious plans for growth, Ottogi America could seek local financing of its operations, which as I explain above might be obtained more easily and on better terms if the lender was not exposed to risk related to Ottogi Korea's business. In light of the plan to have Ottogi America acquire other companies, such financing could also be needed. In addition, having Ottogi America make acquisitions, rather than having Ottogi Korea do so, would reduce the burden on Ottogi Korea's board, avoid potential regulatory hurdles of a cross-border merger, and insulate Ottogi Korea from liabilities of an acquired company. In addition, because the US business would be operated as a stand-alone business with local management decision making, a corporate entity was the more attractive vehicle to Ottogi Korea.[115]

---

[112] "Promissory Note" received by Ottogi America (Borrower) from Ottex Corporation (Lender), July 15, 2009.

[113] Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018.

[114] Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018 and Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018.

[115] Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018.

92.     Another factor that weighed in favor of operating the US business through a subsidiary was South Korean regulations of cross-border currency transfers. As I explain above, foreign currency transactions in Korea were highly regulated during the class period. If Ottogi Korea were to conduct business in the US directly through a US branch, it would have to continuously obtain government approval for each transaction that its business required. This would impede cash flows and impair the business.[116]

93.     Ottogi Korea's standard operating procedure had been and continues to be to establish foreign subsidiaries, rather than branch offices. For example, Ottogi Korea has subsidiaries in China, New Zealand, and Vietnam. The only instances in which Ottogi Korea has established a branch office rather than a subsidiary in a foreign country was where the branch office was designed to serve a very limited function. For instance, in Russia, Ottogi Korea operates a branch office, rather than a subsidiary, because the company does not conduct any sales or production activity; its branch only serves a marketing function.[117]

94.     Likewise, between 1981 and 1991, Ottogi Korea had a branch office in the US that served the limited function of collecting information about raw materials sourced from the US and providing marketing materials to third party distributors.[118] Ottogi Korea's preference for independent subsidiaries abroad is based on its view that the managers of each foreign business should operate independently, understand the local market, and react to local market conditions in real-time without consultation with executives in South Korea.[119]

---

[116] Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018.

[117] I understand that Russian regulations imposed restrictions on sales and expansion. Ottogi's Russian branch office handles only marketing and promotions and sales are conducted through third-party import-export companies. Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018.

[118] Ottogi Korea's branch office in the US that was in existence between 1981 and 1991 did not conduct any sales in the US. Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018. Prior to the establishment of Ottogi America, Ottogi Korea sold all of its products destined for the US market through independent exporters located in South Korea and two in the United States. Deposition of Min Hwan Choi, April 18, 2016, Volume 2, pp. 7-8.

[119] Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018 and Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018.

95.     In sum, Ottogi Korea's motivations for setting up Ottogi America as a subsidiary that would conduct sales and production in the US were consistent with the motivations and practice of other global companies. I have seen no evidence of an improper motive.

### 3.     Ottogi Korea followed corporate formalities in forming Ottogi America and in transacting business with its US subsidiary

96.     Based on my review of the record and other documents provided to me, I have concluded that Ottogi Korea followed appropriate corporate formalities in forming and maintaining Ottogi America.

97.     Appropriate corporate formalities include filing articles of incorporation, electing a board of directors, adopting corporate bylaws, issuing shares, holding meetings of the board of directors and the shareholders, and keeping minutes of board and shareholder meetings. Among a subsidiary and a parent corporation or among affiliates, formalities also include documenting inter-company transactions.

98.     On February 1, 2005, Ottogi America filed articles of incorporation in California.[120]

99.     On May 5, 2005, Ottogi America held an organizational meeting with Mr. Sae Hoon Lee, Mr. Young Joon Ham, and Mr. Won Tae Jin present. Mr. Lee served as the Temporary Chairman and Temporary Secretary. The three individuals present at the meeting were elected as directors, and Mr. Lee was appointed as the President, Secretary, and CFO. During the organizational meeting, the directors authorized the issuance of 10,000 shares to Ottogi Korea in exchange for $1,000,000. The directors also adopted bylaws for the corporation and authorized the officers to pay incorporation and organizational expenses. Mr. Kyungsoo Park, Esq., the incorporator, signed the minutes of the organizational meeting.[121]

---

[120] "Articles of Incorporation of Ottogi America, Inc.," February 1, 2005, RNA0000484-RNA0000488 at RNA0000485.

[121] Ottogi America, Inc., "Minutes of Organizational Meeting," May 5, 2005.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*

100.    Thereafter, Ottogi America held annual board of directors' meetings in person and kept minutes of those meetings.[122] Ottogi America also held annual shareholder meetings, beginning on March 6, 2006,[123] and kept minutes of those meetings.[124]

101.    Whenever there was a significant transaction between Ottogi Korea and Ottogi America, each board of directors separately considered the matter and approved the transaction. For example, between 2005 and 2010, Ottogi Korea made two capital investments in Ottogi America.[125] Each company's board of directors reviewed and approved each transaction at a board meeting.[126]

102.    Ottogi America's board of directors fluctuated between two and four members. Consistent with common practice I describe above, the board always included an officer of Ottogi Korea, specifically the company's CEO. In addition, the board included the Ottogi America CEO. The chart below shows the appointed and elected directors from 2005 to 2010.

---

[122] *See*, for example, Ottogi America, Inc., "Minutes of Special Meeting of Directors of Ottogi America, Inc.," March 14, 2006 and Ottogi America, Inc., "Minutes of Annual Meeting of Directors of Ottogi America, Inc.," February 28, 2007.

[123] Ottogi America, Inc., "Minutes of Special Meeting of Shareholders," March 6, 2006.

[124] *See*, for example, Ottogi America, Inc., "Minutes of Special Meeting of Shareholders of Ottogi America, Inc.," March 6, 2006 and Ottogi America, Inc., "Minutes of Annual Meeting of Shareholders of Ottogi America, Inc.," February 28, 2007.

[125] Ottogi America, Inc., "Minutes of Organizational Meeting," May 5, 2005. Ottogi America, Inc., "Minutes of the Meeting of Boards," September 30, 2009. Ottogi Korea, "Minutes of the Meeting of the Board of Directors," January 10, 2005. Ottogi Korea, "Minutes of the Meeting of the Board of Directors," July 6, 2009.

[126] Ottogi America, Inc., "Minutes of Organizational Meeting," May 5, 2005. Ottogi America, Inc., "Minutes of the Meeting of Boards," September 30, 2009. Ottogi Korea, "Minutes of the Meeting of the Board of Directors," January 10, 2005. Ottogi Korea, "Minutes of the Meeting of the Board of Directors," July 6, 2009.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*          *37*



**Ottogi America's Directors from 2005 to 2010**

Notes and Sources: Data are from the minutes of the Ottogi America, Inc. shareholder meetings and board of directors meetings.

103.     Ottogi Korea had a separate board of directors that held its own meetings and maintained its separate meeting minutes.[127] I understand that Ottogi Korea is a publicly traded company in South Korea and holds regular shareholder meetings as required under the local laws.

104.     Other than regular sales and purchases of products, which would not typically require board approval, there were no other financial transactions between Ottogi Korea and Ottogi America.[128] Every transaction that would typically require board approval was reviewed and approved by the board of directors of each company and properly recorded.

