Volume 17

Pages 2310 - 2441

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

IN RE KOREAN RAMEN ANTRITRUST    ) No. C 13-4115 WHO
LITIGATION,                            )
                                  ) San Francisco, California
                                  ) Monday
                                  ) December 10, 2018
_____) 7:30 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Direct Purchaser**     HAUSFIELD, LLP
**Plaintiffs:**               600 Montgomery Street
                     Suite 3200
                     San Francisco, California 94104
          BY: **CHRISTOPHER L. LEBSOCK, ESQ.**
              **BONNY E. SWEENEY, ESQ.**
              **BRUCE J. WECKER, ESQ.**
              **STEPHANIE CHO, ESQ.**

**For Direct Purchaser**     GLANCY PRONGAY & MURRAY, LLP
**Plaintiffs:**               230 Park Avenue
                     Suite 530
                     New York, New York 10169
          BY: **GREGORY B. LINKH, ESQ.**
              **LEE ALBERT, ESQ.**

                     GLANCY PRONGAY & MURRAY, LLP
                     1925 Century Park East, Suite 2100
                     Los Angeles, CA    90067
          BY: **KEVIN F. RUF, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By: **Vicki Eastvold, RMR, CRR***
              ***Debra L. Pas, CSR 11916, CRR, RMR***
               ***Official Reporters - US District Court***

1  **APPEARANCES:   (CONTINUED)**

2  **For Indirect Purchaser**     IZARD KINDALL & RAABE, LLP
   **Plaintiffs:**                29 South Main Street
3                                 Suite 305
                                  West Hartford, Connecticut 06107
4                         BY:  **MARK P. KINDALL, ESQ.**
                               **CRAIG A. RAABE, ESQ.**
5

6                                 BRAMSON PLUTZIK MAHLER & BIRKHAEUSER
                                  2125 Oak Grove Road
7                                 Walnut Creek, California 94598
                          BY:  **DANIEL E. BIRKHAEUSER, ESQ.**
8

9  **For Defendant**             SQUIRE PATTON BOGGS (US) LLP
   **Nongshim:**                 275 Battery Street
10                               Suite 2600
                                 San Francisco, California 94111
11                        BY:  **MARK C. DOSKER, ESQ.**
                               **TANIA L. RICE, ESQ.**
12

13                               SQUIRE PATTON BOGGS (US) LLP
                                 2000 Huntington Center
14                               41 South High Street
                                 Columbus, Ohio 43215
15                        BY:  **JOHN R. GALL, ESQ.**

16
                                 SQUIRE PATTON BOGGS (US) LLP
17                               620 Hansen Way
                                 Palo Alto, California 94304
18                        BY:  **JOSEPH P. GRASSER, ESQ.**

19
   **For Defendant**             GIBSON DUNN & CRUTCHER LLP
20 **Ottogi:**                   555 Mission Street
                                 Suite 3000
21                               San Francisco, California 94105
                          BY:  **RACHEL S. BRASS, ESQ.**
22                             **JULIAN W. KLEINBRODT, ESQ.**

23

24

25

1    **APPEARANCES:   (CONTINUED)**

2

3    **For Defendant**          GIBSON, DUNN & CRUTCHER
     **Ottogi:**                2029 Century Park East
                                Suite 4000
4                               Los Angeles, California 900a67
                          BY:   **SCOTT A. EDELMAN, ESQ.**
5

6                               GIBSON, DUNN & CRUTCHER
                                1050 Connecticut Avenue, NW
7                               Washington, DC    20036
                          BY:   **MARK A. PERRY, ESQ.**
8                               **JOSHUA M. WESNESKI, ESQ.**

9

10                              GIBSON, DUNN & CRUTCHER
                                333 South Grand Avenue
                                Los Angeles, California 90071
11                              San Francisco, California
                          BY:   **MINAE YU, ESQ.**
12

13                                    —   —   —

14

15

16

17

18

19

20

21

22

23

24

25

1      **I N D E X**

2

3      Monday, December 10, 2018 - Volume 17

4
       **DEFENDANTS' WITNESSES**                                **PAGE**  **VOL.**

5

6      **KU, BANG-WAN (RECALLED)**
       (PREVIOUSLY SWORN)                                        2326    17
7      Direct Examination resumed by Mr. Edelman                 2326    17
       Cross-Examination by Ms. Sweeney                          2419    17
8                             **E X H I B I T S**

9
       **TRIAL EXHIBITS**                             **IDEN**  **EVID**  **VOL.**

10
        14                                                       2384    17
11
        344                                                      2351    17
12
        357                                                      2419    17
13
        369                                                      2377    17
14
        373                                                      2356    17
15
        644                                                      2380    17
16
        644                                                      2419    17
17
        655                                                      2344    17
18
        656 through 661                                          2345    17
19
        665                                                      2362    17
20
        666 and 667                                              2363    17
21
        670                                                      2368    17
22
        673                                                      2386    17
23
        765                                                      2342    17
24

25

1

**I N D E X**

2

**E X H I B I T S**

3

**TRIAL EXHIBITS**                                    **IDEN**  **EVID**  **VOL.**

| Trial Exhibits | IDEN | EVID | VOL. |
|---|---|---|---|
| 781 | | 2339 | 17 |
| 783 | | 2361 | 17 |
| 796 | | 2329 | 17 |
| 816 | | 2374 | 17 |
| 817 | | 2374 | 17 |
| 976 | | 2400 | 17 |
| 2020 - conditionally admitted | | 2381 | 17 |

- - -

<u>**Monday - December 10, 2018**</u>                          <u>**7:31 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---oOo---**

(The following proceedings were held in open court, outside the

presence of the jury:)

       **THE COURT:**  All right.  A few things.  Picking up

where we left off on Friday afternoon regarding Mr. Ku, with

foundation it seems to me that he's certainly able to testify

that he understands that market leaders always meet with the

government prior to price increase.  He understands that that

practice within the ramen industry has always been not to

increase price until the market leader does, and not to exceed

the market leader's increase.  He can testify with foundation

that he suspects it would be a problem with the government if

prices were raised without approval.

    Using the term "price control" doesn't work for me,

Mr. Edelman, I think you were the person who introduced that on

Friday afternoon.  He talked about price regulation.  So with

foundation, he can talk about those other things, but he just

can't say what he doesn't know.  And he's never had a

conversation with the government, and there's no regulations

and there are no statutes about this.  So I think you have to

cabin that.  But within those parameters, he can testify about

that.

       **MR. EDELMAN:**  Okay.  And, Your Honor, if it's helpful

1    to --

2              **THE COURT:**  Wherever you want to be.

3              **MR. EDELMAN:**  I'll be on this side today.  If it's

4    helpful to Your Honor, as we were thinking about this over the

5    weekend, we were reminded of an inquiry that actually did come

6    to Mr. Ku from the same department within the government, the

7    Ministry of Food, Agriculture, Forestry and Fisheries, in 2007.

8    And it really is an example of the government's important role

9    in this area.

10        They inquired of Ottogi whether it intended to decrease

11   its prices in 2007 because there had been a drop, from the

12   government's perception, in the price of flour.  And so there's

13   an email that shows his direct involvement in that topic when

14   it came up in 2007, which really is another example of

15   government intervention, regulation, price control.

16        And by the way, it's my understanding that regulation and

17   price control stem from the same root word in Korean.  And

18   you're quite right that I had asked about -- he had responded

19   about regulation, and I had asked about price control, which --

20   in the translations, when I've spoken with him in the past,

21   that's how it's come back to me.  But it wasn't intended to be

22   different than regulation.

23        But I just wanted -- if this is of interest to you -- to

24   show his involvement in interfacing with the government on the

25   subject of price control.

1        **THE COURT:**  Foundation is of interest to me.

2        **MR. EDELMAN:**  Sure.  Would you like to see this?

3        **THE COURT:**  Sure.

4        **MR. EDELMAN:**  Okay.  This is -- I'm going to hand the

5    Court a document that's been marked for identification Exhibit

6    796.  And what you see here, Your Honor, English and the

7    Korean, but what you see here towards the bottom of the first

8    page is Mr. Ku writing to Mr. Yoo at Ottogi Ramen saying that

9    just earlier the Ministry of Food, Agriculture, Forestry and

10   Fisheries of each ramen company -- called each company to ask

11   if there were any plans to decrease the prices as the flour

12   price dropped recently.  And so he's inquiring of Ottogi Ramen

13   what their plans are with respect to that.

14       **THE COURT:**  Okay.  Ms. Sweeney.

15       **MS. SWEENEY:**  And we'll object to this document, Your

16   Honor, as it's both hearsay and because of relevance.  It's

17   after the last price increase by Ottogi that's relevant to the

18   issues in this case.

19       **THE COURT:**  Well, I think it's very -- it is relevant

20   to his perspective with respect to the government's

21   involvement, which is the -- was of interest to me on Friday

22   and is part of your objection.

23       So I'm -- I would be inclined to overrule your objection.

24       All right.

25       **MR. EDELMAN:**  So I will just not use the word "price

**PROCEEDINGS**

 1   control," which I understand Your Honor would like me not to

 2   do.  But in terms of general foundation of his perception --

 3        **THE COURT:**  Yes, but it's got to be based on

 4   something.  You have to lay the foundation for his -- where

 5   this perception of his comes from.  So that's -- that will be

 6   the thing that you need to do.

 7        **MR. EDELMAN:**  Okay.  Thank you.

 8        **THE COURT:**  All right.

 9   So I also received the defendants' proffer regarding the

10   KFTC and Korean Supreme Court.  Thank you so much.  But my

11   ruling remains and the proffer is in the record now.

12   With respect to the defendants' newspaper articles, I

13   agree with the plaintiffs, this is too late.  These articles

14   weren't on the exhibit list.  I think there's prejudice to the

15   plaintiffs.  Also, I would end up having 403 concerns because

16   the issue is really what the plaintiffs should have known, and

17   the defendants didn't use them with the plaintiffs.  So that's

18   my problem with them.

19   Mr. Perry, good morning.

20        **MR. PERRY:**  Good morning, Your Honor.  Mark Perry for

21   the Ottogi defendants.

22   I understand the ruling.  I would just like to explore, if

23   I could, the ramifications of it.  Because we have made a

24   no-evidence motion on 50(a) as to the third prong of the

25   fraudulent concealment doctrine; that is, diligence.  That the

**PROCEEDINGS**

 1   plaintiffs had a trial and presented zero evidence of

 2   diligence.  They conceded that in their response.  Instead,

 3   they offered a futility exception to the diligence requirement.

 4        There is no law that says there's a futility exception,

 5   for obvious reasons.  If there were futility exception, then

 6   fraudulent concealment would just become the discovery rule.

 7   If there were no reliance or diligence required by the

 8   plaintiff, then we'd be in the world of the discovery rule; and

 9   the Court has already ruled that we're not.

10        So as a matter of law, there is no futility exception.

11   But as a matter of fact, the plaintiffs made a representation

12   to this Court that no amount of internet research would have

13   turned up these facts.  And that's false.  We know it's false.

14   We know it's false from these articles, one of which was

15   submitted to the Court, and the Court wrote an opinion about it

16   earlier.

17        Certainly, the plaintiffs should not be permitted to argue

18   to the jury -- if this issue goes to the jury, and we submit it

19   should not for reasons already stated -- that no amount of

20   internet research would have turned up these facts because

21   that's not a true statement in the world.  And if the evidence

22   doesn't come in, we understand that.  But the evidence was

23   submitted in response to that statement that they made to this

24   Court.

25        We also think this is ultimately a question for the Court.

1    This is an equitable exception that they invoked that they bear

2    the burden on and that they have failed to address.  And we

3    think now, or some other time, we ought to have that discussion

4    as to whether the exception is even available in this case.

5             THE COURT:  So when do you think -- if this is truly a

6    matter for me, which I was interested in seeing, if this is

7    truly a matter for me, when is it a matter for me?  Is it a

8    matter for me that I need to decide before the case goes to the

9    jury?  Is it something that I can consider after the jury's

10   come in in motions for new trials or judgments notwithstanding?

11   Tell me what you think I need to do.

12            MR. PERRY:  So, Your Honor, as with any other

13   equitable tolling doctrine, we believe it is up to the Court's

14   discretion as to how to do that.  The Court can decide it

15   before the jury goes in and decide it one way or the other.

16   The Court may submit it to the jury for an advisory verdict.

17   That's common in equitable determinations, as the Court is

18   aware.  We understood that to be the proposal, and then

19   redecide it afterwards.

20       We think either way it should be decided on the trial

21   record.  I mean, we've had a long trial here.  There's no

22   reason on this or any other matter -- and we could talk about

23   alter ego, and some other things, injunction.  We've a trial.

24   Right?  We should have the decisions on that record.

25            We think, the defendants believe, on fraudulent

1  concealment the Court should decide it now because they just

2  failed to prove that third prong.  There's nothing to give to

3  the jury.  There's nothing to decide.

4      Even if the Court were to stand on its summary judgment

5  ruling as to the first two prongs, the Court never looked at

6  the third, and there's no evidence on the third.  Therefore,

7  the plaintiffs just didn't carry their burden.  There's nothing

8  to submit to the jury.  And the Court can decide that as a

9  matter of law, as a matter of Rule 50(a) law.  In other words,

10  that the plaintiffs failed to carry their burden.  And then you

11  don't have to decide, if you will, when to decide the ultimate

12  question.

13      If, on the other hand, the Court were to decide to weigh

14  the evidence, we would submit it would be efficient to do it in

15  either of the ways I just said.  And it is really up -- we

16  think the Court has the discretion to do it either way.

17          **THE COURT:**  All right.  Mr. Dosker.

18          **MR. DOSKER:**  Join.  And we'll just add, I think, for

19  clarity and for -- clarity for what the jury's going to do in

20  its work, the sooner the better.

21          **MR. KINDALL:**  Your Honor, Mark Kindall for the

22  indirect purchaser plaintiffs.  Our perception on this is that

23  is we have no objection to Your Honor deciding the issue.  We

24  think if you did, it would make sense to decide it before the

25  jury is instructed.

**PROCEEDINGS**

1        And the reason there is simply that the jury has a lot of

2    issues that they need to resolve.  If we could take this issue

3    off the table so that they could get a clean instruction on

4    what the damages period is; if there is a damages period.  In

5    other words, if they decide liability, what is the period that

6    they should look at damages.  That would make life a lot

7    simpler for them.  It would make the instructions simpler.  It

8    would make the verdict form simpler.  There could be a lot of

9    good things that would flow from that.

10       So if Your Honor were inclined to decide this issue, from

11   plaintiffs' perspective it would be better if you did it now.

12            **THE COURT:**  Mr. Albert.

13          **MR. ALBERT:**  Mr. Kindall --

14            **THE COURT:**  What he said?  All right.

15       Thank you on that.  And I have one more question for the

16   plaintiffs.  I've been looking at the defendants' motion for

17   judgment, and this issue I will think about some more.  I'm not

18   inclined otherwise to grant it except for with respect to alter

19   ego.  And I'd like somebody to tell me -- either -- what the

20   plaintiffs' position is today with respect to the alter ego

21   theory; and if it is still that it's in the case, what I should

22   be looking at to make that determination.

23          **MR. KINDALL:**  Your Honor, I think that the plaintiffs'

24   position on this is that the alter ego issue also is for the

25   Court and ultimately not for the jury.  That it's also

 1    something that needn't be decided in advance of judgment in

 2    this case.  That the issue could arise in a scenario where if

 3    there were a judgment for plaintiffs in this case, and we were

 4    in a position where we had to -- well, a scenario where, for

 5    example, there was liability for the Korean parents but not a

 6    liability finding for the U.S. subsidiaries, the issue might

 7    suddenly have salience if we were having issues with collection

 8    down the road.  And then the question would be whether there

 9    was an issue with collection that was being caused as a result

10    of the close relations between the parent and the subsidiary

11    companies that were affecting the ability of assets that would

12    otherwise be findable in the United States.

13           THE COURT:  Right, I remember hearing that.  And but

14    then how would I -- that's, basically, asking me to defer

15    deciding alter ego for a couple years down the road until

16    you're enforcing judgment.

17        So is that what you're really asking?  Should I just take

18    this -- should we take alter ego off the table completely at

19    this point?

20           MR. KINDALL:  For the purpose of the trial, I think

21    that's correct.

22           THE COURT:  Okay.  Mr. Perry, you can't disagree with

23    that.

24           MR. PERRY:  Well, Your Honor, we think it should be

25    taken off the table, period.  I mean, we've had a trial.

1    Remember, they fought like heck to get it into the trial over

2    our objection, the Court allowed it, put no restrictions on

3    their evidence.  We've now had an entire trial --

4         **THE COURT:**  I put some restrictions on it, Mr. Perry.

5    That's a little rough, I think.

6         **MR. PERRY:**  There was no evidence on alter ego that

7    the plaintiff sought to introduce that the Court kept out of

8    the case.  Let me put it that way.  And there are nine factors,

9    as the Court is aware, under California law --

10        **THE COURT:**  There's been very little evidence on alter

11   ego that's been put in one way or another.

12        **MR. PERRY:**  Well, they bear the burden of proof.  We

13   don't have to respond to it.  Because when they got to the end

14   of their case in chief, they hadn't proved alter ego.  And the

15   answer to that is the Court should render judgment on alter

16   ego.

17        They put it in as a claim.  It is a separate, equitable

18   claim, a cause of action.  They asked the Court to decide it.

19   We objected.  The Court said they could try to prove it.  They

20   failed to prove it.  So it's not to be deferred to some future

21   judgment enforcement proceedings.  They should just get --

22   lose.  Right?  That's what happens when you have a trial and

23   you fail to put in evidence.  You lose.

24        And, you know, on the Rule 50 point, we put in a very

25   complete brief on that.  They put in one footnote that says

1    nothing, and essentially have conceded that they lose.  So I

2    take Mr. Kindall's point that they want it out of the trial.  I

3    understand why.  Because they didn't prove it.  But our view is

4    it should be dismissed with prejudice because they don't get

5    another chance.

6              THE COURT:  Well, so the thing that I know that you

7    agree with is that it shouldn't go to the jury.

8              MR. PERRY:  We absolutely agree with that, Your Honor.

9              THE COURT:  That solves that particular problem.

10       All right.  Is there anything else we need to take up

11   before 8:00?

12       (No response.)

13             THE COURT:  All right.  See you at 8.

14                   (Recess taken at 7:47 a.m.)

15                  (Proceedings resumed at 8:08 a.m.)

16             MR. EDELMAN:  Your Honor, just a quick note if I

17   could.

18             THE COURT:  Yes.

19             MR. EDELMAN:  Ms. Sweeney just told me two seconds ago

20   she has objection to our summary exhibit, which I didn't know

21   about previously, in terms of inaccuracies that she believes

22   exist.

23       So I guess what I'll do is I'll try to postpone that so I

24   can talk to her about it on the break.

25             THE COURT:  Okay.

 1          (The jury entering the courtroom.)

 2          **THE COURT:**  All right.  Please be seated, everybody.

 3     Good morning, ladies and gentlemen.  Welcome.  I hope you all

 4     had good weekends.

 5          And so now Mr. Ku is still on the witness stand.

 6          Mr. Edelman, please proceed.

 7          **MR. EDELMAN:**  Thank you, Your Honor.  Good morning,

 8     Your Honor, ladies and gentlemen of the jury, and Mr. Ku.

 9                         **BANG-WAN KU**,

10     called as a witness for the Defendants, having been previously

11     duly sworn, testified further as follows:

12                  **DIRECT EXAMINATION**   (Resumed)

13     BY MR. EDELMAN:

14     **Q.**   Mr. Ku, last week when we left off on Friday afternoon we

15     were talking about the factors that you consider in adjusting

16     prices.  And you had talked to us about cost and market

17     conditions.  Do you remember that?

