Volume 18

Pages 2442 - 2563

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

IN RE KOREAN RAMEN ANTRITRUST          ) No. C 13-4115 WHO
LITIGATION,                            )
                                       ) San Francisco, California
                                       ) Tuesday
_____) December 11, 2018
                                       ) 7:30 a.m.

### TRANSCRIPT OF JURY TRIAL PROCEEDINGS

**APPEARANCES**:

**For Direct Purchaser**      HAUSFIELD, LLP
**Plaintiffs:**               600 Montgomery Street
                              Suite 3200
                              San Francisco, California 94104
                   BY:        **CHRISTOPHER L. LEBSOCK, ESQ.**
                              **BONNY E. SWEENEY, ESQ.**
                              **BRUCE J. WECKER, ESQ.**
                              **STEPHANIE CHO, ESQ.**


**For Direct Purchaser**      GLANCY PRONGAY & MURRAY, LLP
**Plaintiffs:**               230 Park Avenue
                              Suite 530
                              New York, New York 10169
                   BY:        **GREGORY B. LINKH, ESQ.**
                              **LEE ALBERT, ESQ.**


                              GLANCY PRONGAY & MURRAY, LLP
                              1925 Century Park East, Suite 2100
                              Los Angeles, CA    90067
                   BY:        **KEVIN F. RUF, ESQ.**


          (APPEARANCES CONTINUED ON FOLLOWING PAGE)


*Reported By:  Vicki Eastvold, RMR, CRR*
*              Debra L. Pas, CSR 11916, CRR, RMR*
*              Official Reporters - US District Court*

```
 1   APPEARANCES:   (CONTINUED)

 2   For Indirect Purchaser    IZARD KINDALL & RAABE, LLP
     Plaintiffs:               29 South Main Street
 3                             Suite 305
                               West Hartford, Connecticut 06107
 4                        BY:  MARK P. KINDALL, ESQ.
                               CRAIG A. RAABE, ESQ.
 5

 6                             BRAMSON PLUTZIK MAHLER & BIRKHAEUSER
                               2125 Oak Grove Road
 7                             Walnut Creek, California 94598
                          BY:  DANIEL E. BIRKHAEUSER, ESQ.
 8

 9   For Defendant             SQUIRE PATTON BOGGS (US) LLP
     Nongshim:                 275 Battery Street
10                             Suite 2600
                               San Francisco, California 94111
11                        BY:  MARK C. DOSKER, ESQ.
                               TANIA L. RICE, ESQ.
12

13                             SQUIRE PATTON BOGGS (US) LLP
                               2000 Huntington Center
14                             41 South High Street
                               Columbus, Ohio 43215
15                        BY:  JOHN R. GALL, ESQ.

16
                               SQUIRE PATTON BOGGS (US) LLP
17                             620 Hansen Way
                               Palo Alto, California 94304
18                        BY:  JOSEPH P. GRASSER, ESQ.

19
     For Defendant             GIBSON DUNN & CRUTCHER LLP
20   Ottogi:                   555 Mission Street
                               Suite 3000
21                             San Francisco, California 94105
                          BY:  RACHEL S. BRASS, ESQ.
22                             JULIAN W. KLEINBRODT, ESQ.

23

24

25
```

1   __APPEARANCES:   (CONTINUED)__

2

3   **For Defendant**          GIBSON, DUNN & CRUTCHER
    **Ottogi:**                2029 Century Park East
                               Suite 4000
4                              Los Angeles, California 900a67
                          BY:  **SCOTT A. EDELMAN, ESQ.**
5

6                              GIBSON, DUNN & CRUTCHER
                               1050 Connecticut Avenue, NW
7                              Washington, DC    20036
                          BY:  **MARK A. PERRY, ESQ.**
8                              **JOSHUA M. WESNESKI, ESQ.**

9

10                             GIBSON, DUNN & CRUTCHER
                               333 South Grand Avenue
                               Los Angeles, California 90071
11                             San Francisco, California
                          BY:  **MINAE YU, ESQ.**
12

13                                  —   —   —

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

Tuesday, December 11, 2018 - Volume 18

**DEFENDANTS' WITNESSES**                                          **PAGE**  **VOL.**

**KU, BANG-WAN**
(PREVIOUSLY SWORN)                                                 2451   18
Direct Examination Resumed by Ms. Sweeney                          2451   18
Cross-Examination by Mr. Birkhaeuser                              2506   18
Redirect Examination by Mr. Edelman                               2511   18
Recross-Examination by Ms. Sweeney                               2524   18

**HONG, DAE-SIK**
(SWORN)                                                           2526   18
Direct Examination by Ms. Yu                                      2526   18
Direct Examination by Mr. Dosker                                 2552   18

# E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 12 | | 2477 | 18 |
| 20 | 2487 | 2488 | 18 |
| 184 | | 2501 | 18 |
| 369 | | 2502 | 18 |
| 375 | | 2490 | 18 |
| 500 | | 2506 | 18 |
| 646 | | 2482 | 18 |
| 1027 | | 2454 | 18 |
| 1030 | | 2476 | 18 |
| 1031 | | 2475 | 18 |
| 2027 conditionally | | 2513 | 18 |
| 2030 conditionally | | 2524 | 18 |

<u>**Tuesday - December 11, 2018**</u>                              <u>**7:32 a.m.**</u>

P R O C E E D I N G S

---000---

(Proceedings held in open court, outside

the presence and hearing of the jury.)

**THE COURT:**  Two things.  First, I have just finished

and posted soon will be the Jury Instructions, and let's have a

conference tomorrow at 3:00 o'clock.

And what I've done is I've deleted -- I'm keeping the

numbering system in place for the moment.  I've deleted the

instructions that I don't intend to give, and we can have

argument and you can -- if I've omitted something that I need

to put back in, I'm sure you'll tell me.

So we've got one motion that I know about.  I'm modifying

my ruling on the Motions in Limine.  I'm not inclined to do

that.  The plaintiffs can certainly comment on a failure of

proof, but not that the defendants didn't bring witnesses to

testify.

My rulings are longstanding.  I think it would be unfair

given the time limits.  And, also, the fact that the plaintiffs

didn't depose most of the witnesses that they would like to

comment about, I think would be inappropriate.

And with Mr. Doh's -- the question about Mr. Doh, I struck

the testimony that plaintiffs are raising in the motion.  I

don't think his declaration is contradictory necessarily.  He

PROCEEDINGS

 1   doesn't have the opportunity to explain what the differences

 2   are.  So, anyway.  That's my ruling there.

 3         Are there any other issues that we need to take up this

 4   morning?

 5               MR. LEBSOCK:  Good morning, Your Honor.

 6         It may be premature because I don't believe that Dr. Cox

 7   is going to testify for a little bit yet today, but there are a

 8   couple of issues that the plaintiffs had with the slide deck

 9   that was proposed.

10         In one instance there is a reference to "government

11   control."  And in two instances is there is references to a

12   suggestion that the government decides prices.  I raised it

13   last night with the defendants.  I'm not yet sure whether there

14   has been a revised slide deck or not.

15               MR. GALL:  Good morning, Your Honor.

16               THE COURT:  Good morning.

17               MR. GALL:  John Gall for the Nongshim defendants.

18         We did, in fact, talk about this last night and I

19   appreciate Mr. Lebsock bringing it up.  I think I understand

20   Your Honor's rulings and I think we're in compliance with Your

21   Honor's rulings.

22         The Nongshim defendants' people are the ones who actually

23   dealt with the government and who characterized the

24   government's role as one of exercising control.  Nobody is

25   going to use the word "de facto" here.

 1      But as far as the Nongshim defendants are concerned and

 2   their perspective, the word "control" is on the slide in one

 3   place on the Nongshim -- where Dr. Cox is going to testify

 4   about the Nongshim defendants, the word "control" is in the

 5   general overview; that it's a factor that he took into account

 6   in analyzing the market from the Nongshim perspective.

 7      On the way the pricing decisions were made for the

 8   Nongshim defendants, I frankly don't recall how I got away from

 9   the word "control," but somehow the slide now says "decides."

10   The government "decides" about prices.

11      And I'm happy to show Your Honor the slides to which

12   Mr. Lebsock is referring, if Your Honor would like to see them.

13           THE COURT:  All right.

14        MR. GALL:  The first one is the overview slide and

15   the word "control" appears at the bottom of number one.

16        (Whereupon document was tendered to the Court.)

17        MR. GALL:  And as your Honor can see, that is the

18   first place in the outline for Dr. Cox that I would use the

19   word "control" and the slide appears to reference the Nongshim

20   defendants.

21      And the second --

22           THE COURT:  Hang on.

23        MR. GALL:  Yes, sir.

24      (Brief pause.)

25           THE COURT:  All right.

1          **MR. GALL:**   And the second one, Your Honor, these are

2    two slides.  As your Honor will recall, Nongshim America has a

3    plant in California beginning in 2005.  So Dr. Cox will discuss

4    the effect -- the pricing process before 2005 and after 2005.

5    These two slides exemplify the process and he'll go through

6    them.

7          And on the left-hand side in yellow you can see that I --

8    someone talked me out of "control" and I put in "decides."  I

9    would urge the Court to allow me to do that.  I think that

10   certainly accurately describes the process from my client's

11   perspective.

12         **THE COURT:**  Mr. Edelman.

13         **MR. EDELMAN:**  And, Your Honor, we're not using the

14   word "control" in the section of our discussion with Dr. Cox.

15   We have changed it, at Mr. Lebsock's request.  It said:

16             "Government price control led to

17         follow-the-leader pricing in Korea."

18         Our section now says "government regulation."

19         **THE COURT:**  All right.

20         **MR. LEBSOCK:**  You know, we obviously have no

21   objection to words like "negotiation," "consultation," those

22   sorts of things.  But when we talk about words like "decides,"

23   "control," it's -- first of all, Dr. Cox is just regurgitating

24   this.  He doesn't have any personal knowledge of what the

25   situation is.  So we just think it's inappropriate for them to

PROCEEDINGS

1    use those types of words.

2          THE COURT:  You know, he's an expert.  He's making

3    assumptions based on what his -- what the lawyers have told him

4    the evidence is.  If the jury doesn't hear the same -- has not

5    heard the same thing as he's assuming, they are going to think

6    that his testimony isn't as persuasive as the defendants think

7    it is.

8       So I think in these -- I don't think these references are

9    objectionable, and I won't require the defendants to take them

10   out.

11         MR. LEBSOCK:  Thank you.

12         MR. GALL:  Thank you, your Honor.

13         MR. EDELMAN:  Your Honor.

14         THE COURT:  All right.  Is there any other issue that

15   we ought to take up?

16      (No response.)

17         THE COURT:  All right.  See you at 8:00.

18      (Whereupon there was a recess in the proceedings

19       from 7:39 a.m. until 8:03 a.m.)

20      (Proceedings held in open court, in the presence and

21       hearing of the jury.)

22         THE COURT:  All right.  Please be seated, everybody.

23   Ladies and gentlemen, good morning.  Welcome back.

24      Mr. Ku is still on the stand and Ms. Sweeney, I think,

25   you're cross examining.

1    **MS. SWEENEY:**  Thank you, your Honor.

2    <u>**BANG-WAN KU**</u>,

3    called as a witness for the Defendant herein, having been

4    previously sworn, resumed the stand and testified further

5    through a Korean interpreter as follows:

6    <u>**DIRECT EXAMINATION RESUMED**</u>

7    **BY MS. SWEENEY**

8    **Q.**  Good morning, Mr. Ku.

9    **A.**  Good morning, ma'am.

10   **Q.**  I'd like to start by offering into evidence Exhibit 1029.

11   And this is the stipulation which the Court read to the jury

12   yesterday.

13        **THE COURT:**  All right.

14        **MR. EDELMAN:**  I defer to the Court on how the Court

15   wants to have that handled.  I didn't think that's what we had

16   in mind, but I defer to Your Honor.

17        **THE COURT:**  We'll take it up later.  Let's proceed.

18   This is the stipulation that I read to you earlier about the

19   exhibits.

20   **BY MS. SWEENEY**

21   **Q.**  Okay.  Mr. Ku, yesterday we were talking about the 2004

22   memo that you recreated in July of 2008; do you recall that?

23   **A.**  Yes.

24   **Q.**  Okay.  And I'd just like to establish the timeline.  So

25   the KFTC came to Ottogi's premises on June 3rd, 2008; correct?

BANG-WAN KU - DIRECT / SWEENEY

1   A.   Yes, that's correct.

2   Q.   And a couple weeks later, on June 27th, Ottogi received

3   from the KFTC a letter requesting certain documents; is that

4   right?

5   A.   Yes, that's correct.

6   Q.   And then a few days later, around June 30th of 2008, your

7   supervisor Young-Hyun Doh called a meeting of various

8   departments to figure out how to respond to the KFTC letter;

9   correct?

10  A.   Yes.  He sent out an email calling for a meeting to be

11  held.

12  Q.   And there was a meeting; right?

13  A.   Well, as for that, I don't actually have any recollection

14  of there being a meeting.

15  Q.   Okay.  But so in response to Mr. Doh's request that you

16  assist in gathering information, you sent an email yourself on

17  July 2nd of 2008 to one of your subordinates to help you gather

18  information; is that right?

19  A.   Per chance, are you referring to this one email that I

20  sent to a person named Yang, or actually a person named Chul?

21  Q.   Yes.

22  A.   Well, he's not a subordinate of mine, but send it I did,

23  yes.

24  Q.   And the next day, which is July 3rd of 2008, you received

25  from Jae-Hwan Jung a copy of the 2004 memo in the version that

BANG-WAN KU - DIRECT / SWEENEY

1    you call the interim version; correct?

2    **A.**   Yes, that's correct.

3    **Q.**   Okay.  And then you sent that memo to your subordinate

4    Ho-Joon Kang on the very next day, on July 4th.

5        I misspoke, can I withdraw the question?  It was actually

6    on July 3rd that you sent that unaltered version of the 2004

7    memo to Ho-Joon Kang, your subordinate.  And if you want to

8    refer to anything, Mr. Ku, that was Exhibit 359.

9    **A.**   Yes, that's correct.

10   **Q.**   Okay.  And then the next day, and this is July 4th, you

11   received back from Ho-Joon Kang the 2004 memo, but this time

12   it's changed.  The "Purpose" is changed, and all references to

13   competitors are removed, and the document is shorter; is that

14   right?

15   **A.**   What I received back was a revised version to appear akin

16   to our, say, final reports of yore, of the past.

17   **Q.**   And in that revised version, the references to competitors

18   have been removed and the "Purpose" has been changed; correct?

19   **A.**   That's right.  That format is so revised.

20   **Q.**   Okay.  And then on that same day you changed the name on

21   the memo from Kang-Hoon Lee to Jae-Hwan Jung.

22           **MS. SWEENEY:**  And I'd like to offer into evidence

23   Exhibit 1027.

24   **BY MS. SWEENEY**

25   **Q.**   Mr. Ku, do you still have Exhibit 1027 in front of you?  I

BANG-WAN KU - DIRECT / SWEENEY

1  can get you another copy.

2  **A.**   I have it.

3  **Q.**   Okay.  And, Mr. Ku, is this the version of the memo that

4  you created; that is, you took the memo that was sent to you by

5  Ho-Joon Kang and you changed the name to Jae-Hwan Jung?

6  **A.**   Yes, that's correct.

7  **Q.**   Okay.

8          **MS. SWEENEY:**  I offer 1027 into evidence.

9          **MR. EDELMAN:**  No objection, Your Honor.

10         **THE COURT:**  Admitted.

11     (Trial Exhibit 1027 received in evidence).

12         **MS. SWEENEY:**  Can we publish that?

13     (Document displayed)

14  **BY MS. SWEENEY**

15  **Q.**   Okay.  And then what you did next, Mr. Ku, was you took

16  Exhibit 1027, you printed it up, and you took it over to

17  Mr. Jung and Mr. Jung put his stamp on the document; right?

18  **A.**   Yes, that's correct.

19         **MS. SWEENEY:**  And, Jason, can we put Exhibit 976

20  side-by-side with 1027?

21     (Documents displayed)

22  **BY MS. SWEENEY**

23  **Q.**   Okay.  And these two exhibits are identical except for the

24  chop on 976; is that correct, Mr. Ku?

25  **A.**   Yes, that's correct.

**BANG-WAN KU - DIRECT / SWEENEY**

1  **Q.**   Okay.  And you mailed the version with the chop to the

2  KFTC on that same day; is that right?

3  **A.**   So it was a copy thereof that I sent off.

4  **Q.**   Okay.  So you made a copy of 976.  Did you make more than

5  one copy?

6  **A.**   Yes.  To my recollection, I believe I made a couple of

7  copies.

8  **Q.**   Okay.  And what did you do with those copies?

9  **A.**   So one of them I sent off to the KFTC and one I held onto.

10  **Q.**   And the one that you held onto, what did you do with that?

11  **A.**   So I held onto it within my drawers as reference material.

12  **Q.**   And at some point in time you gave testimony in this case

13  in 2016; correct?

14  **A.**   Yes, that's correct.

15  **Q.**   And you gave testimony over four days in April of 2016; do

16  you remember that?

17  **A.**   Yes, indeed.

18  **Q.**   And during those four days of testimony, you didn't say

19  anything about this document with Jae-Hwan Jung's name and chop

20  on it that was sitting in your office; right?

21       **MR. EDELMAN:**  Objection, your Honor.  Compound.

22       **THE COURT:**  Overruled.  You can answer.

23  **A.**   During that point in time, that is during my testimony,

24  that document was no longer in my drawers.

25

**BANG-WAN KU - DIRECT / SWEENEY**

1  **BY MS. SWEENEY**

2  **Q.**   Mr. Ku, you testified a couple weeks ago that --

3  **A.**   Oh, hold on a second.  You said September of 2016, yeah?

4  **Q.**   April of 2016.

5  **A.**   April of 2016.  If we're talking about April 2016, as far

6  as I would think right now, I think there is a possibility that

7  the document may have been underneath my desk in a box because

8  by that point in time I'm thinking material was returned back

9  to me from -- by outside counsel.

10  **Q.**   Okay.  So you had the -- you had the document in your

11  office in a box underneath your desk in April 2016 and you

12  didn't say anything about that document over four days of

13  testimony; correct?

14        **MR. EDELMAN:**  Excuse me, Your Honor.  May we have a

15  brief sidebar?

16        **THE COURT:**  Okay.

17     (Proceedings held at side bar.)

18        **MR. EDELMAN:**  I may be mistaken, in which case I'll

19  be quiet about this, but I thought the purpose of the

20  stipulation was to avoid going into all of this; that we would

21  stipulate it was produced late.  We agreed on the terms.  It

22  went to the jury.  And I didn't expect this line of inquiry in

23  light of the stipulation.