105.     In sum, Ottogi America followed corporate formalities with respect to corporate governance and inter-affiliate transactions.

     **4.**     **Ottogi America maintained operational separation from Ottogi Korea**

---

[127] For example, *see*, Ottogi Korea, "Minutes of the Meeting of the Board of Directors," January 10, 2005 and Ottogi Korea, "Minutes of the Meeting of the Board of Directors," July 6, 2009.

[128] Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018 and Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*     **38**

106.     Based on my review of the record, additional documents that Ottogi America provided to me, and my interviews with Ottogi America's management, I have concluded that Ottogi America maintained operational independence and separation from Ottogi Korea from 2005 to 2010. I base that conclusion on the following: (a) the financial statements that Ottogi America prepared and had audited indicate that Ottogi America was economically viable, (b) Ottogi America's management made decisions independent of Ottogi Korea, (c) the reports that Ottogi America made to Ottogi Korea were consistent with what one would expect of a wholly-owned subsidiary, (d) Ottogi America paid all expenses incurred in its business and did not share any substantial assets or services with Ottogi Korea or any other affiliate, and (e) Ottogi America's purchases from Ottogi Korea and other affiliates were at fair prices and reflected on its financial statements.

*Financial Statements and Economic Viability*

107.     Ottogi America prepared audited annual financial statements for all years since 2005.[129] The tables below show these balance sheet and income statement figures for the years ending 2005 to 2010.

### Select Balance Sheet Financial Information of Ottogi America, Inc.

| Year | Cash | Total Assets | Common Stock | Retained Earnings | Total Equity |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2005 | $ 557,237 | $ 3,059,245 | $ 1,000,000 | $ (4,733) | $ 995,267 |
| 2006 | 485,068 | 3,518,768 | 1,000,000 | 39,582 | 1,039,582 |
| 2007 | 484,028 | 4,451,576 | 1,000,000 | 150,838 | 1,150,838 |
| 2008 | 183,969 | 3,858,189 | 1,000,000 | 463,200 | 1,463,200 |
| 2009 | 290,877 | 10,432,680 | 3,000,000 | 1,091,760 | 4,091,760 |
| 2010 | 821,112 | 11,242,010 | 3,000,000 | 1,786,886 | 4,786,886 |

**Notes and Sources:**
    Data are from Ottogi America, Inc.'s audited financial statements.

---

[129] Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*

**Select Income Statement Financial Information of Ottogi America, Inc.**

| Year | Net Sales | Salaries and Wages | Operating Income | Net Income |
|------|-----------|--------------------|------------------|-----------|
| (1) | (2) | (3) | (4) | (5) |
| 2005 | $  2,267,085 | $ 123,163 | $   (15,535) | $   (4,733) |
| 2006 | 6,787,982 | 476,408 | 51,108 | 43,909 |
| 2007 | 9,743,528 | 658,971 | 201,872 | 111,256 |
| 2008 | 10,417,096 | 642,840 | 535,451 | 312,362 |
| 2009 | 11,642,367 | 634,228 | 1,106,150 | 628,560 |
| 2010 | 13,168,876 | 695,025 | 1,194,295 | 695,126 |

**Notes and Sources:**
Data are from Ottogi America, Inc.'s audited financial statements.

108.    Ottogi America's financial statements for fiscal years ending 2005 to 2010 reflect the following, each of which is consistent with its operational separation from Ottogi Korea and its economic viability:

- A corporation that was economically self-sufficient, generating revenues and profits, and re-investing those profits. Although 2005 ended with a small net loss, the company reported operating and net income in subsequent years.

- An ability to pay its debts and expenses with its own cash flows without assistance from Ottogi Korea.

- Book value of equity of $995,267 and a net loss of $4,733 as of year end 2005,[130] and an equity balance of $4,786,886 and net income of $695,126 as of year end 2010.[131]

- Ownership of a building, vehicles, machinery, inventory, and other items.

- Leases, both capital and operating, an auto loan, and secured lines of credits with unrelated parties.

- Loans from an affiliated company documented with a promissory note with interest and principle repaid according to a fixed schedule.

---

[130] Ottogi America, Inc., "Financial Statements for the Year Ended December 31, 2005 and Independent Auditors' Report," February 22, 2006, OTGAM-0042716-OTGAM-0042728 at OTGAM-0042719 and OTGAM-0042720.

[131] Ottogi America, Inc., "Financial Statements for the Years Ended December 31, 2010 and 2009 and Independent Auditors' Report," February 14, 2011, OTGAM-0042790-OTGAM-0042805 at OTGAM-0042793 and OTGAM-0042794.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*

- Payments of its own operating expenses, including salaries and wages, travel expenses, insurance, legal and professional fees, lease and rent expenses, promotion expenses, advertising expenses, freight out, employee benefits, warehouse expenses, and many more items.

- Arm's-length related-party transactions properly recorded and reflecting the fact that Ottogi America was a distributor of products manufactured by its parent company and affiliates—primarily purchases and accounts payable. Payments for product included freight costs, customs and duty and financing charges associated with the cost of goods sold.

- Transactions with other unrelated suppliers of food products, all of which Ottogi America paid with its own funds.

- Ottogi Korea's equity investments in Ottogi America.

109.    These points and others in the financial statements show that Ottogi America was a fully functioning, successful company that was operating in a financially independent manner, covering its costs and making a profit, with both inter-affiliate and unrelated party transactions consistent with its business purpose of being a food distribution company serving the North American market. Ottogi America did not pay any dividends or otherwise repatriate profits back to Ottogi Korea. Ottogi America instead re-invested its profits in its own operations and growth. Conversely, aside from making the two equity investments described above, Ottogi Korea did not infuse cash into Ottogi Korea.

*Decision Making*

110.    Ottogi Korea and the board of Ottogi America gave Ottogi America's management autonomy to manage the company without involvement from Ottogi Korea.

111.    Ottogi America's CEO and General Manager made the day-to-day decisions for the company in consultation with senior managers. The two of them, for example, made all hiring and firing decisions; determined the salaries of Ottogi America's employees; selected Ottogi America's supplier and vendors; determined what products to sell, including products supplied by unrelated third-party food manufacturers; decided on day-to-day expenditures, such as office

supplies, computers, and furniture; decided on professional services, such as consultants; and decided how to maintain the books and records.[132]

112.    Ottogi America also had the discretion to decide what products it would carry. Out of over 2000 different products manufactured by Ottogi Korea and its affiliates, Ottogi America purchased and distributed only the products that it deemed suitable for the US market.[133] Moreover, Ottogi America did not, and currently does not, limit its product portfolio to items manufactured by Ottogi Korea and its affiliates; instead, Ottogi America has routinely distributed food products manufactured by companies outside of the Ottogi corporate group.[134] Over the years, Ottogi America has purchased and distributed snacks, energy drinks, dairy products, seaweed, dumplings, and dried food products manufactured by unrelated companies located in the US and abroad.[135]

113.    With respect to the terms of the sales of its products, including the prices of ramen products, Ottogi America made its own decisions based on individual negotiations with customers.[136] The head of the sales department and his team had discretion to negotiate and close sales without involvement from the CEO or General Manager, let alone input from the management at Ottogi Korea.[137] Ottogi America's salespeople negotiated prices with their assigned customers, taking into account local market conditions. Prices were reflected in "order lists" that varied from customer to customer.[138] Ottogi America's prices not only differed among

---

[132] Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018 and Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018.