18     **A.**   Yes, I do recall.

19     **Q.**   Okay.  And I believe at least close to where we left off

20     you told us that Ottogi would wait to see what the number one

21     company did before deciding whether Ottogi was going to raise

22     its own prices in Korea.

23     **A.**   Yes, that is correct.

24     **Q.**   And who is the identity of that number one company that

25     you were referring to?

KU - DIRECT / EDELMAN

1   **A.**   Yes.   Nongshim was at number one.

2   **Q.**   Okay.   And why, based on your work in setting prices over

3   the years in the sales planning division, would you wait to see

4   what Nongshim did before deciding whether Ottogi would raise

5   its prices?

6   **A.**   Nongshim at that time enjoyed 70 percent or more in terms

7   of market share, and we were at about 10 percent.   Which meant

8   we were not even number two, but number three.   But if we as

9   number three would go ahead and raise our prices, we feared we

10  might lose that 10 percent threshold.

11  **Q.**   And were there any other reasons besides loss of

12  competitive positioning that entered into your thought process?

13  **A.**   So my thinking at that time was that the government

14  required that any party go through its approval first that it

15  obtain the government's approval before it can go ahead and

16  raise any price.   Therefore, in my view, the fact that Nongshim

17  would raise its price meant that Nongshim had already obtained

18  the government's approval.   And so, you know -- and the same

19  goes for other parties, too.

20  **Q.**   Mr. Ku, I understand that Ottogi was not the number one

21  company so not directly interfacing with the government in the

22  way that you said Nongshim was, or believed Nongshim was.   But

23  did you have direct interactions with the government concerning

24  prices that Ottogi was charging?

25         **THE COURT:**  Ms. Sweeney.

1          **MS. SWEENEY:**  Objection.  Vague as to time.  And

2    relevance.

3          **THE COURT:**  Overruled.  You can continue.

4          **THE WITNESS:**  Given the fact that we never were at the

5    number one position, we have never, to date, ever directly

6    negotiated with the government.  That said, we had -- one time

7    or another did come under the government's, say, scrutiny.

8          For instance, sometime around August of 2008 a government

9    body called MAFRA, Ministry of Food and Agricultural and Rural

10   Affairs, made an inquiry as to whether or not we might want to

11   decrease our price.  Similarly, in January of 2010, the KFTC

12   asked us as to whether or not we might be interested in

13   lowering our prices.  So on that occasion we lowered our price.

14   **BY MR. EDELMAN:**

15   **Q.**   Okay.  I'm going to put the KFTC to later on in your

16   examination.  But I do want to put in front of you an exhibit.

17         **MR. EDELMAN:**  May I approach, Your Honor?

18         **THE COURT:**  You may.

19         **MR. EDELMAN:**  And Your Honor and counsel have copies

20   of this already.

21   **BY MR. EDELMAN:**

22   **Q.**   Mr. Ku, could you just identify what this document is,

23   please?

24   **A.**   So this goes back to that inquiry that I received from the

25   government ministry, MAFRA, as to whether or not we might want

1   to decrease our ramen price or whether we had any such plans.

2   So upon that I made an inquiry with Ottogi Ramen, the company,

3   as to what was going on in terms of any changes in the

4   underlying costs.  And this is what that -- this is that

5   inquiry.

6   Q.   Okay.  So this, as I understand it, is an email from you

7   to Ottogi Ramen?

8   A.   Yes, that's correct.

9   Q.   All right.  And this is something that you sent in the

10  ordinary course of your business?

11  A.   Yes, that's correct.

12  Q.   All right.  And the date of this is August 4 of 2008?

13  A.   Yes, that's correct.

14       MR. EDELMAN:  Your Honor, I would offer 796 into

15  evidence and ask for permission to publish it to the jury.

16       THE COURT:  Any objection?

17       MS. SWEENEY:  No, Your Honor.

18       THE COURT:  It's admitted.

19       (Trial Exhibit 796 received in evidence)

20  BY MR. EDELMAN:

21  Q.   Okay.  Jim, could we please display Exhibit 796?

22       Okay.  So I'm going to ask you about the bottom -- the

23  large bottom part, but where the big box is.  And then

24  everything below that.

25       It indicates that -- first off, this is an email from you

1    to -- why don't you orient us.  Tell us to whom you're sending

2    this email.

3    **A.**   So this is an email that I was sending to Ottogi Ramen in

4    order to ascertain as to, you know, what was happening in terms

5    of any changes as to the underlying costs.  I was asking for

6    material.  This is what I referenced just a moment ago.

7    **Q.**   So that's the "to" line, which we can highlight.  Then

8    your name is on the left in bold.  And then you indicate:

9    Hello, Deputy Division Manager.  You must have received

10   communication from division Young-Hyun Doh, but just earlier

11   Ministry of Food Agriculture Forestry and Fisheries called each

12   ramen company to ask if there were any plans to decrease the

13   prices, as the flour price dropped recently.  I'd like to find

14   out if there were any price decrease factor with the recent

15   drop in flour price, and if so, the degree of the decrease

16   factor.  They said that they're looking into it, and I believe

17   that they will call again soon.

18        Are you looking at it in Korean in front of you?

19   **A.**   Yes.

20            **THE INTERPRETER:**  Your Honor, if it's permissible, as

21   a point of order, just to point out some quick translation

22   errors in the document.  Instead of "they said," it's "I said."

23            **THE COURT:**  I don't need that.

24            **THE INTERPRETER:**  Unnecessary?

25            **THE COURT:**  Thank you.  Just translate what's being

1   said in the courtroom, please.  Thank you.

2           THE INTERPRETER:  Okay.

3   BY MR. EDELMAN:

4   Q.   All right.  And you've given me a good lesson why I should

5   keep my questions short.

6        So Mr. Ku, after you wrote to Ottogi Ramen telling them

7   that the government had asked if Ottogi Korea was planning to

8   decrease the price of ramen, did you have further discussions

9   with the government about what Ottogi was going to do with its

10  ramen price in 2008?

11  A.   Are you asking as to whether I've done anything else with

12  the government again?

13  Q.   No.  I'm asking with respect to this particular incident

14  in August of 2008, after you received the inquiry from the

15  government and wrote to Ottogi Ramen to find out about whether

16  there was going to be a decrease in flour costs, did you have

17  any further interaction with the government?  Meetings,

18  telephone calls, anything of that nature?

19  A.   So, first of all, I received this material from Ottogi

20  Ramen.  And they said that, yes, indeed, the price of flour has

21  gone down, but otherwise all the other raw and sub materials

22  have actually gone up such that the overall cost of ramen has

23  gone up.  And so there have been no reduction factors as to the

24  cost of ramen, they said.  So I conveyed that over the phone

25  with -- to the government authorities, essentially telling them

1   that such being the case the cost of ramen has actually gone up

2   and that it does not look like it's going to come down any time

3   soon.

4   **Q.**   And what was -- did the government accept your

5   explanation?

6   **A.**   Yes.   That's correct.

7   **Q.**   Okay.   Are there, from your familiarity as a Korean

8   citizen, are there other products that are widely known in

9   Korea to be subject to government control?

10          **THE COURT:**  Ms. Sweeney?

11          **MS. SWEENEY:**  Objection as to foundation for questions

12   raised by Mr. Edelman.

13          **THE COURT:**  It's sustained.   He's not an expert.   But

14   from his personal knowledge is he aware of other products that

15   the government has interest in.

16          **MR. EDELMAN:**  Thank you, Your Honor.

17          **THE WITNESS:**  So the Korean government sets the price

18   index.   And based upon that, it exercises cost control as to a

19   number of items.   And to my understanding those things include

20   gasoline, raw rice, imported liquor, beer, and soju.

21   **BY MR. EDELMAN:**

22   **Q.**   And switching gears, do you consider the prices of your

23   competitors when adjusting Ottogi Korea's prices for ramen?

24   **A.**   Yes, I do consider it.

25   **Q.**   And why?

**KU - DIRECT / EDELMAN**

1   **A.**   Because the competition constitutes a part of the market

2   circumstances.   And in order to win over some market share by

3   competing against them, we need to know about what -- how

4   things are with them.

5   **Q.**   Mr. Ku, you've told us about the factors that you consider

6   in deciding whether to adjust price.   The cost, the market

7   conditions and the government regulation.

8       Is there a particular process that Ottogi Korea follows in

9   deciding whether to adjust its price?

10  **A.**   Yes.   We do have such a process.

11  **Q.**   Can you describe the process, please?

12  **A.**   So firstly, when there's a rise as to the underlying

13  costs, the department responsible for managing price within our

14  company conducts an analysis as to the market circumstances.

15  So Ottogi Ramen for its part will typically tell us that the

16  underlying costs on their part have gone up and, therefore,

17  would we please allow for a price increase, the price at which

18  they get to sell their product to us.

19      And upon being -- upon receiving such an inquiry from

20  Ottogi Ramen, our department responsible for price management

21  will conduct the market analysis as to the market

22  circumstances, and also pose inquiries with the folks within

23  the sales field and come up with something of an interim

24  report.

25      And if and when there should happen to be a decision that,

1  oh, yes, I guess we have to raise our prices, then there will

2  be some sort of a final report that is put together that

3  entails the date on which such a price increase shall become

4  effective, as well as the pertinent details thereof.  And said

5  final report will be further rendered into the form of a

6  certain proposal and be turned into a package of materials that

7  we typically refer to as being a request for approval which

8  will be sent up the line and be put in front of the final

9  decision-making authority, namely the CEO.  And if and when he

10  should approve the idea, then that is when there will be a

11  price increase.

12  **Q.**   Okay.  So this -- first off, this internal analysis

13  procedure that you've described, does that result in the

14  creation of various memos that are analyzed by you and others

15  in the company?

16  **A.**   Yes, that's correct.

17  **Q.**   And then when that -- at the culmination of that process

18  when something is transmitted to the CEO, what you call the

19  price increase proposal, is that an actual -- I assume that's

20  an actual document that's sent to the CEO for the CEO to sign

21  off on?

22  **A.**   Yes, that's correct.

23  **Q.**   All right.  So let's -- let's go through that process in a

24  little bit of detail just so that the jury can see the types of

25  memos that you're talking about.  I'm going to focus my

**KU - DIRECT / EDELMAN**

1  questions on the year 2007.

2      You started your explanation by saying that the price

3  adjustment process starts with an increase in price from Ottogi

4  Ramen or some other raw manufacturer -- or, supplier.

5      In 2007 was there an increase in the price of flour?

6  **A.**   Yes.  The price of flour had gone up quite a bit in

7  February of 2007.

8  **Q.**   How did you hear about it?

9  **A.**   So, there was a lot of report -- lots of reports on that

10  in the press, and Ottogi Ramen also sent us word to that

11  extent.  And we, too, are engaged in the business of

12  manufacturing and therefore we happen to use a lot of flour.

13  So it's something that we were aware of.

14  **Q.**   And were you aware when there was this increase in flour

15  prices in 2007, that Nongshim had raised its price?

16  **A.**   Well, there were a lot of reports as to how Nongshim was

17  going to be raising their prices.

18  **Q.**   All right.  So let's look at Exhibit 343, please.  Do you

19  have that in front of you?

20  **A.**   Yes.

21  **Q.**   All right.  Exhibit 343 is already in evidence so let's,

22  please, put it up on the screen.

23      Tell us what this is, please.

24  **A.**   So this is an interim report of a sort that the marketing

25  office had received.  Something to the effect that the

1   competition had already raised its prices.  And this is

2   something that's taking place here in that 2007 time frame when

3   we're looking into whether or not to increase our price.

4   Q.   All right.  And so I see the title here would suggest that

5   Nongshim had already raised its price by the date of this

6   interim memorandum?

7   A.   So there had been an article that was put out that they

8   were going to be raising their price.

9   Q.   Okay.  And I'll get to that in just a second.  These

10  interim memoranda that you just referred to, was it common in

11  these memos that were generated within the company to talk

12  about price increases that the company had become aware of by

13  its competitors?

14       MS. SWEENEY:  Vague as to time and the number of

15  different memos over time.

16       THE COURT:  All right.  If you can specify that, that

17  would be great.

18       MR. EDELMAN:  Sure.

19  BY MR. EDELMAN:

20  Q.   For what period of time when you were at Ottogi Korea,

21  Mr. Ku, did you receive these types of memos?

22  A.   Given that my department was the department that was

23  continually tasked with handling price, I'd been receiving

24  these memos ever since coming on board with the company.

25  Q.   And to remind us what date that is, please?

1    **A.**   So as for me, that would be ever since the year 2000 and

2    on.   But as for the department itself, it predates the year

3    2000.   They'd always been the departments responsible for

4    handling price.

5    **Q.**   So I'll confine my questioning to the years 2000 to 2010,

6    okay?

7    **A.**   Yes.

8    **Q.**   And during that period of time was it common when you

9    received these types of internal memoranda that the memoranda

10   would discuss what your competitors were doing in the market?

11   **A.**   Yes.   That's correct.

12   **Q.**   All right.   And you also mentioned -- and we'll get to it

13   a little bit later -- but that there's this final memo that

14   goes to the CEO at the end of the process.

15        In those memos that would go to the CEO in connection with

16   any price increase, would you typically discuss what the

17   competition was doing in the memo to the CEO?

18            **MS. SWEENEY:**   Objection, vague --

19            **THE COURT REPORTER:**   "Vague" and what?

20            **MR. BIRKHAEUSER:**   Leading.

21            **THE COURT:**   I'll sustain the objection on leading.

22   BY MR. EDELMAN:

23   **Q.**   I'll put that question aside.   We'll get to it later.   Who

24   is marketing team three?

25   **A.**   So marketing team three is one of the teams under the

1    marketing office.  And typically the way things go is marketing

2    team one is responsible for handling our company's flagship

3    product; namely, curry.  And marketing team three is

4    responsible for handling ramen.

5    **Q.**   All right.  And focusing on paragraph number 2 where it

6    says, Nongshim price increases, it indicates that Nongshim in

7    the first line has announced a price increase.  And then in the

8    third line it says 7.4 percent on average.  Do you see that?

9    **A.**   Yes, I see it.

10   **Q.**   All right.  And it says 7.4 percent average as of March 1.

11   And the memo is dated February 28.

12       Where did Ottogi Korea obtain this information about a

13   price increase supposed to be effective March 1?

14   **A.**   So here information to this effect that as of March the

15   1st, by this point in time -- namely February 28 -- this is

16   something that's already been reported in the press and by this

17   point in time it's already been made known to the customers out

18   there.

19   **Q.**   Would you turn to Exhibit 781, please?

20   **A.**   All right.

21   **Q.**   All right.  So Exhibit 781 is a compilation of a few

22   different documents.  Would you tell us briefly what these are?

23   **A.**   So the first document deals with how effective March the

24   1st Nongshim is going to be raising its prices by an average of

25   7.4 percent.  And this one also entails the detailed, say,

1    items in that regard, also.

2    Q.   Let me just ask a broad picture, because I want folks to

3    see this document.  Are these press reports that appeared in

4    Korea in February of 2007 relating to increase in prices by

5    Nongshim and other companies?

6    A.   That is right.  So, for instance, this one is dated the

7    27th of February, and it precedes that former document that we

8    just looked at by one day.  And the details are pretty much the

9    same as each other.

10   Q.   Are these press reports the type of thing that Ottogi

11   Korea considers in gathering information about the marketplace

12   and -- in deciding whether to raise its own prices?

13   A.   Yes, that's correct.

14   Q.   All right.

15        MR. EDELMAN:  Offer 781 and request permission to

16   publish it, Your Honor.

17        THE COURT:  Any objection?

18        MS. SWEENEY:  Hearsay, Your Honor.

19        THE COURT:  Okay.  So the objection's overruled.  781

20   is admitted not for the truth, but for the purposes of the

21   timing and the information considered by Ottogi.

22        (Trial Exhibit 781 received in evidence)

23        MR. EDELMAN:  Thank you, Your Honor.

24   BY MR. EDELMAN:

25   Q.   So let's put the first page up and let's highlight the

 1    first -- the title and the first paragraph.

 2        I'm sorry.  I don't mean -- no, you're exactly right, Jim.

 3    Thank you.

 4        So there's a reference to an average of 7.4 percent,

 5    Mr. Ku.  Do you see that?

 6    **A.**   Yes, I see it.

 7    **Q.**   All right.  Jim, and if you can put up Exhibit 343 which

 8    we just saw a moment ago, side by side.

 9        All right.  And highlight the 7.4 percent reference in the

10    Ottogi memo.

11        So is the -- now, again, the date of the Ottogi memo in

12    relation to the article, which came first?

13    **A.**   So the report in the press is the earlier date.

14    **Q.**   Okay.  So the information that's in Ottogi's memo, Exhibit

15    343, is that public information about Nongshim's price

16    increase?

17    **A.**   Yes, that's what it is.

18    **Q.**   Okay.  We can take down the article, Jim, please, and

19    let's go back to just Exhibit 343.  And I want to direct your

20    attention to the third page of that memo.

21        Now, this is entitled Details of Nongshim's Price Increase

22    for March 1, 2007.

23        Now, where would Ottogi have received that information?

24    **A.**   So again, this being the date, by this point in time

25    Nongshim will have already sent an initial announcement -- a

**KU - DIRECT / EDELMAN**

 1   communiqué of a sort -- to their customers.  And this kind of

 2   information is easily obtainable on our part through such

 3   customers of theirs.

 4   **Q.**   All right.  So let's now turn to page 1006-T.  And I want

 5   to direct your attention to the recommendation at paragraph 6.

 6   If we can blow up paragraph 6, please.

 7        All right.  Now, for context, this is a memo that's being

 8   sent to you by one of the people who reports to you with their

 9   recommendation on how Ottogi should respond to Nongshim's price

10   increase?

11   **A.**   It's actually not a subordinate of mine, but this comes

12   courtesy of our marketing office.  And, basically, it entails

13   something to the effect that it seems like it would be a good

14   idea for us to raise ours effective April the 1st.

15   **Q.**   And did you raise prices on April 1 as recommended in this

16   memo?

17   **A.**   We did not.

18   **Q.**   Why not?

19   **A.**   So we did review this, say, idea, but we ultimately chose

20   to go with a different strategy.

21   **Q.**   And what was that strategy, sir?

22   **A.**   The decision was not to raise the price.  And, rather, to

23   try to take away some of the market share belonging to the

24   competition.

25   **Q.**   Let me direct you now to Exhibit 765, please.  Tell us

1   what this is just generally as a description.

2   **A.**   So this is an interim memo as created by marketing team

3   three concerning a prospective 2007 price increase.

4           **MR. EDELMAN:**  I would offer 765 into evidence Your

5   Honor.

6           **THE COURT:**  Any objection?

7           **MS. SWEENEY:**  No, Your Honor.

8           **THE COURT:**  765 is admitted.

9       (Trial Exhibit 765 received in evidence)

10          **MR. EDELMAN:**  All right.  May we publish it, Your

11  Honor?

12          **THE COURT:**  Yes.

13  **BY MR. EDELMAN:**

14  **Q.**   So, Mr. Ku, this is, what?  A few weeks after the memo

15  that we saw just a moment ago?

16  **A.**   Yes, that's correct.

17  **Q.**   And is this another analysis by marketing as to whether it

18  makes sense to raise the price or not?

19  **A.**   Yes.  It's an interim report as compiled by the marketing

20  office.

21  **Q.**   All right.  And if you look at, for example -- in

22  paragraph 3 on that page, and it says --

23      I'm sorry.  Jim, could you highlight the box just beneath

24  that?

25      Just to give us an example, it talks about a subject of

KU - DIRECT / EDELMAN

1    O-Thick Noodles.  And it says as a reason:  To build foundation

2    for competition against Neoguri.