24        **THE COURT:**  I did.

25        **MR. EDELMAN:**  Okay.

1          **THE COURT:**  I thought that this witness's credibility

2    is very much on the line and I assumed that this would be

3    inquired into, so.

4          **MR. EDELMAN:**  Very well.

5          **THE COURT:**  Okay.

6       (Proceedings held in open court.)

7          **THE COURT:**  Go ahead, Ms. Sweeney.

8          **MS. SWEENEY:**  I'm going to ask the court reporter to

9    read back my question, please.

10      (Record read as requested.)

11   **A.**   I was unaware as at the time as to this document being

12   inside that box at that time.

13   **BY MS. SWEENEY**

14   **Q.**   Are you saying that you forgot?  That you put -- you

15   changed the name on this 2004 memo and you had Mr. Jung put his

16   chop on it and that you had instructed your subordinate to

17   change the content of the memo; is that your testimony?

18         **MR. EDELMAN:**  Objection.  Compound.

19         **THE COURT:**  Sustained.

20         **MS. SWEENEY:**  Okay.

21   **BY MS. SWEENEY**

22   **Q.**   You're saying that you forgot about this document that was

23   in a box underneath your desk in your office; is that right?

24   **A.**   I had forgotten about the fact that this document was in

25   that box lying there in my office.

**BANG-WAN KU - DIRECT / SWEENEY**

1   Q.   Did you forget about the fact that it was you who changed

2   the name from Kang-Hoon Lee to Jae-Hwan Jung and it was -- I'll

3   leave it there so I don't have a compound question.

4   A.   What point in time are we talking about?

5   Q.   April 2016.

6   A.   At that time, during my testimony of that time, I had been

7   focusing on the fact that the content was changed, but I had

8   forgotten about the name having been changed.

9   Q.   Even though that was something that you yourself did?

10  A.   That's right.  What I had in mind at that time was the

11  fact that it was a reconstructed document, but I had been

12  forgetting about the fact that the name had been changed.

13  Q.   Now, in September of 2016, you gave a sworn declaration in

14  this case; do you remember that?

15  A.   Yes, that's right.

16  Q.   And that declaration was given -- strike that.

17       One of the topics of that declaration was the 2004 memo;

18  right?

19  A.   That is right.

20  Q.   And you signed that declaration under penalty of perjury

21  on September 28, 2016; is that right?

22  A.   Yes, that's correct.

23  Q.   And in that declaration when you talked about the 2004

24  memo, you didn't mention that you had changed the name to

25  Jae-Hwan Jung?

1  **A.**   So at that time I was only thinking in terms of the fact

2  that the document had been reconstructed, but I had forgotten

3  about the fact that the name had been changed.

4  **Q.**   And did you also forget that you had -- and did you also

5  forget that the version that you had sent to the KFTC had

6  Mr. Jung's chop on it?

7  **A.**   Yes.  All those parts I had forgotten about.

8  **Q.**   Okay.  In fact, all you said in your declaration about

9  that, about the changes to the 2004 memo was:

10       "We received a copy of a draft memorandum from

11       Marketing Team 3 and reduced the length from seven

12       pages to three pages in order to conform the

13       memorandum to the length and style similar to the

14       final memoranda used in other years."

15  **A.**   That is what I'm stating there, yes.

16  **Q.**   Okay.  And there is nothing in there about your role in

17  changing the document; right?

18  **A.**   So at that time I was not able to recollect the fact that

19  I had changed the name.

20  **Q.**   And you understand, Mr. Ku, that that document was not

21  produced to the plaintiffs in this litigation until

22  November 12, 2018?

23  **A.**   Yes, I am aware of that.

24  **Q.**   All right.  Let's turn to the 2005 memo.  Now, you

25  testified yesterday in response to Mr. Edelman's questions that

**BANG-WAN KU - DIRECT / SWEENEY**

1   the 2005 memo was not changed by you or anyone at Ottogi before

2   it was submitted to the KFTC; is that right?

3   **A.**   That is correct.

4   **Q.**   Okay.  And the version that you say you received and then

5   submitted to the KFTC is Exhibit 644, which was offered into

6   evidence yesterday.

7            **MS. SWEENEY:**  And can we publish that, please?

8        (Document displayed)

9   **A.**   All right.

10  **BY MS. SWEENEY**

11  **Q.**   Is that the version that you sent to the KFTC?

12  **A.**   Per chance, is there a Korean version that I might look

13  at?

14  **Q.**   Oh, I think it's in your binder.  Mr. Edelman.

15       (Document displayed)

16  **A.**   Right.

17  **Q.**   Okay.

18           **MS. SWEENEY:**  And now I'd like Jason to publish

19  Exhibit 384.

20  **BY MS. SWEENEY**

21  **Q.**   And, Mr. Ku, I don't think you have a copy of this, so I'm

22  going to ask to get you a copy.

23       (Whereupon document was tendered to the witness.)

24  **Q.**   Mr. Ku, if you could have a look at Exhibit 384, and

25  please turn --

1        MR. EDELMAN:  Do you have a copy for me?

2        MS. SWEENEY:  Yes, I do.

3     (Whereupon document was tendered to counsel.)

4        MR. EDELMAN:  Thank you.

5     (Brief pause.)

6        MS. SWEENEY:  I apologize.  I wanted 363 up.

7     (Document displayed)

8  BY MS. SWEENEY

9  Q.    Okay.  Mr. Ku, can you turn to the second page of

10 Exhibit 363 and have a look at the contents of this document?

11 Let me know whether it's the same document that you identified

12 yesterday with Mr. Edelman as being the final version that you

13 sent to the KFTC in 2008?

14 A.    All right.  So although I've not been able to make my way

15 through the entire document, it does strike me as being

16 similar.

17 Q.    I'll represent to you that it's the same, and I'm sure

18 that Mr. Edelman will correct me if I'm wrong about that.

19       Now, if you could look at the first page of this document,

20 that is, the first page of Exhibit 363.

21       (Document displayed)

22 A.    All right.

23 Q.    Okay.  And this shows that the document that is

24 content-wise the same as what you submitted to the KFTC was

25 sent to you by your supervisor Young-Hyun Doh on July 4, 2008;

BANG-WAN KU - DIRECT / SWEENEY

1    correct?

2    **A.**   Yes, that's correct.

3    **Q.**   Okay.  And do you know where Mr. Doh got the document?

4    **A.**   What he told me was that he had received this from the

5    Marketing Office.

6    **Q.**   Okay.  And we can't tell where Mr. Doh got the document

7    because he didn't produce any emails in this case.  Did you

8    know that?

9              **MR. EDELMAN:**  Objection.  Foundation, Your Honor.

10             **THE COURT:**  What's the foundation for that?

11   **BY MS. SWEENEY**

12   **Q.**   Mr. Ku, you were designated by Ottogi as the person

13   responsible to testify in this case about documents produced in

14   response to plaintiffs' document requests; correct?

15   **A.**   Yes, that's correct.

16   **Q.**   Okay.

17             **MS. SWEENEY:**  And, Jason, can we show Exhibit 1016,

18   which has been admitted, and turn to Page 2 of that exhibit,

19   please?

20        (Document displayed)

21   **BY MS. SWEENEY**

22   **Q.**   And, Mr. Ku, have a look at the first box where it says

23   Young-Hyun Doh.

24   **A.**   Yes.

25   **Q.**   And that was your supervisor in 2008; correct?

**BANG-WAN KU - DIRECT / SWEENEY**

1   **A.**   Yes, that's correct.

2   **Q.**   And you can see that he produced zero emails?

3   **A.**   Yes.

4   **Q.**   Okay.  And this Exhibit 363 that we were looking at a

5   moment ago is an email from Mr. Doh to you.  That email was

6   produced from your files, not from Mr. Doh's files.  Do you

7   understand that?

8   **A.**   Well, I don't know anything about it not being found among

9   his things, but I do know that it came via my, say, files.

10  **Q.**   Okay.  All right.

11          **MS. SWEENEY:**  Now, can we put up 363 and 644

12  side-by-side please, Jason?

13      And if you could turn a couple pages in, so we have the

14  front page of the memo in each document?

15      (Documents displayed)

16  **BY MS. SWEENEY**

17  **Q.**   And 654 [sic] is the version on the right with the chop,

18  and that's the version that you submitted to the KFTC; right?

19          **THE INTERPRETER:**  Counsel meant 644?

20          **MS. SWEENEY:**  Yes.

21          **THE INTERPRETER:**  With that understanding.

22  **A.**   Yes, that's correct.

23  **BY MS. SWEENEY**

24  **Q.**   Okay.  And when you received 363, that's the document on

25  the left, from your boss, Mr. Doh, you printed it up and had

BANG-WAN KU - DIRECT / SWEENEY

1    Mr. Cho put his chop on it; right?

2    **A.**    No.

3    **Q.**    No.  Can you turn to the last page, please, of

4    Exhibit 363?

5         (Witness complied.)

6         **MS. SWEENEY:**  Jason, can we have the last page of

7    363, please?

8         (Document displayed)

9    **BY MS. SWEENEY**

10   **Q.**    And, Mr. Ku, this is the metadata showing that you

11   modified this document on July 4, 2008; do you see that?

12   **A.**    What do I need to do, look at this "Last Modified"

13   portion?

14   **Q.**    Yes.

15   **A.**    And what is -- "All Custodians" portion, does it mean that

16   it comes from my computer?

17   **Q.**    I just want to draw your attention to the "Last Modified"

18   notation on the metadata which has your name next to it.  Do

19   you see that?

20   **A.**    Yes.

21   **Q.**    Okay.  Now, in July of 2008 Byung-Bak Cho was still

22   employed at Ottogi; correct?

23   **A.**    Yes, that's correct.

24   **Q.**    Okay.  Now, can we turn to Trial Exhibit 384, which I

25   hope, Mr. Ku, you still have in front of you.

BANG-WAN KU - DIRECT / SWEENEY

 1        (Witness complied.)

 2   Q.    Okay.  Let's turn to the second page of that document.

 3        (Document displayed)

 4   Q.    Okay.

 5   A.    All right.

 6   Q.    And the title of this is "Review of Ramen Price Increase

 7   Proposal;" right?

 8   A.    Yes, that's correct.

 9   Q.    Okay.  And it has the date of February 28, 2005; is that

10   right?

11   A.    Yes, that's correct.

12   Q.    And it says "Marketing Team 3" and has the name Byung-Bak

13   Cho; right?

14   A.    Yes.

15   Q.    Okay.  And if you look at the "Purpose" of the document,

16   it says:

17        "Seeking to maximize profits by improving the

18        cost structure, as in by increasing the price on ramen

19        products, given that even Samyang, too, has announced

20        a price increase, following in the footsteps of

21        Nongshim and Paldo, such that our company, too, is

22        desirous of implementing a price increase at the

23        opportune time when the consent/acquiescence of

24        customer and consumer alike might likely to be

25        expected to some extent."

1      Do you see that?

2   **A.**   Yes, I see it.

3   **Q.**   Okay.  And then if you look at the content of the document

4   under the numbered paragraphs, you'll see that there is a

5   number of references to Ottogi's competitors; right?

6   **A.**   Yes, they are there.

7   **Q.**   Okay.  And if you were to count them, Mr. Ku, I -- I'll

8   represent that there will be roughly ten references to

9   Nongshim, and one reference to Yakult, and 18 references to

10  Samyang.

11  **A.**   Okay.  Not that I've counted.  I do see a few, yes.

12  **Q.**   Okay.  And Exhibit 644, which is the 2005 memo that you

13  sent to the KFTC, has no references to Nongshim, Paldo or

14  Samyang; right?

15  **A.**   Yes.  Just quickly perusing through it, I don't see

16  anything.

17  **Q.**   Okay.  And it has quite a different "Purpose;" isn't that

18  right?

19          **MS. SWEENEY:**  Jason, can we put "Purpose" of 644

20  along side the "Purpose" of 384?

21      (Documents displayed)

22  **A.**   All right.  I'm looking at them.

23  **BY MS. SWEENEY:**

24  **Q.**   Okay.  And the "Purpose" in 654 [sic], which is -- it is

25  much shorter, correct, and it has no reference to Nongshim or

1    Paldo or Samyang?

2              **THE INTERPRETER:**  644, counsel; right?

3              **MS. SWEENEY:**  Yes.

4    **A.**    Right.  As was the case with both the 2007 and 2008 final

5    memo -- memos, this, too, does not have that.

6    **BY MS. SWEENEY**

7    **Q.**    Okay.  And I apologize for the number of documents.  It's

8    kind of confusing, but as you recall Exhibit 384 is just like

9    644, except that 644 has the chop.  Can you turn to the front

10   page of Exhibit 384, please?

11        (Witness complied.)

12   **A.**    384, you say?

13   **Q.**    384.

14   **A.**    384.  All right.

15        (Document displayed)

16   **Q.**    Okay.  And can you first, Mr. Ku, just satisfy yourself

17   that the content of 384 -- that is, after the first page --

18   is the same as the document that you submitted to the KFTC in

19   July of 2008, except that this version does not have the chop

20   on it?

21   **A.**    So between 384 and?

22   **Q.**    644.

23   **A.**    644.

24        (Documents displayed)

25   **A.**    Not only is there this difference that 384 does not have

1    the chop mark, this one, what is it, 384 is an interim report;

2    whereas, 644 is a final report.

3    **Q.**   That was my fault, Mr. Ku.  I asked you to compare the

4    wrong documents.

5         Let's just turn to the -- let's go back to the first page

6    of 384.  Okay.  And the -- this is the cover email that goes

7    along with what you describe as the interim report on 2004;

8    right?

9    **A.**   For 2004, did you say?

10   **Q.**   Let's look at the first page of Exhibit 384.  This is an

11   email from yookh at Ottogi Ramen to other people at Ottogi

12   Ramen; correct?

13   **A.**   Well, so I'm having problems here because I'm not entirely

14   familiar with the way Ottogi Ramen's address, you know, reads.

15   But it seems to me that there is a person named Yoo, Y-O-O, KH

16   I guess at Ottogi Ramen sending this email to various other

17   people.

18   **Q.**   Okay.  And the date of this email is March 9, 2005; right?

19   **A.**   Yes, that's right.

20   **Q.**   And the subject is "Regarding the Ramen Price Increase"?

21   **A.**   Yes, that's right.

22   **Q.**   Okay.  And the email reads:

23            "As a heads-up, chairman Ham is said to have

24        approved today."

25        Do you see that?

**BANG-WAN KU - DIRECT / SWEENEY**

1  **A.**   Yes, I see it.

2  **Q.**   Okay.  And then below it says:

3        "Note to relevant departments.  You are kindly

4      requested to change the respective product packaging

5      forthwith."

6  **A.**   I see it.

7  **Q.**   And that note regarding changing the packaging, that's

8  important because Ottogi Ramen, which produces all of Ottogi's

9  ramen, prints the prices on the consumer packaging; is that

10  right?

11  **A.**   That is right.  They print the price of the ramen on the

12  packaging material.

13  **Q.**   Okay.  And then Chairman Ham, who do you understand that

14  to be referring to?

15  **A.**   That would be the chairman of Ottogi Korea.

16  **Q.**   Okay.  And then at the very bottom of this email it says:

17        "Review of ramen price increase proposal 5.1.21."

18      And it has a document extension there.  Do you see

19      that?

20  **A.**   Yes, I see it.

21  **Q.**   And then if you turn the page, this is the attachment to

22  that email talking about the price increase that was approved

23  by Chairman Ham today; right?

24  **A.**   Yes.

25  **Q.**   Okay.  And the memo that is attached is what you have been

**BANG-WAN KU - DIRECT / SWEENEY**

1   referring to as the interim memo; right?

2   **A.**   Yes, that's correct.

3   **Q.**   But Ottogi Ramen is using what you call the interim memo

4   to change prices on the consumer packaging; is that right?

5   **A.**   So in going about changing the price, in terms of the

6   final -- well, so what's important for Ottogi Ramen's purposes

7   is in terms of going about printing the final consumer price

8   is -- well, it's -- that's what's important to them.  And so

9   long as there are no other changes, then the rest of it doesn't

10  matter.

11  **Q.**   Now, you testified yesterday in response to Mr. Edelman's

12  questions about what you called the Request For Approval

13  packages; do you remember that?

14  **A.**   Yes.

15  **Q.**   And when the chairman of the company, at this point in

16  time Mr. Ham, gives final approval for a price increase, he's

17  presented with a package that contains, among other things, a

18  final memo which is a review of the price increase proposal;

19  right?

20  **A.**   Yes, that's correct.

21  **Q.**   Okay.  Let's move on to the 2002 memorandum.  Do you

22  recall your testimony yesterday about a 2002 pricing

23  memorandum?

24  **A.**   Yes, I do recall.

25  **Q.**   Okay.  And you said that in response to the KFTC's request

1   for information, you recreated a price increase memo from 2002;

2   right?

3   **A.**   So in terms of this reconstruction -- now, I'm not sure

4   how this translation is coming out, but basically what I didn't

5   have, I had to come up with.  And I was not able to find this

6   interim memo at the time for the year 2002 either.

7   **Q.**   And this is something that you submitted to the KFTC in

8   response to their request in 2010; right?

9          **THE INTERPRETER:**  2010?

10          **MS. SWEENEY:**  I'm sorry.  Yeah, 2010.

11  **BY MS. SWEENEY**

12  **Q.**   It was later than the others; correct?

13  **A.**   Yes, that's correct.

14  **Q.**   Okay.  And you testified that you created this document

15  from scratch; right?

16  **A.**   Given that I had nothing at all, I had to come up with it

17  from scratch.

18  **Q.**   Okay.

19          **MS. SWEENEY:**  Jason, can we publish Exhibit 357,

20  please?

21     (Document displayed)

22  **BY MS. SWEENEY**

23  **Q.**   Okay.  Do you have that in front of you?

24  **A.**   Yes.  I'm looking at it.

25  **Q.**   Okay.  And the front page of this document is an email

**BANG-WAN KU - DIRECT / SWEENEY**

1   from you dated February 11, 2010 to H. Jun and the subject is

2   "This One;" right?

3   **A.**   Yes.

4   **Q.**   Okay.  And then there is an attachment that's called

5   "Review of Ramen Price Increase Proposal;" right?

6   **A.**   Yes.

7   **Q.**   Okay.  And then if you turn to the next page, you'll see

8   the content of the document.

9        (Document displayed)

10  **Q.**   Do you see that?

11  **A.**   Yes, I see it.