[133] Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018 and Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018.

[134] Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018 and Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018.

[135] Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018 and Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018.

[136] Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018 and Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018. Deposition of Seung Yub Lee, May 19, 2016, pp. 79-80. Deposition of Dong Soo Lim, March 5, 2018, Volume 2, pp. 176 and 178. Deposition of Young Wook Ham, March 18, 2016, Volume 3, pp. 324-325 and 328.

[137] Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018 and Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

[138] Declaration of Young Wook Ham in Support of Ottogi Corporation, Ltd. and Ottogi America, Inc.'s Motion for Summary Judgment, March 28, 2017, ¶¶ 2-4. Deposition of Dong Soo Lim, February 14, 2018, pp. 98-104. Deposition of Dong Soo Lim, March 5, 2018, pp. 177-179. Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

its various customers, but also differed from Ottogi Korea's prices for sales in Korea.[139] There was no overlap in personnel involved in pricing decisions between Ottogi America and Ottogi Korea[140] and I am not aware of any evidence that anyone from Ottogi Korea ever directed, advised, or instructed Ottogi America on what prices to charge Ottogi America's customers.[141]

114.   Even at the strategic level, where one might reasonably expect heavy involvement from a parent corporation, Ottogi Korea's involvement with the affairs of Ottogi America was very limited. Ottogi Korea never dictated or instructed Ottogi America on its business strategy.[142] Instead, every year, Ottogi America would set its own business plan for the following year, including revenue and profit targets and strategic areas to emphasize for growth.[143] Ottogi America's management would present its business plans to Ottogi Korea during a meeting with all of the CEOs of Ottogi Korea's affiliated companies.[144] For example, at the February 2008 meeting, Ottogi America presented its revenue and profit targets and financial projections for the upcoming year and Ottogi America's plans to acquire a dumpling factory and develop new products.[145] Ottogi Korea generally accepted Ottogi America's business plans and never instructed Ottogi America to set a different sales goal or otherwise change its business plans. Based on the sales and profit goals that it set for itself, Ottogi America developed its own

---

[139] Declaration of Young Wook Ham in Support of Ottogi Corporation, Ltd. and Ottogi America, Inc.'s Motion for Summary Judgment, March 28, 2017. Declaration of Bangwan Ku in Support of Ottogi Corporation, Ltd. and Ottogi America, Inc.'s Motion for Summary Judgment, March 29, 2017. Declaration of Heung Duk Seo in Support of Ottogi Corporation, Ltd. and Ottogi America, Inc.'s Motion for Summary Judgment, March 29, 2017.

[140] Declaration of Minae Yu in Support of Ottogi Co., Ltd. and Ottogi America, Inc.'s Motion for Summary Judgment, March 29, 2017, Ex. 54 and 55.

[141] Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018 and Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018. Deposition of Seung Yub Lee, May 19, 2016, pp. 79-80 and 92. Deposition of Dong Soo Lim, March 5, 2018, Volume 2, pp. 176 and 178.

[142] Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018. Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018. Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018.

[143] Deposition of Seung Yub Lee, May 19, 2016, pp. 89-91.

[144] Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018. Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018. Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018.

[145] Ottogi America, Inc. presentation at the February 2008 [Ottogi] International Corporation CEOs' Meeting, February 28, 2008 (OTGAM-0025067).

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*      **43**

employee bonus and incentive programs.[146] This process reflects a high degree of management independence at Ottogi America, which is consistent with Ottogi Korea's expectations from the start.

115.    In short, from a day-to-day management perspective, Ottogi America was an independent entity. Ottogi America was managed as one would expect an independent corporate entity to be managed. Even with respect to strategy, the company operated largely independently of Ottogi Korea.

*Reporting and Communications with Ottogi Korea*

116.    As I explain above, a subsidiary is expected to report to its parent regarding its operations. This follows from the fact that the parent is its sole shareholder and ultimately has the power to step in if the subsidiary's performance fails to meet expectations. During the early years, Ottogi America provided weekly reports on sales, local trends and market conditions. As the company grew and stabilized, these weekly reports became less frequent and were phased out in 2010. Separately, Ottogi America prepared monthly and quarterly reports on sales and financial results for Ottogi Korea.[147] Ottogi Korea's Finance Department used the quarterly reports in preparing Ottogi Korea's consolidated financial reports.[148] Such reporting by a subsidiary to its parent is consistent with the reporting one would expect.

117.    In addition, the CEOs of Ottogi America and all foreign Ottogi subsidiaries met with Ottogi Korea twice a year to report and discuss financial results and business plans for the following year.[149] Because Ottogi America is a wholly owned subsidiary of Ottogi Korea, it is necessary for its management (like management of all subsidiaries) to report its financial performance and risk factors to Ottogi Korea. Ottogi Korea's management is responsible for the performance of the entire group. Having subsidiaries reporting financial results and prospects is

---

[146] Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018. Deposition of Seung Yub Lee, May 19, 2016, pp. 88-91.

[147] I understand that these sales and financial results reports were initially prepared weekly at the start of the enterprise. Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

[148] Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018. Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018. Interview with Mr. Seung Yub Lee, a former CEO of Ottogi America, on July 18, 2018. Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

[149] Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018 and Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018.

particularly important because Ottogi Korea is a public company, and therefore must report that information for the group as a whole to its shareholders.

118.    Other than these reports, the only communication between Ottogi America and Ottogi Korea was related to their transactions as sellers and purchasers of products.

119.    With respect to purchases from Ottogi Korea, all of the company's foreign subsidiaries, including Ottogi America, communicated with the Ottogi Korea Overseas Sales Department.[150] Other departments within Ottogi Korea had no involvement with sales to Ottogi America.[151] Ottogi America's communications with the Overseas Sales Department related to negotiations concerning export prices, notifications of changes to export prices, purchases, shipping, orders and deliveries.[152] There would also be dialogue to discuss any errors, discrepancies, or other concerns. There was no informal channel of communications between Ottogi America and Ottogi Korea other than some personal calls or emails among employees.[153]

*Separation of Assets and Administrative Services*

120.    Ottogi America and Ottogi Korea did not share any physical facilities or assets.

121.    Ottogi America maintained its own human resources and information technology departments and paid for essentially all its own administrative services. Ottogi America did not receive any cash payments from Ottogi Korea, and Ottogi Korea did not pay for any of Ottogi America's expenses.[154]

122.    The only shared business function was email hosting, which an affiliate, Richwood Data Services ("RDS"), provided to Ottogi Korea and affiliated companies. I understand that because the incremental cost of providing email hosting to Ottogi America was de minimis, RDS did not charge Ottogi America for this service.[155]

---

[150] Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018.

[151] Deposition of Bangwan Ku, April 5, 2016, Volume 1, pp. 18-20.

[152] Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018 and Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

[153] Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018. Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018. Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

[154] Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

[155] Interview with Mr. Sung Joo Maeng, Mr. Se Hyung Chun, and Mr. Heung Duk Seo of Ottogi Korea on July 16, 2018 and Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018.