3         Can you explain what that's a reference to?

4    **A.**   So, basically, there's an opinion to the effect that we

5    ought not to raise the price on the O-Thick Noodles, and rather

6    try to compete against Neoguri, which is raccoon.  Whereas, for

7    some of the other items we would be okay to raise the prices

8    on.

9    **Q.**   I'm sorry.  Whereas for some of the other items --

10   **A.**   We would be okay to raise the prices on.

11   **Q.**   Okay.  That's the recommendation.

12   **A.**   That's right.

13   **Q.**   So let's look at the recommendation on the last page, Bate

14   stamp 18440-T -- or, T.  Paragraph 4.

15        Okay.  So it says:  To apply an incremental price on

16   packaging materials starting with Jin Ramen production on

17   March 30, and that the price increase will be applied to entire

18   products as of April 1.

19        Did you follow that recommendation?

20   **A.**   No, we did not follow these recommendations, but rather

21   chose to further analyze the market circumstances.

22   **Q.**   Could you look at Exhibit 655, please.  And just briefly

23   describe what this email is, please.

24   **A.**   So this is something that my department boss, Mr.

25   Young-Hyun Doh, sent over to me.  And it, basically, includes

**KU - DIRECT / EDELMAN**

1    certain opinions submitted by the folks within the sales field

2    itself.  So it's material that I received in order that I might

3    be able to review and analyze the opinions as put forth by the

4    guys out in the field.

5    **Q.**   All right.

6         **MR. EDELMAN:**  I would offer Exhibit 655 into evidence

7    and request permission to publish.

8         **THE COURT:**  Any objection?

9         **MS. SWEENEY:**  No objection, Your Honor.

10        **THE COURT:**  It's admitted.

11        (Trial Exhibit 655 received in evidence)

12   **BY MR. EDELMAN:**

13   **Q.**   So let's look at this exhibit on the screen.  And let's

14   blow up -- well, the subject line is the Summary of Ramen

15   Opinion.  Let's just blow up the text of the email.

16        So this is an email sending you a number of attachments,

17   right?

18   **A.**   Yes, that's correct.

19   **Q.**   And it says things like -- on the first line -- opinion

20   for ramen price increase, benefits if ramen price is not

21   increased, opinion of ramen market and price policy.

22        Are these analyses that were being done by people in the

23   field at Ottogi Korea presenting their views as to whether they

24   thought it made sense for Ottogi to raise its price or not?

25        **THE COURT:**  Mr. Birkhaeuser.

 1             **MR. BIRKHAEUSER:**  Leading.

 2             **THE COURT:**  Overruled.  You can answer.

 3             **THE WITNESS:**  Yes.  These are individuals sending over

 4    their respective opinions as to the question of whether or not

 5    to increase price.

 6    **BY MR. EDELMAN:**

 7    **Q.**   Okay.  Now in your notebook, Mr. Ku, I'd like you to look

 8    at Exhibits 656 through 661 -- those are five memos -- and tell

 9    me if these are the memos you received that were attachments to

10    this email representing the analyses of the various people in

11    the field as to whether Ottogi should raise its price.

12    **A.**   Yes, indeed.

13             **MR. EDELMAN:**  Offer 656 through 661 into evidence and

14    request permission to publish.

15             **THE COURT:**  Any objection?

16             **MS. SWEENEY:**  No, Your Honor.

17             **THE COURT:**  They're all admitted.

18        (Trial Exhibits 656 through 661 received in evidence)

19             **MR. EDELMAN:**  Thank you.

20    **BY MR. EDELMAN:**

21    **Q.**   Mr. Ku, let's look at Exhibit 658.  And is this -- this is

22    one of the memos that you received?

23    **A.**   Yes, that's correct.

24    **Q.**   All right.  From one of the people in the field?

25    **A.**   Yes.

**KU - DIRECT / EDELMAN**

1    **Q.**   All right.  Let's look at -- let's look at the first box.

2          Tell us what this is.

3    **A.**   So this entails details based upon research as to the

4    price at which products by a competition -- by the competition,

5    as well as our company, are being sold at discount stores and

6    supermarkets.

7    **Q.**   Okay.  So this represents your people going out to the

8    field and looking at the prices in the supermarkets, et cetera?

9    **A.**   Yes, that's correct.

10   **Q.**   And let's look at paragraph 3 on the bottom.  And let's

11   highlight that paragraph, or blow it up, please.

12         Tell us what this paragraph discusses, please.

13   **A.**   So this is an observation as to how the status concerning

14   the sales on the part of the competition is going.  It in

15   particular says that Samyang's sales have increased in

16   comparison to Nongshim's.  And it also talks about how Samyang

17   has come up with something that's an improvement, and that the

18   consumers' reception to that is rather decent.

19   **Q.**   So there's a reference here to -- in the second

20   paragraph -- to talking with the store owners.  Do you see

21   that?

22   **A.**   Yes, I see it.

23   **Q.**   And it says that they said that the consumers' recognition

24   improved a lot through product improvement.  Talking about

25   Samyang, right?

**KU - DIRECT / EDELMAN**

1    **A.**    Yes.   That's correct.

2    **Q.**    Is this the type of thing that your sales people would

3    typically do?  They'd go into the stores, they'd talk to the

4    managers and the owners to get information about the market and

5    how your competitors were doing?

6    **A.**    Yes.   That's correct.

7    **Q.**    Let's go to the next page, please, and let's highlight the

8    box that contains the merits of increasing the price (sic) and

9    the drawbacks of not increasing the price.  Do you see that?

10   **A.**    Yes, that's there.

11   **Q.**    Is that one of the typical things that you would do in

12   deciding whether to increase a price?  You would weigh the pros

13   and the cons of raising a price?

14   **A.**    Yes.   That's correct.

15   **Q.**    So, Mr. Ku, we've seen now about eight memos analyzing

16   whether or not to raise prices in 2007.  Do any of these memos

17   discuss an agreement to raise prices together with any of your

18   competitors?

19   **A.**    No.   None of the documents we've gone through just now say

20   anything about there being any, say, agreement with any of the

21   competition that we ought to raise together or that -- anything

22   that would suggest that we felt, say, obligated our raise our

23   prices.

24        It would seem to me that if there had been such an

25   agreement, then I don't think there would have been any need

1   for us to go through this interim reporting and analysis.  For

2   if that were the case, upon Nongshim raising its price, we

3   simply needed to follow suit.  But we did not do that.

4   **Q.**   Did anyone from one of your competitors ever contact you

5   to pressure you to raise prices when you adopted a different

6   strategy than they did in raising prices?

7   **A.**   No.  Never has there been anything like that.  We have

8   never been put under any pressure, nor is it possible for any

9   competition to exert any pressure upon us.

10  **Q.**   Have you heard of something called old-price support?

11  **A.**   Yes, I have.

12  **Q.**   Can you tell the ladies and gentlemen of the jury what

13  old-price support is and how it works?

14  **A.**   So what old-price support refers to is the provision of

15  the product subject to the increased new price, but at the

16  old-price, vis-à-vis the customers.  It's a sort of a discount,

17  say, policy.  The customers typically like this because what it

18  means is they get to buy at the old-price and get to sell at

19  the newer price, meaning there's a greater margin available for

20  them.

21  **Q.**   And why do you offer old-price support?

22  **A.**   It's in order to give the customers some sort of a merit

23  so that the new increased price would be more acceptable to

24  them.

25  **Q.**   Now, do your competitors use old-price support to pressure

1   you to raise your prices?

2          MS. SWEENEY:  Objection.  Leading.

3          THE COURT:  Overruled.

4          THE WITNESS:  I fail to understand how any use of

5   old-price support could constitute pressure on us.  Because to

6   extend old-price support means that you're providing a discount

7   in supplying product to somebody.  If anybody were to do that,

8   then we would have to extend an additional discount.

9   BY MR. EDELMAN:

10  Q.   Go on.

11  A.   So if some competition out there were to extend old-price

12  support on their part, then we would try to counter that by

13  extending additional discounts.

14  Q.   And when you say "extending additional discount," do you

15  mean continuing to sell at what was your old-price?

16  A.   Yes.  So if and when the competition provides old-price

17  support, then we would want to sell product at a lower, less

18  expensive price.

19  Q.   Okay.  And do you provide price support for products other

20  than ramen?

21  A.   Yes.  Old-price support is something that also applies to

22  other products.

23  Q.   Other products that Ottogi sells.

24  A.   That's right.

25  Q.   Can you give us examples?

1    **A.**    In the past we've also extended old-price support to sweet

2    corn.  Same as to noodles, non-ramen noodles.  Also to soy

3    sauce types of -- other sauces.  So simply put, old-price

4    support is something that is applicable to various products out

5    there.

6    **Q.**    So, and you still do it today?

7    **A.**    Yes, even as of late we have been doing that.

8    **Q.**    So price support and ramen you didn't -- that's not

9    something you stopped doing in 2009 or 2010?

10   **A.**    That's right.  Nothing like that.

11   **Q.**    All right.  Let's go to Exhibit 344, please.

12        Can you tell us what -- tell us briefly, please, what this

13   is?

14   **A.**    It's an interim report entailing analysis on the price of

15   ramen back in 2007.

16   **Q.**    June of 2007?

17   **A.**    Yes.  It's compiled as of June the 26th, 2007.

18   **Q.**    All right.  So this is three months after the last price

19   support memo we saw from March, right?

20   **A.**    Yes, that's correct.

21        **MR. EDELMAN:**  May I offer this into evidence and

22   publish it, Your Honor?

23        **THE COURT:**  Any objection?

24        **MS. SWEENEY:**  No, Your Honor.

25        **THE COURT:**  All right.  It's admitted.

1          (Trial Exhibit 344 received in evidence)

2    BY MR. EDELMAN:

3    Q.   So looking at Exhibit 344, read -- well, let me do it out

4    loud in English:  The purpose is to analyze the market trends

5    and sales reactions after the ramen price increase of Nongshim

6    and Samyang and to determine the timing of our price increase.

7          Is that your understanding of the purpose of this memo?

8    A.   Yes, I see it.

9    Q.   Okay.  And if we blow up paragraph number 2 in the box as

10   well as the -- Jim, just the three lines after that.

11         All right.  So this talks about the market share changes

12   of the respective companies.  Do you see that?

13   A.   Yes.

14   Q.   And then it says:  PDS in parenthesis.  Who was PDS?

15   A.   This is an outside company called POS Data Systems.  It's

16   a company that provides an information service.  What they do

17   is they conduct research as to sales data and these sorts of

18   things and make it available to you.

19   Q.   All right.  So this is a research that Ottogi pays for?

20   A.   Yeah.  We pay money and get to see this.

21   Q.   In the paragraph just beneath the box the discussion of

22   Shin Ramen and Samyang ramen.  Again, are those typical types

23   of discussions that we would see in these interim memos where

24   Ottogi is trying to decide whether to raise its price?

25   A.   Yes, that's correct.

**KU - DIRECT / EDELMAN**

1    **Q.**   So look at the conclusion on the last page of this

2    document, the one that says:  Opinions on the price increase.

3    Let's blow up paragraph 2, please.

4        So we're in June.  And this memo is saying:  It behooves

5    us to implement our company's price increase in September.

6    **A.**   Yes.

7    **Q.**   So we're about four months from when Nongshim raised its

8    price on March 1 of 2007 for ramen.  Why, in June, had Ottogi

9    not raised its price in response to the increase in flour costs

10   and other rising costs?

11   **A.**   So on account of the rise in the cost of flour, there had

12   been a lot of requests from Ottogi Ramen made of us to raise

13   the price of ramen.  But given the low, say, market share that

14   we were enjoying at the time, we told Ottogi Ramen that we

15   would seek to increase our share of the pie by going after

16   economies of scale so as to help effectively lower the overall

17   cost.  And so up until this point in time we had not yet raised

18   our price.

19   **Q.**   When you say increase your share of the pie, are you

20   referring to trying to increase your market share by not

21   increasing your cost -- raising your price?

22   **A.**   Yes, that's correct.

23   **Q.**   Am I correct, though, that you did end up raising your

24   price in September?

25   **A.**   Yes.  After all, we did raise the price in September.

1    Q.   And why did you do it then?

2    A.   And so the reason why we hadn't at first raised the price

3    was because we wanted to increase our market share so as to

4    increase our revenue.  Yet in spite of the fact that we were

5    not raising our price, our market share was not growing.  And

6    in the meantime Ottogi Ramen, seeing as how the revenue was not

7    growing, they were continually under these cost pressures so

8    they kept sending us these memos asking us to raise their

9    price.

10        So ultimately, we ended up raising the price of ramen.

11   Q.   And that about six, what?  Six months after Nongshim did?

12   A.   Yes, that's correct.

13   Q.   All right.  And let me just, before we leave Exhibit 344,

14   let me turn your attention back to page 2, Bate stamp 1012-T.

15   And let's blow up the paragraph 2 relating to Samyang.

16        And I want to direct your attention in particular to the

17   line that says:  As ascertained through Samyang's marketing

18   office.

19        Do you see that?  Does this appear to reference some kind

20   of a discussion with somebody in Samyang's marketing office?

21   A.   Yes, that's what it appears to be.

22   Q.   All right.  And just briefly, what is that discussion

23   about?

24            MR. BIRKHAEUSER:  Objection, foundation.

25            THE COURT:  Could you lay just a little bit more of a

1    foundation for that, Mr. Edelman?

2              MR. EDELMAN:  Sure.

3    BY MR. EDELMAN:

4    Q.   Well, have you reviewed this paragraph?

5    A.   Yes, I did.

6    Q.   And is this a memo you would have received -- in fact, did

7    receive -- on or about the day it was generated?

8    A.   Yes, that's correct.

9    Q.   Okay.  Can you tell us what you understand -- what you

10   understood this highlighted section to refer to?

11             MR. BIRKHAEUSER:  Same objection.

12             THE COURT:  Overruled.

13             THE WITNESS:  So it is something to the effect that as

14   far as Samyang is concerned their agents, sales agents, are not

15   really abiding by their policy such that it's a headache for

16   them.  That their sales are lackluster.

17   BY MR. EDELMAN:

18   Q.   All right.  And does this discussion with someone at

19   Samyang -- apparent discussion with someone at Samyang --

20   reflect any agreement between Ottogi and Samyang to set prices?

21             THE COURT:  Ms Sweeney.

22             MS. SWEENEY:  Objection as to leading.

23             THE COURT:  Sustained.

24   BY MR. EDELMAN:

25   Q.   Is there any reference in this memorandum to any sort of

**KU - DIRECT / EDELMAN**

1  agreement to set prices?

2  **A.**   No.   There is nothing whatsoever to that effect.   Even

3  after getting this sort of a memo, we did not raise our price.

4  **Q.**   You're referring to the recommendation at the end of the

5  memo, if we can go to that.

6  **A.**   Right.

7      Well, so my point is we made no decision to raise the

8  price even after receiving this memo.

9  **Q.**   Okay.   Let's look to Exhibit 373, please.   Can you briefly

10  identify what this document is?

11  **A.**   So this is something that pertains to the year 2007.   It

12  is something that includes the proposal form and a somewhat

13  short final report.   This, together, is what we call the

14  approval for -- strike -- request for approval document

15  package.

16  **Q.**   Okay.   And so the jury is now familiar with the various

17  analyses, the various exhibits.   Remind us where does this fit

18  in the process in terms of Nongshim raising its price?   I'm

19  sorry.   Ottogi raising its price.

20  **A.**   So this is the final report that is, basically, floated to

21  the CEO for purposes of -- purposes of obtaining his approval.

22  **Q.**   Okay.   Now this -- does this memo have the various details

23  about what Nongshim is doing and Samyang is doing and what

24  you're seeing in the various stores, the types of things we saw

25  earlier?

1   **A.**   No.  This does not contain that sort of, say, complicated

2   detail.  So this sort of a document that is submitted to the

3   CEO for approval purposes entails just something very simple

4   and clean in terms of its objective.  When the price increase

5   shall be effective and by how much it's going to go up, and

6   such.

7   **Q.**  All right.

8          **MR. EDELMAN:**  I realize I forgot to offer Exhibit 373

9   into evidence.

10          **THE COURT:**  Any objection?

11          **MS. SWEENEY:**  No, Your Honor.

12          **THE COURT:**  It's admitted.

13      (Trial Exhibit 373 received in evidence)

14  **BY MR. EDELMAN:**

15  **Q.**   Let's publish that, please.  So again for purposes of

16  understanding the format of these things, first you have what's

17  called a proposal form, correct?

18  **A.**   Yes.

19  **Q.**   And then you have something that's called a review report

20  for price increase of ramen products.

21  **A.**   Yes, that's correct.

22  **Q.**   And if we go back to the proposal form, first page, and we

23  look at the bottom of the page, number 4, it says Attachment:

24  The details of adjustment for each product item.

25  **A.**   Yes.

**KU - DIRECT / EDELMAN**

1  Q.   Is it typical -- is this a typical format Ottogi would use

2  where you would have this proposal, and then you would have an

3  attachment with additional information?

4           **MS. SWEENEY:**  Objection.  Leading.

5           **THE COURT:**  Overruled.

6           **THE WITNESS:**  Yes.  So on the very first page you have

7  a box on which he, the decision-maker, the CEO, can sign off

8  on.  And way at the end you will see the final report attached.

9  **BY MR. EDELMAN:**

10  Q.   So the box you're talking about is on the top where it has

11  the -- is that the -- what you call the chop?

12  A.   Yes, that's correct.

13  Q.   All right.  And you see just below the first two boxes it

14  says:  Due to the price increase of raw and subsidiary

15  materials, the price adjustment is proposed as below to improve

16  the cost ratio.  Therefore, please consider and approve.

17       Is that an accurate summary of why Ottogi was ultimately

18  raising its prices?  Because of an increase in raw and

19  subsidiary materials?

20  A.   Yes, that's correct.

21  Q.   Okay.  And so did you prepare this document?

22  A.   Yes.  I am the one who did it.

23  Q.   And are you referenced as the hands-on person in the top

24  left where it says "Bang-Wan"?

25  A.   That's correct.

**KU - DIRECT / EDELMAN**

1  Q.   If we go to the second page, the attachment, it shows in

2  the top right corner that it's actually from your supervisor,

3  Mr. Young-Hyun Doh.  Why does it have Mr. Doh's name if you

4  prepared it?

5  A.   So I am the one who prepared this document; and my boss,

6  Mr. Doh, read through this and submitted it in his name.

7  Q.   All right.  And Mr. Ku, was your final recommendation as

8  contained in Exhibit 373 to match Nongshim Korea's prices?

9  A.   No.  We were not only much later than Nongshim in terms of

10 raising our price, but our price was lower than Nongshim's.

11 Q.   So you waited six months, and your price was different?

12 A.   Right.

13 Q.   All right.  Let's compare Ottogi's 2007 prices when you

14 raised them, and Nongshim's prices.

15      And, Jim, if you could please put up Exhibit 343 and 373

16 next to each other.  And I'm taking Nongshim's prices from what

17 you had in your memo in Exhibit 343.

18      So, Jim, on the right hand exhibit we could turn to the

19 second page, please?

20      (Document displayed)

21 Q.   Okay.  So just to cite a few examples.  In 2007 what was

22 the price of Nongshim's flagship -- I realized -- do you see

23 them on the screen?  They are probably in English and it's not

24 helpful.

25 A.   I see it.

KU - DIRECT / EDELMAN

1   Q.   All right.  Can you tell us what the price of Nongshim's

2   flagship product was?

3   A.   It says it was 430 Korean Won, W-O-N.

4   Q.   All right.

5           MR. EDELMAN:  Jim, can you highlight the 430 under

6   "Adjusted"?  Thank you.