12  **Q.**   Is this a document that you submitted to the KFTC in 2010?

13  **A.**   Yes, that would be my recollection.

14  **Q.**   Okay.  Now, what is the date on this memo?

15  **A.**   November 20th, 2002.

16  **Q.**   Okay.  But you created this document in 2010; right?

17  **A.**   Yes.  I came up with this after speaking with the KFTC and

18  then submitted it.

19  **Q.**   And just as with the 2004 memo, you didn't put anything on

20  the face of this document indicating that it was something that

21  you had created in 2010; right?

22  **A.**   Right.  I did not make an indication on the document

23  itself.  I simply had a conversation over the phone with the

24  KFTC.

25  **Q.**   Now, you could have put a footnote in there saying, "This

**BANG-WAN KU - DIRECT / SWEENEY**

1  is a recreated approximation of the actual 2002 memo," but you

2  didn't do that, did you?

3  **A.**  Well, I couldn't have done that because what I promised

4  them that I would come up with was something that would most

5  approximate the final report.  So that would not have been

6  allowable for me to do.

7  **Q.**  Did you send it with a cover letter saying, "This is an

8  approximation of the 2002 report"?

9  **A.**  No.  There is nothing that I sent over in document form

10  like that.

11  **Q.**  And did you write a memo to the file explaining what you

12  had done to recreate the 2002 memo?

13  **A.**  No.  There is no, say, indication as such on the document

14  or in the document.

15  **Q.**  And there is nothing in the document that indicates that

16  you had anything at all to do with this 2002 memo recreation;

17  right?

18  **A.**  Right.  There is nothing in terms of the document itself,

19  per se.

20  **Q.**  Is there anything other than a document itself?  For

21  example, did you send a letter to the KFTC saying, "I recreated

22  this 2002 memo and I submit it to you as the best approximation

23  of the actual 2002 memo."

24      Did you do that?

25  **A.**  The KFTC desired no such document.  All they wanted to

1    have was the final document only.

2            **MS. SWEENEY:**  I move to strike and I'm going to ask

3    the question again.

4            **THE COURT:**  Overruled.

5    **BY MS. SWEENEY**

6    **Q.**   Mr. Ku, the 2002 memo that you sent to the KFTC has a

7    "Purpose" that is very much like the "Purpose" in the 2004 and

8    2005 memos that you sent to the KFTC; correct?

9    **A.**   That's right.  I came up with that based upon looking at,

10   say, data or material pertaining to the year 2002 time frame,

11   such as, you know, things about the price of wheat, flour and

12   such.

13   **Q.**   Okay.  And like the 2004 and 2005 memos, the 2002 memo

14   that you recreated does not have any references to Yakult or

15   Samyang; right?

16   **A.**   Well, the fact is I'm the one who had created the '07 and

17   '08 memos and, likewise, you know, the person, whoever it was

18   back in 2002, would have done the same.  So it goes without

19   saying that those references would not be there.

20   **Q.**   Let's move to another topic.

21       Mr. Ku, you testified yesterday that you were the person

22   who spearheaded the efforts in 2008 to prepare and submit to

23   the KFTC a number of documents that the KFTC requested;

24   correct?

25   **A.**   Yes, that's correct.

1    Q.    Okay.  I'd like to show you two documents which have been

2    marked for identification as Exhibits 1030 and 1031.

3              MS. SWEENEY:  May I approach, Your Honor?

4              THE COURT:  You may.

5         (Whereupon documents were tendered to the witness.)

6    BY MS. SWEENEY

7    Q.    Mr. Ku, if you could have a look first at Exhibit 1031.

8         (Witness complied.)

9    A.    Is it this one?  All right.

10   Q.    Is that something that you prepared for submission to the

11   KFTC, Mr. Ku?

12   A.    Yes.  It appears to be something that I prepared in

13   concert with some other department or departments for

14   submission purposes.

15   Q.    Okay.

16             MS. SWEENEY:  I move to offer that into evidence.

17             THE COURT:  Any objection?

18             MR. EDELMAN:  None, Your Honor.

19             THE COURT:  It's admitted.

20        (Trial Exhibit 1031 received in evidence).

21   BY MS. SWEENEY

22   Q.    Mr. Ku, if you could turn to the next document, which is

23   Trial Exhibit 1030?

24   A.    All right.

25   Q.    Is this document also something that you prepared to

BANG-WAN KU - DIRECT / SWEENEY

1   submit to the KFTC?

2   **A.**   Yes.   To my recollection, I worked on this and sent it

3   over.

4   **Q.**   Okay.

5           **MS. SWEENEY:**   Your Honor, plaintiffs move to enter

6   Exhibit 1030.

7           **MR. EDELMAN:**   No objection.

8           **THE COURT:**   It's admitted.

9       (Trial Exhibit 1030 received in evidence)

10      (Document displayed)

11  **BY MS. SWEENEY**

12  **Q.**   All right.   I'm going to move to another document that you

13  prepared, I believe, in connection with the KFTC investigation.

14          **MS. SWEENEY:**   Can we have a look at Exhibit --

15  actually, it hasn't been admitted yet.   So I would like to show

16  the witness Trial Exhibit 12.

17      May I approach, Your Honor?

18          **THE COURT:**   You may.

19      (Whereupon document was tendered to the witness.)

20  **BY MS. SWEENEY**

21  **Q.**   All right.   Mr. Ku, what is Trial Exhibit 12?

22  **A.**   These are details of personnel who participated in the

23  price determination during ramen price increases.

24  **Q.**   Is this a document that you created and submitted to the

25  KFTC?

1    A.    Yes, that's correct.

2            MS. SWEENEY:  Plaintiffs move its admission.

3            MR. EDELMAN:  No objection.

4            THE COURT:  It's admitted.

5        (Trial Exhibit 12 received in evidence)

6            MS. SWEENEY:  Can we publish that, please?

7        (Document displayed)

8    BY MS. SWEENEY

9    Q.    And these are all the various departments and personnel

10   who participated in the price adjustments between May 1 of 2002

11   through sometime in 2008; is that right?

12   A.    Yes, that's correct.

13   Q.    And, Mr. Ku, the Sales Planning Division, which is your

14   department, doesn't appear until the very last box; right?

15   A.    Yes, that's correct.

16   Q.    Okay.  And your name doesn't appear until the very last

17   box; correct?

18   A.    Yes, that's correct.

19   Q.    Okay.  And, in fact, before 2007 there were other

20   departments that were responsible for price increases of ramen

21   at Ottogi; right?

22   A.    Yes, that's correct.

23   Q.    Okay.  And so in -- between 2002 and 2003 it was the

24   Management Planning Team that was responsible; right?

25   A.    Yes, that's correct.

**BANG-WAN KU - DIRECT / SWEENEY**

1  **Q.**   And then after that it was the Product Planning Team?

2  **A.**   Yes.  That was done together by the Product Planning Team

3  and the Marketing Office.

4  **Q.**   Okay.  And the Marketing Office was involved for a number

5  of years in setting the prices for ramen; correct?

6  **A.**   Yes.  You see Marketing Office appearing twice here.

7  **Q.**   Okay.  And they were responsible for the price increases

8  in 2004 and 2005; right?

9  **A.**   Yes.

10  **Q.**   Okay.  And you remember Mr. Edelman showed you a chart

11  that he had prepared showing the organizational structure of

12  Ottogi?

13  **A.**   Yes, I recall.

14  **Q.**   Okay.

15          **MS. SWEENEY:**  Could we show that to the jury -- or to

16  Mr. Ku?  Do we have it?

17      Actually, I was looking for the document that the

18  defendants created.

19          **MR. EDELMAN:**  Our chart?

20          **MS. SWEENEY:**  Yes.

21      (Discussion held off the record between counsel.)

22          **MS. SWEENEY:**  And I believe this has been marked for

23  identification as 2020.  Can we publish that, please?

24      Oh, I'm sorry?

25          **MR. EDELMAN:**  2021.

```
1              MS. SWEENEY:  2021.

2              THE COURT:  Is it in evidence?

3              MS. SWEENEY:  It's not in evidence.

4              MR. EDELMAN:  It's not, although I had intended to

5      offer it into evidence.  So if you want to display it, that's

6      fine.

7              MS. SWEENEY:  Mr. Edelman had been displaying it in

8      the board form, which we could put up, or we could just put it

9      on the screen.

10             THE COURT:  Either way.  Either way you do it is

11     fine.

12             MS. SWEENEY:  Okay.  We can put the board up.

13        (Demonstrative displayed)

14             MS. SWEENEY:  Thank you, Mr. Edelman.

15     BY MS. SWEENEY

16     Q.  So, Mr. Ku, looking at this, at this organizational chart,

17     the Management Planning Team, the Product Planning Team and the

18     Marketing Office are not on the left-hand side of this chart;

19     right?

20         And I realize it's in English, so maybe that's not

21     something that you can answer.  But let me ask you this

22     question:  Would it be appropriate to include on an

23     organizational chart that shows who sets the prices for ramen,

24     would it be appropriate to include the Marketing Office, the

25     Product Planning Team and the Management Planning Team when
```

**BANG-WAN KU - DIRECT / SWEENEY**

1   you're talking about the time period 2001 through 2008?

2   **A.**   Well, that board, I believe, is part of a simplified

3   representation of things and, indeed, the facts are a little

4   more complex, such as the table of organization that we just

5   briefly perused through.

6   **Q.**   But if you're talking about the period prior to 2007,

7   isn't it inaccurate to identify the Sales Planning Office and

8   not mention the Marketing Office or the Management Planning

9   Team or the Product Planning Team?

10  **A.**   It would seem to me that perhaps they came up with

11  something that simply would just show the flow of things,

12  because were they to try to represent everything for the

13  benefit of the jury, then I think it would be a little too

14  complex.

15  **Q.**   Mr. Ku, can you look at the last set of boxes on

16  Exhibit 12?

17  **A.**   Okay.

18  **Q.**   And you see there where it says Director Ki-Soo Kim?

19  **A.**   Yes.

20  **Q.**   Okay.  And Mr. Ki-Soo Kim, he was the director of the

21  Sales Planning Division from September 1 of 2007 forward?

22  **A.**   No.  This chart is -- well, to be most accurate, he was

23  not with the Sales Planning Division.  Rather, he was serving

24  as the head of the Sales HQ.

25  **Q.**   But you identify him in Trial Exhibit 12 as someone who

1   participated in the price determination during ramen price

2   increases.   Sometime after September 1, 2007, did Ki-Soo Kim

3   have responsibility for pricing for ramen?

4   **A.**   So the actual determination of pricing per se is done by

5   the Sales Planning Division itself, but this gentleman was

6   indicated here because said Sales Planning Division is under

7   his auspices.   Him being the head of the Sales HQ.

8   **Q.**   But he was involved in price increases of ramen; right?

9   **A.**   Well, in terms of the hierarchical line, he's there.   I

10  mean, in terms of the determination of the ramen price.

11  **Q.**   Mr. Kim approved price increases; right?

12  **A.**   Yes, that's correct.

13  **Q.**   Okay.   And Mr. Kim was the boss of your boss Young-Hyun

14  Doh; right?

15  **A.**   Yes, that's correct.

16  **Q.**   And Ki-Soo Kim attended the Ramen Conference in the years

17  2005, 2006, 2007 and 2008; right?

18  **A.**   Yes, that's correct.

19  **Q.**   And before Ki-Soo Kim attended the Ramen Conference, it

20  was attended, as you testified yesterday, by Geun-Ho Choi;

21  right?   And that's G-E-U-N.   Ho, H-O.   Choi, C-H-O-I.

22  **A.**   Yes, that's correct.

23  **Q.**   Okay.   I'd like to show the witness Exhibit 646.

24          **MR. EDELMAN:**   Your Honor, may I inquire of counsel if

25  I can take this board down now?

1          MS. SWEENEY:  Sure.  Thank you.

2      (Demonstrative removed from display)

3          MS. SWEENEY:  May I approach, Your Honor?

4          THE COURT:  Yes.

5      (Whereupon document was tendered to the witness.)

6  BY MS. SWEENEY

7  Q.   All right.  Mr. Ku, I've handed you what has been marked

8  as Trial Exhibit 646, and this is an organization chart as of

9  August 1, 2000.

10     Mr. Ku, have you seen organizational charts like

11 Exhibit 646 before?

12 A.   Yes, I have.

13 Q.   Okay.

14         MS. SWEENEY:  And I offer this into evidence.

15         MR. EDELMAN:  No objection, your Honor.

16         THE COURT:  It's admitted.

17     (Trial Exhibit 646 received in evidence).

18         MS. SWEENEY:  Can we publish that, please?

19     (Document displayed)

20 BY MS. SWEENEY

21 Q.   All right.  I think one of the exhibits we looked at

22 yesterday identified Geun-Ho Choi as the senior manager of

23 Business Division 2.  Do you remember that?

24 A.   Yes, that's correct.

25 Q.   Okay.  And do you see Business Division 2 on this chart?

**BANG-WAN KU - DIRECT / SWEENEY**

1    A.   You're talking about -- yes, Business Division 2 here;

2    right?  I see it, yes.

3    Q.   Okay.  So Mr. Choi in 2001 was head of Business

4    Division 2, which is on this organizational chart 646; right?

5    A.   So, right.  Not that I have a precise recollection, but

6    that would seem to be what I think I recall.

7    Q.   Okay.  And that's a fairly high level executive position

8    within Ottogi; right?

9    A.   Well, I don't know what the, say, criterion might be in

10   terms of what is high or not high, but it is true that he was

11   in charge of that unit.

12   Q.   Okay.  And I believe you also testified yesterday in

13   response to Mr. Edelman's questions that because Mr. Choi was

14   in sales, he had no responsibility for pricing.  Is that what

15   you said yesterday?

16   A.   Yes, that's correct.

17   Q.   Okay.  And, yet, Mr. Ki-Soo Kim, who approved price

18   increases at least since 2007 and 2008, his position was as

19   supervisor of sales; right?

20   A.   Well, back during this relevant period of time, although

21   I was within the -- under the umbrella of Sales HQ, I was not

22   handling sales at that time.

23   Q.   In 2015 and 2008 you worked for Mr. Kim; right?

24   A.   Speaking with respect to Mr. Ki-Soo Kim, he at one time or

25   another did handle sales personally and at some other times he

BANG-WAN KU - DIRECT / SWEENEY

1   was not handling sales personally, but, rather, was within the

2   overall Sales HQ.

3       So during this relevant point in time when I was with the

4   Sales Planning Division and when I indicated that he had any

5   responsibility for determining sales, when he had authority as

6   to price determination, that is when he was with the overall

7   Sales HQ, but not engaged in sales per se.

8   Q.   I'd like to show the witness Trial Exhibit 13.

9       (Brief pause.)

10          MS. SWEENEY:   We'll have to come back to that

11   document.

12   BY MS. SWEENEY

13   Q.   Mr. Ku, you testified yesterday about the Ramen

14   Conference.   And that conference stopped being held in 2010;

15   right?

16   A.   I don't quite know as to the date on which that ceased.

17   Q.   But it did cease; right?

18   A.   I don't know that I could give you a definitive answer on

19   that.

20   Q.   You gave some testimony in a deposition about the Ramen

21   Conference; do you remember that?

22   A.   I do recall.

23   Q.   And do you recall testifying in that deposition that the

24   Ramen Conference was not held in 2010 or after 2010?

25   A.   That I do recall, but right now it seems to me that you're

1   asking me for something exact.  So in that regard, I'm not sure

2   I can give you an answer.

3   **Q.**   Okay.  Now, and it's true, isn't it, that during the years

4   2001 through 2009 when the Ramen Conference met, there were

5   only four companies that attended the Ramen Conference; right?

6   **A.**   Yes.  There were four ramen companies.

7   **Q.**   And that was Ottogi, Nongshim, Yakult and Samyang; right?

8   **A.**   Yes, that's right.

9   **Q.**   Okay.  And you testified yesterday that the Ramen

10  Conference was related to tax collection; right?

11  **A.**   Yes.  It's an organization put together by the National

12  Tax Service.

13  **Q.**   Okay.  But even though the Ramen Conference is no longer

14  being held, the taxes that ramen companies -- ramen companies

15  still have to pay taxes; right?

16  **A.**   So that you know, the Ramen Conference was put together

17  not because the ramen companies were cheating on their taxes.

18  Rather, the government was asking for the ramen companies' help

19  so as to prevent the middlemen from transacting under the

20  table.

21  **Q.**   Okay.  Understood.  Thank you.

22       Now, can we turn back please to Trial Exhibit 12?

23       (Document displayed)

24  **Q.**   And if you look at the first page under the bottom set of

25  boxes, by Marketing Office it says "Team Leader Byung-Bak Cho."

BANG-WAN KU - DIRECT / SWEENEY

1    Do you see that?

2    **A.**    Yes, I see it.

3    **Q.**    Okay.  And during that period of time, that is 2004, 2005,

4    Byung-Bak Cho was someone who worked in the Marketing Office

5    and had responsibility for pricing of ramen; right?

6    **A.**    Yes, that is correct.

7    **Q.**    And below his name is Jae-Hwan Jung; do you see that?

8    **A.**    Yes, I see it.

9    **Q.**    Okay.  And Jae-Hwan Jung also worked in the Marketing

10   Office and had responsibility for pricing of ramen; right?

11   **A.**    Yes.  As of that point in time, that is my understanding,

12   yes.

13   **Q.**    Okay.  And Jae-Hwan Jung was working at Ottogi, at least

14   in July of 2008 when you submitted the pricing memoranda to the

15   KFTC; right?

16   **A.**    Yes, he was there at that time.

17   **Q.**    And, in fact, you and Mr. Jung were in the same general

18   office area; correct?

19   **A.**    Yes, that's right.

20   **Q.**    And his desk was only, like, ten meters from yours?

21   **A.**    That is correct.

22   **Q.**    Okay.  Now, Mr. Jung is someone from the Marketing Team

23   who provided to you information about the competitive situation

24   which you used in determining price increases; right?

25   **A.**    So as of when -- could you specify the time or the date

BANG-WAN KU - DIRECT / SWEENEY

1   for me, please?

2   **Q.**   Sure.  How about 2007, 2008?

3   **A.**   Okay.  So he was one of many people who would provide me

4   with such kind of information.

5   **Q.**   Okay.  And yesterday Mr. Edelman showed you a couple of

6   memos, or at least one memo that Mr. Jung had prepared; right?

7   **A.**   So for what year are you talking about?

8   **Q.**   The memo that you looked at yesterday, I believe, was

9   Exhibit 344.

10  **A.**   Yes.

11  **Q.**   Okay.