123.    Ottogi America fully paid the salaries and expenses of all its employees.[156] There were no employees that worked for Ottogi America and Ottogi Korea or any affiliate concurrently during the class period.

124.    Ottogi America also maintained its own books and records and generated its own financial reports using off-the-shelf Peachtree accounting software that was not linked to Ottogi Korea. When preparing reports for Ottogi Korea, Ottogi America would port the Peachtree output into a template form for the parent company.[157]

125.    In sum, Ottogi America covered the costs of its own operations.

*Related-Party Transactions*

126.    Ottogi Korea initially capitalized Ottogi America with $1,000,000 in 2005.[158] In 2009, it invested another $2,000,000.[159] Ottogi Korea did not make any other equity investments in Ottogi America during the class period, nor did it provide Ottogi America with cash in any other way.

127.    Ottogi America's only significant related-party transactions were for purchases of product from Ottogi Korea and other affiliates. To the extent Ottogi America transacted business with affiliates, it identified and accounted for those transactions in its financial statements. The table below shows the related-party transactions from 2005 to 2010.

---

[156] Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018.

[157] Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018 and Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

[158] Ottogi America, Inc., "Minutes of Organizational Meeting," May 5, 2005.

[159] Ottogi America, Inc., "Minutes of the Meeting of Boards," September 30, 2009.

### Related-Party Transactions of Ottogi America, Inc.

| | Purchases | | | | Accounts Payable | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Year | Ottogi Korea | Jiangsu Ottogi Foods | Jiangsu Taedong Foods | | Ottogi Korea | Jiangsu Ottogi Foods | Jiangsu Taedong Foods |
| (1) | (2) | (3) | (4) | | (5) | (6) | (7) |
| 2005 | $ 2,802,489 | | | | $ 1,885,531 | | |
| 2006 | 5,116,584 | | | | 2,327,988 | | |
| 2007 | 7,619,157 | $ 134,520 | $  68,561 | | 2,991,211 | | |
| 2008 | 6,765,808 | 100,503 | 102,024 | | 2,076,351 | $  19,178 | $ 22,606 |
| 2009 | 7,829,494 | 207,979 | 176,634 | | 2,830,326 | 30,763 | 30,770 |
| 2010 | 7,351,043 | 282,224 | 191,586 | | 3,128,415 | 113,290 | 3,516 |

**Notes and Sources:**
Data are from Ottogi America, Inc.'s audited financial statements.

128.   Ottogi America purchased product from Ottogi Korea and other affiliates at arm's-length prices. The IRS requires an evaluation of transfer prices for purposes of determining the taxable income of a US subsidiary. Beginning in 2009, its auditor formalized the analysis of the prices at which Ottogi America purchased products from Ottogi Korea in written transfer pricing reports and continued to prepare those reports biennially thereafter.[160] In preparing the 2009 report, Ottogi America's auditor examined Ottogi America's operating margin and compared it to that of comparable companies under the Comparable Profits Method, which is a widely accepted method of conducting transfer price studies.[161] It did this for the years 2007, 2008 and 2009. Based on the comparison, the auditor concluded that Ottogi America's purchase price of products from Ottogi Korea were at fair market prices. Ottogi America was not required to alter any procedure or pricing as a result of the transfer price study.

129.   Ottogi America made all purchasing decisions, and each purchase was documented with a purchase order.[162] As I discuss above, Ottogi America negotiated the purchase price of products

---

[160] Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018. "Ottogi America, Inc. Transfer Pricing Study For the calendar year ended 12/31/2009" (OTGAM-0039515).

[161] "Ottogi America, Inc. Transfer Pricing Study For the calendar year ended 12/31/2009" (OTGAM-0039515).

[162] Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

*See*, for example, OTGAM-0004252; OTGAM-0006587; OTGAM-0006591; OTGAM-0006597; OTGAM-0006601; OTGAM-0006605; OTGAM-0012589; OTGAM-0012633; OTGAM-0012649; OTGAM-0004242; and OTGAM-0004244.

*HIGHLY CONFIDENTIAL —ATTORNEYS' EYES ONLY*          47

with Ottogi Korea at arm's length and paid fair market value for the products.[163] After receiving the products, Ottogi America made payments to Ottogi Korea as reflected in commercial invoices.[164] This is what one would expect of an independently operating subsidiary.

130.   Other than payments for the products, Ottogi America did not pay dividends or otherwise distribute profits to Ottogi Korea during the class period, nor did Ottogi Korea infuse any cash into Ottogi America other than through the two equity investments described above. send any money to Ottogi Korea. Ottogi America did not distribute any dividends during the class period.

131.   In sum, with respect to all aspects of Ottogi America's operations, Ottogi America functioned as a separate entity from Ottogi Korea.

### 5.   Ottogi America's operations and procedures did not dramatically change after the end of the class period in 2010

132.   Based on my review of Ottogi America's financial statements and board minutes and on my interviews with Ottogi America employees, it is my opinion that the management of Ottogi America has remained consistent in maintaining formal and operational separation from Ottogi Korea since the end of the class period in 2010.

## VI.   Professor Haggard's Characterization of the Nongshim and Ottogi Groups as "Chaebols" Has No Bearing on My Opinions

133.   I am aware that Professor Stephen Haggard has submitted a declaration ("Haggard Declaration") in which he expressed opinions regarding whether the Nongshim and Ottogi corporate groups should be characterized as "chaebols," a South Korean term that, I understand, is used to refer to certain corporate groups managed by families.[165] I am also aware that Professor Dae Sik Hong has submitted a rebuttal expert report ("Hong Rebuttal Expert Report") in which he disputes the characterization of Nongshim and Ottogi as "chaebols."[166] None of the opinions

---

[163] Interview with Ms. Hye Bong Jeon, Mr. Young Wook Ham, Mr. Dong Soo Lim, and Ms. Judy Kim of Ottogi America on July 18, 2018 and Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

[164] Interview with Mr. Kang Sik Hong of Ottogi America on July 21, 2018.

*See*, for example, OTGKR-0002016-17; OTGKR-0002024-25; OTGKR-0002028-29; OTGKR-0002038-44; OTGKR-0002045-53; OTGKR-0002287-90; OTGKR-0002293-301; OTGKR-0002351-54; OTGKR-0002423-27; OTGKR-0002527-29; OTGKR-0002535-37; OTGKR-0002635-37; OTGKR-0002742-54; OTGKR-0002792-94; OTGKR-0002804-05; OTGKR-0002966-67; OTGKR-0002982-83; and OTGKR-0003089-90.

[165] Declaration of Stephan Haggard, July 21, 2017. *See* ¶¶ 11-12.

[166] Rebuttal Expert Report of Dae Sik Hong, August 18, 2017. *See* ¶¶ 5-12.

expressed in this report turn on the characterization of either Nongshim or Ottogi as a "chaebol." Thus, the resolution of the characterization dispute does not affect my opinions.

134.     Professor Haggard has also opined that South Korean chaebols are different from publicly traded firms in the US. These opinions also have no bearing on the opinions I have explained in this report. Some, however, are incorrect. According to Professor Haggard, there are four such differences.[167]

- Chaebols are vertically integrated and "nominally-independent firms within the group are typically engaged in joint maximization for the group as a whole, not of the particular entity or its shareholders";

- Chaebols have "multi-subsidiary" structures rather than "multi-divisional" structures;

- Chaebols have family control; and

- Chaebols have a strong culture of "hierarchy, familism and loyalty."