7   BY MR. EDELMAN

8   Q.   And if we look to the left on Ottogi's flagship product,

9   the Jin Ramen, what is its price?

10  A.   417 Won.

11  Q.   And Nongshim's Neoguri?  It's three down.

12  A.   So Nongshim's Neoguri is listed at 463.

13  Q.   Is there a product sold by Ottogi that competes with

14  Nongshim's Neoguri?

15  A.   So we have the O-Thick noodles, which basically competes

16  against Nongshim's Neoguri product, but we did not implement a

17  price adjustment for that.

18  Q.   So what's your price?

19  A.   It's 434.

20  Q.   So Nongshim raised its price on its competing product, but

21  you did not raise yours?

22  A.   That's correct.

23  Q.   How about Nongshim's chapagetti?

24  A.   Their chapagetti is 496 KRW.

25  Q.   Do you have a product that competes with their chapagetti?

**A.**   We have something called the Beijing Black Bean Sauce

Noodle.   That is at 486.

**Q.**   So let's leave 2007 behind and go to 2008.   In 2008 did

Ottogi go through a similar process of trying to decide whether

to raise prices once Nongshim had made an announcement that it

was going to raise its prices?

**A.**   Yes, that's correct.

**Q.**   Was there something that had that happened that was unique

in the market in terms of the prices of subsidiary materials in

2008?

**A.**   So sometime around the end of 2007 and the beginning of

2008, the international price as to wheat flour and palm oil,

et cetera, basically increased drastically.

**Q.**   And did you go through a similar process in 2008 to what

we just saw with respect to 2007 in terms of analyzing whether

to raise prices?

**A.**   Yes, that's correct.

**Q.**   Look quickly at Exhibit 783 and tell me if these are news

articles that appeared in the press in 2008?

     **MS. SWEENEY:**   Counsel, I couldn't hear the number.

     **MR. EDELMAN:**   783.

     **MS. SWEENEY:**   Thank you.

     (Brief pause.)

**A.**   Okay.   I've gone through it.

1   BY MR. EDELMAN

2   Q.   Okay.  And did you, once again, see these reports in the

3   press in 2008 in the process of deciding what Ottogi was going

4   to do with respect to its prices?

5   A.   Yes.  That's correct.

6           MR. EDELMAN:  I offer 783, Your Honor.

7           MS. SWEENEY:  To the extent they are not being offered

8   for the truth, no objection.

9           THE COURT:  All right.  So 783 will be admitted.  They

10  are the newspaper articles.

11      Again, they are not offered for the truth of what's there,

12  but for information that Ottogi was considering at the time.

13      (Trial Exhibit 783 received in evidence)

14          MR. EDELMAN:  Thank you, your Honor.

15  BY MR. EDELMAN

16  Q.   Would you turn to 783-6, please?  Which I think would be 8

17  for you -- no, that's wrong.  Sorry, that's not the Korean

18  version.  It's 18.  I'm sorry.

19      (Document displayed)

20  Q.   And what is this news article reporting on?

21  A.   So, firstly, this article is dated February 18th, 2008 and

22  it essentially sets forth that effective the 20th of February,

23  Nongshim will be raising their price by 100 Korean Won,

24  representing 5 to 16 percent.

25      And then it talks about how there had been an increase as

1   to the underlying cost of the raw end sub materials.

2       And, finally, it also entails the detailed breakdown as to

3   Nongshim's products.

4   **Q.**   So these references to flour going up 50 percent, palm oil

5   94 percent, rice bran oil 55 percent, was there a big spike in

6   prices in 2007, 2008?

7   **A.**   Yes, indeed.

8   **Q.**   Would you look at Exhibit 665, please?

9       (Witness complied.)

10  **Q.**   And tell us what this is?

11  **A.**   This is market information -- well, it's an email

12  containing market information coming from one of our

13  salespersons to me.

14      And as attachments it includes things about Nongshim's --

15  the details concerning Nongshim's price increase as well as

16  Nongshim's old price support.

17          **MR. EDELMAN:**  Offer 665, Your Honor.

18          **THE COURT:**  Any objection?

19          **MS. SWEENEY:**  No, your Honor.

20          **THE COURT:**  It's admitted.

21      (Trial Exhibit 665 received in evidence)

22  **BY MR. EDELMAN**

23  **Q.**   Let's look at the first page, please.

24      (Document displayed)

25  **Q.**   So this email to you on February 23rd, 2008, it says:

1                "Here's Nongshim Ramen Unit Price Increase List."

2    A.    That's correct.

3    Q.    And the attachments are in Exhibits 666 and 667; correct?

4    A.    Yes, that's correct.

5          MR. EDELMAN:  Offer 666 and 667, Your Honor.

6          THE COURT:  Any objection?

7          MS. SWEENEY:  No objections, Your Honor.

8          THE COURT:  All right.  They are admitted.

9          (Trial Exhibits 666 and 667 received in evidence)

10   BY MR. EDELMAN

11   Q.    Okay.  So my question to you, Mr. Ku, you have one of your

12   salespeople sending you a price list and information on old

13   price support that he received from one of his customers; is

14   that correct?

15         MR. BIRKHAEUSER:  Objection.  Leading.

16         THE COURT:  The objection was leading.  It's

17   sustained.

18         MR. EDELMAN:  Okay.  I'm sorry.  Let me reask that

19   question.

20   BY MR. EDELMAN

21   Q.    Let's look at Exhibit 666.

22         (Document displayed)

23   Q.    This is one of the attachments to the email.  Can you tell

24   us what this is?

25   A.    So this entailed pertinent details on Nongshim's price

KU - DIRECT / EDELMAN

1    increase.

2    **Q.**   All right.  Now let's look at Exhibit 667.

3         (Document displayed)

4    **Q.**   This is another one of the attachments that you were sent?

5    **A.**   That's correct.

6    **Q.**   All right.  And what is this?

7    **A.**   So it entails something about how Nongshim is going to

8    extend old price support following their price increase.

9    **Q.**   Where did you understand that your salesperson obtained

10   this information about Nongshim's prices and its price support?

11        **MS. SWEENEY:**  Objection.  Foundation.

12        **THE COURT:**  Overruled.

13   **A.**   So he got this from a particular customer who deals in

14   both Nongshim's products as well as our products.

15   **BY MR. EDELMAN**

16   **Q.**   And how do you know that?

17   **A.**   That's what the guy who sent this over to me told me.

18   **Q.**   And is it common for you to be able to get price lists,

19   information on price support that your competitors are offering

20   from the customers that you share in common?

21        **MR. BIRKHAEUSER:**  Objection.  Leading.

22        **THE COURT:**  Overruled.

23   **A.**   So this kind of information is something that these

24   customers are typically willing to easily provide you with

25   because by doing so, by sharing with you details about some

```
 1   other company, they have these hopes that maybe you might
 2   extend to them some further discounts or whatever benefits
 3   there may be.
 4          THE COURT:  All right?  Why don't we take our morning
 5   break.
 6      Ladies and gentlemen, 15 minutes.  Please remember the
 7   admonitions.
 8      (Jury exits the courtroom at 9:53 a.m.)
 9          THE COURT:  We'll be in recess.
10      (Whereupon there was a recess in the proceedings
11       from 9:53 a.m. until 10:08 a.m.)
12          MR. EDELMAN:  Your Honor, I'm not sure if there is
13   still an objection to our summary exhibit, which I would be
14   using in this next section of my outline.
15          THE COURT:  Is there any question about the accuracy
16   of the summary?
17          MS. SWEENEY:  There is, Your Honor.  And Ms. Cho
18   analyzed the documents that counsel pointed to as supporting
19   the summary exhibit and there are inaccuracies in those
20   documents, both within the supporting documents and as compared
21   to the summary exhibit.  So it all -- they have different start
22   dates for the price increases.
23      What he's trying to do with the exhibit is show what the
24   exchange rate would have been and so what the price in U.S.
25   dollars would have been.  So you can't determine the correct
```

 1  exchange rate if you don't know the date of the increase.

 2       And Ms. Cho -- oh, is right here.  She can explain it

 3  better than me.

 4            THE COURT:  Ms. Cho, what is the issue and how

 5  material is it?

 6            MS. CHO:  Just a moment, Your Honor.

 7       But so when we looked through the cited documents, they

 8  were a series of Requests For Approval documents and the date

 9  of adjustment listed in those documents had different dates

10  than what is currently listed there.  And when you conduct the

11  exchange rate calculation, then that obviously has an impact on

12  the price on the right-hand column.

13       So that was one of the material objections that we had to

14  this document.

15            THE COURT:  Okay.  And so how material are the

16  exchange rate differences between what you believe is accurate

17  and what is shown on the summary?

18            MS. CHO:  It's a difference of a cent, but it is -- it

19  still does go to the accuracy of the date of adjustment, as

20  well as actual choolgo warehouse price.

21            THE COURT:  Ms. Yu.

22            MS. YU:  So, first of all, I would like to note that

23  plaintiffs have relied on the exact same dates to establish

24  when Ottogi Korea's prices have changed.  They have relied on

25  Trial Exhibit 10, I believe, that shows the same date.  So if

1  there is no dispute regarding the dates, then there is actually

2  no dispute regarding the exchange rate.

3      And during the break Ms. Cho and I have been discussing

4  that I would provide additional support that shows that these

5  dates are actually accurate.  And I'm currently looking for one

6  additional trial exhibit to show Ms. Cho so that she could

7  satisfy herself that those dates are the actual dates that

8  Ottogi Korea's prices have changed.

9          **THE COURT:**  Okay.  So I'm going to conditionally allow

10  the summary.  And if there is some substitution that needs to

11  be made because of any inaccuracy, we can do that.

12          **MR. EDELMAN:**  Thank you, your Honor.

13      **MS. CHO:**  Thank you, your Honor.

14      (Jury enters the courtroom at 10:12 a.m.)

15          **THE COURT:**  All right.  Please be seated, everybody.

16      Mr. Edelman, go ahead.

17          **MR. EDELMAN:**  Thank you, your Honor.

18  **BY MR. EDELMAN**

19  **Q.**  Mr. Ku, when did Ottogi Korea raise its prices in 2008?

20  **A.**  Effective April 1st.

21  **Q.**  Would you look at Exhibit 670, please.

22      (Witness complied.)

23  **A.**  All right.

24  **Q.**  Is this the final document, the Proposal Form and the

25  product increase review report, that was submitted to the

KU - DIRECT / EDELMAN

1  president with respect to the 2008 price increase?

2  **A.**   Yes, that's correct.

3       **MR. EDELMAN:**  Offer 670, Your Honor.

4       **THE COURT:**  Any objection?

5       **MS. SWEENEY:**  No, your Honor.

6       **THE COURT:**  It's admitted.

7       (Trial Exhibit 670 received in evidence)

8  **BY MR. EDELMAN**

9  **Q.**   So if we look at the face page of Exhibit 670.

10      (Document displayed)

11 **A.**   All right.

12 **Q.**   Do you have it?

13      **MR. EDELMAN:**  I'm sorry.  Is it on the screen?  I

14 don't have it on the screen.

15      **THE CLERK:**  I think it's a matter of a roving failure.

16      **THE COURT:**  Some but not all.

17      **MR. EDELMAN:**  Okay, fine.  As long as the jury has it,

18 Your Honor.

19 **BY MR. EDELMAN**

20 **Q.**   This is the same format, right, that we saw for 2007?

21 **A.**   Yes, that's correct.

22 **Q.**   And this is -- am I correct that this is the format you

23 used for all of these final reports that go to the president on

24 pricing?

25 **A.**   Yeah, that's correct.

1   Q.   And so for 2008, Mr. Ku, did you match Nongshim's prices?

2   A.   No.  As in the case with 2007, we were different as to the

3   date in terms of Nongshim and we were lower in price.

4   Q.   Now, what about the timing of your price increase?  You

5   said it was different.  How different was it?

6   A.   So whereas back in 2007 we were behind by, oh, six months

7   or so, but in 2008 we were behind by only two months or so.

8   Q.   Let's look at the second page, which contains the

9   attachment, the report part.

10        (Document displayed)

11  Q.   So in 2006 you were -- I'm sorry, 2007 you were about six

12  months different from Nongshim in price increase, and here you

13  just said you were a month and a half for 2008.  Why were you

14  closer in time in 2008 than you were in 2007?

15  A.   So during the year 2008, as we had just seen in that one

16  series of articles, the cost of the raw and subsidiary

17  materials had gone up quite some bit, quite a bit.

18        And so already starting in February of 2018 -- 2008,

19  Ottogi Ramen had continually been asking us to allow for a

20  price increase.  It was to the point where Ottogi Ramen was

21  saying that they could no longer bear given the costs that had

22  become so burdensome.

23        And going back to 2008, even though we had raised our

24  price quite a bit later in comparison to Nongshim, the market

25  share did not really increase.  So by this point in time our

1  thinking was just by holding our price lower is not going to

2  gain us any more market share necessarily.

3  **Q.**   Okay.  So we've reviewed the price changes for 2007, 2008

4  and I know there was -- you told us there was no price increase

5  for 2006.

6      So was the process similar for 2001, 2003, 2004 and 2005

7  to what you've just explained for 2007 and 2008?

8          **MS. SWEENEY:**  Objection.  Foundation.

9          **THE COURT:**  Sustained.  Could you lay a foundation for

10  those dates?  Because his position changed, as I understand it.

11          **MR. EDELMAN:**  Okay.

12  **BY MR. EDELMAN**

13  **Q.**   Early in your examination, Mr. Ku, I asked you the dates

14  of the price changes between the years 2000 and 2010.  Do you

15  recall that?

16  **A.**   Yes.

17  **Q.**   And can you remind us what those -- what years Ottogi had

18  price increases?

19  **A.**   That would be 2001 and 2003, January of 2003, which is

20  something that we reviewed back in 2002.  And then 2004, 2005,

21  2007, 2008 and 2010.

22  **Q.**   Okay.  And just for foundational purposes, remind us how

23  you know that?

24  **A.**   That's because sometimes I'm the one who did the review

25  and otherwise I've also reviewed the other review documents.

1   **Q.**   For each of -- each of the price increases that you just

2   mentioned?

3   **A.**   Yes, that's correct.

4   **Q.**   All right.  And so back to my earlier question.  Was the

5   process that you explained to the jury for 2007 and 2008

6   similar to the process that Ottogi employed for the years 2001,

7   2002/'03, 2004 and 2005?

8          **MS. SWEENEY:**  Objection.  Foundation.

9          **THE COURT:**  Yeah.  Sustained.  He may have seen the

10  same documents -- the documents, but he wasn't involved in the

11  prices, so you may want to clarify.

12         **MR. EDELMAN:**  Let me try to nail this down a little

13  better.

14  **BY MR. EDELMAN**

15  **Q.**   In the years 2001, 2003, 2004 and 2005 explain to us what

16  your role was with respect to Ottogi's decision and process for

17  raising prices?

18  **A.**   So for the years 2007, 2008 and 2010 it was our department

19  that was responsible for handling these sorts of matters, and

20  it was, in fact, me, personally who performed the price

21  adjustments.

22         And even prior to 2007, it was still our department that

23  was responsible for handling these sorts of price related

24  things, included such things as discounts, et cetera.  So if

25  there would be any change as to the choolgo price, then our

1  department would be notified as to same.

2  **Q.**   And were you personally involved in the price increases

3  for 2001, 2003, 2004 and 2005?

4  **A.**   I was not personally involved in that, but I was still on

5  the receiving end as to all the related matters concerning

6  those years.

7  **Q.**   And by the "receiving end," do you mean you received all

8  the documentation each year for each of the price increases at

9  issue?

10 **A.**   That is right.

11 **Q.**   And did you review the internal memos and analyses

12 relating to the price increases for the years 2001, '03, '04

13 and '05?

14 **A.**   That is right.  Given that it was our department that was

15 responsible for the conduct of these price matters, all that

16 kind of information has to come to us.

17 **Q.**   All right.  And was the process that Ottogi employed in

18 those years, 2001, 2002/'03, 2004 and 2005, as outlined in all

19 the memos that you reviewed and the documentation you received,

20 the same as what you've described for 2007 and 2008?

21             **THE COURT:**  Ms. Sweeney.

22             **MS. SWEENEY:**  Same objection, Your Honor.

23             **THE COURT:**  Overruled.

24 **A.**   That's right.  So over time the department responsible for

25 these sorts of price management things would change.  However,

KU - DIRECT / EDELMAN

1  the overall processes involved or undertaken remained basically

2  the same.

3  **BY MR. EDELMAN**

4  **Q.**   In each of the years that we've discussed where there was

5  a price increase, was there a cost increase in the underlying

6  materials used for ramen?

7  **A.**   Yes, there had been cost increases.

8  **Q.**   And in each of the years in which Ottogi raised its price

9  that we have been discussing, did Ottogi do an independent

10  analysis of market conditions, competitors, the things you have

11  been testifying to, like you explained to us for 2007 and 2008?

12  **A.**   That is right.  So Ottogi would independently review,

13  analyze and discuss those things.  And we not only differed

14  from the competition in terms of the price, but also the

15  timing.

16      And upon going through such a review, the company would

17  come to decide on a price certain that we believed would be

18  most beneficial to our company in conducting an increase.

19  **Q.**   All right.  And let's look at Exhibit 817, please.

20      (Witness complied.)

21  **Q.**   Is 817 the final Request For Approval for the year 2001?

22  **A.**   Yes, that's correct.

23          **MR. EDELMAN:**  Offer 817, Your Honor.

24          **MS. SWEENEY:**  No objection.

25          **THE COURT:**  It's admitted.

```
 1          (Trial Exhibit 817 received in evidence)

 2              MR. EDELMAN:  Can we publish it briefly?

 3              THE COURT:  Go ahead.

 4          (Document displayed)

 5   BY MR. EDELMAN

 6   Q.   Okay.  I'm not going to ask any particular questions about

 7   that, Mr. Ku.

 8          Let's turn to Exhibit 816, please.

 9          (Witness complied.)

10   Q.   What is 816?

11   A.   So this is the front page of that package of Request For

12   Approval materials that is submitted for obtaining approval.

13              MR. EDELMAN:  I will offer 816, Your Honor.

14              THE COURT:  Any objection?

15              MS. SWEENEY:  No, your Honor.

16              THE COURT:  All right.  It's admitted.

17          (Trial Exhibit 816 received in evidence)

18              MR. EDELMAN:  All right.  Let's please pop 816 on the

19   screen.

20          (Document displayed)

21   BY MR. EDELMAN

22   Q.   So this is the Proposal Form for the year 2002?

23   A.   Yes, that's correct.

24   Q.   Okay.  So for purposes of this litigation, and indeed for

25   submissions that Ottogi made to the KFTC when it was conducting
```

1   its investigation, were you able to find all of these forms for

2   each of the years between 2000 and 2010?

3   **A.**   I tried to look for those.

4   **Q.**   Okay.  And were there some that you were not able to find

5   in Ottogi's files?

6   **A.**   Yes, some of them I was not able to locate.

7   **Q.**   Which ones were you not able to locate, Mr. Ku?

8   **A.**   So I was unable to find the final report as said to be

9   attached hereto, the one pertaining to 2002 --

10  **Q.**   Okay, sorry.  2002?

11  **A.**   Right.  And for the year 2004 I was not able to find the

12  entire, say, Request For Approval package.

13  **Q.**   Okay.  So just staying with 2002, since this is the one

14  we've been talking about just now, Exhibit 816.

15          **MR. EDELMAN:**  If you could put that on the screen,

16  Jim?

17     (Document displayed)

18  **BY MR. EDELMAN**

19  **Q.**   Are you saying you were able to find the Proposal Form,

20  but not the remainder that's referred to at the bottom of the

21  page as the attachment?