12          **MS. SWEENEY:**  And then I'd like to mark for

13  identification Trial Exhibit 20.

14      (Trial Exhibit 20 marked for identification.)

15      (Whereupon document was tendered to the witness.)

16  **BY MS. SWEENEY**

17  **Q.**   Now, Mr. Ku, is the document that's been marked as Trial

18  Exhibit 20 a -- one of the kinds of memoranda that you received

19  from Jae-Hwan Jung and others from the Marketing Team in 2007?

20  **A.**   Yes, there is such a possibility.

21  **Q.**   Is Exhibit 20 in the form of many of the memoranda that

22  you received and reviewed in 2007?

23  **A.**   Yes, indeed.

24  **Q.**   Okay.

25          **MS. SWEENEY:**  Plaintiffs offer Exhibit 20.

1              **MR. EDELMAN:**  No objection.

2              **THE COURT:**  It's admitted.

3          (Trial Exhibit 20 received in evidence).

4          (Document displayed)

5    **BY MS. SWEENEY**

6    **Q.**    Okay.  Mr. Ku, look at the title.  It says "Opinion on

7    Price Increase of Ramen Products."  Do you see this?

8    **A.**    Yes, I see it.

9    **Q.**    And over on the right-hand side it says "July 18, 2007,

10   Marketing Team 3."  Do you see that?

11   **A.**    Yes, I see it.

12   **Q.**    And in 2007 Jae-Hwan Jung and Byung-Bak Cho were both

13   employed in Ottogi's Marketing Team 3; right?

14   **A.**    Yes, that's correct.

15   **Q.**    Okay.  And the content of this memo is describing the

16   competitive situation and making recommendations with respect

17   to Ottogi's price increases; right?

18   **A.**    Yes.

19   **Q.**    Okay.  And some of this information that's contained in

20   this memo came directly from Ottogi's competitor; correct?

21   **A.**    Yes, that's correct.

22   **Q.**    Okay.  And if you look at the very -- the sentence just

23   above the box on the second page of this document, do you see

24   where it says "phone conversation"?

25   **A.**    Yes, I see it.

BANG-WAN KU - DIRECT / SWEENEY

1   Q.   Okay.  And here the author of this memo is referring to:

2         "Phone conversation with Jong-Moon Yui of

3   Samyang, assistant manager - reaction post-price

4   increase."

5         Do you know who Mr. Jong-Moon Yui is?

6   A.   I don't know who that is.

7   Q.   But it's someone who at that time, in 2007, was in

8   Samyang's Marketing Department?

9   A.   At Samyang?  Well, there is nothing I can tell you about

10  this person because I don't know anything about this person,

11  so...

12  Q.   Okay.  But that's what it says in the memo; right?

13  A.   Yes, that's correct.

14  Q.   Okay.

15         THE COURT:  Ms. Sweeney, is this a good time for a

16  break?

17         MS. SWEENEY:  Yes, it is, Your Honor.

18         THE COURT:  Ladies and gentlemen, we'll take our

19  morning recess for 15 minutes.  Please remember the

20  admonitions.

21                (Recess taken at 9:46 a.m.)

22              (Proceedings resumed at 10:01 a.m.)

23         THE COURT:  All right.  Please be seated, everybody.

24    Ms. Sweeney, go ahead.

25         MS. SWEENEY:  Thank you, Your Honor.  I'd like to

1   start by showing the witness Trial Exhibit 375.

2       May I approach, Your Honor?

3   **BY MS. SWEENEY:**

4   **Q.**   Mr. Ku, my first question is, are you familiar with

5   Exhibit 375?

6   **A.**   Yes, I am indeed.

7   **Q.**   And this is the proposal form for the price increase of

8   ramen in 2008, right?

9   **A.**   Yes, that's correct.

10  **Q.**   And you were involved in the 2008 price increase, correct?

11  **A.**   Yes, that's correct.

12       **MS. SWEENEY:**   Plaintiffs offer Exhibit 375.

13       **MR. EDELMAN:**   No objection.

14       **THE COURT:**   It's admitted.

15   (Trial Exhibit 375 received in evidence)

16  **BY MS. SWEENEY:**

17  **Q.**   Okay.   Mr. Ku, I think you testified yesterday about this

18  kind of document.   This is also sometimes called an inception

19  document, right?

20  **A.**   Yes, that's correct.

21  **Q.**   Okay.   And this document shows the approvals and the chops

22  of various executives of the price increase that was adopted in

23  2008, right?

24  **A.**   That is correct.

25  **Q.**   Over on the far right-hand side we have the name and chop

BANG-WAN KU - DIRECT / SWEENEY

1   of the president, Young-Joon Ham?

2   A.   Yes.

3   Q.   Okay.  And then there's someone named Kang-Hoon Lee.  Is

4   that a different Kang-Hoon Lee from the employee whose name was

5   on the marketing memo that you said left the company?

6   A.   Right.  They just have the same name.

7   Q.   And then it was also approved by Ki-Soo Kim, right?

8   A.   Yes.

9   Q.   And then your supervisor, Young-Hyun Doh.  That's his

10  chop, right?

11  A.   Yes, that's correct.

12  Q.   If you could go down into the next set of boxes that says

13  Proposal there.  Do you see that?

14  A.   Yes.

15  Q.   And to the right of that there's a date of February 26,

16  2008, right?

17  A.   Yes, I see it.

18  Q.   All right.  And is that the date of the proposal, as

19  opposed to the approval of the price increase?

20  A.   Well, it is the date on which it was proposed, but

21  typically on the quick end sometimes you obtain approval on the

22  same day, though.

23  Q.   Sometimes it can take quite a few days between the

24  proposal and the approval, right?

25  A.   Yeah, on occasion there are such times, as well.

**BANG-WAN KU - DIRECT / SWEENEY**

1  **Q.**   And for this particular price increase proposal -- that

2  is, for 2008 -- you can't tell from this document what the date

3  of approval is, right?

4  **A.**   That is right.

5  **Q.**   And just to clarify, in the box above the date of

6  2-26-2008 there are a series of numbers.  But that's not a

7  date, right?

8  **A.**   That is right.  That's not a date.

9  **Q.**   That's the document control number.  Looking at about

10  halfway down the page it says date of adjustment as of April 1,

11  2008.  That's the date this particular price increase became

12  effective, right?

13  **A.**   That is correct.

14  **Q.**   Then if you go about four-pages into this document there's

15  something called a business communication dated March 5, 2008.

16  **A.**   March 8?

17  **Q.**   I'm sorry.  March 5, 2008.  Thank you.

18  **A.**   Yes, I see it.

19  **Q.**   Okay.  So would you agree that the approval for this price

20  increase for 2008 occurred sometime between the 26th of

21  February and March 5, 2008?

22  **A.**   Yes, that's right.

23       **MS. SWEENEY:**  Okay.  Now I'd like to show the witness

24  what has been marked Exhibit 44, and this had been

25  conditionally admitted.

BANG-WAN KU - DIRECT / SWEENEY

 1        Can we publish, Your Honor?

 2              THE COURT:  No, I don't think so.

 3              MS. SWEENEY:  Oh, I'm sorry.  I thought that had been

 4    admitted.

 5              THE COURT:  No.  That's the exhibit of all of the

 6    emails?

 7              MS. SWEENEY:  Yes.

 8              THE COURT:  And you can show him specific -- show him

 9    specific documents.

10              MR. EDELMAN:  And of course there's an issue as to

11    when is these emails --

12              MS. SWEENEY:  May I approach, Your Honor?

13    BY MS. SWEENEY:

14    Q.   Okay.  Mr. Ku, I handed you what's been marked for

15    identification as Exhibit 44.  And just have a look through

16    that.

17    A.   I've gone through it.

18    Q.   And if you could go to the document that has -- excuse me

19    -- the page that has the Bates number SHD 00003130 in the

20    English version.

21              MS. SWEENEY:  Perhaps Mr. Interpreter could help him

22    find the right page.  I'm looking for number 24.

23    A.   We're there.  I'm looking at it.

24    Q.   Do you see the information and the text below the number

25    24?

**BANG-WAN KU - DIRECT / SWEENEY**

1   **A.**   Yes, I do.

2   **Q.**   Okay.  And do you recognize that email address there for

3   Jae-Hwan Jung?

4   **A.**   Well, there appears the name Jae-Hwan Jung.

5   **Q.**   There's the name Jae-Hwan Jung, and then there's also an

6   email address after it, right?

7   **A.**   Yes, there is an email address.

8   **Q.**   That is the email address Mr. Jung used when he was

9   employed by Ottogi in 2008?

10  **A.**   I would believe that to be the case.

11  **Q.**   Well, in fact, we looked at some emails today that you

12  received from Jae-Hwan Jung in 2008 when you were preparing the

13  approximated memos.  Is this the same email address that he

14  used then?

15  **A.**   Yes.  This email address is that email address.

16  **Q.**   Okay.  And you know that in 2007 and 2008 Mr. Jung was

17  getting information directly from Ottogi's competitors about

18  the competitive market situation, correct?

19  **A.**   No, I have not heard about anything as to that.

20  **Q.**   But you remember when we looked at Exhibit 20 which

21  referenced a conversation with someone at the Samyang marketing

22  office named Jong-Moon Yui.

23  **A.**   Yes.  That -- I do.

24  **Q.**   Okay.  And so you don't have any reason to doubt, do you,

25  Mr. Ku, that Jae-Hwan Jung was emailing the Samyang marketing

1   office on February 28, 2008.

2            **MR. EDELMAN:**  Objection.  No foundation.

3            **THE COURT:**  He can answer that question.  Overruled.

4            **THE WITNESS:**  Well, if per chance you could first

5   explain to me as to what this is, whether it's an email or not.

6   I'm not too sure what this is.

7   **BY MS. SWEENEY:**

8   **Q.**   Can you answer my question?

9   **A.**   So I am to suppose that this is an email in giving you an

10  answer?  Is that --

11  **Q.**   I think you can answer my question --

12       Well, let me ask the court reporter to read back my

13  question.

14       (Question read back by the court reporter.)

15  **A.**   Well, there is nothing that I've directly heard in that

16  regard.

17  **Q.**   Do you see -- all right.  Let's start with the date.

18  2-28-2008.  Is that a time when Mr. Jung was involved in

19  gathering market research for use by the members of the sales

20  and planning department that set price?

21  **A.**   Well, this individual, too, is but one of many such

22  individuals who would conduct market research and inform us as

23  to such.

24  **Q.**   Okay.  But you personally -- strike that.

25       You don't have any reason to doubt that he was at this

```
 1   time -- that is, in 2008 -- communicating with competitors
 2   marketing departments.
 3              MR. EDELMAN:  Objection, Your Honor.  Asked and
 4   answered.  Argumentative.
 5              THE COURT:  Overruled.  He may answer.
 6              THE WITNESS:  Well, not that I've heard anything
 7   directly to such effect.
 8   BY MS. SWEENEY:
 9   Q.   That wasn't exactly my question.  My question was:  Do you
10   have any reason to doubt that he was communicating with members
11   of the marketing teams at Ottogi's competitors?
12   A.   Do I have any reason to doubt?  Well, for starters, I
13   don't know as to what the source of this is.
14   Q.   You don't have to know -- I can tell you, Mr. Ku, this is
15   something that you reviewed at your deposition in 2016.  Do you
16   remember that?
17   A.   I kind of vaguely recall it.
18   Q.   Okay.  Mr. Ku, yesterday you gave some testimony about the
19   surprise visit that Ottogi received on June 3, 2008.  Do you
20   recall that?
21   A.   Yes, I do recall.
22   Q.   And during that first visit in 2008, the KFTC
23   investigators copied some hard copy documents from the sales
24   and planning department, right?
25   A.   Yes.  That's right.
```

**BANG-WAN KU - DIRECT / SWEENEY**

1  Q.   And they printed some documents from the computers of

2  personnel in the sales and planning department.  Right?

3  A.   Yes, that's right.

4  Q.   And Ottogi employees took some notes of at least some of

5  the materials that were copied and printed by the KFTC, right?

6  A.   We weren't able to do that with respect to all of that.

7  Q.   Understood.  But you were able to record at that time at

8  least some of the documents that were copied and printed by the

9  KFTC, right?

10 A.   So we were able to do that only as to a few at the onset,

11 but later on it just became too voluminous so we couldn't do

12 it.

13 Q.   And you didn't produce those notes of those documents in

14 this litigation, right?

15 A.   Well, as for me, whatever we had on hand I provided that

16 to that collection company.

17 Q.   Now, it wasn't until 2010, when the KFTC conducted its

18 third on-site investigation, that the KFTC searched the

19 computers of the personnel in marketing team 3, right?

20 A.   No.  On the contrary, the marketing team also underwent

21 the 2008 and, basically, all three occasions of the

22 investigations.

23 Q.   You recall that you gave testimony in April of 2016?

24 A.   Yes.

25 Q.   All right.  And you testified then that in its first visit

1  in 2008 the KFTC came and wanted to know who was in charge of

2  setting prices, right?

3  **A.**    So, generally, the department responsible for price

4  setting within most Korean companies would be the marketing

5  office.  So when those folks came acalling, they first went to

6  our marketing office.  And this thing called a sales planning

7  office, most Korean companies doesn't have that.  So they went

8  there only later on.

9  **Q.**    Didn't you testify at your deposition that because your

10  department was the one that handled price related matters, they

11  asked for that department and they came to your department.

12  **A.**    I don't believe I was saying that they first came to my

13  department.  Basically, it was a long day, Madam, and I believe

14  I was giving you a birds-eye view, a synopsis, if you will.

15  Basically, it was going to be too long and involved a story if

16  I were to entail to you everything that went on from, say, 9:30

17  to about 5:00 that day.  So I gave you the summarized version

18  of it.

19      Basically, I guess I ended up talking mostly in terms of

20  me because I was trying to tell you about what I underwent.

21          **MS. SWEENEY:**  Jason, can we play some deposition

22  testimony from Mr. Ku's deposition on --

23      I'm sorry.  I can't tell the date of this.

24      The 7th of April.  And this is pages 93, line 20, to 95,

25  line 4.

 1            MR. EDELMAN:  I'm sorry.  Could I have the page

 2   number again?

 3            MS. SWEENEY:  Sure.  Page 93, line 20.

 4            MR. EDELMAN:  The date of the depo first.

 5            MS. SWEENEY:  The 7th.  93-20 to 95-04.

 6            (Video was played but not reported.)

 7   BY MS. SWEENEY:

 8   Q.   Okay.  And then in your declaration that you submitted to

 9   the Court in 2016, you said that the KFTC conducted a third

10   on-site investigation in May of 2010.  And it was at that time,

11   according to your declaration, that the KFTC searched the

12   computers of marketing team 3.  Do you remember that?

13   A.   By that do you mean to ask if I recall my deposition?

14   Q.   It was a declaration that you submitted.  A written

15   declaration.  I can show it to you, if that would be helpful.

16   A.   I do recall submitting that.

17   Q.   Okay.  And would it surprise you that you said in that

18   declaration that it was in 2010 that the KFTC searched the

19   computers of marketing team 3?

20   A.   No, I would not find that to be surprising.  What I meant

21   by that was that it was in that year, during the third visit of

22   theirs, that the marketing -- that marketing team 3 underwent

23   an intensive -- underwent intensive scrutiny.

24   Q.   Okay.  Changing topics, you testified yesterday that the

25   sales and planning office had nothing to do with overseas

1    sales.  Do you remember that?

2    **A.**   Yes.  That's right.

3           **MS. SWEENEY:**  Okay.  I would like to show the witness

4    Exhibits 30 through 33.

5           Pardon me, Elliot.  It's not 30 through 33.  It's 500,

6    369, 472, and 184.

7           I'll do one at a time.

8    **BY MS. SWEENEY:**

9    **Q.**   Mr. Ku, do you recognize Exhibit 472?

10   **A.**   Yes.  I'm thinking I've seen this.

11   **Q.**   Okay.  And this is an email from you, right?  On August 8,

12   2007?

13   **A.**   2009?

14   **Q.**   I'm sorry.  Is this an email that you sent on August 8,

15   2007, to the overseas sales division.

16   **A.**   I don't see any reference whatsoever as to 2007.

17          (Pause.)

18          I don't see any reference whatsoever as to 2007.

19   **Q.**   Okay.  Let's -- I'm going to have Ms. Cho hand you all the

20   documents at once, then we'll go through them.  I apologize.

21          (Pause.)

22   **Q.**   Okay.  If we could look first at Exhibit 184.  And I think

23   that's the confusion.  That's what I was looking at.

24          **MS. SWEENEY:**  Do you have -- Mr. Interpreter, do you

25   have Exhibit 184?

BANG-WAN KU - DIRECT / SWEENEY

```
 1              THE INTERPRETER:  Evidently, we do.  So let's see how

 2    this goes.  The one that says 184, right?  On the English

 3    version, presumably.

 4    BY MS. SWEENEY:

 5    Q.   Okay.  Do you have -- Mr. Ku, do you have Exhibit 184 in

 6    front of you?

 7    A.   Yes, that's right.

 8    Q.   And is this an email that you received on July 1, 2008?

 9    A.   Yes, that's correct.

10    Q.   Okay.  And this attaches the request for cooperation for

11    2002, right?

12    A.   Yes, that is correct.

13              MS. SWEENEY:  Okay.  Your Honor, we offer Exhibit

14    184.

15              MR. EDELMAN:  No objection, Your Honor.

16              THE COURT:  It's admitted.

17         (Trial Exhibit 184 received in evidence)

18    BY MS. SWEENEY:

19    Q.   Okay.  And do you see in the box in the middle of this

20    page where it has a list of recipients?

21    A.   Yes, I do.

22    Q.   Okay.  And this shows that the price increase for 2002 was

23    being sent to the overseas sales department, right?

24    A.   Yes.  The overseas sales division is included along with

25    many other departments.
```

**BANG-WAN KU - DIRECT / SWEENEY**

1  **Q.**   Okay.  Now let's look at Trial Exhibit 500.

2          **THE INTERPRETER:**  This is by the interpreter.  Your

3  Honor, counsel, there's no Korean version accompanying.

4  **BY MS. SWEENEY:**

5  **Q.**   Okay.  Let's turn to Exhibit 369.  Is there a Korean

6  version of 369?

7          Okay.  Mr. Ku, is Exhibit 369 an email that you sent on

8  July 1, 2008?

9  **A.**   It's an email I received.

10  **Q.**   Oh, pardon me.  Yes.  Is this an email you received on

11  July 1, 2008?

12  **A.**   Yes, that's correct.

13  **Q.**   Okay.  And this attaches the request for cooperation for

14  2004, right?