135.     In any corporate group, the ultimate parent company does, and should, control the group. The parent is the controlling shareholder, directly or indirectly, of the subsidiaries in the group and its duty to its shareholders is to maximize the group's profits. Professor Haggard describes this situation as one in which subsidiaries within the chaebol are "controlled" and lack "independence."[168] These concepts of a parent's "control" and a subsidiary's lack of "independence," however, do not relate to operational or formal separation, which is what I have addressed in this report. Professor Haggard's notion of control is simply a description of a controlling shareholder's exercise of its legal right, and his notion that a subsidiary lacks independence is simply a recognition of that same right from the perspective of the subsidiary. In chaebols and elsewhere, shareholders control corporations. Professor Haggard in effect acknowledged the difference between his notions of "control" and "independence," and the concept of operational separation. In his deposition, he emphasized that the control he had in mind was in the nature of "guidance" and "direction," not day-to-day involvement or,

---

[167] Haggard Declaration, ¶ 12.

[168] Haggard Declaration, ¶ 89.

specifically, control over pricing decisions.[169] This sort of control has no bearing on the formal or operational separation of a properly run parent and subsidiary.

136.     There is also nothing unusual about a corporate group consisting of many subsidiaries, vertically integrated or not.[170] Some corporations—in the US and elsewhere—are organized largely in divisions within a single corporate entity, and others are divided into multiple subsidiaries. Similarly, some corporations are vertically integrated and some are not. These organizational decisions are matters of management choice in response the business environments in which a firm operates.

137.     Some subsidiaries within a corporate group may be managed to maximize profits, and others may be managed to contribute in some other way to the maximization of the profits of the group as a whole. The latter situation is potentially problematic—in any corporate group—only where the subsidiary has minority shareholders who may be disadvantaged by virtue of the fact that the subsidiary itself is not maximizing profits. But since neither Nongshim America nor Ottogi America had minority shareholders, this point is not relevant to them, and in any case has no bearing on their formal or operational separation from Nongshim Korea or Ottogi Korea, respectively.

138.     With respect to family control, it is true that many corporate groups in South Korea are controlled by families, but there are family-controlled firms in the US as well.[171] Examples in the US include Wal-Mart, Ford Motor Company, Tyson Foods, and News Corp. Family control of a corporate group has no relevance to the formal or operational separation of the group's subsidiaries.

---

[169] Deposition of Stephen Haggard, May 18, 2017, Volume 1, pp. 115-117.

[170] For example, the five companies with the greatest market capitalization in the US have between 67 (Apple Inc) and 1,217 subsidiaries (Berkshire Hathaway Inc), excluding branch offices. The other three companies are Alphabet Inc (113 subsidiaries), Microsoft Corporation (238 subsidiaries), and Amazon.com, Inc (192 subsidiaries) (Company Profiles Retrieved from Factiva database, August 2018).

Specifically, Microsoft Corporation, in its 10K filing for fiscal year ended June 30, 2017, lists Microsoft Capital Group, LLC, Microsoft Online, Inc., Microsoft Regional Sales Corporation, and LinkedIn Corporation as US subsidiaries. The company also lists Microsoft Ireland Research (Ireland), Microsoft Global Finance (Ireland), Microsoft Ireland Operations Limited (Ireland), Microsoft Operations Pte Ltd (Singapore), SkypeCommunications S.á.r.l (Luxembourg), and Mojang Synergies AB (Sweden) as foreign subsidiaries.

[171] *See* the University of St. Gallen Global Family Business Index, http://familybusinessindex.com, accessed August 15, 2018. *See* also Villalonga, Belen and Raphael Amit, "Family Control of Firms and Industries," *Financial Management* Volume 39 Issue 3 (Autumn 2010), pp. 863-904.

139.    Finally, Professor Haggard's description of chaebol as having a strong culture of hierarchy and loyalty, which he describes as being tied to the element of family control has no bearing on the formal or operational separation of a parent and subsidiary. Professor Haggard does not explain specifically what he means by hierarchy and loyalty, nor does he explain how South Korean firms are distinctive in this respect. He stated in deposition, however, that he has not studied whether US subsidiaries have a corporate culture of hierarchy and loyalty.[172] Family-controlled firms in the US may be equally hierarchical, and indeed non-family-controlled firms may be as well. I have no opinion on either Professor Haggard's characterization of South Korean firms or on how they may compare to US firms.

140.    In sum, key characteristics that Professor Haggard identified as purportedly distinctive features of chaebols are not distinctive. The fact that South Korean firms are organized as groups of subsidiaries does not distinguish them from many public firms in the US and elsewhere. The fact that South Korean corporate groups are managed to maximize group profits also does not distinguish them from corporate groups in the US or elsewhere. This characteristic is only problematic when minority shareholders of subsidiaries are disadvantaged as a result, a point that is irrelevant with respect to Nongshim America and Ottogi America, neither of which has minority shareholders. Furthermore, this point has no bearing on the questions of formal or operational separation, which I have addressed in this report. Professor Haggard's opinions regarding family control and a culture of loyalty and hierarchy also have no bearing on formal and operational separation.

---

[172] Deposition of Stephen Haggard, May 18, 2017, Volume 1, pp. 86-90.

## VII.    Miscellaneous

141.    My opinions are subject to revision based on new information (including new reports or testimony by Plaintiffs' experts or new filings by Plaintiffs' counsel), which subsequently may be provided to, or obtained by me.

Dated: October 4, 2018

Sincerely,

Michael Klausner

# Exhibit B

## Greg Linkh

| | |
|---|---|
| **From:** | Christopher L. Lebsock <clebsock@hausfeld.com> |
| **Sent:** | Friday, October 05, 2018 12:13 AM |
| **To:** | Kleinbrodt, Julian Wolfe; Lee Albert; Stephanie Y. Cho; Bonny Sweeney; Bruce J. Wecker; Dan Birkhaeuser; Craig Raabe; Mark Kindall; Greg Linkh |
| **Cc:** | Edelman, Scott A.; Brass, Rachel S.; Yu, Minae; Gall, John R.; Dosker, Mark C.; Grasser, Joseph P. |
| **Subject:** | RE: In re Korean Ramen Antitrust Litigation, No. 13-cv-04115-WHO -- Expert Report |

Dear Julian,

Without waiving Plaintiffs' right to move to strike on the grounds that Klausner's declaration is untimely and/or unreliable or unhelpful to the jury/Court pursuant to FRE 702 and *Daubert*, please immediately forward the following materials related to the Klausner declaration:

1. All documents listed in Klausner, App. C that have not previously been produced, including translations relied upon by Klausner;
2. Complete notes of all referenced interviews;
3. All NSA and OA board actions and/or written consents, including those for the years of the class period that are not expressly relied upon by Klausner. If certain years do not exist, please clearly state that fact.
4. All transfer pricing studies, including those not expressly relied upon by Klausner for each year of the class period. If certain years do not exist, please clearly state that fact.
5. Book entries, journals, spreadsheets, and/or ledgers concerning intra-enterprise transfers of cash or other assets for each year of the class period and benchmark period.
6. All intra-enterprise agreements concerning leases, royalty payments, IT services, and/or other shared service agreements that were in effect for each year of the class period and benchmark period. If documents do not exist for certain years, please clearly state that fact.
7. Intra-enterprise loan/debt guarantees for each year of the class period and the benchmark period.
8. The following articles/publications:
   a. Shareholder Suits against Korean Directors*, in* **Korean Business Law**, Hwa-Jin Kim, editor, Cheltenham, UK: Edward Elgar, 2012 (with Bernard S. Black, Brian R. Cheffins);
   b. Shareholder Suits and Outside Director Liability: The Case of Korea (with Bernard Black and Brian Cheffins) in **Corporate Governance and the Capital Market in Korea** (Young-Jae Lim, ed. forthcoming 2005) (with Bernard Black and Brian Cheffins)

We will take a closer look at our request for materials tomorrow, however, defendants' duty to produce under the expert stipulation runs from today's date for the materials sought here.