22          **MR. BIRKHAEUSER:**  Objection.  Leading.

23          **THE COURT:**  Overruled.

24  **A.**   That is correct.

25

1   BY MR. EDELMAN

2   Q.   And for 2004, if I understood you correctly, you were not

3   able to find the entire packet, neither the Proposal Form nor

4   the attachment; is that correct?

5           MR. BIRKHAEUSER:   Same objection.

6           THE COURT:   Overruled.

7   A.   Right.   We tried in vain to locate it.

8   Q.   Okay.   So look at Exhibit 369, please.

9           THE INTERPRETER:   36, counsel?

10          MR. EDELMAN:   369.

11      (Witness complied.)

12  A.   All right.

13  BY MR. EDELMAN

14  Q.   Looking for a quick answer so I can get it up to the jury

15  before we talk about its contents.   Tell me what this is?

16  A.   This is a communique.

17  Q.   Is this something that you were involved in drafting in

18  2008?

19      I'm sorry.   I misspoke as to the year.   In 2004?

20  A.   Well, now, so, you know, this sort of a document is

21  something that is used for signing off purposes after there is

22  -- sorry, strike.

23      So this is a document that comes to be once a decision has

24  been made and signed off on as to a price increase.   So it is

25  used to inform the various respective departments as to such.

1         And I also am listed as one of the recipients, but I

2    looked for this in my own files, but was not able to locate it.

3    Q.   All right.  So is this document, Request For Cooperation,

4    something that is regularly created by Ottogi in the normal

5    course of business once a price increase has been approved by

6    the president?

7    A.   Yes, that's right.

8    Q.   And is this the Request For Cooperation for 2004?

9    A.   Yes, that's correct.

10         MR. EDELMAN:  Offer 369, Your Honor.

11         THE COURT:  Any objection?

12         MS. SWEENEY:  No, your Honor.

13         THE COURT:  All right.  It's admitted.

14    (Trial Exhibit 369 received in evidence)

15    (Document displayed)

16   BY MR. EDELMAN

17   Q.   All right.  So looking at the screen, you just said a

18   moment ago that this is a document that's created after the

19   president has approved the approval packet; correct?

20   A.   That is correct.

21   Q.   So although Ottogi was not able to locate the approval

22   packet for 2004, you did locate this in the files?

23   A.   Yes, that's correct.

24   Q.   All right.  And this document references an attachment on

25   the second page, if we look at that?

1          **MR. EDELMAN:**  Can we look at Exhibit 766, please?  And

2    maybe keep 369 on the left of the screen?

3        (Documents displayed)

4    **BY MR. EDELMAN**

5    **Q.**   What is 766?

6    **A.**   So it's a document that is -- well, it is the document

7    that is referenced here within this Request For Cooperation

8    communique.

9    **Q.**   All right.  You have a Request For Cooperation that

10   attaches something called a Ramen Export Price and Consumer

11   Price Increase Details.

12       What's the purpose of transmitting this Request For

13   Cooperation and the attachment within the company once the

14   president has signed off on a price increase?

15          **THE INTERPRETER:**  I'm sorry.  May the interpreter have

16   that repeated?

17          **MR. EDELMAN:**  Yes.

18   **BY MR. EDELMAN**

19   **Q.**   So we see the Request For Cooperation, Exhibit 369.  We

20   see the Ramen Export Price and Consumer Price Increase Details,

21   Exhibit 766.  And the question is:  What is the purpose of

22   sending around this Request For Cooperation with the attachment

23   within Ottogi once the president has approved the price

24   increase?

25   **A.**   So mind you, it does not say export price here on this

1    document.  It talks about the choolgo price and consumer price.

2         But in any event, so this is something that is circulated

3    as an FYI after the gentleman grants his approval.

4    Q.   Thank you for that correction.  I was reminded of that by

5    my colleague.  I'm looking at an old translation.

6         So your version, the correct version, says ramen choolgo

7    or warehouse price and Consumer Price Increase Details on

8    Exhibit 766; correct?

9    A.   Yes, that's correct.

10   Q.   Okay.  So what I was asking is why is this sent around the

11   company?

12   A.   So upon there being an increase as to the choolgo price,

13   this is sent around internally within the company to various

14   relevant departments and if any of those departments find it

15   personally useful, then, you know, this is to be used for -- as

16   their reference.

17   Q.   So, Mr. Ku, does -- I know you said you couldn't find the

18   final 2004 packet, but does this price list that gets sent

19   around to the various companies show the same prices that would

20   have been found in the final approval packet that the president

21   signed?

22   A.   No.  So this is not a document that gets submitted to the

23   CEO.  Rather, after the CEO grants his approval on the whole

24   idea, this is something that gets provided to the relevant

25   departments for their heads-up.

KU - DIRECT / EDELMAN

1  **Q.**   And this reflects the prices that the CEO approved for

2  2004; correct?

3  **A.**   Oh, yes, that's correct.

4  **Q.**   Okay.  Let's move away from 2004 for the moment and go to

5  Exhibit 644.

6       Is Exhibit 644 a Proposal Form and price product increase

7  details signed off by the CEO for 2005?

8  **A.**   Yes.  It's the Request For Approval package.

9  **Q.**   Okay.  Let's put that up on the screen briefly.

10          **THE COURT:**  Is that in evidence?

11          **MR. EDELMAN:**  I'm sorry, your Honor.  I offer 644 into

12  evidence.

13          **THE COURT:**  Any objection?

14          **MS. SWEENEY:**  No, your Honor.

15          **THE COURT:**  All right.  It's admitted.

16      (Trial Exhibit 644 received in evidence)

17          **MR. EDELMAN:**  And, Jim, take us through the pages?

18      (Document displayed)

19  **BY MR. EDELMAN**

20  **Q.**   All right.  I'm not going to ask you any particular

21  questions about that one in the interests of time.

22       I'd like to move to a summary exhibit.

23          **MR. EDELMAN:**  May I approach, Your Honor?

24          **THE COURT:**  You may.

25          **MR. EDELMAN:**  All right.  Thank you.

1          (Whereupon document was tendered to the witness.)

2     BY MR. EDELMAN

3     Q.    Now, is this a chart that you personally prepared, Mr. Ku?

4     A.    Yes, that's correct.

5     Q.    And tell us what it is -- well, let me ask it this way.

6          Did you personally prepare this based on your review of

7     the price approval packets and the Request For Cooperation that

8     we've now seen for the years in question where there were price

9     increases?

10              MR. BIRKHAEUSER:  Objection.  Leading.

11              THE COURT:  Overruled.

12    A.    That is right.  I prepared this document based upon the

13    various Requests For Approval documents and the Requests For

14    Cooperation documents.

15              MR. EDELMAN:  Offer 2020 into evidence, Your Honor.

16              THE COURT:  All right.  Ms. Sweeney?

17              MS. SWEENEY:  We object to its being admitted into

18    evidence.  We have no objection to Mr. Edelman using it as a

19    demonstrative.

20              THE COURT:  All right.  So at the moment, ladies and

21    gentlemen, I'm going to conditionally admit this document so

22    that you can review it.  There is some questions about

23    accuracy, which will be ironed out at some point before you get

24    the case.

25          (Trial Exhibit 2020 conditionally  received in evidence)

1        (Document displayed)

2   BY MR. EDELMAN

3   Q.   Mr. Ku, tell us what this chart shows, please?

4   A.   So it basically shows us two things for the years 2001

5   running through 2010 concerning the changes as to our company's

6   Jin Ramen product, plus a dollar conversion of it.

7   Q.   Okay.  So for each of the price increases that you've

8   explained to the jury, does this show how the price of a bag of

9   Jin Ramen at the choolgo price, or what's the warehouse price,

10  went up in that given year?

11  A.   That is correct.

12       MR. EDELMAN:  You can put that down.

13       (Document removed from display)

14  BY MR. EDELMAN

15  Q.   Mr. Ku, I'm only going to ask you to do this a couple

16  times today, but I want you to look at the jury when you answer

17  the following question.

18  A.   All right.

19  Q.   This is my question:  Was Ottogi Korea part of an

20  agreement with other ramen companies to fix or raise the prices

21  of ramen in Korea between 2000 and 2010?

22  A.   No, we never did anything like that.  Ottogi adjusted its

23  price based upon its own independent analysis, review and

24  discussions.

25  Q.   Is it possible that Ottogi Korea was part of a conspiracy

1  concerning ramen prices between 2000 and 2010 and you didn't

2  know about it?

3  **A.**   Sir, I am the one who has been responsible -- who was

4  responsible from 2007 and thereafter as being a person within

5  the actual department responsible for these sorts of price

6  related matters, as well as the actual hands-on person for

7  price.

8        Even before 2007, I was with said department and the

9  department was responsible for discount matters and so forth,

10  and there cannot have -- it could not have been any collusion

11  that I was unaware of.

12  **Q.**   I'm going to hand you a document which has been marked for

13  identification as Trial Exhibit 14.

14        **MR. EDELMAN:**   May I approach the witness, Your Honor?

15        **THE COURT:**   You may.

16        (Whereupon document was tendered to the witness.)

17        **THE COURT:**   Do you have one for me?

18        **MR. EDELMAN:**   Yes, your Honor.

19        (Whereupon document was tendered to the Court.)

20  **BY MR. EDELMAN**

21  **Q.**   Do you recognize this document, Mr. Ku?

22  **A.**   Yes.

23  **Q.**   Briefly, can you just tell us what it is?

24  **A.**   It's a compilation of the attendees for particular given

25  years who were in attendance at this thing called the Ramen

1    Conference.

2    **Q.**   Did you prepare this?

3    **A.**   Yes, I created it.

4    **Q.**   All right.

5         **MR. EDELMAN:**  Offer Exhibit 145, Your Honor.

6         **THE COURT:**  Any objection?

7         **MS. SWEENEY:**  No, your Honor.

8         **THE COURT:**  All right.  It's admitted.  So it's Trial

9    Exhibit 14.

10        (Trial Exhibit 14 received in evidence)

11        **MR. EDELMAN:**  I'm sorry, Trial Exhibit 14.  I was

12   looking at the deposition exhibit.  Thank you.

13        Can we put it on the screen?

14        (Document displayed)

15   **BY MR. EDELMAN**

16   **Q.**   Okay.  First off, tell us why -- tell the jury why you

17   prepared this document?

18   **A.**   So based upon a request for this material by the defense,

19   I conducted my investigation and put this together.

20   **Q.**   All right.  So were you the person at Ottogi Korea who was

21   charged with gathering material for the KFTC when it requested

22   material?

23   **A.**   Yes, I was tasked with that.

24   **Q.**   All right.  And you reviewed -- did you review Ottogi's

25   files and speak with people to get the information that you put

**KU - DIRECT / EDELMAN**

1  in this chart?

2  **A.**   Yes, of course.

3  **Q.**   All right.  And what is your understanding of what the

4  Ramen Conference is?

5  **A.**   So speaking with respect to the Ramen Conference, this is

6  something that the Korean National Tax Service, basically the

7  tax authorities on the part of the government, put together.

8  Its purpose is so as to ensure that the middlemen, merchants,

9  if you will, do not conduct business under the table.  And so

10  as to -- this is intended to prevent cheating on their taxes.

11  **Q.**   So it's -- the Ramen Conference is a conference that is

12  put together by the government to ensure compliance with tax

13  laws; is that accurate?

14  **A.**   Yes, that's correct.

15  **Q.**   All right.  You would look at Exhibit 673 in your

16  notebook, please?

17       (Witness complied.)

18  **A.**   All right.

19  **Q.**   Can you tell us what 673 is?

20  **A.**   It's a document sent to the below-listed recipients by the

21  Korean National Tax Service.

22  **Q.**   And is this something that you are familiar with from the

23  work you did in your investigation on the Ramen Conference for

24  the KFTC?

25  **A.**   Yes, that's correct.

**KU - DIRECT / EDELMAN**

Q.   And is this a document that Ottogi Korea maintains in the normal course of business?

A.   Yes, that's correct.

         MR. EDELMAN:  Offer 673, Your Honor.

         THE COURT:  Any objection?

         MS. SWEENEY:  Foundation, Your Honor.

         THE COURT:  Overruled.  It will be admitted.

     (Trial Exhibit 673 received in evidence).

         MR. EDELMAN:  All right.  Let's look at Exhibit 673, please.

     (Document displayed)

BY MR. EDELMAN

Q.   And tell us what this document is, please?

A.   So this is an official document sent by the Korean National Tax Service to various companies thanking them, thanking each of them for helping to maintain order in transactions.  And it further asks for their continuous, say, cooperation going forward.

Q.   Okay.  I want to direct your attention to the small print beneath "Commissioner of the National Tax Service."

         MR. EDELMAN:  And ask, Jim, if we could below that you, please?

     (Document enlarged)

A.   All right.

1    BY MR. EDELMAN

2    Q.    Okay.  So it says that the recipients are:

3          "The Chairman"  -- I can't wait for the translation

4      on this -- "for the Transaction Order Normalization

5      Conference for refreshing drinks, cosmetics, toilet paper,

6      sanitary products, confectionaries, ice cream, marine food

7      products, electronic products, paints, ink, plywood,

8      timber, meat, ramen, edible oil, oil and fat, shoes, paper

9      cups, spices and pharmaceutical products."

10   A.    Yes.

11   Q.    Does the Korean government require all of these industries

12   to hold their own conferences to ensure that appropriate taxes

13   are being paid?

14          THE COURT:  Ms. Sweeney.

15          MS. SWEENEY:  Objection.  Foundation.  Relevance as to

16   timeframe.

17          THE COURT:  Sustained.

18          MR. EDELMAN:  All right.

19   BY MR. EDELMAN

20   Q.    Let me ask it a little differently.  Is it your

21   understanding, Mr. Ku, that the -- for the years in question

22   when you did this investigation, that there were conferences

23   for industries other than just ramen?

24   A.    Yes, that's right.

25   Q.    All right.  So let's go back to Exhibit -- Trial

1  Exhibit 14.

2      (Document displayed)

3  **Q.**  In the year 2001, from your investigation who attended the

4  Ramen Conference on behalf of Ottogi?

5  **A.**  For the year 2000 it was a Mr. Geun-Ho Choi.

6  **Q.**  Who is Mr. Geun-Ho Choi?

7  **A.**  It was somebody charged with sales.

8  **Q.**  Did he have pricing authority in 2001?

9          **MS. SWEENEY:**  Objection.  Foundation.

10          **THE COURT:**  Sustained.

11  **BY MR. EDELMAN**

12  **Q.**  I'm sorry.  Repeat the department that he was in?

13  **A.**  It was a sales related department.

14  **Q.**  And did his department -- are you familiar -- you are

15  familiar with the department he was in?

16  **A.**  Yes, I know about it.

17  **Q.**  Did his department have price setting authority for Ottogi

18  Korea in 2001?

19  **A.**  No.  It was a sales related department.

20  **Q.**  Was Mr. Geun-Ho Choi in that same department in -- well,

21  let me ask it differently.

22      Was Mr. Geun-Ho Choi ever in a department in Ottogi Korea

23  that had price setting authority between 2000 and 2010?

24  **A.**  No.

25  **Q.**  So from the department that he was in 2001 would he have

**KU - DIRECT / EDELMAN**

1   been up to speed on Ottogi's price strategy for ramen that

2   year?

3           THE COURT:  Sustained.  No foundation.

4   BY MR. EDELMAN

5   Q.   Was there another person who attended the Ramen Conference

6   in 2001?

7   A.   It is possible that somebody referred to as the secretary

8   may have been in attendance, but it's not something we were

9   able to verify.

10  Q.   All right.  But it would have been somebody beneath

11  Mr. Choi?

12  A.   That's right.  The person I have in mind is somebody at a

13  lower rank than Mr. Choi.

14  Q.   All right.

15          MR. BIRKHAEUSER:  Objection.  Foundation.

16          THE COURT:  Overruled.  He did -- overruled.

17          MR. EDELMAN:  Okay.

18  BY MR. EDELMAN

19  Q.   Okay.  Was that person in your department?

20  A.   No.

21  Q.   Did Ottogi Korea send anyone to the Ramen Conference in

22  2001 that had pricing authority?

23          THE COURT:  Sustained.  No foundation.

24  BY MR. EDELMAN

25  Q.   Did you -- did your department ever send anyone to the

**KU - DIRECT / EDELMAN**

1  Ramen Conference -- did your department send anyone to the

2  Ramen Conference in 2001 who had pricing authority?

3          **THE COURT:**  Ms. Sweeney.

4          **MS. SWEENEY:**  Objection.  Foundation, given the

5  department that he was in at the time.

6          **THE COURT:**  Sustained.

7  **BY MR. EDELMAN**

8  **Q.**   Did you ever hear from anyone at Ottogi that there was any

9  agreement at a Ramen Conference in 2001 to set prices with

10  competitors?

11  **A.**   No.  I've never heard anything like that.

12  **Q.**   Okay.  I want to quickly ask you about information

13  exchange.

14      Did you ever exchange confidential non-public pricing

15  information with Nongshim or any of Ottogi Korea's competitors

16  in Korea?

17  **A.**   No, I never did.

18  **Q.**   Let's turn to the KFTC investigation.  Was Ottogi Korea

19  investigated by the KFTC for price fixing?

20  **A.**   Yes, it was.

21  **Q.**   Tell the jury what the KFTC is.

22  **A.**   The KFTC in Korea is charged with implementing the rules

23  concerning fair trade.  So they, along with the Prosecutor

24  General's Office plus the National Tax Service, they, the three

25  bodies, constitute the top-most investigatory bodies within

KU - DIRECT / EDELMAN

1  Korea.

2  **Q.**   Is it a powerful agency?

3  **A.**   That is right.

4  **Q.**   What was your understanding of the scope of the KFTC's

5  investigation?

6  **A.**   I understand it as having been concerning the overall

7  scope of the pertinent fair trade laws.

8  **Q.**   Within domestic Korea?

9  **A.**   That's correct.

10  **Q.**   All right.  And how did you first learn about the

11  investigation?

12  **A.**   They came in and started investigating us unannounced on

13  June the 3rd, 2008.

14  **Q.**   Announced or unannounced?

15       **THE INTERPRETER:**  Unannounced, by the interpreter.

16       **MR. EDELMAN:**  Unannounced.

17       **THE INTERPRETER:**  Yeah.

18  **BY MR. EDELMAN**

19  **Q.**   Was it a total surprise?

20  **A.**   Yes.  They basically raided us without any prior

21  announcement.

22  **Q.**   Did you have a lawyer there?

23  **A.**   No, we didn't.

24  **Q.**   Describe for the jury what happened?

25  **A.**   So it was June the 3rd in 2008 and it was just like any

1    other ordinary workday.  We were just working and it was a

2    little past 9:00 and about 10:00 -- around 10:00 or so

3    investigators from the KFTC just came and raided us

4    unannounced.

5        So at that time our office was, I'd say, a little wider

6    than this courtroom here and there were no cubicles.  It was

7    all open.  The entryway was about yea big over here and there

8    was only one entryway.

9        So these ten investigators come in.  They say, Cease what

10   you're doing.  Just save all your work on your computer and

11   move away from your computer.  And then they said, As of this

12   point in time we are going to be investigating you as to the

13   overall laws and regulations pertaining to fair trade.

14       And then they started spreading around within each of our

15   departments and started going through the cabinets, the desks,

16   the computers and such.

17            **THE COURT:**  Mr. Edelman, let's proceed by questions

18   and answers rather than narratives.

19            **MR. EDELMAN:**  Okay, Your Honor.  Sure.

20   **BY MR. EDELMAN**

21   **Q.**   So do they lock the doors and tell everybody not to leave?

22   **A.**   Yes.  As soon as they came in, they locked the door and

23   there was one guy standing guard there and said, Nobody gets to

24   leave.