15  **A.**   Yes, that's correct.

16          **MS. SWEENEY:**  Okay.  Plaintiffs move to move in

17  Exhibit 369.

18          **MR. EDELMAN:**  No objection.

19          **THE COURT:**  It's admitted.

20      (Trial Exhibit 369 received in evidence)

21  **BY MS. SWEENEY:**

22  **Q.**   Okay.  And this document shows that the price increase for

23  2004 was sent to the overseas sales division, right?

24  **A.**   Yes.  Along with many other divisions to whom this was

25  copied on.

1        MS. SWEENEY:  Okay.  Plaintiffs move the exhibit of

2   500 into evidence.  We don't have a hard copy of the Korean,

3   but we can have both versions displayed on the screen.

4        THE COURT:  Any objection to 500?

5        MR. EDELMAN:  As long as he can see it in Korean.

6   BY MS. SWEENEY:

7   Q.   Mr. Ku, can you see Exhibit 500?

8   A.   Yes.

9   Q.   And this is an email that you sent to the overseas sales

10  division on August 8, 2007?

11       THE COURT:  Are we going to put up --

12       MS. SWEENEY:  We'll can have to come back to that.

13  BY MS. SWEENEY:

14  Q.   Okay.  Mr. Ku, you testified that Ottogi was visited by

15  the Ministry of Food and Agricultural and Rural Affairs in

16  2008, and they asked if Ottogi was going to lower its price.

17  Do you recall that testimony?

18  A.   Yes.  I entailed to a certain phone conversation

19  investigation that they conducted.

20  Q.   Okay.  And Ottogi did not decrease its prices that year,

21  correct?

22  A.   That is correct.  Upon inquiring with Ottogi Ramen, the

23  company, they said that there are no factors that warrant a

24  reduction in price and so we simply informed the ministry as to

25  same.

BANG-WAN KU - DIRECT / SWEENEY

1   **Q.**   Okay.  Yesterday Mr. Edelman showed you some newspaper

2   articles that showed press releases from Nongshim.  Do you

3   remember that?

4   **A.**   I do recall.

5   **Q.**   Okay.  And then he also showed you Exhibit 343 which is

6   one of the Ottogi internal memoranda.

7        Do you remember that?

8   **A.**   Yes.

9   **Q.**   And you looked at some prices for comparing Nongshim's

10  prices to Ottogi's prices.  Do you remember that?

11  **A.**   Yes.  There was something comparing the choolgo prices.

12  **Q.**   And, in fact, the two exhibits that you compared are

13  Exhibit 343 and 373.  Can you have a look at those, please?

14  **A.**   All right.  I'm looking at them.

15  **Q.**   Okay.  And do you have the line that you were comparing?

16       And I would ask if Jason could -- maybe he doesn't have --

17       Do you have 343 and 373?  And if you could go to page 3 of

18  343.  Okay.  And then page 2 of 373.

19       Okay.  Do you have that in front of you, Mr. Ku?

20  **A.**   Yes, I do.

21  **Q.**   Okay.  And you were commenting in response to

22  Mr. Edelman's question that the adjusted price at the choolgo

23  rate was different between Nongshim and Ottogi, right?

24  **A.**   That is right.

25  **Q.**   And this is a comparison of the two companies' flagship

**BANG-WAN KU - DIRECT / SWEENEY**

1  products, is that right?

2  **A.**   Yes, that's right.

3  **Q.**   Okay.  But if you look over at the adjusted consumer

4  price, that is the consumer price after the increase, the

5  prices are identical.  Isn't that right?

6  **A.**   The consumer prices are the same, yes.

7  **Q.**   Okay.  And if you look at the Ottogi price increase list,

8  and this is for Jin Ramen -- and again, this is Exhibit 373 --

9  Ottogi increased its choolgo price and it also at the same time

10  reduced the discount rate, isn't that right?

11  **A.**   The company did indeed increase the choolgo price and

12  decrease the discount rate.  However, when it comes to the

13  discount rate, there's this concept of that being the actual *de*

14  *facto* choolgo price associated with it.  But so anyway, yeah.

15  **Q.**   Okay.  But the end result was that the consumer price was

16  identical for the Ottogi product and the Nongshim product,

17  right?

18  **A.**   At this point in time the consumer price as is indicated

19  on the back side, that -- or, those were identical, yeah.

20       **MS. SWEENEY:**  Okay.  Can we have a look now at Trial

21  Exhibit 500?  And I understand that we can show the Korean on

22  the screen this time.

23       Can we approach the witness, Your Honor?

24       **THE COURT:**  Yes, please.

25

BANG-WAN KU - CROSS / BIRKHAEUSER

1   BY MS. SWEENEY:

2   **Q.**   Okay.  Mr. Ku, is Exhibit 500 an email that you sent on

3   August 8, 2007?

4   **A.**   Yes, that's correct.

5   **Q.**   Okay.  And this email is sending the price increase

6   information to the overseas sales division, correct?

7   **A.**   That is correct.  But even prior to that I would imagine

8   that said overseas sales division probably would have received

9   as much via a request for communication communiqué.

10  **Q.**   So the price increase information is always sent to the

11  overseas sales division.

12  **A.**   Whereas it gets sent to all departments and divisions,

13  among them is the overseas sales division.

14         **MS. SWEENEY:**  Okay.  Thank you.  I'm going to pass

15  the witness.

16         **THE COURT:**  All right.  And 500 is admitted if I

17  didn't say that on the record.

18         **MS. SWEENEY:**  Oh, thank you, Your Honor.

19      (Trial Exhibit 500 received in evidence)

20                        **CROSS-EXAMINATION**

21  BY MR. BIRKHAEUSER:

22  **Q.**   Good morning, Mr. Ku.

23  **A.**   Yes.  Good morning, sir.

24  **Q.**   My name is Dan Birkhaeuser, and I represent the indirect

25  purchaser plaintiffs.

**BANG-WAN KU - CROSS / BIRKHAEUSER**

1   **A.**   Yes.

2   **Q.**   Mr. Ku, could you turn in your binder to Exhibit 344?

3   **A.**   Okay.  I'm there.

4   **Q.**   Do you remember discussing Exhibit 344 with your attorney

5   yesterday?

6   **A.**   Yes, indeed.

7   **Q.**   Okay.  Could we publish Exhibit 344?  I believe it's

8   admitted.

9       So the point of this document, Mr. Ku, is that Nongshim

10   has already raised its price, and Ottogi is considering whether

11   to raise its price as well.  Correct?

12   **A.**   Yes, that's correct.

13   **Q.**   Okay.  And one of the points you wanted to make is that

14   the announcement -- I'm sorry.  One of the points that you

15   wanted to make was under number 2, under Samyang, that somebody

16   had consulted with the marketing office, is that right?

17   **A.**   Yes.  I spoke something about such a thing.

18   **Q.**   And what's being reported to you is that Samyang's -- the

19   information that Ottogi had received from Samyang is that sales

20   were at less than 50 percent on track.  Is that right?

21   **A.**   There's something about how their revenue is not too good.

22   **Q.**   50 percent of what Samyang had been planning to sell.

23   Correct?

24   **A.**   Yeah, that's what it is.

25   **Q.**   Thank you.  Can you turn to Exhibit 343, please?

**BANG-WAN KU - CROSS / BIRKHAEUSER**

1   A.   Okay.  I'm looking at it.

2   Q.   And again, this is -- this is a situation Nongshim has

3   raised its price, Ottogi is considering whether to raise its

4   price, too.  Is that correct?

5   A.   So, let's see.  Right.  Nongshim has decided that it is

6   going to be raising its prices, and Ottogi has yet to make any

7   determination.

8   Q.   Ottogi is considering whether to raise its price.

9   A.   Yes.  We are taking that under consideration.

10  Q.   Okay.  And this was the exhibit where you went to the

11  newspaper articles which were identified as Exhibit 781 and you

12  showed us where Nongshim had announced in the press that it was

13  going to raise its price in two days, is that right?

14  A.   Yes, that's what it is.

15  Q.   And what's important to you at Ottogi is whether or not

16  Samyang and Yakult are going to raise their price as well, is

17  that correct?

18  A.   There is that, too, yes.

19  Q.   And do you see under paragraph 5 on the second page the

20  information about Samyang, sir?

21  A.   Yes, I see it.

22  Q.   Do you see where it says that Samyang is weighing the

23  timing of such a price increase?

24  A.   Yes, that's right.

25  Q.   With an implementation date of April 1.

**BANG-WAN KU - CROSS / BIRKHAEUSER**

1   **A.**   Yes.  Something to such effect.

2   **Q.**   That's more than two months from the date of Exhibit 343?

3   **A.**   I'm -- didn't quite follow.  I apologize.  Say that again.

4   **Q.**   April 1 is more than two months from the date of this

5   memo, which is Exhibit 343.

6   **A.**   Yes.  Between April 1 here and February 28 there's more

7   than, say, a month plus or so of a lag.

8   **Q.**   In the newspaper articles that are attached as Exhibit

9   781, do you see anything about Samyang contemplating a price

10  increase on April 1?

11  **A.**   Sir, ramen is made pretty much using the same ingredients,

12  all of which ingredients are all imported.  And so to say that

13  Nongshim has raised their prices means that all other companies

14  also have come under the same cost burdens.

15  **Q.**   I don't believe you answered the question so let me ask it

16  again.

17      Do you see anything in the newspaper articles that you

18  reviewed in Exhibit 781, do you see anything about Samyang

19  weighing the timing of a price increase with an implementation

20  date of April 1?

21  **A.**   While there is nothing in terms of the article or articles

22  themselves, that is certainly something sufficiently being

23  talked about within the marketplace.

24  **Q.**   Number 2 discusses Yakult, right?  Right beneath Samyang?

25  **A.**   Yes.

**BANG-WAN KU - CROSS / BIRKHAEUSER**

1    Q.    Is it says plans are -- as for Yakult, plans are to

2    implement a price increase effective April 1?  Do you see that?

3    A.    Yes.  And this is information that is more than

4    sufficiently obtainable within the marketplace.

5    Q.    Including the exact products that are going to be subject

6    to that price increase two months beforehand?

7    A.    Although you're not able to find out as to the

8    nitty-gritty details upon Nongshim raising its price, the

9    customers make inquiries with all these other companies saying,

10   How are you guys going to raise it?  And how is it going to go?

11   That's how it goes.

12   Q.    Can you turn to Exhibit 644, please?

13   A.    I'm looking at it.

14   Q.    Is it true that 644 is the proposal form for increasing

15   the price of ramen dated March 9, 2005?

16   A.    Yes, that's correct.

17   Q.    And as noted on the very first page in the approval

18   request, Ottogi was considering raising the price of Jin-Cup,

19   but excluded it at the last minute, as reflected on Exhibit

20   644.  Is that correct?

21   A.    Yes, that's what it reads.

22   Q.    And if we look at the second page, we see that Jin-Cup is

23   not in the product list, correct?

24   A.    Right.  I am unable to find Jin-Cup here.

25   Q.    And this is the official -- 644 is the official price

BANG-WAN KU - REDIRECT / EDELMAN

1    approval with the chops on it, correct?

2    **A.**   Well, this is -- this is the proposal form that is created

3    for purposes of obtaining approval.

4         **MR. BIRKHAEUSER:**  Thank you, sir.  I have no further

5    questions.

6         **THE COURT:**  All right.  Mr. Edelman.

7         **MR. EDELMAN:**  I'm trying to activate my timer, Your

8    Honor.

9      Would you activate my timer, please?  Thank you.

10                    **REDIRECT EXAMINATION**

11   BY MR. EDELMAN:

12   **Q.**   Okay.  Mr. Ku, good afternoon.  Good morning, I guess.  A

13   little bit left.

14     A few topics I'm going to cover with you.  I won't be

15   long, I promise.

16     You were asked just a moment ago by Mr. Birkhaeuser about

17   Ottogi's interest in what Samyang Foods and Yakult might have

18   been doing in raising their prices after Nongshim.  Do you

19   recall that line of inquiry?

20   **A.**   Yes, I do recall.

21   **Q.**   And you talked about how some of that information is

22   readily available from customers.

23   **A.**   Yes, that's correct.

24   **Q.**   And then he asked you if there was anything in any of the

25   articles that you had talked about yesterday that also talked

1  about what Samyang or Yakult might have been doing?

2  **A.**   Yes.

3  **Q.**   Could you go back in your notebook, please, to some of the

4  articles that you were looking at yesterday, Exhibit 781-4.

5       If you could display that, Jim.

6  **A.**   All right.

7  **Q.**   All right.  And the reference to Samyang contemplating a

8  price increase in March.  Do you see that in the article?

9  **A.**   Yes, I do.

10 **Q.**   That is the type of thing that you would read about in the

11 newspapers with respect to your competitors?

12 **A.**   Yes, that's right.

13 **Q.**   Okay.  We can put that away.

14      Now, you were asked some questions about Exhibit 384.

15 This was a 2005 final approval memo that went to the KFTC.

16 **A.**   Yes.

17           **MR. EDELMAN:**  If you don't mind, I can't see it.

18 **Q.**   Let's go to the metadata page that counsel showed you.

19 **A.**   Yes.

20 **Q.**   I'm going to show you --

21           **MR. EDELMAN:**  May I approach, Your Honor?

22           **THE COURT:**  You may.

23 **BY MR. EDELMAN:**

24 **Q.**   I'm going to show you a more complete version of the

25 metadata which you were not shown.  And I'm going to mark this

1  as Exhibit 2027.

2          MR. EDELMAN:  I would offer this into evidence, Your

3  Honor.

4          THE COURT:  Is there any objection?

5          MR. BIRKHAEUSER:  I don't see anything that ties this

6  to the document itself.  Normally there's a Bates number on the

7  top.

8          MR. EDELMAN:  We can connect it.  Can I have it

9  conditionally admitted and then I'll tie it up precisely later?

10         THE COURT:  All right.  Go ahead.

11      (Trial  Exhibit2027 conditionally received in

12       evidence)

13  BY MR. EDELMAN:

14  Q.  All right.  I'll represent to you that this pertains to

15  Exhibit 384 which you saw earlier.  We can put 384 on the

16  screen, please, just for a second.

17      All right.  And just let's go to the next page.  All

18  right.  So this is the 2005 final memo that you gave to the

19  KFTC.  Correct?

20  A.  One second, please.

21  Q.  I have the wrong exhibit up.  That's not the final one.

22  So while we're looking for the final one, let me just go back

23  to the line of questioning.  Let's go to the metadata that we

24  just looked at that Ms. Sweeney showed Mr. Ku.

25      All right.  Now let's compare that to the metadata that we

1   marked as Exhibit 2027.

2   **A.**   All right.

3   **Q.**   All right.  And let's have them both on the screen.

4   Exhibit 2027 that we just marked for identification --

5       Do you have that, Jim?  No.  You may not have that as an

6   exhibit.  I just marked it for identification.

7       Maybe I can activate the Elmo.

8       Okay.  So this version of the metadata which I'm showing

9   you, do you remember you were asked by Ms. Sweeney whether you

10  printed the version in 2008, and added chops to it?

11  **A.**   Yes, I do recall.

12  **Q.**   What does this metadata show as the last printed date of

13  this document?

14  **A.**   It reads February 28, 2005.

15  **Q.**   2005.  Not 2008?

16  **A.**   2005.

17  **Q.**   So to follow up on her line of questioning did you, in

18  fact, print this -- the 2005 memo that went to the KFTC, did

19  you print it in 2008 and add the chops to it of Mr. Jung as

20  Ms. Sweeney was suggesting?

21  **A.**   So when it comes to the 2005 document, that we were able

22  to locate within the premises of the marketing office.  The

23  original, that is.  So it was a copy thereof that was

24  submitted.

25  **Q.**   Right.  And did you print it in 2008 -- she asked you

1  about that -- and add chops to it?

2  **A.**   No.

3  **Q.**   Okay.  And with respect to the last modified date that

4  this shows of July 4, 2008, are you aware, Mr. Ku, that the

5  last modified date of a document may be updated to the current

6  date simply by using the "save as" function in the Word program

7  without changing the content?

8  **A.**   Yes, I am aware of that.

9  **Q.**   Okay.  Let me switch topics.  And I want to talk about the

10 2004 memo, which we've talked about two different versions of

11 that today.  Ms. Sweeney asked you a lot of questions about it.

12 And you talked about one that had an author by the name of

13 Kang-Hoon Lee, and then you explained that in the process of

14 recreating the document for the KFTC you changed the author to

15 Jae-Hwan Jung.  Do you remember that line of questioning?

16 **A.**   Yes, I do recall.

17 **Q.**   So for purposes of our understanding, is there any

18 difference between those two documents?

19     And why don't we call them up for the record.  They're

20 Exhibit 1027 and I believe --

21        **MR. EDELMAN:**  Just one moment, please, Mr. Ku.

22     (Pause.)

23 **BY MR. EDELMAN:**

24 **Q.**   Well, while we're doing that, let me ask you another

25 question.

1    You were asked a series of questions by Ms. Sweeney about

2    why the document bearing Mr. Jung's name as the author was not

3    produced earlier.  Do you that line of questioning?

4    **A.**    Yes.

5    **Q.**    All right.  Now, did you turn over your entire computer

6    with all of its contents to be produced in response to this

7    case?

8    **A.**    Yes.  That's right.

9    **Q.**    And would the Lee version of the memo and the Jung version

10    of the memo both have been on your computer?

11    **A.**    Yes.  That's correct.

12    **Q.**    And the difference between the Lee version of the memo and

13    the Jung version of the memo is only the name Lee in one and

14    Jung in the other.  They're otherwise identical.  Correct?

15    **A.**    That's right.

16    **Q.**    Were you responsible in this case for the actions of your

17    counsel in producing documents in response to the plaintiffs'

18    request?

19    **A.**    Well, as for me, what I did was to give everything to the

20    company that does the collecting on our behalf.  But beyond

21    that, I don't have any involvement.

22    **Q.**    All right.  If we can put up 1027 and 368 right next to

23    each other.

24    Can you maybe turn off --

25    **MR. EDELMAN:**  368 and 1027.