Finally, please explain why this report has been served today, 6 months or more since the Court allowed Plaintiffs to proceed on an alter-ego theory.

When, in the next 14 days, is Klausner available to sit for deposition?

Thank you.

Chris

**From:** Kleinbrodt, Julian Wolfe <JKleinbrodt@gibsondunn.com>
**Sent:** Thursday, October 4, 2018 7:18 PM
**To:** Christopher L. Lebsock <clebsock@hausfeld.com>; Lee Albert <LAlbert@glancylaw.com>; Stephanie Y. Cho <scho@hausfeld.com>; Bonny Sweeney <bsweeney@hausfeld.com>; Bruce J. Wecker <bwecker@hausfeld.com>; Dan Birkhaeuser <dbirkhaeuser@bramsonplutzik.com>; Craig Raabe <craabe@ikrlaw.com>; Mark Kindall <mkindall@ikrlaw.com>; Greg Linkh <GLinkh@glancylaw.com>
**Cc:** Edelman, Scott A. <SEdelman@gibsondunn.com>; Brass, Rachel S. <RBrass@gibsondunn.com>; Yu, Minae <MYu@gibsondunn.com>; Gall, John R. <john.gall@squirepb.com>; Dosker, Mark C. <mark.dosker@squirepb.com>; Grasser, Joseph P. <joseph.grasser@squirepb.com>
**Subject:** In re Korean Ramen Antitrust Litigation, No. 13-cv-04115-WHO -- Expert Report

Counsel,

Please find attached the expert report of Professor Michael Klausner and related appendices.

Regards,
Julian

**Julian Kleinbrodt**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
555 Mission Street, San Francisco, CA 94105-0921
Tel +1 415.393.8382 • Fax +1 415.374.8470
JKleinbrodt@gibsondunn.com • www.gibsondunn.com

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

Exhibit C

## Greg Linkh

| | |
|---|---|
| **From:** | Greg Linkh |
| **Sent:** | Friday, October 05, 2018 3:39 PM |
| **To:** | 'Christopher L. Lebsock'; Kleinbrodt, Julian Wolfe; Lee Albert; Stephanie Y. Cho; Bonny Sweeney; Bruce J. Wecker; Dan Birkhaeuser; Craig Raabe; Mark Kindall |
| **Cc:** | Edelman, Scott A.; Brass, Rachel S.; Yu, Minae; Gall, John R.; Dosker, Mark C.; Grasser, Joseph P. |
| **Subject:** | RE: In re Korean Ramen Antitrust Litigation, No. 13-cv-04115-WHO -- Expert Report |

Julian,

In addition, Professor Klausner's report relies on meeting minutes which seemingly have not been produced by Defendants. Please produce the meeting minutes relied upon in the report.

Furthermore, for each defendant, please produce minutes for the following categories of meetings occurring during the class period, whether referenced by Professor Klausner or not: (1) organizational meetings, (2) shareholders meetings, and/or (3) board of directors meetings.  Alternatively, please confirm that no such additional documents exist.

Regards,

Greg

Greg Linkh
Glancy Prongay & Murray LLP
230 Park Avenue, Suite 530
New York, New York 10169
Tel: 212.682.5340

This e-mail message is confidential, is intended only for the named recipient(s) above, and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not a named recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this message in error, please immediately notify the sender by return e-mail and delete this e-mail message from your computer. Thank you.

**From:** Christopher L. Lebsock [mailto:clebsock@hausfeld.com]
**Sent:** Friday, October 05, 2018 12:13 AM
**To:** Kleinbrodt, Julian Wolfe; Lee Albert; Stephanie Y. Cho; Bonny Sweeney; Bruce J. Wecker; Dan Birkhaeuser; Craig Raabe; Mark Kindall; Greg Linkh
**Cc:** Edelman, Scott A.; Brass, Rachel S.; Yu, Minae; Gall, John R.; Dosker, Mark C.; Grasser, Joseph P.
**Subject:** RE: In re Korean Ramen Antitrust Litigation, No. 13-cv-04115-WHO -- Expert Report

Dear Julian,

Without waiving Plaintiffs' right to move to strike on the grounds that Klausner's declaration is untimely and/or unreliable or unhelpful to the jury/Court pursuant to FRE 702 and *Daubert*, please immediately forward the following materials related to the Klausner declaration:

1. All documents listed in Klausner, App. C that have not previously been produced, including translations relied upon by Klausner;

1

2. Complete notes of all referenced interviews;

3. All NSA and OA board actions and/or written consents, including those for the years of the class period that are not expressly relied upon by Klausner. If certain years do not exist, please clearly state that fact.

4. All transfer pricing studies, including those not expressly relied upon by Klausner for each year of the class period. If certain years do not exist, please clearly state that fact.

5. Book entries, journals, spreadsheets, and/or ledgers concerning intra-enterprise transfers of cash or other assets for each year of the class period and benchmark period.

6. All intra-enterprise agreements concerning leases, royalty payments, IT services, and/or other shared service agreements that were in effect for each year of the class period and benchmark period. If documents do not exist for certain years, please clearly state that fact.

7. Intra-enterprise loan/debt guarantees for each year of the class period and the benchmark period.

8. The following articles/publications:

    a. Shareholder Suits against Korean Directors, in **Korean Business Law**, Hwa-Jin Kim, editor, Cheltenham, UK: Edward Elgar, 2012 (with Bernard S. Black, Brian R. Cheffins);

    b. Shareholder Suits and Outside Director Liability: The Case of Korea (with Bernard Black and Brian Cheffins) in **Corporate Governance and the Capital Market in Korea** (Young-Jae Lim, ed. forthcoming 2005) (with Bernard Black and Brian Cheffins)

We will take a closer look at our request for materials tomorrow, however, defendants' duty to produce under the expert stipulation runs from today's date for the materials sought here.

Finally, please explain why this report has been served today, 6 months or more since the Court allowed Plaintiffs to proceed on an alter-ego theory.

When, in the next 14 days, is Klausner available to sit for deposition?

Thank you.