25   **Q.**   Did they access your computers and copy the contents?

1  **A.**   So as I mentioned just a moment ago, they went through

2  everything within our cabinets, went through everything within

3  our desk drawers and on top of the desks, and then they used a

4  USB sort of thing that they brought with them and connected it

5  to our computers and installed something.

6      It was as though it were a scene from a movie.  And after

7  doing so, they basically continued to basically investigate or

8  go through people's computers.

9  **Q.**   How long were they there?

10  **A.**   So they came there a little after 9:00 and left at

11  5:00 p.m.

12  **Q.**   Did they give you any instructions before they left?

13  **A.**   No.  There were no instructions or anything, but they did

14  make copies of all our documents, made copies of our computers.

15  And, in fact, a lot of the inside contents of the computers

16  they actually printed out -- printed them out right then and

17  there as hard copies and took quite a lot of things back with

18  them.

19  **Q.**   Did they tell you you're obligated to preserve files,

20  documents, emails, anything of that nature?

21  **A.**   No.  There was no word like that, nothing.

22  **Q.**   All right.  So what's the next thing that happened with

23  respect to the KFTC after they investigated you in -- they did

24  their raid in June of 2008?

25  **A.**   So about a month or so thereafter, they sent over some

**KU - DIRECT / EDELMAN**

```
 1  sort of a document asking for us to provide answers on.

 2  Q.   Look at Exhibit 17, please.

 3       (Witness complied.)

 4          MR. EDELMAN:  Your Honor, this has already been

 5  conditionally admitted.

 6       So let's put up Exhibit 17 on the screen, please.

 7       (Document displayed)

 8  BY MR. EDELMAN

 9  Q.   And let me take you back to Page 18192-T, or for you, Mr.

10  Ku, I think it's -- well, it's the same number, 18192.

11  A.   All right.

12  Q.   Is this the list of questions that you received from the

13  KFTC?

14  A.   Yes, it's a questionnaire.  And there beneath I checked

15  off a few things.

16  Q.   So wherever we see an arrow with the bolded print that

17  references a part of the company, is that your writing?

18  A.   Yes.  I wrote those in.

19  Q.   So what were you doing in listing these various parts of

20  the company?  What was your purpose?

21  A.   So you see a list of questions here, not all of which my

22  department could answer.  So I wrote down the relevant

23  departments which could answer.

24  Q.   Were you the person that was spearheading the effort to

25  respond to the KFTC's inquiry?
```

1  **A.**   It was pretty much me who handled it.

2  **Q.**   Did you ask them to be -- did you understand them to be

3  asking you for documents and things?

4  **A.**   Well, the questions are asking us to provide answers and

5  so, but some of the questions were requesting the submission of

6  material.

7  **Q.**   Did you have a conversation with anyone at the KFTC,

8  either by phone or otherwise, where you tried to understand

9  exactly what they were asking from you?

10        **MS. SWEENEY:**  Objection.  He's asking for hearsay.

11        **THE COURT:**  Overruled.  You can answer.

12  **A.**   I'm sorry.  The question was?

13  **BY MR. EDELMAN**

14  **Q.**   Well, the question was just if you had a conversation with

15  the KFTC about what they were asking for?

16  **A.**   Yes.  So as I was going through these questions with the

17  questionnaire, whatever I had questions about, I often

18  discussed that with the KFTC folks.

19  **Q.**   All right.  And what did they tell you that they wanted

20  from you in this conversation or conversations?

21        **MS. SWEENEY:**  Objection.  Hearsay.

22        **THE COURT:**  All right.  Ladies and gentlemen, when the

23  witness is describing what the KFTC person may have told him,

24  that's not admitted for the truth.  It's admitted for how he

25  took that information and did whatever he did.  This is his

**KU - DIRECT / EDELMAN**

1   testimony.

2   **A.**   So here they were basically asking for us to put certain

3   materials together and send it back their way.  Additionally,

4   they were also wanting to see that -- those series of Requests

5   For Approval packages.

6   **Q.**   The Request For Approval packages that we went over

7   earlier?

8   **A.**   That is correct.

9   **Q.**   And remind the jury which ones you were able to find and

10   which ones you were not able to find?

11   **A.**   We were able to locate the years '07 and '08 for which our

12   department was responsible, as were we with respect to 2005.

13        However, the other years that we spoke about earlier,

14   namely, '01, '02 and '04, we were not able to find those.

15   **Q.**   Okay.  And for the years '01, '02 and '04, was -- are you

16   saying it was a different department that prepared these

17   approval packets?

18   **A.**   That's right.  It was a different department and so we

19   asked that department to try to locate those, but in certain

20   cases the department was no longer there.  So we were basically

21   unable to locate those.

22   **Q.**   Okay.  So did you tell the KFTC that you were able to find

23   the final approval packets for the years where your department

24   was responsible, but you couldn't find them for the earlier

25   years?

1          **MS. SWEENEY:**  Objection.  Hearsay.

2          **THE COURT:**  Overruled.

3    **A.**   I did, in that I said for '01, '02 and '04 we were not

4    able to locate those documents.

5    **BY MR. EDELMAN**

6    **Q.**   Okay.  And what did the KFTC investigator say in response?

7          **MS. SWEENEY:**  Hearsay.  Objection, Your Honor.

8          **THE COURT:**  Again, this is -- overruled.  It's

9    admitted not for the truth of what Mr. Ku says that the KFTC

10   told him, but for why he ended up doing what he did.

11   **A.**   So when I informed the KFTC investigator about that over

12   the phone, he said, Look, this being 2008 and '01 and '02, I

13   understand it's been awhile.  So that I understand.  However,

14   2004, that's relatively recent, so you must come up with that,

15   he said.

16        So for the time being I said, Okay, I'll try my best

17   again, and hung up on the phone.

18   **BY MR. EDELMAN**

19   **Q.**   And did you go back and look again?

20   **A.**   Yes, I did, but I was just simply unable to locate the

21   documents for 2004.

22   **Q.**   So let's just go one at a time.  So what did you do then?

23   **A.**   I placed another call to the KFTC.  Told them, Look, I

24   looked but wasn't able to find it.

25   **Q.**   And what did the KFTC investigator say?

 1              MS. SWEENEY:  Same objection, Your Honor.  Hearsay.

 2              THE COURT:  Again, admitted not for the truth of the

 3   matter of what the KFTC person said.

 4   A.   Still you must submit that no matter what, says he.

 5   BY MR. EDELMAN

 6   Q.   Even though you couldn't find it and you had gone back and

 7   looked again?

 8   A.   That's right.

 9   Q.   So what did you say to the investigator when he told you

10   you simply had to have it?

11   A.   I said to him, How can I submit what I don't have?

12   Q.   What did the investigator say?

13              THE COURT:  Same objection and same ruling.  It's not

14   offered for the truth.

15   A.   Still, you must.  He repeated the same thing.

16   BY MR. EDELMAN

17   Q.   What did you say?

18   A.   I said, We don't have it.  I can't.  I continued to say

19   that.

20   Q.   Did this go back and forth for awhile like this?

21   A.   Yes.  The phone conversation lasted for quite awhile.

22   Q.   And how did you guys resolve the stalemate?

23              THE COURT:  Ms. Sweeney.

24              MS. SWEENEY:  Objection to the extent it's calling for

25   hearsay from the KFTC.

1          **THE COURT:**  Same ruling.  It's not offered for the

2    truth.

3    **A.**  So this went on for quite some time.  I say, We don't have

4    it.  We can't submit it.

5          The guy says, You must submit it.  And this goes back and

6    forth.

7          I say, What do you want us to do?  Reconstruct it and

8    submit it?

9          He goes, Yes.

10   **BY MR. EDELMAN**

11   **Q.**  So is that what you ended up doing?

12   **A.**  Yeah.  So the investigator said, No matter what you must

13   submit it.

14   **Q.**  Do you remember the name of this investigator?

15   **A.**  No, I can't quite recall.  It's just been way too long.

16   But I recall that he was a man.

17   **Q.**  Tell us what you did then after you were told to

18   reconstruct the memo?

19   **A.**  So I was able to find something from within the marketing

20   office, which in the day was handling the matter.  And this was

21   the -- this was an interim report.

22   **Q.**  Like the interim reports we have been looking at in --

23   earlier in your testimony?

24   **A.**  Yes, but not something so neatly compiled.  But, yeah, an

25   interim report.

1   **Q.**   Look at Exhibit 976, please.

2        (Witness complied.)

3   **Q.**   I'm going to start at the end of the story, Mr. Ku, on

4   this document and then work backwards.

5        Tell us what 976 is.

6   **A.**   This appears to be a final report, one that I had

7   submitted to the KFTC.

8   **Q.**   Is this the report that you recreated after these

9   discussions that you've just described?

10  **A.**   Yes, that's right.

11           **MR. EDELMAN:**  Offer 976, your Honor.

12           **THE COURT:**  Any objection?

13           **MS. SWEENEY:**  No, your Honor.

14           **THE COURT:**  It's admitted.

15       (Trial Exhibit 976 received in evidence).

16           **MR. EDELMAN:**  Okay.  Let's look at 976.

17       (Document displayed)

18  **BY MR. EDELMAN**

19  **Q.**   So it's dated January 5th, 2004; correct?

20  **A.**   Yes, that's correct.

21  **Q.**   But is this the one you created in 2008, as you have been

22  explaining?

23  **A.**   That's right.  This is my reconstruction.

24  **Q.**   And did you create this from a draft report that you found

25  in the files?

**KU - DIRECT / EDELMAN**

 1  **A.**   That is right.  This is a document that I came up with

 2  based upon that other document.

 3  **Q.**   And just quickly, in the upper right-hand corner the name

 4  Jae-Hwan Jong, J-O-N-G, who is that?

 5  **A.**   That's an employee who used to work within the -- within

 6  Marketing Team 3.

 7  **Q.**   And did you speak to him about this document that you were

 8  recreating at the time you were doing so?

 9  **A.**   Yes, I did.

10  **Q.**   Did he work in your office?

11  **A.**   Well, he offices within the same office premises as mine.

12  **Q.**   Okay.  And you showed him this?

13  **A.**   I did.

14  **Q.**   Did you ask him to review it and approve it as what you

15  both thought a memo from 2004, final memo would have looked

16  like?

17          **MR. BIRKHAEUSER:**  Objection.  Leading.

18          **THE COURT:**  Sustained.

19  **BY MR. EDELMAN**

20  **Q.**   What did you ask Mr. Jong to do when you showed it to him?

21  **A.**   So I told him that whereas there ought to have been this

22  document within Marketing Team 3, that this is a reconstruction

23  of what you folks seem to have misplaced.  If after your review

24  of this, this strikes you as being something that comports with

25  or something that is similar to what you recall, then would you

**KU - DIRECT / EDELMAN**

```
 1   kindly place your chop on it.
 2   Q.   And what did he say?
 3             MS. SWEENEY:  Objection.  Hearsay.
 4             THE COURT:  Sustained.
 5   BY MR. EDELMAN
 6   Q.   What did he do in response to that conversation?
 7   A.   He says it seems similar and then he placed his chop on
 8   it.
 9   Q.   All right.  So let's look at Exhibit 359, please.
10        (Witness complied.)
11   Q.   Do you have 359 in front of you?
12   A.   Yes.
13   Q.   All right.
14             MR. EDELMAN:  So let's -- it's already been
15   conditionally admitted, your Honor, so let's please display
16   that.
17   BY MR. EDELMAN
18   Q.   Can you tell us what 359 is?
19             MR. EDELMAN:  Let's look at the bigger picture of it,
20   Jim, not zoomed in.
21        (Document displayed)
22             MR. EDELMAN:  Thank you.
23   A.   It's an email that I sent to one of my subordinates,
24   Mr. Ho-Joon Kang.
25
```

 1   BY MR. EDELMAN

 2   Q.   Okay.  And what is the attachment?

 3   A.   That's an interim memo as received from the marketing

 4   office.

 5   Q.   All right.  And did you use this interim memo to create

 6   the reconstruction of the final memo that you gave to the KFTC?

 7   A.   Yes.  So I came up with the closest approximation as a

 8   reconstruction of the final report and submitted that.

 9        MR. EDELMAN:  Jim, let's just go through -- quickly

10   just page through page two, so the jury can see it, page three,

11   page four, page five, page six.

12        That's it.

13        (Document displayed)

14   BY MR. EDELMAN

15   Q.   So why not just submit Exhibit 359 to the KFTC instead of

16   reconstructing the final memo that you just testified to?

17   A.   The KFTC was asking for the final report.  And as for this

18   document, I was thinking that they had already had it in their

19   possession.

20   Q.   Why were you thinking that?

21   A.   That's because when they came and investigated us and went

22   through the cabinet, et cetera, et cetera, or our computers, I

23   thought they basically had this document already.

24        MR. EDELMAN:  Jim, could you pull it up again, please,

25   359?

1        (Document displayed)

2    **BY MR. EDELMAN**

3    **Q.**   Is this a final report?

4    **A.**   No.  This is not the final report.

5    **Q.**   What is different about this document than the final

6    report or the final reports that the jury has been seeing this

7    morning?

8    **A.**   So the most important thing is the fact that the price

9    itself, which is the most important thing, there is an error

10   here.  And when you look way at the end, the conclusion

11   portion, it says let us not raise the price.  Therefore, this

12   is not the final report.

13       **MR. EDELMAN:**  Let's look -- leave that first page up,

14   Jim, please.  Move it to the left and let's pull up the last

15   page.

16       (Documents displayed)

17   **BY MR. EDELMAN**

18   **Q.**   Are we looking at the right page, where you're saying it

19   does not recommend a price increase?

20   **A.**   So based upon the document that I have before me in

21   Korean, it basically is the portion that sets forth --

22       **MR. EDELMAN:**  Jim, pull up section six, please.  "For

23   the time being" in the bottom, highlight those bottom two

24   paragraphs?

25       (Document displayed)

1   **A.**   "It seems best that we postpone any price increase to

2   whatever extent that we are able to hold off," dah, dah, dah.

3   That portion.

4   **Q.**   Okay.  So you're saying that wasn't the final report

5   because it recommended against the price increase?

6   **A.**   That is correct.

7   **Q.**   Any other reasons why Exhibit 359 would not have been a

8   final report?

9   **A.**   So you had seen earlier the final report for the years

10   2007 and 2008.  A final report is not going to look -- is not

11   going to be this long and detailed.  They typically are in a

12   simple fashion, just entailing the timing, the details of the

13   increase and the cause of such.  And the reason why is because

14   CEOs do not have the luxury of time to look through something

15   this detailed.

16      And these sorts of details about the market and

17   circumstances, the pros and cons of this, that, these are

18   things that get discussed at the interim level, at the level --

19   at the stage where they make a determination as to price.

20      Further, the author listed here is a Kang-Hoon Lee, who as

21   of this point in time had already decided was going to leave

22   the care of the company and, furthermore, he was a rather low

23   echelon type of employee such that it's unlikely that he would

24   have been the guy putting together the final report.

25      **MR. EDELMAN:**   Jim, would you put up 976 again, the

1   final, the recreation Mr. Ku testified to?

2       And leave up Exhibit 359.  Put one next to the other.  Why

3   don't you -- yeah, that's fine.

4       Okay.  So let's blow up the "Purpose" on 359.

5       (Documents displayed)

6   **BY MR. EDELMAN**

7   **Q.**   So in an interim report it talks about a price increase

8   becoming inevitable on account of Nongshim's price increase.

9       Do you see that?  359?

10  **A.**   Yes.

11  **Q.**   Do you understand this to be saying that because Nongshim

12  has raised its price, Ottogi has to?

13  **A.**   No.

14  **Q.**   Why not?

15  **A.**   My take on this is that seeing as how Nongshim has been

16  granted the go-ahead from the Korean government to increase the

17  price, that serves as the impetus for us also to make a

18  determination one way or another as to whether to raise or not

19  raise, in view of how the underlying costs for us have

20  increased also.

21  **Q.**   All right.  So let's look at the "Purpose" on the

22  recreated memo, Exhibit 976.

23      Now, that "Purpose" doesn't say anything about Nongshim,

24  does it?

25  **A.**   That is right, it does not.

1   Q.   Why not?

2   A.   As I mentioned earlier, the agreement with the KFTC was

3   that, okay, we're going to try to reconstruct and submit

4   something that is as closely -- as closely approximates what

5   would have been the final report, but as you previously saw in

6   the cases of 2007 and 2008, this is put in a very concise form,

7   as would a final report have been.

8        So anything that includes details about the market

9   circumstances and reference about the competition, that is

10  something that you would come across within an interim report,

11  but not in a final report.

12  Q.   Mr. Ku, in creating this document, Exhibit 976, this

13  approximation or recreation, were you trying to trick the KFTC

14  into thinking that that was the real memo from 2004?

15  A.   No, sir.  I had no intention whatsoever of tricking the

16  KFTC authorities.  This was the very first time I was

17  undergoing something like this myself and the KFTC put quite a

18  bit of pressure on me, yeah.  I was scared and I felt that I

19  had no choice but to do something like this.

20       So we, they and I, discussed this and the KFTC agreed

21  about this.  And even while I was doing this, I was feeling

22  uncomfortable.

23  Q.   Did you talk to anyone at the time about the discomfort

24  you were feeling about the situation?

25  A.   Yes.  I spoke about this with my departmental head.

**KU - DIRECT / EDELMAN**

1   Q.   And what did the two of you talk about?

2   A.   I said, sir --

3           THE COURT:  Hold on just a second.

4           MS. SWEENEY:  Objection.  Calls for hearsay.

5           THE COURT:  Sustained.

6           MR. EDELMAN:  Your Honor, it's not being offered for

7   the truth of the matter asserted.

8           THE COURT:  There are some things where that works and

9   some things where it doesn't.  It doesn't work here.

10          MR. EDELMAN:  Very well.

11  BY MR. EDELMAN

12  Q.   Mr. Ku, did you seek to discuss the situation with your

13  superior at Ottogi before proceeding with the recreation of the

14  memo that the KFTC had asked for?

15  A.   Yes.  I spoke about this with my boss at the time, within

16  the department.

17  Q.   And did you conclude that you had no choice but to do what

18  the KFTC was requesting?

19          THE COURT:  Ms. Sweeney.

20          MS. SWEENEY:  Objection.  Leading.

21          THE COURT:  Sustained.

22  BY MR. EDELMAN

23  Q.   What did you conclude after your conversation with your

24  superior?

25  A.   So my boss on his part said that it seems -- seeing as how

1   the KFTC is so adamant about it, we have no choice but to

2   reconstruct it and submit it to them.  And that's what I also

3   thought at that time and so I came up with the reconstruction.

4           THE COURT:  So the jury will disregard anything that

5   Mr. Ku said with respect to what his boss may or may not have

6   told him.

7   BY MR. EDELMAN:

8   Q.   Mr. Ku, do you understand that you have been accused in

9   this case of purposefully attempting to deceive the KFTC

10  through your recreation of the 2004 final packet?

11          THE COURT:  Ms. Sweeney.

12          MS. SWEENEY:  Objection.  Improper argument.

13          THE COURT:  It is argumentative.  Sustained.

14  BY MR. EDELMAN:

15  Q.   Has it been important to you, Mr. Ku, to come from Korea

16  to testify in this case about accusations made against you?

17          THE COURT:  Sustained.  Argumentative and leading.

18  BY MR. EDELMAN:

19  Q.   Has it been important to you, Mr. Ku, to come testify in

20  this case?

21  A.   Yes.  As for me, it's important.

22  Q.   Please look at the jury and tell them why.

23  A.   I wanted to clear my name.  And I had no intention

24  whatsoever of misleading the KFTC authorities.  I wanted to

25  come here, look at you in the face and be able to explain

1    things to you and clear my name.