BANG-WAN KU - REDIRECT / EDELMAN

```
 1          I'm sorry.  365.

 2          Not working?  Do we need --

 3                  THE INTERPRETER:  Switch off the Elmo?

 4              MR. EDELMAN:  Turn the Elmo off.

 5              THE CLERK:  No.  You're good.

 6              MR. EDELMAN:  Am I good?  All right.

 7   BY MR. EDELMAN:

 8   Q.   So this is the Jung version on the left and the Lee

 9   version on the right, correct?

10   A.   Yes, that's correct.

11   Q.   And are they identical in all respects except just for the

12   author?

13   A.   Yes, that's correct.

14   Q.   And so it's only the version that has Jung as the author

15   that was produced later in the case?

16   A.   That is correct.

17   Q.   And so if we go back a little to the Korean, back to the

18   first page of each document -- never mind.  We don't need to

19   spend time on that.  Let me just switch gears.

20          A few other things I want to cover with you.  Can you pull

21   up Exhibit 20?

22          Now you were asked questions about this by Ms. Sweeney and

23   she asked you whether there's -- this document indicates in any

24   respect that you -- that Ottogi received information directly

25   from competitors.  Do you recall that?
```

1    **A.**    Yes, I recall.

2    **Q.**    Is there any information in this document that, as far as

3    you know, Ottogi received directly from a competitor?

4    **A.**    Is there per chance the Korean version?

5    **Q.**    Sorry.  You don't have it in Korean?

6          Here I have it.  I can give you my copy.  You do have it?

7          It's on the screen.  Okay.

8    **A.**    Right.  I am unable to find anything to that effect.

9    **Q.**    All right.  You were also asked about Exhibit -- Trial

10   Exhibit 12.  Can we pull that up, please?  And this is the list

11   of -- it says details of personnel who participated in the

12   price determination during ramen price increases.

13   **A.**    Yes.  That's correct.

14   **Q.**    And you only show up in the last box.

15   **A.**    Yes.  That's correct.

16   **Q.**    Did you have involvement in pricing determinations at

17   Ottogi prior to September 1, 2007?

18   **A.**    Well, prior to that point in time, it was our department

19   that was responsible in terms of the conduct of our domestic

20   pricing as to Ottogi Ramen.

21   **Q.**    And were you involved in that effort?

22   **A.**    Well, of course.

23   **Q.**    Well, then why are you not depicted in any of the boxes

24   before the last one?

25   **A.**    Because the only question that was put to me that begat

BANG-WAN KU - REDIRECT / EDELMAN

1  this was something having to do with the choolgo price only.

2  But even prior to that, I was the one responsible for handling

3  all the discounts.

4  **Q.**   And that's what I wanted to ask you about.  So when this

5  memo, Exhibit 12, talked about price determination, are you

6  telling us that this has to do with the choolgo price, or the

7  warehouse price?

8  **A.**   That is right.  It addresses that and it is limited to

9  that only.

10  **Q.**   All right.  But you were involved in the actual price?  Or

11  the discount price for the entire period of time?

12  **A.**   That's right.

13  **Q.**   All right.  And I want to just probe that distinction for

14  a very short period of time.  We've heard a lot of testimony in

15  this case about the list price and competitors' efforts to

16  figure out the list price of their competitors.  What's the

17  difference between the list price, or the choolgo price, and

18  the discount price?

19  **A.**   So speaking with respect to our company, so we have a

20  choolgo price, all right.  But rarely do we ever actually sell

21  at the choolgo price.  Because we discount said price when

22  selling to our customers.  And so there exists this notion of

23  an actual choolgo price.

24  **Q.**   Articles we've seen, the efforts to get information from

25  customers that the various ramen companies share in common, is

1  that about the list price or the discount price?

2  **A.**   It only speaks in terms of the choolgo price.  You're not

3  able to obtain anything on the actual or *de facto* choolgo

4  price.

5  **Q.**   That was my question.  Is Ottogi able to get information

6  about the actual price or the discount price at which its

7  competitors sold ramen between 2000 and 2010 in Korea?

8  **A.**   It couldn't.

9  **Q.**   All right.  Two more lines of inquiry and then I'm going

10  to sit down.

11       Please look at Trial Exhibit 500.  This is a document you

12  were shown by Mr. Birkhaeuser a moment ago.  What is the date

13  of the email?

14  **A.**   August the 8th, 2007.

15  **Q.**   All right.  Now please look at Exhibit 2009.  This is the

16  summary of changes to the export price.  Do you see any changes

17  around August of 2007?

18  **A.**   Negative.

19  **Q.**   All right.  My last line of questions.  Do you recall the

20  questioning by Ms. Sweeney comparing the final memos that you

21  submitted to the KFTC for 2004 with the interim memo that you

22  used as a basis to draft the final memo?

23  **A.**   Yes, I do recall.

24  **Q.**   And you were asked a number of questions about the

25  difference between a final memo that you recreated and the

1   interim memo, with focus on the fact that the final memo had

2   all the references to your competitors not in it.  Do you

3   remember that line of questioning?

4   **A.**   Yes.

5   **Q.**   Did you prepare these final memos in a calculated way to

6   strip out the references to your competitors to fool the KFTC?

7              **MR. BIRKHAEUSER:**  Objection.  Leading.

8              **THE COURT:**  Sustained.

9   **BY MR. EDELMAN:**

10  **Q.**   Did you -- well, let me do it a little differently.  Let's

11  look at Exhibit 384, please.

12  **A.**   All right.

13  **Q.**   All right.  Can we go to the front of this, please?

14          Actually, let's go to Exhibit 343.  Is this one of the

15  interim memos?

16  **A.**   Yes, that's correct.

17  **Q.**   And does this contain discussions about Nongshim on the

18  front page?

19  **A.**   Yes, that's right.

20  **Q.**   Let's go to the next page.  And does this also contain

21  discussions about Samyang?

22  **A.**   That's correct.

23  **Q.**   Let's go back to the front page.

24          Is this a document that you provided to the KFTC?

25  **A.**   That is right.  The KFTC does have this document.

BANG-WAN KU - REDIRECT / EDELMAN

1   **Q.**   And do we know that because the reference to defendants'

2   Exhibit 130 that we see in English, in Korean refers to a

3   so-gap number, which is an exhibit that the KFTC used in

4   marking documents?

5   **A.**   Yes.   That's correct.

6   **Q.**   You told us earlier that the KFTC copied all of the

7   documents on your computer, right?

8   **A.**   That's correct.

9   **Q.**   So would the KFTC, then, have had all of the documents

10  that we looked at over the last couple days; the interim memos

11  that have all of the discussions of your competitors?

12  **A.**   Yes.   They took everything with them.

13  **Q.**   Last question.   The ramen conference.   You said the four

14  -- you named the four competitors that went.   Do you remember

15  that?

16  **A.**   Yes, that's right.

17  **Q.**   All right.   Are you aware whether Binggrae attended the

18  ramen conference in 2002?

19  **A.**   That I don't quite know about.

20        **MR. EDELMAN:**   Okay.   No more questions.   Thank you.

21        **THE COURT:**   Ms. Sweeney, should we take a break now

22  or are you going to be brief?

23        **MS. SWEENEY:**   We can take a break.

24        **THE COURT:**   Ladies and gentlemen, let's take our

25  second break.   We'll be back in 15 minutes.   Please remember

 1   the admonitions.

 2                    (Recess taken at 11:45 a.m.)

 3                    (Proceedings resumed at 11:56 a.m.)

 4   (The following proceedings were held in open court, outside the

 5   presence of the jury:)

 6         MR. EDELMAN:  Your Honor, while we're waiting, the

 7   metadata document I marked as Exhibit 2027; that was a mistake

 8   of mine to use that number.  Can we make it 2030?  It's

 9   metadata for Exhibit 363.

10         THE COURT:  Okay.  2030.

11         MR. EDELMAN:  Instead of 2027.

12         THE COURT:  Okay.  That I'll do, but you still need

13   to reach show agreement or otherwise.

14         MR. EDELMAN:  Absolutely.

15         THE COURT:  You have a problem, Mr. Birkhaeuser?

16         MR. BIRKHAEUSER:  I do have a problem.  Because it

17   was misidentified in the record.  And with the questioning of

18   the witness it was identified as Exhibit 384.  And then it was

19   described as a different document.  And now we're hearing that

20   it's 363.

21         THE COURT:  This was just 2030, as I heard

22   Mr. Edelman.

23         MR. BIRKHAEUSER:  It was just --

24         MR. EDELMAN:  I assigned a number to it that we're

25   already using.  That's all I'm trying to change.

 1          (The jury entering the courtroom.)

 2              THE COURT:  All right.  Please be seated, everybody.

 3          And, Ms. Sweeney, before you get going.

 4          Ladies and gentlemen, while you were gone the --

 5   Mr. Edelman realized that document number 2027 had already been

 6   used, so we're changing that to 2030.  So the references in

 7   Mr. Edelman's questions to document 2027 will now be changed to

 8   2030.  And that will be the document that is conditionally

 9   admitted.

10          (Trial Exhibit 2030 conditionally received in

11           evidence)

12              MR. EDELMAN:  Thank you, Your Honor.

13              THE COURT:  All right.  Ms. Sweeney, go ahead.

14                      **RECROSS-EXAMINATION**

15   BY MS. SWEENEY:

16   Q.   Mr. Ku, very briefly.  The KFTC's first on-site visit

17   occurred on June 3, 2008, right?

18   A.   That is correct.

19   Q.   At that time they reviewed the contents of your computer

20   and others in your department and printed out from your

21   computer certain documents, right?

22   A.   Yes.  That's correct.

23   Q.   And then it was about three weeks later, on July 3 and 4,

24   that you received emails from the marketing team and also from

25   Mr. Young-Hyun Doh that contained the memos that we looked at

1    today and yesterday, is that right?

2    **A.**    Are you referring to the 2005 memo?

3    **Q.**    And 2004.

4    **A.**    Well, what I got from Mr. Doh was the 2005 memo.

5    **Q.**    And you received that from Mr. Doh on July 3, correct?   Of

6    2008?

7    **A.**    Yes, that's correct.

8    **Q.**    Okay.   And you received from Ho-Joon Kang the other memo

9    on July 3, correct?

10   **A.**    Well, whether it was the 3rd or the 4th, it's sometime

11   thereabouts that I got it from Mr. Ho-Joon Kang.

12   **Q.**    And I meant the 2004 memo.   You understood that, right?

13   **A.**    Yes.   Yes.

14   **Q.**    Okay.   And then there were additional on-site visits by

15   the KFTC.   And it was in 2010 that the KFTC searched the

16   computer of Jae-Hwan Jong and other members of the marketing

17   committee right -- excuse me -- marketing team.

18   **A.**    Yes.   That's correct.

19              **MS. SWEENEY:**   Okay.   Nothing further.

20              **THE COURT:**   Mr. Birkhaeuser, anything else?

21              **MR. BIRKHAEUSER:**   No, Your Honor.

22              **THE COURT:**   Mr. Edelman.

23              **MR. EDELMAN:**   Your Honor, I just want to clarify that

24   the metadata document I offered, 2030, which you just brought a

25   new number for, applies to Exhibit 363.

 1          THE COURT:  All right.  Was that what you indicated

 2  before?

 3          MR. EDELMAN:  I believe I said on the record 384.

 4  And so I'm correcting that error.  And I'll tie it up with

 5  counsel later to make sure there's no --

 6          THE COURT:  Okay.  We'll discuss this later.

 7          MR. EDELMAN:  Thank you.

 8          THE COURT:  All right.  Thank you very much, Mr. Ku.

 9  You're excused.

10                    (Witness excused.)

11                    **DAE-SIK HONG**,

12  called as a witness for the Defendants, having been duly sworn,

13  testified as follows:

14          THE CLERK:  Be seated.  And if you would please state

15  your full name for the record and spell it for the court

16  reporter.

17          THE WITNESS:  Yes.  My name is Dae-Sik Hong.  And I

18  spell my name in English H-O-N-G, last name.  D-A-E, S-I-K.

19                    **DIRECT EXAMINATION**

20  BY MS. YU:

21  Q.   Okay.  Good afternoon, Professor Hong.

22  A.   Yes, good afternoon.

23  Q.   Do you speak English?

24  A.   I do read and write and am able to carry on some

25  conversations in English, but not to the extent where I feel

DAE-SIK HONG - DIRECT / YU

 1  comfortable enough testifying directly in English.

 2  **Q.**   Okay.  Now, what is your current job?

 3  **A.**   I'm a professor of law at Sogang University located in

 4  Seoul, Korea.

 5  **Q.**   And I believe we prepared some slides to help you explain

 6  your testimony today.

 7           **MS. YU:**  May I approach the witness?

 8           **THE COURT:**  You may.

 9           **MS. YU:**  And I'd like to mark this as Trial Exhibit

10  2022.

11      May I publish it to the jury?

12           **THE COURT:**  Just move right along, Ms. Yu.  Go ahead.

13  **BY MS. YU:**

14  **Q.**   And, Jim, can you turn to the first page after the title

15  page?

16      Professor Hong, is this the current version of your

17  resume?

18  **A.**   Yes, that is right.

19  **Q.**   And can you please briefly describe your educational

20  background?

21  **A.**   Yes.  I graduated from Seoul National University in 1990.

22  And it was during the same year of my graduation that I passed

23  the bar exam within Korea.  And for the next two years I

24  studied at the Judicial Research and Training Institute within

25  South Korea.  And the following year I undertook my graduate

**DAE-SIK HONG - DIRECT / YU**

1  studies at Seoul National University obtaining a master's

2  degree in law, plus a Ph.D. in law, as well.

3  **Q.**   Did you ever study the laws of other countries?

4  **A.**   Yes.  I served as a visiting scholar at University College

5  London from 2001 through 2002.  And I also served as a visiting

6  scholar from 2013 to 2014 here at Cal Berkeley for one year.

7  **Q.**   And did you practice law after you graduated from law

8  school?

9  **A.**   So following my studies at the Judicial Research and

10 Training Institute, for the next ten years I served as a judge.

11 Following that, for about four years plus, I served as an

12 attorney at a law firm called Yulchon located in Korea.

13 **Q.**   And are there any areas of law that you focus on?

14 **A.**   Yes.  My areas of specialty include the Fair Trade Act of

15 South Korea, consumer laws and regulations, general

16 governmental regulations, government -- strike -- corporate

17 governance structures, and privacy acts as applies to

18 individuals.

19 **Q.**   And did you say that you have experience with the Korean

20 Fair Trade Act?

21 **A.**   Yes.  While in private practice I mostly handled matters

22 involving the Fair Trade Act as part of the Fair Trade Act team

23 within my firm.

24 **Q.**   Okay.  And do you have any experience with the Korea Fair

25 Trade Commission?

DAE-SIK HONG - DIRECT / YU

1  **A.**   Yes.   For certain period of time I also consulted for them

2  -- to them.   Also served as --

3            **THE INTERPRETER:**   May the interpreter have the last

4  part repeated, please, Your Honor.

5            **THE WITNESS:**   I also undertook certain studies as

6  commissioned by the Fair Trade Commission, by the KFTC.

7  **BY MS. YU:**

8  **Q.**   I'm just going to call the Korean Fair Trade Commission

9  the KFTC.   What is the KFTC?

10  **A.**   Typically, the KFTC is referred to within Korea as the

11  economic police -- strike -- the economic prosecutors.   And

12  what they're charged with is to implement the Fair Trade Act

13  itself and to stimulate competition and consumerism.

14  **Q.**   Okay.   And what subject matters have you advised the KFTC

15  on?

16  **A.**   There happen to be a number of areas, but among them what

17  is germane to this present action would be how in 2005 I

18  provided some consulting to them as to the investigatory

19  procedures as on the part of the KFTC.

20       So as it were at the time, there were a lot of, say,

21  concerns raised concerning the manner in which the KFTC was

22  going about conducting their investigations.

23  **Q.**   What kind of issues?

24            **MR. RAABE:**   Your Honor, I object on relevance to

25  2005.

1      THE COURT:  Okay.  Overruled.  This is background.

2      THE WITNESS:  For instance, there were certain

3  concerns having to do with the evidence as acquired by the KFTC

4  as part of their investigations, in that the companies subject

5  to those investigations were not being told as to what they

6  were being investigated about or what the underlying matters

7  were that they were being investigated about, and in spite of

8  their requests to be provided with same.  And they further did

9  not know as to what kind of evidence was being involved

10  concerning them.

11  BY MS. YU:

12  Q.   And did the KFTC change their ways?

13  A.   So my recommendation to the KFTC was something to the

14  effect that as in the -- as in other, say, civil and criminal

15  cases they, too, shall do well to also provide, during the

16  course of their investigations, the details concerning the

17  evidence and so forth to the investigatees after their

18  investigation, to also provide them with the evidence on the

19  allegations.

20      Ultimately, the extent to which the KFTC made any change

21  was limited to the fact that after the conduct of their

22  investigation they come up with something called a review --

23      THE INTERPRETER:  This would be a legal term of art,

24  and if the gentleman has the equivalent English --

25      THE COURT:  Okay.

1          **THE WITNESS:**  An examination report.

2          **THE INTERPRETER:**  Thank you.

3          **THE WITNESS:**  And, basically, they decided that

4     they're going to include a list of evidence.  Or, an

5     evidentiary list with such.

6     **BY MS. YU:**

7     **Q.**   Just a list?

8     **A.**   Yes.  All they give you is a list.

9     **Q.**   Okay.  And did you represent any companies being

10    investigated by the KFTC when you were practicing law?

11    **A.**   Yes.  I represented in excess of 100 companies during the

12    four years plus period of time.

13    **Q.**   And did you publish any papers on the KFTC or the Korean

14    Fair Trade Act?

15    **A.**   Yes.  Whereas I, to date, have published more than 70

16    studies, more than 40 of them have to do with the Fair Trade

17    Act.

18    **Q.**   Okay.  And does this slide show some of your publications?

19    **A.**   Yes.  There are some.  And I also have some books.

20    **Q.**   Okay.  Now, who retained you in this case?

21    **A.**   So I have been retained by Nongshim Korea and Nongshim

22    America, as well as Ottogi Korea, as well as Ottogi America.

23    **Q.**   And is your compensation contingent on what opinions you

24    offer?

25    **A.**   That is not the case.

1    **Q.**   Okay.  So what was your assignment?

2    **A.**   So my assignment is twofold.  The first has to do with

3    whether or not under Korean law there is a duty to preserve

4    documents.  And specifically, the question has to do with

5    whether or not during the investigatory period as by the KFTC

6    Nongshim and Ottogi were under any obligation to preserve

7    documents and whether they were in violation of any applicable

8    law to that extent.

9         Secondly, whereas a Dr. Haggard has opined about the

10   Korean chaebol system, I have been asked to proffer my opinions

11   concerning his opinions.

12   **Q.**   Okay.  Thank you, Professor Hong.

13            **MS. YU:**  Your Honor, I now offer Professor Hong as an

14   expert to testify in this matter in areas about which he was

15   engaged.

16            **THE COURT:**  Is there any objection?

17            **MR. RUF:**  Subject to the prior briefing.