Chris

**From:** Kleinbrodt, Julian Wolfe <JKleinbrodt@gibsondunn.com>
**Sent:** Thursday, October 4, 2018 7:18 PM
**To:** Christopher L. Lebsock <clebsock@hausfeld.com>; Lee Albert <LAlbert@glancylaw.com>; Stephanie Y. Cho <scho@hausfeld.com>; Bonny Sweeney <bsweeney@hausfeld.com>; Bruce J. Wecker <bwecker@hausfeld.com>; Dan Birkhaeuser <dbirkhaeuser@bramsonplutzik.com>; Craig Raabe <craabe@ikrlaw.com>; Mark Kindall <mkindall@ikrlaw.com>; Greg Linkh <GLinkh@glancylaw.com>
**Cc:** Edelman, Scott A. <SEdelman@gibsondunn.com>; Brass, Rachel S. <RBrass@gibsondunn.com>; Yu, Minae <MYu@gibsondunn.com>; Gall, John R. <john.gall@squirepb.com>; Dosker, Mark C. <mark.dosker@squirepb.com>; Grasser, Joseph P. <joseph.grasser@squirepb.com>
**Subject:** In re Korean Ramen Antitrust Litigation, No. 13-cv-04115-WHO -- Expert Report

Counsel,

Please find attached the expert report of Professor Michael Klausner and related appendices.

Regards,
Julian

**Julian Kleinbrodt**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
555 Mission Street, San Francisco, CA 94105-0921
Tel +1 415.393.8382 • Fax +1 415.374.8470
JKleinbrodt@gibsondunn.com • www.gibsondunn.com

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Exhibit D

**Greg Linkh**

| | |
|---|---|
| **From:** | Brass, Rachel S. <RBrass@gibsondunn.com> |
| **Sent:** | Friday, October 05, 2018 4:56 PM |
| **To:** | Greg Linkh; Christopher L. Lebsock; Kleinbrodt, Julian Wolfe; Lee Albert; Stephanie Y. Cho; Bonny Sweeney; Bruce J. Wecker; Dan Birkhaeuser; Craig Raabe; Mark Kindall |
| **Cc:** | Edelman, Scott A.; Perry, Mark A.; Yu, Minae; Gall, John R.; Dosker, Mark C.; Grasser, Joseph P. |
| **Subject:** | RE: In re Korean Ramen Antitrust Litigation, No. 13-cv-04115-WHO -- Expert Report |

Chris & Greg,

On behalf of Defendants, I am responding to the principal points raised in your e-mails from yesterday evening and this afternoon regarding the Klausner Report.

First, Defendants propose setting Professor Klausner's deposition on October 23.  If that does not work for Plaintiffs, Professor Klausner is also available to sit for a deposition on October 30 as well as November 2.  This will allow Plaintiffs ample opportunity to explore the opinions he has expressed.

Second, Plaintiffs have told the Court that the issues of corporate structure and control have been in the case since they filed their complaints, and Plaintiffs therefore had ample time during discovery to seek whatever materials they believed were relevant to those issues.  Defendants will produce the data and information Professor Klausner relied upon in forming his opinions by October 9, as the parties agreed in the Expert Stipulation.

Third, the Court expressly authorized Defendants to designate additional witnesses, and Defendants have done so sufficiently in advance of trial so that there is no prejudice to Plaintiffs.

Best,
Rachel

**Rachel S. Brass**
**Partner**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
555 Mission Street, San Francisco, CA 94105-0921
Tel +1 415.393.8293 • Mobile +1 415.264.5998
RBrass@gibsondunn.com • www.gibsondunn.com

---

**From:** Greg Linkh <GLinkh@glancylaw.com>
**Sent:** Friday, October 5, 2018 12:39 PM
**To:** Christopher L. Lebsock <clebsock@hausfeld.com>; Kleinbrodt, Julian Wolfe <JKleinbrodt@gibsondunn.com>; Lee Albert <LAlbert@glancylaw.com>; Stephanie Y. Cho <scho@hausfeld.com>; Bonny Sweeney <bsweeney@hausfeld.com>; Bruce J. Wecker <bwecker@hausfeld.com>; Dan Birkhaeuser <dbirkhaeuser@bramsonplutzik.com>; Craig Raabe <craabe@ikrlaw.com>; Mark Kindall <mkindall@ikrlaw.com>
**Cc:** Edelman, Scott A. <SEdelman@gibsondunn.com>; Brass, Rachel S. <RBrass@gibsondunn.com>; Yu, Minae <MYu@gibsondunn.com>; Gall, John R. <john.gall@squirepb.com>; Dosker, Mark C. <mark.dosker@squirepb.com>;

Grasser, Joseph P. <joseph.grasser@squirepb.com>
**Subject:** RE: In re Korean Ramen Antitrust Litigation, No. 13-cv-04115-WHO -- Expert Report

[External Email]
Julian,

In addition, Professor Klausner's report relies on meeting minutes which seemingly have not been produced by Defendants. Please produce the meeting minutes relied upon in the report.

Furthermore, for each defendant, please produce minutes for the following categories of meetings occurring during the class period, whether referenced by Professor Klausner or not: (1) organizational meetings, (2) shareholders meetings, and/or (3) board of directors meetings.  Alternatively, please confirm that no such additional documents exist.

Regards,

Greg

Greg Linkh
Glancy Prongay & Murray LLP
230 Park Avenue, Suite 530
New York, New York 10169
Tel: 212.682.5340

This e-mail message is confidential, is intended only for the named recipient(s) above, and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not a named recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this message in error, please immediately notify the sender by return e-mail and delete this e-mail message from your computer. Thank you.

**From:** Christopher L. Lebsock [mailto:clebsock@hausfeld.com]
**Sent:** Friday, October 05, 2018 12:13 AM
**To:** Kleinbrodt, Julian Wolfe; Lee Albert; Stephanie Y. Cho; Bonny Sweeney; Bruce J. Wecker; Dan Birkhaeuser; Craig Raabe; Mark Kindall; Greg Linkh
**Cc:** Edelman, Scott A.; Brass, Rachel S.; Yu, Minae; Gall, John R.; Dosker, Mark C.; Grasser, Joseph P.
**Subject:** RE: In re Korean Ramen Antitrust Litigation, No. 13-cv-04115-WHO -- Expert Report

Dear Julian,

Without waiving Plaintiffs' right to move to strike on the grounds that Klausner's declaration is untimely and/or unreliable or unhelpful to the jury/Court pursuant to FRE 702 and *Daubert*, please immediately forward the following materials related to the Klausner declaration:

1.  All documents listed in Klausner, App. C that have not previously been produced, including translations relied upon by Klausner;
2.  Complete notes of all referenced interviews;
3.  All NSA and OA board actions and/or written consents, including those for the years of the class period that are not expressly relied upon by Klausner. If certain years do not exist, please clearly state that fact.
4.  All transfer pricing studies, including those not expressly relied upon by Klausner for each year of the class period. If certain years do not exist, please clearly state that fact.