2    **Q.**   What happened after you submitted Ottogi Korea's response

3    to the KFTC's request for information in 2008?

4         **THE INTERPRETER:**  I'm sorry, Your Honor.  May the

5    interpreter have that repeated?

6         (The question read back by the court reporter)

7         **THE WITNESS:**  So there was yet another on-site

8    investigation that was conducted in January of 2010.

9         **THE COURT:**  Would this be a good time to break?

10        **MR. EDELMAN:**  Certainly, Your Honor.

11        **THE COURT:**  Ladies and gentlemen, we'll take our

12   second break.  Please remember the admonitions.

13             (Recess taken at 11:56 a.m.)

14             (Proceedings resumed at 12:10 p.m.).

15   (The following proceedings were held in open court, outside the

16   presence of the jury:)

17        **MR. EDELMAN:**  Your Honor, can we raise one issue with

18   you before the jury comes in?

19        **THE COURT:**  What's the issue?

20        **MR. EDELMAN:**  I sought to meet and confer with counsel

21   before the jury came in.  There was a line of cross-examination

22   of one of the Nongshim witnesses, Hak-Sung Kim, by Mr. Ruf

23   where he was asked:  Let's talk about your market share.  You

24   had 70 percent, and your market share has gone down quite a bit

25   since 2010.  And he says:  Yes.  And Mr. Ruf asks:  And that's

1    a result of the fact that your competition is competing with

2    you more effectively?  He said:  Right.

3        I think the line of questioning is set up for oral

4    argument that after the conspiracy ended, the market shares of

5    the respective companies changed.  And so I had intended very

6    briefly to elicit from my witness the fact that they came out

7    with a major hit product which resulted in a big uptick in

8    their market share.

9        And I'm not sure whether -- counsel hasn't decided whether

10   they're going to object to it or not, but I want to be able to

11   have something in the record to respond to the argument if

12   they're going to make it that that's why the market share

13   changed after 2010.  If there isn't going to be any argument

14   about a change in market share after the end of the conspiracy

15   period, I don't need to cover it.  But I think they are going

16   to argue it.

17           **THE COURT:**  Ms. Sweeney.

18           **MS. SWEENEY:**  We were just alerted that Mr. Edelman

19   might get into some issues beyond the class period, but he

20   hadn't specified how or whether Mr. Ku has any kind of

21   foundation.  So we were reserving our rights to object as the

22   evidence is elicited.

23           **THE COURT:**  Okay.  So let's go ahead and see what

24   happens.  I'm not seeing the relevance of it.  I understand

25   what your arguing Mr. Edelman, but it may be that the -- we'll

 1 | just see what the -- whether the plaintiffs object.  And if

 2 | they do, I'll rule.

 3 |      **MR. EDELMAN:**  Okay, Your Honor.  Thank you.

 4 |      **MR. BIRKHAEUSER:**  Your Honor --

 5 |      **THE COURT:**  Hang on.

 6 |      **MR. BIRKHAEUSER:**  I would just like to note for the

 7 | record the witness was present for that conversation.

 8 |      **THE COURT:**  He knows the answer to that question, I

 9 | suspect.

10 |      **MS. YU:**  And the witness doesn't speak English.

11 |      **MR. EDELMAN:**  There is that.

12 |     NOTE: the jury entering the courtroom.

13 |      **THE COURT:**  All right.  Please be seated, everybody.

14 |     Mr. Edelman, go ahead.

15 |      **MR. EDELMAN:**  Thank you, Your Honor.

16 | **BY MR. EDELMAN:**

17 | **Q.**  Mr. Ku, before the break I had just asked you the question

18 | after you submitted this information to the KFTC in 2008, what

19 | happened next?

20 | **A.**  So they made another on-site investigation in January of

21 | 2010.

22 | **Q.**  All right.  And I don't want to get into all the details

23 | again.  But was it just like the last one that you've already

24 | described?

25 | **A.**  Yes.  The circumstances and method of investigation are

**KU - DIRECT / EDELMAN**

1  pretty much the same.

2  **Q.**   And did they say anything in particular to you during that

3  investigation about Ottogi's prices?

4          **MS. SWEENEY:**  Objection, hearsay.

5          **THE COURT:**  Sustained.

6  **BY MR. EDELMAN:**

7  **Q.**   As a result of the conversation -- of any conversation

8  with the KFTC when they were there doing their investigation --

9  did Ottogi take any action with respect to its prices?

10 **A.**   So upon undergoing that investigation of January 2010 by

11 the KFTC, we lowered our prices.

12 **Q.**   And did you do that in response to what the investigators

13 said to you when they were on-site for their investigation in

14 2010?

15         **MS. SWEENEY:**  Objection.  Hearsay.

16         **THE COURT:**  I'm going to sustain it on another ground.

17 Leading.  Ask him direct questions.

18 **BY MR. EDELMAN:**

19 **Q.**   Why did you --

20         **MR. EDELMAN:**  I was trying not to elicit hearsay.

21 That's why I didn't ask it that way.

22 **Q.**   Why did you drop your prices after the KFTC raid in 2010?

23 **A.**   So around the end of 2008 -- or actually, I mean, the end

24 of 2009 -- the price of flour went down somewhat.  And on this

25 occasion the KFTC folks were saying, Hey, how come you guys are

1  not lowering your price, the price of ramen, when the price of

2  -- the cost of flour has gone down?  They kept saying that as

3  they were going around.

4  **Q.**  And what did you do in response to that?

5  **A.**  Quick adjustment as to the last answer.

6      So they kept going around saying that, and that they're

7  curious as to why we're not lowering our price.

8      This answer:

9      And so they kept saying, So we're curious as to why you

10  folks are not lowering your price on ramen.  So then I caught

11  on to the fact that, oh, these guys want us to lower our price.

12  **Q.**  And what did you do?

13  **A.**  So seeing as how it seemed to us that they wanted to see

14  us lowering the price our ramen, I said to them that, Okay, we

15  will positively look into this and see if, in fact, the cost of

16  wheat flour has gone down to see if it's feasible for us to

17  lower our price.

18      So upon that the KFTC said, we are also out there

19  investigating Samyang as well as Nongshim.  And as far as the

20  government is concerned, whoever is the company to lower their

21  prices earlier they're going to be in the government's favor.

22  So if at all possible, you probably would do well to lower your

23  price early on.

24  **Q.**  And did Ottogi Korea lower its price in response to that

25  from the KFTC?

1   **A.**   We did, as of February 4.

2   **Q.**   February 4, 200 --

3   **A.**   2010.

4   **Q.**   2010.  Thank you.  All right.

5        Now, during the second on-site visit, Mr. Ku, we talked

6   earlier about the recreated memo.  And the memo, you recreated

7   it from for the years 2004.

8        Did you still have those memos on your computer when the

9   KFTC came in the second time in 2010?

10  **A.**   Yes.  It was there within my computer at the time.

11  **Q.**   And in 2010 during the raid, did the KFTC copy your

12  computer and its contents again?

13  **A.**   Yes.  They came and obtained a copy of my computer

14  contents as also -- as they did also with respect to Mr. Doh's

15  computer.  And as in the previous instance, they also made hard

16  copies of documents that were there.

17  **Q.**   What happened next with respect to the KFTC they left in

18  2010?

19  **A.**   So on that occasion when they came, and as they were

20  leaving they asked for a copy of the document that I'd come up

21  with back in July of 2008.  So I also gave them one of those.

22  **Q.**   Okay.  And then after they left, what was the next thing

23  that happened with respect to the KFTC?

24  **A.**   So after that, and after they went through my final report

25  material for the year 2008, they said, We see that the final

1  reports for the years 2001 and 2002 are not here.  Please

2  submit those.

3  **Q.**  This was a phone call?

4  **A.**  That's right.  That was by telephone that they sent word.

5  **Q.**  Was this the same investigator that you had in 2008?  Or a

6  different one?

7  **A.**  It was somebody else.

8  **Q.**  Do you remember his name?

9  **A.**  No, not quite.  Not this gentleman, either.

10 **Q.**  All right.  So what did you say when they said that they

11 want copies of the final 2001 and 2002 approval packets?

12 **A.**  I told them that you folks at the KFTC said that you

13 understand that we don't have it -- this is back in 2008 -- and

14 so they excused us.  And so I told him about that.

15 **Q.**  You're referring back to the conversation you had in 2008

16 when you told them you didn't have 2001 and 2002?

17 **A.**  That's right.  So due to that we weren't able to submit it

18 back then, is what I said.

19 **Q.**  Okay.  And back then they were okay with your not having

20 it because it was so far back, right?

21 **A.**  That's correct.

22 **Q.**  But this time they were insisting on it?

23 **A.**  And so here we're dealing with a different guy, and this

24 guy is saying, Please submit those.

25 **Q.**  What did you say?

KU - DIRECT / EDELMAN

1   **A.**   I said that back then we were not able to locate those,

2   but we will try to look for them again.

3   **Q.**   And briefly describe for the jury the process that you

4   went through.

5   **A.**   So we, again, tried to look for it.  And, in fact, we were

6   able to locate the documents for 2001.  And as for 2002, we

7   were not able to locate the entire request for approval

8   package, but only the front page thereof.  The proposal form.

9   **Q.**   Okay.

10  **A.**   Without the attachments.

11  **Q.**   Without going through all of the back and forth with the

12  KFTC, can you summarize the gist of your conversation with

13  them?

14         **MS. SWEENEY:**  Object to the extent it calls for

15  hearsay.

16         **THE COURT:**  Again, ladies and gentlemen, whatever

17  Mr. Ku says the KFTC person said is not admitted for its truth,

18  but it's admitted to show what his story is about how he dealt

19  with that -- the situation.

20         **THE WITNESS:**  So when I informed this investigator

21  that we were able to locate all of the 2001 documentation but

22  only part of 2002 documentation, he said that, You must submit

23  the final approval memo also for 2002.

24         And upon that I said, As in the previous instance, look, I

25  cannot submit that because we don't have it.  And this

1  gentleman, too, said, You must.

2      And so in view of how they were adamant no matter what I

3  would tell them that we must submit this, I said, okay,

4  thinking back, reflecting back on 2008 I said to him:  Look,

5  back then in 2008 since we couldn't come up with the 2004

6  document we had to recreate it and submit it.  Is that what you

7  want me to do here in this instance also?  Something that

8  approximates the final report?

9  **BY MR. EDELMAN:**

10  **Q.**  And what did he say?

11          **MS. SWEENEY:**  Objection, Your Honor.

12          **THE COURT:**  Same ruling.  You can answer.

13          **THE WITNESS:**  Do that, if you must.

14  **BY MR. EDELMAN:**

15  **Q.**  And look at Exhibit 357.

16  **A.**  All right.

17  **Q.**  That is the memo that you submitted to the KFTC for 2002

18  year?

19  **A.**  Yes, that's correct.

20  **Q.**  All right.  Last question.  For 2005 were you able to find

21  the final approval packet in your files.

22  **A.**  Now, for that, we obtained that through the marketing

23  office and submitted a copy of it.

24  **Q.**  So you were able to find it.

25  **A.**  That's right.  The marketing team -- strike -- marketing

BANG-WAN KU - CROSS / SWEENEY

1    office was able to locate that.

2            **MR. EDELMAN:**  First let me offer 357 into evidence,

3    Your Honor.

4            **THE COURT:**  Any objection?

5            **MS. SWEENEY:**  No, Your Honor.

6            **THE COURT:**  It's admitted.

7        (Trial Exhibit 357 received in evidence)

8    BY MR. EDELMAN:

9    Q.   Let's turn 2005 packet Exhibit 644.  What is Exhibit 644?

10   A.   This is the request for approval package for the 2005

11   occasion.

12   Q.   Okay.

13           **MR. EDELMAN:**  Offer 644, Your Honor.

14           **THE COURT:**  Any objection?

15           **MS. SWEENEY:**  No.

16           **THE COURT:**  It's admitted.

17       (Trial Exhibit 644 received in evidence)

18           **MR. EDELMAN:**  All right.  Thank you, Mr. Ku, I have no

19   further questions, at this time.

20                        **CROSS-EXAMINATION**

21   BY MS. SWEENEY:

22   Q.   Good afternoon, Mr. Ku.

23   A.   Good afternoon.

24   Q.   We met recently, almost two weeks ago when I took your

25   deposition in the late afternoon, isn't that right?

BANG-WAN KU - CROSS / SWEENEY

1  **A.**   Yes, that is correct.

2  **Q.**   I'd like to start with Trial Exhibit 1029, which is a

3  stipulation entered into by the parties.

4          **MR. EDELMAN:**  Objection, Your Honor.  Objection.

5          **THE COURT:**  Objection on the basis of -- do you want

6  me to --

7          **MR. EDELMAN:**  The stipulation was to, I understood,

8  avoid this.

9          **MR. DOSKER:**  Your Honor, counsel said "parties."  And

10 that's not accurate.

11         **THE COURT:**  Let's go to the side for just a moment.

12      (The following proceedings were heard at the sidebar:)

13         **THE COURT:**  I understand Mr. Dosker's objection.

14      **MS. SWEENEY:**  I do, too.  I'm sorry.

15         **THE COURT:**  So what's --

16         **MR. EDELMAN:**  My objection, Your Honor, is that my

17 understanding was the purpose of the stipulation was to avoid

18 spending time getting into the discovery situation and just

19 have this agreement which you were going to read to the jury.

20         **THE COURT:**  Well, I did think that I was going to read

21 this to the jury.  Is there some reason that you needed to --

22      **MS. SWEENEY:**  I guess that wasn't our understanding.

23 We thought we were going to read it to the jury during or just

24 before Mr. Ku's testimony on cross-examination.

25         **THE COURT:**  Okay.  Well, it has more force when it

1    comes from the judge, so I'll read it.

2         (End of sidebar.)

3         **THE COURT:**  So ladies and gentlemen at some time when

4    you were not here the parties entered into a stipulation.  Some

5    of the parties entered into a stipulation.  And here's the

6    stipulation:

7         The Ottogi defendants and the plaintiffs stipulate that

8    the Court ordered the parties to provide each other with

9    relevant documents by April 29, 2016.  Ottogi Korea did not

10   provide the documents that have been marked as Trial Exhibits

11   1027 and 1028 until November 12, 2018, at 8:22 p.m.

12        All right.  Please go ahead, Ms. Sweeney.

13        **MS. SWEENEY:**  Thank you, Your Honor.

14   **BY MS. SWEENEY:**

15   **Q.**   Mr. Ku, Ottogi's attorney asked you a number of questions

16   about documents that you submitted to the KFTC.  And I'd like

17   to turn your attention to Trial Exhibit 17, which I believe is

18   in the binder that Mr. Edelman provided for you.

19        And looking at the first page of Trial Exhibit 17, is that

20   your email at the top?  Sky@ottogi.co.kr?

21   **A.**   Yes, that is correct.

22   **Q.**   Okay.  And this is an email that you sent shortly after

23   the KFTC visited the premises of Ottogi on June 3, 2008,

24   correct?

25   **A.**   Yes, that's correct.

**BANG-WAN KU - CROSS / SWEENEY**

1   Q.   Okay.  And this email and the attachments pertain to

2   materials that you were tasked with obtaining.  And I just want

3   to draw your attention to the subject line at the top of the

4   first page of Exhibit 17.

5        Do you see that, Mr. Ku?

6   A.   Yes.

7   Q.   And there was a meeting that was organized by your

8   supervisor, Young-Hyun Doh, regarding discussion re preparation

9   of materials requested by KFTC re ramen price fixing.  Correct?

10  A.   I see it.

11  Q.   Okay.  And so you knew as of the date of this email --

12  that is, July 2, 2008 -- that the KFTC was investigating price

13  fixing in the ramen industry, correct?

14  A.   Yes.  I was aware of the fact that they were conducting an

15  investigation concerning ramen.

16  Q.   A price fixing investigation, isn't that right?

17  A.   My understanding was it wasn't limited to price fixing,

18  but concerns all of the fair trade regulations.

19  Q.   But it included price fixing, correct?

20  A.   Yes.  It is my understanding price fixing or collusion is

21  included under the broad umbrella of the Fair Trade Act

22  regulations.

23  Q.   So that was your understanding as you prepared to gather

24  the materials that you ultimately submitted to the KFTC,

25  correct?

**BANG-WAN KU - CROSS / SWEENEY**

1  **A.**   Yes.  That's right.

2  **Q.**   Okay.  And then if you could look about three quarters of

3  the way down this first page of Exhibit 17.  It says -- there's

4  a couple of sentences, and the last one has a parenthetical.

5  It says:  The chairman personally inquired about the status of

6  this matter yesterday.

7         Do you see that?

8  **A.**   Yes, I see it.

9  **Q.**   Okay.  And at that time -- this is July of 2008 -- who was

10  the chairman?

11  **A.**   This may or may not be exact, but I think the present

12  chairman was the chairman back then as well.

13  **Q.**   And what's the name?

14  **A.**   Young-Joon Ham.

15  **Q.**   Then turning to the third page of this document, which has

16  a header reading the Fair Trade Commission.  You received this,

17  correct?

18  **A.**   Yes.  That's correct.

19  **Q.**   Okay.  And the top of it says:  For the reference of

20  recipients Nongshim Company, Limited; Samyang Foods Company,

21  Limited; Ottogi Company, Limited; and Yakult Korea.

22  Implemented by:  Service cartel department.

23         Do you see that?

24  **A.**   Yes, I see it.

25  **Q.**   And at that time in 2008 Nongshim, Samyang and Yakult

BANG-WAN KU - CROSS / SWEENEY

1   Korea were all competitors of Ottogi's, correct?

2   **A.**   Yes, that's correct.

3   **Q.**   And those companies were Ottogi's competitors throughout

4   the time period 2001 through 2008, correct?

5   **A.**   That was the case as far as the ramen segment is

6   concerned.  And if we're talking about the early part of 2000

7   there was yet another company back then.

8   **Q.**   Okay.  And then sticking with that same page that starts

9   out the Fair Trade Commission at the top.  Looking at the

10  fourth numbered paragraph there.  It says:  For your

11  information, in the event that materials are not submitted or

12  false materials are submitted, your company could be subject to

13  penalties.  Do you see that?

14  **A.**   Yes, I see it.

15  **Q.**   And then let's go to the next page which is -- as I

16  understand it, this is the list that was ultimately -- the list

17  that was sent to Ottogi from the KFTC with your inserts as to

18  which department was responsible for which items.  Is that

19  correct?

20  **A.**   That's right.  I was the one who provided these answers to

21  their inquiry, as such.

22  **Q.**   And the bolded portions below each numbered paragraph,

23  that's your determination as to which department within Ottogi

24  should respond, is that correct?

25  **A.**   So by making that indication I did not mean to say that it

1    was those respective departments that would be able to answer

2    those inquiries, but rather it seems that the material would be

3    available through those respective departments.

4    **Q.**    Okay.  And you yourself were responsible, at least in

5    part, for responding to items numbers 4 and 5, correct?

6    **A.**    Yes, that's correct.

7    **Q.**    And number 4 is your company's determination structure and

8    method regarding the price of ramen, particularly the process

9    and method of determining price as to such time as when a price

10   increase of ramen is implemented, contents of review by the

11   relevant departments.

12       So when you started gathering materials in response to the

13   KFTC's request, you understood that the KFTC was interested in

14   the contents of review by the relevant departments that went

15   along with a request for a price increase, correct?

16   **A.**    So concerning this passage at that time, it was not

17   entirely clear to me what precisely the folks were interested

18   in getting from us.  So I placed a phone call to them and I

19   said, There is this gist here.  So what exactly are you looking

20   for?  And they said, Okay, simply submit that final report as

21   we discussed previously.  The request for approval package.