18            **THE COURT:**  All right.  You may proceed.

19   **BY MS. YU:**

20   **Q.**   Okay.  Let's go into your assignment more in detail and

21   we'll take one at a time.

22        Jim, can you turn to the next slide?

23        And Professor Hong, can you please explain what this slide

24   shows?

25   **A.**   So this sets forth my conclusions concerning the first

**DAE-SIK HONG - DIRECT / YU**

 1  aspect of my assignment.  Namely, that concerning the -- any

 2  obligation concerning document preservation.

 3  **Q.**   And what was your conclusion?

 4  **A.**   That is, basically, that none of Nongshim's actions --

 5  Nongshim and Ottogi's actions or conducts are in violation of

 6  any applicable laws concerning the -- concerning any duty to

 7  preserve documents.

 8  **Q.**   And can you briefly explain the reasons for your

 9  conclusions?

10        **THE INTERPRETER:**  The interpreter could not hear.

11  **BY MS. YU:**

12  **Q.**   Can you briefly explain the reasons for your conclusion?

13  **A.**   Yes.  There are three.

14        **MR. RAABE:**  Objection, Your Honor.  I would ask a

15  foundation be laid first before we hear the details.

16        **THE COURT:**  Yes.  So what did he do in order to make

17  this determination?

18  **BY MS. YU:**

19  **Q.**   Sure.  And what did you do in order to arrive at your

20  conclusions?

21  **A.**   So I first ascertained whether or not under Korean law and

22  applicable KFTC laws and regulations there is any duty or any

23  obligation to preserve documents.  And I applied that vis-à-vis

24  the present case and came up with my conclusion.

25  **Q.**   And did you review records in this case?

DAE-SIK HONG - DIRECT / YU

1  **A.**   Yes.   I verified, say, a number of those opinions as made

2  available through the plaintiffs' counsel.

3  **Q.**   Okay.   So now can you go through the reasons for your

4  conclusion?

5  **A.**   Just a moment ago I misspoke.   Not the plaintiffs', but

6  the defendants'.

7  **Q.**   Okay.   Me (indicating.)

8     Can you briefly go through the reasons for your

9  conclusion?

10  **A.**   Firstly, it has to do with the fact that the laws of Korea

11  do not apply to those American entities, meaning Nongshim

12  America and Ottogi America.   And the second part is that is

13  because there is no Korean law that requires companies to

14  preserve -- any general law to preserve documents.   And

15  thirdly, it's also just because there is an investigation that

16  was begun by the KFTC, does not mean that there arises some

17  sort of a duty on the part of the company undergoing such

18  investigation to preserve documents.

19  **Q.**   Okay.   And Jim, can you turn to the next slide?

20     And Professor Hong, can you explain what this slide shows?

21  **A.**   This entails my reasons as to Professor Haggard's

22  opinions.

23  **Q.**   And in arriving at your opinions, did you review Professor

24  Haggard's report?

25  **A.**   I did, indeed.

DAE-SIK HONG - DIRECT / YU

1   **Q.**   Okay.  And what did you conclude with respect to his

2   opinions?

3   **A.**   So under Korean law, there is no corporate structure

4   called chaebol.  And just because Dr. Haggard chooses to label

5   something as a chaebol -- assuming there is such a thing --

6   doesn't mean that there exists some high degree of control sort

7   of governance structure as between a mother company and a

8   daughter company.

9   **Q.**   Did you have a third?

10  **A.**   Ah.  So I entailed to my conclusion.

11  **Q.**   Okay.  Then we'll go into your conclusions more in detail.

12  **A.**   All right.

13  **Q.**   We'll first deal with the document preservation issue.

14  And first you concluded that the Korean law does not apply to

15  Ottogi America or Nongshim America.  Could you please explain

16  why that is the case?

17  **A.**   So Korean law applies to Korean nationals and conduct or

18  activities as arising within Korea.

19       Now, there's one proviso in that the KFTC-related

20  regulations do from time to time apply to foreign entities.

21  And that is if, and only if, any conduct as committed by said

22  foreign entities apply or affect anything having to do with the

23  Korean market.

24       Now, when it comes to Nongshim America, Ottogi America,

25  these are California corporations and they simply import into

1    the United States Korean-made products.  They do not export to

2    Korea.

3    **Q.**    And if they don't export products to the Korean domestic

4    market, there would be no application of the Korean law.  Is

5    that what your opinion is?

6    **A.**    That is right.  Because if they do not export anything to

7    Korea, they do not, say, impact the Korean domestic market.

8    **Q.**    Now, what if their parent corporations are being

9    investigated by the KFTC?  Does that change anything?

10    **A.**    It has nothing to do with that, because they're completely

11    separate companies.

12    **Q.**    Okay.  Now, let's turn to your second opinion about the

13    general document preservation law.  And you said that Korea

14    does not have a general duty to preserve documents.  So then

15    what are companies supposed to do with their documents?

16    **A.**    Companies have autonomy to come up with their own

17    respective policies to the effect that they can keep them for a

18    time certain or they can discard them.

19        Now, there's one thing that in Korea there is a set of

20    laws concerning privacy-related information.  You're supposed

21    to protect individual's privacy.  And it is to the effect that

22    after the passage of a time certain, you are to destroy

23    anything containing individual's private information.

24    **Q.**    So is it legal to have a corporate policy of discarding

25    documents older than three years?

**DAE-SIK HONG - DIRECT / YU**

1   **A.**   Yes.   Companies can do that.

2   **Q.**   How about one year?

3   **A.**   They can be as short as that.

4   **Q.**   How about placing capacity limits on email accounts so

5   that emails are automatically deleted if maximum capacity is

6   reached.   Is that okay?

7   **A.**   Yes.   You can so set up your company policy.

8   **Q.**   How about placing time limits on email accounts so that

9   anything older than 30 days are automatically deleted?   Is that

10  okay?

11  **A.**   That's all up to the company's policies.

12  **Q.**   How about discarding old laptops when employees leave the

13  company?   Is that okay?

14  **A.**   If it's owned by the company, then you can do that.

15  **Q.**   Now, are companies then required to have a document

16  preservation policy?

17  **A.**   There is no law requiring them to do that.   The company

18  can choose to do that or not choose to do that.

19  **Q.**   And can companies modify their document retention policies

20  and practices from time to time?

21             **MR. RAABE:**   Your Honor, I object to leading.

22             **THE COURT:**   Overruled.   You can continue.

23             **THE WITNESS:**   Yes, that's possible.

24  **BY MS. YU:**

25  **Q.**   Sir, in your opinion, is there anything wrong with

 1   companies not saving decades old emails?

 2   **A.**   There's no mistake whatsoever concerning that.

 3   **Q.**   Okay.  Now, if a company is under investigation, does that

 4   impose a general obligation to preserve documents?

 5   **A.**   No.  That does not give rise to any general duty to

 6   preserve.

 7   **Q.**   And can companies continue with their normal document

 8   retention practices during an investigation?

 9   **A.**   That is right.  Just because some sort of an investigation

10   has begun, it does not mean that they need to cease

11   implementing whatever policy they may have.

12   **Q.**   And, now, does an investigation by the KFTC impose any

13   specific duties regarding document retention?

14   **A.**   There does arise, say, about two kinds of limited sorts of

15   obligations.  And the first one has to do with when they're

16   conducting an on-site investigation at your premises.  So

17   whilst the authorities are conducting their on-site

18   investigation, you are not allowed to interfere with them.

19       Secondly, the KFTC can make a request for these --

20   provision of documents or material.  And if you have it -- so

21   long as you have it, you may not refuse such a request by them.

22   **Q.**   Now, before we get further into details about those two

23   limited specific duties, could you give us a little bit more

24   information about how KFTC investigations are conducted?

25   **A.**   Certainly.  So an investigation by the KFTC can be split

1    up into a general sort of investigation versus an on-site

2    investigation.  And typically what they first do is they make

3    an on-site investigation wherein they actually come to your

4    premises.  And these sorts of on-site investigations are

5    usually conducted with respect to cartel-related concerns.  And

6    typically, the investigators will come to your premises

7    unannounced.

8        And what they do is once they get to your premises they,

9    without informing you as to what they're there for and what

10   they're investigating about, they will halt whatever you're

11   doing and go through your, say, your desk, your computer, your

12   cabinet; and basically, that's how they conduct their

13   investigation.  And once they figure they've got the documents

14   that they want to take with them, they leave the premises

15   without informing you as to what they're taking with them.

16   **Q.**   Okay.  And then what happens after they leave the premise?

17   **A.**   So since the amount of documents and material that the

18   KFTC folks will take back with them tends to be rather

19   voluminous, they sit down and re-review it, they conduct an

20   analysis.  And they, basically, come up with a synopsis that

21   constitutes certain -- or, that tend to show certain

22   allegations.

23       And if, in their minds, they figure they need some extra

24   material, or they need some supplemental -- supplementary

25   material, then they will draft up some sort of an official

DAE-SIK HONG - DIRECT / YU

1    communiqué and send it to the company.  And at times they may

2    require giving of evidence by the company or third parties.

3    That is, testifying.

4    **Q.**   Okay.  And during these examinations of employees or

5    third-party witnesses, is there a complete record of whenever

6    of this interrogation created?

7                **THE INTERPRETER:**  I'm sorry, Your Honor.  May the

8    interpreter have that repeated please?

9    **BY MS. YU:**

10   **Q.**   Okay.  And when these witnesses or employees are

11   interrogated by the KFTC, is there a complete record of witness

12   statements that are created?

13   **A.**   So the way these interviews conducted by the KFTC go is

14   that all you have there within the interrogation room would be

15   the investigator and the person subject to the investigation

16   only.  There is no stenographer, nobody taking notes or

17   anything.

18       And so the government employee will, basically, pose a lot

19   of questions, have the person testify, and cherry-pick only

20   that which in that person's mind is going to be helpful to

21   their investigation.

22   **Q.**   Does the KFTC investigator create a document after the

23   interrogation?

24   **A.**   Yes.  And that would be a document that is created by the

25   investigator.  And it is something on which the investigatee,

**DAE-SIK HONG - DIRECT / YU**

1  the person subject to the investigation, basically, is asked to

2  sign off.

3  **Q.**   And what is that document called?

4  **A.**   It is called a protocol of examination.

5  **Q.**   And what happens if the employee sees something incorrect

6  and refuses to sign?

7  **A.**   Well, of course, the person --

8        **MR. RAABE:**  Objection.   Sorry.   Relevance and

9  foundation to this case.

10        **THE COURT:**  It's sustained.

11     Lay a foundation, if you can.

12        **MS. YU:**  Okay.   It's background information, Your

13  Honor.

14        **THE COURT:**  I want more.

15  **BY MS. YU:**

16  **Q.**   So now what happens after the KFTC conducts its on-site

17  investigation, and the KFTC conducts its interrogation, and the

18  KFTC requests specific information or documents?   What does it

19  do?

20  **A.**   So if in the investigator's own determination there are

21  grounds for allegations to be made, then the investigator will

22  create an examination report and float that up to the

23  commission.   And, basically, essentially, lodge a -- lodge this

24  as an agenda item.

25  **Q.**   Okay.   And what do they do after a report is prepared?

DAE-SIK HONG - DIRECT / YU

1  Does the KFTC commissioner make a decision about it?

2  **A.**   That's right.  So what they do is they have the company

3  present there, conduct a hearing, and then come to a certain

4  decision.

5  **Q.**   Okay.  So the KFTC conducts both an investigation and also

6  the adjudication of the accusations.  Is that right?

7  **A.**   Right.  So although we were talking about different

8  departments, it is still within the same big organization.

9  **Q.**   Okay.  And so when does the KFTC investigation end?

10 **A.**   So the investigation concludes upon the investigator's

11 preparation of the examination report.

12 **Q.**   And your basis for knowing -- the basis of your knowledge

13 about how the KFTC conducts its investigation, does that arise

14 from your experience representing clients being investigated by

15 the KFTC?

16 **A.**   Yes, that's correct.

17 **Q.**   And have you represented any clients who were interrogated

18 by the KFTC?

19 **A.**   Yes.

20 **Q.**   Okay.  And have you had any experience where your clients

21 did not want to sign the Protocols of Examination, but they

22 were forced to?

23        **MR. RAABE:**  Relevance and foundation in this case,

24 Your Honor.

25        **THE COURT:**  Yes.  Sustained.

1  BY MS. YU

2  Q.   Okay.  Professor Hong, now let's go back to the company's

3  duties you discussed earlier.  You said that there were two

4  specific and limited duties, and one of them pertains to an

5  on-site investigation.

6      What are companies required to do during an on-site

7  investigation?

8  A.   Sure.  So when the official comes over to investigate you,

9  you must neither block or prevent them from coming into your

10 premises nor prevent them from going to whatever location they

11 desire to go to within your premises.

12     And when they say they want to open up one of your

13 cabinets or when they say they want to access your computer,

14 you must allow them to do so.

15     And when they ask that you bring over certain materials,

16 you must do so.

17 Q.   And when does this duty start?

18 A.   So for those unannounced visits by them, it would be the

19 moment when the investigator, investigators, appear at your

20 premises.

21 Q.   And can these duties ever start before the KFTC on-site

22 investigation starts?

23 A.   Well, had they but pre-informed you, maybe; but being

24 unannounced, there is no way for you to get to know about that

25 in advance.

DAE-SIK HONG - DIRECT / YU

1  Q.   So does the duty only start when the KFTC investigation,

2  on-site investigation starts?

3  A.   That's right.  That's in the case of an unannounced

4  visitation by them.

5  Q.   And when does this duty end?

6  A.   So it all depends on the case.  So sometimes when they

7  conclude their investigation, on that very day that's when it

8  ceases.

9       Sometimes for investigations that last a number of days,

10 then, for instance, they say, Oh, we'll come again tomorrow.

11 Then -- and when they have certain, say, locations within your

12 premises that they have not fully gone through, before they

13 leave they basically seal things off, okay, and you must not,

14 you know, disturb those.

15      So, but even those, after so many days have passed and

16 when they finish their investigation, that's when your duty

17 ceases.

18 Q.   Okay.  So when the KFTC investigators leave your company

19 and they don't tell you that they are coming back, is that the

20 end of the first duty that you're referencing?

21 A.   Yes, that's correct.

22 Q.   And can companies reassume their normal document retention

23 practices at that point?

24 A.   Yes, that's correct.

25 Q.   Now, in situations where there are successive on-site

 1   investigations that span several years, is the duty ongoing

 2   throughout that entire time period?

 3   **A.**   There is no investigation that can last over the span of

 4   so many years because when they are there investigating you,

 5   you're basically paralyzed as to your current affairs.  So they

 6   can come out and then they can go back and then later on they

 7   can come back out again.

 8       But the point is, when they are there, you must not

 9   interfere or, you know, stop them from doing what they are

10   there for.

11   **Q.**   So your duty only lasts for those --

12   **A.**   But your duty exists and is given rise to only on those

13   occasions when they are there for each investigation.

14   **Q.**   And I think you've answered my question.

15       So outside of the specific dates on which the KFTC

16   investigators were on-site at Nongshim Korea and Ottogi Korea,

17   was it a problem that these companies resumed their normal

18   document retention practices?

19           **MR. RAABE:**   Foundation, Your Honor.

20           **THE COURT:**   Do you want to have him make an

21   assumption?  Otherwise, you need a foundation for this.

22   **BY MS. YU**

23   **Q.**   Okay.  Professor Hong, you have reviewed the records in

24   this case and you have heard the testimony of witnesses in this

25   case in connection with your opinion; is that right?

 1              MR. RUF:  Objection, Your Honor.  That's overbroad

 2   with respect to the materials that were listed as having been

 3   relied upon in the report.

 4              THE COURT:  All right.  Sustained.

 5   BY MS. YU

 6   Q.   Okay.  And did you review the records in this case related

 7   to the specific dates on which Nongshim Korea and Ottogi Korea

 8   were subjected to these on-site investigations?

 9   A.   Yes.  Those sorts of dates were disclosed within the

10   opinion documents that were submitted to the Court in this

11   matter.

12   Q.   So outside of the specific dates on which the KFTC

13   investigators were on-site at Nongshim Korea and Ottogi Korea,

14   was it a problem that they resumed their normal document

15   retention practices?

16              MR. RUF:  Object to form, Your Honor.

17              THE COURT:  Sustained.  If you do it as a

18   hypothetical, you can get the answer you're looking for, but

19   don't do it as a fact.

20   BY MS. YU

21   Q.   So if the company resumes its normal document retention

22   practices outside of the specific dates on which the KFTC

23   investigators are on-site, is that a violation of any law?

24   A.   So as I indicated earlier, once the on-site investigation

25   concludes, they may resume their regular day-to-day activities

 1  and, as such, there is no problem.

 2  **Q.**   Okay.  And assume that a company was subjected to an

 3  on-site investigation on June -- in June 2008 and again in

 4  January 2010, and assume that they modified their company-wide

 5  email policy in March 2009, would that be a problem?

 6           **MR. RAABE:**  I object, Your Honor.

 7           **MS. YU:**  It's a hypothetical.

 8           **THE COURT:**  On the basis of?

 9           **MR. RAABE:**  Same objection I have been making, Your

10  Honor.

11           **THE COURT:**  Sustained.  And it's an incomplete

12  hypothetical.

13           **MS. YU:**  Okay.

14           **THE COURT:**  Don't draw it more specifically to the

15  facts of this case.

16  **BY MS. YU**

17  **Q.**   Professor Hong, if a company is subjected to an on-site

18  investigation on day one and then they are subjected to another

19  on-site investigation a year later, in the meantime between

20  those two dates if they modify their company-wide email policy,

21  is that a violation of any law?

22           **MR. RAABE:**  I object, Your Honor.

23           **THE COURT:**  For?

24           **MR. RAABE:**  We're doing indirectly what we can't do

25  directly.

1          THE COURT:  Sustained.

2     BY MS. YU

3     Q.    Okay.  So outside of the specific days on which the KFTC

4     investigators are on-site, is it a violation of law to change

5     your company-wide email policy?

6     A.    That is not the case.

7     Q.    And based on your experience with the KFTC investigations,

8     your experience with the KFTA and your review of the record in

9     this case, did Nongshim Korea or Ottogi Korea violate the duty

10    not to interfere with on-site investigations?

11          MR. RUF:  Object.

12          MR. RAABE:  Object on foundation grounds, Your Honor.

13          THE COURT:  Sustained.

14    BY MS. YU

15    Q.    Professor Hong, did you review -- in forming your

16    opinions, did you review the record in this case about the

17    conduct of Nongshim Korea and -- or Ottogi Korea employees

18    during the on-site investigations?