5. Book entries, journals, spreadsheets, and/or ledgers concerning intra-enterprise transfers of cash or other assets for each year of the class period and benchmark period.
6. All intra-enterprise agreements concerning leases, royalty payments, IT services, and/or other shared service agreements that were in effect for each year of the class period and benchmark period. If documents do not exist for certain years, please clearly state that fact.
7. Intra-enterprise loan/debt guarantees for each year of the class period and the benchmark period.
8. The following articles/publications:
   a. Shareholder Suits against Korean Directors, in **Korean Business Law**, Hwa-Jin Kim, editor, Cheltenham, UK: Edward Elgar, 2012 (with Bernard S. Black, Brian R. Cheffins);
   b. Shareholder Suits and Outside Director Liability: The Case of Korea (with Bernard Black and Brian Cheffins) in **Corporate Governance and the Capital Market in Korea** (Young-Jae Lim, ed. forthcoming 2005) (with Bernard Black and Brian Cheffins)

We will take a closer look at our request for materials tomorrow, however, defendants' duty to produce under the expert stipulation runs from today's date for the materials sought here.

Finally, please explain why this report has been served today, 6 months or more since the Court allowed Plaintiffs to proceed on an alter-ego theory.

When, in the next 14 days, is Klausner available to sit for deposition?

Thank you.

Chris

---

**From:** Kleinbrodt, Julian Wolfe <JKleinbrodt@gibsondunn.com>
**Sent:** Thursday, October 4, 2018 7:18 PM
**To:** Christopher L. Lebsock <clebsock@hausfeld.com>; Lee Albert <LAlbert@glancylaw.com>; Stephanie Y. Cho <scho@hausfeld.com>; Bonny Sweeney <bsweeney@hausfeld.com>; Bruce J. Wecker <bwecker@hausfeld.com>; Dan Birkhaeuser <dbirkhaeuser@bramsonplutzik.com>; Craig Raabe <craabe@ikrlaw.com>; Mark Kindall <mkindall@ikrlaw.com>; Greg Linkh <GLinkh@glancylaw.com>
**Cc:** Edelman, Scott A. <SEdelman@gibsondunn.com>; Brass, Rachel S. <RBrass@gibsondunn.com>; Yu, Minae <MYu@gibsondunn.com>; Gall, John R. <john.gall@squirepb.com>; Dosker, Mark C. <mark.dosker@squirepb.com>; Grasser, Joseph P. <joseph.grasser@squirepb.com>
**Subject:** In re Korean Ramen Antitrust Litigation, No. 13-cv-04115-WHO -- Expert Report

Counsel,

Please find attached the expert report of Professor Michael Klausner and related appendices.

Regards,
Julian

**Julian Kleinbrodt**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
555 Mission Street, San Francisco, CA 94105-0921
Tel +1 415.393.8382 • Fax +1 415.374.8470
JKleinbrodt@gibsondunn.com • www.gibsondunn.com

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

# Exhibit E

Pages 1 - 65

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

IN RE KOREAN RAMEN ANTRITRUST ) No. C 13-4115 WHO
LITIGATION,                   )
                              )  San Francisco, California
                              )  Friday
                              )  January 26, 2018
_____)  2:00 p.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Direct Purchaser**    HAUSFIELD, LLP
**Plantiffs:**              600 Montgomery Street
                            Suite 3200
                            San Francisco, California 94104
                    BY:     **CHRISTOPHER L. LEBSOCK, ESQ.**
                            **BONNY E. SWEENEY, ESQ.**
                            **BRUCE J. WECKER, ESQ.**
                            **STEPHANIE YUNJIN CHO, ESQ.**


**For Direct Purchaser**    GLANCY PRONGAY & MURRAY, LLP
**Plaintiffs:**             230 Park Avenue
                            Suite 530
                            New York, New York 10169
                    BY:     **GREGORY BRADLEY LINKH, ESQ.**
                            **LEE ALBERT, ESQ.**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

 1   Professor Haggard has not testified to or disclosed, and we

 2   would have to come up with that.  And we are now -- if it were

 3   me and I could back up, I'd go find an expert of my own to

 4   analyze these elements and come in and testify that of the

 5   12 elements, they don't have anything to talk about here.

 6        Professor Haggard talks about ownership and control.  Some

 7   of the cases in the -- in the filings before your Honor already

 8   make it perfectly clear that 100 percent ownership and

 9   commonality of officers and directors doesn't get you to alter

10   ego.  I think that's fairly traditional.

11        There are other factors that have not been looked into,

12   and if we were going to make that presentation, I've now been

13   handicapped by not being able to come up with a crackerjack

14   expert to come in and analyze these factors and directly

15   confront the alter ego defense.

16        The word "alter ego" doesn't appear in Professor's reports

17   anywhere.  It's not in the Complaint.  All that's in the

18   Complaint is ownership and control, and ownership and control

19   doesn't get you to alter ego.  It's unfair to spring this on us

20   even under the traditional analysis.  But I think the outside

21   reverse veil piercing cases in California absolutely preclude

22   that claim, your Honor.

23        THE COURT:  Okay.

24        MR. GALL:  And I would like the opportunity to brief

25   it further.  This is -- this is something we put together in

Exhibit F

Pages 1 - 82

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

IN RE KOREAN RAMEN ANTITRUST      )
LITIGATION,                       )
_____ )   **NO. C 13-04115 WHO**

San Francisco, California
Monday, April 16, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Direct Purchaser Plaintiffs:
                          Hausfeld, LLP
                          600 Montgomery Street, Suite 3200
                          San Francisco, CA  94111
                          (415) 683-1908
                          (415) 358-4980 (fax)
              BY:  **STEPHANIE YUNJIN CHO**
                    **CHRISTOPHER L. LEBSOCK**
                    **BONNY E. SWEENEY**
                    **BRUCE J. WECKER**

For Indirect Purchaser Plaintiffs:
                          Glancy Prongay & Murray LLP
                          122 East 42nd Street, Suite 2920
                          New York, NY  10168
                          (212) 682-5340
                          (212) 884-0988 (fax)
              BY:  **LEE ALBERT**
                    **GREGORY BRADLEY LINKH**

For Indirect Purchaser Plaintiffs:
                          Bramson Plutzik Mahler & Birkhaeuser
                          2125 Oak Grove Road, Suite 120
                          Walnut Creek, CA  94598
                          (925) 945-0200
                          (925) 945-8792 (fax)
              BY:  **DANIEL E. BIRKHAEUSER**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

1        We went through the discovery period, the identification

2   of experts.   There was no suggestion of this.   No filing

3   mentioned alter ego until -- until --

4            **THE COURT:**  Well, they didn't mention alter ego, but

5   the chaebols, as an example.

6            **MR. GALL:**  Yeah.

7            **THE COURT:**  It's similar concept.   And all of the

8   things, all of the factors that you just described are ones

9   where the evidence is very much in your control.   So I was

10  interested.   I understand what your legal argument is, and I

11  will consider it one more time; but for the prejudice argument,

12  tell me what the prejudice is.

13           **MR. GALL:**  Well, I can tell you one right away,

14  Your Honor.   First of all, I would have identified, prepared,

15  and gotten ready to put on the stand the people necessary to go

16  through each of these factors, and say it isn't so.

17       I would have hired an expert.   I would have gotten

18  somebody from Berkeley, across the river here, to come in and

19  say, *I've looked at this structure, and it is not an alter ego.*

20  *There is no domination.   There is no control.   This is a*

21  *standard corporate relationship.*   And that would be an

22  important expert to put in front of the jury.

23       I've been deprived of the opportunity to do that.

24       Professor Haggard is going to testify about chaebols.

25  Professor Haggard said this is a chaebol for the sole purpose