22   **Q.**    Isn't it true, Mr. Ku, that the KFTC was interested in

23   knowing the reasons for Ottogi's ramen price increases during

24   the period 2001 through 2010?

25   **A.**    Yes, but be that as it may, that's something that's

BANG-WAN KU - CROSS / SWEENEY

1    entailed within the final reports.

2    **Q.**   Can you -- I'd like to have you take a look Exhibit 368,

3    which is in evidence.

4           **MS. SWEENEY:**   I'll need a copy for the witness.

5           (Whereupon document was tendered to counsel.)

6           **MS. SWEENEY:**   May I approach, Your Honor?

7           **THE COURT:**   You may.

8           (Whereupon document was tendered to the witness.)

9    **BY MS. SWEENEY**

10   **Q.**   Okay.  Exhibit 368 is an email to you dated July 3rd,

11   2008, with an attachment.  Now, who did you receive that email

12   from?

13   **A.**   This is an email that I received from one of my

14   subordinates, Mr. Ho-Joon Kang.

15   **Q.**   Okay.  And then -- I'm not going to spend any time with

16   this document.  I'm trying to establish the timeline.

17         After you received this document from your subordinate,

18   what did you do with it?

19   **A.**   So after receiving this document, I made some partial

20   revision on this document.

21   **Q.**   Did you make the revisions yourself, Mr. Ku?

22   **A.**   Yes, I made the revisions.

23   **Q.**   Do you remember when you gave a deposition about two weeks

24   ago?

25   **A.**   Yes, I do.

**BANG-WAN KU - CROSS / SWEENEY**

1    Q.   Didn't you testify then that most of the revisions to this

2    document were made by someone else?

3    A.   So perhaps I misunderstood your former question just now.

4    I thought you had asked as to what kind of action I took after

5    receiving this document.  Did I misunderstand you?

6    Q.   Perhaps you were confused about which document you were

7    looking at, Mr. Ku.

8         So there is a timeline.  You received a version of the

9    2004 memo from Jae-Hwan Jong; do you remember that?

10   A.   Yes, that's correct.

11   Q.   Okay.  And then you forwarded that document from 2004 to

12   your subordinate; correct?

13        And this is a different exhibit.  I think it's the one

14   that Mr. Edelman showed you, Exhibit 359.  You forwarded that

15   to your subordinate and asked him to make revisions to it; is

16   that correct?

17   A.   Yes, that's correct.

18   Q.   Okay.  And so I believe you have in front of you, perhaps

19   in your binder, Exhibit 359, which has already been admitted

20   into evidence.  If you do, can you please turn to that?

21        (Witness complied.)

22   A.   Yes.  I'm looking at it.

23   Q.   Okay.  And this is the document which you referred to in

24   your testimony earlier today as the interim memo for 2004; is

25   that right?

1    **A.**    Yes.  The document that Mr. Jae-Hwan Jong sent over to me

2    was an interim report.

3    **Q.**    Okay.  And at your instruction -- and I'm sorry, I have

4    forgotten how to say his name -- your subordinate modified

5    Exhibit 359; correct?

6    **A.**    Yes, that's correct.

7    **Q.**    Okay.  And this was also done in consultation with your

8    supervisor, Mr. Young-Hyun Doh; correct?

9    **A.**    Yes, that's correct.

10   **Q.**    And your deadline for submitting these materials to the

11   KFTC was July 6, 2008; correct?

12   **A.**    Yes, that's correct.

13   **Q.**    Okay.  And then you received a revised version of

14   Exhibit 359 back from your subordinate.  Is his name Mr. Kang?

15   Is it Ho-Joon Kang?

16   **A.**    Yes, that's correct.

17   **Q.**    Okay.  And I'd like you to have a look at that document;

18   that is, the revised version of the 2004 memo, which I believe

19   is also in your binder as Exhibit 365?

20   **A.**    All right.  I looked at it.

21   **Q.**    Okay.  And I'd like to compare these.

22        **MS. SWEENEY:**  So, Jason, if you could put the front --

23   those two documents side-by-side, that would be great?

24        (Documents displayed)

25

BANG-WAN KU - CROSS / SWEENEY

1    BY MS. SWEENEY

2    Q.   And let's start by focusing on the date and title in the

3    right-hand corner.

4         (Document displayed)

5              MS. SWEENEY:  My fault.  Second page, thank you.

6         (Document displayed)

7    BY MR. SWEENEY

8    Q.   Do you see where it says 2004.01.05.

9    A.   Yes, I see it.

10   Q.   Okay.  Now, if you compare these two documents, the

11   material in the upper right-hand corner is identical; isn't

12   that right?

13   A.   Yes, that's right.

14   Q.   Okay.  And both are dated January 5th, 2004; correct?

15   A.   Yes, that's correct.

16   Q.   And both say "Marketing Team 3"?

17   A.   Yes, that's correct.

18   Q.   And both say Kang-Hoon Lee?

19   A.   Yes, that's correct.

20   Q.   And the title is the same; right?  Both say "Review of

21   Ramen Price Increase Proposal"?

22   A.   Yes, that's correct.

23   Q.   But the content of these documents is quite different,

24   isn't it?

25   A.   They are different; right.

**BANG-WAN KU - CROSS / SWEENEY**

1   Q.   Okay.  And let's start with the "Purpose."  And you knew

2   when you asked your subordinate Ho-Joon Kang to revise these

3   documents, the KFTC was interested in the reasons for Ottogi's

4   price increases in the years 2001 through 2010, including 2004,

5   correct?

6   A.   Was it not through 2008?

7   Q.   Pardon me, 2008.

8   A.   Right, through 2008.

9   Q.   Okay.  You also knew at the time that you gave the

10  instructions to modify the document in this manner, that

11  Nongshim and Samyang and Yakult were also being investigated,

12  along with Ottogi, for price fixing in the ramen market;

13  correct?

14  A.   So my understanding at this point in time was that the

15  investigation had to do with the overall Fair Trade Act

16  regulations.

17  Q.   Including price fixing; correct?

18  A.   Right.

19  Q.   Okay.  And so you had your subordinate change the

20  "Purpose" to remove the language that says "a price increase is

21  inevitable on account of Nongshim's price increase" and

22  substitute instead language about a "rise in the cost of raw

23  and subsidiary materials"; right?

24  A.   No.  I did not give any instructions to change the

25  language as such.  What I instructed Ho-Joon Kang to do was to

**BANG-WAN KU - CROSS / SWEENEY**

1  look at the final reports of 2007 and 2008 and come up with

2  something similar; and that the numbers here also seem to be

3  off, so make sure that you come up with the right numbers.

4  That's what I instructed him to do.

5  **Q.**   Well, let's start with your instruction that he look at

6  those other years' memos.  Don't you think that the KFTC wanted

7  to know the reasons for Ottogi's price increase in 2004, as

8  opposed to those other years?

9  **A.**   Well, there was a price increase as to the cost of raw

10  materials, even in 2004.

11  **Q.**   And that wasn't in the -- in the original version of the

12  memo in 2004, in the "Purpose" section of that memo; was it?

13  **A.**   Ma'am, so as for this "Purpose" section here, I don't know

14  how the English translation goes, but the way the Korean

15  original reads to me, it's rather ambiguous.

16      **MR. SWEENEY:**  I'm going to ask the court reporter to

17  read my question back.  Perhaps, Mr. Ku, you didn't understand

18  it.

19      (Record read as requested.)

20      **MR. EDELMAN:**  Your Honor, I object on the grounds that

21  the response the witness gave was responsive.

22      **THE COURT:**  Overruled.

23  **A.**   It is not there, no.  However, when I look at the

24  "Purpose" as indicated here, I think it is somewhat problematic

25  in terms of the content, because it doesn't comport with the

1   content that follows in the back pages.  For instance, it says

2   here, let's raise it.  Whereas, in the back page it says, let

3   us not raise it.

4       So I think my take is that he, when looking at this, also

5   figured that there is something problematic about this.

6   **Q.**  Now, other changes that you instructed your subordinate to

7   make include removing all references to Ottogi's competitors;

8   correct?

9   **A.**  I never gave any instructions to that effect.

10  **Q.**  Okay.  Well, I will represent to you, Mr. Ku -- if you had

11  time, I would ask you to count them, but I will represent to

12  you that in Exhibit 359, which is your original version of the

13  2004 memo, there were 20, 20 references to Nongshim.  There

14  were two references to Paldo or Yakult.  And there were two

15  references to Samyang.

16      Now, are there any references to Nongshim, Paldo or

17  Samyang in the revised version of this document?

18  **A.**  Well, so the newly revised version, I can see that there

19  is no such reference whatsoever.  I can easily discern that.

20      But the -- what number was this?  In that other version, I

21  don't -- I don't know if those references appear that many

22  times, but I see that they are there a few times.  But as we've

23  already seen, it is common, it is typical for these sorts of

24  references as to the competition to appear in an interim

25  report, as was the case in yet another interim report.  In

1  fact, that other interim report that I have in mind, in fact,

2  was under the title of the anticipated reactions or whatever

3  post the increase by Nongshim.

4      And just for your information, the reference material I

5  provided my subordinate, Mr. Ho-Joon Kang were the ones

6  pertaining to '07 and '08.  And when you look at that, and this

7  is as we discussed previously, it does talk about the timing of

8  the increase and the actual gist of the increase, but it makes

9  no reference to the competition.  And the reason for that is

10 because the final decision-making authority does not want to

11 see such kinds of details.

12     MS. SWEENEY:  I move to strike everything starting

13 with the word "but" and request that the witness answer my

14 questions.

15     THE COURT:  I will move to strike the second

16 two-thirds of the answer starting with "but."

17     And, Mr. Ku, if you could please just answer the question

18 that you're being asked, please.

19     THE WITNESS:  Okay.

20 BY MS. SWEENEY

21 Q.  Another difference between these two memoranda, if you

22 look, Mr. Ku, at the third page of Exhibit 359, there is a

23 chart called "Price Comparison Between Competing Products

24 (after the price adjustment)."

25 A.  Yes, I see it.

**BANG-WAN KU - CROSS / SWEENEY**

1  Q.   Now, that chart, which compares the prices by product of

2  Ottogi's prices and Nongshim's prices, including the percentage

3  price increase, that chart does not appear in the revised

4  version, which is Exhibit 365; correct?

5  A.   Right.  To date, no final report has ever included a chart

6  comparing things against the competition.

7       MR. SWEENEY:  And, again, I move to strike everything

8  after the word "right."

9       THE COURT:  Correct.  So sustained.

10      Mr. Ku, Mr. Edelman can ask you more questions after this,

11  but for now just answer the question you're being asked.

12      THE WITNESS:  Understood.

13  BY MS. SWEENEY

14  Q.   Okay.  So Exhibit 365, which you received from your

15  subordinate at about 9:08 in the morning, what did you do after

16  you received that?

17  A.   So I reviewed the contents here and I think I revised the

18  name of Kang-Hoon Lee to Jae-Hwan Jong.

19  Q.   And what else did you do?

20  A.   Save for that, there is no further revision that I made on

21  the soft file of this document.

22  Q.   Okay.  So you're referring to the electronic version,

23  which has not yet been introduced into evidence, but I may as

24  well introduce it now.

25      MS. SWEENEY:  And that would be Trial Exhibit 1027.

BANG-WAN KU - CROSS / SWEENEY

1   If I could have copies of those, please?

2        (Whereupon document was tendered to counsel.)

3            **MS. SWEENEY:**  May I approach, Your Honor?

4            **THE COURT:**  You may.

5        (Whereupon document was tendered to the witness.)

6   **BY MS. SWEENEY**

7   **Q.**   Is Exhibit 1027 a version of the 2004 memo that was in

8   your computer?

9   **A.**   Yes, that's correct.

10  **Q.**   And if you look at the last page, it's metadata showing

11  that it was last modified by you?

12  **A.**   Yes, that's correct.

13  **Q.**   Okay.  And this document was in your computer from its

14  creation date in 2008 up at least until 2016 or '17; correct?

15  **A.**   Yes, that's correct.

16  **Q.**   Okay.  And you understand that it was not produced to the

17  plaintiffs in this case until November 12?

18  **A.**   Ma'am, my understanding as to myself is that I have no

19  personal obligation to submit documents or anything.  My

20  computer was submitted to the collecting company.

21  **Q.**   Okay.  Let's turn back to 976.

22       (Document displayed)

23  **A.**   All right.

24  **Q.**   Okay.  You have that in front of you?

25  **A.**   Yes, I'm there.

**BANG-WAN KU - CROSS / SWEENEY**

1   Q.   Okay.  And 976 is the final version of the 2004 memo which

2   you sent to the KFTC; is that correct?

3   A.   Yes.  My recollection is that this is what I sent to them.

4   Q.   Okay.  And this document has all the content changes that

5   we talked about.  For example, with respect to the "Purpose;"

6   correct?

7   A.   Yes.

8   Q.   And this document also has the change with respect to the

9   removal of the competitors' names; correct?

10  A.   That is right.  There is no reference as to the

11  competition.

12  Q.   Okay.  And another difference between this version of the

13  2004 memo and the original one is that you changed the name to

14  Jae-Hwan Jong; correct?

15  A.   Yes, that is right.

16  Q.   And then you had Mr. Jong put his chop on this document;

17  right?

18  A.   Yes.  He, himself, placed his chop mark on it, deeming

19  this to be similar to that which he had created in the past

20  after reviewing it.

21  Q.   But he wasn't the one who created the original document;

22  was he?

23  A.   Well, it wasn't Kang-Hoon Lee.  And he, himself, wasn't

24  sure if he had or hadn't made it back then himself.

25  Q.   Now, you changed the name because Kang-Hoon Lee had left

**BANG-WAN KU - CROSS / SWEENEY**

1   the company by 2008; correct?

2   **A.**   No.

3   **Q.**   You remember you were deposed about a little less than two

4   weeks ago in this case.  Do you remember testifying then that

5   you changed the name because Mr. Lee had left or was about to

6   leave the company and because you thought that Mr. Lee was too

7   junior to be putting his name and chop on such a document?

8   **A.**   So I don't know how the interpretation to your former

9   question just went, but the way it sounded to me, and the way I

10  remember it, was did you not change this in 2008 because he had

11  left the company?  And so I said no.

12  **Q.**   Well, let me ask you this:  In 2008 was Kang-Hoon Lee

13  employed by Ottogi in Korea?

14  **A.**   If we're talking about 2008, that is the time frame when

15  he would have left the company.

16  **Q.**   In fact, you testified that he left a couple years before

17  2008; correct?

18  **A.**   Indeed.  So even sometime prior to 2008 he was already

19  gone.  And my point was, when I was testifying, the time frame

20  when the subject final report was or would have been prepared,

21  at that point in time in the past he had already -- it had

22  already been decided that he was going to leave the care of the

23  company.  That was my point.

24  **Q.**   But he was still at the company on January 5th, 2004;

25  isn't that correct?

BANG-WAN KU - CROSS / SWEENEY

1   **A.**   On January 5th he was still working for the company.

2   **Q.**   Okay.  And after an employee leaves Ottogi, they typically

3   take their chop with them; correct?

4   **A.**   Yes, that's correct.

5   **Q.**   So in 2008, even if you had wanted to, you couldn't have

6   placed Mr. Lee's chop on the document that you sent to the

7   KFTC; correct?

8   **A.**   That's correct.

9   **Q.**   Okay.  I heard you tell Mr. Edelman earlier today that you

10  were uncomfortable sending this revised version of the 2004

11  memo to the KFTC.  Do you recall that?

12  **A.**   That is right.

13  **Q.**   But when you sent Exhibit 976 to the KFTC, you did not

14  send it along with a letter explaining that this was just your

15  approximation of the memo; correct?

16  **A.**   That was explained only over the phone to them and, no, I

17  did not send along such a letter to such effect.

18  **Q.**   And you don't remember the name of the person that you

19  supposedly spoke to at the KFTC about this; correct?

20  **A.**   It was a male and I am not able to recall his name.

21  **Q.**   Okay.  And when you sent this to the KFTC, you sent it by

22  post as opposed to email, so there would not have been any

23  metadata in the document; correct?

24           **MR. EDELMAN:**  Objection.  Compound.

25           **THE COURT:**  Yeah.  Break it down.

1  BY MS. SWEENEY

2  **Q.**   You sent Exhibit 976 to the KFTC via post; correct?

3  **A.**   That is so, to my recollection.

4  **Q.**   Okay.  And you did not email it to the KFTC; correct?

5  **A.**   The KFTC did not tell me to send it via email.

6  **Q.**   But you did not send it to the KFTC via email; correct?

7  **A.**   That is correct.

8  **Q.**   Okay.  And so when the KFTC received this document, they

9  received it in hard copy form without any metadata; correct?

10  **A.**   That is correct.

11  **Q.**   And there is nothing on the face of 976 that indicates

12  that it was created in July of 2008; correct?

13  **A.**   That is the case in terms of the hard copy.

14  **Q.**   And there is nothing in the whole body of Exhibit 976 that

15  indicates that it was created in 2008?

16  **A.**   That is correct.

17  **Q.**   And you didn't indicate on the face of the document, for

18  example in parentheses, that the document was created in 2008?

19  **A.**   That is correct.

20  **Q.**   And you didn't create a memo to the file explaining what

21  you did and why you did -- why you sent this document with a

22  different date to the KFTC; correct?

23  **A.**   That is correct.

24  **Q.**   Okay.  Now, one thing you could have done was send both

25  memos, the original 2004 memo and your recreation of it in

**BANG-WAN KU - CROSS / SWEENEY**

1  2008, you could have done that; right?  You could have sent

2  both those memos to the KFTC?

3  **A.**   The KFTC had asked only for the final memo.

4  **Q.**   But you sent nothing to the KFTC to indicate in any way

5  that this document had been recreated in July of 2008; correct?

6  **A.**   There isn't anything in terms of a document that I

7  submitted in that regard, no.

8  **Q.**   Okay.

9          **THE COURT:**  Ms. Sweeney, is this a good time to break?

10         **MS. SWEENEY:**  This is a good time, Your Honor.

11         **THE COURT:**  Okay.  Ladies and gentlemen, tomorrow is

12  another day.  We're in recess now.  Please remember the

13  admonitions.

14     Thank you for your attention, your promptness, and we'll

15  look forward to seeing you in the morning.

16     (Jury exits the courtroom at 1:29 p.m.)

17         **THE COURT:**  So before I leave you all, I'm interested

18  in where the Defense case is.  Who will follow Mr. Ku?

19         **MR. EDELMAN:**  Well have Professor Hong, and then we

20  will have Mr. Cox, Dr. Cox.  And then we will probably be out

21  of time.  So we will be cutting our Witness List at that point.

22         **THE COURT:**  Okay.  All right.  Fine.  I do want to --

23  we need to finish the evidence this week.  That's very much on

24  my mind.

25         **MR. EDELMAN:**  Absolutely.

1          THE COURT:  Okay.

2          MS. SWEENEY:  Your Honor, before we break, can we get

3    the admonition for the witness, including in-house counsel?

4          THE COURT:  Absolutely.  Mr. Ku, while we're on break

5    until tomorrow morning, do not have any discussions with the

6    lawyers.

7          THE WITNESS:  Understood.

8          THE COURT:  Or with anybody who wants to talk to you

9    about your testimony.

10          THE WITNESS:  Understood, Your Honor.

11          THE COURT:  All right.  Thank you.

12          MS. SWEENEY:  Thank you.

13          MR. EDELMAN:  Thank you, your Honor.

14      (Whereupon at 1:32 p.m. further proceedings were

15        adjourned December 11, 2018 at 7:30 a.m.)

## CERTIFICATE OF REPORTERS

 

 

    We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Vicki Eastvold, RMR, CRR

 

 

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

 

Monday, December 10, 2018