19          MR. RUF:  Your Honor, could the foundation be more

20    specific, because I -- it's not clear what the record would be.

21    There were references in his report to two discrete

22    declarations.

23          THE COURT:  Yeah.

24          MS. YU:  And I was about to get to that question.

25          THE COURT:  Okay.  So go ahead.

1          MS. YU:  Okay.

2    BY MS. YU

3    Q.   Did he...

4          THE COURT:  So you can -- yeah, answer that specific

5    question.

6    A.   So I cite a certain example within the pages of my

7    declaration, so that is something I based upon the statements

8    as by the company employees.

9    BY MS. YU

10   Q.   Okay.  And do you recall whose statements you reviewed in

11   forming your opinion?

12   A.   Yes.  So there was, for instance, a statement by Mr. Ku,

13   who was here testifying just a moment ago, as was there one by

14   Mr. Doh.

15   Q.   Okay.  And based on your review of those records, did you

16   see any violation of duty not to interfere with on-site

17   investigations?

18   A.   We're talking about any conduct during the on-site

19   investigations, yeah?

20   Q.   Yes.

21   A.   I have not come across any record or indication that there

22   was any such conduct during the course of the on-site

23   investigations.

24   Q.   Okay.  Now, let's turn to the second duty you spoke about

25   earlier, relating to Requests For Information.  And can you

1  please explain what that duty requires?

2  **A.**   So the KFTC is allowed to ask for any documents, material

3  or things of the company being investigated and if the company

4  has any such document, material or thing on hand, then they

5  have a duty to provide such.

6  **Q.**   Now, are companies required to suspend normal document

7  retention practices upon receiving this Request For

8  Information?

9  **A.**   No, that is not the case.  The only thing is if, say, you

10  have a request to document in your possession, then you have a

11  duty to provide that to them.

12  **Q.**   And typically, based on your experience, when the

13  companies are responding to these specific requests, do they

14  know what type of materials the KFTC has secured through the

15  on-site investigation?

16        **MR. RAABE:**  Objection.  Foundation, your Honor.

17        **THE COURT:**  Overruled.  You can answer.

18  **A.**   No, that is not the case.  So as I mentioned earlier, they

19  are not informed by the KFTC as to what the KFTC is taking back

20  with them as a result of the on-site investigation.  So while

21  being in the dark, they are here having to respond to this

22  additional, say, request for the submission of materials.

23  **BY MS. YU**

24  **Q.**   So would they have an incentive to withhold documents?

25        **MR. RUF:**  Your Honor, objection.  Lacks foundation.

 1  This witness is not qualified to give that opinion.

 2          **THE COURT:**  Yes.  Sustained.

 3  **BY MS. YU**

 4  **Q.**   You have represented companies under investigation by the

 5  KFTC; right?

 6  **A.**   Yes, that's correct.

 7  **Q.**   Okay.  And now you've also represented companies who were

 8  subjected to an on-site investigation; right?

 9  **A.**   Yes, I have.

10  **Q.**   And did you represent companies in responding to the

11  specific information requests made by the KFTC?

12  **A.**   Yes, I have.

13  **Q.**   And based on your experience, would there be an incentive

14  to withhold documents?

15          **MR. RUF:**  Objection.

16          **MR. RAABE:**  Relevance, Your Honor.

17          **THE COURT:**  Sustained.  It's not -- it's not a

18  question you're going to be able to get an answer from this

19  witness in this Court, so I would move on.

20          **MS. YU:**  Okay.

21  **BY MS. YU**

22  **Q.**   If a company does not have a document specifically

23  requested by the KFTC, is that a violation of the law?

24          **MR. RAABE:**  Objection, Your Honor.  Foundation and

25  relevance to this case.

1    **THE COURT:**  Overruled.  You can answer that question.

2  **A.**   No, that's not the case.  You don't get to submit what you

3  don't have.

4  **BY MS. YU**

5  **Q.**   Okay.  Now, you've mentioned that the KFTC investigation

6  terminates upon when the KFTC examination report is prepared.

7  Do these duties continue after that point?

8  **A.**   So the duties I spoke of in terms of the duty that is

9  given rise to on account of the on-site investigation or on

10  account of the request for certain documents and what-have-you.

11  So to the extent that there is no further investigation that is

12  conducted following the preparation of the examination report,

13  there also are no associated duties thereafter.

14  **Q.**   Professor Hong, have you heard the testimony of

15  Mr. Bang-Wan Ku that was given at trial in this case?

16  **A.**   Yes, I have.

17  **Q.**   And, in your opinion, did Mr. Ku violate any KFTA law?

18    **MR. RUF:**  Your Honor, this is way beyond the scope of

19  his expertise and inappropriate.

20    **THE COURT:**  Sustained.  On all grounds.

21    **MS. YU:**  Okay.  I have no further questions at this

22  time.

23           **<u>DIRECT EXAMINATION</u>**

24  **BY MR. DOSKER**

25  **Q.**   Good afternoon.  Mark Dosker from Nongshim Company,

 1    Limited, Nongshim America, Inc.  Good afternoon, sir.

 2    **A.**    Hello, sir.

 3    **Q.**    What does the word "chaebol" mean?

 4    **A.**    So chaebol is a word that is often used within Korea.  It

 5    is used in reference to companies that are rather rich.

 6    **Q.**    And have you reviewed the written opinions of the

 7    plaintiffs' Political Science Professor Haggard in this case?

 8    **A.**    Yes, I have.

 9    **Q.**    Have you also reviewed the transcript of the testimony

10    Professor Haggard gave at trial in this case?

11    **A.**    I also got to see that, too.

12    **Q.**    What is your understanding of Professor Haggard's views as

13    to the significance that the concept of chaebols has to this

14    case?

15    **A.**    So Professor Haggard is rendering a definition based upon

16    some subjective understanding on his part, subjective view on

17    his part.

18          And, further, the professor is of the opinion that if

19    there is a concern that constitutes a chaebol and a company

20    belongs to such a chaebol, then by that there exists a very

21    high degree of governance relationship that obtains.

22    **Q.**    And by what has come through the interpreter is

23    "governance relationship," is that also control?

24    **A.**    That is right.  So it means that in the case of two

25    companies, there is no independence between them, no autonomy

1    between them, where one or the other exercises control over the

2    other.

3    **Q.**   Do you agree with Professor Haggard's opinions in that

4    regard?

5              **MR. RAABE:**   Your Honor, I object to the form of that

6    question in terms of characterization.

7              **THE COURT:**   You can answer.   Overruled.

8    **A.**   I'm a legal scholar and the gentleman is a political

9    scientist and his learned opinions do not have any bearing on

10   Korean law.

11   **BY MR. DOSKER**

12   **Q.**   A little while ago this afternoon you testified that there

13   is no corporate forum called chaebol.   So my question is:   What

14   are the different corporate forums which exist under Korean

15   law?

16             **THE INTERPRETER:**   Your Honor, just because of the

17   legality or legal aspects of this, this interpreter is going to

18   want to also have the gentleman state this in English, if

19   that's permissible.

20             **THE COURT:**   That would be fine.

21        (Brief pause.)

22   **A.**   So in Korea there are, for instance, a limited company, a

23   joint limited company, a corporation, a partnership, and a

24   limited partnership.

25

DAE-SIK HONG - DIRECT / DOSKER

1  BY MR. DOSKER

2  **Q.**   What type of corporation is Nongshim Korea?

3  **A.**   It's a corporation, quote/unquote listed corporation.

4  **Q.**   And when you say "listed corporation," is that the same

5  thing as a publicly traded corporation?

6  **A.**   Yes, as openly traded on the stock market.

7  **Q.**   And what type of corporation is Ottogi Korea?

8  **A.**   That also is a corporation that is listed and traded on

9  the stock market.

10  **Q.**   So, likewise, Ottogi Korea is publicly traded on the stock

11  market; is that right?

12  **A.**   Yes, that's correct.

13  **Q.**   What type of corporation is Nongshim America?

14  **A.**   Nongshim America is not a Korean company.  I would believe

15  that to be an entity set up under California law.

16  **Q.**   And what about Ottogi America?

17  **A.**   That also is not a Korean entity.  It is a company here,

18  so I would also believe that to be something founded pursuant

19  to local laws.

20  **Q.**   So in Korea are corporations distinguished based on

21  Professor Haggard's criteria that he discusses in his opinions?

22  **A.**   No.  So under the KFTC related regulations, they define

23  what a cartel is, but that is different from the criteria under

24  which Professor Haggard is opining.

25  **Q.**   Is Nongshim Korea a chaebol?

DAE-SIK HONG - DIRECT / DOSKER

1   **A.**   Well, so chaebol is not a legal term of art and there does

2   not exist something called a chaebol under Korean law.  So, you

3   know, there isn't any such construct.

4   **Q.**   And would your answer be the same as to Ottogi Korea?

5   **A.**   All right.  Under Korean law it cannot be regarded a

6   chaebol.

7   **Q.**   So under Korean law does labeling something as a chaebol

8   indicate anything about control between the parent company and

9   its subsidiary?

10  **A.**   That is not the case.  So even if something belongs to the

11  same, let's say, collection of companies, the question as to

12  whether there is a control type of structure that obtains, that

13  is something that you still need to look into.

14  **Q.**   Now, sir, you were a judge in Korea for ten years and

15  you're presently a law professor in Korea; right?

16  **A.**   That is correct.

17  **Q.**   And have you prepared a slide to use in explaining to the

18  jury how the existence of control between a parent corporation

19  and its subsidiary is determined under Korean law?

20  **A.**   Yes.  That would be disclosed on page eight of the slide

21  that I've brought with myself.

22       **MR. DOSKER:**  So, Jim, would you please publish page

23  eight of Exhibit 2022?

24       (Document displayed)

25

1  BY MR. DOSKER

2  **Q.**   Sir, this is your slide?

3  **A.**   Yes, that's correct.

4  **Q.**   Using it, would you please explain to the jury the factors

5  by which the existence of control between a parent corporation

6  and its subsidiary is determined under Korean law?

7             **MR. RAABE:**  Relevance, Your Honor.

8             **THE COURT:**  So, ladies and gentlemen, you are

9  reminded that the Korean law, as I instructed you, is

10  irrelevant to the determinations that you need to make in your

11  case.  However, if you want to proceed, you may.

12  BY MR. DOSKER

13  **Q.**   If you could briefly summarize for the jury?

14  **A.**   So in Korea in going about determining whether there is a

15  high degree of control as between two companies, there are

16  certain, say, factors that the Korean Supreme Court has decided

17  are telling.  There are basically nine factors in that regard.

18        So to sum up, the -- one of the tests is you look at the

19  equity ownership as between the companies.

20        You also want to look at whether there is any influence as

21  exerted upon one by the other and the method of such.

22        You also look at whether there are any day-to-day, say,

23  instructions or orders coming from the one to the other.

24        And you also want to see if there is any overlapping, say,

25  executives or directorship between the companies.

DAE-SIK HONG - DIRECT / DOSKER

1      You also look at the perceptions on the part of each of

2  the two companies as applies to themselves and the other.

3      You also see if the financial accounting is integrated.

4      You also see if the companies are independently able to

5  exercise their respective judgments in terms of the realm of

6  their own business affairs.

7      You also look at the conduct and behavior, whereas within

8  the market by the business companies.

9      And you also look at how a certain company will -- may

10  have arrived at certain conduct or activities in comporting

11  themselves.

12      And so courts in Korea will basically look at these

13  various factors and make an independent determination on a

14  case-by-case basis based upon evidence.

15  **Q.**  Thank you.

16      Now, in preparing your written reports of your opinions in

17  this case, did you review the materials that you listed and

18  cited in your reports?

19  **A.**  I did indeed.

20  **Q.**  And did the materials that you cited in your reports

21  include various sworn declarations of witnesses in this case?

22  **A.**  That is right, yes.

23  **Q.**  Based upon the materials that you have reviewed and the

24  analysis that you've done, in your opinion, based on the proper

25  factors under Korean law for determining control, did Nongshim

 1   Korea substantively control Nongshim America?

 2          **MR. RAABE:**  Relevance, Your Honor.

 3          **THE COURT:**  Sustained.

 4   BY MR. DOSKER

 5   **Q.**   Did you see any evidence in the material that you

 6   reviewed, as cited in your reports in this case, to suggest

 7   that Nongshim Korea directed the day-to-day business management

 8   of Nongshim America?

 9   **A.**   I was not able to find any evidence that would suggest

10   that from amongst the material that I reviewed.

11   **Q.**   And same question as to whether there was any evidence

12   that Ottogi Korea directed the day-to-day business management

13   of Ottogi America?

14          **MR. RAABE:**  Objection, Your Honor.  That's the jury's

15   question.

16          **THE COURT:**  I think if Mr. Dosker limits that to the

17   documents that he reviewed, I think he's --

18          **MR. DOSKER:**  That's how I tried to phrase the

19   question, Your Honor.

20          **THE COURT:**  You didn't actually.

21          **MR. DOSKER:**  Well, I was trying to keep it short.

22   BY MR. DOSKER

23   **Q.**   I'll ask the same question as to Ottogi Korea that I asked

24   a moment ago as to Nongshim Korea.

25          Based on all the information and evidence that you

**PROCEEDINGS**

 1    reviewed, as cited in your two reports in this case, did you

 2    see any evidence that Ottogi Korea directed the day-to-day

 3    business management of Ottogi America?

 4    **A.**   I was not able to come across anything that would suggest

 5    that from amongst the material I reviewed.

 6    **Q.**   And as you concluded in paragraph 15 of your second report

 7    in this case, did you find any evidence to suggest that either

 8    Nongshim America or Ottogi America did not act independently

 9    with respect to details of daily operations, such as setting

10    ramen prices?

11    **A.**   No, not in terms of any of the material I reviewed.

12           **MR. DOSKER:**  I pass the witness, Your Honor.  Thank

13    you.

14           **THE COURT:**  All right.

15           **MR. RUF:**  Your Honor, I am happy to tell you we have

16    no questions.

17           **MR. RAABE:**  Me either.

18           **THE COURT:**  All right.  So you're excused.  Thank you

19    very much.

20        (Witness excused.)

21           **THE COURT:**  All right.  So, ladies and gentlemen, we

22    are done for the day.  So please remember the admonitions and

23    thank you, as always, for your attention to this.  We're

24    getting to the end, but we're not there yet.

25        So I will look forward to seeing you in the morning.

PROCEEDINGS

1    Thank you.

2        (Jury exits the courtroom at 1:30 p.m.)

3        **THE COURT:**  All right.  I have a question for

4    Mr. Edelman.  And I'm now looking at document 2030.

5        **MR. EDELMAN:**  Yes.

6        **THE COURT:**  Which was this metadata document.

7        **MR. EDELMAN:**  Yes.

8        **THE COURT:**  Were you saying that the -- when you

9    started, that this was not related to Trial Exhibit 384?

10       **MR. EDELMAN:**  Correct.  I meant to identify the

11   document.  I think it's 363 that I was intending to refer to.

12       **THE COURT:**  Okay.  So in the morning I'd like to hear

13   what corrective measures I should take with respect to that

14   mistake.

15       **MR. EDELMAN:**  Sure.

16       **MR. RAABE:**  One very quick matter, Your Honor.  The

17   stipulation.

18       **THE COURT:**  Yes.

19       **MR. RAABE:**  From the plaintiffs' perspective, we

20   believe that it ought to be marked as a substantive exhibit and

21   provided to the jury for a couple of reasons.

22       The primary reason being, I'm not sure juries understand

23   when a stipulation is read to them what it means and what the

24   import is.  I'm not sure that they knew at the time they should

25   be taking notes about what the substance of it was.

 1        So I think it's appropriate, specifically because it

 2    references exhibits that are relevant to it.  If they didn't

 3    catch that the first time around, it's important for them to

 4    have it in front of them.

 5            THE COURT:  All right.  Mr. Edelman?

 6            MR. EDELMAN:  Sure.  I think -- I was referring to

 7    the 2005 memo, and that's what I called it.  But then when I

 8    referenced the exhibit number, that's where I --

 9            THE COURT:  Okay.  So this is actually a different

10    issue, I think.

11            MR. EDELMAN:  Oh, I'm sorry.  I'm sorry.

12            THE COURT:  This is the Exhibit 1029, which was the

13    written stipulation that you agreed to --

14            MR. EDELMAN:  Oh, I'm sorry.

15            THE COURT:  -- with respect to the exhibits.

16            MR. EDELMAN:  So you're asking that the exhibit be

17    admitted?

18            MR. RAABE:  Yes, your Honor.

19            MR. EDELMAN:  I don't think that the exhibit needs to

20    be admitted.  I think they have conducted examination on the

21    point, went through it with the witness, were able to cross

22    examine on what happened.  And in light of that, I don't see

23    the reason for the stipulation going into evidence.

24            THE COURT:  I'm not inclined -- I've never -- the

25    stipulations are stipulations.  I read it slowly and carefully.

 1 | There was a lot of examination on it.  So I don't think -- I'm

 2 | not inclined to give it further.

 3 |       **MR. RAABE:**  Yes, your Honor.

 4 |       **THE COURT:**  All right.  Thank you, all.

 5 |       **THE INTERPRETER:**  Your Honor, may the interpreter

 6 | inquire as to whether there are any other Korean witnesses and,

 7 | if not, may the interpreters thank the Court and be excused?

 8 |       **THE COURT:**  You can always thank the Court.

 9 |     (Laughter.)

10 |       **THE COURT:**  Are there any other Korean witnesses that

11 | would be expected for the remainder of the trial, I guess is

12 | what is being asked?

13 |       **MR. EDELMAN:**  Not on our end, Your Honor.

14 |       **MR. DOSKER:**  Not on our end.

15 |       **MR. RAABE:**  Not on our side, Your Honor.

16 |       **THE COURT:**  Okay.  Thank you.  You both performed

17 | extraordinary service.  Thank you.

18 |       **THE INTERPRETER:**  Thank you, your Honor.  And thank

19 | you to everybody.

20 |     (Whereupon at 1:33 p.m. further proceedings were

21 |      adjourned until December 12, 2018 at 7:30 a.m.)

22 |

23 |

24 |

25 |

1

2

3                    **<u>CERTIFICATE OF REPORTERS</u>**

4

5

6        We certify that the foregoing is a correct transcript from

7   the record of proceedings in the above-entitled matter.

8

9   _____

10                  Vicki Eastvold, RMR, CRR

11

12

13   _____

14

15           Debra L. Pas, CSR 11916, CRR, RMR, RPR

16                  Tuesday, December 11, 2018

17

18

19

20

21

22

23

24

25